# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION

## Commercial Arbitration Tribunal

| | |
|---|---|
| Liquidbits Corp. | Case No.: 01-14-0000-1357 |
| Claimant, | |
| and | **EMERGENCY INTERIM ORDER NO. 1** |
| Hashfast Technologies, LLC, | |
| Respondent. | |

THE UNDERSIGNED EMERGENCY ARBITRATOR, (a) having been designated as an AAA Commercial Arbitration Rule ("CAR") R-38 Emergency Arbitrator on April 17, 2014, (b) having held a Preliminary Hearing pursuant to Rule R-38, occurring via teleconference commencing on April 21, 2014 at 11:00 am PT and continuing April 22, 2014 at 11:30 am PT, (c) having issued Emergency Scheduling & Procedure Order No. 1 on April 23, 2014, (d) having reviewed the Parties' submissions, and (e) having held a telephonic Emergency Hearing as stipulated by the parties on May 2, 2014 at 12:00 pm PT, does hereby issue this Emergency Interim Order No. 1 pursuant to CAR R-38.

## I. INTRODUCTION

Claimant Liquidbits Corp. ("Liquidbits") commenced this arbitration seeking emergency injunctive relief against Respondent Hashfast Technologies, LLC ("Hashfast") pursuant to CAR R-38. Specifically, Liquidbits moves that the Emergency Arbitrator issue an order restraining and enjoining Hashfast from:

> "1. delivering, selling or otherwise transferring ownership of the Golden Nonce Chips ("Chips") and wafers (from which the Chips are cut) that Hashfast currently has in its inventory to any third party;
>
> 2. granting any third party a security interest in those Chips or wafers; and/or

> 3. taking any action that would disable Hashfast from delivering to Liquidbits 28,000 Chips by June 30, 2014."

*See Claimant's [Proposed] Interim Order For Emergency Relief*. Liquidbits alleges that Hashfast is contractually obligated to deliver to Liquidbits 28,000 Golden Nonce Chips ("the Chips") for which Liquidbits paid $6,000,000, of which 15,000 should have already been delivered and the balance to be delivered by June 30, 2014. Liquidbits alleges that it needs the Chips for bitcoin mining.

Liquidbits alleges that its need for immediate injunctive relief is explained by the following statement of Liquidbits' CEO Gregory Bachrach:

> "As a consequence of the protocol by which new bitcoins are created, the value of the equipment used in bitcoin mining (including the Sierra units, Golden Nonce Chips and wafers discussed below) declines approximately eighteen percent (18%) every ten (10) days. The devaluation is publicized and fixed by the protocol.
>
> \* \* \*
>
> "As a consequence of the protocol by which new bitcoins are created, the Golden Nonce Chips that Liquidbits purchased will be valueless within the next 90 days."

*See Declaration of Gregory Bachrach (Bachrach Dec.)*, ¶¶ 6 and 21. Accordingly, Liquidbits alleges that the Chips are rapidly depreciating in value and are perishable.

Liquidbits further alleges (i) that Hashfast only has approximately 28,000 Chips in inventory, (ii) that it takes as long as 90 days to manufacture them and 30 more days to make them usable for bitcoin mining, and (iii) that if not enjoined, Hashfast will sell its inventory of Chips to others and will be unable to fulfill its delivery obligation to Liquidbits. Moreover, Liquidbits alleges that it will suffer irreparable harm if an injunction does not issue because it is unable to timely purchase alternative bitcoin mining chips from another supplier and it will lose its bitcoin mining position as compared with bitcoin mining competitors. Finally, Liquidbits asserts that Hashfast is insolvent and has no ability to refund the $6,000,000 paid by Liquidbits. Accordingly, Liquidbits contends that it not only will suffer irreparable harm if injunctive relief is not granted, but that it has no ability to recover restitution or other monetary damages from Hashfast and is therefore deprived of any adequate remedy at law.

Hashfast asserts that Liquidbits' sole and exclusive remedy for nondelivery under

the Hashfast Terms of Sale is a refund and that Liquidbits has no right to specific performance. Hashfast does admit, however, that it only has approximately 28,000 Chips in inventory, but asserts that it would be able to continue to manufacture Chips and ultimately fulfill delivery of the 28,000 Chips if Liquidbits prevails on its claim of specific performance in this arbitration. Moreover, Hashfast asserts that it will suffer severe irreparable harm if the requested emergency injunctive relief requested by Liquidbits is granted, and that the harm could result in the need to file a bankruptcy petition and/or to cease operating as a going concern.

## II. THE PARTIES' ARBITRATION AGREEMENT

The parties' original agreement for the sale of bitcoin mining chips entitled "Order Confirmation Agreement," effective October 3, 2014 ("the October 3rd Agreement), incorporated by reference the terms contained in the Hashfast Terms of Sale in Exhibit 1 thereto. The October 3rd Agreement was modified by the Memorandum of Understanding, dated March 4, 2014 ("the MOU"). Section 15 of the Hashfast Terms of Sale contains the parties' arbitration agreement and provides that the arbitration may be conducted by the American Arbitration Association ("AAA"). Moreover, subsection (f) of Section 15 provides that "The arbitrator shall be empowered to grant whatever relief would be available in court under law or equity."

The AAA's current Commercial Arbitration Rules, which became effective October 1, 2013, includes Rule R-38 "Emergency Measures of Protection" as a mandatory rule providing a procedure for requesting emergency injunctive relief. The Emergency Arbitrator's authority to rule on Liquidbits's request for emergency injunctive relief is derived from the parties' arbitration agreement, AAA's Rule R-38, California law, and where applicable, the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

### III. STANDARD FOR EMERGENCY INJUNCTIVE RELIEF

CAR Rule R-38(e) provides: "If after the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage shall result in the absence of emergency relief, and that such party is entitled to relief, the emergency arbitrator may enter an interim order or award granting the relief and stating the reason therefore."

Hashfast acknowledges that, under California law, two factors must be considered before preliminary injunctive relief can be granted:

> "The first is the likelihood that the [claimant] will prevail on the merits at trial. The second is the interim harm that the [claimant] is likely to sustain if the injunction were denied as compared to the harm that the [respondent] is likely to suffer if the preliminary injunction were issued. *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 607-08 (Cal. 1997)…."

*See Hashfast's Opposition*, p. 9. Liquidbits agrees with this standard, but notes that "The required showing of harm, however, varies inversely with the required showing of the merit of the claim." *See Liquidbits' Memorandum in Support ("Liquidbits' Memorandum")*, p. 9, *citing Butt v. State of California,* 4 Cal. 4th 668, 678 (1992).

Liquidbits also argues that preliminary injunctive relief can be granted to preserve the remedy of specific performance and "when it appears, during the litigation, that a party to the action is doing, or threatens, or is about to do…some act in violation of he rights of another party to the action respecting the subject of the action, and tending to render the judgment ineffectual." *See Liquidbits' Memorandum*, p. 9, *citing Steinmeyer v. Warner-Cons. Corp.*, 42 Cal.App. 3d 515, 519-520 (1974) and *quoting Cal. Code Civ. Proc.* § 526(a)(3).

### IV. THE EMERGENCY ARBITRATOR'S DECISION

The Emergency Arbitrator finds and rules that the operative agreement that contains the duties and obligations of the parties with respect to the subject matter of this arbitration is comprised of the October 3rd Agreement (which includes the Hashfast Terms of Sale incorporated therein) as amended by the MOU (hereinafter referred to as "the

- 4 -

Parties' Agreement"). As evidenced in the briefing, declarations and oral argument, the parties disagree as to many facts, as well as the construction and application of key provisions of the Parties' Agreement. For example, the parties have differing interpretations of the MOU provision that starts with the words "The delivery schedule for said chips is as follows:..." In addition, the parties disagree as to whether Hashfast's failure to deliver the balance of the Chips described in the MOU constitutes an anticipatory repudiation or breach of the Parties Agreement. Moreover, the parties disagree as to whether the remedy of specific performance is available in the event of Hashfast's nonperformance and whether Hashfast is capable of refunding any of the money already paid to it by Liquidbits in the event that Hashfast is unable to deliver the balance of the Chips.

With respect to resolving these many disputed fact issues, the Emergency Arbitrator did not have the benefit of live witness testimony, cross-examination or potential arbitrator witness examination in order to assess witness credibility because the parties stipulated to a telephonic oral argument without witness testimony. On the basis of the limited record, the Emergency Arbitrator believes that, as of now, each of the parties has a 50% chance of prevailing in this arbitration on Liquidbits' claim for specific performance.

As Liquidbits correctly points out and Hashfast does not dispute, there is an inverse relationship between the required showing of the merit of the claim and the required showing of harm. In other words, the greater the irreparable harm to be suffered by the claimant, the lesser of a required showing of the merit of the claim at the time of the requested injunctive relief. *See Butt v. State of California*, 4 Cal. 4th at 678 (1992). Liquidbits has presented sufficient evidence that the quantum of immediate and irreparable loss or damage that it is likely to suffer in the absence of emergency injunctive relief is high enough so that a 50% probability of success on the merits of its claim for specific performance is sufficient to meet the test expounded in *Butt*. The facts that lead to this conclusion will be discussed below.

- 5 -

Hashfast does not dispute that it can take 90 days to manufacture new Chips from source materials and approximately 30 days to build them into systems suitable for bitcoin mining. *See Bachrach Dec.* ¶ 13. Hashfast does not deny that the undelivered Chips purchased by Liquidbits represent approximately 90% of Hashfast's present inventory. *See Liquidbits' Memorandum*, p. 16. Accordingly, if Hashfast were free to sell or transfer its present inventory of Chips, there would likely be no Chips available for delivery to Liquidbits until Hashfast could manufacture an additional 28,000 Chips and assemble them into usable units by the June 30, 2014 deadline as alleged by Liquidbits. Based on the current limited record, the very earliest that could happen would be September 2014, assuming that Hashfast had the operating capital and the capacity to produce that many new Chips.

Liquidbits' CEO, Gregory Bachrach testified via declaration that, "As a consequence of the protocol by which new bitcoins are created, the Golden Nonce Chips that Liquidbits purchased will be valueless within the next 90 days." *See Bachrach Dec.*, ¶ 21. Mr. Bachrach cites to two sources to support his conclusion. Indeed, Hashfast argues that, "If this Tribunal mothballs the Chips until June 30, 2014, then the Chips will become worthless according to Mr. Bachrach before Liquidbits could even place them into service." *See Hashfast's Opposition*, p. 15 and n. 9. Hashfast submits the Declaration of its CEO Edward DeCastro who, among other things, disputes Mr. Bachrach's "18% devaluation every 10 days" analysis. *DeCastro Dec.,* ¶19. Regardless of whether the Chips will become "valueless in 90 days," at this early stage in the proceedings, it appears more likely than not that the Chips will continue to decline in value during the pendency of this arbitration.

Mr. Bachrach also testified that shipment of Chips to third parties not only deprives Liquidbits of the productive output of the units, but also shifts the percentage of overall processing capacity to Liquidbits' competitors who receive the Chips. *See Bachrach Dec.,* ¶29. Thus, Liquidbits suffers irreparable harm in three ways: (1) the value of the Chips for which it already paid $6,000,000 is diminishing, (2) Liquidbits is

deprived of the additional processing capacity that the Chips would have provided if delivered, thereby causing it to become weaker among its bitcoin mining competitors, and (3) competitors who receive delivery of the Chips that Liquidbits already bought and paid for will become stronger by having additional processing capacity at the expense of Liquidbits. In other words, the goods are spoiling, Liquidbits is becoming weaker, and Liquidbits' competitors are becoming stronger.

Moreover, based on the limited record before the Emergency Arbitrator, the prospect of Liquidbits ever being able to recover the purchase price for undelivered chips as provided for in the Parties' Agreement appears to be diminishing in light of what appears to be growing financial and operational challenges experienced by Hashfast. Accordingly, while Hashfast has insisted that a refund of the purchase price is the sole contractual remedy, it has so far failed to provide sufficient evidence that it has the financial means to comply with its restitution obligation.

The Emergency Arbitrator has considered Hashfast's contention that it will suffer irreparable harm that may result in bankruptcy or going out of business if the emergency relief requested by Liquidbits is granted. The only way to mitigate the risk of continuing irreparable harm to either party is to expedite the final evidentiary hearing on the merits so that both sides will have a full and fair opportunity to present their evidence and arguments. During the Preliminary Hearing, the Emergency Arbitrator encouraged the parties to stipulate to a final evidentiary hearing on the merits on an expedited schedule. While Liquidbits requested a final hearing during the week of May 19, 2014, Hashfast asserted that it needed until September 2014 to conduct discovery and prepare for trial. What is puzzling about Hashfast's position is that, given its concerns about irreparable harm that it would suffer if the requested emergency injunctive relief were granted, it would appear to have been in its interest to stipulate to an earlier date for the final evidentiary hearing.

Accordingly, at the conclusion of the oral argument, the Emergency Arbitrator informed the parties that the final evidentiary hearing would commence on July 1, 2014

unless the parties otherwise agreed to an earlier date. The Emergency Arbitrator selected this date as a compromise to give Hashfast sufficient time to fully and fairly prepare its defense while at the same time mitigating any harm caused by the delay of the final evidentiary hearing and issuance of the final award. By expediting the final evidentiary hearing on the merits to commence on July 1, 2014, it mitigates the interim harm to both parties, while at the same time, (i) allowing sufficient time for the Arbitration Panel to be appointed, to make disclosures and to enable either party to object to any panelist within the time prescribed under California law, and (ii) enabling the parties to engage in sufficient discovery and preparation for the final evidentiary hearing.

Weighing the substantial irreparable harm that Liquidbits is likely to sustain if the emergency injunctive relief were denied altogether as compared to the harm that Hashfast is likely to suffer if some interim injunctive relief were granted, the Emergency Arbitrator finds and rules that emergency injunctive relief is warranted (although not the full, unconditional relief requested by Liquidbits). The reasons for this conclusion include, without limitation, the following preliminary findings of the Emergency Arbitrator:

1. Given how the bitcoin mining protocol works, the Chips are perishable – they are decreasing in value with time.
2. Liquidbits paid the full purchase price (i.e., $6,000,000) to Hashfast for the Chips (including the undelivered 28,000).
3. Liquidbits is likely to suffer substantial irreparable harm while waiting for a final evidentiary hearing and final award in one or more of the following ways: (a) by the permanent depreciation in value of the $6,000,000 asset for which it has already paid; (b) by being deprived of needed additional computer processing power resulting in the loss of its competitive position among the bitcoin mining community, and/or (c) by competitors who purchase the Chips from Hashfast increasing their competitive position over Liquidbits.
4. Hashfast's assertions that it may file for bankruptcy or go out of business if it is precluded from selling the same Chips already paid for by Liquidbits

- 8 -

Case: 14-30725   Doc# 14-1   Filed: 05/21/14   Entered: 05/21/14 14:32:35   Page 9 of 12

appears to support Liquidbits' concern that Hashfast is facing financial and operational challenges that may preclude it from being able to comply with the refund remedy that Hashfast has asserted applies in lieu of specific performance.

5. While Hashfast contends that it will suffer severe irreparable harm that may necessitate a bankruptcy filing or going out of business if the emergency injunctive relief requested by Liquidbits is granted, the emergency injunctive relief fashioned by the Emergency Arbitrator, as well as the expediting of the final evidentiary hearing, achieves the purpose of mitigating the alleged harm so that the harm will be considerably less than that suffered by Liquidbits in the absence of any emergency injunctive relief.

For all the foregoing reasons, and having found that the requirements of CAR Rule R-38 to be met in that Liquidbits has shown (i) that immediate and irreparable loss or damage shall result in the absence of emergency relief, and (ii) that Liquidbits is entitled to such relief, it is hereby:

**ORDERED:**

1. That Hashfast is hereby restrained and enjoined from (i) selling or otherwise transferring ownership of, (ii) giving possession, custody or control of, and/or (iii) granting any security interest in, all or any portion of Hashfast's current inventory of Golden Nonce Chips (and wafers from which the Chips are cut) up to and including the sum of 28,000 Golden Nonce Chips ("the Enjoined Chips") until further Order of the Emergency Arbitrator or the Arbitration Panel after same is convened and approved.

2. That Hashfast is hereby restrained and enjoined from exposing the Enjoined Chips to damage, destruction and/or theft and is ordered to keep and preserve them in a safe, secure and clean location designed to protect the Enjoined Chips from damage, destruction and/or theft, and to provide Liquidbits with a certificate of insurance listing Liquidbits as a loss payee covering the value of the Enjoined Chips in the event of a

- 9 -

casualty loss until further Order of the Emergency Arbitrator or the Arbitration Panel after same is convened and approved.

    3. That Hashfast may file a motion to modify the preliminary injunction set forth in paragraphs 1 and 2 above for the purpose of effectuating a sale or transfer of a specific number of the Enjoined Chips to a specific purchaser, provided that Hashfast demonstrates to the satisfaction of the Emergency Arbitrator (or the Arbitration Panel after it is convened and approved): (a) that Hashfast is contractually obligated to effectuate such sale or transfer to a third party pursuant to a contract executed prior to the issuance of Emergency Scheduling & Procedure Order No. 1 on April 23, 2014, (b) that Hashfast demonstrates sufficient evidence that it will have insufficient operating funds to continue operating as a going concern in the absence of such sale, and/or (c) that Hashfast will place into escrow sufficient proceeds from such sale or transfer to secure the payment of any refund or other form of monetary damages that may be awarded to Liquidbits in this arbitration. Any such motion to modify the preliminary injunction shall be accompanied by a memorandum of points and authorities and evidence and served upon Liquidbits counsel, and Liquidbits shall have five (5) days from such service to file and serve its opposition, with Hashfast having a right to file and serve a reply within three (3) days thereafter. Oral argument (and/or an evidentiary hearing, if necessary) will take place as soon as practicable after such reply is served.

    4. That the final evidentiary hearing on the merits in this arbitration shall commence on July 1, 2014 at 10:00 a.m. in a location to be designated by the AAA Case Manager in Santa Clara County, California, unless the parties agree to another location, and will continue on July 2 and 3, 2014, if necessary.

    5. That the parties shall comply with Emergency Scheduling & Procedure Order No. 2 to be issued.

    6. That the failure of any party to comply with the terms of this Emergency Interim Order No. 1 will subject such non-complying party to sanctions to the fullest extent available under applicable law.

7. This Emergency Interim Order No. 1 shall remain in effect until further order of the Emergency Arbitrator (or the Arbitration Panel when it is convened and confirmed by the AAA).

8. Pursuant to CAR R-38(i), the costs associated with the application for emergency relief shall be apportioned equally to the parties, subject to the power of the tribunal to determine finally the apportionment of such costs.

**SO ORDERED on May 8, 2014.**

*/s/ Paul E. Burns*

Paul E. Burns
Emergency Arbitrator