Ashley M. McDow (245114)
Michael T. Delaney (261714)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:    310.820.8800
Facsimile:     310.820.8859
Email:          amcdow@bakerlaw.com
                    mdelaney@bakerlaw.com

[Proposed] Attorneys for OFFICIAL COMMITTEE
OF UNSECURED CREDITORS

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No.: 14-30725 |
| HASHFAST TECHNOLOGIES, LLC, *et al.,*[1] | (Jointly Administered with HashFast LLC, Case No. 14-30866) |
| Debtors. | Chapter 11 |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS'
MOTION FOR SUBSTANTIVE CONSOLIDATION**

The Official Committee of Unsecured Creditors (the "Committee") in the above-captioned bankruptcy case of HashFast Technologies, LLC, respectfully submits this motion (the "Motion") requesting that the Court substantively consolidate the jointly-administered estates of Hashfast Technology, LLC, case no. 14-30725 DM, and Hashfast, LLC, case no. 14-30866 DM (collectively, the "Debtors").[2]  In support of the Motion, the Committee states as follows:

**JURISDICTION**

This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors are HashFast LLC (FEIN 46-2943354) and HashFast Technologies LLC (FEIN38-3913245).
[2] The Debtors have represented to the Committee that they do not intend to oppose this Motion, and authorized the Committee to represent as much herein.  Additionally, the Debtors have consented to setting this Motion for hearing on shortened time for July 28, 2014, at 2:00 p.m.

- 1 -

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 1 of 326

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**BACKGROUND**

**A.** **Corporate Formation and Assets**

1.      On or about May 9, 2013, HashFast LLC ("HF") was formed as a Delaware limited liability company. Soon thereafter, on or about June 10, 2013, HashFast Technologies, LLC ("HFT") was formed as a California limited liability company and registered to do business in California.

2.      At all times, HF has owned 100% of the membership interests of HFT.[3]

3.      HF has no meaningful business operations, no employees,[4] the same officers as HFT,[5] and the same principal place of business as HFT.[6]  In fact, the Debtors have conceded that HF exists solely for the purpose of owning and purportedly developing certain intellectual property – identified on HF's schedules as two United States provisional patent applications and various "trade secrets, mask works related to chip design" (collectively, the "Intellectual Property") – solely for the benefit of HFT.  Moreover, while HF purportedly "licenses" the Intellectual Property to HFT,[7] the Debtors have admitted that there is no known license agreement between HF and HFT regarding the use of the Intellectual Property.[8]  Rather, HFT simply has the unfettered ability to use the Intellectual Property for the benefit of HFT's operations without any obligation to pay HF for such use.

4.      Since HF's formation, its only source of revenue has been money transferred, or up-streamed, from HFT to HF.[9]  HF's schedules reflect that in 2013, HFT transferred $1,002,643.77 to HF,[10] and in 2014, HFT transferred $170,000.00 to HF.[11]  Although Simon

---

[3] Meeting of Creditors of HashFast LLC dated 7/8/13, 47:11-13.  A copy of the transcript of the July 8, 2014 meeting of creditors is attached to the Declaration of Michael T. Delaney (the "Delaney Declaration") as **Exhibit "A"**.
[4] Meeting of Creditors of HashFast LLC dated 7/8/13, 53:20-23.
[5] *See* Case No. 14-30866, D.E. 17, p. 7; Case No. 14-30725, D.E. 92, p. 10.
[6] Case No. 13-30866, D.E. 1, p. 1; Meeting of Creditors of HashFast Technologies, LLC dated 7/8/14; 7:24-8:11.
[7] The Intellectual Property is identified on HF's Schedules as US Provisional Patent Application No. 61/917,828, US Provisional Patent Application No. 61/896,559, and "Trade secrets, mask works related to chip design."  *See* Case No. 14-30866, D.E. 19, p. 3.  The Committee requests that the Court take judicial notice pursuant to Fed. R. Evid. 201 of all documents referenced herein that have been filed with the Court.
[8] Meeting of Creditors of HashFast Technologies LLC dated 7/15/14; 24:8-14.  A copy of the transcript of the July 15, 2014 meeting of creditors is attached to the Delaney Declaration as **Exhibit "B"**. Ex. A, 24:8-14.
[9] *See* Case No. 14-30866, D.E. 17, p. 1.
[10] *Id.*
[11] *Id.*

- 2 -

Barber, current and former CEO of HFT, testified that he was completely unaware why the two entities were structured as they were, the current CFO of HFT testified that the purpose of the structure (which did nothing more than isolate the Intellectual Property in an entity unlikely to incur any significant non-insider liabilities) was to enable HF to derive its revenue from licensing the Intellectual Property to HFT, so that "[HFT] in essence, paid for the IP by funding [HF]."[12]

5.      Despite the absence of any agreement between HFT and HT which governed the allocation and/or transference of funds by and between the two entities, in 2013 alone, HFT paid HF over $1,000,000 for the purpose of satisfying HF's (or HFT's)[13] liabilities to various independent contractors who performed services for HF and HFT.[14]

6.      HF has no secured creditors, no unsecured priority creditors, and only two alleged unsecured non-priority creditors.[15]   The first alleged creditor of HT, Sandgate Technologies ("Sandgate"), was scheduled identically in the schedules of both HFT and HT – as the holder of an unliquidated claim in the amount of $89,377.00.[16]   Moreover, the principals of Sandgate – Chad Spackman, Adrian Port, and John Wells – each hold an approximate 12% equity interest in HF according to the List of Equity Holders filed by HF.[17]   The second purported unsecured non-priority creditor, DXCorr Design, Inc. ("DXCorr"), is similarly scheduled identically in the schedules of both HFT and HT - as a disputed claim in the amount of $0.00.[18]   HFT also scheduled DXCorr as a party to two executory contracts.[19]   Additionally, despite the fact that the design work that DXCorr performed related primarily to the Intellectual Property owned by HF, the actual signatory to the executory contract with DXCorr was HFT.[20]   Moreover, most of the payments to DXCorr were made by HF - who was not a party to the contract - while only a few of

---

[12] Ex. A, 54:25-55:5.
[13] During the Meeting of Creditors, the Debtors' representatives could not explain which company was directly liable for certain debts.  Rather, the Debtors' representatives testified that HF was primarily responsible for paying the Debtors' obligations, while HFT would only occasionally pay the Debtors' liabilities.
[14] Ex. B, 46:1-10; 65:21-66.
[15] *See, generally,* Case No. 14-30725, D.E. 83-91.
[16] Case No. 14-30866, D.E. 22, p. 1.
[17] Case No. 14-30725, D.E. 5.
[18] Case No. 14-30725, D.E. 87, at p. 33; Case No. 14-30866, D.E. 22, at p. 1.
[19] Case No. 14-30725, D.E. 88, p. 1.
[20] Ex. B, p. 18.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

the payments were made by HFT.[21]  The Debtors' have thus-far been unable to provide any credible explanation for why HF would pay the liabilities of HFT (to DXCorr or otherwise).[22]

7.    By structuring the entities in the manner in which they have, the Debtors have ensured that the assets which are crucial to the operations of HFT (and of significant value) are isolated in HF, and thus insulated from the significant liabilities incurred by HFT in those same operations.  In fact, as of the Debtors' respective petition dates, HFT purportedly had over $15,000,000.00 in unsecured claims, while HF's schedules identify less than $90,000.00 in unsecured claims.

**B.    Bankruptcy and Post-Petition Conduct**

8.    On May 9, 2014, Koi Systems Ltd., UBE Enterprises, Timothy Lam, Edward Hammond, and Grant Pederson commenced an involuntary bankruptcy under chapter 7 against HFT.

9.    On June 3, 2014, HFT filed the *Debtor's Conditional Consent to an Order for Relief Regarding Involuntary Petition* and *Debtor's Motion to Convert to Chapter 11*.[23]  On June 4, 2014, the Court entered an order converting the Bankruptcy Case to one under chapter 11 of the Bankruptcy Code.[24]  Thereafter, HFT has acted as debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

10.    On June 6, 2014, HF filed a voluntary petition under chapter 11 of the United States Code (the "Bankruptcy Code").

11.    On or about June 23, 2014, the Office of the United States Trustee appointed the Committee to represent the interests of all unsecured creditors for HFT pursuant to section 1102 of the Bankruptcy Code. The members appointed to the Committee were: (i) Hamilton Hee; (ii) Sistemas Operativos Sanitarios ca; (iii) Uniquify, Inc.; (iv) Antony Vo; (v) Koi Systems Ltd.; (vi) Digimex Ltd.; and (vii) Peter Morici.

---

[21] Ex. B, p. 21.
[22] Ex. B, p. 22:11-14.
[23] Case No. 14-30725, D.E. 35 and 36.
[24] All references herein to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq.*

- 4 -

MOTION FOR SUBSTANTIVE CONSOLIDATION

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

12.     On July 8, 2014, this Court granted the Debtors' motion to jointly administer the Debtors' bankruptcy cases.[25]

13.     On July 18, 2014, the Debtors' filed their *Motion Pursuant to 11 U.S.C. §§ 105(A), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9014 and 9019 for Entry of Orders (I) Authorizing the Sale of Estate Property, (II) Authorizing the Sale of Estate Property Free and Clear of Liens, Claims, Encumbrances and Interests, and (III) Authorizing the (A) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (B) Assumption of Certain Liabilities, and (c) Granting Certain Related Relief* (the "Sale Motion").[26]  Among other things, the Sale Motion requests that this Court approve a sale of all or substantially all of the Debtors' assets to Liquidbits Corp. (the "Potential Purchaser") based upon a non-binding term sheet, without providing any evidence regarding the value of the assets to be sold or allowing for any potential overbids, and which, among other things, seeks a general release of any and all claims (including all claims under Chapter 5 of the Bankruptcy Code) against the Potential Purchasers and its affiliates, none of which are disclosed or appear to have been investigated.[27]  Significantly, neither the Sale Motion nor the non-binding term sheet attached thereto indicate which Debtor owns the assets proposed to be sold or provide any explanation of how the purchase price is to be allocated between the Debtors. Rather, the Sale Motion contemplates a sale of substantially all of the assets of *each* of the Debtors in a single transaction to a single purchaser for a single sum of money.[28]  In fact, the HFT's CFO testified that in negotiating and finalizing the non-binding term sheet, which forms the basis for the Sale Motion, she believed that all of the assets of each of the estates were being sold.[29]

14.     Given the essentially irrefutable and extensive interrelatedness between HF and HFT, the Committee has continuously emphasized the need for substantive consolidation of the two estates.  While the Debtors have been unwilling to stipulate to substantive consolidation, on

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[25] Case No. 14-30725, D.E. 121.
[26] Case No. 14-30725, D.E. 134.
[27] *Id.* at pp. 8-9.  The Committee intends to file an objection to the Sale Motion more fully setting forth its objections.
[28] *See* Ex. B, 81:25-82:6.
[29] Ex. B, p. 82:3-6.

- 5 -

or about July 22, 2014, the Debtors finally confirmed that they would not oppose the substantive consolidation sought herein by the Committee.

<center>**RELIEF REQUESTED**</center>

The Committee respectfully requests that this Court enter an order substantively consolidating the Debtors' bankruptcy estate(s) into a single bankruptcy estate, and granting all other relief that is appropriate under the circumstances.[30]

<center>**BASIS FOR RELIEF REQUESTED**</center>

Substantive consolidation is an uncodified, equitable doctrine allowing the bankruptcy court to "combine the assets and liabilities of separate and distinct – but related – entities into a single pool and treat them as though they belong to a single entity." *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir. 2000). The doctrine "enables a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation." *Id.* The essential purpose of substantive consolidation "is to ensure the equitable treatment of all creditors." *Id.* And, while it is to be used sparingly, without the protections provided by substantive consolidation, "debtors could insulate money [or assets] through transfers among inter-company shell corporations with impunity." *Id.*

In determining whether substantive consolidation is appropriate, the Ninth Circuit has established a disjunctive two-factor test: (i) whether the creditors dealt with the debtors as a single economic unit and did not rely on the separate credit of each of the consolidated entities; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Id.* at 766. The presence of either factor is a sufficient basis to order substantive consolidation. "In either case, the bankruptcy court must in essence establish that the assets of all of the consolidated parties are substantially the same." *Id.* at 771. Ultimately, the decision to apply the substantive consolidation doctrine stems from a weighing of the equities and must be tailored to meet the needs of each particular case. *Id.*

---

[30] A copy of the proposed order is attached to the Delaney Declaration as **Exhibit "C"**.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

<center>- 6 -</center>

Substantive consolidation is appropriate in this case under either factor of the *In re Bonham* standard. Indeed, based on the Debtors' business practices (both historically and since the respective petitions were filed) and by their own admissions, it is clear that the Debtors' creditors (as well as the Debtors) treated the companies as a single enterprise and that the Debtors' business operations are and have always been inextricably intertwined.

Since the formation of the respective entities, the Debtors have operated as a single entity. HF does nothing more than hold the Intellectual Property (and/or the license(s) associated with the Intellectual Property),[31] while HFT contracts for the manufacture of the tangible products and enters into sales agreements with customers—thus, incurring most (if not all) of the debt associated with the joint enterprise. Indeed, it appears that HF was formed primarily for the purpose of insulating the Intellectual Property from the liabilities of HFT. The current CFO of HFT testified to this fact, stating that "the intent of the structure was that HashFast LLC was set up to pay the IP and isolate the IP. HashFast Technologies was the operating company."[32] The current CFO also testified that due to the corporate structure, the Debtors were integrally interrelated.[33]

In addition to an inextricably intertwined operational structure, HFT and HT frequently paid obligations purportedly incurred by the other entity (although, quite frankly, it is unclear which entity even incurred the obligation(s) in a number of situations). For example, even though the services contract was between HFT and DXCorr,[34] HF regularly paid the obligations owed to DXCorr.[35] The same is true for Uniquify[36] and Sandgate.[37] Moreover, the determination

---

[31] The Debtors have provided conflicting testimony regarding HF's business. First, Simon Barber testified that HF merely holds intellectual property rights (ownership or license rights). *See* Ex. A, 52:18-53:6. Then, counsel for HFT/HF and Monica Hushen stated that HF also engages in the development of intellectual property. *See* Ex. A, 53:9-14. However, later during the Meeting of Creditors, Ms. Hushen testified that the Debtors "are not investing in the future technology." *See* Ex. A, 63:15-16. Based on the testimony of Mr. Barber (who is routinely noted during both Meetings of Creditors as the person most knowledgeable for the Debtors), it appears that HF does not engage in any business activities other than hold intellectual property rights for the exclusive benefit of HFT and occasionally pay the financial obligations of HFT from funds paid to HF from HFT as alleged license payments (despite the absence of a license).

[32] *See* Ex. B, 23:10-13.

[33] *See* Ex. B, 23:13-18 ("[o]bviously HashFast Technologies had to have the license, because that's where all the operations took place, so they couldn't sell product without the license. So HashFast LLC owned, theoretically, the license rights, and they licensed those to HashFast Technologies.").

[34] *See* Ex. B, 17:25-18:16.

[35] *see* Ex. B, 20:24-21:13.

- 7 -

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:16    Page 7 of
326
603835613.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

regarding which entity would make any given payment appears to have been completely arbitrary, and made on a "case-by-case basis" by Simon Barber and/or Eduardo de Castro— current or former executives of HFT and majority owners of HF.[38]

Perhaps even more demonstrative of the complete disregard of the legal distinction between the two entities, HFT continuously transferred substantial sums of money to HF in order to enable HF to pay the obligations of both HFT and HF. In fact, in the statement of financial affairs filed by HFT,[39] HFT admitted that it transferred approximately $1,200,000 to HF.[40] These funds were then transferred from HF to vendors who were providing services for both HF and HFT, despite the absence of any contractual obligation or invoice requiring that any such payments be made in this manner.[41] The arbitrary nature of these payments was reinforced by the CFO of HFT, who attested that after the respective bankruptcy petitions were filed, she caused HFT to pay Sandgate directly, rather than have HFT pay HF who would then simply pay Sandgate.

Over 99% of the scheduled liabilities in these jointly-administered cases are solely against HFT (the entity which is operating), while HF (the non-operating entity whose sole function is to "isolate the IP") owns what is likely to be the most valuable asset of either estate yet has few, if any, legitimate creditors. HF has admitted that it has no meaningful business operations, and has admitted that it has nominal liabilities. HFT has also admitted that it transferred significant funds to HF without receiving any demonstrative consideration in return, while HFT incurred significant liabilities that it was unable to satisfy.

The Debtors (let alone the creditors of the Debtors) have admitted that they viewed the entities as a single economic unit – a fact which is evidenced by the structure of the recent Sale Motion and confirmed by the recent testimony of the Debtors' representatives. Moreover, the

---

[36] *See, e.g.,* Ex. B, 36:2-6 ("Q. So do your records that you are reviewing right now indicate that both debtors made payments to Uniquify? A. Let me verify that HashFast Technologies did as well. Yes.").
[37] *See., e.g.,* Ex. B, 41:18-22 ("Q. Which entity made the payments to Sandgate? A. Similar to the other vendors, both entities did. Primarily HashFast LLC, I believe. Let me double-check that. It appears that Sandgate was primarily paid through HashFast Technologies.").
[38] *See* Ex. B, 42:12-17.
[39] Case No. 14-30725, D.E. 92.
[40] *See* Ex. B, 44:15-45:15; 47:5-18.
[41] *See* Ex. B, 65:21-66:4.

MOTION FOR SUBSTANTIVE CONSOLIDATION

affairs of the Debtors are so entangled that the Debtors themselves cannot articulate any rationale explanation for the manner in which the entities were structured or which entity incurred or paid certain obligations. Moreover, the Debtors themselves view the assets of the two entities as substantially the same, as reflected in the structure of the Sale Motion. Accordingly, the Committee respectfully submits that all creditors will benefit from substantive consolidation by ensuring that the Debtors are not permitted to insulate the Intellectual Property (which is likely the most valuable asset in either of the estates) from the liabilities of the joint enterprise operated through HFT. *See In re Bonham*, 229 F.3d at 764.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court enter an order substantively consolidating the Debtors' bankruptcy estate into a single bankruptcy estate, and for such other relief as this Court deems just and appropriate under the circumstances.

Dated:    July 23, 2014            Respectfully submitted,

BAKER & HOSTETLER LLP

By:    _____
       Ashley M. McDow
       Michael T. Delaney

[Proposed] Attorneys for Official Committee of Unsecured Creditors

- 9 -

603835613.1

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 9 of 326

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## DECLARATION OF MICHAEL T. DELANEY

I, Michael T. Delaney, hereby declare:

1.        I am an attorney of law, duly authorized to practice before this Court.  I am an associated at the law firm of Baker & Hostetler LLP, proposed counsel for the Official Committee of Unsecured Creditors in the above-captioned bankruptcy case.  I make this declaration in support of the *Official Committee of Unsecured Creditors' Motion for Substantive Consolidation* of the bankruptcy estates in *In re Hashfast Technologies, LLC*, case no. 14-30725, and *In re Hashfast, LLC*, case no. 14-30866 (collectively, the "Bankruptcy Case").

2.        I have personal knowledge of the facts in this declaration, except those fact that are based upon information and belief, and, as to those facts, I believe such facts to be true.  If called as a witness, I could and would competently testify to the facts in this declaration.

3.        My firm ordered transcripts of the meetings of creditors held in the Bankruptcy Cases on July 8, 2014, and July 15, 2014.  A true and correct copy of the transcript of the meeting of creditors held on July 8, 2014, my firm received from the transcription service is attached hereto as **Exhibit "A"**.  A true and correct copy of the transcript of the meeting of creditors held on July 15, 2014, my firm received from the transcription service is attached hereto as **Exhibit "B"**.

4.        A copy of the proposed order granting the Motion is attached hereto as **Exhibit "C"**.

I declare the foregoing is true and correct under penalty of perjury.  Executed at Los Angeles, California, this 23rd day of July, 2014.

Michael T. Delaney

- 1 -

MOTION FOR SUBSTANTIVE CONSOLIDATION

EXHIBIT "A"

Page 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE: HASHFAST, LLC / CASE NO. 14-30866

IN RE: HASHFAST TECHNOLOGIES, LLC / CASE NO. 14-30725

*    *    *    *    *    *    *    *    *    *    *    *

STENOGRAPHICALLY TRANSCRIBED VIA PRE-RECORDED AUDIO

MEETING OF CREDITORS BEFORE JULIE GLOSSON

DATE TAKEN:         JULY 8, 2014

TIME:               11:00 A.M.

TRANSCRIBED BY:     ALISON PRESLEY
                    STENOGRAPHIC SHORTHAND REPORTER
                    NOTARY PUBLIC STATE OF FLORIDA
                    COMMISSION NO. FF111939
                    EXPIRES: APRIL 22, 2018

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 12 of
326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1                        CONTENTS

2    PROCEEDINGS                                          3

3    TESTIMONY OF SIMON BARBER AND MONICA HUSHEN
          Examination by Ms. Glosson.........................11
4         Examination by Ms. McDow...........................28
          Examination by Mr. Gallo...........................97
5         Examination by Mr. Kozachenko.....................106
          Further Examination by Ms. Glosson................157

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 13 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1                    P R O C E E D I N G S

2                            - - -

3          MS. GLOSSON:   This is the meeting of creditors

4     in the Chapter 11 bankruptcy case for Hashfast

5     Technologies, LLC.  The case number is 14-30725.

6          This case was commenced as an involuntary

7     petition that was filed on May 9th, 2014.  The

8     debtor consented to the order for relief and

9     converted this case to Chapter 11 on June 6th, 2014

10    -- I'm sorry, June 4th, 2014.

11         Today is July 8th, 2014, and it is a little

12    before 11:00 in the morning.  We are at 235 Pine

13    Street in San Francisco, California.  Today -- this

14    is the place and time for this meeting of creditors.

15    My name is Julie Glosson.  I am an attorney with the

16    United States Trustees Office, and I will be

17    conducting today's meeting of creditors.

18         This case is jointly administered with the

19    Chapter 11 case In Re: Hashfast, LLC; the case

20    number is 14-30866.  That meeting and that case is

21    also scheduled for this morning.  But I will be

22    calling that upon the conclusion of the meeting in

23    Hashfast Technologies, LLC.  When I call for

24    examination by creditors, if you could, please limit

25    your questions to the respective cases.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 14 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1        This meeting is required by the bankruptcy

2    code.  The purpose of the meeting is to find out why

3    the debtor converted the case to Chapter 11 and how

4    the debtor intends to reorganize or exit Chapter 11.

5    Questions will include the questions about the

6    debtor's assets and liabilities and exit strategy.

7    It is not an examination about the debtor, about

8    your claim in the case.

9        We are recording today's meeting with this

10   digital recording that's in front of me.  We

11   maintain a copy of the recording for two years from

12   the date of the closing of the bankruptcy case.

13   Anyone can request a copy of the recording by

14   contacting my office.

15       For those of you who are going to be answering

16   questions, if you could please make sure that you

17   answer your questions audibly as opposed to nodding

18   or shaking your head, as the machine is not going to

19   pick that up.  If there are any members of the press

20   who are present, there is only one recording that is

21   authorized, and that is this recording by my office.

22   So if you are present and you are a member of the

23   press, please refrain from recording today's

24   meeting.  That goes for anyone else who is present.

25   You should not be recording today's meeting.  As I

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 15 of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1       stated, this is the only authorized recording.

2           Okay.  Counsel for the debtor, do you want to

3       state your appearance, please.

4           MS. MICKELSEN:  Yes.  My name is Jessica

5       Mickelsen.  And we represent Hashfast and Hashfast,

6       LLC.

7           MS. GLOSSON:  And so we have two individuals

8       here for the debtor.  I think I am just going to go

9       ahead and swear both of you in and then proceed.

10          So why don't we start with Ms. Hushen.

11          Ms. Hushen, would you please raise your right

12      hand.  Do you solemnly swear or affirm to tell the

13      truth, the whole truth, and nothing but the truth in

14      today's proceeding?

15          MS. HUSHEN:  I do.

16          MS. GLOSSON:  And state your name for the

17      record, please.

18          MS. HUSHEN:  Monica Hushen.

19          MS. GLOSSON:  Can you please speak up?

20          MS. HUSHEN:  Monica Hushen.

21          MS. GLOSSON:  And before we got started,

22      Ms. Hushen handed to me her California driver's --

23      California identification card.  And the picture on

24      that card matches the individual before me, and that

25          identification card is current.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 16 of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          I am returning that to you.

2          Ms. Hushen, what is your capacity with the

3     debtor?

4          MS. HUSHEN:  CFO.

5          MS. GLOSSON:  All right.  And we also have here

6     Simon Barber.

7          Will you please raise your right hand.  Do you

8     solemnly swear or affirm to tell the truth, the

9     whole truth, and nothing but the truth in today's

10    proceeding?

11         MR. BARBER:  I do.

12         MS. GLOSSON:  And state your name for the

13    record, please.

14         MR. BARBER:  Simon Barber.

15         MS. GLOSSON:  And what is your capacity with

16    the debtor?

17         MR. BARBER:  I am chief technology officer.

18         MS. GLOSSON:  Okay.  I am going to need you to

19    speak up.  I want to make sure that your voice is

20    getting picked up.

21         Before we get started, Mr. Barber handed to me

22    his permanent resident card, and the card is current

23    and the picture on the card matches the individual

24    before me.

25         I am returning that to you, thank you.

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1           There are a number of other people who are

2    present in the room.  And I am just going to go

3    through that list.  Patricia Martin is a bankruptcy

4    analyst, and she is sitting to my right.  She is

5    with my office.  We also have four interns from my

6    office.  We have Noshon Aldabashi (ph), Sara

7    Zendahas (ph), Sonya Singh(ph), and Andrew Batwash

8    (ph).  In the back is another person with my office,

9    that's Incy Toh (ph), she is a paralegal with my

10   office.

11          And on the list, the sign-in sheet, we have

12   Ashley McDow, Victor -- I can't read your last name.

13          MR. DELAGLIO:  Delaglio (ph).

14          MS. GLOSSON:  Delaglio, all right.

15          We have Richard Chang, Rob Edgeworth, Ray

16   Gallo, and Igor Kozachenko (ph); is that correct?

17          MR. KOZACHENKO:  Correct.

18          MS. GLOSSON:  And that's it for the people who

19   are in the room.

20          All right.  A few housekeeping matters, and

21   then I will proceed.  I will open up the meeting to

22   questions by creditors.  And then when that is

23   concluded, I will proceed with my examination.

24          I need to verify the debtor's mailing address.

25   Is that 649 Mission Street, Fifth Floor, San

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 18 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    Francisco, California?

2         MS. HUSHEN:  No.  It is 100 Bush Street, Suite

3    650.

4         MS. MCDOW:  This is just for Hashfast

5    Technologies?

6         MS. GLOSSON:  We are just talking about

7    Hashfast Technologies.

8         So 100 Bush Street, and what's the -- is there

9    a suite?

10        MS. HUSHEN:  Suite 650, San Francisco.  I don't

11   know the zip.

12        Do you know the zip?

13        MS. GLOSSON:  It is probably the same as ours,

14   94104.

15        MR. BARBER:  Yes.

16        MS. GLOSSON:  We need to check to make sure

17   that is correct.  Because I think it is still

18   showing the 649 Mission.

19        MS. MICKELSEN:  Okay.  I thought my firm had

20   corrected that.  But I will go back and check.

21        MS. GLOSSON:  Maybe it was.

22        All right.  So if at any point during the

23   course of the case the address changes, whether it

24   is from 100 Bush Street, it is the debtor's

25   responsibility to make sure that that gets changed

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 19 of
326
Electronically signed by Alison Presley (001-159-987-5451)    92be47ea-a665-4c9d-be42-899f3e91c918

1    with the bankruptcy court.

2         Do you understand that?

3         MS. HUSHEN:  Yeah.

4         MS. MICKELSEN:  Actually, we had actually --

5         MS. HUSHEN:  I don't know where that address

6    came from.

7         MS. MICKELSEN:  We had actually received a

8    call.  It was the involuntary petition that had used

9    that Mission Street address.

10        MS. GLOSSON:  Right.

11        MS. MICKELSEN:  Yes.  And then my understanding

12   was that it was corrected.  But if it hasn't been

13   corrected on public record, we can correct that.

14        MS. GLOSSON:  All right.  That's fine.  But if

15   it changes from what's currently on the record, it

16   is the debtor's obligation.

17        MS. MICKELSEN:  I understand.  And actually, if

18   I may make one statement before this starts.

19        MS. GLOSSON:  I am going to give you an

20   opportunity to make an opening statement.

21        MS. MICKELSEN:  Okay.

22        MS. GLOSSON:  Is that what you were

23   contemplating or did you have something else in

24   mind?

25        MS. MICKELSEN:  It is not so much an opening

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 20 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      statement, as a correction to our schedules.  But I

2      can wait.

3          MS. GLOSSON:  Okay.  I will be going through

4      the schedules and give the debtor's an opportunity

5      to make a correction to that.

6          MS. MICKELSEN:  Thank you.

7          MS. GLOSSON:  For the record, in the Hashfast

8      Technologies, LLC case, there is a committee that

9      was appointed on June 23rd.  And that committee is

10     represented by Ashley McDow, who is present.

11         All right.  Who is going to be the responsible

12     individual in the case?

13         MS. MICKELSEN:  Monica.

14         MS. GLOSSON:  Okay.  Because I haven't seen an

15     application.

16         MS. MICKELSEN:  Okay.

17         MS. GLOSSON:  When do you anticipate filing

18     that?

19         MS. MICKELSEN:  As soon as possible after this

20     meeting.

21         MS. GLOSSON:  Okay, all right.  Counsel, this

22     is probably a statement for you.  Do you anticipate

23     any other professionals being employed by the

24     estate?

25         MS. MICKELSEN:  At this time, we are not

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 21 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

```
                                          Page 11
```

1       contemplating other professionals being employed.

2       And that is because we do have a potential sale that

3       we would -- we hope to have consummated by the end

4       of the month.

5            MS. GLOSSON:  When you say "consummated," when

6       do you anticipate filing a motion for approval of

7       the sale?

8            MS. MICKELSEN:  I believe we are planning to do

9       so on an emergency basis.  And I would think, if not

10      this week, next week, perhaps next week or soon

11      thereafter.

12           MS. GLOSSON:  Okay. I am sure that there will

13      be more questions about that.  So we will get to

14      that later.

15                EXAMINATION BY MS. GLOSSON

16  BY MS. GLOSSON:

17      Q    Ms. Hushen, with respect to the debtor and

18  possession accounts, the debtor needed to convert the DIP

19  accounts or existing accounts to DIP accounts.  Has that

20  been done yet?

21      **A    (By Ms. Hushen) My understanding was that we**

22  **filed a motion to retain the existing accounts.**

23      Q    Right.  And that the debtor was obligated under

24  that --

25      **A    (By Ms. Hushen) Then it hasn't happened yet.**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 22 of
326

Electronically signed by Alison Presley (001-159-987-5451)                 92be47ea-a665-4c9d-be42-899f3e91c918

1     Q    Okay. So once --

2     **A    (By Ms. Hushen) So I assume that is a**

3  **communication with the bank?**

4     Q    It would be, right.

5     **A    (By Ms. Hushen) Okay.**

6     Q    So both of the banks that the debtor was using,

7  existing accounts or authorized depositories, those

8  accounts need to be converted to a debtor-in-possession

9  account.

10     **A    (By Ms. Hushen) Okay. I will do that today.**

11     Q    And once that has been done, I need you to

12  provide me with proof that that has been done.

13     **A    (By Ms. Hushen) All right.**

14     Q    Okay, all right. The involuntary that was

15  filed identified the name of the debtor as Hashfast

16  Technologies, LLC; is that the correct name of this

17  entity?

18     **A    (By Ms. Hushen) Yes.**

19     Q    All right. Can you say that louder?

20     **A    (By Ms. Hushen) Yes, it is.**

21     Q    All right. So after the order -- or after the

22  debtor consented to the order for relief and the case was

23  converted to Chapter 11, there were a number of schedules

24  that were filed. These are schedules of the debtor's

25  assets and liabilities. And there is a place for the

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 23 of 326

Electronically signed by Alison Presley (001-159-987-5451)    92be47ea-a665-4c9d-be42-899f3e91c918

1  debtor to sign those schedules.

2      Did you personally sign the schedules that were

3  filed in this case, Ms. Hushen?

4      **A    (By Ms. Hushen) Electronically, yes.**

5      Q    Did you affix a wet signature to these -- to

6  the declaration?

7      **A    (By Ms. Hushen) Yes, I believe I did.**

8      Q    And when I say "wet signature," I mean with a

9  pen.

10     **A    (By Ms. Hushen) I believe I did.  I would have**

11  **to doublecheck.**

12     Q    Okay.  Is that something that you could look

13  into?

14     **A    (By Ms. Hushen) Yeah.**

15     Q    And get back -- I mean, have your attorney

16  contact me.  Because you are required -- under the local

17  rules, you are required to personally sign with a wet

18  signature these documents.

19     **A    (By Ms. Hushen) Yes.  I am sure if it was**

20  **required, then Pete had me do it.**

21     Q    Okay.  At the time that you signed the

22  schedules -- and your attorney has indicated that there

23  might be some changes to these schedules -- at the time

24  that you signed them, did you believe that they were true

25  and correct?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 24 of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 14

1    **A    (By Ms. Hushen) Yes.**

2    Q    Do you know of any changes or amendments that

3    need to be made to these schedules?

4    **A    (By Ms. Hushen) Yes.  On the inventory**

5    **schedule, it refers to book value.  And really, it is**

6    **market value.  In the SOFA, it had an option as to which**

7    **value you could elect.  And Pete and I had discussed**

8    **market value.  And when it got filed, it -- you know,**

9    **we -- there was an --**

10   Q    Okay.  I just want to make sure -- you said

11   "SOFA," which refers to the statement of financial

12   affairs?

13   **A    (By Ms. Hushen) Right.**

14   Q    And I just want to make sure that we are

15   talking about the same thing.  Because schedule B is the

16   list of the debtor's personal property.

17   **A    (By Ms. Hushen) Uh-huh.**

18   Q    And so when you say book value or market value,

19   what are you referring to?

20   **A    (By Ms. Hushen) Where it says book value on the**

21   **inventory and the equipment, that really is market value.**

22   Q    All right.  And are there any other changes

23   other than that to the schedules?

24   **A    (By Ms. Hushen) I think the only other change**

25   **of substance was an update to the bucketing of chips**

First Choice Reporting & Video Services
www.firstchoicereporting.com        Worldwide Scheduling        800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 25 of
326
Electronically signed by Alison Presley (001-159-987-5451)        92be47ea-a665-4c9d-be42-899f3e91c918

Page 15

1    **inventory between raw substrates and in-process -- excuse**

2    **me, between raw and in-process chips.**

3         Q    Okay.

4         **A    (By Ms. Hushen) And we provided that in the**

5    **update that was provided to you today.**

6         Q    Well, there is a distinction between changes to

7    inventory after the schedules are filed.  And the

8    schedules are a moment in time.

9         **A    (By Ms. Hushen) Uh-huh.**

10        Q    And this -- for purposes of this case, it would

11   be the date that the -- well, is this as of the order for

12   relief or as of the date of the involuntary, the

13   schedules?

14        **A    (By Ms. Hushen) These were as of the date of**

15   **the involuntary.**

16        Q    Okay.

17        **A    (By Ms. Hushen) But that is not the basis for**

18   **the change.  The basis for the change was we had**

19   **information received from our subcontractor.  And the**

20   **information from our subcontractor changed.**

21        Q    So the information as of the date of the

22   involuntary -- is that what you are saying -- is

23   different from what was here?

24        **A    (By Ms. Hushen) Right.**

25        Q    So can you tell me specifically on this

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 26 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    inventory list what will be changed?

2         **A      (By Ms. Hushen) These three that are**

3    **highlighted.**

4         Q      Okay.  So this is my highlights.  So this is

5    the --

6         **A      (By Ms. Hushen) The Golden Nonce ASICs, and the**

7    **work in process.**

8         Q      And then the wafers?

9         **A      (By Ms. Hushen) Yes.**

10        Q      All right.  So what's the difference then?

11        **A      (By Ms. Hushen) The ASICs are 16882.  The work**

12   **in process is 2850.  And the raw wafers, there is 92 raw**

13   **wafers, which makes 186 ASICs, which is 17151.**

14             MS. MCDOW:  I'm sorry, that's as of the date of

15             the schedules it has changed or as of now that -- I

16             don't understand what -- are you saying as of the

17             date the involuntary was filed, that was actually

18             the chips and wafers in existence then or are we

19             just distinguishing between then and now?

20             MS. HUSHEN:  It is the same number then as now

21             because nothing has happened with the chips since

22             the involuntary.  The data changed from our

23             subcontractor because there was work in process that

24             was already scheduled.  And we were using

25             information that was a couple of weeks old at the

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 27 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 17

1    time.

2         MS. GLOSSON:  Okay.  Hold on, hold on.  I am

3    not going to permit multiple questions.  So if a

4    creditor wants to -- or an attorney representing a

5    creditor wants to ask questions of the debtor, they

6    will be given an opportunity to do so.  We are not

7    going to have multiple parties asking questions at

8    the -- you know, sort of around the table.

9    BY MS. GLOSSON:

10       Q    So my understanding, based on your testimony,

11   Ms. Hushen, was that the figures that you just gave me

12   was as of the date of the involuntary; is that right?

13       **A    (By Ms. Hushen) Right.**

14       Q    Why so were there any -- when did the debtor

15   discover that the data that's in the schedule B needs to

16   be updated?

17       **A    (By Ms. Hushen) When we were working with our**

18   **partner, Uniquify, to reconcile the data.**

19       Q    What point in time was that?

20       **A    (By Ms. Hushen) Over the last couple of weeks.**

21   **I don't know the exact date.  I would have to verify.**

22       Q    Because the schedules were filed on June 23rd.

23       **A    (By Ms. Hushen) Yeah.  So it was after**

24   **June 23rd.  The week between June 23rd and today.**

25       Q    Okay.  So when -- do you anticipate any other

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 28 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 18

1    changes to be made to the inventory list?

2        A    **No, not that I am aware of.**

3        Q    All right.  And will an amendment by filed?

4             MS. MICKELSEN:  Yes, we do plan to file an

5        amendment.

6             MS. GLOSSON:  Okay.  And when is that going to

7        be done?

8             MS. MICKELSEN:  We were going to do it after

9        this meeting.  So if not this week, early next week.

10   BY MS. GLOSSON:

11       Q    All right.  So in addition to filing the

12   schedules of assets and liabilities, the debtor also

13   filed statement of financial affairs.  And this consists

14   of about 20 or so questions concerning certain financial

15   transactions that occurred prior to the filing.  And this

16   also contains an electronic signature.

17            Ms. Hushen, did you personally sign the

18   statement of financial affairs?

19       A    **(By Ms. Hushen) The same answer as previously.**

20   **I assume I did, yes.**

21       Q    Okay.  So I am going to need to find out.

22       A    **(By Ms. Hushen) Right.**

23       Q    You are going to need to --

24            MS. GLOSSON:  In fact, it might just be the

25        easiest way to resolve this if debtor's counsel

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 29 of
326
Electronically signed by Alison Presley (001-159-987-5451)                          92be47ea-a665-4c9d-be42-899f3e91c918

Page 19

1      provides me with a copy of the original wet

2      signature.

3             MS. MICKELSEN:  Okay.

4             MS. GLOSSON:  And then we can resolve that.

5  BY MS. GLOSSON:

6      Q    At the time that you signed the statement of

7  financial affairs, Ms. Hushen, was everything true and

8  correct?

9      **A    (By Ms. Hushen) Yes.**

10     Q    Do you know of any changes that need to be made

11 to the statement of financial affairs?

12     **A    (By Ms. Hushen) No.  Other than the caveat to**

13 **the inventory.**

14     Q    Okay.  That was to the schedules?

15     **A    (By Ms. Hushen) Right.**

16     Q    That's a separate document?

17     **A    (By Ms. Hushen) But that forms the basis for**

18 **the asset evaluation.  As well, what's in the financial**

19 **affairs.**

20     Q    Okay.  There -- can you tell me what on the

21 statement of financial affairs you anticipate needing to

22 be updated?

23     **A    (By Ms. Hushen) Let me just look and see where**

24 **it is, I'm sorry.**

25     Q    It's okay.

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 30 of
326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1      **A      (By Ms. Hushen) I don't have the inventory on**

2    **this one so I take it back.   It's not on this one.**

3      Q      "This one" meaning the statement of financial

4    affairs?

5      **A      (By Ms. Hushen) Yes.**

6      Q      Okay.

7             MS. GLOSSON:   All right.   Counsel, do you know

8         of any changes that need to be made to the statement

9         of financial affairs?

10            MS. MICKELSEN:   There actually are a couple

11        that we do plan to make.

12            MS. GLOSSON:   Okay.

13            MS. MICKELSEN:   And we are going to make these

14        amendments.   And we are still -- but we are still

15        verifying certain information with our client.   So I

16        am hesitant to say until we actually have something,

17        file our amendments.

18            MS. GLOSSON:   Well, the schedules have been

19        signed under penalty of perjury.

20            MS. MICKELSEN:   Uh-huh.

21            MS. GLOSSON:   So that's as if the debtor was

22        making these statements in a court of law.   And so

23        my concern is that I am and the rest of the

24        creditors are relying on this as if it were true and

25        correct.   So if there is something in here that

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 31 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1     might not be accurate, I think we need to know that

2     today.  Because I am going to be asking questions

3     about the accuracy of these documents.

4          MS. MICKELSEN:  Okay.  So there are two items

5     of which I believe that we are still confirming to

6     some extent.  And the first is the bonuses, a bonus

7     that Eduardo, I believe, received in Christmas of

8     last year.

9          MS. GLOSSON:  Okay.

10          MS. MICKELSEN:  And that Simon received

11    Christmas of last year.

12          MS. HUSHEN:  And the Bitcoin transactions.

13          MS. GLOSSON:  And then Bitcoin transactions?

14          MS. HUSHEN:  That was a Bitcoin transaction.

15          MS. GLOSSON:  Oh, those were -- the bonuses

16    were paid in Bitcoin?

17          MS. MICKELSEN:  Five each.

18          MS. HUSHEN:  Right.

19          MS. GLOSSON:  Okay.

20          MS. HUSHEN:  And the bonuses that are listed in

21    here were asking for dollar payments.  And so there

22    is a nuance as to where do you record the Bitcoin

23    payments.  And we provided that to you subsequently

24    through the Bitcoin transactions.

25

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 32 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 22

1   BY MS. GLOSSON:

2       Q    Okay.  Well, the payments that are shown to

3   Mr. deCastro and Mr. Barber on statement of financial

4   affairs number 3C disclose salary and expense

5   reimbursement.  Are you saying that these amounts do not

6   reflect the bonuses that were paid in Bitcoin?

7       **A    (By Ms. Hushen) They do not.**

8       Q    All right.  But it does say bonuses -- it does

9   identify a bonus for Mr. Barber.  So that would be a cash

10  bonus?

11      **A    (By Ms. Hushen) Right.**

12      Q    Is that what you are saying?

13      **A    (By Ms. Hushen) Right.**

14      Q    And what's the timing on the amendment with

15  respect to the statement of financial affairs?

16          MS. MICKELSEN:  We plan to emend everything all

17      at once.

18          MS. GLOSSON:  Okay.

19          MS. MICKELSEN:  That's why we wanted to have

20      all of our numbers verified though, before we filed

21      the amendments.  And the other one that we are still

22      verifying is, we believe, that Eduardo may have had

23      some car payments paid by the company up until the

24      beginning of this year.  But I am not clear on -- we

25      are still verifying when those were paid and when

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 33 of
326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1        those payments stopped.

2              MS. GLOSSON:  So payments on a car that he

3        personally owns; is that your understanding?

4              MS. MICKELSEN:  I -- well, that's something,

5        too, whether it is a business car, business-related

6        expense or personal.

7              MS. GLOSSON:  Because the debtor didn't

8        schedule any interest in vehicles.

9              MS. MICKELSEN:  Uh-huh, right.

10   BY MS. GLOSSON:

11        Q    Are there any vehicles owned by the debtor?

12        **A    (By Ms. Hushen) It was a rented vehicle that**

13   **the company was paying for a period of time.  And it is**

14   **no longer paying for it.**

15        Q    All right.

16        **A    (By Ms. Hushen) And I just didn't assume that**

17   **as a payment to Eduardo in terms of how it was asked.  It**

18   **was more of a business expense in terms of how the**

19   **company had paid it since it wasn't going directly to**

20   **him.**

21        Q    Okay.  So other than those changes that we just

22   identified to the statement of financial affairs and to

23   the schedules, do you believe that the schedules and the

24   statement of financial affairs are true and correct?

25        **A    (By Ms. Hushen) Yes.**

First Choice Reporting & Video Services
www.firstchoicereporting.com               Worldwide Scheduling               800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 34 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Q All right. And you have -- the debtor has identified all of its assets as of the date of the involuntary?

**A (By Ms. Hushen) Yes.**

Q Okay. So, Ms. Hushen, when did you come on board with the debtor?

**A (By Ms. Hushen) In April.**

Q Can you tell me, was there any specific date?

**A (By Ms. Hushen) April 7th, I believe.**

Q So what is -- as of the date of the involuntary, what is the debtor's business? And when I say "debtor," I mean Hashfast Technologies.

**A (By Ms. Hushen) As of the date of the involuntary, we were providing equipment to be used for Bitcoin mining. And we were selling both systems, raw components, and chips to be assembled into systems.**

Q Has the debtor's business changed since it was formed in 2013?

**A (By Ms. Hushen) Yes. In 2013, I think the primary focus was selling systems. As the company got into a pinch point in the January time frame, February time frame as it relates to cash, given that a lot of the inventory existed in chip format and we had other components, there were attempts to sell bundled parts, if you will, as opposed to producing systems.**

Electronically signed by Alison Presley (001-159-987-5451) 92be47ea-a665-4c9d-be42-899f3e91c918

Page 25

1    Q    Now, Mr. Barber, since Ms. Hushen wasn't with

2  the company in January 2014, do you agree with the

3  statements that she made with respect to the change in

4  the debtor's business?

5    **A    (By Mr. Barber) Yes.  We have made informal**

6  **offers of selling the chips earlier.  But we didn't have**

7  **a formal program listed publically.  But in general, yes.**

8    Q    Do you have anything to add other than what you

9  have already just said to what Ms. Hushen stated?

10   **A    (By Mr. Barber) No.**

11   Q    All right.  So when you say "pinch point," that

12 was the word that you used, what did you mean by that?

13   **A    (By Ms. Hushen) There was less cash than**

14 **desirable to fund ongoing production of systems and meet**

15 **payroll.**

16   Q    So what led to the debtor's cash shortage?

17   **A    (By Ms. Hushen) Delays in product development**

18 **and, therefore, the ability to ship product.**

19   Q    Okay.  So I --

20        MS. MICKELSEN:  May I actually --

21        MS. GLOSSON:  Yes.

22        MS. MICKELSEN:  And I just don't want to forget

23        this, for the record, the one last -- and I was

24        trying to wrack my brain for this last one.  The

25        last one we are going to amend is the lease that

Electronically signed by Alison Presley (001-159-987-5451)                                    92be47ea-a665-4c9d-be42-899f3e91c918

1       they have is not included on the executory

2       contracts, which I believe was a mistake.  And we

3       are going to amend to include the lease on the

4       executory contracts for the --

5           MS. GLOSSON:  And who has the lease, is it

6       Hashfast Technologies or Hashfast, LLC?

7           MS. MICKELSEN:  My understanding is it is

8       Hashfast Technologies.

9           MS. GLOSSON:  Okay.

10          MS. MICKELSEN:  Sorry.  That was the last one I

11      just wanted to say.

12          MS. HUSHEN:  Yeah.  The sublease is listed as

13      opposed to the original lease.  The sublease is our

14      actual contract.

15          MS. GLOSSON:  Okay, all right.  So I am going

16      to reserve the balance of my questions for after

17      creditors have asked questions.

18          So are there any creditors that wish to examine

19      the debtor?

20          Okay.  The committee and Mr. Gallo, anyone

21      else?  Mr. Kozachenko, do you wish to examine the

22      debtor as well?

23          MR. KOZACHENKO:  Yes.

24          MS. GLOSSON:  All right.  So who wants to go

25      first?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 37 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1    MS. MCDOW:  I have the majority of questions.

2    So I don't know whether the individual creditors --

3    I think --

4    MR. GALLO:  You should go first.

5    MS. MCDOW:  Okay.

6    MS. GLOSSON:  Okay.  So for purposes of making

7    sure that your questions, Ms. McDow, are picked up

8    on the record, I think I am going to ask you to

9    switch places with Mr. Kozachenko and then -- so

10   that the person who is asking the questions is

11   sitting right here.

12   MS. MCDOW:  Do you mind, just because I want to

13   confer both with the chair and our financial

14   adviser, can we all three maybe --

15   MR. GALLO:  Sure.

16   MS. GLOSSON:  Okay.  So I want to try to make

17   sure that we keep a handle on time.  So it's about

18   11:25 right now.  So about how many questions or how

19   much time do you think you need, Ms. McDow?

20   MS. MCDOW:  I'll probably need a half-an-hour

21   to 45 minutes.

22   MS. GLOSSON:  Let's try a half-an-hour.

23   MS. MCDOW:  Okay.

24   MS. GLOSSON:  And the reason I say that is

25   because we have two meetings.  And for two -- we

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 38 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1       have two cases that we need to conduct meetings in.

2       There is only a committee in the Technologies case.

3       Do you anticipate, Ms. McDow, asking any questions

4       on behalf of the committee in the LLC case?

5              MS. MCDOW:  Unfortunately, a lot of mine are

6       going to be crossovers; for example, transfers from

7       the Technologies to the LLC.  So I will try and -- I

8       don't have any specifically about the LLC case, I

9       don't think.

10             MS. GLOSSON:  Okay.

11             MS. MCDOW:  But there are going to be some

12      crossovers about transfers of money.

13             MS. GLOSSON:  I understand that.

14             MS. MCDOW:  Okay.  I will try to do it all in a

15      half-an-hour.

16                    EXAMINATION BY MS. MCDOW

17   BY MS. MCDOW:

18      Q    We were just talking a moment ago about, kind

19   of, you know, the pinch of money.  When did the company

20   first -- I think that is a question for Simon:  When did

21   the company --

22             MS. GLOSSON:  Can you speak up?

23             MS. MCDOW:  Yes, of course.

24   BY MS. MCDOW:

25      Q    When did the company first start to experience

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 39 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 29

1    financial difficulties?

2        A    (By Mr. Barber) It was in the -- maybe the

3    January, February time period.

4        Q    Of 2014?

5        A    (By Mr. Barber) Of 2014, yes.

6        Q    Okay.  So before January, February 2014, was

7    the company meeting all of its obligations as they came

8    due?

9        A    (By Mr. Barber) I would have to go and check

10   records.  See, in my role as chief technology officer, I

11   have been hats down on technology rather than business

12   functions.

13           (By Ms. Hushen) In general, the cash flow was

14   supported through the January, February time frame with

15   the orders that were flowing in.

16       Q    So what does that mean?  Just so I understand.

17       A    (By Ms. Hushen) The orders that were coming in

18   were funding operations.  And there was sufficient cash

19   on hand to fund the operation.

20       Q    Was there sufficient cash, for example, again,

21   before January, February, 2014?  For example, November

22   and December, if somebody had requested a refund, were

23   they always getting it before January and February 2014?

24       A    (By Mr. Barber) So I don't think customers were

25   entitled to refunds if they requested them in that period

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 40 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    of time.

2           **(By Ms. Hushen) They weren't entitled until**

3    **after December 31st, which was the guaranteed commit**

4    **date.**

5        Q    Okay.  So you are testifying that before

6    January and February of 2014, no customers -- there were

7    no customers that were entitled to refunds, whether in

8    Bitcoin or in dollars?

9        **A    (By Mr. Barber) I don't believe so.**

10       Q    So January, February of 2014, when you say you

11   first started to encounter financial difficulties, can

12   you explain what that means to you?

13       **A    (By Mr. Barber) So we incurred a significant**

14   **liability at the end of December when we missed our**

15   **guarantee shipment date for the batch one customers.  And**

16   **at that point in time, we issued a number of refunds.**

17       Q    Okay.  And what was the reason for missing the

18   guaranteed date?

19       **A    (By Mr. Barber) So we had issues with the**

20   **system board design, the event that it was not ready for**

21   **volume production.**

22       Q    Any other reasons?

23       **A    (By Mr. Barber) That's it.**

24       Q    And I know it hasn't been your testimony, but

25   it has been testified on behalf of the debtor that that

First Choice Reporting & Video Services
www.firstchoicereporting.com                    Worldwide Scheduling                    800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 41 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1   problem has been fixed.  Do you believe it has been

2   fixed?

3        **A    (By Mr. Barber) Yes.**

4        Q    Okay.  And in what way?

5        **A    (By Mr. Barber) So we -- in mid to late**

6   **January, we were producing boards in volume that met**

7   **specifications.  And we started shipping them in volume.**

8        Q    Did you bring on somebody new to do that or was

9   it just your existing staff?

10       **A    (By Mr. Barber) Existing staff.**

11       Q    Did your hire an outside consultant or anyone

12   to help you kind of figure out what the issue was with

13   the operations?

14       **A    (By Mr. Barber) No.**

15       Q    Okay.  We just talked before about possibly

16   amending the schedules to include, among other things,

17   the bonus you received in December.  What was the bonus

18   you received in December?

19       **A    (By Mr. Barber) I believe it was five Bitcoins.**

20            (By Ms. Hushen) Five Bitcoins.

21            (By Mr. Barber) Yes.

22            (By Ms. Hushen) Everybody in the company

23   **received a bonus to varying levels; five was the most,**

24   **some received three, some received one; based on tenure**

25   **and effort.**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 42 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      Q      What was the value of the Bitcoin when you

2   looked last; do you know?

3      **A      (By Ms. Hushen) About $740, I believe, 743 or**

4   **something in that range.  I would have to look at the**

5   **specific schedule.**

6      Q      In January or February of 2014, you referred to

7   significant liabilities being incurred.  What dollar

8   amount would you assign to that liability?

9      **A      (By Mr. Barber) I don't know how many -- it**

10  **would depend on how many customers requested a refund.**

11  **And I would have to go and look in the records.**

12     Q      Okay.  Can you give me a ballpark; is it

13  $10,000, half a million?

14     **A      (By Mr. Barber) I think Monica might be more**

15  **familiar with the records.**

16          **(By Ms. Hushen) Well, total refunds requested**

17  **were about 3 million.  And we had another 250K actually**

18  **refunded.  I don't know how many of those were in the**

19  **January time frame without looking at the records.  I**

20  **could pull that up, if that's important.**

21     Q      On the statement of financial affairs, it shows

22  that last year the company made 18 million, give or take.

23  What was the majority of those -- that income spent on?

24     **A      (By Ms. Hushen) Over 10 million of it was spent**

25  **on design and manufacturing with our subcontract**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 43 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1   manufacturers.  And then another couple million was on

2   inventory.

3        Q    So when you say design and manufacturing, does

4   that mean paying people to design it; what does that

5   mean?

6        A    (By Ms. Hushen) We had subcontract engineering

7   firms such as DXCore.  Uniquify was doing the design and

8   production of the chips.  DXCore was doing the design of

9   the future next generation chip.  Sandgate was doing

10  current boards and future boards; and Sierra was doing

11  assembly of boards into systems; Sonic; and there was

12  another vendor.  Sonic was doing the -- also board

13  assembly and test.

14       Q    So when you say "design and manufacturing,"

15  just so I understand in my head, is that just for

16  services rendered for different parts of the company?

17       A    (By Ms. Hushen) Yes.

18       Q    Okay.

19       A    (By Ms. Hushen) It is services rendered, you

20  know, as well as IP.  It is not all tangible product,

21  some of it is future product, future value.

22       Q    Okay.

23       A    (By Ms. Hushen) And in addition to that, there

24  is also a large chunk of money in that that related to

25  expedite fees.  Because of the problems in the production

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 44 of
326

Electronically signed by Alison Presley (001-159-987-5451)                                      92be47ea-a665-4c9d-be42-899f3e91c918

1   **and the fact that the product wasn't ready in time, there**

2   **was probably a half-a-million dollars spent just on**

3   **expedite fees to do rework, swap out parts, pull parts in**

4   **overnight express.**

5          **So, you know, some of it wasn't actual labor**

6   **and tangible value in the product.  It was to respond to**

7   **customer needs.**

8       Q    Who is -- when you just talked about the delay

9   and having to expedite, who is -- as best you can assess,

10  who was responsible for the delay?  Is it something the

11  debtor is responsible for or one of these independent

12  companies?

13      **A    (By Ms. Hushen) I think everybody had a part in**

14  **it.  All of the subcontractors, there were a number of**

15  **failures, and unfortunately, it was kind of a perfect**

16  **storm.**

17      Q    Does the debtor intend to pursue any of those

18  claims against those engineering firms to the extent they

19  think they are responsible for the delay?

20          MS. MICKELSEN:  Actually, I will answer that

21      question.  We are currently investigating these

22      claims, and we haven't made a decision at this

23      point.

24  BY MS. MCDOW:

25      Q    Of those engineering firms you just listed, are

1    any of the insiders of either of the debtors also

2    insiders, officers, directors of any of those engineering

3    firms?

4        A    (By Ms. Hushen) No.  Well, one exception, we

5    have an employee, Chad Spackman, who is the owner or

6    principal in Sandgate.  And the Sandgate employees work

7    through his direction and through him.

8        Q    What is Sandgate's relation to both of the two

9    debtors?

10       A    (By Ms. Hushen) Nothing.  It is -- they are a

11   subcontract.  They are Australian-based employees and

12   they are run through a contract organization because of

13   their own purposes.

14       Q    Are they creditors of both estates?

15       A    (By Ms. Hushen) Yes.

16       Q    So the $10 million to design and manufacturing,

17   what was the rest of the --

18       A    (By Ms. Hushen) It might be 10.8, thereabouts.

19   The rest was salary and expenses and legal fees, contract

20   fees.

21       Q    About how much in salary, give or take?

22       A    (By Ms. Hushen) Well, let's see, we are running

23   about 200K a month now, and we had 4X the staff.  So

24   maybe 800K a month, I am just guessing.  I would have to

25   go look at the details.  I don't have that in front of

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 46 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

**me.**

Q If so, that would put us closer to 19 million, which doesn't work. But I assume that not all of them were as high-level employees as those who are in place now. You said about 8 million, how much in salary total did you say -- oh, you think eight, that puts us over the amount.

**A (By Ms. Hushen) I don't know. I don't have it with me.**

MS. MICKELSEN: There were four times the amount of employees and of various levels.

BY MS. MCDOW:

Q It is your understanding though that they weren't paying payroll and operating at a loss; or is that true?

Because the numbers that we just put in, if we talked about 10.8 million going out for the benefit of design and manufacturing, even if we don't include operating expenses, whatever they were, if payroll really is 800K, the company ran at a deficit in 2013, just as a matter of payroll.

**A (By Ms. Hushen) The company was cash flow positive in 2013. On an income statement basis, it was at a loss, yes. It had no revenue because we didn't ship product until December.**

1    Q    Okay.  But you said, on a cash flow basis, it
2  was positive?
3    **A    (By Ms. Hushen) Yes.**
4    Q    Do you know how positive at the close of the
5  year in 2013?
6    **A    (By Ms. Hushen) No, I would need to look.**
7         MS. GLOSSON:  Can you speak up?
8         MS. MCDOW:  Sorry.
9  BY MS. MCDOW:
10    Q    Do you know how much cash flow positive?
11    **A    (By Ms. Hushen) No, I would have to look.  I**
12  **don't keep those in memory.**
13    Q    Do you, at the close of 2013 -- perhaps you
14  know this -- do you know what the company, what the cash
15  flow was at the end of the year, close of 2013?
16    **A    (By Mr. Barber) I don't.**
17    Q    Do we have --
18    **A    (By Ms. Hushen) the company was selling its**
19  **Bitcoins weekly, thereabouts, to cover cash flow.  So I**
20  **don't imagine we ever -- I don't recall a month where we**
21  **ever had substantial cash in the bank of more than a**
22  **million or two, just in going through the bank recs.**
23  **Maybe we did, but I don't recall it.**
24    Q    Also, on the statement of financial affairs,
25  you say that through May 9th, which, I believe is when

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 48 of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1    the TRO came in from LiquidBits, the income the company

2    has made, Hashfast Technologies is about 1.4 million.

3    What's the source of that income?

4         A    (By Ms. Hushen) **Revenue less expenses.**

5         Q    But the same -- can you put it up --

6         A    (By Ms. Hushen) **The system sales.**

7         Q    Okay.  So system sales, is any component of

8    that chip sales?

9         A    (By Ms. Hushen) **Well, the chips are in the**

10   **systems.**

11        Q    I understand.  But the chips, on their own

12   separately?

13        A    (By Ms. Hushen) **It was nominal.  It wasn't a**

14   **huge.**

15             (By Mr. Barber) **It had to have been some**

16   **small --**

17             (By Ms. Hushen) **Yeah, it was small volume of**

18   **chip sales.**

19        Q    And as of May 9th, what was -- was the company

20   operating at a cash plus or a cash negative as far as

21   cash flow?

22        A    (By Ms. Hushen) **The company was struggling to**

23   **make payroll.  And we deferred payroll, you know, a few**

24   **days to the officers of the company until we would get**

25   **cash in.  And we were hand to mouth.**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 49 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    Q    Okay.  And what was the reason for that?  And

2    it -- you may be the best -- whoever is best to answer:

3    What do you think the reason was?

4    **A    (By Ms. Hushen) The company had spent the cash**

5    **proceeds for the systems, and we had significant legal**

6    **claims underway, and we had significant legal bills that**

7    **had to be paid ahead of payroll because they were on**

8    **retainer.**

9    Q    What was your salary, Mr. Barber, as of January

10   1st, 2014?

11   **A    (By Ms. Hushen) Same as it is now.**

12   **(By Mr. Barber) No, right around then, I got a**

13   **raise.  And I don't remember whether the raise was just**

14   **before or right after that date.  So I can't tell you**

15   **exactly.**

16   Q    January -- after January 1st, you think

17   perhaps; what would the raise have been, whenever it was?

18   **A    (By Mr. Barber) So the raise was to an annual**

19   **salary of 220,000.**

20   Q    From where would it have started?

21   **A    (By Mr. Barber) Sorry, from --**

22   Q    I'm sorry.  What was the raise amount itself,

23   so from 200 to 220, from 220 to --

24   **A    (By Mr. Barber) No.  The raise was to 220.**

25   Q    From what?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 50 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 40

1      **A     (By Mr. Barber) From, I believe, it was 144.  I**

2   **would have to check.**

3      Q     144?

4      **A     (By Mr. Barber) Yeah.**

5      Q     So when the company started having increasing

6   liabilities, you increased your pay by 70 or $80,000,

7   what was the reason for that?

8            Let me back up.  Who was responsible at the

9   company for determining who gets salary increases and

10  why?

11     **A     So Eduardo and I were responsible.**

12     Q     Okay.

13           MR. KOZACHENKO:  Same question for Eduardo.

14           MS. GLOSSON:  Okay.

15  BY MS. MCDOW:

16     Q     So in your estimation, you testified the

17  company, January or February, unsure when your raise

18  was -- what was the reason for giving yourself nearly a

19  $100,000 raise when the company was experiencing

20  significant liabilities and couldn't then, either close

21  to or before your raise, could not meet its obligations

22  as they became due?

23     **A     (By Mr. Barber) So at that point in time, I had**

24  **a choice of either leaving the company or being paid a**

25  **more appropriate salary for the role.**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 51 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 41

1          **(By Ms. Hushen) It is an appropriate market**

2  **rate compared to Silicon Valley.  I have done numerous**

3  **external competitive executive salaries, and it is very**

4  **appropriate.**

5      Q    Perhaps for a company that's operating and

6  meeting --

7      **A    (By Ms. Hushen) Right.**

8      Q    -- its obligations?

9      **A    (By Ms. Hushen) Right.  I am just saying.  At**

10  **the time, it may have been appropriate.  It was prior to**

11  **the cash issues.**

12      Q    It may have been, but we don't know.

13          In any event, okay, so the salary is 144 to

14  220.  Did you -- any Bitcoin component to your salary

15  raise?

16      **A    (By Mr. Barber) The only Bitcoin that I have**

17  **ever received from the company was the Christmas bonus.**

18      Q    Okay.  What was Eduardo's pay, say January 1st,

19  what was his raise, from what to what?

20      **A    (By Ms. Hushen) He didn't have a raise.  He**

21  **went from -- he was always at 144.**

22      Q    And what's he at today?

23      **A    (By Ms. Hushen) 144.**

24      Q    But in a sales position?  When was the last

25  time Eduardo had a raise?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 52 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 42

1       **A    (By Ms. Hushen) He didn't.**

2       Q    Eduardo has never had a raise at the company?

3       **A    (By Mr. Barber) No.**

4       Q    What is the total amount in bonuses that

5    Eduardo has received?

6       **A    (By Ms. Hushen) I would have to look at the**

7    **disclosure schedule.  I don't remember what we reported.**

8    **It wasn't significant.  Less than 10K, I think.**

9          **(By Mr. Barber) I would have to look at the**

10    **records.  But there would be no large bonuses.**

11          MS. GLOSSON:  No what?

12          MR. BARBER:  No large bonuses.

13    BY MS. MCDOW:

14       Q    And that's in Bitcoin and cash?

15       **A    (By Ms. Hushen) Yeah.**

16       Q    Same?

17       **A    (By Ms. Hushen) Yeah.**

18       Q    Okay.  Who else at the time, January 2014, who

19    else received a raise?

20       **A    (By Ms. Hushen) In January, I don't know.**

21       Q    Anytime in the past, the year preceding, who

22    else received a raise?

23       **A    (By Ms. Hushen) A number of employees got**

24    **raises just prior to my arrival.  The week prior to my**

25    **arrival, a number of employees got raises.**

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 53 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    Q    Which employees were those?

2    **A    (By Ms. Hushen) Tim Wong, Cara Johns -- well,**

3    **essentially, Eldy, who is no longer with the company.**

4    Q    Eldy?

5    **A    Eldy Nodal.**

6         MS. GLOSSON:  Can you spell that?

7         MS. HUSHEN:  E-L-D-Y N-O-D-A-L, I believe.  I

8    don't recall if Amy Woodward got one, Marty Jackson

9    got one.  Did Shaun -- a number of the customer

10   service reps who are no longer with the company.

11   BY MS. MCDOW:

12   Q    Okay.  And what was the reason for those

13   raises?

14   **A    (By Mr. Barber) Retention.**

15   Q    Okay.  And what was the amount of those raises,

16   if you can estimate for each of them?

17   **A    (By Ms. Hushen) Tim went from 140K to 220.  The**

18   **customer service reps might have gone up five to 10K at a**

19   **base of 80 to 100.  I don't know exactly.  I would have**

20   **to go look at them all.**

21   Q    What is Tim's role there at the company?

22   **A    (By Ms. Hushen) He is chief -- he was chief**

23   **marketing officer.  Now he is VP of ops working with our**

24   **subcontract manufacturing partners.**

25   Q    Did Tim indicate to you at any time that he was

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 54 of 326

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1    going to leave if you didn't give him an $80,000 bonus?

2          **A     (By Mr. Barber) I don't recall him doing so,**

3    **no.**

4          Q     Okay.  So you and Eduardo decided, at a time

5    when publically you admitted that you were having cash

6    flow difficulties, and when you knew at that point that

7    certainly you couldn't meet all of the obligations as

8    they became due, you decided to give him an $80,000

9    raise?

10         **A     (By Mr. Barber) So at that point in time, we**

11   **had the chip sale program in place.  And we had a healthy**

12   **pipeline of prospects that we were expecting to close.**

13   **And so we had the anticipation of significant revenue**

14   **coming in.**

15         Q     But you knew there were customers and creditors

16   whose obligations you were not able to meet at that time?

17         **A     (By Mr. Barber) We believed that the pipeline**

18   **of chip sales would allow us to generate significant**

19   **incoming revenue.**

20         Q     I am asking a different question, sir.  I am

21   asking:  At the time that you increased the salary of

22   Mr. Wong, were you aware that there were creditors whose

23   obligations you could not meet currently.  Whether you

24   thought you could with some future act or otherwise, you

25   knew there were customers whose obligations you could not

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 55 of
326
Electronically signed by Alison Presley (001-159-987-5451)                      92be47ea-a665-4c9d-be42-899f3e91c918

1    meet?

2         A    (By Mr. Barber) Yes.

3         Q    So, having not any specific recollection that

4    Mr. Wong demanded an increase in $80,000 to stay with the

5    company, what was the basis upon which you decided it was

6    appropriate to pay him rather than to try to get as much

7    money as you could to your customers; what was your

8    reason?

9         A    (By Mr. Barber) At that -- so Tim was an

10   essential part of operations of the company at that time.

11   And we believed -- so he had previously, in his previous

12   job, been earning a significantly more salary than even

13   after we gave him the raise.  And we understood, not by

14   direct request, that we had a significant chance of

15   losing Tim if we didn't bring his salary somewhat closer

16   to what would be market rate for him.

17        Q    How long had Mr. Wong been making 140,000?

18        A    (By Mr. Barber) Since he started work.

19        Q    And when did he start?

20        A    (By Ms. Hushen) I believe it was December of

21   2013.

22        Q    Okay.  So --

23             MR. KOZACHENKO:  What date?

24             MS. HUSHEN:  I don't remember it off the top of

25        my head.

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          MS. GLOSSON:  Okay.  So just for the record,

2     that was Mr. Kozachenko who asked that question.

3     And I would just like to remind everybody that right

4     now it is Ms. McDow's opportunity to examine the

5     debtors, or the debtor, I should say.

6  BY MS. MCDOW:

7     Q    So he started in 2013.  Did you ever have any

8  thought to increase his pay between December and May if

9  you thought he was severely under market?

10    **A    (By Mr. Barber) So the -- did we have -- yes,**

11 **we did.**

12    Q    Okay.  And why didn't you?

13    **A    (By Mr. Barber) The pressure to do so was not**

14 **raised to the point that we considered that we would lose**

15 **him if we didn't do so.**

16    Q    Okay.  It says here that his current pay is

17 closer to 240.  Has he had an increase since the

18 petition?

19    **A    (By Ms. Hushen) It is 220.  He had a bonus of**

20 **10,000.  And the numbers that are reported there are**

21 **gross.  Those include employer benefits.**

22    Q    Okay.  So inclusive, his actual pay, if we take

23 into account associated benefits, it is closer to 240

24 rather than 220; is that fair?

25    **A    (By Mr. Barber) Monica would --**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 57 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1          **(By Ms. Hushen) Yeah, that's what's on the**

2  **schedule.**

3      Q     Okay.  Is that the same for you, Simon?

4      **A    (By Ms. Hushen) That includes medical benefits**

5  **and employer taxes, yes.  The actual salary is 220,**

6  **employee salary.**

7      Q     Simon, what's your equity stake in the company?

8      **A    (By Mr. Barber) I don't know the exact numbers.**

9  **But approximately a quarter of the units of Hashfast,**

10 **LLC.**

11     Q     Okay.  And Hashfast Technologies is 100 percent

12 owned by LLC, correct?

13     **A    (By Mr. Barber) Correct.**

14     Q     There is no separate equity stakeholders.

15          Okay.  So 25 percent of LLC, you said, I'm

16 sorry?

17     **A    (By Mr. Barber) Approximately.**

18     Q     Okay.  And when were you given that 25 percent?

19     **A    (By Mr. Barber) On the founding of the company.**

20     Q     Okay.  And when was LLC formed?

21     **A    (By Ms. Hushen) July, August of 2013.  I don't**

22 **know the exact date.**

23          **(By Mr. Barber) May or June, I think.**

24          **(By Ms. Hushen) Okay, May, yeah.**

25     Q     Who was responsible for the formation?

```
                                              Page 48
 1           MS. GLOSSON:  We are talking about Hashfast,
 2      LLC?
 3           MS. MCDOW:  Yeah.
 4           MS. GLOSSON:  I just want to make sure it is
 5      clear on the record.
 6           MS. MCDOW:  Sorry, I apologize.
 7           MR. BARBER:  The formation was done by our
 8      corporate counsel, Adam Ettinger.
 9  BY MS. MCDOW:
10      Q    Okay.  And what was the process for -- who went
11  to Adam and said, Please form this LLC:  Hashfast, LLC?
12      A    (By Mr. Barber) I don't recall.  It was either
13  myself or Eduardo.  I don't recall.
14      Q    Okay.  And what was the reason?
15      A    (By Ms. Hushen) Simon has 23.66 percent.
16      Q    23.66, is that what you --
17      A    (By Ms. Hushen) Yes.
18      Q    Okay.
19      A    (By Ms. Hushen) As does Eduardo.
20      Q    Okay.  While we are here, what's the rest of
21  the make up; it's long, right?
22      A    (By Ms. Hushen) Yeah.
23      Q    Okay.  Can I just have a couple that matter
24  while you have it out?  Tim Wong, what's his percentage
25  interest in Hashfast, LLC?
```

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 59 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      **A    (By Ms. Hushen) 1 percent.**

2      Q    For Wong?

3      **A    (By Ms. Hushen) Yes.**

4      Q    And what's yours?

5      **A    (By Ms. Hushen) Three.**

6      Q    3 percent?

7      **A    (By Ms. Hushen) Yes.**

8      Q    What about Joseph Russell (ph)?

9      **A    (By Ms. Hushen) .14.**

10     Q    Chad Spackman?

11     **A    (By Ms. Hushen) Chad is close to ten, 9.56.**

12     Q    Shaun Taffler?

13     **A    (By Ms. Hushen) .57.**

14     Q    Cara Johnson?

15     **A    (By Ms. Hushen) .1.**

16     Q    Is there anybody else on that list with a

17  percentage over 25 percent?

18     **A    (By Ms. Hushen) No.**

19     Q    Okay.  Any over the --

20     **A    (By Ms. Hushen) Actually, there was actually**

21  **21.5 percent, 22 percent.**

22     Q    You want to -- 22 percent, I think for Eduardo

23  and Simon, yes?

24     **A    (By Ms. Hushen) Yeah.**

25     Q    Anyone else over 15 percent that we haven't

First Choice Reporting & Video Services
www.firstchoicereporting.com                    Worldwide Scheduling                    800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 60 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 50

1    mentioned other than Simon and Eduardo?

2         **A    (By Ms. Hushen) No.**

3         Q    Okay.  Any more greater than 5 percent?

4         **A    (By Ms. Hushen) There was the original**

5    **investments, the Port Family Trust, the Wells Family**

6    **Trust, we got Adrian and John (inaudible), and that looks**

7    **like it.**

8         Q    Okay, thank you.  So to go back, what was

9    the --

10        **A    (By Ms. Hushen) Oh, no, nevermind.  It looked**

11   **like --**

12        Q    What was the reason that you and Eduardo

13   decided to form Hashfast, LLC in August 2013?

14        **A    (By Mr. Barber) To develop mining systems, to**

15   **develop themselves.**

16        Q    Why was it that Hashfast Technologies couldn't

17   do that?

18        **A    (By Ms. Hushen) What was the reason for the**

19   **structure between the LLC and the Technologies, basically**

20   **is what you are asking?**

21             **(By Mr. Barber) So at --**

22             **(By Ms. Hushen) Was it the intent really to**

23   **keep?**

24             MS. MCDOW:  I would like to hear his --

25             MS. GLOSSON:  I want to make sure we have one

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 61 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1       person speaking at a time.

2           MR. BARBER:  Adam Ettinger suggested the

3       structure of two companies.

4   BY MS. MCDOW:

5       Q    Two what, I'm sorry?

6       A    (By Mr. Barber) Adam Ettinger suggested the

7   structure with two companies.

8       Q    Okay.  And did -- without disclosing

9   attorney/client privilege, what was your reason for doing

10  it; not what your attorney advised, but did you

11  understand it would have better tax consequences, what

12  was your understanding of why it would be better to have

13  two companies doing two different things?

14      A    (By Mr. Barber) We followed our attorney's

15  advice.

16      Q    Okay.  What assets does Hashfast Technologies

17  hold -- Hashfast, LLC, I'm sorry, what are the assets?

18      A    (By Mr. Barber) So Hashfast, LLC holds the

19  intellectual property.

20      Q    Okay.  Has it held it since inception, since it

21  was formed?

22      A    (By Mr. Barber) Yes.

23           (By Ms. Hushen) Yes.

24      Q    Okay.  Was the IP put into place -- that come

25  into existence, I should say -- strike that.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 62 of
326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 52

1          What is the IP mask work, I mean, can you

2   describe just briefly what it is?

3       **A    (By Mr. Barber) So those mask works and there**

4   **are two provisional patent applications.**

5       Q    Okay.  And what are those?

6       **A    (By Mr. Barber) What's the -- do you have the**

7   **titles, Monica?**

8            **(By Ms. Hushen) Yeah.  But probably, they**

9   **wouldn't be meaningful.  One is the -- around the board**

10  **layout, right?**

11           **(By Mr. Barber) Yes.  So one is -- you know,**

12  **one is we filed a provisional application before**

13  **publishing our interface protocol guide as a precaution**

14  **in case we wanted to patent something inside that guide.**

15      Q    Okay.

16      **A    (By Mr. Barber) And the second one is titled**

17  **"stack chips."**

18      Q    Okay.  What does Hashfast, LLC do, what is its

19  business?

20      **A    (By Mr. Barber) It holds the IP.**

21      Q    Does it do anything else other than just hold

22  the IP?

23      **A    (By Mr. Barber) I don't believe so, no.**

24      Q    Okay.  What's your understanding of why that

25  company holds the IP and not Hashfast Technologies?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 63 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      **A     (By Mr. Barber) Our attorney advised us to set**

2  **up a structure.**

3      Q     Just to hold the IP?

4      **A     (By Mr. Barber) Yes.**

5      Q     Okay.  Who uses the IP, the Hashfast, LLC?

6      **A     (By Mr. Barber) Hashfast Technologies.**

7      Q     And what is the arrangement as far as how it

8  used, the IP?

9          MS. MICKELSEN:  Just one clarification on what

10         Hashfast, LLC does.  It does more than just hold the

11         IP.

12         MS. HUSHEN:  Yes.  It continues to develop and

13         augment the IP.  So all payments for design work

14         went through the LLC.

15  BY MS. MCDOW:

16     Q     Who are the credit --

17     **A     (By Ms. Hushen) Hashfast Technologies funded**

18  **the LLC and the LLC licensed that technology back to**

19  **Hashfast Technologies.  That was the legal structure.**

20     Q     Who are the current employees of Hashfast, LLC?

21     **A     (By Ms. Hushen) There are none.  It is the**

22  **contract employees that are paid through the LLC.**

23     Q     Wait, they are paid through -- Hashfast, LLC

24  actually cuts checks to --

25     **A     (By Ms. Hushen) To Sandgate, DXCore, and**

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

 1   **Uniquify.**

 2        Q    Okay.  And that's --

 3        **A    (By Ms. Hushen) Some.**

 4        Q    Is that for services provided to Hashfast

 5   Technologies?

 6        **A    (By Ms. Hushen) Well, to the LLC or**

 7   **Technologies.**

 8             MS. MICKELSEN:  For the intellectual property

 9        that's held on the LLC.

10             MS. HUSHEN:  Right.

11   BY MS. MCDOW:

12        Q    But the Sandgate -- is the only entity that

13   pays Sandgate -- all of those engineers that you talked

14   about that got paid 10.8 million out of the income to

15   Hashfast Technologies, do they provide services to both

16   Hashfast Technologies and Hashfast, LLC?

17        **A    (By Ms. Hushen) Well, just to clarify, it is**

18   **not just the engineers that got the 10.8 million.  Those**

19   **were our manufacturing partners as well, Sierra and other**

20   **providers.  And the engineers were a component of that.**

21   **And Sandgate was paid through the LLC for the most part,**

22   **as was DXCore.**

23        Q    But for services provided to both?

24        **A    (By Ms. Hushen) Yes.**

25        Q    Okay.  Does Hashfast, LLC -- what is the source

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 65 of
326
Electronically signed by Alison Presley (001-159-987-5451)              92be47ea-a665-4c9d-be42-899f3e91c918

Page 55

1  of revenue for Hashfast, LLC?

2     **A     (By Ms. Hushen) The source of revenue -- the**

3  **intent of the source of the revenue was licensing revenue**

4  **to Hashfast Technologies.  Hashfast Technologies, in**

5  **essence, paid for the IP by funding Hashfast, LLC.**

6     Q     Do you have an understanding that the assets of

7  Hashfast, LLC are separate and apart from anything that

8  might happen in this bankruptcy proceeding insulated from

9  the liabilities of Hashfast, LLC?

10         MS. MICKELSEN:  Can you please break up that

11      question a bit?

12  BY MS. MCDOW:

13     Q     Do you have any understanding whether the

14  assets -- so for example, the IP of Hashfast, LLC is

15  insulated, otherwise not liable for the debts or

16  liabilities of Hashfast Technologies, LLC?

17     **A     (By Mr. Barber) I don't know.**

18     Q     If a creditor of Hashfast Technologies, Inc.,

19  right now, if Pete Maurici (ph), for example, won his

20  lawsuit against Hashfast Technologies, Inc., is it your

21  understanding that he could pursue the assets of

22  Hashfast, LLC?

23     **A     (By Mr. Barber) I don't know.**

24     Q     Okay.  Who would know that?

25         MS. MICKELSEN:  These do appear to be legal

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 66 of
326

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 56

1       questions.

2               MS. MCDOW:  I am asking his understanding of

3       what creditors of his company could do.

4               MR. BARBER:  Yeah.  I would have to refer to

5       counsel.

6  BY MS. MCDOW:

7       Q    Okay.  So you don't have any understanding of

8  what -- the distinction between the assets and

9  liabilities of the two companies?

10      **A    (By Mr. Barber) I would have to refer to**

11 **counsel.**

12      Q    Okay.  Without disclosing attorney/client

13 communications, was there ever discussions about whether

14 or not the assets and liabilities would be separate when

15 you formed it in August of 2013?

16      **A    (By Mr. Barber) No.**

17      Q    There was never discussions about it?

18              MS. MICKELSEN:  I would imagine these would all

19      be attorney/client privileges.

20              MS. MCDOW:  The content of them would be, but

21      whether the discussions occurred would not be.

22              MS. HUSHEN:  So it wasn't in the business rule.

23      It was Eduardo, so just putting that out there.

24 BY MS. MCDOW:

25      Q    Would you have ever discussed with Eduardo the

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    distinction between the two companies and the differences

2    between the assets and liabilities of the independent

3    companies?

4         **A    (By Mr. Barber) Possibly.**

5         Q    Okay.  Do you have a recollection that you did?

6         **A    (By Mr. Barber) No.**

7         Q    Okay.  Is that because you are not concerned

8    about the IP, why wouldn't you have ever had those

9    discussions when you were forming a company of which you

10   are nearly a 25 percent shareholder?

11        **A    (By Mr. Barber) I mean, my focus has been on**

12   **developing the technology.  And I have left the business**

13   **side of things to Eduardo and working with counsel.**

14        Q    Okay.  What's your understanding of what the IP

15   is worth at Hashfast, LLC?

16        **A    (By Mr. Barber) So does the -- I think -- so**

17   **the three -- yeah, those --**

18             **(By Ms. Hushen) We went and had a formal**

19   **valuation done.**

20        Q    I just want his understanding.

21        **A    (By Mr. Barber) the IP, so does the mask work.**

22        Q    Okay.

23        **A    (By Mr. Barber) We have an idea, you know, we**

24   **have a list price in our price list for boards, what**

25   **wafers sell for today.  And from that, you could**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 68 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 58

1  **potentially assess -- you are -- producing more wafers**

2  **from that mask work would take two month's time.  So it**

3  **would be possible to make an assessment based on that of,**

4  **where, you know, what you think the wafers you produced**

5  **might be worth in two month's time, and then try and put**

6  **a value on that mask set.**

7       Q     Okay.  In your estimation, if we were to go out

8  on the open market today and sell that, whether to -- you

9  know, ideally to someone who has an interest in those

10 things, what would you get for it?

11           MS. MICKELSEN:  I just want to say:  Some of

12      these seem to be border on expert testimony, and he

13      is not qualified -- I understand this is just a

14      meeting of creditors, but I am just saying that some

15      of the questions are, in my opinion, outside of the

16      scope of his knowledge.  He can feel free to answer.

17      But I just want to make that clear.

18 BY MS. MCDOW:

19      Q     We are not going to bring you up, I don't

20 think, for any sort of expert testimony.  I just want to

21 understand.  It is a company you have a quarter interest

22 in, it is the only asset there.  What's your

23 understanding of what the mask works are worth?  If you

24 had to go out and sell to, again, preferably an

25 interested party and not to --

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 69 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1      **A     (By Mr. Barber) Yeah.  So in this Bitcoin**

2  **mining space, the value changes rapidly over time.  There**

3  **are newer, more efficient designs coming to market in the**

4  **next few months.**

5      Q    How about when you formed the company in

6  August 2013, what would have been the value of those mask

7  works in your estimation?

8      **A     (By Mr. Barber) So the mask works, when they**

9  **were created in -- they were completed at the end of**

10 **August or in -- yeah, at that point in time, they were**

11 **extremely valuable.**

12     Q    Can you just give me a ballpark?

13         MS. MICKELSEN:  This is only if it is within

14     your knowledge.

15         MR. BARBER:  Yeah, I mean -- I mean --

16 BY MS. MCDOW:

17     Q    I mean, if we were in a deposition, I would say

18 estimate, not guess.

19     **A     (By Mr. Barber) Yeah.**

20     Q    So just whatever ballpark you know having

21 experience in this area and having a pretty big stake in

22 it.

23         MS. MICKELSEN:  But it also has to be within

24     your knowledge.

25         MR. BARBER:  Yeah, I mean, one of our

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 70 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 60

1      competitors with not-as-good mask work design has

2      generated, I think, $80 million of revenue from such

3      a design.  And so, you know, I don't know how you

4      would estimate the exact value.  But it would have

5      significant value.

6  BY MS. MCDOW:

7      Q    Okay.  And do you think it still, even if not

8  $80 million today, still has pretty significant value?

9      **A    (By Mr. Barber) I am sure there is some**

10 **residual value.  But the Bitcoin market moves very, very**

11 **quickly.  And there is a high pressure to develop more**

12 **efficient designs.  So, also, assessing the value can be**

13 **very difficult because each customer has a different**

14 **situation in terms of operating costs and their personal**

15 **appraisal of the future income potential.  But the**

16 **expected returns would be much, much lower today than**

17 **they were in August of last year.**

18     Q    Okay.  And just really briefly, what would be

19 the cause and estimation for the decrease in value?

20     **A    (By Mr. Barber) The competition in the Bitcoin**

21 **market, Bitcoin mining market.**

22     Q    Okay.  And is that something -- excuse my, kind

23 of, ignorance in this regard -- is that something that,

24 presumably, you have people employed by Technologies, LLC

25 who are attempting to keep up with the competition, who

Electronically signed by Alison Presley (001-159-987-5451)                 92be47ea-a665-4c9d-be42-899f3e91c918

1 are attempting to keep making better products so that

2 they are the best?

3     **A     (By Mr. Barber) Yes.**

4     Q    What would -- what happened to this for -- this

5 mask works that made this piece so far -- or you didn't

6 say "so far," but far below the competitive market?

7     **A     (By Mr. Barber) Sorry, what made it?**

8     Q    Yeah.  What causes the decrease in -- what

9 happened that your product is now less competitive than

10 others on the market if you have people who are there,

11 kind of, you know, employed, presumably, to keep the

12 company in between the assets at the competitive edge?

13     **A     (By Mr. Barber) So we are probably equally**

14 **competitive to solutions that are out there right now.**

15 **But there are solutions coming that we expect to see**

16 **coming on the market over the next few months.  So it**

17 **would be significantly more efficient than our systems.**

18     Q    Is that something that, right now, we are --

19 although we are not paying it right now, but presumably

20 we are going to get to a place where we are paying it

21 again if that's what it entails; and since the petition,

22 we have been paying good chunks of money to people who, I

23 understand, are trying to keep the company at a

24 competitive edge in order to keep the value there for

25 creditors.  What do you think is going to happen if we

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 72 of 326

Electronically signed by Alison Presley (001-159-987-5451)     92be47ea-a665-4c9d-be42-899f3e91c918

Page 62

1  continue to pay these guys if it's going to keep us

2  behind the market for the next three months, in the next

3  three months?

4        **A     (By Mr. Barber) So we have new board design**

5  **where we have a working proof of concept.  And we have a**

6  **plan to complete a prototype and take it to production.**

7  **That will reduce the cost of the systems produced by more**

8  **than a factor or two.**

9        Q     Okay.  What is it -- what's your understanding

10  of what's going to be the real cause for the competitive

11  loss by Hashfast?  I am trying to understand.

12        **A     (By Mr. Barber) So then we have another effort.**

13  **So we started in August last year developing a next**

14  **generation chip that is more efficient than the current**

15  **chip.**

16        Q     Okay.  So it sounds like -- I guess I am

17  missing something.  It sounds like, at least, the company

18  is trying to do all of the right things.  So I am trying

19  to figure out why we think the value of the IP is going

20  to decline so rapidly, continue to decline rapidly in the

21  next few months.  I am missing the --

22        **A     (By Mr. Barber) So the value of everyone's IP**

23  **in this market declines.  And it requires continuous**

24  **innovation.**

25              **(By Ms. Hushen) Could I maybe add to that?  So**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 73 of
326

Electronically signed by Alison Presley (001-159-987-5451)        92be47ea-a665-4c9d-be42-899f3e91c918

1  the IP we currently have is a 28 nanometer wafer.  And

2  the new form factor going to 16 is where, you know, you

3  would get incremental competitive advantage that would

4  require significant development resources.  And we are

5  not anywhere near capitalized to do that.

6       So the IP that we are working on now is to

7  enhance the value of the current assets, the current

8  wafers that we hold to make sure they don't diminish in

9  value anymore than they currently are by virtue of the

10 market competition and the market difficulty.

11     Q    Okay.

12     A    (By Ms. Hushen) So we are not -- so there is

13 future technology development, and then there is kind of

14 maintaining the current stuff we already have and making

15 that as best as we can.  But we are not investing in the

16 future technology.

17     Q    And I assume the future are the two provisional

18 patents?

19     A    (By Ms. Hushen) No.

20          (By Mr. Barber) No.

21     Q    Okay.  Then tell me --

22     A    (By Ms. Hushen) Those are existing.

23     Q    Okay.  So is it the mask work?  I am just

24 trying to understand.

25     A    (By Ms. Hushen) Mask work is current

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1  **technology.**

2       Q    Okay.  So that's the one that we think we are

3  basically just treading water with, we are maintaining,

4  is the mask work?

5       **A    (By Mr. Barber) So it is a new system design,**

6  **which is related with the second patent.  We'll increase**

7  **the value of the mask works because it allows us to use**

8  **the current silicone, but build systems at less than half**

9  **the costs.**

10      Q    Okay.  And who at the company, maybe an average

11 employee, is responsible for that; who is working on

12 that?

13      **A    (By Mr. Barber) That work?**

14      Q    Uh-huh.

15      **A    (By Mr. Barber) Shaun, Nick, and Chad.**

16           MS. GLOSSON:  Ms. McDow, it is a little after

17      noon, and how much more time do you have?  You

18      started at about 11:25.

19           MS. MCDOW:  I still have quite a few questions,

20      honestly.  I can go -- I think we all want to get to

21      the sale, too, at least some components of the sale.

22           Probably another half-an-hour.  I still won't

23      be done, but I understand that there is other

24      creditors.  And we have 2004 exams that we can do.

25           MS. GLOSSON:  Right.

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 75 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 65

1          MS. MCDOW:  But I think a couple basic

2      questions about the remaining IP.  And I will move

3      on to some insider questions, and maybe the sale.

4      So maybe I will try to stick to ten minutes.

5          MS. GLOSSON:  Okay.  So let me pause this for a

6      moment then.

7          (Off the record.)

8          MS. GLOSSON:  All right.  We are back on the

9      record.

10         Go ahead, Ms. McDow.

11         MS. MCDOW:  Thank you.

12  BY MS. MCDOW:

13     Q    What do you think the value is as we sit here

14  today?  And I am just going to try to wrap this up.  I,

15  obviously, have a million more questions about it, but

16  what is the value of the IP today?  And again, not an

17  expert evaluation, but just your understanding of general

18  knowledge of the depreciation issues we talked about

19  that -- the competition.  What's the value now of all

20  three of them put together?

21     **A    (By Mr. Barber) All three of them put together,**

22  **there are some questions that -- it is hard to say.**

23  **There are some questions that may mean that some of it**

24  **could be very valuable or not have that much value.**

25     Q    Give me worst case.  Give me a range, worst

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 76 of
326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 66

1  case to best case, if you were to --

2      **A    (By Mr. Barber) Best case, the value could be,**

3  **you know, substantial, many millions.**

4      Q    "Many" like 5 million, 10 million, 30 million?

5      **A    10 million, 30 million.**

6          MS. MICKELSEN:  And are these presuming that

7      all conditions are completely ideal and the

8      environment, competitors don't have an advantage?

9          MR. BARBER:  Uh-huh, yeah.

10  BY MS. MCDOW:

11      Q    Yeah.  If we were to market it, let's say

12  again, in open market auction process, and, you know,

13  whoever wanted it the most got it at a price that was

14  fair, can you narrow it anymore between ten and

15  30 million?

16          Best case, okay.  Was that your range, ten to

17  30 or was that your range just for best case?

18      **A    (By Mr. Barber) That's my range for best case.**

19      Q    Okay.  What's your range for worst case?  Or

20  preferably, just your worst case, not the range.

21      **A    (By Mr. Barber) For worst case, could be zero.**

22      Q    Okay.  And why do you think it could be zero?

23      **A    (By Mr. Barber) Let's see.**

24          MR. GALLO:  Doesn't make --

25          MS. GLOSSON:  Okay.  We really only need one

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 77 of
326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

```
                                                    Page 67
```

1   person talking.  And if I have to remind somebody

2   again, then we are going to have to adjourn the

3   meeting.

4     MR. BARBER:  So it would depend on -- you know,

5   we don't know whether, for instance, the patents are

6   going to be issued.

7 BY MS. MCDOW:

8   Q  When did you apply for the patents, can I ask

9 you that, I'm sorry?

10   **A  (By Mr. Barber) So we haven't -- it's**

11 **provisional applications.  So they are not full patent**

12 **applications.**

13   Q  Okay.  And when were they filed?

14   **A  (By Mr. Barber) They were filed -- you would**

15 **have to check the records to get the exact dates.  But in**

16 **the September to December timeframe.**

17   Q  Okay.  And who was responsible for developing

18 the IP?

19   **A  (By Mr. Barber) I was.**

20   Q  You were?

21   **A  (By Mr. Barber) Yeah.**

22   Q  And were you ever paid by Hashfast, LLC?

23   **A  (By Mr. Barber) No.**

24   Q  Was --

25   **A  (By Mr. Barber) Oh, no, hang on.  I would have**

First Choice Reporting & Video Services
www.firstchoicereporting.com   Worldwide Scheduling   800.939.0093
Case: 14-30725  Doc# 148  Filed: 07/23/14  Entered: 07/23/14 19:01:10  Page 78 of
326
Electronically signed by Alison Presley (001-159-987-5451)       92be47ea-a665-4c9d-be42-899f3e91c918

1    to check that.

2            (By Ms. Hushen) I think in the early days

3    before the Silicon Valley bank accounts were set up,

4    there were some payments made out of bridge account,

5    which was owned by Hashfast, LLC.

6        Q    Okay.  So payments from --

7        A    (By Ms. Hushen) Salary.

8        Q    Okay.  So you were also receiving a salary from

9    LLC?

10       A    (By Mr. Barber) Yeah.  And the company did, as

11   well, pay for work that I have done preparing a Bitcoin

12   mining business plan in 2011.  So on formation, the

13   company covered some of the expenses I had incurred.

14       Q    Okay.  And what do you estimate that Hashfast,

15   LLC paid you in salary since August 2013, since it was

16   formed?

17       A    (By Ms. Hushen) I don't know.  I would have to

18   look, maybe a month or so of salary before the -- maybe a

19   month or so.

20            (By Mr. Barber) Yeah, I don't remember.

21       Q    You don't remember the amount you got?

22       A    (By Mr. Barber) Yeah.  It was the -- I don't

23   even remember if there was a salary payment out of --

24       Q    Okay.  Payment or salary otherwise, you don't

25   know whether you got paid from Hashfast, LLC?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 79 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    **A    (By Mr. Barber) I don't know.**

2    Q    Who would know?

3    **A    (By Mr. Barber) We would have to check the**

4    **records.**

5    Q    Did you file tax returns for 2013?

6    **A    (By Ms. Hushen) No, we extended them.**

7    Q    No, no.  You personally?

8    **A    (By Mr. Barber) Not yet.**

9    Q    Do you have an extension?

10    **A    (By Mr. Barber) Yes.**

11    Q    Okay.  Did you ever receive any transfers in

12    Bitcoin from Hashfast, LLC?

13    **A    (By Mr. Barber) No.**

14    Q    Any other compensation, assuming there was

15    some, from Hashfast, LLC other than the equity stake I

16    understand you have?

17    **A    (By Mr. Barber) Yeah.**

18    Q    Any distributions on equity or anything?

19    **A    (By Mr. Barber) Yeah, no distributions.  The --**

20    **so I don't remember exactly which entity it came from,**

21    **but the formation, as I said, I had incurred a number of**

22    **expenses prior to the existence of the company to develop**

23    **a business plan and to get quotes from vendors and to --**

24    **and I received compensation.  I received a reimbursement**

25    **against those expenses.**

Page 70

1     Q     From Hashfast, LLC or Hashfast Technologies?

2     **A     (By Mr. Barber) I don't recall.**

3     Q     Okay.  Who would be responsible for writing

4     checks from Hashfast, LLC?

5     **A     (By Mr. Barber) Back then or today?**

6     Q     Back then.

7     **A     (By Mr. Barber) Back then, both myself and**

8     **Eduardo were signers on the bank account.**

9     Q     But you were never formally employed by

10    Hashfast, LLC?

11    **A     (By Mr. Barber) No.**

12    Q     Do you have an employment agreement with

13    Hashfast Technologies?

14    **A     (By Mr. Barber) We have used offer letters**

15    **rather than formal employment agreements.  But I believe**

16    **they have a similar effect.  And yes, I believe Monica --**

17            **(By Ms. Hushen) Yes.**

18            **(By Mr. Barber) Yes.**

19    Q     Was it revised in any way after Hashfast, LLC

20    was formed?

21    **A     (By Mr. Barber) Hashfast, LLC was formed first.**

22    Q     Hashfast -- wait a minute, Hashfast, LLC was

23    August 2013, correct?

24    **A     (By Mr. Barber) So I think it was actually a**

25    **little earlier.  It was either May or June.**

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 71

1    Q    That Hashfast, LLC was formed?

2    **A    (By Mr. Barber) Yes.**

3    Q    Okay.  You said August before, but that's fine.

4  Whenever it was.

5         MS. MICKELSEN:  I think he had actually

6         corrected it and said it was either May or June when

7         Monica said August.  Must have mistaken.

8  BY MS. MCDOW:

9    Q    And how -- quickly, and then we will move on.

10  How does -- what is the relationship between the two

11  companies now?  Does Hashfast, LLC -- again, I am not

12  going to put words in your mouth, but does it have a

13  licensing agreement with Hashfast Technologies and

14  Hashfast Technologies pays money; what's the arrangement

15  between the two?

16    **A    (By Mr. Barber) I believe so.  I would need to**

17  **go and check with counsel.**

18    Q    And I'm sorry, I want to understand.  You

19  believe what does what?

20    **A    (By Mr. Barber) That Hashfast Technologies**

21  **licenses the technology from Hashfast, LLC.**

22    Q    Okay.  Do you know whether it is an exclusive

23  license?

24    **A    (By Mr. Barber) I don't know.**

25    Q    How much does Hashfast Technologies pay for the

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1   use of that license?

2       **A    (By Mr. Barber) I don't know.  Monica would**

3   **know what payments are made.**

4           **(By Ms. Hushen) Yeah.  I would have to look it**

5   **up.  Roughly 85K a month.**

6       Q    85K?

7           MS. GLOSSON:  Can you speak up?

8           MS. HUSHEN:  Roughly 85K a month for a number

9       of months.  I would have to go look it up exactly.

10      Six months or so.

11  BY MS. MCDOW:

12      Q    Who negotiated the licensing agreement between

13  the two entities?  Not on a counsel level, on a business

14  level?

15      **A    (By Mr. Barber) I imagine it was between**

16  **Eduardo and our counsel, Adam.**

17      Q    You didn't play any part in negotiating the

18  licensing agreement between the two entities?

19      **A    (By Mr. Barber) No.**

20      Q    Is there any other agreement, to your

21  knowledge, between the two entities other than the

22  licensing agreement?

23      **A    (By Mr. Barber) Not that I know of personally.**

24  **But there might be.**

25          **(By Ms. Hushen) The operating agreement.**

First Choice Reporting & Video Services
www.firstchoicereporting.com              Worldwide Scheduling              800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 83 of
326
Electronically signed by Alison Presley (001-159-987-5451)              92be47ea-a665-4c9d-be42-899f3e91c918

1          **(By Mr. Barber) Oh, the operating agreement?**

2          **(By Ms. Hushen) That's between Hashfast**

3   **Technologies and Hashfast, LLC.**

4          **(By Mr. Barber) I'm sorry, the Technologies**

5   **operating agreement?**

6      Q    Because it is the parent, I think?

7          MS. MICKELSEN:  Formation documents, I would

8      imagine.

9          MS. HUSHEN:  Right.  Hashfast, LLC was May of

10     2013.

11  BY MS. MCDOW:

12     Q    Do Hashfast Technologies and Hashfast, LLC

13  maintain the same business address?

14     **A    (By Mr. Barber) I believe.  I would have to**

15  **check.  But I believe that Hashfast, LLC operates from a**

16  **Delaware agent's address.**

17     Q    But where does it do its business?  I only ask

18  because there is a lot of cost over employees.  So is it

19  safe to assume that they operate whatever it is they're

20  doing, developing the IP to make it better in the same

21  place; or is there actually people working in Delaware

22  other than just the agent for service and process and

23  formation?

24     **A    (By Mr. Barber) So there are no employees of**

25  **Hashfast, LLC.**

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      Q    Right.

2      **A    (By Mr. Barber) Any work done is done by**

3  **subcontractors.**

4      Q    Okay.  But is it done here -- does that make

5  sense -- or is it done in Delaware; do you have

6  subcontractors who are currently in Delaware performing

7  services for the company?

8      **A    (By Mr. Barber) Where are the subcontractors**

9  **located?**

10     Q    Right.

11     **A    (By Mr. Barber) So the primary subcontractor of**

12  **Hashfast, LLC is DXCore.  And their head office in**

13  **Sunnyvale.**

14     Q    Okay.

15     **A    (By Ms. Hushen) And Sandgate.**

16          **(By Mr. Barber) So I believe -- I don't -- the**

17  **Sandgate agreement, yes, is with Hashfast, LLC, yeah.**

18     Q    How much has the company made in the last two

19  months, Hashfast Technologies, Inc.'s gross revenue?

20     **A    (By Mr. Barber) That would be a question for**

21  **Monica.**

22          **(By Ms. Hushen) 350K or so.**

23     Q    350?

24     **A    (By Ms. Hushen) I would have to look.  I know**

25  **that was requested.  I just got the notice this morning.**

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 85 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 75

1  **I haven't looked at the current weeks, current couple**

2  **weeks.**

3      Q    So you think since the beginning of -- let's

4  say since May 9th, since the TRO, you think the company,

5  give or take, has brought in 350K?

6      **A    (By Ms. Hushen) No.  It has probably been a**

7  **little more than that.  We have covered expenses.  I**

8  **would have to look it up.**

9      Q    By "expenses," do you mean payroll?

10      **A    (By Ms. Hushen) Yeah.  Payroll and other**

11  **expenses.**

12      Q    What other expenses would you be referring to?

13      **A    (By Ms. Hushen) We have some subcontract**

14  **payments, contractors, manufacturing payments for sales.**

15      Q    Okay.  It says here that you prepaid the lease

16  where the company is?

17      **A    (By Ms. Hushen) Uh-huh.**

18      Q    When was it prepaid?

19      **A    (By Ms. Hushen) When the lease was signed.**

20      Q    When was the lease signed?

21      **A    (By Mr. Barber) November of last year.  Might**

22  **have been the end of October.**

23      Q    And it says here it is a five month prepayment?

24      **A    (By Ms. Hushen) Yeah.**

25      Q    How much was the prepayment?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 86 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      **A     (By Mr. Barber) Do you know, Monica?**

2            **(By Ms. Hushen) There is about 7,800 left,**

3      **roughly.**

4      Q     What was the amount of the payment made?

5      **A     (By Mr. Barber) I don't recall the exact**

6      **amount.  But it was somewhere around $60,000.**

7      Q     So what's the monthly rent, 10,000, give or

8      take?

9      **A     (By Mr. Barber) Eleven, something like that.**

10     Q     Why did you prepay?

11     **A     (By Mr. Barber) So the location was offered at**

12     **about half market rate, but they required a prepayment to**

13     **accept us.**

14     Q     Okay.

15     **A     (By Ms. Hushen) It was 58K was the prepayment.**

16     Q     58K?

17     **A     (By Ms. Hushen) Uh-huh.**

18     Q     So that expires soon, correct?

19     **A     (By Mr. Barber) I think the lease expires --**

20           **(By Ms. Hushen) End of September.**

21           **(By Mr. Barber) Yeah, the end of September.**

22     Q     Well, here it says it was prepaid five months.

23     So are you now paying rent?

24     **A     (By Mr. Barber) No.**

25           **(By Ms. Hushen) No.**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 87 of
326

Electronically signed by Alison Presley (001-159-987-5451)        92be47ea-a665-4c9d-be42-899f3e91c918

Page 77

1     Q     Okay.  I am not the brightest when it comes to

2   math, but it seems November plus five is earlier than

3   July.  Or am I missing something?

4     **A     (By Mr. Barber) Okay.  So we paid rent.  The**

5   **prepayment was held as a deposit.**

6     Q     Okay.

7     **A     (By Mr. Barber) And we pay rent until last**

8   **month or the month before.**

9         **(By Ms. Hushen) It was April or May.**

10        **(By Mr. Barber) And so now we are working**

11  **through the amount that was prepaid.**

12    Q     Who is your lessor?

13    **A     (By Mr. Barber) Something --**

14        **(By Ms. Hushen) SF Casa.**

15    Q     Any connection that you have to SF Casa?

16    **A     (By Mr. Barber) No.**

17    Q     So you prepaid the rent.  Did you have any

18  agreement ahead of time that you would pay rent until a

19  period of time, and then you would start to apply the

20  security deposit?

21    **A     (By Mr. Barber) At the end of the -- I**

22  **believe --**

23        **(By Ms. Hushen) Yeah, it is a sublease**

24  **agreement.**

25        **(By Mr. Barber) Monica would know the details.**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 88 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1       Q    It is a sublease, so who is the actual -- is SF

2    Casa the original lessor?

3       **A    (By Ms. Hushen) They are the lessor.  And they**

4    **are leasing from 100 Bush Street Corporation.**

5       Q    Okay.

6       **A    (By Ms. Hushen) Which is the address that we**

7    **are at.**

8       Q    In addition to that deposit, is there an

9    additional security deposit held?

10      **A    (By Mr. Barber) I don't know.**

11           **(By Ms. Hushen) 7,774.**

12      Q    7,774?

13      **A    (By Ms. Hushen) Uh-huh.**

14      Q    And when does that lease expire?

15      **A    (By Ms. Hushen) At the end of September.**

16           **(By Mr. Barber) The end of the September.**

17           MS. GLOSSON:  Can we move on to the sale?

18           MS. MCDOW:  Yeah, we sure can.

19           MS. GLOSSON:  And then I am going to -- we will

20       give another creditor an opportunity.

21    BY MS. MCDOW:

22      Q    I don't know how much of this we want.  I am

23    going to, kind of, respect how much of this is public, so

24    to speak, because I don't know the extent.  It is going

25    to be the subject of a sale motion, so presumably, it

Page 79

1   will all be out there soon.

2           With respect to -- there was a current offer, I

3   think we all know it, from LiquidBits to purchase the

4   company or substantially all of the assets.  Did you help

5   negotiate that deal?

6       **A     (By Mr. Barber) I provided support to Monica,**

7   **yes.**

8       Q   Okay.  As part of that deal, the IP is being

9   sold, correct?

10      **A     (By Mr. Barber) Huh, Monica?**

11          **(By Ms. Hushen) Yes, the current IP.**

12      Q   Okay.  Did you perform any formal valuations of

13  the company or are you aware of any that have been

14  performed, have been conducted?  I mean of the company,

15  of the components; has there been a formal appraisal done

16  of the IP, of the inventory on hand that you are aware

17  of?

18      **A     (By Mr. Barber) No.**

19      Q   Do you know what the proposed pricing structure

20  is of the deal?

21      **A     (By Mr. Barber) So Monica has been taking a**

22  **lead on negotiating that deal.  So I have provided**

23  **support, but these questions are probably best directed**

24  **at Monica.**

25      Q   Okay.  So if we can, just briefly, because I

First Choice Reporting & Video Services
www.firstchoicereporting.com            Worldwide Scheduling            800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 90 of
326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1  don't know how many people in the room have had the

2  benefit of seeing it, I know most of them, but certainly,

3  probably not the new creditors or the old creditors who

4  are new to the party, if -- right now, is it fair to say

5  the components are twofold, one is a $3 million

6  promissory note of sorts with a component that there is a

7  return to creditors based on the amount of profits

8  generated; is that a fair component of one?

9        **A      (By Ms. Hushen) Yeah.  Essentially, the**

10 **structure is that in exchange for the acquisition of**

11 **assets, the buyer would invest the ten to 12 million**

12 **necessary to build out the boards, turn them into act of**

13 **viable mining systems.  And based on that, the creditor**

14 **is guaranteed a $6 million return, secured return.**

15           **And LiquidBits, in return, released their claim**

16 **on the estate of 5.3 million.  So it has got roughly an**

17 **11 million, $11-and-a-half million dollar value to the**

18 **estate.**

19       Q    Is that based on the estimation that all

20 general unsecured claims are going to get paid 100 cents

21 on the dollar?

22       **A      (By Ms. Hushen) No.  I am looking at the**

23 **liabilities of 15 million less 5 million of LiquidBits,**

24 **gets you about ten.  And their deal returns six, at**

25 **minimum.  If we hold the Bitcoin for the benefit of the**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 91 of
326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 81

1   creditors, the range is anywhere from six to 20 depending
2   on the assumptions that you make as to Bitcoin price and
3   market difficulty level.  And those are -- we have run 20
4   different scenarios of the bottom end of six, the upper
5   end is 20-plus.
6        Q    When you say a guarantee $6 million minimum to
7   the estate, can you explain?  Because that's not my
8   understanding of the offer at all.
9        A    (By Ms. Hushen) It is a secured note.  And at
10  the point in time that payments -- if there becomes a
11  point in time that the mine does not deliver the income
12  to the creditors, then all of the equipment returns to
13  the estate.
14       Q    So you --
15       A    (By Ms. Hushen) So it has essentially been
16  funded and built out.  Our reasoning for doing that is we
17  have a customer who has substantially lower cost of
18  power.  And so we could get future value to the creditors
19  through that.
20       Q    Okay.  But in that scenario, just certainly for
21  the benefit of the other creditors, the guarantee -- for
22  example, in that scenario, if we go through with the
23  deal, they get it, and they are not able to generate any
24  profit, they turn over the equipment, and we can only
25  sell it for $200,000, there is no guarantee of

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 92 of
326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 82

1    $3 million.  The guarantee is we get all of the stuff

2    back that wasn't producing the money?

3        A    (By Ms. Hushen) You get all of the equipment

4    back that isn't selling in the market today, yes.

5            So relative to a liquidation scenario, it

6    certainly has a much more positive outcome than having

7    inventory sit there and not collecting any income.

8    Putting it into a mining operation delivers substantially

9    more value to the creditors.

10           There is also an additional 8,000 chips that

11   are not turned over as part of the deal that remain in

12   Hashfast's estate that we have two other negotiations

13   underway on that will deliver more value to the

14   creditors.  And then future IP, if that is sold or

15   developed, remains in the estate.  Then would be

16   potentially more value elsewhere.

17       Q    Okay.  So just so I understand, what do you

18   think, if we, today, went out and liquidated it either on

19   the price list that we gave or something close, we

20   liquidated all of the inventory today, what would be the

21   amount we will get?

22       A    (By Ms. Hushen) We are estimating market values

23   somewhere between seven-and-a-half million and nine

24   depending on the price.

25       Q    For just the chips today?

First Choice Reporting & Video Services
www.firstchoicereporting.com            Worldwide Scheduling            800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 93 of
326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 83

1    **A    (By Ms. Hushen) For all of the inventory,**
2    **including all of the physical assets, not counting the IP**
3    **value.**
4         **(By Mr. Barber) You would have to find buyers.**
5         **(By Ms. Hushen) You would have to find buyers.**
6    **And you would also have to pay at least a million in cure**
7    **claims to realize that value.**
8    Q    Okay.  So I must be the most dense human on the
9    planet.  If today we could sell the inventory, finding
10   willing buyers, which is seems like we could do, that's
11   9 million exclusive of avoidance actions and exclusive of
12   IP.  And the deal on the table is for 6 million,
13   3 million of which is not guaranteed and 3 million of
14   which is of promissory note.
15        In your estimation, why is it a better deal to
16   go forward with this sale?
17   **A    (By Ms. Hushen) Well, we haven't been able**
18   **to -- we haven't been allowed to sell for the last month.**
19   **And so the value in our product is diminishing rapidly.**
20   **And it is hard to find buyers today for the inventory.**
21   **Nobody else has stepped up to the table.  It has been on**
22   **the market for two months.  We have been out --**
23   Q    What does that mean, "been on the market;" what
24   does that mean?
25   **A    (By Ms. Hushen) We have been out talking to**

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 84

1   competitors.  We have met with all of our key

2   competitors.  We have met with a number of

3   inter-capitalists.  We have met with banks; we have met

4   with financing agents, eight of them.  We have met with a

5   number of people in the market.  And we haven't had

6   anybody express interest beyond LiquidBits.  So if

7   anybody else is willing to step up to the table --

8           (By Mr. Barber) Well, we do have a sales --

9           (By Ms. Hushen) Major interest.  We don't have

10  anything major in terms of a major deal, nothing in

11  writing or term sheet from anybody other than LiquidBits.

12  And if anybody else has a proposal that creates greater

13  value, we would love to see it, and we are more than

14  welcome to consider it.

15          We felt it was our duty to put a proposal

16  together that would benefit the creditors.  And we worked

17  earnestly to do that.

18      Q   I am still having a hard time, again, just work

19  with me.  The IP, although we don't have a formal

20  valuation of it, what component, value component of

21  that -- of the 6 million, again, 3 million is -- although

22  I appreciate your comment on guaranteed, it really is:

23  A, if LiquidBits does it, they don't do a very good job,

24  we get all the crap back; and whatever we get at the end

25  of that period is what we get.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 95 of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          And the other 3 million component is of

2    preferred equity, correct?  And you say the other

3    component just for the benefit of --

4        **A    (By Ms. Hushen) Right.  Which is a percentage**

5    **of gross mining proceeds that would come back to**

6    **creditors.**

7        Q    Okay.  So again, if we assume that LiquidBits

8    can't do what we all hope they can do if this sale goes

9    through -- and keeping in mind that LiquidBits,

10   unfortunately, doesn't have a fiduciary duty to any of

11   the creditors of this estate --

12       **A    (By Ms. Hushen) Uh-huh.**

13       Q    -- to maximize value, what security should the

14   creditors have that there is going to be a significant

15   distribution on equity, and that it is going to be a

16   successful operation, there is going to be $3 million or

17   anywhere close for a return?

18       **A    (By Ms. Hushen) I don't understand your**

19   **question.  What?**

20       Q    Has there been due diligence done on the

21   ability of LiquidBits to perform under this deal?

22       **A    (By Ms. Hushen) There has been some.  This is a**

23   **term sheet that's part of the due diligence that**

24   **continues once you reach agreement on a term sheet.**

25            **We have asked for verification of their**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 96 of
326

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1    **financial wherewithal.  We understand the resources that**

2    **they would be absorbing to build out the boards.  So I**

3    **know the current resources and resource requirements.**

4    **And I have verification of their operational resource**

5    **requirements.**

6         Q    Okay.  But I think I want to go a little

7    bigger, which is:  What's your comfort, if you have any,

8    that they are going to be able to perform such that

9    anywhere close to 6 million will be returned to the

10   estate?

11        What are you counting on with LiquidBits as far

12   as, again, this sort of deal which is contingent on,

13   essentially, LiquidBits doing well?  Because again, if

14   they don't do well, two things happen:  One, they turn

15   over all the equipment again and all of the avoidance

16   actions are gone, all of the IP, you know, the IP comes

17   back, and whatever it is -- and we get to do whatever it

18   is with it.  And if they don't do well, we don't get a

19   dime on the profits for the preferred equity side.

20        **A    (By Mr. Barber) I think we probably want to**

21   **discuss some of this under sale.**

22        Q    Well, to the extent that it's going to be a

23   sale motion that's going to be put on emergency notice, I

24   want to understand what the company has done in order to

25   ensure the creditors that this is a good deal because

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 87

1    LiquidBits will be able to perform.  I don't want

2    specific -- I mean, what --

3         **A    (By Ms. Hushen) That's diligence that needs to**

4    **be completed.  That's part of the diligence part of the**

5    **deal.**

6         Q    Has the offer been accepted?

7         **A    (By Ms. Hushen) The offer is a term sheet.**

8         Q    Okay.  But it is ready to be put in front of

9    the Court?

10        **A    (By Ms. Hushen) Yes.**

11        Q    Okay.  So it is a deal that the debtor now

12   feels it is safe to say -- you said in the best interest

13   of creditors better than anything else out there?

14        **A    (By Ms. Hushen) Right.**

15             **(By Mr. Barber) At the moment.**

16        Q    So what have you done in order to ensure, to

17   the best you can, that LiquidBits will be able to perform

18   under this contract?

19        **A    (By Ms. Hushen) I haven't had those dialect**

20   **specifically.  We have talked about the operational**

21   **performance requirements.**

22        Q    When do you plan to do those due diligence

23   requirements?

24        **A    (By Ms. Hushen) At the point in time that we**

25   **are authorized to move forward with having the diligence**

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 98 of
326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 88

1    discussions.

2         Q    What are we waiting for in that regard?

3         A    (By Ms. Hushen) Well, we don't currently have a

4    budget approved, we don't currently have sales approved,

5    and we don't have a motion in front of the Court yet to

6    go forward with the deal.  So we aren't doing anything

7    with it at this point in time.

8         Q    Just so -- I mean, generally, before a deal is

9    brought to the Court and the debtor says this is the best

10   deal we have, just like you have represented, they have

11   an understanding of why it is in the best interest of

12   creditors to propose.  So I am struggling with, in your

13   estimation, why you think this is the best deal there is.

14   Because it hinges entirely on LiquidBits being able to

15   perform and return money to the estate.  And I am just

16   trying to figure out why you think --

17        A    (By Ms. Hushen) We have high confidence in the

18   board production requirements.  I have done the build

19   plans.  I know how many boards we can deploy.  Once they

20   are deployed and up and running, we have been through

21   numerous test cycles, and we know what the current

22   performance of the boards is.  We have evidence of that.

23   We have evidence of the resources that are available to

24   deploy those to the operating mine.

25             And after they begin mining, it is a matter of

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 99 of
326

Electronically signed by Alison Presley (001-159-987-5451)                                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 89

1    **network difficulty and Bitcoin price that generates the**

2    **mining returns, largely.**

3         Q    Okay.  Again, I am just --

4              MS. MICKELSEN:  A lot of these due diligence

5         questions, also, I think can be handled with the

6         2004 exam.  And more detail could be provided with

7         document productions and other things.  And the

8         understanding is that you are going to do that.  So

9         maybe -- unless there is a more important question

10        that maybe they can answer, we can handle that

11        afterwards.

12   BY MS. MCDOW:

13        Q    What other -- you said there have been other

14   deals, none have been as good in your estimation.  What

15   about liquidating the inventory, for example, and just

16   getting seven-and-a-half to 9 million, putting the IP up

17   on the block for, you know, the chopping block for sale

18   in the open market?

19             What has made you decide that selling it to

20   LiquidBits is better than, perhaps, selling it as

21   components or doing some other --

22        **A    (By Ms. Hushen) All of the liquidators we**

23   **talked to wanted anywhere from 18 to 20 percent off the**

24   **top, which didn't seem to make a lot of sense.**

25        Q    Okay.  For example --

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1      A     (By Ms. Hushen) And the IP value, we have

2   various reads on that -- I think Simon's estimates are

3   high, in my financial opinion.  I think they are very

4   high with the current IP.  I think we would be lucky to

5   get a million for it.

6            (By Mr. Barber) Yeah.  It --

7            (By Ms. Hushen) And there is bills owed to be

8   paid that offset the value.

9      Q     But we haven't gotten an appraisal or put it to

10  market at all, the IP, specifically?

11     A     (By Ms. Hushen) Not yet.

12           (By Mr. Barber) So there is one thing which

13  I -- just for -- to clarify, there is one asset which

14  is -- which I am not calling IP, which is our next

15  generation chip design.  And that comes through a

16  contract we have with DXCore.  And the other is a

17  generation chip design that is very close to completion.

18  So I talked -- I went to a Bitcoin conference in June.

19           (By Ms. Hushen) May or early June.

20           (By Mr. Barber) End of May, where I met with

21  all of our competitors.  And I offered them all of the

22  various pieces of IP to see if there would be interest

23  from any of them.  I got one expression of interest in

24  this next generation chip design.  But that company would

25  only be able to offer stock and not cash to take it.

First Choice Reporting & Video Services
www.firstchoicereporting.com         Worldwide Scheduling         800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 101
of 326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 91

1        Q      Thank you.

2        **A      (By Mr. Barber) And that next generation design**

3    **has also some complication as to how it is held due to**

4    **the way the contracts were organized.**

5        Q      Why has there not been a formal appraisal done

6    of the IP before it is put to market or a marketing

7    process?  Because as I understand it, there is going to

8    be no overbid procedure with the current sale.  There is

9    going to be no room for overbid.

10       **A      (By Ms. Hushen) I don't understand that that**

11   **way.**

12             MS. MICKELSEN:  Well, one thing, appraisals

13        cost money, and there are limited funds.

14   BY MS. MCDOW:

15       Q      All right.  Why has there not been a formal

16   appraisal done, assuming we were to --

17       **A      (By Ms. Hushen) I think that answer is**

18   **primarily it.  Plus, we have been out talking to people**

19   **for two months.  And there has been little to no interest**

20   **expressed.**

21       Q      Okay.  That's a different --

22             MS. GLOSSON:  Ms. McDow, we really --

23             MS. HUSHEN:  That is the answer.

24             MS. GLOSSON:  -- need to wrap it up.

25

Electronically signed by Alison Presley (001-159-987-5451)                                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 92

1  BY MS. MCDOW:

2      Q    Okay.  Last question about the sale process, I

3  guess:  Have you done, since you have been in place, an

4  analysis of the current avoidance, potential avoidance

5  action liabilities for the company?

6      **A    (By Ms. Hushen) Such as?**

7      Q    Such as transfers to Eduardo, transfers to

8  Simon?

9          MS. MICKELSEN:  Those are still being

10         investigated.

11 BY MS. MCDOW:

12     Q    Okay.  So that hasn't been done prior to

13 entering into the term sheet, that hasn't been done yet?

14         MS. MICKELSEN:  And just because this is

15         preliminary -- I mean, these questions are fine for

16         the purpose of this meeting because I know it is an

17         open meeting and this is not a deposition of any

18         sort.  But we are finalizing the term sheet.  There

19         are certain exclusions that may be made in it.

20         Until everything is completely finalized, I am

21         not going to say anything in public until our motion

22         is filed.  But some of your questions may be

23         resolved by the finalized term sheet.

24         MS. MCDOW:  I understand.

25         MS. HUSHEN:  Yeah.  Our goal was to try to get

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 103
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      a structure that made sense financially.

2   BY MS. MCDOW:

3      Q    I understand that.  The term sheet that's out

4   there now that, in your terms has been accepted, it

5   contemplates the transfer of all avoidance actions to

6   LiquidBits as part of the $6 million component.  I am

7   asking whether before entering into that, did you do any

8   independent evaluation of what those were worth?

9      **A    (By Ms. Hushen) As it was stated, those are**

10  **still under review.**

11     Q    Okay.  Have you done any preliminary analysis,

12  have you looked at the bank statements?

13     **A    (By Ms. Hushen) I have looked at all of the**

14  **bank statements, yes.**

15     Q    Okay.  And have you done any, whether it is

16  completed or not, have you done any independent

17  evaluation of the avoidance action liabilities?

18     **A    (By Ms. Hushen) I have done an independent**

19  **evaluation of every transaction that has gone through the**

20  **company.  And we are still in the process of reviewing**

21  **those.**

22     Q    Okay.  And for the purposes of avoidance

23  actions under 547, 548, have you come to an independent

24  understanding of what the value --

25          MS. GLOSSON:  Well, first, she is not a vacancy

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 104
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1       expert.  So her understanding of the code is a

2       little meaningless.

3               MS. HUSHEN:  Yeah.  I don't know what the code

4       means.

5               MS. MCDOW:  Okay.

6               MS. HUSHEN:  And as we stated, it is still

7       under review.

8   BY MS. MCDOW:

9       Q    Okay.  Have you identified the value of any

10  transfers made to insiders, so to Eduardo or Simon since

11  formation in this case?

12      **A    (By Ms. Hushen) Oh, it has been little to**

13  **nothing made to them other than salary.**

14      Q    Okay.  But have you analyzed, for example,

15  whether reasonably equivalent value was provided, whether

16  there were --

17      **A    (By Ms. Hushen) Oh, yes.**

18      Q    Okay.  So you have done an independent

19  evaluation?

20      **A    (By Ms. Hushen) Yeah.**

21      Q    What do you think the avoidance actions, the

22  liability of those are; do you have any independent --

23      **A    (By Ms. Hushen) It is still under review, as we**

24  **said.  I am finished answering that here.**

25      Q    When will the review be finished, before the

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 105
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    sale motion is filed?

2        A    (By Ms. Hushen) **I guess that will depend when**

3    **the sale motion is filed.**

4            MS. MICKELSEN:  And also, will also depend on

5        the terms of the sale motion.

6            MS. MCDOW:  Okay.

7            MS. GLOSSON:  Are you done?

8            MS. MICKELSEN:  Or terms of the term sheet that

9        will be attached to the sales motion.

10           MS. MCDOW:  I understood.

11           No.  But I understand that --

12           MS. GLOSSON:  Okay.  We have been going --

13           MS. MCDOW:  I understand.

14           MS. GLOSSON:  -- an hour and 20 minutes.

15           MS. MCDOW:  I understand completely.

16           MS. GLOSSON:  Mr. Gallo, do you have questions?

17           MR. GALLO:  Thank you.

18           MS. GLOSSON:  Can you switch seats with

19       Ms. McDow?

20           MR. GALLO:  Sure.  I can just be a little

21       louder, if that's okay.  Your preference?

22           MS. GLOSSON:  I prefer you just move to where

23       Ms. McDow is or where Mr. Edgeworth is.

24           All right.  I am going to put this on pause.

25           (Off the record.)

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 106
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          MS. GLOSSON:  Okay.  So we are back on the

2     record.  And Ms. Mickelsen expressed an interest in

3     making a statement before we begin with

4     Mr. Delaglio's questions.

5          MS. MICKELSEN:  There are a number of due

6     diligence questions that were asked.  And we just

7     want to clarify for the record that our client has

8     conducted a lot of due diligence, some of which

9     cannot be disclosed because it would be subject to a

10    confidentiality agreement.  We are happy to disclose

11    further information, but only once a confidentiality

12    agreement is in place.  But we didn't want to leave

13    the impression that not enough due diligence has

14    been conducted in regard to LiquidBits, the company.

15    It is just, at this time, we don't have a

16    confidentiality agreement in place and would like to

17    have that, and could provide more information after

18    that.  So actually, we -- Ms. McDow, if we want to

19    work this out afterwards, before -- you know, around

20    the time of the sale motion or before ...

21         MS. MCDOW:  Okay.

22         MS. GLOSSON:  All right.  Mr. Gallo?

23         MR. GALLO:  Thank you.

24

25

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 97

1                    EXAMINATION BY MR. GALLO

2     BY MR. GALLO:

3         Q    Ms. Hushen, how do you pronounce your last

4     name?

5         **A    (By Ms. Hushen) Hushen.**

6         Q    Hushen, thank you.  Ms. Hushen, has anybody

7     looked at the possibility that directors and officers

8     insurance held by the company could provide any benefit

9     to the creditors?

10        **A    (By Ms. Hushen) It -- the policy could provide**

11    **coverage, yes.**

12        Q    Do you know whether it includes an insuring

13    clause providing coverage to the company or just to the

14    officers and directors?  Some include both these days.

15        **A    (By Ms. Hushen) I would have to look at it in**

16    **more detail.**

17        Q    Okay.  Do you know who has done an analysis on

18    that?

19        **A    (By Ms. Hushen) I have it available.  I**

20    **haven't.**

21        Q    Okay.

22        **A    (By Ms. Hushen) I would have to just go back**

23    **and refresh it.**

24        Q    Okay.  Is that something that could be

25    produced?

First Choice Reporting & Video Services
www.firstchoicereporting.com            Worldwide Scheduling            800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 108
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 98

1          MS. MICKELSEN:  If you want us to produce it.

2          MR. GALLO:  That would be great.

3          MS. MICKELSEN:  Uh-huh.

4   BY MR. GALLO:

5      Q    Okay.  Is there any particular reason, to your

6   knowledge, as to why the debtor has denied that the batch

7   one creditors who purchased in Bitcoin before

8   September 6th, 2013, why the company has taken the

9   position they are not entitled to the Bitcoins they paid

10  back for those who requested refunds and canceled their

11  orders after a non-delivery?

12     **A    (By Ms. Hushen) I can offer you my opinion.**

13     Q    Okay.  I would be glad to hear your opinion.

14     **A    (By Ms. Hushen) It is a financial transaction.**

15  **Prices were stated in dollars.  It's like if I were to**

16  **buy a chocolate bar with French francs in the United**

17  **States, and I convert it and it is a dollar; and then I**

18  **want to return it, they are going to give me the dollar**

19  **back, that are not going to give me the francs if a week**

20  **later the franc has changed in fluctuation.  So that's**

21  **the same issue with Bitcoins.  They were priced in**

22  **dollars, and the sale was made in dollars.**

23     Q    Have you looked at any of the contract terms

24  that surrounded those transactions?

25     **A    (By Ms. Hushen) Yes.**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 109
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1      Q     So just to give an example, I happen to have

2   here an order confirmation for Mr. Sillegg (ph); would

3   you take a look at that, please?

4      **A     (By Ms. Hushen) Uh-huh.**

5      Q     Would you agree that the price is primarily

6   denoted, not in dollars, but in Bitcoins?

7      **A     (By Ms. Hushen) It is in dollars and Bitcoins.**

8      Q     But the Bitcoins is merely, sort of, a

9   parenthetical there; isn't that true?

10     **A     (By Ms. Hushen) The dollars is parenthetical.**

11     Q     Right.  So the primary price is the Bitcoins,

12  right?

13     **A     (By Ms. Hushen) It is not in parenthesis.**

14     Q     All right.  You are not willing to agree with

15  my statement that the unit price is really stated in

16  Bitcoins, and that only parenthetically stated in --

17          MS. GLOSSON:  Okay.  Let's limit our questions

18      to assets, liabilities, and exit strategy.  Because

19      what you are talking about is really a dispute that

20      you have with respect to a claim.  And that's --

21      there is a form for that, and that's decided by a

22      bankruptcy judge.

23          MR. GALLO:  All right.  I will turn it over to

24      somebody else.

25          Very quick, if we are not going to have -- I

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1    thought we could do ten minutes on this because it

2    is a very big issue.  It means the difference with

3    us between whether the claims might be 15 million as

4    suggested or much larger than that, which matters to

5    a lot of people.  I was just going to take ten

6    minutes.

7         MS. GLOSSON:  Okay.  Well --

8         MR. GALLO:  I mean, literally, ten minutes,

9    not --

10         MS. GLOSSON:  Not what?

11         MR. GALLO:  Not three-times-that.

12         MS. MICKELSEN:  But also, would it actually be

13    resolved today if this is a disputed issue or would

14    it have to go through litigation and be handled in

15    the bankruptcy case?

16         MR. GALLO:  It will.  But it bears on the

17    potential plan because there is issues surrounding

18    allocation of a rights offering, which would be

19    submitted in pro rata based on the size of claims.

20    It is a meaningful issue.  I understand your point,

21    we can do it that way.  But I thought it would be a

22    useful inquiry.

23         MS. MCDOW:  Can I ask, not having any idea

24    about where you were going, is it trying to assess

25    like the total liabilities of the estate?

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          MR. GALLO:  It goes to that, yes.  Because for

2     example, Mr. Travo's (ph) claim is either worth, you

3     know, X dollars or 7.5X if he has a Bitcoin refund

4     right.  So it makes a big difference.  I don't know

5     how many people accepted the dollar refund and,

6     therefore, waived the Bitcoin refund right and so

7     forth.  I haven't analyzed the claims insofar,

8     obviously, the claims insofar and complete.

9          MS. MICKELSEN:  Well, what we can say is that

10     the terms of sale on that document that you just

11     provided has the refund policy.  And we will refer

12     to that.  And as far as claims of the estate, that's

13     something that would have to be resolved in the

14     bankruptcy case.  There is going to be no resolution

15     today.  So creditors are not going to know.

16          MR. GALLO:  Agreed.  I was just trying to get a

17     sense of why the company was taking the position it

18     was.  I have a couple of statements I believe

19     Mr. Barber made that I was going to ask him about.

20     I can skip that, if you prefer.

21          MS. GLOSSON:  Why don't you go ahead and ask a

22     few of your questions.  But I don't want to talk

23     about a specific claim.  Because it is not going to

24     be decided today.

25          MR. GALLO:  It is a class of claims.

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1          MS. GLOSSON:  Okay.  That's fine.

2          MS. HUSHEN:  Generic issue.

3          MS. GLOSSON:  All right.  But let's see where

4     it goes.

5          MS. MICKELSEN:  And also, do we have the

6     statement that the refund policy is stated on the

7     term, the sheet that you have before you?

8          MR. GALLO:  Right, exactly.

9          MS. HUSHEN:  Refers to refund of payment.

10 BY MR. GALLO:

11     Q    Right.  And if you would, look at the same

12 document there again.

13     **A    (By Ms. Hushen) Uh-huh.**

14     Q    You would agree, wouldn't you, Ms. Hushen, that

15 the description of the payment in the middle of -- in the

16 middle box of the middle of the page is that the payment

17 is BTC, correct?

18     **A    (By Ms. Hushen) BTC, yes.**

19     Q    And the payment is what's to be refunded in the

20 language, it appears at the bottom of this page, quote,

21 Hashfast does not deliver?

22     **A    (By Ms. Hushen) Payment is by Bitcoin, Bitcoin**

23 **are converted into dollars, and that's the value.  So**

24 **what you refund is the consideration received.**

25     Q    Okay.  That's --

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1    **A    (By Ms. Hushen) Or equal value.**

2    Q    That's what you are saying here today.  But the

3    document we are looking at says that Hashfast --

4    **A    (By Ms. Hushen) I am just giving you my**

5    **opinion.  It says refund of payments.**

6    Q    It says Hashfast will refund the payment,

7    correct?

8    **A    (By Ms. Hushen) Right.  And not all the**

9    **documents are the same.**

10   Q    They changed after a certain time period,

11   right?

12   **A    (By Ms. Hushen) Right.**

13   Q    Mr. Barber, do you know when these terms and

14   conditions changed, was it about September 6th?

15   **A    (By Mr. Barber) I was focused on technical**

16   **development at that time, not sales and marketing.  So I**

17   **am not familiar with the evolution of documents.**

18   Q    Okay.  But at some point, Hashfast realized

19   that it had significant exchange risk in connection with

20   these refund guarantees; is that correct?

21   **A    (By Mr. Barber) I -- this was all under sales**

22   **and marketing department.  Any policy or changes thereof**

23   **are not things that I am familiar with.**

24   Q    Okay.  At some point, you personally made some

25   statements about the refund policy on the web, correct?

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

```
 1        A    (By Mr. Barber) Correct.

 2        Q    Have you seen this before?

 3        A    (By Mr. Barber) I'm sorry, this is?

 4        Q    It is some printed out exchange from Bitcoin

 5   form.

 6        A    (By Mr. Barber) Yes.  I have not seen this one

 7   before, but I am generally familiar with the Bitcoin

 8   form, yeah.

 9        Q    At the bottom left, it indicates you speaking

10   on the first page; is that you?

11        A    (By Mr. Barber) Correct.

12        Q    And are these things that you posted here?

13        A    (By Mr. Barber) Yes, they are.

14        Q    Okay.  And would you look at the top of page

15   two?

16        A    (By Mr. Barber) Indeed.

17        Q    Is that your statement, quote, Orders are taken

18   in BTC, in the unlikely event that we get to refunds,

19   they will be given in BTC?

20        A    (By Mr. Barber) Correct.

21        Q    You made that statement?

22        A    (By Mr. Barber) Correct.

23        Q    And it was intended for the benefit of Hashfast

24   customers and prospective customers?

25        A    Correct.
```

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 105

1       MS. MICKELSEN:  This appears to be more of a

2   deposition than anything.

3       MR. GALLO:  I will be done for now.  I will

4   table it.

5       MS. MCDOW:  Julie, can I just ask one, just

6   general follow-up question to that, just an assets

7   and estates and liabilities question, just one?

8       When the schedule --

9       MS. GLOSSON:  Okay.  So is that a question that

10   can be posed to the debtor outside of the context of

11   this meeting?

12       MS. MCDOW:  I suppose, yeah.  I was going to

13   try and get an understanding whether the summary,

14   the assets of the liabilities are in Bitcoin cash or

15   some combination for the general liability for the

16   estate now that I understand there is a big

17   distinction.

18       MS. GLOSSON:  Okay.  Well, I will just ask the

19   question then.  Is there anyone else who wants to

20   ask questions of the debtor?  There is two creditors

21   left.

22       Mr. Kozachenko, do you have questions?

23       Is that a yes?

24       MR. KOZACHENKO:  Yes.

25       MS. GLOSSON:  Okay, all right.  So go ahead.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 116
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1                EXAMINATION BY MR. KOZACHENKO

2    BY MR. KOZACHENKO:

3        Q    So I would like to ask.  So as I understand,

4    the company was formed in June of 2000 --

5            MS. GLOSSON:  Okay.  Mr. Kozachenko, your voice

6        is not getting picked up.  So can you please project

7        it?

8    BY MR. KOZACHENKO:

9        Q    So the LLC was formed in June of 2013; is that

10   right?

11       **A    (By Mr. Barber) I don't remember the exact date**

12   **of formation.**

13           **(By Ms. Hushen) Hashfast, LLC was May of 2013.**

14           MS. GLOSSON:  Okay.  So we are -- we are still

15       doing the meeting in Hashfast Technologies, LLC.  I

16       still have to call the meeting of Hashfast, LLC.  So

17       let's limit the questions as much as possible.

18           MR. KOZACHENKO:  It is connected to that.  So

19       there are formed assets in all of it.

20   BY MR. KOZACHENKO:

21       Q    And who were the first employees of the

22   company?

23           MS. GLOSSON:  Okay.  You need to speak up.  So

24       the question was:  Who were the first employees of

25       debtor, Hashfast Technologies, LLC?

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 117
of 326
Electronically signed by Alison Presley (001-159-987-5451)                          92be47ea-a665-4c9d-be42-899f3e91c918

Page 107

1        MR. BARBER:  Hashfast Technologies, the first
2     employees, I think the first employee was Eduardo,
3     probably closely followed by Chad.  And I came on
4     pretty soon after.
5  BY MR. KOZACHENKO:
6     Q    So around what time?
7     **A    (By Mr. Barber) This was in, I believe, the**
8  **start of July.**
9     Q    Okay.  Start of July.  That's three people on
10 board, right?
11    **A    (By Mr. Barber) Yes.**
12    Q    And when did you start developing the
13 technology?  As I understand, you mentioned --
14       MS. GLOSSON:  Okay.  Mr. Kozachenko, you need
15    to project your voice.  You are not getting picked
16    up.
17 BY MR. KOZACHENKO:
18    Q    So when did you start developing the
19 technology; I suppose it was way before that, right?
20    **A    (By Mr. Barber) So I started developing the**
21 **technology in 2011.**
22    Q    With prototyping or just concepts?
23       MS. GLOSSON:  Your voice, I'm sorry, you are
24    not getting picked up.
25

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 118
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1  BY MR. KOZACHENKO:

2       Q    With prototyping or just concepts?

3       **A    (By Mr. Barber) So, design documents.**

4            MS. MCDOW:  I didn't hear the question, I'm

5       sorry.  What was the question?

6            MR. KOZACHENKO:  So I asked when did he start

7       to develop technology.  And he answered --

8            MR. BARBER:  In 2011.

9  BY MR. KOZACHENKO:

10      Q    End of the year or ...

11      **A    (By Mr. Barber) Maybe September 2011.**

12      Q    When did you start to work on the design?

13      **A    (By Mr. Barber) September 2011.**

14      Q    Like on the computer, with the CAD tools and

15 everything?

16      **A    (By Mr. Barber) No, this was conceptual phase.**

17      Q    When did you start using CAD tools?

18           MS. GLOSSON:  I'm sorry, I don't understand.

19      Are you saying, "CAD tools"?

20           MR. KOZACHENKO:  Yeah, computer-aided design

21      tools for the chip.

22           MR. BARBER:  So the computer-aided design tools

23      used probably starting in May.

24  BY MR. KOZACHENKO:

25      Q    Of 2013?

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    **A     (By Mr. Barber) 2013, yeah.**

2    Q     So basically, that would be the right statement

3    to say that you started the active stage of the design in

4    May and continued until, as I know from your previous

5    conversation, until August when you completed it?

6    **A     (By Mr. Barber) So the design was sent for**

7    **manufacturing at the end of August.**

8    Q     Uh-huh.

9    **A     (By Mr. Barber) But at least the silicone part**

10   **of the chip was sent for manufacturing at the end of**

11   **August.  We did make a revision while it was in**

12   **manufacturing.  So design work did continue.**

13   Q     What months did you complete the revision?

14   **A     (By Mr. Barber) In September.**

15   Q     September?

16   **A     (By Mr. Barber) We revised the silicone while**

17   **it was still in manufacturing.**

18   Q     And when you say "you," you mean yourself or

19   some other people were (inaudible)?

20   **A     (By Mr. Barber) There were many people involved**

21   **in the design work.**

22   Q     So since you are saying that in July you had

23   three employees, how many more employees were working on

24   design of this chip until the end of August?

25   **A     (By Mr. Barber) So we had internally, there was**

First Choice Reporting & Video Services
www.firstchoicereporting.com              Worldwide Scheduling              800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 120
of 326

Electronically signed by Alison Presley (001-159-987-5451)              92be47ea-a665-4c9d-be42-899f3e91c918

1    myself and Chad Spackman, contractors, there were two

2    people under Sandgate.  And then under Uniquify, there

3    were probably five to ten people.

4        Q    So --

5        A    (By Mr. Barber) Not all full time.

6        Q    So another company you mentioned, one was

7    Uniquify, and the second one was what?

8        A    (By Mr. Barber) Sandgate.

9        Q    How many people?

10       A    (By Mr. Barber) Two people.  Full time.

11       Q    Full time in Uniquify or --

12       A    (By Mr. Barber) Uniquify was five to ten

13   people, but not all full time.  This is my estimate.  I

14   don't know exactly how many people we used.

15       Q    Right.  So I suppose from the company in July,

16   three people were -- by the way, when Chad came --

17       A    (By Mr. Barber) Chad started working in May.

18       Q    In May?

19       A    (By Mr. Barber) Yes.

20       Q    Right before the --

21       A    (By Mr. Barber) Correct.

22       Q    Correct.  So is it a true statement to say that

23   between May and July, that only two people were working

24   actively on design?

25            MS. GLOSSON:  Okay.  You are not getting picked

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 121
of 326

Electronically signed by Alison Presley (001-159-987-5451)            92be47ea-a665-4c9d-be42-899f3e91c918

1      up.

2           MR. BARBER:  So, no, from May, myself, Chad,

3      and the two Sandgate people in the Sandgate team

4      were all working full time on the design.

5  BY MR. KOZACHENKO:

6      Q    Even though the company was not formed?

7      **A    (By Mr. Barber) Correct.**

8      Q    And how they were get paid?

9           MS. GLOSSON:  And how were they getting paid,

10     that's the question.

11  BY MR. KOZACHENKO:

12     Q    How were --

13     **A    (By Mr. Barber) So Hashfast, LLC was formed in**

14  **May.  And since this was IP development, they were paid**

15  **out of Hashfast, LLC.  And I, myself, was not paid.**

16     Q    So you were not paid until September or August?

17     **A    (By Mr. Barber) Until July.**

18     Q    Until July.  But they were paid?

19     **A    (By Mr. Barber) Yes.**

20     Q    But the company was not formed, who paid, you

21  paid, they were --

22          MS. GLOSSON:  Okay.

23          MR. BARBER:  The company was formed in May.

24  BY MR. KOZACHENKO:

25     Q    Okay.  No, you said in June, I think you said

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 122
of 326

Electronically signed by Alison Presley (001-159-987-5451)                        92be47ea-a665-4c9d-be42-899f3e91c918

1    June, no?

2          MS. GLOSSON:  Okay.  Well, first of all, I

3    think we are just, sort of, mixing apples and

4    oranges in terms of which company.

5          Can you get to your question?

6          MR. KOZACHENKO:  I am going to the point

7    because I am going to figure out how to value the

8    assets.

9          So we are talking about IP.  So I am trying to

10   find out how many people were working on it.

11         MS. GLOSSON:  On the IP, okay.

12         MR. KOZACHENKO:  And how many --

13         MS. GLOSSON:  So the IP is owned by Hashfast,

14   LLC, right?

15         MS. MICKELSEN:  Yes.

16         MS. GLOSSON:  That's what it says on the

17   schedules.  And this is Hashfast Technologies.

18         MR. KOZACHENKO:  It is the same because you

19   have licensing.  It is just a few more questions.

20         MS. GLOSSON:  Okay.

21   BY MR. KOZACHENKO:

22    Q    So they were paid -- okay.  Where did you get

23   the money for the initial payment for that?

24         MS. GLOSSON:  Okay.  Your voice is not getting

25   picked up, you have to project it.

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1 BY MR. KOZACHENKO:

2    Q    So where did you get the money for this initial

3 payment for the Sandgate employees?

4    **A    (By Mr. Barber) The early investors in the**

5 **company put money into the company.**

6           MS. GLOSSON:  And when you say "the company,"

7      you are meaning Hashfast, LLC?

8           MR. BARBER:  Hashfast, LLC.

9           MS. GLOSSON:  Which we are not talking about

10      right now.  So I think you need to limit your

11      questions to Hashfast Technologies.

12           MR. KOZACHENKO:  Just need an estimate.

13           MS. HUSHEN:  640K, thereabouts, roughly.

14 BY MR. KOZACHENKO:

15    Q    So and you, I suppose, until September -- so

16 when did you start the sales in Hashfast Technologies?

17    **A    (By Mr. Barber) I believe we opened sales on**

18 **August 8th.**

19    Q    So by August 8th, all of the bills were paid,

20 right, for development, there was no outstanding

21 liability?

22    **A    (By Mr. Barber) I don't know.**

23    Q    Can you draft a letter and send by e-mail?  Can

24 you answer this question by e-mail?

25    **A    (By Ms. Hushen) Whether the bills were paid as**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 124
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 114

1    **of August 8th?**

2         Q    Yes.

3         **A    (By Ms. Hushen) I can probably determine that.**

4         Q    It would be, you know, like a contract or

5    something with a payment --

6              MS. MCDOW:  Wait, what was --

7              MS. GLOSSON:  I don't understand what your

8         question is.

9              MR. KOZACHENKO:  So the question was:  If all

10        of the bills for development by the August 8 were

11        paid, all of the liabilities were satisfied without

12        outstanding bills from people who developed their

13        project or technology.

14             MS. HUSHEN:  And what is the purpose of knowing

15        that?

16             MS. MCDOW:  I think Mr. Edgeworth could

17        actually clarify it pretty well if you would let

18        him.

19             MR. EDGEWORTH:  Okay.  I believe what he is

20        asking is whether you used customer money to fund

21        your technology development or whether it was all

22        investor money.

23             MS. HUSHEN:  Oh, okay.  Got it.

24             MR. BARBER:  Did we use customer money to fund

25        the development of the --

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 125
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1        MS. MICKELSEN:  Again, I am just -- I am just

2    going to make a statement.  Because these still seem

3    like questions that are questions that would have to

4    be resolved potentially as a claim against the

5    estate.  It sounds to me that that's what you are

6    getting at.  And unless you are going somewhere else

7    here --

8        MR. KOZACHENKO:  No, I am going to the question

9    of how much the IP worth.  Because what was the

10   investment into developing the IP is going to be the

11   basis of the determination of the worth.

12       MS. HUSHEN:  Not necessarily.

13       MS. MCDOW:  No.

14       MS. HUSHEN:  You could spend $10 million on IP

15   and have it still be worthless.  It is all dependent

16   on market conditions and the quality of the IP.

17       MR. KOZACHENKO:  It is still a reference point,

18   right?

19       MS. HUSHEN:  Yes, it is a reference point.

20       MS. GLOSSON:  Okay.  So you know what, we are

21   not going to decide anything today.  This is a

22   meeting of creditors, the focus of which is assets,

23   liabilities, and exit strategy.  So while you may

24   have a dispute about how the debtor is valuing its

25   assets --

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 126
of 326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

```
1          MR. KOZACHENKO:  No, no, I have no disputes
2     thus far.  I am asking questions.
3          MS. MICKELSEN:  But you are also not an expert,
4     from what I know, about valuing intellectual
5     property.
6          MR. KOZACHENKO:  How do you know about --
7          MS. MICKELSEN:  Well, I don't know.  But there
8     has been no foundation laid.
9          MS. GLOSSON:  Okay.  So let's --
10         MS. HUSHEN:  Are you an expert in --
11         MR. KOZACHENKO:  Yes --
12         MS. GLOSSON:  Okay.  He is not here to answer
13     the debtor's questions.  The debtor is here to
14     answer questions.  And so let's ask a question about
15     the Hashfast Technologies, LLC.
16         MR. KOZACHENKO:  Yes, I already asked one:
17     When did they start sales; so that was one question,
18     and I will continue with more.
19  BY MR. KOZACHENKO:
20     Q    So who is -- as I understand, John Skrodenis
21  was the sales, main sales person, right?
22         MS. GLOSSON:  I'm sorry, I didn't understand
23     who you said, the name.
24         MS. HUSHEN:  John Skrodenis.
25         MR. BARBER:  Yes, John Skrodenis was the VP of
```

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 127
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 117

1      sales and marketing.

2   BY MR. KOZACHENKO:

3      Q    And he was with the company since the sales

4   started?

5      **A    (By Mr. Barber) He was with the company, yes,**

6   **from a little before when sales started.**

7           MS. GLOSSON:  Okay.  Just for the record, what

8      is his last name?

9           MR. BARBER:  Skrodenis.

10          MS. GLOSSON:  Can you say that louder?

11          MS. HUSHEN:  Skrodenis, S-K-R-O-D-E-N-I-S.

12   BY MR. KOZACHENKO:

13      Q    So only person was responsible, sales and

14   marketing was one person, right, no other people?

15      **A    (By Mr. Barber) There were multiple people**

16   **working for John, yes.**

17      Q    Okay.  And who was the CFO at that time?

18      **A    (By Mr. Barber) We didn't have a CFO at that**

19   **time.**

20      Q    And as I suppose then, Monica Hushen is the

21   first CFO?

22      **A    So Tim Wong acted as interim CFO for a period**

23   **before Monica.**

24      Q    And what was his other position?

25      **A    (By Ms. Hushen) CMO, chief marketing officer.**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 128 of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1      Q    So you are saying that besides John Skrodenis,
2   Tim Wong was involved in sales?

3      **A    (By Mr. Barber) No.  Tim Wong was interim chief**
4   **financial officer.**

5      Q    But she is saying marketing?

6      **A    (By Ms. Hushen) You asked what his other**
7   **position was.**

8      Q    Right, yes.

9      **A    (By Ms. Hushen) Marketing is different than**
10  **sales.**

11     Q    I know.  But sometimes it is merged, right.

12          Okay.  So what was the compensation for Tim
13  Wong and John Skrodenis?

14     **A    (By Ms. Hushen) Well, we already answered**
15  **Tim's.  He was at 140.**

16     Q    All right.

17     **A    (By Ms. Hushen) Initially.**

18     Q    And John?

19     **A    (By Mr. Barber) And John Skrodenis, I don't**
20  **remember.  I would have to go and look it up.**

21     Q    Well, would it be over 200?

22     **A    (By Mr. Barber) I don't remember.**

23     Q    It is above 100?

24     **A    (By Mr. Barber) It was above 100, yes.  But I**
25  **don't remember if it was above or below 200.**

Page 119

1      Q    Okay.  So when did you start selling batch one

2  products?

3      **A    (By Mr. Barber) August 8th.**

4      Q    When did you end selling batch one products?

5      **A    (By Mr. Barber) Monica, do you know --**

6           **(By Ms. Hushen) Yeah.**

7           **(By Mr. Barber) -- when the last batch one sale**

8  **was?**

9           **(By Ms. Hushen) Yeah.  I was just looking for**

10  **the sheet with the order history.  Well, it is in this**

11  **pile somewhere anyways.  I don't know, it seems to have**

12  **walked off.**

13           MS. MICKELSEN:  Maybe I have it in my file.

14           MS. HUSHEN:  Yeah.  It has got colors on the

15      top, different colors of the order batches.

16  BY MR. KOZACHENKO:

17      Q    So the other question would be:  How much were

18  the sales of batch one, batch two, batch three, batch

19  four; separately, if possible.

20      **A    (By Ms. Hushen) It was here.  I don't know what**

21  **happened to it.**

22           **I don't recall.  I wasn't -- I don't know**

23  **without looking at the document.  I wasn't here so I**

24  **would have to look at the document.**

25           **What was your question again?  Let me pull it**

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1   **up.**

2       Q    When did you start selling batch one?

3       **A    (By Ms. Hushen) The batches.**

4       Q    When did you start selling -- for every batch

5   basically, the start and end date of sale.

6           MS. MICKELSEN:  Of each batch.

7           MR. KOZACHENKO:  Of each batch.  As well as the

8       total amount of gross sales from each batch.

9           MS. HUSHEN:  Batch one was available for sale

10      from August 1st to September 10th, 2013.

11  BY MR. KOZACHENKO:

12      Q    Okay.

13      **A    (By Ms. Hushen) And do you want batch two also?**

14      Q    Yes, every one.

15      **A    (By Ms. Hushen) 9/1/2013 to January 2014.**

16      Q    Okay.

17      **A    (By Ms. Hushen) Batch three was**

18  **February 28th -- or no, excuse me.**

19      Q    Can you go back to the second batch.  Because I

20  think something is -- what was the date of the second

21  batch?

22      **A    (By Ms. Hushen) 9/1/2013 to January 2014.**

23      Q    Uh-huh, next one.

24      **A    (By Ms. Hushen) batch three, 10/4/2013 to**

25  **11/12/2013.  Batch four is 11/22 to January 3rd.**

Page 121

1      Q    11/22, okay.  So -- and I didn't get the

2  numbers for gross sales for each batch.

3      **A    (By Ms. Hushen) At some point.  That will take**

4  **too long to do it here.  We will provide that later.**

5      Q    Right.  So we are saying that you sent for --

6  basically, your design for production for chip

7  manufacturing at the end of August?

8      **A    Yes.**

9           MS. MCDOW:  What was the question, I'm sorry?

10           MR. KOZACHENKO:  I asked when did he send the

11      design for production for chip manufacturing.

12           MR. BARBER:  That was the very end of August.

13      We first sent it off maybe August 28th.  But we did

14      make a small revision in the early stage of

15      manufacturing.

16  BY MR. KOZACHENKO:

17      Q    You are saying mid September?

18      **A    (By Mr. Barber) Yes.**

19      Q    And all chips produced with the revision,

20  right?

21      **A    (By Mr. Barber) Correct.**

22      Q    Okay.  And when did you receive them from --

23  actually, what's the name of the company?

24      **A    (By Mr. Barber) So we contracted with Uniquify**

25  **to do all of the manufacturing.  They had a subcontractor**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 132
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    who actually performed the silicone manufacturing.

2        Q     Okay.  So when did you receive them back from

3    manufacturing, the wafers?

4        A     (By Mr. Barber) So the wafers were ready at the

5    end of -- well, the start of November.

6        Q     Okay.

7        A     (By Mr. Barber) But we had a -- we were

8    originally expecting wafers in the middle of October.

9    And the manufacturer was able to deliver us wafers mid

10   October.  But because of delays with the other parts of

11   the design, we instructed them not to rush.

12       Q     And you mentioned in the previous questions

13   answered that you made research before you started the

14   company, called the contractors, right, and figured out

15   how much it costs?

16       A     (By Mr. Barber) Yes.

17       Q     Can you tell me how much you paid for the mask?

18       A     (By Mr. Barber) That's under nondisclosure with

19   Uniquify.

20       Q     How much did you pay for each chip or each

21   wafer, let's say?

22       A     (By Mr. Barber) So I don't know if I am allowed

23   to answer that under the nondisclosure with Uniquify.

24       Q     Yes.  But we are talking about assets and

25   liabilities.  We should know how much you paid for --

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 133
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 123

1           MR. BARBER:  Jessica?

2           MS. MICKELSEN:  If there is a nondisclosure --

3       and I have not seen a nondisclosure agreement at

4       this time, but it is something that we would want to

5       review before any information is disclosed to

6       determine whether this could be disclosed or not

7       disclosed.  If it is under a nondisclosure, he could

8       be subject to contract liability if he were to

9       disclose this.

10          MR. KOZACHENKO:  Okay, let's see.  If there is

11      nothing in the contract, then I suppose you can send

12      me an e-mail with the prices, right?

13          MS. MICKELSEN:  If there is nothing in the --

14      once we review the contract, if it is not covered by

15      it, yes, I can follow up with you.

16          MR. KOZACHENKO:  And I would like also to have

17      a copy.  If there is something providing that, I

18      would like to see it.

19          MS. MICKELSEN:  Okay.

20          MR. KOZACHENKO:  All right.

21          MS. MICKELSEN:  If there -- and just for

22      client's purposes, if there is nondisclosure, is

23      there any other reason why we could not provide

24      that, any other confidentiality reason?

25          MR. BARBER:  No.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 134
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 124

1        MS. MCDOW:  Can I -- just because I can't hear
2    very well down here, are we saying that we --
3        MR. KOZACHENKO:  I am trying to find out how
4    much they paid for their mask work and how much they
5    paid for each individual wafer to produce.
6        MS. MCDOW:  But they bought it from Uniquify?
7    That's what I was trying to understand.
8        MR. KOZACHENKO:  Yes.
9        MR. BARBER:  Yes.  Our contract.
10       MS. HUSHEN:  So it is our pricing with
11   Uniquify.
12       MR. BARBER:  We have two contracts with
13   Uniquify.  We had an initial design services only
14   contract.  And, in fact, we had three contracts with
15   Uniquify.
16       Then we had an interim contract for the
17   manufacturing of the wafers.  And that's a contract
18   that Uniquify refused -- even though they proposed
19   it and signed it, they refused to honor it.
20       And we had a subsequent manufacturing agreement
21   with Uniquify for the manufacturing of the wafers
22   and the complete chips.
23       MS. MCDOW:  So was there an actual purchase of
24   the mask works or was that embedded in one of these
25   and I just don't know it because I don't understand

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 135
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      it?

2            MR. BARBER:  It is embedded in the

3      manufacturing contract with Uniquify.  The mask --

4      there is the mask works, which is the design, and

5      that came out of the design contract.  And then

6      there is the actual mask set that is the physical

7      instantiation of the masks.  And they fall under the

8      manufacturing contract.

9  BY MR. KOZACHENKO:

10     Q    So basically, the question would be how much

11 each piece of this work is -- I mean, how much did you

12 pay for mask works, for mask sets, and for the

13 manufacturing of the wafers as well?

14           MS. GLOSSON:  So the question, because I don't

15     think it was picked up, is:  How much did the

16     debtor, Hashfast Technologies, LLC, pay for the mask

17     work, the mask set, and other --

18 BY MR. KOZACHENKO:

19     Q    And for manufacturers --

20           MS. GLOSSON:  And manufacturers.

21 BY MR. KOZACHENKO:

22     Q    Manufacturing of individual wafers.

23           MS. GLOSSON:  And for the manufacturing of

24     individual wafers.

25           MS. MICKELSEN:  We will review the contract.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 136
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 126

1        MR. BARBER:  Well, the mask works was the

2        product of all of the silicone design work.  And so

3        the mask work was the product of our engineering,

4        the Sandgate engineering, and the design services

5        under the first Uniquify design contract.

6  BY MR. KOZACHENKO:

7        Q    Right, I understand that.  But the specific

8  question:  How much they pay to Uniquify.  Because we

9  already found out that you had two employees and two

10  subcontractors full time working on your side.  I am not

11  sure how much -- that is easy to estimate how much you

12  paid for it on this side.  But we don't know how much you

13  paid for that -- okay.

14        MR. KOZACHENKO:  You will provide it, right?

15        MS. MICKELSEN:  Yes.  We will let you know what

16        the answer is after we look at the contracts and the

17        nondisclosure portion.

18  BY MR. KOZACHENKO:

19        Q    Okay.  Next, as you -- what happens with the

20  board design then at that time then?  When, basically,

21  you send it to the chip design to the manufacturing, and

22  then what happens to the board?  When do you start

23  developing the board first?

24        **A    (By Mr. Barber) Is this related to the current?**

25        MS. MICKELSEN:  Could you ask the question

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 137
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    again?

2  BY MR. KOZACHENKO:

3    Q   When did you start developing the board?

4       MS. MICKELSEN:  And this is in regard to

5    Hashfast Technologies?

6       MR. KOZACHENKO:  Yes.

7       MS. GLOSSON:  Okay.

8       MR. BARBER:  Is this concerned with the claim,

9    not the --

10      MR. KOZACHENKO:  Okay.  Another question --

11      MS. MICKELSEN:  Oh, okay, yes.

12      MS. MCDOW:  It's not.  I can say from the

13    creditors' perspective, it is certainly not.  It is

14    not a particular claim.  It is when you started --

15    what your normal course of business was when it

16    changed.

17      MR. BARBER:  So we started the board

18    development.  I think the first things happened in

19    July.

20  BY MR. KOZACHENKO:

21    Q   And who was working it?

22    **A   (By Mr. Barber) So Chad, the Sandgate team, and**

23  **then we engaged World Electronics.**

24    Q   World?

25       MS. GLOSSON:  Can you spell that?

First Choice Reporting & Video Services
www.firstchoicereporting.com      Worldwide Scheduling      800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 138
of 326

Electronically signed by Alison Presley (001-159-987-5451)      92be47ea-a665-4c9d-be42-899f3e91c918

Page 128

1          MS. HUSHEN:  World, W-O-R-L-D.

2          MR. BARBER:  World, W-O-R-L-D, World

3     Electronics.

4  BY MR. KOZACHENKO:

5     Q    Where are they?

6     A    (By Mr. Barber) They are in Pennsylvania.

7     Q    Okay.  So when did you have a first design

8  ready, not physically produced?

9     A    (By Mr. Barber) Monica, when did that design --

10         Monica, do you have the timeline?

11         (By Ms. Hushen) I do.  So let's see, which one

12  was this, rev one?

13         (By Mr. Barber) Yes, or rev zero.  It was the

14  first board design sent for manufacturing.  It was --

15         (By Ms. Hushen) We had -- well, September, it

16  was -- the board design was provided on August -- the

17  week of August 25th; does that sound right?

18         (By Mr. Barber) No, I think it was -- it was

19  mid November, I thought it was completed and sent to

20  manufacturing.

21         (By Ms. Hushen) Okay.

22         (By Mr. Barber) But I don't remember exactly.

23         (By Ms. Hushen) The original board?

24         (By Mr. Barber) Yeah, the first revision.

25         (By Ms. Hushen) Oh, this is rev one.

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1          (By Mr. Barber) Yeah.

2          (By Ms. Hushen) Which are you saying, rev zero

3    or rev one.  Because rev zero, the design was in process.

4          (By Mr. Barber) Yes.

5          (By Ms. Hushen) In July.

6          (By Mr. Barber) Yes, started in July.

7          (By Ms. Hushen) or in August and September.

8          (By Mr. Barber) Yes, started in July.  World

9    Electronics, I believe, started work early August.

10          (By Ms. Hushen) Right.  And so the board design

11    for the initial rev was -- based on what we had gone

12    through before, was the end of August.  And the --

13          (By Mr. Barber) No.  The end of August was the

14    chip design.

15          (By Ms. Hushen) Okay.

16          (By Mr. Barber) Was the silicone design.

17          (By Ms. Hushen) Okay.

18          (By Mr. Barber) And the board design had

19    multiple slippages.  But ended up, I think, being sent

20    for manufacture around mid November.

21      Q    So was it on time or not, the design?

22      A    (By Mr. Barber) It had multiple delays.

23      Q    So what was the original planned date or

24    timeframe for the board design?

25      A    (By Mr. Barber) So I would have to go and

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 140
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 130

1   review my records.  But yeah, I would have to go and

2   review my records.  I believe it was early October.

3           (By Ms. Hushen) Yeah, that's what I have, World

4   Electronics on Sandgate, the initial board delays.

5       Q    But October was the target date?

6       A    (By Mr. Barber) Yeah.

7       Q    Okay.  And then you sent it to the

8   manufacturer; and where did you send it to?

9       A    (By Mr. Barber) So it was sent to -- handled by

10  World Electronics.  And they subcontracted the

11  fabrication of the blank boards to a company called TTM.

12      Q    TTM, where are they?

13      A    (By Mr. Barber) Somewhere on the west coast.  I

14  believe, Ohio, maybe -- no, Ohio.

15      Q    East coast?

16      A    (By Mr. Barber) I don't remember exactly.

17          (By Ms. Hushen) He is from Europe, so it is a

18  different east coast.

19      Q    All right.  And how much do you pay for the

20  manufacturing for each individual board?

21      A    (By Mr. Barber) For the blank boards, I don't

22  remember.  But it was the first run of blank boards.  We

23  paid a high premium of expediting fees to get them

24  faster.  So they were quite expensive.

25      Q    Around --

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 141
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 131

1      **A    (By Mr. Barber) But I don't remember the exact**

2 **number.**

3      Q    Okay.  The same question to Monica, if you

4 could, provide this information later by e-mail?

5      **A    (By Ms. Hushen) What was the question?**

6           MS. MICKELSEN:  The payment for manufacture of

7      the blank boards.

8           MR. BARBER:  And then after the blank boards,

9      there was payments for the assembly of the

10      components onto blank board.

11 BY MR. KOZACHENKO:

12      Q    Which happens where?

13      **A    (By Mr. Barber) So it was supposed to be done**

14 **by World Electronics.**

15      Q    Uh-huh.

16      **A    (By Mr. Barber) But they were very slow.  And**

17 **so we simultaneously started assembly at Sonic here in**

18 **Fremont.  And the first completed boards came from Sonic.**

19      Q    And so when did you receive the boards, plain

20 boards from TTM or World Electronics?  I am not sure.

21      **A    (By Mr. Barber) Late November, but I would have**

22 **to look.**

23      Q    And you started assembling it in December,

24 right?

25      **A    (By Mr. Barber) For sometime around very late**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 142
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1    **November, early December, yes.**

2         MS. GLOSSON:  Can I encourage you,

3    Mr. Kozachenko, to perhaps get to the question that

4    you are developing this line of questioning to?

5    Because a lot of the questions, perhaps, might be

6    better posed during the 2004 exam where you have --

7    well, I will just leave it at that.

8         MS. MICKELSEN:  Well, also, I agree that a lot

9    of the questions that are posed are for a 2004

10   examination.  And also, if there is a purpose, more

11   of a purpose to the questions.  Because right now,

12   you haven't been appointed as an expert.  I am not

13   sure about the value of the -- giving you, in

14   particular, this information, the payment

15   information unless it was something that the

16   committee -- I don't know where Ashley just went --

17        MS. MCDOW:  I am here.

18        MS. MICKELSEN:  Oh, okay.

19        Is also seeking -- for us to give a bunch of

20   information to one particular creditor.  And I am

21   not sure how this information is going to be used

22   and if this is for the purpose of an adversary

23   proceeding, if it is for a purpose of being

24   appointed as an expert in this case.  This is very

25   unclear to me right now.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 143
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 133

1        MS. GLOSSON:  Well, he is a creditor.  So he

2    can ask questions that relate to assets and

3    liabilities.  But I think the level of detail that

4    he might want is better suited for a 2004 --

5        MR. KOZACHENKO:  Well, it would be only a few

6    more.

7        MS. GLOSSON:  -- as opposed to the --

8        MR. KOZACHENKO:  It is coming to an end.

9        MS. GLOSSON:  Well, my point is that you are

10    asking very detailed questions that are better

11    suited for a different forum than what we are here

12    for.  I am not suggesting you are not entitled to

13    ask questions, because you are a creditor and this

14    is a meeting of creditors.

15        But my suggestion to you is:  Perhaps ask the

16    question that you are building up to.  And that the

17    details of your questions that you are trying to lay

18    the foundation for might be better suited in a

19    different context.  And the bankruptcy rules provide

20    for any creditor or any party to pose questions to a

21    debtor.  And that is called a rule 2004 examination.

22        MR. KOZACHENKO:  I understand that.  Thank you

23    for noting that.

24        MS. GLOSSON:  Okay.

25

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 134

1    BY MR. KOZACHENKO:

2         Q    So the next would be --

3              MS. GLOSSON:   Okay.   Your voice is not getting

4         picked up at all.   And I am going to have a really

5         awful record because I don't have your questions on

6         the record.

7    BY MR. KOZACHENKO:

8         Q    So we finished with the question that you

9    started assembling the boards in late November and --

10        **A    (By Mr. Barber) And early December, yes.**

11        Q    And what was the reason why you hired another

12   company, Sonic for that?

13        **A    (By Mr. Barber) Because we had found that World**

14   **Electronics were quite slow at getting things done.**

15        Q    When you say "slow," what does it mean?

16        **A    (By Mr. Barber) They had already been**

17   **responsible for multiple delays.   And when we asked them**

18   **how long it would take them to do things like assemble**

19   **boards, the answers were, you know, unreasonably long.**

20        Q    And you switched to Sonic after that?

21        **A    (By Mr. Barber) So we did parallel path.   We**

22   **had World continue, but we also had Sonic do board**

23   **assembly as well.**

24        Q    And when did you get the first board assembled?

25             MS. GLOSSON:   The question was:   When did you

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1      get the first board assembled?

2          MR. BARBER:  So Sonic completed the board

3      assembly in a small number of days, two or three

4      days.  I don't remember if it was late November,

5      early -- sometime early December, maybe.

6  BY MR. KOZACHENKO:

7      Q    Okay.  And then they -- the boards were working

8  or not quite?

9      **A    (By Mr. Barber) So as of -- when we got the**

10 **assembled boards back, we discovered that no, they did**

11 **not perform to our specification.**

12     Q    And what happens after that?

13     **A    (By Mr. Barber) So we went back to World**

14 **Electronics being responsible for a substantial part of**

15 **the design layout of the boards, and worked with them to**

16 **revise the design.**

17     Q    How many days it took, around, approximately?

18     **A    (By Mr. Barber) I would have to go back to my**

19 **records to see exactly how long it took.**

20     Q    It's days or weeks?

21     **A    (By Mr. Barber) Days.**

22     Q    Within a week?

23     **A    (By Mr. Barber) Might be more than one week,**

24 **but probably not more than two weeks.**

25     Q    So we are looking at the first week in

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 146
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1  December; is that fair to say?

2     **A     (By Mr. Barber) So the revised design was sent**

3  **out for manufacturing at some point early to mid**

4  **December.**

5     Q     Okay.  So early to mid December, the revised

6  design of the board is sent out to manufacturing?

7     **A     (By Mr. Barber) Yes.**

8     Q     And when did you get it back?

9     **A     (By Mr. Barber) It was just after Christmas.**

10    Q     Just after Christmas, you get the revised

11 board?

12    **A     (By Mr. Barber) The blank board, yes.**

13    Q     Without the components?

14    **A     (By Mr. Barber) Correct.**

15    Q     And when do you have a board with the

16 components on it?

17    **A     (By Mr. Barber) So maybe a couple of days**

18 **later, we have the board with the components on it.**

19          MS. MCDOW:  Can I interject for a second?  What

20       might make sense is if I speak with Igor afterwards.

21       Because I am going to take a 2004 exam of

22       Mr. Barber.

23          And I am really interested in what you have

24       said.  And I represent all of the creditors.  So

25       what may make sense is for you and I to spend an

Page 137

1     hour together or something.  I will get all of your

2     questions out, and I can present them to him.

3          MR. KOZACHENKO:  I think that you are very busy

4     and you just don't have time for it.

5          MS. MCDOW:  Well, no.  I have an obligation to.

6     So I am very interested in what you said.  And in

7     the interest of speeding it up, I will question him

8     about whatever it is you would like.  It is -- in

9     the interest of making it quicker for everyone.

10          MR. KOZACHENKO:  Yeah.  So it is coming to an

11     end, as I said.  It is almost there, all right.

12     Almost there.

13   BY MR. KOZACHENKO:

14     Q    So you are saying -- she interrupted, I don't

15   remember.  You said after Christmas, one week after

16   Christmas you had the board ready, right?

17     **A    (By Mr. Barber) Yeah.**

18     Q    So just after Christmas, you had the board

19   ready?

20     **A    (By Mr. Barber) A few days after Christmas, we**

21   **had the assembled board ready, yes.**

22     Q    Uh-huh.  All right.  So what was the time

23   when -- first time you had the working board?

24     **A    (By Mr. Barber) So a very small number of those**

25   **assembled boards did work and meet specification.**

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 138

1      Q     Very small number of -- ten?

2      **A     (By Mr. Barber) I don't remember the exact.**

3   **But no, in the, sort of, ten kind of range.**

4      Q     But others failed, right, of those?

5      **A     (By Mr. Barber) Did not meet specification.**

6      Q     So basically, it is fair to say that by the end

7   of December, you didn't have any board in production

8   which were working properly?

9      **A     (By Mr. Barber) Correct.  We had a small**

10  **number.**

11     Q     And it is fair to say that you didn't have any

12  working product to sell by the end of December?

13     **A     (By Mr. Barber) We had a small number.**

14     Q     But they were not ready for mass production?

15     **A     (By Mr. Barber) It was not ready for mass**

16  **production, no.**

17     Q     Right.  So can you tell -- look at this?

18           MS. GLOSSON:  Do you have a copy for him?

19           MR. KOZACHENKO:  Yes, if you want, here.

20           MS. GLOSSON:  Is this about your claim?

21           MR. KOZACHENKO:  No.  It is just in general.

22           MS. GLOSSON:  Okay.  So this is an order

23     confirmation on Hashfast Technologies, LLC.  Order

24     number 12.5.4.

25

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 139

1    BY MR. KOZACHENKO:

2        Q    How do you see here, can you tell?

3        **A    (By Mr. Barber) Order confirmation.**

4        Q    Yeah, can you tell?  Order confirmation, what

5    was the batch, order batch?

6        **A    (By Mr. Barber) Batch four.**

7        Q    Okay.  And so you go to the last -- to the

8    second page and you will see the signature?

9        **A    (By Mr. Barber) Yes.**

10       Q    And so --

11            MS. GLOSSON:  Whose order confirmation is this?

12            MR. KOZACHENKO:  It is mine.

13            MS. GLOSSON:  Okay.  So this does involve your

14       individual claim?

15            MR. KOZACHENKO:  It doesn't matter.  It is just

16       an example.

17            MS. GLOSSON:  Okay.  But this does involve your

18       individual claim.

19            MS. MICKELSEN:  So why don't you --

20            MR. KOZACHENKO:  Anyone else's order

21       confirmation, I don't care.  Give me.

22            MS. MICKELSEN:  Or claims of creditor bodies as

23       a whole that should be better handled in the

24       bankruptcy estate.

25            MR. KOZACHENKO:  So it is the last question,

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 150
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 140

1      basically.

2            MS. MICKELSEN:  And for the record, I think

3      this is completely inappropriate, this path that we

4      have been going down.

5            MS. GLOSSON:  I just asked you if this was

6      about your claim.  And this order is as to your

7      claim.

8            MR. KOZACHENKO:  No, it is not about the claim.

9      It is about the business.  I don't even ask how

10     much, it doesn't matter.

11           MS. MICKELSEN:  But these are claims against

12     the estate.

13  BY MR. KOZACHENKO:

14     Q    So who signed the order confirmation?

15           MS. MICKELSEN:  Again, I know this isn't a

16     deposition, so my right to object is very limited.

17           MR. KOZACHENKO:  Yeah, so please don't.

18           MS. MICKELSEN:  But this is very inappropriate

19     for a meeting of creditors and should be addressed

20     in another forum.

21  BY MR. KOZACHENKO:

22     Q    Who signed the ordered confirmation?

23     **A    (By Ms. Hushen) We have spent a couple of hours**

24  **answering these questions with him earlier.**

25     Q    Just two more questions.

Page 141

1          MS. GLOSSON:  I mean, I don't understand why we

2     are talking about an order that relates to your

3     claim.

4          MR. KOZACHENKO:  It doesn't matter to which

5     claim.  A few more questions, you will find out why.

6          MS. GLOSSON:  Well, why don't you just ask the

7     final question at this point.

8  BY MR. KOZACHENKO:

9     Q    Well, what -- who signed the confirmation?

10    **A    (By Mr. Barber) John Skrodenis.**

11    Q    And what was the date?

12    **A    (By Mr. Barber) 15th of December.**

13    Q    So basically, he was signing orders at the time

14 when you didn't have any working products to sell?

15         MS. MICKELSEN:  This is -- okay.  First, I am

16    going to instruct you not to answer.  Because this

17    does get to litigation claims.  And there will be a

18    time and place for him to answer these questions,

19    but this is not the time and place.

20         MR. KOZACHENKO:  Okay.

21         MS. MCDOW:  I think that was actually a

22    question -- that question right there I think was

23    one of the more relevant for estate purposes.

24         Can you ask it, again?

25         MR. KOZACHENKO:  Yeah.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 152
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 142

1    BY MR. KOZACHENKO:

2        Q    So basically, what was the date of his

3    signature, it is December 15th, right; is that true?

4        **A    (By Mr. Barber) Correct.**

5            MS. MCDOW:  Was the question -- can I - I'm

6        sorry.  Is the question whether or not he was

7        putting in order requests at a time when they knew

8        they couldn't produce the order?

9            MS. MICKELSEN:  But wait, these are making

10       assumptions at a time when they knew.  There was

11       never a time when they didn't know.  They believed.

12           MS. MCDOW:  I believe that was the question he

13       was asking.

14           MR. KOZACHENKO:  No, they knew.

15           MS. MICKELSEN:  Well, this is your position.

16       But this is your claim, so again --

17           MS. MCDOW:  But this goes to a lot of claims of

18       the creditors.  This is --

19           MS. MICKELSEN:  And that may be true.  And that

20       may be a claim of the creditor class.  And you can

21       do a 2004 exam and, you know, institute an adversary

22       proceeding if you like.

23           But what I am saying is that there are

24       responses and there are a time and a place to

25       address these claims.  And this is not the time to

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 143

1      start feeding information.

2            MS. MCDOW:  An instruction not to answer to

3      341A is not appropriate in the first place.

4            MS. MICKELSEN:  Okay.  Well --

5            MS. MCDOW:  The UST can decide whether or

6      not --

7            MS. MICKELSEN:  It falls out of the scope.

8            MS. MCDOW:  Okay.  Well, that's not for either

9      of us to decide.  I would like to know.  That

10     question goes to all sorts of questions of the

11     estate, insider liability, liability actions.  That,

12     I think, is one of the appropriate questions that

13     has been asked.

14           MS. MICKELSEN:  Our client, at all times,

15     believed that they were able to produce.

16           MS. MCDOW:  I would like his testimony to that

17     effect under oath.

18  BY MR. KOZACHENKO:

19     Q    So did John Skrodenis know about problems with

20  the board design and ship delays?

21           MS. MCDOW:  Okay.  Was there ever a time when

22     you thought you would not be able to produce

23     products that orders were being --

24           MR. BARBER:  No.

25           MS. MCDOW:  Okay.  So at all times up until May

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 154
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 144

1       2013, you thought you could fulfill orders?

2              MR. BARBER:  Yes.

3              MS. MCDOW:  On May 2014, I'm sorry?

4              MR. BARBER:  Yes.

5              MR. KOZACHENKO:  So did you hear the question

6       or do I have to repeat it?

7              MS. MICKELSEN:  He answered it.

8              MS. GLOSSON:  He answered the question.

9              MS. MCDOW:  He said there was never a point

10      where he thought he couldn't make the --

11             MR. KOZACHENKO:  I didn't ask that question.  I

12      asked a different question.

13  BY MR. KOZACHENKO:

14      Q    Did John Skrodenis know about the problems with

15  the board design?

16      **A    (By Mr. Barber) I assume he did.**

17      Q    Did the sales team know about it?

18      **A    (By Mr. Barber) I don't know.  But I assume**

19  **John would have communicated that.  And then this order**

20  **confirmation, it states that we expect to ship in-- from**

21  **the very end of February.  And we would provide a**

22  **guarantee by the end of March.**

23      Q    Right.

24      **A    And so given the state of the design and the**

25  **board that we were seeing at that point in time, we**

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1    **believed that we would be able to resolve the problems**

2    **and produce the boards.**

3              MS. MICKELSEN:  And just for the record, too,

4         initially, you had said that you were asking this

5         line of questioning for the purpose of asset

6         valuation of some sort.  I have not heard any

7         conclusion, I have not heard anything that -- with

8         this line of questioning, that deals with asset

9         valuation.

10             MR. KOZACHENKO:  Yeah.  But all of the

11        information that I asked for, I was not provided

12        with any numbers so far, with any number of sales or

13        payments to the contractors or nothing.

14             MS. MICKELSEN:  Then you cannot conduct an

15        asset valuation.  And the rest of the line of

16        questions was for what purpose?

17             MR. KOZACHENKO:  So you had prepared them well.

18        That's my conclusion.

19             MS. GLOSSON:  Okay.  So this is a meeting of

20        creditors about assets and liabilities and on the

21        debtor's exit strategy.

22             To the extent that you have very specific

23        questions that the debtor has said here today that

24        it is unable to answer for either because the

25        information is not readily available or it recalls

Page 146

1        for too much detail, then there is another forum in

2        which to do that.  You can either meet with the

3        debtor individually, or you can compel their

4        testimony under -- by a court order.

5              MS. MCDOW:  I will renew, I am happy to sit

6        down with you, talk on the phone, and get the

7        information you want.

8              MS. GLOSSON:  The committee has a statutory

9        duty to confer with the creditors that it

10       represents.  The committee represents all unsecured

11       creditors, of which, you are a member of that class.

12       And the committee has a duty to provide information

13       to creditors and also has a duty to solicit input.

14       So if you have any more questions of the debtor,

15       then let's pose those questions.

16             MR. KOZACHENKO:  Okay.

17    BY MR. KOZACHENKO:

18       Q    So what are the liabilities of the company

19    currently to the entities who are not customers?

20       A    **(By Ms. Hushen) 2 million.**

21       Q    Can you break down that?

22       A    **(By Ms. Hushen) It is in the public records.**

23       Q    All right.

24             MS. GLOSSON:  I think what she means is it is

25       in the debtor's bankruptcy filing.

Electronically signed by Alison Presley (001-159-987-5451)        92be47ea-a665-4c9d-be42-899f3e91c918

1          MS. HUSHEN:  Right.

2          MS. MCDOW:  I actually think in this case -- I

3     heard before, I don't know for sure, but I think

4     that Igor may not have been included on the original

5     filing.  So I don't think he has the ability to

6     access those.  So maybe just for his benefit, this

7     one -- I heard that his address was not included.

8          MS. GLOSSON:  Well, his -- according to

9     schedule F, it just says e-mail address only.

10          MS. HUSHEN:  Right.

11          MS. MCDOW:  I don't have any independent

12     knowledge.

13          MS. GLOSSON:  And schedules wouldn't be sent to

14     the general creditor bodies, just the notice.

15          MS. MICKELSEN:  He just gave me his address,

16     his physical address.

17          MR. KOZACHENKO:  I just gave -- they had my

18     address all the time.

19          MS. HUSHEN:  He had access to the schedules

20     because he called us to ask us about it.

21          MR. KOZACHENKO:  And they didn't do it.

22          MS. GLOSSON:  Okay.  We are not going to debate

23     these issues, okay.  So my point is that some of the

24     questions might be asked by revealing the debtor's

25     schedules.  And when she said the information is in

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 148

1       the public record, I am telling you the pubic record

2       she is referring to are the schedules which list

3       liabilities and list assets are available through

4       the bankruptcy court.  Or you can ask the debtor for

5       copies.

6    BY MR. KOZACHENKO:

7       Q    Okay.  So what's the current expenses of the

8    company right now?  I mean per month, salary, or

9    something else.

10      **A    (By Ms. Hushen) Probably 200K roughly.**

11      Q    Per month, right?

12      **A    (By Ms. Hushen) Per month.**

13      Q    So what is your salary?

14           MS. MICKELSEN:  So we have a list of budgetary

15      expenses which we are planning to submit to the

16      Court before a continued hearing on Friday.  And

17      that lays out all of this information.

18           MR. KOZACHENKO:  That's okay.  We will do it on

19      Friday then.  But now it is easy to answer the

20      question, simple question right now.

21           MS. MICKELSEN:  Well, it is a whole long sheet.

22      So we can -- should we go through everything on the

23      list?

24    BY MR. KOZACHENKO:

25      Q    So we know his salary, which is 240, right;

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 159
of 326
Electronically signed by Alison Presley (001-159-987-5451)                      92be47ea-a665-4c9d-be42-899f3e91c918

Page 149

1    what's your salary?

2        **A    (By Mr. Barber) 220.**

3            **(By Ms. Hushen) 210.**

4            MS. MICKELSEN:  Have we already went over this

5        information?

6    BY MR. KOZACHENKO:

7        Q    All right.  So then how many employees do you

8    have besides Monica?

9        **A    (By Ms. Hushen) There is ten total.**

10       Q    How many?

11       **A    (By Ms. Hushen) Ten total.**

12           **(By Mr. Barber) Including contractors.**

13           **(By Ms. Hushen) Including contractors.**

14       Q    Which contractors?

15       **A    Sandgate, an accountant; and an engineer,**

16   **Workbridge Engineer.**

17       Q    Sandgate --

18       **A    (By Ms. Hushen) Sandgate.**

19       Q    Two people?

20       **A    (By Ms. Hushen) One.**

21           **(By Mr. Barber) It has been reduced to one.**

22       Q    Accountant, which is an employee of a company?

23       **A    (By Mr. Barber) Contractor.**

24           **(By Ms. Hushen) Temporary contractor.  You**

25   **asked me which contractors there were.  The three**

First Choice Reporting & Video Services
www.firstchoicereporting.com            Worldwide Scheduling            800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 160
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 150

1    contractors that there are is Sandgate, Workbridge and a

2    Robert Half employer -- I don't know the agency, Hula

3    (ph) now.  An agency employee.

4        Q    Okay.  Sandgate, one --

5        A    (By Ms. Hushen) Workbridge, one; accounting,

6    one; total three.  Those are all our contractors.

7        Q    And employees?

8        A    (By Ms. Hushen) Seven.

9        Q    Did you hire someone, anyone during the months

10   of June, no?

11       A    (By Ms. Hushen) During when?

12       Q    During the month of June?

13       A    (By Ms. Hushen) I hired an accountant.  I had

14   four turn over in the last two months.  So yes, I have

15   replaced that person with a contractor.

16       Q    Okay.  But when I visit you June, correct me if

17   I'm wrong, you told me that you have only five employees,

18   including yourself?

19       A    (By Ms. Hushen) I have never said only five.

20   We have never had only five, and we never would have said

21   that.  You must have misunderstood.

22            MS. MCDOW:  In fairness, there is a

23       difference -- because we had the same confusion --

24       between officers, who I think were not included in

25       employees originally in the formation.  We had the

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 161
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 151

1    same misunderstanding is why I am kind of -- between

2    the officers, contract, and employees.

3            MS. HUSHEN:  Okay.

4            MS. MCDOW:  Does that help?

5            MS. HUSHEN:  Okay.

6            MS. MCDOW:  Because I think the officer --

7            MS. HUSHEN:  Yeah.  I mean, we have never been

8    down to five.  But including officers, then it would

9    have been seven.

10   BY MR. KOZACHENKO:

11       Q    So what's the purpose of a Sandgate contractor;

12   what does he do?

13       A    (By Ms. Hushen) Well, here.  I will be happy to

14   provide you a copy of what everybody's roles and

15   responsibilities are.  And maybe you could read that

16   while other questions are getting asked.  I don't know if

17   it would speed things up.

18            Oh, you have it there.

19       Q    It will speed things up if you could include

20   myself on the list correctly.

21       A    (By Ms. Hushen) We explained it was an error

22   made and we had you included on the list.

23            MS. MICKELSEN:  I believe --

24            MS. HUSHEN:  I had your e-mail address.

25            MS. GLOSSON:  Well, first of all, when you say

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 162
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1     error in providing them with information --

2         MR. KOZACHENKO:  And I don't believe it is an

3     error.  I'm sorry to interrupt you.  Because I was

4     there in the office and I exchanged three times with

5     e-mail.  And it is not an error.

6         MS. GLOSSON:  So the information that has been

7     provided to creditors to date from the debtor at

8     this point is information that is required by the

9     bankruptcy code that is filed with the Court.  To

10    the extent that the debtor has entertained

11    individual inquiries from creditors or from the

12    committee, then that information would be available

13    to that particular person.

14        The debtor has an obligation to provide

15    information within, sort of, a reasonable request

16    and a reasonable amount of time.  But this is not

17    the forum for asking detailed questions kin to a

18    deposition that could be answered in a different

19    forum.

20        MR. KOZACHENKO:  Yes.  So we are close to

21    finish, right.

22        MS. GLOSSON:  Okay. So can I ask -- give you an

23    opportunity to ask two more questions and then we

24    will proceed.  Mr. Chang may have some questions

25    himself.

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 163
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 153

1          MR. KOZACHENKO:  All right.  Three more.

2          MS. GLOSSON:  Why don't you ask two more, and

3     then -- because I don't feel like this is -- that we

4     are focusing on exit strategy and assets and

5     liabilities.

6          MR. KOZACHENKO:  I don't think you can even ask

7     questions for exit strategy.  It is not enough in

8     half-an-hour to ask those questions.

9          MS. GLOSSON:  Okay.  Well, you can reserve your

10    questions for another venue.

11         MS. MICKELSEN:  Or you can consult with the

12    creditors' committee counsel and she can provide you

13    this information.  Because it is all information

14    that I am sure she will be seeking in further detail

15    in a 2004 exam.  And she has an obligation to

16    provide it.

17         MS. GLOSSON:  Sorry.  Mr. Chang, do you have

18    any -- do you wish to examine the debtor?

19         MR. CHANG:  No.

20         MR. KOZACHENKO:  See?

21         MS. GLOSSON:  Well, I have questions.  I have

22    about, I am hoping, less than an hour's worth of

23    questions.  Plus, I need to do an examination of the

24    other debtor.

25         MS. MICKELSEN:  What time is it?

First Choice Reporting & Video Services
www.firstchoicereporting.com                    Worldwide Scheduling                    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 164
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 154

1        MS. GLOSSON:  So it is 2:13.

2        MS. MICKELSEN:  And no one has had lunch.

3        MS. GLOSSON:  Right.  We have been going

4    straight since 10:45.

5        MR. KOZACHENKO:  That was a voluntary decision.

6    It was a voluntary decision.

7        MS. GLOSSON:  Okay.  So let me just -- why

8    don't I proceed with some questions.  And then if

9    you have any following mine, then we will go there.

10       MR. KOZACHENKO:  Can I just -- three more?

11   Because we will cutoff -- topic changes, and it is

12   difficult.  It is more easier than to do it

13   afterwards.

14       MS. MCDOW:  I am going to say it again.  I have

15   an obligation to represent you.  I don't know where

16   you -- you have never reached out to me, done

17   anything.  I can assure you, if you give me your

18   questions, as long as they are reasonable within the

19   scope of 2004, I will ask them.  I will give you my

20   card and we can talk about it as long as you want.

21   I can assure you I am going to do an emergency

22   motion for a 2004.

23       MR. KOZACHENKO:  Sure, I understand.  Thank you

24   for the information there.  But it will take like

25   five more minutes or maybe two more minutes.

Case: 14-30725    Doc# 148    Filed: 07/23/14    Entered: 07/23/14 19:01:10    Page 165
of 326

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

Page 155

1            MS. GLOSSON:  Why don't you ask one question,

2       and then let's leave it at that.

3  BY MR. KOZACHENKO:

4       Q    So how many chips do you have sold or wafer or

5  in the production or in form already?

6            MS. GLOSSON:  Right now or as of the petition

7       date?

8            MS. HUSHEN:  Essentially, the same thing.

9  BY MR. KOZACHENKO:

10      Q    And second question will be:  Where are they

11  stored?

12           MS. GLOSSON:  Well, I am going to be asking

13      those kinds of question.  So if you want to withhold

14      it and --

15           MR. KOZACHENKO:  No more after that.

16           MS. HUSHEN:  16,882 between San Jose and Korea.

17           MR. BARBER:  Yes, mostly San Jose.

18           MS. GLOSSON:  You are talking about chips,

19      Ms. Hushen?

20           MS. HUSHEN:  Yeah.

21           MS. GLOSSON:  This is what --

22           MR. KOZACHENKO:  It is wafer or what?

23           MS. GLOSSON:  Well, this is what was covered

24      actually at the beginning.  Counsel for the debtor

25      and Ms. Hushen made oral revisions to the schedule B

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 156

1    which lists wafers, which lists chips, and which

2    lists chips and things in progress, right; am I

3    correct in that statement?

4         MS. HUSHEN:  Absolutely.

5  BY MR. KOZACHENKO:

6    Q    So we have covered this line of questions.

7  What -- how many chips are -- I know what's -- I am not

8  sure what it is for terms of how many chips on the wafer

9  or how many cores on the wafer?

10   **A    (By Mr. Barber) so each chip is composed of**

11   **four dyes.  And we would get 186 sets of four dyes out of**

12   **one wafer on an untested basis.**

13        Q    So basically, the number 186 represents, in the

14   future, if you process them, it will become an individual

15   chip, right?

16   **A    (By Ms. Hushen) Less fall out.**

17        **(By Mr. Barber) If we choose to make them into**

18   **chips with four dyes, then yes.**

19        **(By Ms. Hushen) Right.**

20        Q    How much does it cost to process, you know,

21   from the wafer to the chip?

22   **A    (By Ms. Barber) Same question we already asked**

23   **about Uniquify.  We would have to go evaluate the terms**

24   **of the contract, whether or not we can disclose that.  We**

25   **have already answered that.**

Electronically signed by Alison Presley (001-159-987-5451)                                 92be47ea-a665-4c9d-be42-899f3e91c918

Page 157

1           MS. GLOSSON:  Okay.  So let's -- I am going to

2      move on.  I am going to proceed with my questions at

3      this point.  I may end up continuing the meeting,

4      counsel, to another date.  Because -- well, for

5      obvious reasons.

6                FURTHER EXAMINATION BY MS. GLOSSON

7  BY MS. GLOSSON:

8      Q    So we are still sticking with Hashfast

9  Technologies, LLC, that has not been concluded.  Why was

10 Mr. deCastro's position as CEO terminated in May 2014?

11          MR. KOZACHENKO:  May I interrupt you?

12          MS. GLOSSON:  No, not right now.

13          MR. KOZACHENKO:  Just what's the connection to

14     assets and liability?

15          MS. GLOSSON:  Go ahead.

16          Do you want me to repeat the question?

17          MR. BARBER:  So why was Mr. deCastro removed

18     from the position of CEO?

19 BY MS. GLOSSON:

20     Q    Correct.  Are you able to answer that question?

21     **A    (By Mr. Barber) I am just trying to remember**

22 **the exact reasoning.**

23          **(By Ms. Hushen) Pete had answered that for us**

24 **before.**

25     Q    Well, I want Mr. -- I want testimony under

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 168
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 158

1    oath.  So Mr. Siddiqui's statements that he makes in

2    Court are not necessarily the same as statements made by

3    the debtor under oath.  So that's why I am asking the

4    questions.

5         **A    (By Ms. Hushen) Right.  I was just -- sorry.**

6              **(By Mr. Barber) So we felt that going forward,**

7    **that it was better for the creditors not to have Eduardo**

8    **in the CEO position.**

9         Q    When you say "we," who are you referring to?

10        **A    (By Mr. Barber) So the decision was made by the**

11   **board, which is myself, Eduardo, and one tie-breaking**

12   **adviser.**

13        Q    So what were the circumstances, then, that

14   surrounded that decision to terminate him?

15        **A    (By Mr. Barber) To remove him from the position**

16   **of CEO?**

17        Q    Correct.

18        **A    (By Mr. Barber) The company was in bankruptcy.**

19        Q    Well, at that point, the involuntary had been

20   filed?

21        **A    (By Mr. Barber) Yes.  We were in the gap**

22   **period.**

23        Q    But from your testimony earlier today, it

24   sounds like there was no change to his compensation

25   structure from before who was -- when he was CEO and when

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 169
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 159

1    he was no longer CEO; is that correct?

2         **A    (By Mr. Barber) Correct, yes.**

3         Q    Has there been any change to the type or nature

4    of the services that he provides to the debtor since his

5    termination?

6         **A    (By Mr. Barber) Yes, very significant.**

7         Q    Okay.  What are -- can you just give me an

8    example of what has changed with regards to the services

9    or responsibilities that he has performed?

10        **A    (By Mr. Barber) So previously, he was**

11   **responsible for the day-to-day operations of the company.**

12   **And after he was removed from the CEO position, he has**

13   **now been filling a sales and business development role**

14   **and is being purely focused on closing sales.**

15             MS. MCDOW:  Can you say that last part again,

16        focused on something?

17             MR. BARBER:  On closing sales.

18             MS. MCDOW:  And then before that?

19             MS. GLOSSON:  Business development, sales and

20        business development role.

21             Was that right?

22             MR. BARBER:  Yes.  So he has been helpful in

23        negotiating contracts and closing sales.

24   BY MS. GLOSSON:

25        Q    So who is now responsible for the day-to-day

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 160

1   responsibilities that were previously performed by

2   Mr. deCastro?

3       **A    (By Mr. Barber) So I hold the title of**

4   **president, has been added.  And the general day-to-day, I**

5   **share many of the tasks with Monica.**

6       Q    So is it your testimony then that you and

7   Ms. Hushen together, sort of perform the day-to-day

8   operational functions of the debtor?

9       **A    (By Mr. Barber) Yes.**

10      Q    Do you agree with that Ms. Hushen?

11      **A    (By Ms. Hushen) Yes.**

12      Q    When did Hashfast Technologies advance the

13  $31,000 to Mr. deCastro that's shown on the schedules?

14      **A    (By Mr. Barber) Monica, you have the break**

15  **down.**

16          **(By Ms. Hushen) Well, it was early in the**

17  **formation of the company.**

18      Q    Was that all one?

19      **A    (By Ms. Hushen) No, it was in multiple months.**

20      Q    Okay.  What was the reason for -- well, do know

21  why, Mr. Barber, why --

22      **A    (By Ms. Hushen) It was in 2013, I think.**

23      Q    Okay.  Why did the debtor advance the money to

24  Mr. deCastro?

25      **A    (By Mr. Barber) So, I know Mr. deCastro was**

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 171
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 161

1 **having personal financial problems. And so the company**

2 **advanced him money. He was being paid significantly**

3 **under market salary for the position.**

4     Q    Has the debtor ever attempted to collect on

5 this receivable from Mr. deCastro?

6     **A    (By Ms. Hushen) We collect $500 out of every**

7 **pay check.**

8     Q    So what was the total amount that was advanced

9 to Mr. deCastro?

10     **A    (By Ms. Hushen) It was roughly 32, 35K. Let me**

11 **look.**

12     Q    That's fine. A range is fine.

13     **A    (By Ms. Hushen) It was in that range.**

14     Q    When did the debtor start collecting this $500

15 month -- or I'm sorry, $500 per pay check?

16     **A    (By Ms. Hushen) $2,000 as month. I have to**

17 **look exactly.**

18     Q    Was it before or after the involuntary?

19     **A    (By Ms. Hushen) Oh, it has been many months**

20 **before. The advances were made in November of '13**

21 **through January. And the repayments started in -- it**

22 **looks like it started in November. So the repayment**

23 **started in November of last year.**

24     Q    Okay. With respect to the number of employees

25 at Hashfast Technologies, at what point did the debtor

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 172
of 326

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

1   employ the greatest number of employees?  Because there

2   was some statements, I think made by Ms. Hushen, that

3   there was a downsizing.

4       **A   (By Ms. Hushen) Yeah.  On May 7th, we had a**

5   **significant staff reduction.  We were close to 40 at that**

6   **point and reduced to maybe a dozen plus contractors.  And**

7   **then we had two subsequent reductions after that.**

8       Q   Was Hashfast Technologies contemplating filing

9   a bankruptcy petition --

10      **A   (By Ms. Hushen) Yes.**

11      Q   -- before the involuntary was filed?

12      **A   (By Ms. Hushen) Yes, we were.**

13      Q   And when did the debtor, Hashfast Technologies,

14   first contemplate filing bankruptcy?

15      **A   (By Ms. Hushen) A few weeks after I arrived.**

16   **We were essentially --**

17      Q   So mid April?

18      **A   (By Ms. Hushen) Yeah, end of April.  We were**

19   **trying to gather the retainer money.  That was our gating**

20   **item given all of the other legal suits and process.**

21      Q   So other than trying to gather the money for

22   the retainer, what other steps did the debtor take in

23   contemplating filing a bankruptcy at the end of April

24   time period?

25      **A   (By Ms. Hushen) We cut staff.  We cut all**

First Choice Reporting & Video Services
www.firstchoicereporting.com    Worldwide Scheduling    800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 173
of 326

Electronically signed by Alison Presley (001-159-987-5451)    92be47ea-a665-4c9d-be42-899f3e91c918

Page 163

1    spending.  We got rid of every discretionary spend that

2    we could.  Changed structure of the organization and

3    roles and responsibilities, and did what we could to stop

4    the burn and refocus.

5         And at that point in time, we just started

6    going through reconciling and recreating history.

7    Q    Who was responsible for bringing in Ms. Hushen?

8    A    (By Mr. Barber) I was.

9    Q    Mr. Barber, at what point did the debtor

10   consider that the problems with production and the

11   problems with design were cured?

12   A    (By Mr. Barber) So we started shipping in

13   volume the second half of January.

14   Q    I believe you have answered this question, but

15   let me ask it again:  Does the debtor believe that there

16   are any claims against third parties arising from any of

17   the production or design flaws?

18        There is none scheduled so that's why I am

19   asking.

20        MS. MICKELSEN:  We are currently investigating

21        that.  There are possibilities, but that is still

22        being evaluated.

23   BY MS. GLOSSON:

24   Q    Why was the debtor unable to make any

25   disclosure with respect to that issue on the schedules?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 174
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 164

```
 1          MS. MICKELSEN:  Not enough information at that
 2     time.
 3          MS. GLOSSON:  With respect to not enough
 4     information, do you mean that that is as to like
 5     data available to make that determination or is it
 6     more determination of whether there is a legal
 7     claim?
 8          MS. MICKELSEN:  Both, actually.
 9          MS. GLOSSON:  Okay.
10 BY MS. GLOSSON:
11     Q    All right.  With respect to -- did the debtor,
12 at any time, maintain a customer list?
13     A    (By Mr. Barber) Yes.  We maintain a customer
14 list at all times.
15     Q    And was there a customer list as of the date of
16 the involuntary?
17     A    (By Mr. Barber) Yes.  At all times, we had a
18 database of all of the customers.
19     Q    Is there any truth to the article that was
20 published by Extreme Tech in January that Hashfast
21 Technologies customer's list was stolen or leaked?
22     A    (By Mr. Barber) There was a -- our -- one lady
23 in marketing sent an e-mail message out and accidently
24 put the e-mail addresses on CC rather than BCC, so
25 leaking the e-mail addresses of many customers.
```

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 175
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 165

1    Q    All right.  Does the debtor assign any value to

2  that customer list?

3    **A    (By Ms. Hushen) That's hard to say.  We didn't**

4  **assign it a value given the bankruptcy situation.**

5    Q    Well, there wasn't a customer list scheduled.

6  The debtor marked none on schedule B?

7    **A    (By Ms. Hushen) Well, because it asked about**

8  **whether or not -- I think it was some of the wording in**

9  **the way it was phrased, whether it had been offered for**

10 **sale or something like that.  I would have to look at the**

11 **schedule.**

12   Q    Okay.  But you -- the debtor acknowledges there

13 is a customer list?

14   **A    (By Ms. Hushen) Yes.**

15   Q    It didn't disclose it because you believed it

16 didn't fit within the definition?

17   **A    (By Ms. Hushen) It didn't fit within the way it**

18 **was defined, right.**

19        MS. MCDOW:  Why didn't it fit, I'm sorry?

20 BY MS. GLOSSON:

21   Q    So have there been --

22   **A    (By Ms. Hushen) No, wait.**

23   Q    I'm sorry?

24   **A    (By Ms. Hushen) Go ahead.**

25   Q    So the inventory list that's on schedule B that

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 176
of 326
Electronically signed by Alison Presley (001-159-987-5451)                      92be47ea-a665-4c9d-be42-899f3e91c918

1   you provided us the updated figures for, is this -- have

2   there been any changes to this inventory, to the debtor's

3   inventory since the involuntary was filed?

4       **A     (By Ms. Hushen) We have had subsequent sales.**

5       Q     Okay.  So those sales, what kinds of items were

6   sold?

7       **A     (By Ms. Hushen) Chips, power supplies, boards,**

8   **other components, chassis, pretty much.**

9           MS. MICKELSEN:  Any easy way to reconcile this,

10          out of curiosity?  The list that we provided with

11          the inventory, can that be reconciled with the list

12          that was --

13          MS. HUSHEN:  Did we have our -- our actual more

14          detailed inventory list starts with the May 9th date

15          and then it shows every sale since then to today's

16          date.  So we have a --

17          MS. GLOSSON:  Mr. Kozachenko, you just took

18          something from my pile.

19          MR. KOZACHENKO:  It's mine.

20          MS. HUSHEN:  It was his contract.

21          MS. GLOSSON:  Okay.  Well, I am going to put it

22          part of the record because you referred to it.

23          MR. KOZACHENKO:  Can you make a copy?

24          MS. GLOSSON:  Can I make a copy, yes, I can

25          make a copy.

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1   BY MS. GLOSSON:

2       Q    Okay.  So chips, power supplies, chassis were

3   what was sold?

4       **A    (By Ms. Hushen) Yeah.  Cables and everything**

5   **that we had in inventory readily available that there was**

6   **demand for.**

7       Q    Is there a -- does the debtor have the ability

8   to provide me with a list of what was sold?

9       **A    (By Ms. Hushen) Absolutely, yeah.**

10      Q    From schedule B.  So what was sold and to who

11  it was sold to?

12      **A    (By Ms. Hushen) Yeah.**

13      Q    Okay.  And about how much time do you need to

14  provide that information?

15      **A    (By Ms. Hushen) It is done currently.**

16      Q    Okay.  So you can resend it to your attorney

17  and she can send it to me?

18      **A    (By Ms. Hushen) Yeah.**

19          MS. MCDOW:  Can you send it to me as well?

20          MS. MICKELSEN:  Yes.

21          MS. MCDOW:  Thank you.

22  BY MS. GLOSSON:

23      Q    Were any sales made to Quito Ochoa (ph)?

24      **A    (By Ms. Hushen) Yes.**

25      Q    And what were the nature of those?

First Choice Reporting & Video Services
www.firstchoicereporting.com           Worldwide Scheduling           800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 178
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 168

1          MS. MICKELSEN:  And I'm sorry, just to clarify

2     the time frame for what was sold, are you talking

3     about just from the involuntary to the voluntary?

4          MS. HUSHEN:  Post May 9th.

5          MS. GLOSSON:  Basically an update to what's on

6     the schedule B.

7          MS. MICKELSEN:  So after the voluntary and

8     after we filed our schedules, an update, okay.

9          MS. GLOSSON:  Because the way I understand or

10    what I understood from Ms. Hushen earlier was that

11    these figures on schedule B are as of May 9th.

12 BY MS. GLOSSON:

13    Q    Is that right or is it as of June 23rd?

14    **A    (By Ms. Hushen) I will have to confirm that.**

15 **It should be as of May 9th.**

16    Q    Okay.  Now, some of this inventory, for

17 example, the Golden Nonce ASIC, that's located in San

18 Jose?

19    **A    (By Ms. Hushen) At Uniquify.**

20    Q    At Uniquify.  Why does the debtor not provide

21 more specificity regarding the location of these assets?

22    **A    (By Ms. Hushen) Just for ease and getting it on**

23 **to a piece of paper.  We have it in detail as to the**

24 **location.**

25          **(By Mr. Barber) Also, to locate -- so these are**

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1   **all held by Uniquify, rather than directly by us.**

2        Q    Right, I understand that.

3        **A    (By Ms. Hushen) Right.**

4        Q    The debtor -- but they are still assets of the

5   bankruptcy estate, right?

6        **A    (By Mr. Barber) Yes.**

7             MS. MICKELSEN:  Do we have that information?

8             MS. HUSHEN:  We had very detailed files.  And

9        the legal firm truncated them into this one format

10       that we were told was required.

11            MS. GLOSSON:  Okay.  Well, I don't want you to

12       divulge attorney --

13            MS. HUSHEN:  Yeah, no, no, I understand.  I

14       thought that was just the format that was required.

15            MS. GLOSSON:  Okay.  But I understand that you

16       understand me.

17  BY MS. GLOSSON:

18       Q    The Golden Nonce chips that are ASICs that are

19  in progress and the wafers that you say are in Korea,

20  where are they in Korea?

21       **A    (By Ms. Hushen) At Signetics, who is the actual**

22  **producer, assembler of the chips.  They are subcontracted**

23  **through Uniquify.**

24       Q    Does Signetics or Uniquify assert any claim

25  against those, those assets?

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 170

1      **A      (By Ms. Hushen) Their claim is that if they are**

2  **not paid, they won't release the assets.**

3              **(By Mr. Barber) Uniquify.**

4      Q      They said that?

5      **A      (By Ms. Hushen) Oh, yes, they have said that**

6  **repeatedly.  And then when we met with them, they said as**

7  **long as we are paid for our --**

8      Q      What's the basis -- do you know, what's the

9  basis for Uniquify or Signetics asserting that position?

10     **A      (By Ms. Hushen) Their basis is that they are**

11 **under financial hurt by virtue of not being paid.  They**

12 **were extended credit terms by Signetics, which they were**

13 **late in making payments on because Hashfast was late in**

14 **paying them.  And because of that, they feel they have**

15 **been damaged.  So some of it was negotiation.**

16     Q      So there is no, like, UCC that has been filed

17 by Uniquify; is that right?

18     **A      (By Ms. Hushen) No, no.**

19             MS. MICKELSEN:  Not that I am aware of.

20             MS. HUSHEN:  No.

21             MS. MICKELSEN:  And as far as a legal basis as

22         to how they can withhold property in an estate or

23         setoff, I haven't heard of any such claims.

24             MS. HUSHEN:  We did send them a formal letter

25         indicating that they were not legally allowed to do

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 171

1      that.  And after that, subsequent meetings were a

2      little more favorable.

3   BY MS. GLOSSON:

4      Q    What -- so --

5           MS. MCDOW:  Julie, if I can, I have a little

6      bit more to add to that based on my conversation.

7      Maybe it will help you.

8           MS. GLOSSON:  No.  Let's just -- you can tell

9      me later.

10          MS. HUSHEN:  I think, frankly, some of it is

11     negotiating positioning.  We have three claims

12     against them that we believe have substantial merit.

13          MR. BARBER:  And potentially more.

14          MS. HUSHEN:  And I believe, you know,

15     potentially more.

16  BY MS. GLOSSON:

17     Q    But those are claims you haven't scheduled; the

18  debtor hasn't scheduled any claims against Uniquify?

19     **A    (By Ms. Hushen) No.  Because we are in the**

20  **process of working through the specifics, the legal**

21  **interpretation of the contract.**

22          MS. MICKELSEN:  Whether or not they brought

23     claims is a completely different matter.

24          MS. HUSHEN:  Right.

25          MS. MICKELSEN:  Okay.  I mean, three issues

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 182
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 172

1        that they are trying to resolve in negotiations.

2              MS. GLOSSON:  I understand that.  But at the

3        same time, the debtor is responsible for filing a

4        list of assets.  Assets include claims against third

5        parties.

6              MS. HUSHEN:  Right.

7   BY MS. GLOSSON:

8        Q    What inventory on schedule B constitutes the

9   batch 500?

10       **A    (By Ms. Hushen) Batch 500 is miscellaneous**

11  **components, I believe.**

12       Q    Well, I don't know what that means.  So can you

13  tell me?

14       **A    (By Ms. Hushen) I am looking it up.  I don't**

15  **know it off the top of my head either.  I am going to**

16  **look it up.**

17            **This is the excess inventory that was not part**

18  **of the original order change.  So we had components that**

19  **were on order in excess of the actual orders on the**

20  **books; power supplies, cables, it is all of our parts.**

21       Q    And that's what's being -- that's --

22       **A    (By Ms. Hushen) That's what 500 --**

23       Q    The 500 is?

24       **A    (By Ms. Hushen) Yes.  We had started excess**

25  **inventory sales in the April timeframe.  Because at that**

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 183
of 326
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

1 point in time, we were trying to look for ways to

2 generate cash.  So we had calculated, based on the

3 builds, what our excess inventory position was.  And I

4 tried to get focused on generating some revenue.

5     Q   What was sold to Mr. Ochoa in May for about

6 530,000?

7     A   (By Ms. Hushen) I would have to get the

8 specific order confirms.

9     Q   Or was it batch 500 or was it something else?

10     A   (By Ms. Hushen) Some of batch 500.  There were

11 some rework boards, there were existing boards, and a

12 number of systems and components.  It was a pretty

13 lengthy list.

14     Q   And what was sold to Mr. Minor in May for about

15 53,000?

16     A   (By Ms. Hushen) I would have to look at the

17 specifics.  I don't have it at it top of my head.

18     Q   Okay.  Is that something --

19     A   (By Ms. Hushen) We had about 500K of sales from

20 May 9th forward, 500-and-change.  And I would have to go

21 look at all of the order confirms.  I don't know them off

22 the top of my head.

23     Q   Now, in May, Hashfast announced on its website

24 that it was refocusing its business model.  What did the

25 debtor mean by that?

Page 174

1      A      (By Ms. Hushen) That we were looking to sell

2  chips as opposed to building systems given that we had a

3  significant number of chips in inventory and we weren't

4  in a position to build up systems at the time.

5           There was a prior proposal, I think early in

6  May, for a chip conversion strategy whereby some of the

7  customers that held orders for systems were potentially

8  going to be offered equal processing power in the form of

9  chips as opposed to systems.

10          (By Mr. Barber) Or more processing.

11          (By Ms. Hushen) Or more processing power.

12          (By Mr. Barber) And some customers were

13  converted.

14          (By Ms. Hushen) You know, 100 gig of hashing

15  power.  They would get 2X or 3X in hashing power in lieu

16  of a system.

17      Q      The 16,000 Golden Nonce ASICs, is that

18  something that's -- is that a ready-to-ship product?

19      A      (By Ms. Hushen) Portions of them are ready to

20  ship.

21      Q      Well, there is about 2,800 that are -- you said

22  are in assembly?

23      A      (By Ms. Hushen) Right.  They aren't tested yet.

24  So they would need to be tested.

25      Q      So that would not be necessarily ready to ship?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 185
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 175

1      **A      (By Ms. Hushen) Right.**

2      Q      But the other ones, the 16,000, is that ready

3  to go?

4      **A      (By Ms. Hushen) They still need to be tested.**

5      Q      They still need to be tested?

6      **A      (By Ms. Hushen) Yes.**

7      Q      So what's the timing on that?

8      **A      (By Mr. Barber) The testing is very quick.  It**

9  **could happen in one day.**

10            **(By Ms. Hushen) Probably not all 16,000.**

11            **(By Mr. Barber) And you will lose about**

12  **10 percent of them.**

13     Q      So with respect to the wafers, which you say

14  there are about 92 wafers, what's the time period of

15  those getting to a finished or final product?

16     **A      (By Ms. Hushen) Probably two to three months.**

17  **Because a good portion of those substrates would need to**

18  **be ordered, and other components.**

19     Q      Now, are any of the --

20            MS. MICKELSEN:  Does it factor in the ability

21         to have cash on hand to be able to finish the build

22         out with the wafers?

23            MS. HUSHEN:  Well, that is presumed in any

24         build out, yeah.

25            MS. GLOSSON:  No, I understand that there is a

First Choice Reporting & Video Services
www.firstchoicereporting.com                Worldwide Scheduling                800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 186
of 326
Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

1       cost.

2             MS. HUSHEN:  So all builds are contingent on

3       funding to do it.

4             MS. MICKELSEN:  And also that right now we

5       don't have authority to be able to generate the

6       revenue that we need to finish this.  So two to

7       three months is -- you know, in some ways, would

8       presume that we would get authority this Friday.

9             MS. GLOSSON:  Well, and I understand that's two

10      to three months, sort of, in an ideal world.

11            MS. MICKELSEN:  Sure, all right.  Just want to

12      clarify.

13            MS. HUSHEN:  Rough timeline.

14  BY MS. GLOSSON:

15      Q    So what's the cost then -- my next question:

16  What is the cost associated with getting those wafers in

17  a form that can be liquidated and returned to creditors?

18      A    (By Ms. Hushen) Right.  So I think that comes

19  back to the same question about Uniquify, whether or not

20  we have an ADA on that pricing.

21      Q    Okay.

22      A    (By Ms. Hushen) I know what the cost is, I am

23  just not sure if we --

24            (By Mr. Barber) I can talk to -- one of the

25  things we had been working on is we had previously

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 187
of 326

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

Page 177

1   developed a new substrate design, which is much lower

2   cost.  And one of the things we have been working on is

3   this new cheaper system design.  We would anticipate

4   building out those wafers with the lower cost substrates.

5       Q   Okay.

6       A   (By Mr. Barber) And those would cost, I think,

7   maybe $12 per --

8           (By Ms. Hushen) That's for the substrate.

9           (By Mr. Barber) -- chip for the substrate.  And

10  a little bit more, but I would anticipate under $20 for

11  the substrate and assembly.  This is approximate from

12  memory.

13          MS. GLOSSON:  All right.  I am going to reserve

14      the rest of my questions for another day.  So I am

15      going to put the record on pause for a moment for

16      purposes of just scheduling another time to come

17      back.

18          (Off the record.)

19          MS. GLOSSON:  Okay.  We are back on the record.

20      We are going to adjourn the Hashfast Technologies,

21      LLC case to July 15th at 11:15 a.m.  And I will note

22      that on the Court's docket.

23          Anything further, I am withholding my questions

24      until then.

25          (Pre-recorded audio was concluded.)

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 188
of 326
Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 178

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA)

3     COUNTY OF ORANGE)

4

5              I, Alison Presley, Stenographic Shorthand

6     Reporter, Notary Public, State of Florida, CERTIFY that I

7     was authorized to and did stenographically transcribe the

8     foregoing proceedings from pre-recorded audio of a

9     proceeding; and that the transcript is a true and

10    complete record to the best of my ability.

11

12             I FURTHER CERTIFY that I am not a relative,

13    employee, attorney, or counsel of any of the parties, nor

14    am I a relative or employee of any of the attorneys or

15    counsel connected with the action, nor am I financially

16    interested in the action.

17

18             DATED this 18th day of July, 2014.

19

20

21    _____

      ALISON PRESLEY

22    Stenographic Shorthand Reporter
      Notary Public, State of Florida

23

24

25

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 189
of 326

Electronically signed by Alison Presley (001-159-987-5451)        92be47ea-a665-4c9d-be42-899f3e91c918

EXHIBIT "B"

1            UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4                     ---OOO---

5    In re                        )  Case No.:
                                  )  14-30725
6    HASHFAST TECHNOLOGIES, LLC, a )
     California limited liability  )  (Jointly
7    company,                      )  Administered with
                                  )  HashFast, LLC, Case
8    Debtor and Debtor-in-Possession. )  No. 14-30866)
                                  )
9    _____ )
     Affects HASHFAST LLC, a Delaware )  Chapter 11
10   limited liability company,    )
                                  )
11   Debtor and Debtor-in-Possession. )
     _____)

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             TUESDAY, JULY 15, 2014

15                 PAGES 1 - 112

16   CONTINUED MEETING OF CREDITORS IN THE CHAPTER 11
       BANKRUPTCY CASE OF HASHFAST TECHNOLOGIES, LLC
17              CASE NUMBER 14-30725

18

19

20                   SF REPORTERS
21           912 Cole Street, Number 304
             San Francisco, California 94117
22                 415-948-8289
                Info@sf-reporters.com
23

24
     Reported By: Karla Ellis-Davis
25   Certified Shorthand Reporter No. 12998, RPR

```
 1  A P P E A R A N C E S:

 2

    For OFFICE OF THE U.S. TRUSTEE:
 3
    UNITED STATES DEPARTMENT OF JUSTICE
 4  235 Pine Street, Suite 700
    San Francisco, California 94104
 5  By:  Julie M. Glosson, Attorney At Law

 6  For PETITIONING CREDITOR KOI SYSTEMS:

 7  BAKERHOSTETLER
    11601 Wilshire Boulevard, Suite 1400
 8  Los Angeles, California 90025-0509
    By:  ASHLEY M. MCDOW, Attorney At Law
 9
    For DEBTOR HASHFAST TECHNOLOGIES LLC:
10
    KATTEN MUCHIN ROSENMAN LLP
11  2029 Century Park East, 26th Floor
    Los Angeles, California 90067-3012
12  By JESSICA M. MICKELSEN, Attorney At Law

13
    Also Present:
14
    Rob Edgeworth
15  Patricia Martin

16

17

18

19

20

21

22

23

24

25
```

```
 1                        WITNESS INDEX

 2  WITNESS:                                      PAGE:

 3  MONICA HUSHEN

 4     EXAMINATION BY MS. GLOSSON.................  6

 5     EXAMINATION BY MS. MCDOW...................  67

 6     EXAMINATION BY MS. GLOSSON.................  104

 7                          *****

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        BE IT REMEMBERED that on Tuesday, July 15, 2014,

 2   commencing at the hour of 11:18 a.m. thereof, at the

 3   Office of the U.S. Trustee, 235 Pine Street, Suite 700,

 4   San Francisco, California, 94104, before me, KARLA

 5   ELLIS-DAVIS, CSR No. 12998, a Certified Shorthand

 6   Reporter in the State of California, personally appeared

 7                      MONICA HUSHEN,

 8   was called as a witness herein, and after having been

 9   duly sworn to testify to the truth, the whole truth and

10   nothing but the truth, was examined and testified as

11   follows:

12        MS. GLOSSON:  Good morning.  This is the

13   continued meeting of creditors in the Chapter 11

14   bankruptcy case of HashFast Technologies, LLC.  The case

15   number is 14-30725.  Today is Tuesday, July 15, 2014,

16   and it is 11:20 in the morning.  We are at 235 Pine

17   Street on the 8th floor, in the meeting of creditors

18   room in San Francisco, California.  This is the time and

19   place for this continued meeting of creditors.  This

20   meeting was continued from last week, which was July 8,

21   2014, and at that meeting there were a number of

22   creditors who were present as well as creditors'

23   committee counsel.

24        And so, because -- in terms of just the format

25   for today, I'm going to be asking my questions first and
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 194 of 326

```
1    then give committee counsel an opportunity to ask any
2    additional follow-up questions.  After -- I will later
3    be calling today the meeting in the HashFast LLC case,
4    which is the related case.
5              All right.  My name is Julie Glosson.  I'm an
6    attorney with the U.S. Trustee's Office, and I will be
7    conducting today's meeting.
8              Ms. Hushen, you've already been sworn in, so
9    will you please state your name for the record.
10             THE WITNESS:  Monica Hushen, H-u-s-h-e-n.
11             MS. GLOSSON:  Counsel, you want to state your
12   appearance.
13             MS. MICKELSEN:  Yes.  My name is Jessica
14   Mickelsen.  I am appearing on behalf of HashFast
15   Technologies, LLC.
16             MS. MCDOW:  Ashley McDow, BakerHostetler.
17   Counsel for the unsecured creditors.
18             MS. GLOSSON:  And also in the room is Rob
19   Edgeworth of Koi Systems, who is a member of the
20   committee; Patricia Martin, who is sitting to my left,
21   she is a bankruptcy analyst with my office; and there
22   are four interns who are with the U.S. Trustee's Office.
23   And they are Moshin Aldabashi, Andrew Batwash, Sara
24   Cendejas, and Sonia Singh.
25             And I will provide you with spellings of those
```

```
 1  later.
 2              EXAMINATION BY MS. GLOSSON
 3         MS. GLOSSON:  Q.  Okay.  You said that you had
 4  wet signatures, copies of wet signatures for me.  Is
 5  this the original wet signature on -- okay.  Do you have
 6  the wet signature for the statement of financial
 7  affairs?  Because this is just as to the debtor
 8  schedules.
 9      A.    That's what I thought we were to bring.  I
10  will be happy to get those to you.
11              MS. MICKELSEN:  Sorry, that was my
12  understanding as well.
13              MS. GLOSSON:  Okay.  I think her testimony was
14  the same as to both the statement of financial affairs
15  and the schedules.
16              MS. MICKELSEN:  Okay.
17              MS. GLOSSON:  But you can send that to me by
18  e-mail.
19              MS. MICKELSEN:  Okay.
20              THE WITNESS:  PDF.
21              MS. GLOSSON:  That's fine.
22              You've also handed to me the declaration
23  concerning the schedules for HashFast LLC, but we will
24  cover that later.
25              All right.  The debtor has filed an
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 196 of 326

1  application to designate a responsible individual; is
2  that correct?
3          MS. MICKELSEN:  Yes, that is correct.
4          MS. GLOSSON:  And that is Ms. Hushen, right?
5          MS. MICKELSEN:  That's correct.
6          MS. GLOSSON:  And we have discussed a number
7  of amendments that needed to made, and I don't recall
8  seeing any amendments.  Can you give me -- since our
9  last meeting.  Can you give me a time frame on when you
10  expect those amendments to be made?
11          MS. MICKELSEN:  We have been finalizing them.
12  They are near finalized.  We just need a little bit of
13  additional information, and we received that, mostly in
14  parts.  We are going to follow up with our client after
15  this 341 meeting, to obtain -- basically obtain the last
16  information that we need to finalize the amendment.  And
17  we hope to have those on file in the next couple of
18  days.
19          MS. GLOSSON:  So by the end of the week?
20          MS. MICKELSEN:  That is the plan, yes.
21          MS. GLOSSON:  Q.  And with respect to the
22  inventory, we had asked for an updated inventory list
23  from the date of the involuntary, and Ms. Hushen, I
24  think your testimony was that is readily accessible to
25  you.  Do you have that with you today?

```
 1      A.  I have it with me.  There is one addition that
 2  needs to be added to it.  There is some inventory that
 3  is added to the beginning statement.
 4          MS. MICKELSEN:  We also sent you a copy by
 5  e-mail of the most recent inventory that we had had,
 6  that was held a few days ago, not too long ago.
 7          MS. GLOSSON:  You sent it to me?
 8          MS. MICKELSEN:  Yes.
 9          MS. MCDOW:  Did you send it to me?
10          MS. GLOSSON:  I don't remember getting that.
11          THE WITNESS:  I will resend it after this
12  meeting.
13          MS. GLOSSON:  Q.  Did it come from you or did
14  it come from Ms. Mickelsen?
15          MS. MICKELSEN:  I believe it came from Monica.
16          THE WITNESS:  I thought it did.  I'll resend
17  it.
18          MS. MCDOW:  Did I get it?
19          MS. MICKELSEN:  Yes, I believe it was to both
20  you and --
21          MS. GLOSSON:  My apologies for not
22  remembering.  If Ms. Martin says we got it, then we got
23  it.
24          MS. MCDOW:  I recall seeing it, though, so...
25          MS. GLOSSON:  Okay.  Thank you.  All right.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 198
of 326

```
 1    So I understand that Mr. Barber is not going to be here.
 2    I was informed of this development yesterday, and that
 3    he has retained counsel and his counsel doesn't want
 4    him -- is not prepared for him to be here today; is that
 5    correct?
 6              MS. MICKELSEN:  That is correct.
 7              MS. GLOSSON:  All right.  And so -- but I'm
 8    going to proceed with Ms. Hushen, and to the extent you
 9    can answer the questions, we will see where that leaves
10    us.
11              MS. GLOSSON:  Q.  All right.  So with respect
12    to the inventory, can you tell me what the Premier
13    Design Partnership is?
14         A.   Premier?
15         Q.   Premier Design Partnership?
16         A.   I don't know that one.  I would have to
17    investigate.
18         Q.   Who would you contact to investigate?
19         A.   Somebody on our team.
20         Q.   Who would you go to first?
21         A.   Tim or Simon or Eduardo.  Or go through the
22    records.  I just don't recognize that name.  Is it
23    called something else?  Is it on a schedule?  I just
24    don't recognize the name as a vendor.
25         Q.   I don't think it is a vendor.
```

```
 1      A.   Oh.

 2      Q.   I think it is a --

 3      A.   The name of a contract term?

 4      Q.   No.

 5      A.   Where did it appear?

 6      Q.   It's on the website.  On your website, May 12,

 7   2014, HashFast announced its Premier Design Partnership

 8   program.

 9      A.   I do not know.  It may have been tied in with

10   Pepper Mining.  There was an announcement of a

11   partnership related to them.

12      Q.   One of the things discussed at the last

13   meeting that I want to the talk a little more on is with

14   respect to the chips.  Is Schedule B, does that reflect

15   only the first generation chips?

16      A.   Schedule B being our inventory?

17      Q.   Correct.

18      A.   Yes, it's the current generation of chips.

19      Q.   And that's the first generation of chips; is

20   that right?

21      A.   Our first, yes.

22      Q.   Your first generation.  Because I understand

23   that there were generation 1.5 --

24      A.   Right.

25      Q.   -- 2 --
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 200
of 326

```
 1          A.   Yes.

 2          Q.   -- and perhaps 3.

 3          A.   Yes.

 4          Q.   So who owns the IP associated with the first

 5     generation of chips?

 6          A.   That was developed by HashFast and Sandgate in

 7     conjunction with, I believe, Uniquify.

 8          Q.   When you say HashFast, which entity do you

 9     mean?

10          A.   Well, Sandgate was paid primarily through

11     HashFast LLC.

12          Q.   So it's HashFast LLC that owns the -- so my

13     question was --

14          A.   Yes.

15          Q.   -- who owns the IP associated with --

16          A.   HashFast LLC.

17          Q.   And then you also said Sandgate in connection

18     with Uniquify.  Does Sandgate have an ownership interest

19     in the first generation of chips?

20          A.   Sandgate was a subcontractor working for

21     HashFast LLC.

22          Q.   I understand that.

23          A.   And they helped develop the chip design.

24          Q.   Does Sandgate have any ownership interest in

25     that IP associated with the first generation of chips?
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 201
of 326

1    A.    Sandgate is an equity owner in the company;

2    certain principals of Sandgate are.

3    Q.    With respect to the intellectual property that

4    is for the first generation of chips, do you believe

5    that Sandgate as an entity has an ownership interest in

6    that IP?

7    A.    No, as employees of HashFast, and HashFast

8    should have the ownership interest.  As a contractor to

9    HashFast.  I think Uniquify played a role in the design

10   of the Mask Works as well, but I would have to clarify

11   that with Simon.  I'm less versed on the technical

12   aspects.

13   Q.    I'm sorry, what did you say?

14   A.    I am less versed on the technical aspects.

15   Q.    Who would be?

16   A.    Simon.

17   Q.    On HashFast, the parent's bankruptcy

18   documents, there is the two patents.  One is the stacked

19   chips and the other is the Golden Nonce interface

20   protocol.  Which one of those relates to the first

21   generation of chips?

22   A.    I can't articulate that clearly.

23   Q.    Who owns the IP associated with generation

24   1.5?

25   A.    HashFast LLC paid for DXCorr to develop that,

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 202
of 326

```
 1   and DXCorr in turn licensed to HashFast.

 2       Q.   I want to make sure that we know which entity

 3   we are talking about when you say HashFast.  So you said

 4   HashFast LLC, which is the parent, paid DXCorr?

 5       A.   Right.

 6       Q.   Do I understand that right?  And then you said

 7   DXCorr licensed to HashFast.  Which HashFast entity are

 8   you referring to?

 9       A.   HashFast LLC, I assume.  I will have to verify

10   that in the contract.  There were some payments made by

11   both entities to DXCorr, but primarily they were paid

12   through HashFast LLC.

13       Q.   Getting back to the question of who owns the

14   IP associated with that generation 1.5 chip, does --

15   which entity owns the IP?

16       A.   HashFast.

17       Q.   LLC, the parent?

18       A.   Yes.  That would probably be subject to some

19   legal opinion on the contract term, that I'm not in a

20   position to offer.

21            Is there a --

22       Q.   I'm sorry?

23       A.   Nothing.  Go ahead.

24            MS. GLOSSON:  Did you need to connect?

25            THE WITNESS:  Yeah.  Just to a network.  I
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 203
of 326

1   sent an outline of the IP.

2       MS. MICKELSEN:  No, I'm sorry.  We don't have

3   WiFi available.

4       MS. GLOSSON:  Q.  So I was under the

5   impression that DXCorr had the rights and license -- had

6   the rights to the generation 1.5 chip, based on

7   information that you provided to my office through the

8   initial depo interview, and that DXCorr licensed that IP

9   to HashFast.

10      A.   Yes.

11      Q.   So DXCorr owns the IP?

12      A.   I said that piece is subject to a legal review

13  of the contract terms.  I don't know that for a fact.

14  HashFast LLC makes payments to DXCorr, DXCorr was

15  contracted on by HashFast LLC and DXCorr licensed to

16  HashFast LLC.

17      Q.   Is there litigation regarding who owns the

18  generation 1.5 IP?

19      A.   I don't believe there is litigation.  I

20  believe there is a claim as it relates to what work was

21  done under which version of which contract.  There was a

22  1.5 contract and a 2.0 contract.  One of them was

23  unsigned.  There was work done under both contracts.

24  DXCorr's position is different than HashFast's position.

25      Q.   DXCore's claim is listed as disputed.  Is that

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 204
of 326

```
 1    the basis for the dispute?

 2         A.   Yes.

 3              MS. MICKELSEN:  On our amended schedules we

 4    will be including a possible claim against DXCorr.

 5              MS. GLOSSON:  And what's the amount of that

 6    claim?

 7              MS. MICKELSEN:  That information will be

 8    provided on the schedules.  Our client did provide that

 9    information, but at this time I'd rather just wait until

10    our schedules have come out.

11              MS. GLOSSON:  Q.  So on the debtor's --

12    HashFast Technologies, LLC, it identifies a memorandum

13    of understanding between HashFast Technologies and

14    DXCorr that is dated August 21, 2013.  What is the scope

15    of that memorandum of understanding?

16         A.   I would have to look at that specifically to

17    answer that.

18         Q.   Do you know which generation of chips that

19    covered?

20         A.   Would you like me to look at that?  I don't...

21         Q.   Well, do you know which --

22         A.   Not without looking.  You are referring to

23    names of contracts and I haven't been here long enough

24    to have absorbed all of that in the memory banks yet.

25    I'd have to go look at all of the specific contracts to
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 205
of 326

1    see what the terms state.

2         Q.   There is another contract that is dated

3    December 1, 2013, on Schedule G, and that's between

4    HashFast Technologies and DXCorr.  Do you know what

5    DXCorr was supposed to do under that agreement?

6         A.   Let me try and pull up the schedules.

7         Q.   I can show you a copy, if you would like.

8         A.   Yeah, that's what I'm looking at.

9              So there's one dated August of 2013, a memo of

10   understanding.  Is that one of the ones you were

11   referring to?

12        Q.   Yes.  That was the first one I mentioned.

13        A.   And that is work on the 16-nanometer chip,

14   which was generation 2.

15        Q.   That's the one dated August 21st?

16        A.   Yes.

17        Q.   So are you reviewing the actual agreement

18   right now?

19        A.   Yes.  The two-page memo of understanding.

20        Q.   What are the other terms of that August 21,

21   2013 agreement -- or memorandum?

22        A.   We provided the non-refundable deposit for

23   them to be begin work on the 16-nanometer design.  There

24   was a structure of the payment terms.  They were to

25   deliver a tape-out.

SF Reporters (415) 948-8289

| | |
|---|---|
| 1 | Q.   Say that again? |
| 2 | A.   They were to deliver a tape-out. |
| 3 | Q.   What is a tape-out? |
| 4 | A.   It's a point at which production can become |
| 5 | real.  It's probably the easiest way to explain it. |
| 6 | MS. MICKELSEN:  I think that's how you |
| 7 | explained it to me. |
| 8 | THE WITNESS:  And I don't believe that was |
| 9 | delivered.  I could be wrong.  DXCorr would retain |
| 10 | ownership of the IP in the development of fulfilling |
| 11 | these products and services, and would license the IP to |
| 12 | HashFast. |
| 13 | MS. MCDOW:  Can you say that again. |
| 14 | THE WITNESS:  DXCorr shall retain ownership of |
| 15 | the IP that DXCorr develops, and will license the IP to |
| 16 | HashFast.  The license fee should be included... |
| 17 | MS. MICKELSEN:  I want to clarify, though, |
| 18 | that this is the contract that was not signed, correct? |
| 19 | THE WITNESS:  This one is signed. |
| 20 | MS. MICKELSEN:  Oh, this one is the one that |
| 21 | was signed. |
| 22 | THE WITNESS:  Right. |
| 23 | MS. MICKELSEN:  It's the other one. |
| 24 | THE WITNESS:  This one is signed. |
| 25 | MS. GLOSSON:  Q.  The last part, you said |

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 207
of 326

```
 1   DXCorr licenses to HasfFast?

 2        A.   To HashFast.

 3        Q.   Does is specify which HashFast?

 4        A.   No, it doesn't.

 5        Q.   All right.

 6             MS. MARTIN:  Who signed it; which HashFast

 7   signed it?

 8             THE WITNESS:  HashFast Technologies actually

 9   signed it.

10             MS. GLOSSON:  Q.  Who signed it on behalf of

11   HashFast Technologies?

12        A.   Eduardo.  And the letterhead is HashFast

13   Technologies, LLC.  HashFast Technologies, a California

14   corporation engaged in the business of producing

15   microchips.  So they are the party, HashFast

16   Technologies.

17        Q.   What was the non-refundable deposit amount?

18             MS. MICKELSEN:  Just to clarify, I want make

19   sure there aren't any confidentiality provisions in

20   there.

21             THE WITNESS:  I don't see one in here.  I

22   don't know if this refers to another contract.

23             MS. MICKELSEN:  All that she knows is that the

24   initial signed contract was particularly addressed as a

25   result of the last questioning from the creditors.  The
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 208 of 326

```
 1   prior meeting does contain very strict confidentiality

 2   provisions.

 3            THE WITNESS:  They're concerned because of the

 4   three-way confidentiality with TM&C.  And so theirs is

 5   more.

 6            MS. MICKELSEN:  I just want to make sure

 7   DXCorr does not have something similar.

 8            MS. GLOSSON:  Q.  Can I get --

 9        A.   The other term that is important in the

10   contract, that I know is one that HashFast's team has

11   emphasized, is there was an exclusivity that DXCorr

12   would not participate on any other cryptocurrency design

13   or creation of intellectual property.  And that extended

14   one year beyond the termination of the relationship.

15   And that is also the subject of a claim right now.

16        Q.   Do you have the amount -- does the contract

17   state the amount of the non-refundable deposit?

18        A.   To start -- it's 100K, I believe, plus 425.

19        Q.   So 100 and?

20        A.   100K would be the non-refundable, I'm reading.

21        Q.   And then you said 425.  Is that --

22        A.   Which was subsequent payments of 85K each.  1,

23   2, 3, 4, 5.  And then 200K for the tape-out.

24        Q.   All right.  Can you just slow down a little

25   bit.  You are going very fast for me.  So the
```

1    non-refundable deposit is 100,000.  And then you said
2    there were other payments of 8500 [sic], plus for the
3    tape-out.  So can you go a little bit more --
4         A.   The total cost of the contract is 982K.  The
5    payment plan was 100K upfront, plus 425K, divided into
6    equal payments -- September 1st, 85; October 1st, 85;
7    November 1, 85; December 1, 85; and then 1/1, 85.  And
8    then 200K was for the tape-out.  A subsequent 100K a
9    month after tape-out.  And then the final two payments
10   of 100K and 57K, two months and three months after
11   tape-out.
12        Q.   Okay.  What were the final payments again?
13        A.   100K and 57K.
14        Q.   Were all of these amounts that you just
15   described, were they all paid to DXCorr?
16        A.   Not all of them, no.
17        Q.   So at what point -- up to what point was -- or
18   do you have an amount that was paid to DXCorr?
19        A.   Yes.  I would have to look at the schedules.
20        Q.   I didn't see payments to creditors that were
21   made -- any payments to DXCorr.  The debtors are
22   required to list payments in the 90 days prior to
23   filing.  And I didn't see that HashFast Technologies...
24        A.   DXCorr most likely was paid through the LLC,
25   and I believe that probably stopped prior to the

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 210
of 326

1   90 days.  I believe the last payment may have been in

2   the February time frame, but I would have to look.

3         Q.   What documents would you refer to, to answer

4   that question?

5         A.   I have a summary of payments to DXCorr.

6         Q.   Is that available on your laptop that you have

7   before you right now?

8         A.   I will find out.  I would have to look for

9   that and provide it.

10        Q.   Do you know who made the payments to DXCorr;

11  was it HashFast Technologies or HashFast LLC?

12        A.   Primarily HashFast LLC.  There may have been

13  one or two payments from HashFast Technologies.

14        Q.   Would the summary of payments that you just

15  described provide that detail on which entity made the

16  payments?

17        A.   We can provide that, yes.

18        Q.   Go ahead.

19        A.   It appears that the total payment to DXCorr --

20  let me just reorient to this.  I haven't looked at this

21  for quite some time, so it helps to...

22             Under generation 1.5 there are unpaid

23  balances.  And this is the subject of the dispute

24  between which contract they were working on, between 1.5

25  and 2.0.  Because the work was stopped on 2.0 and

1   supposed to have been restarted on 1.5.  And it wasn't

2   clear that that's what happened.  And HashFast felt it

3   was paying for the 1.5 work, in which case if the

4   payments that we paid were applied to 1.5 work, DXCorr

5   actually owes us 29,000.  They applied for the payments

6   to the 2.0 work, and believe we owe them incrementally

7   for both projects.  So that is the dispute.  The 2.0

8   contract was not officially signed.

9       Q.   You said earlier that primarily HashFast LLC

10  made the payments to DXCorr, but sometimes HashFast

11  Technologies would make the payment.  Why would HashFast

12  LLC make payments to DXCorr when the contract with

13  DXCorr was with HashFast Technologies?

14      A.   I can't answer that.  That's the way it was

15  structured.

16      Q.   Who --

17           MS. MICKELSEN:  Well, also, we haven't

18  confirmed that it wasn't HashFast LLC that was the one

19  that actually licensed it.  Again, I understand that

20  HashFast Technologies was the signatory, but that

21  doesn't necessarily mean that HashFast Technologies was

22  the one that actually -- it doesn't mean that HashFast

23  LLC was the one that actually wasn't receiving that

24  license.  I think she said the contract was unclear on

25  that point.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 212 of 326

```
 1          MS. GLOSSON:  Well, the debtor scheduled it on
 2   Schedule G for HashFast Technologies, so I have to rely
 3   on that, that's the debtor's position, and that these
 4   issues have been run to ground.
 5          MS. MICKELSEN:  Okay.
 6          MS. GLOSSON:  Q.  And so my question still
 7   stands.  Why --
 8       A.   I think the intent, as I understand the intent
 9   of the structure -- whether that was effective or not is
10   a different question, but the intent of the structure
11   was that HashFast LLC was set up to pay the IP and
12   isolate the IP.  HashFast Technologies was the operating
13   company.  Obviously HashFast Technologies had to have
14   the license, because that's where all the operations
15   took place, so they couldn't sell product without the
16   license.  So HashFast LLC owned, theoretically, the
17   license rights, and they licensed those to HashFast
18   Technologies.  That was the intent of the structure.
19   Now whether or not that plays out is a legal opinion as
20   to how that...
21       Q.   Who would be most knowledgeable at HashFast
22   Technologies about why the contract and the payment
23   schedule was structured in this manner?
24       A.   Simon or Eduardo, I would assume.  That's how
25   it has been explained to me by Simon.  And our legal
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 213
of 326

```
1    counsel, Strategic Counsel, Adam Ettinger, was involved
2    in the contract structures at that point.  All the
3    payments but one were made out of Bridge Bank, which was
4    the HashFast LLC bank.  One payment in September was
5    made out of the Silicon Valley Bank.
6        Q.   How do you spell Mr. Ettinger's last name?
7        A.   E-t-t-i-n-g-e-r.  He's with Strategic Counsel.
8        Q.   Is there an agreement between HashFast LLC and
9    HashFast Technologies with respect to -- with respect to
10   the IP?
11       A.   I am not aware of one.  It may be part of an
12   operating agreement, but I don't believe that is in the
13   operating agreement.  I would have to go back and
14   validate.
15       Q.   So the contracts that are listed on Schedule G
16   for HashFast Technologies --
17            Counsel, have you had an opport -- with
18   respect to the DXCorr Design, have you reviewed those
19   contracts?
20            MS. MICKELSEN:  No.  Not at this time, I
21   haven't personally.  Other counsel at my firm may have,
22   I would have to check with them.  But I also was not the
23   one who was preparing -- there was another counsel who
24   actually prepared the schedules with Monica, or with our
25   client, that's named Pullman, up there in Chicago.  He
```

1      may have.  I can't say, one way or another.

2                MS. GLOSSON:  Q.  All right.  So with respect

3      to the December 1, 2003 proposal with DXCorr, is that

4      the one that you said is not signed?

5           A.   Can I validate?

6                December 1st, there was a proposal from DXCorr

7      to HashFast dated December 1st that was unsigned.  This

8      is the 1.5.  Or let's see.  This will be a bridge to the

9      16-millimeter implementation of the G2 design.  To

10     implement the G1 design...

11          Q.   Everything --

12          A.   So it's a 1.5, was the December 1st contract.

13          Q.   Who was that proposal made to, which entity?

14          A.   Well, it says HashFast on the top.  And it

15     says HashFast, Inc., in the signature block that is

16     unsigned.

17          Q.   Well, neither entity is a corporation?

18          A.   Right.  So your guess is as good as mine.

19          Q.   So you said it was to cover the 1.5 generation

20     chip?

21          A.   This one was, right.

22          Q.   What are the other terms of that proposal?

23          A.   There is a number of terms, in terms of design

24     terms.

25          Q.   Is there a payment structure?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 215 of 326

SF Reporters  (415) 948-8289

1    A.   Yeah.   The business proposal, a total sum of

2    1.1 million for the design, implementation and final

3    delivery.  And HashFast IP has 750K.  Chip finishing was

4    350K, with payment terms structured according to the

5    following plan.  500K due and payable at contract

6    execution no later than 12/1.  200K due and payable the

7    first day of each month.  Commencing January 1st,

8    assuming we start the project upon exercise of the

9    contract.

10    Q.   Was any money paid to DXCorr pursuant to this

11    December 1, 2013 proposal?

12    A.   It appears, based on the payments that we had

13    been making, that we were paying the 85K a month.  We

14    did make a 500,000 -- oh, no, that was the invoice that

15    wasn't paid.  No.  It appears that the last payment made

16    to DXCorr was February 5th.  We were continuing with the

17    installments, the 85K installments under the other

18    contract.  December 4th, January 14th and February 5th,

19    there were three installments at the 85K level.

20          So it appears that that is what was being

21    paid, was the old contract, based on the payment amount.

22    Q.   Based on the records you are reviewing right

23    now, is it your testimony that the debtor did not make

24    any payments on the December 1, 2013 proposal?

25    A.   Yes.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 216
of 326

```
 1        Q.    Does Mr. deCastro have an interest in DXCorr?
 2        A.    Not that I am aware of.
 3        Q.    Does Mr. Barber have an interest in DXCorr?
 4        A.    No, not that I'm aware of.
 5              They were polled at the time we submitted
 6   schedules and did not claim an interest in any of the
 7   related vendors or contractors.  Not related, but with
 8   any of the vendors or contractors we were doing business
 9   with.
10        Q.    Did you say they were polled?
11        A.    Yes.  I sat down and talked to them,
12   confirming that.
13        Q.    So you personally asked the questions?
14        A.    Yes.
15        Q.    Of both of them?
16        A.    Yes.
17        Q.    And their response was --
18        A.    Was no.
19        Q.    Was no.
20              So what's the status of the generation 1.5
21   technology?
22        A.    I don't think I'm in a good position to answer
23   that.
24        Q.    Well, do you know the answer?
25        A.    On a technical basis, no, I don't.
```

```
 1        Q.   Has any indication been given to the debtor
 2   with respect to the timing of when this technology is
 3   going to be ready for purchase by the public or
 4   available for sale?
 5        A.   No.  DXCorr stopped having verbal
 6   communications with us when the bankruptcy proceedings
 7   occurred and wanted to only communicate a resolution of
 8   claim by e-mail, which we have not done.  I know Simon
 9   met with them the day before his vacation.  I don't know
10   what transpired in that dialogue.
11        Q.   When did this meeting take place,
12   approximately?
13        A.   Last week.
14        Q.   What's the status of the generation 2.0
15   technology?
16        A.   Again, I couldn't talk to it from a technical
17   perspective.  I don't know.
18        Q.   What about with respect to the timing on when
19   that technology will be available for sale?
20        A.   I'm not close enough to answer that.  I don't
21   know.
22        Q.   Do you know if it is in production?
23        A.   I really don't know enough to answer that.
24        Q.   Who would be in the best position to answer
25   the question with respect to the status of the
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 218
of 326

1   technology?

2       A.   DXCorr would probably be in the best position,

3   and Simon would be in the second best, from an ancillary

4   perspective.

5       Q.   So at the last meeting, last week, Mr. Barber

6   described some of the problems with respect to

7   production and the design of the board and redoing that.

8   What is the -- have all of the problems been corrected

9   with respect to the board itself?

10      A.   Yes.  My understanding is those initial

11  problems have been fixed.

12      Q.   Is there any plans to design a new board?

13      A.   Yes.  We are working on continuous

14  improvements to the current design, to lower cost and

15  improve efficiency.

16      Q.   Mr. Barber spoke to sort of maintaining the

17  intellectual property so as to continue to make it

18  valuable.  When you are saying working on improving

19  design, is that related to his statements about --

20      A.   Yes.

21      Q.   -- maintaining the product?

22      A.   Yes.

23      Q.   Is this being -- who is performing the work to

24  improve the design of the board?

25      A.   Our team, locally.

SF Reporters (415) 948-8289

1      Q.   Is that internally?

2      A.   Yes, an internal team.  We have two

3  contractors, engineering contractors, and the rest are

4  on staff.

5      Q.   Which are the engineering firms that are

6  working?

7      A.   Sandgate has one resource still working for

8  us.  The other organization is Workbridge.  We employ

9  individuals through Workbridge.  They are a payroll

10 agency, in essence.

11     Q.   But the person that is working through

12 Workbridge is a technical person?

13     A.   Right.  Right.  Workbridge may do other

14 technical work.  I don't know what their scope is.  I

15 just know we are employing him as a contractor.

16     Q.   So the other problem that Mr. Barber described

17 last week was a problem with the wafer, wafers; is that

18 right?

19          MS. MARTIN:  Actually, excuse me.  He

20 discussed a problem with the wafer in conjunction with

21 my initial debtor interview.

22          MS. GLOSSON:  Oh, okay.

23          MS. MARTIN:  He didn't mention that last week.

24 He only talked about the board defect or problem.

25          MS. GLOSSON:  Q.  So is there -- have -- were

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 220
of 326

1  there problems with a wafer?

2      A.   I would have to look at the timeline.  We had

3  issues with the substrates in October, which is tied in

4  with the chip.

5      Q.   Isn't that also part of the wafer?

6      A.   Yeah.

7      Q.   Okay.

8      A.   Well -- it's tied in with the chip.  I won't

9  get more technical.  There were board delays and chip

10 delays.  Chip delays were driven in part by the

11 substrate issues.

12     Q.   Which he talked about last week, if I recall

13 correctly.  He talked about problems with substrates.

14     A.   And the substrates were finally made

15 available, but then they had the board issues.  So they

16 were problem-solving one issue with regard to the

17 substrates.  When those got fixed, then the board issues

18 were in their head, and then the focus shifted to

19 solving those.

20     Q.   So have the problems with the wafers or the

21 substrates been --

22     A.   Yes.

23     Q.   -- fixed?

24     A.   Yes.  They weren't manufacturable initially,

25 and we are manufacturing them, so...

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 221
of 326

1    Q.   Does your timeline tell you when those
2  problems were fixed with respect to the wafers and the
3  substrate?
4    A.   No.  Well, let's see.  In -- yes, in late
5  November, I believe, the substrates were available.  And
6  at that the point we ran into the board issues -- or the
7  board issues were continuing.
8    Q.   Now, you said last week -- I think this was a
9  statement by counsel -- that because Uniquify was
10  involved in the manufacture of the wafers -- right; is
11  that right?
12    A.   They do the chip design and manufacturing.  So
13  they were involved in the first generation.
14    Q.   Right.  But I thought that there was some
15  discussion last week about an agreement or some sort of
16  confidentiality terms between Uniquify and the debtor.
17  Did I understand that correctly?
18    A.   Yes.
19    Q.   So what -- can you describe for me the nature
20  of that contract between Uniquify and HashFast
21  Technologies?
22    A.   We had a number of contracts with Uniquify.
23    Q.   Your bankruptcy documents indicate two; one
24  that is dated September 6, 2013 and another one that is
25  dated April 9, 2013.

1    A.   Yeah.   April 9th is the work stream being
2  worked on, which is the manufacturing -- the master
3  design, manufacturing, services and consulting
4  agreement.
5         MS. MCDOW:  What was the second one?
6         THE WITNESS:  The second one, I believe, is
7  the September 9th statement of work, second statement of
8  work, in quotations, manufacturing services.
9  September 6th.  Did I say 9th?  I apologize.
10         MS. GLOSSON:  Q.  So what was the purpose of
11  the April 9th master design agreement?  Have you
12  reviewed it before today?
13    A.   Yes.  I have gone through it.  I don't have it
14  committed that well to memory.  I'm trying to find a
15  quick way to explain it, rather than go through all the
16  definitional work.  It's a lengthy contract for the
17  design, manufacturing and production of chips and
18  wafers.  So the confidentiality agreement is in here.
19  Is that the question you were asking earlier?
20    Q.   Well, I wanted to get a sense of the scope of
21  the agreement, and you said it is chips and wafers.  The
22  manufacturing, design and production of chips and
23  wafers; is that right?
24    A.   Right.  So it's -- I'm trying to find a
25  paragraph that we can read that will be short, for the

```
 1   record.

 2        Q.   Well, you answered my question with regards to

 3   the scope --

 4        A.   Yeah.

 5        Q.   -- of the agreement.  Now you said --

 6        A.   Design and production of chips.

 7        Q.   In that agreement, is there a confidentiality

 8   clause?

 9        A.   There is.

10        Q.   Does it specify what aspects of the contract

11   are to remain confidential?

12        A.   "Any information relating to the products,

13   methods of manufacture, software or business affairs of

14   either party or either party's vendor or either party's

15   customer, which either party may acquire during the term

16   of this agreement, including without limitation any

17   specifications or written technical requirements of the

18   products and the work and deliverables.  All of that is

19   included as confidential information, and that shall be

20   maintained by both parties as confidential and may not

21   be disclosed to any third party, except in performing

22   work or rendering services, without the written consent

23   of the other party."

24        Q.   Who are the parties to the contract that is

25   April 9, 2013?
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 224 of 326

```
 1        A.    HashFast Technologies, LLC and Uniquify are

 2   the signatories on it.  And let's see in the terms if

 3   they call it HashFast Technologies.  I would assume they

 4   do.  Yes.  HashFast Technologies, LLC -- limited

 5   liability.

 6        Q.    Were any payments made to Uniquify by HashFast

 7   Technologies or --

 8        A.    Yes.

 9        Q.    -- HashFast LLC?

10        A.    Yes, there were payments made by HashFast

11   Technologies.  I would have to look as to whether there

12   were payments made by HashFast LLC.

13        Q.    Do you have a summary of payments that's

14   similar to the one that you have for the DXCorr

15   contract?

16             MS. MICKELSEN:  The payments that were made

17   90 days before are on our schedules.

18             THE WITNESS:  You are asking more generic

19   payments?

20             MS. GLOSSON:  Q.  Well, I understand that the

21   schedules reflect the 90 days, but I want to know --

22        A.    Right.  I want to be clear.

23        Q.    -- further back.

24        A.    I don't have that schedule prepared yet.  I

25   have to see if there were any made to HashFast.  There
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 225
of 326

1    were payments made out of HashFast LLC as well.

2         Q.   So do your records that you are reviewing

3    right now indicate that both debtors made payments to

4    Uniquify?

5         A.   Let me verify that HashFast Technologies did

6    as well.  Yes.

7         Q.   Who made the decision as to which entity would

8    make the payment?

9         A.   I do not know.

10        Q.   Who would know?

11        A.   Simon or Eduardo would.

12             It may be that payments were made for the IP

13   out of the LLC, and payments for the manufacturing

14   services were made out of HashFast Technologies.  I

15   would have to look at specific invoices to verify that.

16   I mean, if that is the logic of how it was set up, it

17   would stand to reason there was some basis for the

18   payments to be segregated.

19        Q.   Okay.  So you wanted to make a statement.  You

20   were --

21        A.   I may have been wrong about Sandgate on the

22   first generation chip, now that I am looking through

23   some of the details.  It may have been that it was

24   purely Uniquify involved, although I know Sandgate was

25   involved in some of the design.  So I would have to

clarify that -- which part Sandgate owned versus --
which part Sandgate worked on versus Uniquify.  I would
have to clarify that.

Q.   Is there any documentation between HashFast,
the parent, and HashFast Technologies, the sub, with
respect to allocating payments to, in this case,
Uniquify?

A.   Not that I am aware of.  There may be
something in the operating agreement for HashFast
Technologies.  I don't recall that, but I can go back
and double-check.

Q.   When you are referring to the operating
agreement, which -- what are you referring to?

A.    It's called the operating agreement for
HashFast Technologies, LLC.  And it's a form of
operation between HashFast LLC and the member of
HashFast Technologies -- as the sole member of HashFast
Technologies.  That defines the organizational
structure, indemnification rights and the like.

Q.   Is there anything in the April 9, 2013
contract with Uniquify that speaks to an allocation
between HashFast Technologies and HashFast LLC?

A.   Not that I am aware of.

MS. MICKELSEN:  I don't believe a contract of
this sort would contain enough information --

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 227
of 326

```
 1            THE WITNESS:  Yeah.

 2            MS. MICKELSEN:  I can go back and double-check

 3   whether I --

 4            THE WITNESS:  The contract is --

 5            (Reporter interrupted proceedings.)

 6            THE WITNESS:  Contracts with the supplier

 7   typically don't define how the supplier allocates their

 8   payments.  It's not a typical provision.  I can

 9   certainly look, but I would be surprised that it would

10   be in the contract.

11            MS. MICKELSEN:  Would you like us to look

12   right now, or --

13            MS. GLOSSON:  No, that's fine.  You can

14   provide a response later.

15            MS. MICKELSEN:  Okay.

16            MS. GLOSSON:  Q.  But I would like to know how

17   the allocation was arrived at -- whether and who made

18   that decision.

19        A.   The only thing that I am seeing in the

20   operating agreement with regards to distribution is that

21   it says "Payment distributions shall be made at such

22   times, from time to time, as member may determine."  And

23   that restrictions on distributions are that the company

24   needs to be able to pay its debt before any distribution

25   is made to the LLC.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 228 of 326

```
 1        Q.   Which company are you referring to?

 2        A.   This is the Technologies.

 3             MS. MICKELSEN:  So the member would be

 4   HashFast LLC.

 5             THE WITNESS:  "Before any payments were made

 6   from Technologies to HashFast LLC, HashFast Technologies

 7   would need to be able to pay its debts."  That's the

 8   only provision I see in here with regards to payments

 9   between the two.

10             MS. GLOSSON:  Q.  Is that operating agreement

11   that you are looking at, is that the only agreement that

12   governs the conduct between the two debtors?

13        A.   To the best of my knowledge.  There may be

14   something else, but I haven't seen it.  I've tried to

15   gather as much information as I can.  I haven't found

16   anything else.

17        Q.   Can you provide us with a copy of the

18   operating agreement?

19             MS. MARTIN:  We have that.

20             THE WITNESS:  Yeah, I believe that was

21   provided.

22             MS. GLOSSON:  Everything that you are saying

23   is being taken down by the court reporter.

24             MS. MICKELSEN:  It looks like HashFast LLC may

25   have had discretion to determine payments according to
```

```
 1   this.  But we can send you a copy.  So long
 2   as conditions are met as specified in the operating
 3   agreement.  Actually, you already have a copy.
 4          MS. GLOSSON:  Q.  Who would have made the
 5   decision to write the checks from HashFast Technologies
 6   versus transferring the money from HashFast Technologies
 7   to HashFast LLC, and HashFast LLC make the payment?
 8       A.   My guess is it would have been Eduardo or the
 9   accountant at the time.
10       Q.   Who is the accountant?
11       A.   At the time it was Kathleen Shy.
12       Q.   How do you spell her last name?
13       A.   S-h-y.  It might have been Simon as well.
14       Q.   Have you seen any writing -- in your review of
15   the debtor's records, have you seen any writing that
16   would explain how this decision, this allocation, was
17   made?
18       A.   No.
19       Q.   All right.  I'm going to move on to Sandgate.
20   Before I do you that, we have been going about an hour.
21          (An off-the record discussion occurred at
22          12:22 p.m.)
23          MS. GLOSSON:  Q.  All right.  What is -- so
24   with respect to Sandgate, what is the nature of the
25   contract between HashFast Technologies and Sandgate?
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 230
of 326

1    A.    Engineering services.  Provision of
2 engineering services by Sandgate to HashFast.
3    Q.    What are the services; you said engineering?
4    A.    Right.
5    Q.    What does that mean?
6    A.    Board design, chip design.
7    Q.    Why is Sandgate listed as a creditor of
8 HashFast Technologies?
9    A.    Because we had outstanding payables to them.
10 The contract, as I understand it, is actually with
11 HashFast Technologies.  But similar to the others, there
12 was a difference in terms of how it was paid out.
13    Q.    HashFast LLC lists the same amount owed to
14 Sandgate as HashFast Technologies.  Why would there be
15 the same amount due to Sandgate by both entities?
16    A.    I don't know.  I would have to look at that.
17 It could be subsequent invoices.
18    Q.    Which entity made the payments to Sandgate?
19    A.    Similar to the other vendors, both entities
20 did.  Primarily HashFast LLC, I believe.  Let me
21 double-check that.  It appears that Sandgate was
22 primarily paid through HashFast Technologies.
23    Q.    Did any payments come from HashFast LLC to
24 Sandgate?
25    A.    Yes.  There were some.  A few months' worth in

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 231 of 326

```
 1    the early to late time frame.

 2         Q.   What is that time frame?

 3         A.   June of 2013.  So that was probably before the

 4    Silicon Valley Bank was up and running for HashFast

 5    Technologies.

 6         Q.   What are the payment terms for this contract?

 7         A.   I don't know if I have that here.

 8              I don't believe I have that here.

 9         Q.   Do you have the date of the contract?

10         A.   I don't have the contract in front of me.  I

11    do not recall.

12         Q.   Who was responsible for making the decision to

13    allocate payments from HashFast LLC versus HashFast

14    Technologies?

15         A.   The same answer as before.

16         Q.   Simon or Eduardo or the accountant?

17         A.   Yes.

18         Q.   What generation of chips does the Sandgate

19    contract relate to?

20         A.   I don't have the contract in front of me.  I

21    can't answer that.

22         Q.   Did Sandgate work on the generation 1.5

23    chip --

24         A.   No.

25         Q.   -- with DXCorr?
```

SF Reporters (415) 948-8289

```
 1       A.   I don't know that specifically; whether or not

 2   they were in a supervisory role or not.  I would have to

 3   defer to Simon.

 4       Q.   Who are the employees of HashFast Technologies

 5   that are working through or provided through Sandgate?

 6       A.   Through Sandgate itself or on our payroll?

 7       Q.   On the debtor's payroll.

 8       A.   Chad Spackman.

 9       Q.   Can you spell his last name?

10       A.   S-p-a-c-k-m-a-n.

11       Q.   Is there anyone else in that same situation?

12       A.   No.  He's the only employee on HashFast's

13   payroll.

14       Q.   Is that -- when you say HashFast, which entity

15   do you mean?

16       A.   HashFast Technologies is the only one with a

17   payroll.

18       Q.   Why does Mr. Spackman have a preferred stock

19   interest in HashFast Technologies?

20       A.   He was one of the original investors, I

21   believe.

22       Q.   Who would know the answer to that question?

23       A.   I will look at the cap table, in just a

24   second.

25            Yeah -- I don't know.  Actually, he was -- he
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 233 of 326

1   has a preferred stock interest, and I believe it's

2   because of his work on the chip engineering.  He and

3   Simon had started work prior to when the company was

4   capitalized.  So Simon would have to answer that

5   specifically, or Eduardo.

6           Q.   Which company are you referring to?

7           A.   HashFast LLC is the one with the cap table.

8           Q.   With the what?

9           A.   With the "cap table."

10          Q.   What does that mean?

11          A.   Stock ownership.  Equity interest.  It's a

12  class of shares.

13          Q.   Is "cap" short for something?

14          A.   Capitalization.  Sorry.

15          Q.   So HashFast -- I'm sorry.  HashFast LLC

16  shows an -- on the statement of financial affairs, shows

17  a transfer, or a receipt for cash received from HashFast

18  Technologies in the amount of 1,202,643.  What does that

19  one million represent, from HashFast Technologies to

20  HashFast LLC?

21          A.   It represents payment to HashFast LLC, for the

22  IP services provided to HashFast LLC.

23          Q.   Is there anything in writing other than the

24  operating agreement that HashFast Technologies relied

25  upon in making the transfer?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 234 of 326

```
 1        A.    Invoices from the various design partners.
 2        Q.    Why is the same amount, this one million, not
 3   shown as a receivable on HashFast Technologies'
 4   bankruptcy documents?
 5        A.    It wouldn't be a receivable.  It was an
 6   outflow.  It was a payment to HashFast LLC that was
 7   paid.
 8        Q.    My recollection from statements that were made
 9   to my office was that this $1 million transferred from
10   Technologies to HashFast LLC was a distribution from the
11   sub to the parent.
12        A.    Mm-hmm.
13        Q.    Is my understanding correct?
14        A.    Right.  A cash distribution, for payment of
15   the services.
16        Q.    Well, a distribution would suggest that there
17   was some profit -- that the sub, HashFast Technologies,
18   generated a profit that it was distributing up to the
19   parent.
20        A.    That was where we were guided to report that
21   cash payment to the LLC.
22        Q.    So you are saying that based on -- on advice
23   of counsel, that's where --
24        A.    Right.  Right.  We weren't sure how to handle
25   the cash.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 235 of 326

1    Q.   Well -- but does the debtor HashFast

2    Technologies reflect that as a distribution to HashFast

3    LLC, or does it reflect it as some other type of --

4    A.   It reflects it as a cash outflow to LLC.  It's

5    a payment to LLC in order to pay the invoices that were

6    generated to the LLC.  The legal entity terms and

7    parameters of how things were paid hasn't been cleaned

8    for tax-type purposes, and that would be need to be

9    addressed, probably, as it relates to tax purposes, but

10   nothing has been done or given to handle the situation.

11   Q.   When was the last time HashFast Technologies

12   paid or transferred any money to HashFast LLC?

13   A.   Before April.  I don't know exactly.

14   Q.   Before April of 2014?

15   A.   Yes.  I know there weren't -- I don't believe

16   there were any done since April.

17        Do you need an exact date?

18   Q.   If you have it.  You said it was before

19   April 2014.

20   A.   Right.  I would have to verify that.  It may

21   have been earlier in the year.  Let me look on the

22   next... Bridge Bank, after February 28th there was

23   nothing that went into HashFast LLC.

24   Q.   So the last payment was February 28th?

25   A.   Well, it was --

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 236
of 326

1    Q.   Or transfer?

2    A.   That's the bank statement that month.  I don't

3    know the exact date, but it was in the month of

4    February.

5    Q.   So just to clarify, the last transfer that

6    HashFast Technologies made to HashFast LLC was in the

7    month of February?

8    A.   In February, right.

9    Q.   What was the amount of that payment, or

10   payments that were made in that month?

11   A.   85,000.

12   Q.   Does that relate to any of the contracts that

13   we discussed here today?

14   A.   DXCorr.

15   Q.   HashFast Technologies did not list any

16   transfers of any funds from HashFast Technologies to

17   HashFast LLC.  Why is that?

18   A.   Oversight.  We were not -- it wasn't clear

19   where that would be reported.

20   Q.   Well --

21   A.   I thought we had added that back in, as we did

22   the addition to the outflow or the influx to HashFast

23   LLC.  I thought we added it to both sides, but we must

24   have missed one.

25   Q.   Well, section 10 of the statement of financial

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 237 of 326

```
1   affairs provides for other transfers that occurred
2   within two years of the filing.
3       A.   Okay.  And I thought that was not counting
4   within parent companies.  So it was a misunderstanding.
5   We added it, the transfer, at the last minute, for
6   HashFast LLC.  We debated where it went and it got added
7   at the last minute, and we must have left off the other
8   side.
9           MS. MICKELSEN:  We can update that when we
10  amend the schedule in the statement of financial
11  affairs.
12          MS. GLOSSON:  Where would it be shown?
13          MS. MICKELSEN:  I'm assuming that it would be
14  in section 10, that you just mentioned.  I can look at
15  it, though.
16          I would want to consult with the person who
17  actually -- our counsel, who actually had assisted with
18  us in the first place.  Perhaps under 10, the first
19  category, but I would want to see the reasoning as to
20  why it was included there in the first place.  So if you
21  want us to include it on this, you know, we can put in
22  an explanatory.
23          MS. GLOSSON:  I'm not going to tell you where
24  it should be shown.  I'm just telling you that it's not
25  shown.  I don't see any transfers.
```

```
 1           MS. MICKELSEN:  Okay.

 2           MS. GLOSSON:  But I don't have the benefit of

 3   the details that the debtor has with respect to -- you

 4   know, maybe it is shown as part of the payments made

 5   directly to the creditors that are listed on -- I mean

 6   under question number three.  So that's where I don't --

 7   I can't give any legal advice anyway, but I don't even

 8   know where it would be shown.

 9           MS. MICKELSEN:  Right.

10           MS. GLOSSON:  But based on -- because of the

11   way it has been characterized, and you indicated you are

12   not in the position to be able to answer that, because

13   you'd have to look at invoices, and if I am

14   understanding you correctly --

15           THE WITNESS:  Yeah, well, we provided you

16   outflows to specific parties over the 90 days.  We did

17   not believe that outflows to our parent company was

18   considered part of that.  So if that needs to be

19   reported, we'll add it in.  It wasn't clear from the

20   dialogue.  Peter did ask us to disclose.

21           MS. GLOSSON:  Q.  Well, I don't want you to --

22   wait, hold on.  I don't want you to tell me what your

23   attorney told you, because that's in confidence, that is

24   privileged.

25       A.   I will be happy to put it on whatever schedule
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 239 of 326

```
 1    anybody would like it on.  I'm just not clear where it

 2    belongs.

 3         Q.   Well, I think that there should be some

 4    disclosure with respect to transfers that were made by

 5    HashFast Technologies to HashFast LLC.  If it's related

 6    to any of these transfers to creditors, then you can put

 7    some sort of the notation to that effect.

 8         A.   Okay.

 9         Q.   If that is indeed what happened.  I will defer

10    that decision to you.

11              At the hearing -- or the meeting of creditors

12    last week, there was some discussion regarding the sale

13    to LiquidBits and the terms of that sale, or proposed

14    sale, that hasn't been proposed to the Court or

15    publicized.  And the figure that was mentioned was a

16    $6 million figure, and that included in that was perhaps

17    IP that would be sold.  What allocation has been made

18    with respect to the -- of this purchase price to each

19    entity and to -- perhaps including the LLC?

20         A.   There hasn't been an allocation made.  The

21    initial term sheet focused on business terms, not on

22    legal entity structure and allocation.

23         Q.   Well, who would get the money, then?  Which

24    entity would get the money, the $6 million?  Would it go

25    to HashFast Technologies or HashFast LLC?
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 240
of 326

```
 1              MS. MICKELSEN:  My understanding is that is
 2     something that will be determined.  I haven't been
 3     working directly on the term sheets, so this is
 4     something that I don't really want to speak to.  But it
 5     will pay off to most of the, if not --
 6              THE WITNESS:  My understanding is it went to
 7     the estate.
 8              MS. GLOSSON:  Q.  Well, there are two estates,
 9     and they are not consolidated, and one has all the debt
10     and one has potentially all the assets.  And so --
11              MS. MICKELSEN:  A majority of the --
12              THE WITNESS:  The majority of the assets are
13     in the same entity that has the majority of the debt.
14              MS. GLOSSON:  Q.  Well, the debtor HashFast
15     LLC has scheduled the value of its IP as unknown.
16         A.    Right.
17         Q.    So if that debtor thinks that the value is in
18     the IP then -- and Mr. Barber indicated that there could
19     be up to, you know -- $30 million could be associated
20     with the value of the IP.  So at this point, what I need
21     to know is which entity is going to get the money.  And
22     from counsel's statement, it sounds like that
23     determination has not been -- or she is not aware of
24     whether that determination has been made.
25              MS. MICKELSEN:  Can I take one moment.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 241 of 326

```
 1              (Off the record at 12:47 p.m.)

 2         MS. MICKELSEN:  This is still something that

 3   has to be structurally defined.  A majority of creditors

 4   of both estates -- well, I would prefer that we just

 5   wait until the sale motion comes out and to have those

 6   questions raised at a later time.

 7         MS. GLOSSON:  Q.  So other than the bankruptcy

 8   court having to approve such a sale, is there any other

 9   party that would have to approve a sale?

10         A.   The creditors.

11         MS. MICKELSEN:  There are a number of parties

12   that could object to a sale.

13         MS. GLOSSON:  Q.  What about DXCorr, that

14   might have an ownership interest in the generation 1.5

15   and perhaps the generation 2 chips -- the IP associated

16   with it?

17         A.   They were licensing those rights to us.

18         Q.   But would they have --

19         A.   They could object to the right to license or

20   the right to assign the license.

21         Q.   Debtor --

22         A.   But --

23         MS. MICKELSEN:  There are going to be specific

24   carve-outs in the term sheet that will be attached to

25   the sale motion, and I believe that this will, again,
```

```
 1    clarify some of the questions.  I know this was raised a
 2    bit at the last meeting.  The sale motion has been --
 3    still has to be finalized.  There is a draft that still
 4    has to be finalized.  We do plan to get this on file as
 5    soon as possible.  But the terms of the term sheet are
 6    still under final revision and review, and I think a
 7    number of these questions are going to be answered in
 8    the final draft.  So at this point, I just think it's a
 9    little premature to be able to answer.
10              MS. GLOSSON:  Has debtor completed its
11    preference analysis?
12              MS. MICKELSEN:  That is something that the
13    debtor is still investigating.  We are on the amended
14    schedule.  It's going to include potential claims that
15    there may be.  These claims, however, may be carved out
16    of the term sheet, so it won't be an issue for the sale.
17    We do understand that those would be issues with the
18    sale if that determination has not been made, which is
19    why there may be a carve-out, among other reasons.
20              MS. GLOSSON:  Q.  Now, the debtor -- with
21    respect to sales that have already been made by the
22    debtor, the debtor made a sale to Guido Ochoa in May --
23    May 21st, I believe.  Since May 21st, have any assets of
24    the debtors or HashFast Technologies been sold to
25    Mr. Ochoa or his company?
```

1    A.    Since what date?

2    Q.    Since May 21st.

3    A.    Yes, there have been.

4    Q.    Can you give me the dates and the amounts?

5    A.    I would have to total them.  This is a long

6    schedule.  Mr. Ochoa has purchased, I think, on the

7    order of $350,000 since May 9th, and this is a schedule

8    since May 9th.  So I would have to go and total it by

9    date, since you are looking for a specific date cut-off.

10    Q.    Okay.  So what you are looking at doesn't --

11    it is sorted by date, but you don't have the --

12    A.    It's sorted by part number, and then customer

13    is a category in it as well.  I would have to re-sort it

14    by customer in order to answer your question.

15    Q.    Okay.  Is that something that you could

16    provide me with within the next few days?

17    A.    Yeah, that will be on -- yes.

18    Q.    That will be on what?

19    A.    I will provide that to you in the next few

20    days.  It's on the inventory schedule, but we had taken

21    the customer names off the inventory schedule, for

22    confidentiality reasons.  That's why I hesitated.

23    Q.    We're not looking to file this information

24    with the court.

25    A.    Right.  So I have it here, I just...

```
 1        Q.   Has the debtor, since May 9th -- since the
 2   involuntary was filed, has the debtor sold any assets to
 3   any member of the committee?
 4        A.   Other than Guido, no.  We have a sale that is
 5   under way, related to LiquidBits.
 6        Q.   That's the one we were just discussing?
 7        A.   Right.
 8        Q.   LiquidBits is not on the committee?
 9        A.   Right.  But that hasn't been transacted yet.
10        Q.   Is the debtor in any discussions with DigiMex?
11        A.   No.  Not that I am aware of.
12             Is that Willem?
13        Q.   Yes.
14             (Reporter interrupted proceedings.)
15             THE WITNESS:  I was just asking if that was
16   Willem.
17             MS. GLOSSON:  And that's spelled W-i-l-l-e-m.
18             And you are referring to Mr. Van Rooyen.
19             MS. MICKELSEN:  I just want to clarify the
20   information that you want for the inventory.  Did you
21   want all of the customer names or just for Guido?
22             MS. GLOSSON:  With respect to the customer
23   names, I just want --
24             THE WITNESS:  Purchases.
25             MS. GLOSSON:  Purchases by Mr. Guido.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 245
of 326

```
 1              THE WITNESS:  I have a schedule of all
 2     purchases since May 9th by customer and by date.
 3              MS. GLOSSON:  Q.  But I had previously
 4     requested an updated inventory.
 5          A.   Right.
 6          Q.   From --
 7          A.   We have that.
 8          Q.   From the schedules?
 9              MS. MICKELSEN:  Which we did provide.
10              MS. GLOSSON:  Right.
11              MS. MICKELSEN:  And it's been further updated.
12              MS. GLOSSON:  Have there been any sales since
13     that was provided to us?
14              MS. MICKELSEN:  No.  There haven't been sales.
15     We just got authority to sell.  So that should be the
16     most recent, unless there was a reconciliation that
17     you've mentioned at the beginning, that --
18              THE WITNESS:  We will send the most current,
19     that reconciles everything, to alleviate any questions.
20              MS. GLOSSON:  Let's take a break for about
21     five minutes, okay.
22              (A recess was held at 12:54 p.m., after which
23               the proceedings reconvened at 1:05 p.m.)
24              MS. GLOSSON:  Q.  Okay.  So we are back on the
25     record.  I have a few follow-up questions, and then I
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 246
of 326

```
 1   will give committee counsel a brief opportunity to ask
 2   some questions.  All right.  You mentioned, Ms. Hushen,
 3   that Mr. Barber met with DXCorr recently.  And do you
 4   know which entity he was representing at that meeting?
 5        A.   No, I don't.
 6        Q.   Do you know if anyone went with him from the
 7   debtor to that meeting with DXCorr?
 8        A.   I don't believe so.
 9        Q.   You don't know?
10        A.   I don't believe anybody went with him.
11        Q.   Did debtor's counsel accompany him to that
12   meeting?
13        A.   No.
14        Q.   Why did he have this meeting with DXCorr?
15        A.   I don't know.  I believe it was related to our
16   claims.
17        Q.   When does Mr. Barber return?  I understand
18   he's -- he had plans to leave the country.  Do you know
19   when he is expected to return?
20        A.   About a month from now.  I don't know the
21   exact date.  I can look it up.
22        Q.   Do you know if he's already left?
23        A.   No, he has not left.
24        Q.   Do you know when he is scheduled to leave?
25        A.   He's -- I believe he's flying out today from
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 247
of 326

1    here to meet his family, and then go overseas.

2        Q.    While Simon is away from HashFast

3    Technologies, who is responsible for managing the

4    day-to-day activities of HashFast Technologies?

5        A.    I am.

6        Q.    Did you have any discussions with Mr. Barber

7    before he left concerning how to handle things with

8    respect to day-to-day operations?

9        A.    General updates on issues that were on the

10   table, yes.

11       Q.    What types of issues?

12       A.    Primarily related to bankruptcy proceedings,

13   and open issues that had to be resolved.

14       Q.    What kind of open issues?

15       A.    Well, we spent the last week and a half trying

16   to negotiate a stipulation to continue in the ordinary

17   course of business.  So most of them pertain to that.

18   There were some open issues around -- that creditors had

19   requested around his vacation timing and pay and the

20   like, so we had some dialogue around that as well.

21       Q.    Is he available to answer any questions that

22   you may have concerning day-to-day activities?

23       A.    Yes.

24       Q.    And how -- if you had a question that you

25   needed to pose to Mr. Barber, how would you go about

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 248
of 326

```
 1   doing that?

 2        A.   E-mail or phone, depending on the urgency.

 3        Q.   What is the scope of your authority in his

 4   absence?

 5        A.   What is your specific question?

 6        Q.   Do you understand the question?

 7        A.   Yes.  I mean, I would go to him for anything

 8   of significance.

 9        Q.   Would that include authorizing a sale to

10   LiquidBits or any other entity?

11        A.   Yes.

12             MS. MICKELSEN:  And also, just to clarify,

13   LiquidBits -- this was on the record during Friday's

14   hearing.  LiquidBits had stated that they can

15   communicate with him, I mean to the extent that they

16   need certain authority for things while he's on vacation

17   and he is -- it is anticipated that he's going to do a

18   certain number of -- a certain level of work while he's

19   on vacation, and that's all in our stipulated order that

20   was lodged yesterday, by telephone and e-mail.

21             MS. GLOSSON:  Q.  Remind me again when you

22   arrived, when you started to work at HashFast

23   Technologies.

24        A.   April 7th.

25        Q.   What was the state of HashFast Technologies'
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 249 of 326

SF Reporters (415) 948-8289

```
 1   books and records at the time that you arrived?
 2        A.   They were not completely pulled together.
 3   That's probably the easiest way to put it.
 4        Q.   What do you mean by that?
 5        A.   A lot of information was missing;
 6   transactional systems didn't agree with financial
 7   records, and financial records, vice-versa, didn't agree
 8   with transactional systems.
 9             MS. GLOSSON:  You might be speaking too fast
10   for the court reporter.
11             MS. GLOSSON:  Q.  All right.  So just to
12   clarify.  So there was missing information.  What kind
13   of information was missing.
14        A.   The order -- order flow, order chain -- was
15   not complete.  Inventory records were not complete.
16        Q.   What do you mean by the order flow was not
17   complete?
18        A.   There had been a number of system conversions
19   and the data had not been reconciled as to total
20   orders -- total and filled orders, backlog, refunds
21   requested, order shifts.  Just the basic status of
22   affairs.
23        Q.   You also mentioned that the financial records
24   didn't reconcile with the operational records?
25        A.   Right.
```

1       Q.   Can you give me an example?

2       A.   Well, it said we made a very large profit in

3  2013, which was significant millions of dollars in

4  revenue.  And we only shipped a few systems in December,

5  so...

6       Q.   So you are saying the financial records showed

7  a profit, but in reality there wasn't one?

8       A.   Right.

9       Q.   How long did it take for you to figure out

10  that there was no profit?

11      A.   Well, I -- it took a few weeks of digging

12  through details.  My first focus was getting the

13  operational data -- my arms around the operational data,

14  so that -- because that drives the financials.  I was

15  trying to understand what the status of affairs was with

16  regard to the order chain and our pending liabilities

17  and whether or not we really had a bankruptcy ahead of

18  us.

19      Q.   What -- can you be specific as to what you did

20  to improve the status of the books and records since you

21  arrived?  You said your first focus was operational.

22  Can you be more specific about that?

23      A.   Well, we tried to get a clean view of all the

24  bitcoin transactions, all the cash transactions and all

25  of the orders placed with the company, as well as a

1    clean view of all shipments, refunds requested,

2    documentation of what the actual scope of the orders

3    were, make sure that was clear.  And then reconcile the

4    sides out to each other.

5         Q.   Is this process that you just described, has

6    it been completed?  Or is it --

7         A.   For the most part, yeah.  Within -- in all

8    materiality aspects.  There are some stragglers.

9         Q.   What other aspect of the debtor's books and

10   records have you focused on, other than what you just

11   described?

12        A.   Well, the cash burn was the most significant

13   aspect.  We had to reduce head-count significantly and

14   arrest the bleed.

15        Q.   But --

16        A.   A lot of the attention was focused on keeping

17   the company afloat-- keeping the doors open and making

18   payroll.

19        Q.   With respect to the books and records of the

20   debtor, what other aspects needed correcting or cleaning

21   up, than what you've already described?

22        A.   Well, the QuickBooks data isn't completely

23   clean.  We have gone through and reconciled each of the

24   monthly financial now, to the operational data.  The

25   actual financial statements aren't clean, but the

1    transaction details are largely -- the cash transactions

2    are clean.  We've reconciled those.

3         Q.   When you say that the financial statements

4    aren't clean, what do you mean by that?

5         A.   The bucketing of line items, so we know where

6    the cash went.  It may not be bucketed in the system in

7    the right -- you know, did it go to expense versus

8    inventory.  But we know that all cash that came in has

9    been tied to the cash that went out.  It may not be from

10   a GAAP perspective in the right bucket.  But that is a

11   separate activity.

12        Q.   So is it fair to say that the financial

13   statement might not be reliable because you don't know

14   if it is properly reflected in each line item?

15        A.   Right.  I haven't used the financial

16   statements since I arrived.  I have used all Excel

17   schedules, because of the --

18        Q.   Because they were not reliable?

19        A.   Because they weren't reliable when I arrived.

20   So I had to recreate some Excel sheets.

21        Q.   Do you believe that the debtor is in a

22   position today to produce reliable financial statements?

23        A.   With the right time and skill sets.

24        Q.   But today --

25        A.   Yes.

```
 1        Q.    -- if you were to generate financial
 2   statements today --
 3        A.    Yes.
 4        Q.    -- do you believe that they would be reliable?
 5        A.    Oh, yes.  Yes.  For going forward?
 6        Q.    Well, no, like, I mean something that would
 7   take time --
 8        A.    Having put the time into recreating the
 9   history, right, I could.
10        Q.    So with respect to a balance sheet -- a
11   balance sheet is a snapshot of one particular day; do
12   you agree with that?
13        A.    Right.
14        Q.    So if you were to produce a balance sheet
15   today, would it be reliable?
16        A.    Yes.
17        Q.    What about a profit and loss statement; would
18   that be reliable?
19        A.    In material aspects, yes.
20        Q.    When you arrived, did HashFast Technologies
21   maintain a general ledger?
22        A.    Yes.  QuickBooks.
23        Q.    Did HashFast LLC have a general ledger?
24        A.    Yes.  Also QuickBooks.
25        Q.    Was it current; was that general ledger
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 254
of 326

1    current for both of the debtors?

2         A.   No.

3         Q.   So what was the status of the general ledger

4    for HashFast Technologies at the time that you arrived?

5         A.   There were invoices and reconciliations that

6    had not occurred.  Account reconciliations and invoices

7    and entries that had not been booked.

8         Q.   So how -- over what period of time had these

9    invoices and reconciliations not been booked?

10        A.   Probably about a month.

11        Q.   Would that be the case for both entities?

12        A.   There was very little activity for HashFast

13   LLC, so no.

14        Q.   At the time that you arrived in late April,

15   would you have been able to tell from the books and

16   records at that time, the underlying basis for payments

17   that were made, say perhaps to various vendors or up to

18   HashFast LLC?

19        A.   Yes.  There were invoices attached to any

20   payments.  There were files of invoices.

21        Q.   When you spoke about invoices earlier to

22   explain why HashFast Technologies would pay HashFast

23   LLC, were those invoices that you were referring to,

24   were they invoices from the vendor or were they invoices

25   from HashFast LLC?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 255
of 326

```
 1        A.    From the vendor.

 2        Q.    Did HashFast LLC ever issue an invoice to

 3   HashFast Technologies for payment?

 4        A.    Not that I am aware of.  They may have.

 5        Q.    Have you looked at all of the books and

 6   records for both of the debtors?

 7        A.    I have looked through the QuickBooks.  I

 8   haven't gone through every file for every invoice, no.

 9        Q.    What's the status of the tax returns for

10   HashFast Technologies?

11        A.    We filed an extension for both HashFast

12   Technologies and the LLC.

13        Q.    So what would be the deadline, then, for

14   filing?

15        A.    For September, I believe it is;

16   September 15th.

17        Q.    Did HashFast Technologies issue any 1099s for

18   2013?

19        A.    I believe they did.

20        Q.    Have you seen them?

21        A.    I haven't personally seen them, no.

22        Q.    How do you have the belief that they were

23   issued?

24        A.    Because there was a question raised from one

25   of the contractors about it.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 256
of 326

```
 1      Q.    Raised to you or raised to someone at HashFast
 2  Technologies?
 3      A.    Raised to the accounting person at the time.
 4  I believe there were.   I could be wrong.
 5            MS. GLOSSON:   All right.   I don't have any
 6  more questions at this point, so I'm going to turn it
 7  over to committee counsel.   It's about 1:25.   So if you
 8  could be brief.
 9            MS. MICKELSEN:   Okay.
10                  EXAMINATION BY MS. MCDOW
11            MS. MCDOW:   Q.   How did you first come to
12  start working for HashFast Technologies?
13            MS. GLOSSON:   Why don't you state your name.
14            MS. MCDOW:   Ashley McDow, BakerHostetler, on
15  behalf of the committee.
16            MS. MCDOW:   Q.   How did you first start to
17  become acquainted, I should say, or become involved with
18  the debtors?
19      A.    I reached out to Mr. Barber and Mr. deCastro.
20      Q.    And what caused you to reach out to them?
21      A.    I was doing consulting at the time, and was
22  interested in learning about bitcoins and saw some of
23  the press and figured they needed some help.
24      Q.    And when do you think that was?
25      A.    When?
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 257
of 326

```
 1      Q.   About what date and month?

 2      A.   Probably about a month, maybe, before I

 3   joined.

 4      Q.   And did you know either Simon or Eduardo

 5   before that date?

 6      A.   No.

 7      Q.   Did you know anyone associated or affiliated

 8   with the debtors before that date?

 9      A.   No.

10      Q.   What is your, I guess, compensation structure,

11   as far as it relates to both entities, because I know

12   you have an interest -- or are being paid by one and

13   have, I believe, an equity interest in the other.  Can

14   you just tell us?

15      A.   Yeah, I have a cash salary and an equity.

16      Q.   Okay.  Who negotiated that on behalf of the

17   debtors?

18      A.   Simon and his wife Julia, who was acting in

19   the HR capacity at the time.

20      Q.   And that was in April or May?

21      A.   Yeah, it was in April.  I came on board as a

22   contractor, initially.  A consultant.

23      Q.   Did you have any specific discussions about

24   why the equity piece?

25      A.   Why the equity?  Because I took a cut in cash
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 258
of 326

```
 1    comp to get equity, not knowing we were going into
 2    bankruptcy.
 3         Q.   Did they give you any suggestion as to the
 4    value of the LLC, or did you make any independent
 5    judgment as to the value of the LLC when you took that
 6    equity?
 7         A.   No.
 8         Q.   And what is the extent of the interest in
 9    that, in the LLC?
10         A.   You mean what percent?
11         Q.   Yeah.
12         A.   Three percent.
13         Q.   And what are the terms; is it an option?
14         A.   I don't know, to be honest.  I would have to
15    look.
16         Q.   Okay.  Did you ever have -- sorry.  Did you
17    ever have any discussions with Simon or Julia at that
18    time about what the value of the LLC was?
19         A.   No.
20         Q.   Did you ever have any discussions with anyone
21    else at that time what the valve of the LLC was?
22         A.   No.
23         Q.   Is Julia still employed by HashFast
24    Technologies or HashFast LLC?
25         A.   No.
```

```
 1        Q.   No?

 2        A.   No.

 3        Q.   What was the reason for her termination or her

 4   resignation?

 5        A.   We reduced staff.

 6        Q.   You said she was -- what was her role there?

 7        A.   She came in as an HR person a week or two

 8   before I joined, and then she left with the reduction of

 9   force in May.

10        Q.   Okay.  So she was there for about two weeks?

11        A.   About a month.

12        Q.   Okay.  Do you know what she was paid in that

13   month?

14        A.   I don't recall.

15        Q.   Okay.

16        A.   I would have to look.

17        Q.   So it would be somewhere in the books and

18   records?

19        A.   Yeah.

20        Q.   Do you know if she was paid in cash and

21   bitcoin or just cash or just bitcoin?

22        A.   She was paid in cash.  She did not receive pay

23   for the first three weeks.  She was one of the -- we

24   weren't making payroll, so the executives were deferred,

25   and she was deferred and then received catch-up payments
```

```
 1    for the hours.  She was an hourly basis.  I want to say
 2    maybe 80 or 90K a year, I don't remember exactly.  I'd
 3    have to look.
 4         Q.   You said executives weren't paid.  Was she an
 5    executive?
 6         A.   Because of her family relationship, we had
 7    deferred her.
 8         Q.   Okay.  So for the month -- you are not sure
 9    what the month was for that month?
10         A.   No.  I can look if you need it.
11         Q.   It's okay.  It's something I will follow up
12    with at the 2004.
13              Okay.  And do you know who was -- were you
14    responsible for terminating her?
15         A.   Yes.  Well, we made -- the management team
16    made the decision to terminate all employees.
17         Q.   And who was -- sorry.  Go ahead.
18         A.   Eduardo and Simon.
19         Q.   Okay.  Do you know -- and now I'm going to
20    jump around a bit, because I want to be respectful of
21    getting out of here at a reasonable time, and I
22    recognize we have the 2004.  So forgive me for being a
23    little jumpy now.  I'm going to do what I can to be
24    brief.
25              Was the license from DXCorr ever assigned to
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 261 of 326

```
 1   HasfFast LLC?  Have you ever seen any assignment
 2   documents or any documents assigning the license to
 3   HashFast LLC?
 4        A.   You mean to HashFast Technologies?
 5        Q.   Yes, I'm sorry.
 6        A.   Not that I am aware of.
 7        Q.   Well, I think actually -- who was the
 8   original --
 9        A.   The contract was with HashFast Technologies,
10   but the payments were made through the LLC.
11        Q.   Okay.  So I was right the first time.  So have
12   you ever seen an assignment of that license to HashFast
13   LLC?
14        A.   No.  I haven't seen any assignments of
15   licenses, but that doesn't mean they don't exist.  I
16   haven't been able to find them yet.
17        Q.   Have you asked whether any of those exist?
18        A.   No.
19        Q.   Who was responsible primarily for negotiating
20   the term sheet for LiquidBits?
21        A.   I was.
22        Q.   Did Eduardo and Simon play a significant role
23   in that or was it primarily you?
24        A.   Primarily me.
25        Q.   Okay.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 262 of 326

```
 1         A.   I sought input.
 2         Q.   Okay.  In the term sheet -- and obviously
 3    there are three main components.  One is obviously
 4    inventory.  Let me back up.  Let me try and go through
 5    this one a little more carefully than I would even if I
 6    spent more time on this.
 7              Was the term sheet at a place last week where
 8    it was -- I think told to me, certainly, where it was
 9    ready to go?
10         A.   How do you mean?
11         Q.   It had been accepted and agreed to between
12    LiquidBits and the debtor?
13         A.   We agreed on the general terms in the term
14    sheet, yes.
15         Q.   Okay, so...
16         A.   It formed a basis for a structure and a
17    dialogue as to what the final terms would be, yes.
18         Q.   But would you say that the material terms were
19    done, subject to -- I know you were seeking input from
20    various parties, including committee.  But would you say
21    that as of last week, when it was presented, it was --
22    the material terms had been ironed out between the
23    parties?
24         A.   Yes, I believe so.
25         Q.   When did you first start negotiating the
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 263 of 326

SF Reporters  (415) 948-8289

```
 1   LiquidBits deal with LiquidBits?
 2        A.   About a month prior to that.
 3        Q.   So the beginning of June, maybe?
 4        A.   Yeah.  I would have to look at the exact date.
 5        Q.   How did you first come to start the deal with
 6   LiquidBits?
 7        A.   They had submitted a proposal.
 8        Q.   Was the company seeking proposals?
 9        A.   Yes.  From others as well.
10        Q.   And how so?  How were the proposals being
11   sought?
12        A.   We didn't seek that one.  I believe -- I'm not
13   sure how it originated originally.
14             MS. MICKELSEN:  Actually, I believe that
15   LiquidBits originally called me and asked about a
16   potential proposal, and then we got the ball rolling and
17   it went to Pete and others.
18             THE WITNESS:  Yeah.  I'm not sure where it
19   originated, to be honest.
20             MS. MICKELSEN:  I'm fairly certain that
21   LiquidBits was the one who first initiated it and
22   reached out to us.
23             THE WITNESS:  Greg had reached out to me
24   through LinkedIn, asking if I was willing to talk, and
25   we started a dialogue.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 264

```
 1              MS. MCDOW:  Q.  Okay.

 2        A.   And so -- yeah.

 3        Q.   Once you got the -- I guess the dialogue open

 4   with LiquidBits, what else did you do to start marketing

 5   the company?

 6        A.   We went off and met with competitors, some

 7   venture capitalists, other financing agents.  And that's

 8   primarily it.

 9        Q.   Okay.  We talked earlier about whether a

10   preference analysis had been done.  When was the last

11   shipment that LiquidBits received of chips?

12        A.   I believe it was within the 90 days.

13        Q.   Okay.

14        A.   I think there were a few shipments in that

15   90 days.

16        Q.   Was the total about 2,000 chips?

17        A.   Yes.

18        Q.   Do you know how much -- what the value of

19   those chips would have been at the time they were

20   transferred?

21        A.   Well, I think the value assigned in the MOU

22   was $200 a unit, based on the original order.

23        Q.   Okay.  Have you factored into the price or the

24   term sheet the potential that that would be a

25   preferential payment?
```

```
 1        A.    No.

 2        Q.    And why not?

 3        A.    I didn't view it.  I thought they would have

 4   been built out by the time we were negotiating the term

 5   sheet.  It wasn't until the last few days that those

 6   chips appeared as potential inventory to be added to the

 7   pot.

 8        Q.    In the last few days -- I'm sorry?

 9        A.    In the last few days of the negotiations on

10   the term sheet, we became aware that those chips hadn't

11   built out.  My assumption was they were delivered some

12   time ago.  They already had been built out in the boards

13   and the mining.  I didn't factor them into the term

14   sheet, initially.

15        Q.    Did you first become aware when the committee

16   made the debtors aware?

17        A.    No.

18        Q.    Okay.  How did you first become aware?

19        A.    Through one of our manufacturing partners who

20   stopped ordering long lead-time parts from us, because

21   they were no longer building out boards for LiquidBits.

22        Q.    Okay.  So now that you know that there may be

23   a potential preference payment of at least $400,000 give

24   or take, depending on the value, do you intend to change

25   the terms of the LiquidBits deal to account for that
```

```
 1   value?

 2         A.    I think we have to look at all the preference

 3   payments and get legal counsel on that.

 4         Q.    Okay.  What did you do in negotiating the

 5   deal -- what value if any did you assign to the

 6   intellectual property?

 7         A.    Based on inputs we had received, we had

 8   initially tried to defer the intellectual property.  And

 9   that became a show-stopper, and after dialogues

10   internally, there wasn't a large value ascribed to the

11   IP, and with the payments that were remaining,

12   potentially, to pay off, acquiring the IP, we didn't

13   accrue a large value to that.

14         Q.    When you say internally they ascribed it a low

15   value, who, internally?

16         A.    Simon and Eduardo.

17         Q.    Okay.  Do you have any understanding of why

18   Simon would suggest to us under oath that it was worth

19   10 to 30 million, and why he would tell you what seems

20   to be the opposite?

21         A.    I think his belief was that under certain

22   circumstance if one were to pursue claims against a

23   competitor of ours that is using a similar technology,

24   that you could potentially realize the value out of the

25   IP.  It would cost you some money to go after that and
```

```
 1    fight for it.
 2            MS. MICKELSEN:  This gets back to the previous
 3    testimony about potential -- or potential litigation
 4    claims concerning the intellectual property, some
 5    ownership issues, licensing issues.
 6            THE WITNESS:  Right.
 7            MS. MCDOW:  Q.  So the term sheet as it is now
 8    contemplates transferring the IP as a whole.  It doesn't
 9    contemplate transferring licenses or licensees.  At the
10    time it was entered into, did you believe that the
11    debtors owned the IP outright?
12        A.   No.  They would have transferred the IP that
13    they owned, which would have been a limited set of IP.
14        Q.   Does the term sheet account for the transfer
15    of the limited IP?
16        A.   It accounts for IP that was owned, and so, if
17    it is not owned, it doesn't get transferred.
18        Q.   Okay.  So here it says that the claims --
19        A.   Therefore the portion that is owned had very
20    little value, because other parties had developed the
21    majority of it.
22        Q.   Okay.  I guess -- why don't you explain it to
23    me, because I guess it's unclear in the term sheet what
24    it is you think is being transferred by and through this
25    sale, as far as the IP is concerned?
```

Page 78

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 268 of 326

1    A.    It would have been the ownership in the 1.0
2    design, which is necessary to effect the build-out of
3    the current chips.
4    Q.    Anything else?
5    A.    There would have been board-related IP, board
6    design IP, as related to the employees that are retained
7    by HashFast, or generated by the employees retained by
8    HashFast or potentially acquired by LiquidBits.
9    Q.    Is there anything else?
10   A.    No.   That would be primarily it.   And then
11   future designs that would accrue out of the employees
12   that were retained.
13   Q.    Who do you understand owns the two
14   intellectual property rights we just discussed?
15   A.    HashFast.
16   Q.    Which HashFast?
17   A.    That's for the lawyers to decide.
18   Q.    Well, you are the one who said you negotiated
19   the sale.   I assume part of the sale is making sure that
20   the correct entity has the ownership rights that it is
21   going to transfer.   So I'm trying to figure out -- I
22   assume you've looked at something to figure who owns
23   what the debtor is going to transfer.   I'm trying to
24   figure out what you've looked at and who owns what.
25   A.    So -- yes.   So I mean, right now, HashFast LLC

```
 1   is designated as the owner of the IP.

 2             MS. MICKELSEN:  So that to the extent there

 3   are ownership rights, it would be HashFast LLC.

 4             MS. MCDOW:  Okay.

 5             MS. MCDOW:  Q.  Do you intend to substantively

 6   consolidate these two estates?  Do you intend to bring

 7   the assets and liabilities, to the extent you don't know

 8   the legal effect of substantive consolidation?  Through

 9   the sale, are you contemplating that the two estates are

10   combined?

11             MS. MICKELSEN:  The answer remains the same as

12   the last time, that that is still being investigated.

13   That decision hasn't been made at this time.

14             MS. MCDOW:  I'm trying to understand from the

15   negotiation perspective, when she was negotiating, did

16   she view the two entities' estates as combined.

17             MS. MICKELSEN:  Well, she also said that

18   allocation hadn't been determined yet, or actually that

19   it was something that was still to be determined.

20             MS. MCDOW:  I'm asking a different question,

21   though.  I'm asking whether she viewed all of the assets

22   and liabilities of both debtors as one and the same when

23   she entered into this purchase and sale agreement.

24             THE WITNESS:  We were viewing that we had

25   license rights as HashFast Technologies to build out the
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 270
of 326

1    chip, and that license rights would be transferred,

2    along with all the assets that were being built out.

3              MS. MCDOW:  Q.  You just told me that --

4         A.    As well as the IP rights for the employees

5    that remained.

6         Q.    Which belonged to HashFast LLC, is your

7    understanding.

8         A.    Some do.  It is isn't clear that they all do.

9         Q.    But this agreement itself says HashFast and

10   HashFast LLC will be selling the assets?

11        A.    Right.

12        Q.    It regards both of them as the seller here.

13   So is it safe to say that you were viewing the assets of

14   both companies as combined for the purposes of this sale

15   agreement?

16             MS. MICKELSEN:  Well, I think the question is

17   a little tricky, in that she could be reviewing the

18   assets of each of the companies as separate entities for

19   the purpose of the agreement to determine allocation

20   that -- allocation still has to be determined later on,

21   but not necessarily combining everything and viewing it

22   as one asset.

23             MS. MCDOW:  Q.  Okay.  I'll try and be more

24   clear.

25             Did you believe that by and through the sale

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 271
of 326

1    agreement -- other than the specifically excluded

2    assets, which are the inter-company claims essentially

3    between the two -- did you view all of the assets of

4    both estates as being sold through this purchase and

5    sale agreement?

6         A.    Yes.

7         Q.    Other than the intellectual property, the

8    avoidance actions we just discussed briefly, what else

9    did you view as having value in these estates?

10        A.    The inventory is the primary asset.

11        Q.    Okay.  And how much value did you assign to

12   the inventory?

13        A.    Probably in the eight-and-a-half million

14   range, at market value --

15        Q.    Okay.

16        A.    -- with a rapidly declining value.

17        Q.    And was it the same or was it more at the time

18   you entered into the term sheet?

19        A.    That's the value at the time we entered into

20   the term sheet.  It's less now.

21        Q.    Okay.  What then was the rationale for

22   entering into an agreement that was for a total of

23   $6 million, and that was a cap of $6 million to the

24   estates, with no guarantee on either portion of the six

25   million?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 272
of 326

```
 1          MS. MICKELSEN:  I believe she actually
 2    answered this during the last examination --
 3          THE WITNESS:  I did.
 4          MS. MICKELSEN:  -- when she spoke about the --
 5    not necessarily having a buyer's market at this time.  I
 6    mean, if you do a liquidation, you have to have your own
 7    buyers, there has to be a market value.  But for there
 8    to be a market value, you still need a market for that.
 9    And among other things, you know, when you acquire
10    there's also due diligence.  So I believe this has
11    been -- well...
12          THE WITNESS:  The rationale is that the 6
13    million gave up 5.3 in claims.  And the 6 million is the
14    capped bitcoin return, off of which, if the bitcoins are
15    held, can grow to anywhere from 10 to 20 million,
16    depending on what your assumption of it is.  We ran a
17    number of models and looked at the range of
18    alternatives, and looking at a range of 6 to 20 million
19    for total liabilities of ten, seemed like a reasonable
20    bet, compared to a liquidation scenario.  And our
21    guidance was that we had to come up with a scenario, and
22    that was the only one on the table.  So we did the best
23    we could to put one on the table.
24          MS. MCDOW:  Q.  The 5.3, you said -- it was
25    your testimony that it was worth 8.5 million at the time
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 273
of 326

```
 1   you entered into it.  So I was just using your number.
 2   The 5.3 million, you said that invalidated the claim.
 3   What investigation did you do, if any, into the validity
 4   of the LiquidBits claim, at or before you entered this
 5   agreement?
 6        A.   I validated it.  I knew what their report
 7   claimed.
 8        Q.   I'm sorry.  Can you explain what it means to
 9   say you validated it?
10        A.   I know what their order liability is.  The
11   amount that is on our books as unfilled orders.
12        Q.   Okay.  You testified that the books and
13   records were not in fantastic shape when you came in.
14   Did you independently verify the validity, whether
15   through invoices or anything else, of the LiquidBits
16   claim?
17        A.   Yes, I did.
18        Q.   And what did you do to conduct that?
19        A.   I went through the MOUs, the sequence of the
20   events, all the payments that were made.  The product
21   that was shipped.  And the value ascribed to the order
22   based on all of those.
23        Q.   I missed the last part, I'm sorry.
24        A.   And the value ascribed to the remaining order
25   balance based on all of that.
```

```
 1        Q.    Who ascribed that value?
 2        A.    Greg and Eduardo did, in their MOU.
 3        Q.    And what is an MOU?
 4        A.    Memo of understanding, that carved out the
 5   chips.
 6        Q.    Was that one listed in Schedule G?
 7        A.    It should be.
 8        Q.    Okay.  And you said -- does the debtor intend
 9   to assume that contract as part of this agreement?
10        A.    Does the debtor intend to what?
11        Q.    To assume that contract?
12        A.    No.
13        Q.    No?
14        A.    No.  You mean in terms of the purchase?  No.
15   It becomes -- it is no longer in effect.
16        Q.    Okay.  Have you had any discussions about the
17   legal effect of the debtor not assuming that contract?
18              MS. MICKELSEN:  Are you talking about if the
19   sale doesn't go through, and whether or not we are going
20   to assume or not assume this contract?  They have a
21   claim, regardless.
22              THE WITNESS:  Right.
23              MS. MCDOW:  Well, there is a difference in the
24   amount of the claim, whether you assume or reject the
25   contract.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 275 of 326

1          MS. MICKELSEN:  I understand rejection damage.
         2          MS. MCDOW:  I'm not saying you don't.  I'm
         3    trying to understand what she understood at the time she
         4    entered into the sale.
         5          MS. MCDOW:  Q.  Did you have any understanding
         6    of what would happen if the debtor assumed or rejected
         7    the contract we just talked about?
         8      A.   Well, no, because in entering into the
         9    agreement we were looking at the agreement as the
        10    agreement would go through, and therefore whether or not
        11    we rejected the contract was a moot point, because at
        12    that point the agreement would have gone through, so
        13    there was no contract to consider.
        14      Q.   But did you evaluate --
        15      A.   So if you're asking me what the claim would be
        16    if the contract didn't go through, and we evaluate their
        17    claim, we haven't done that because that isn't what the
        18    term sheet was intended to portray.
        19      Q.   Okay.  So did you not do, then, an analysis of
        20    what their claim would be were it not for this term
        21    sheet?
        22      A.   We know what their claim is for the MOU.  I'm
        23    not understanding your question.
        24      Q.   Who negotiated the MOU; you said Eduardo and
        25    Greg?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 276 of 326

```
 1        A.    Eduardo and Greg, I believe.

 2        Q.    Do you know the basic terms of the MOU?

 3        A.    I can pull it up.  I don't -- because there

   were numerous orders that were converted a number of

 5    times into an agreement that was reached.  There was a

 6    reallocation of product to fill the order value.

 7        Q.    Do you know when the debtor first started

 8    doing business with LiquidBits?

 9        A.    Last year sometime.

10        Q.    The month and year?

11        A.    I want to say September/October.

12        Q.    The last kind of part about this.  You said

13    that you thought that the deal was a good deal because

14    if the bitcoin rose in value, it would could be up to, I

15    think you said, 10 or 20 million.  I could be

16    misquoting.  But isn't it true that none of the benefit

17    of that increase goes to the unsecured creditors,

18    correct?

19        A.    No.  That's not true at all.

20        Q.    What is the effect on -- what is the benefit

21    to the unsecured creditors if the bitcoin goes up?

22        A.    The bitcoins that are received from the mine

23    are held in the estates, and at the point in time, they

24    are paid out.  Based on the price of the bitcoin, there

25    is a different value that is ascribed to the payout than
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 277 of 326

1    the point in time that they were received.

2        Q.   As I understand the transaction, there is a
3    seller note in a principal amount of the million, and
4    then a liquidation preference equity portion capped at
5    three million.  So to the extent the bitcoin rises in
6    value, which of those does it affect for the better?

7        A.   If six million is paid out in bitcoin, and
8    that bitcoin is held, it can be held to the date as
9    defined in the term, and when it is paid out a year
10   later, based on price of bitcoin, that is a significant
11   variation of it.

12       Q.   One more question about this and then I will
13   finish up in the 2004.  In that scenario, with this term
14   sheet, is there a chance that the unsecured creditors
15   get nothing?

16       A.   Everything, you know, possible would have to
17   go wrong, and we would have to sue LiquidBits.

18       Q.   What obligation does LiquidBits have under
19   here that would give rise to a suit against LiquidBits?
20   Because it seems to me that --

21       A.   It's a security interest in the inventory and
22   in the assets.

23       Q.   I understand.  They have an obligation to turn
24   back over everything if the mining is unsuccessful.
25   They have to turn back over the bits.  But that's

1   different, I think, than being sued, than having a suit

2   against them for damages for some sort.

3       A.   For the balance, for the remaining three

4   million?

5       Q.   For any of it.

6       A.   Yeah.

7       Q.   Okay.  So --

8       A.   Well, there's a security interest in three

9   million.  And the balance of the three million starts at

10  the point in time that the mine starts generating income

11  in excess of the procurement requirements to build out

12  the balance of the boards.

13      Q.   So if LiquidBits is unsuccessful, it is a

14  distinct possibility the general unsecured contracts

15  will be zero dollars from this deal, although they would

16  get the inventory, whatever is left at that point, back?

17      A.   If that is how you want to interpret it.

18      Q.   I have read it a number of times.  I'm trying

19  to figure out how I interpret it anything other than

20  that.  So if LiquidBits is unsuccessful in mining, if

21  things go wrong, which they may --

22      A.   Well, any mine would be like that.  Anybody

23  that buys a product from us.  They buy the product.  The

24  market tanks, you are in the tubes.

25      Q.   Understood.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 279
of 326

1    A.   You know, if you buy the stock today, it could
2    be worthless tomorrow.  That's the nature of bitcoin
3    mining.
4    Q.   So there's a chance the general and unsecured
5    creditors would get nothing except the inventory turned
6    over at the end of this venture?
7    A.   Possibly, yes.  It could be structured
8    differently.
9    Q.   So why in your estimation is that a better
10   deal than liquidating the current inventory which you --
11   A.   The inventory, you could get.
12   Q.   Let me -- can I finish my question, please.
13   A.   Sorry.
14   Q.   Why in your estimation, as the one who
15   negotiated this deal, do you believe this deal -- which
16   you just testified could distribute zero dollars to the
17   general unsecured creditors -- is better than a deal
18   which just liquidates the inventory, which you
19   testified, at the time you entered into this agreement,
20   you believed was $8.5 dollars?
21   A.   Well, I think you are going to get 10 cents on
22   the dollar in liquidating the inventory, and your
23   ability to get that is going to diminish with time.  I
24   have done numerous inventory liquidations in prior lives
25   with a product that doesn't diminish in value at the

1   rate of bitcoin mining equipment, and 15 cents on the

2   dollar is a high estimate.

3           So ten cents on the dollar that diminishes

4   with time versus a deal that has a likely opportunity of

5   succeeding, that had numerous provisions built in that

6   all the lawyers looked at and felt that we were

7   protected on the downside, and gave them anywhere from

8   60 cents to a hundred percent or 200 percent on the

9   dollar, seemed like a pretty good alternative, given

10  there were no others on the table.

11      Q.   And when you say 60 to a hundred cents on the

12  dollar, what are you referring to?

13      A.   I'm looking at total liabilities of 15

14  million, less five million on LiquidBits.  That leaves

15  you 10 million of liabilities, and you pay out six.

16  That's 60 cents on the dollar.  And then you have

17  additional upside opportunity of up to 20 million.

18      Q.   Okay.  And then $15 million liabilities, you

19  get that off the schedules?

20      A.   Yeah.

21      Q.   Okay.  The last question about this, and then

22  we will move on.  How much do you estimate the debtor is

23  going to liquidate in chips this month?

24      A.   I don't know.

25      Q.   Dollar value.  What's your best estimate?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 281 of 326

1    A.   You have the budget, so it is some portion of
2    what is in the budget.
3        Q.   No.  What is going to generate an income.
4    Just from the liquidation of chips alone?
5        A.   Well, we're not liquidating, we're selling
6    right now.  We're not in a liquidation mode, and we just
7    got the authority to sell, so...
8        Q.   How much do you believe the debtor is going to
9    make from the sale of individual chips?
10       A.   Whatever I put in the budget.  I'd have to
11   look.
12       Q.   Just give me an estimate.  What's your guess
13   about how much they're going to make?
14       A.   I won't contradict the budget.  I will see
15   what is in the budget.
16            MS. MICKELSEN:  Well, first, I think it is
17   unfair to provide estimates at this point.
18            MS. MCDOW:  I think --
19            MS. MICKELSEN:  You're asking what is her
20   knowledge, and right now we have been prohibited from
21   lining up and conducting sales.  Now we are in a
22   position where we can line up and conduct sales.
23            MS. MCDOW:  Q.  Who is responsible for
24   determining, at the company, whether a sale of chips is
25   made?

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 282
of 326

1          A.    Whether what?

2          Q.    Whether a sale of chips is made.  Who is

3    responsible for making that decision?

4          A.    Well, apparently you guys are because we

5    haven't been able to do it for two-and-a-half weeks.

6          Q.    Now that there has been a stipulated order

7    that's been uploaded that authorizes the sale of certain

8    chips under certain guidelines, who at the company is

9    responsible for authorizing the sale of chips?

10         A.    I review the orders.  They are subject to a

11   price list that we've reviewed and gotten approved by

12   you guys.

13         Q.    And then who makes the final determination

14   about whether the sale should be made?

15         A.    The actual salesperson, whether it's Tim Wong

16   or Eduardo.  Assuming it is within the boundaries.  And

17   we all review it.  We have a daily management meeting

18   and we review what deals are on the table and discuss

19   them.

20         Q.    Do you make a final determination?

21         A.    Simon and myself have been, yes.

22         Q.    Now that Simon is gone, will you be making the

23   final determination?

24         A.    Yes, unless there is something controversial

25   and then I will have to raise it.

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 283
of 326

1    Q.   In your best estimate, how much in income is
2    the company going to make this month from the sale of
3    chips?
4    A.   Let me look at the budget.
5         I think this month is very low, because there
6    is not much left of the month.
7    Q.   Okay.  Let's say the next two months.  Even
8    better, what do you estimate --
9         MS. MICKELSEN:  Well, we provided a budget to
10   you, and the budget gives you projections --
11        THE WITNESS:  Yeah --
12        MS. MCDOW:  I'm asking a different question.
13        MS. GLOSSON:  Wait.  One of you --
14        MS. MCDOW:  Q.  The stipulated order that we
15   just entered into authorized the sale of up to 3,000
16   chip and 5,000 wafers' worth of chips.  In your
17   estimate, what revenue is that going to provide to the
18   company?
19   A.   I would have to do the math.  I don't know.
20   3,000 chips at the current price that we proposed, it
21   will depend on the volume, whether we do them in small
22   volumes or large volumes, somewhere between 120 and $175
23   a chip.  Plus there's associated peripherals with it.
24   Q.   That's why I'm looking for an estimate.  What
25   is your estimate about --

```
 1          MS. MICKELSEN:  There's also additional
 2   non-inventory provision.  So --
 3          THE WITNESS:  So we have an estimate --
 4          (Reporter interrupted proceedings.)
 5          MS. MICKELSEN:  Well, I guess the difficulty
 6   that I am having here is that we provided a budget of
 7   projections of sales, and we have been prohibited from
 8   lining up sales, and that is something that we are doing
 9   now.  But we have provided what we think will be the
10   projection already.  And I don't want our clients
11   providing an estimate or, you know, speculating on it
12   what might be, which doesn't have the information before
13   here, and it's not within her personal knowledge right
14   now.  I mean, this is something we are working on.
15   We've been prohibited from doing it.  And we have
16   provided a budget.
17          MS. GLOSSON:  I think that the best forum for
18   sort of these kinds of details might be at the 2004 exam
19   that's already been noticed.
20          MS. MCDOW:  Okay.
21          MS. MICKELSEN:  I agree.  Thank you.
22          MS. MCDOW:  Q.  And just -- it's something I
23   want you to know the answer to, which is the estimate of
24   what it will be, now that the stipulated order is
25   entered, so if you want to think about it, you may.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 285 of 326

1          A.    The budget revenue estimate was 150,000.

     2          Q.    For the 8,000 total?

     3          A.    No, that includes all inventory.  I haven't

     4    gone through breaking that out by chips versus other

     5    components.  I probably won't have that done by the time

     6    of the 2004 exam, but that's what we have.

     7                MR. EDGEWORTH:  I think the two of you are

     8    talking about different things.

     9                MS. MCDOW:  I'm talking about the 2004.

    10                MR. EDGEWORTH:  She's talking about an

    11    estimate of the total revenue that's generated from

    12    sales.  You are talking about your expenses.

    13                MS. MICKELSEN:  If these --

    14                THE WITNESS:  No.  I was talking about

    15    revenue.

    16                MR. EDGEWORTH:  You're going to sell 8,000

    17    chips for $150,000?

    18                THE WITNESS:  No.  She asked me for the next

    19    two weeks.  I'm not selling 8,000 chips in the next two

    20    weeks.

    21                MS. MCDOW:  Two months.

    22                MS. MICKELSEN:  We have a misunderstanding of

    23    time frame, but still I think these questions can be

    24    answered at the 2004 as well.

    25                MS. MCDOW:  Q.  Again, I will tell you the

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 286
of 326

```
 1   question I'm going to ask, if you want think about it, I
 2   guess.

 3           As the CFO, I think you've probably made an
 4   estimate of what it's worth.  You have been marketing it
 5   for a while, it's your job.  But I will give you some
 6   time to think about it.  The question is going to be:
 7   What -- we've now stipulated that you can sell 3,000
 8   chips and 5,000 chipsful of wafers during the pendency
 9   of the case.  I want to know what you estimate the
10   revenue will be to the companies from those sales.
11       A.   Okay.
12           MS. GLOSSON:  Is that something that you know,
13   sitting here right now?
14           THE WITNESS:  No.
15           MS. MICKELSEN:  To the extent we have done
16   projections, they have been provided.
17           MS. MCDOW:  It's a different issue.
18   Projections is a different issue than what she thinks
19   she can get later, the total.  That's what I'm trying to
20   figure out.
21           MS. MICKELSEN:  Well, not if she doesn't
22   actually know for certain.  Then it's still a projection
23   and estimate.
24           MS. MCDOW:  That's all I asked for.  That's
25   all I asked for, was the estimate.  She can have a
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 287 of 326

1    couple of days to think about the estimate.

2              MS. GLOSSON:  So let's just go off the record.

3              (A recess was held at 1:56 p.m., after which

4              the proceedings reconvened at 1:57 p.m.)

5              MS. GLOSSON:  Let's go back on the record.

6              MS. MCDOW:  Q.  What were the total amount of

7    payments made by HashFast Technologies, LLC during the

8    period of time after the involuntary petition was filed

9    and the entry of order for relief was entered?

10        A.   The total amount of payments made?  I would

11   have to look at it.  Whatever I provided you in the

12   actuals.  Since the...

13        Q.   In the gap period.  But since the involuntary

14   petition was filed and the time the order for relief --

15   well, here it's actually probably going to be that the

16   order was entered later.  But the voluntary petition was

17   filed first.  It was just, you know, an issue with the

18   court.  But between -- in the gap period, which is what

19   we call it, after the involuntary petition was filed?

20        A.   Well, between May 10th and July 8th, which was

21   the last time we updated this.  It was four hundred

22   thousand -- 401,008 were the operating expenses -- oh,

23   and then adding in some shipping and freight -- and

24   73,668, so whatever that adds up to.

25        Q.   At the time the involuntary petition was filed

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 288
of 326

```
 1   were you in charge of the books and records as far as
 2   who made payments?
 3        A.   Yeah.
 4        Q.   Yes?  Okay.  And the involuntary petition was
 5   filed on May 8th?
 6        A.   May 9th.
 7        Q.   May 9th.  Okay.  You list on schedule --
 8   financial affairs, number three, a host of payments made
 9   May 9th, the date the involuntary petition was filed.
10        A.   Uh-huh.
11        Q.   Why did you make a host of payments on the
12   date the involuntary petition was filed?
13        A.   Well, we were notified of the involuntary the
14   12th or the 13th.  We had business operations continuing
15   as is.
16        Q.   You had no independent knowledge that the
17   involuntary petition had commenced on May 9th?
18        A.   No.
19        Q.   Did anybody in the company know that the
20   petition had been filed on May 9th?
21        A.   No.  We found out the 12th or the 13th.
22        Q.   Okay.
23        A.   Monday afternoon or Tuesday morning.
24        Q.   How did you find out?
25        A.   I don't recall exactly.  Somebody called us.
```

```
 1        Q.    Somebody called you?

 2        A.    One of the legal counsels that was working on

 3   one of the arbitrations or lawsuits mentioned it.  I

 4   don't recall which one.

 5        Q.    Okay.  Did you personally authorize any

 6   payments to be made subsequent to learning the

 7   involuntary petition had been filed?

 8        A.    No, we were -- no.

 9        Q.    The last question and then I will just go.

10   Who determined that it would be appropriate to remove

11   Simon Barber as the CEO?

12        A.    Eduardo was the CEO.  The board did.

13        Q.    Sorry.  Simon Barber was the president and

14   CFO, I thought.

15        A.    He was president and CEO.

16        Q.    Okay.

17              MS. MICKELSEN:  Eduardo was the CEO, and moved

18   down to sales.

19              THE WITNESS:  The board determined it, as was

20   stated in the last exam.

21              MS. MCDOW:  Q.  I think I have it backwards,

22   but okay.  And who was the board again?

23        A.    Eduardo, Simon, and a tie-breaker, Roy.

24        Q.    And who is the tie-breaker?

25        A.    Roy -- I can't say his last name.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 290
of 326

```
 1      Q.   Can you give me a slaughtering of it?

 2      A.   I will look it up.  I just don't have the

 3  spelling of it.

 4      Q.   Did you make any personal recommendations or

 5  give any advice or opinion as to whether you thought

 6  Simon Barber should be remain in his position?

 7      A.   Eduardo?

 8      Q.   I was actually -- Simon changed positions as

 9  well --

10      A.   No.

11      Q.   -- didn't he?

12      A.   Never.

13      Q.   Okay.  Then it is Eduardo that I am thinking

14  of.  Did you make any recommendations or give your

15  thoughts or advice about whether he should be taken out

16  of the management position and put into sales?

17      A.   I may have, yes.

18      Q.   And what were those?

19      A.   I was in support of that recommendation.

20      Q.   In support of him being taken out of

21  management?

22      A.   Yes.

23      Q.   And why?

24      A.   I didn't think it was in the best interest of

25  the creditors.
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 291
of 326

```
 1        Q.   And why not?

 2        A.   Because we needed to cut costs and act for the

 3   benefit of retaining the value of the estates.

 4        Q.   Did Eduardo's salary stay the time from the

 5   time he was in management to the time he was in sales?

 6        A.   Yeah.

 7        Q.   Then how was it a cost-cutting measure for him

 8   to be taken out of management?

 9        A.   There were actions, you know, engineers were

10   still being bought lunches and the like, and we had a

11   healthy payroll when I arrived.  And we had to get some

12   decisions effected to change that situation.  And it

13   took some effort to get those decisions effected.

14        Q.   Other than hoping to eliminate the

15   extracurricular lunches, was there any other reason you

16   supported the removal of Eduardo from a management

17   position?

18        A.   Not that I am going to go on record for.

19        Q.   There is no privilege that I know of that

20   protects that.

21        A.   Then no.

22        Q.   There was no other reason that you had to

23   support his being removed from management?

24        A.   No.

25        Q.   So were it not for the lunches and those
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 292 of 326

1    de minimus costs, you would have supported keeping him

2    in a management position?

3         A.   No, I don't think decisions were being made

4    effectively.

5         Q.   Okay.  What kind of decisions?

6         A.   That focused on the details and the data

7    needed at the time to steer us into the bankruptcy.

8         Q.   Okay.  Can you give me a few more details

9    about what decisions you think were being made poorly by

10   Eduardo?

11        A.   I think it was that there was a belief that

12   things would turn around, and we needed to, you know,

13   get a little more attentive to the sense of urgency of

14   getting into the bankruptcy situation.

15        Q.   What was your belief that Eduardo was doing

16   things to hinder those efforts?

17        A.   I think he believed and still does believe

18   that there was a chip conversion strategy that would

19   have significantly helped alleviate some of the backlog

20   of liabilities; that by offering customers equivalent

21   processing power in chips, that it could alleviate, you

22   know -- that people would relinquish their liability in

23   order to get more chips.  There was a lot of attention

24   at the company being spent on pushing that notion.

25        Q.   Did you have any conversations with him about

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 293 of 326

```
 1   whether or not the strategy should change, as opposed to

 2   just removing him from management?

 3        A.   Yes.  We had a number of discussions about

 4   that, as a management team.

 5        Q.   Any other reasons you chose -- you supported

 6   the notion of him being removed from management?

 7        A.   No.

 8        Q.   Okay.

 9             MS. GLOSSON:  Any further questions --

10             MS. MCDOW:  Tons, but I'll save them.

11             MS. GLOSSON:  -- at this point.  Well, you do

12   have the 2004 exam.

13             MS. MCDOW:  Yes.

14             MS. GLOSSON:  All right.

15             MS. MCDOW:  Is it going Monday morning or

16   afternoon?

17             MS. GLOSSON:  Can we talk about that after?

18   We're still on the record.

19                  EXAMINATION BY MS. GLOSSON

20             MS. GLOSSON:  Q.  This declaration that was

21   provided to me concerning the debtors' schedules that

22   bears your original signature; is this your signature,

23   Ms. Hushen?

24        A.   Yes.

25        Q.   And at the time that you signed it, did you
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 294 of 326

1    have an opportunity to review the schedules?

2        A.    Yes.

3        Q.    And with respect to any amendments that we've

4    discussed on the record, do you believe the schedules

5    are true and correct?

6        A.    Yes, based on knowledge we had --

7        Q.    Okay.

8        A.    -- at that point in time.

9        Q.    And you didn't provide me with a copy of the

10   declaration concerning the statement of financial

11   affairs.  Did you -- since our last meeting, did you

12   review an original wet signature for this declaration

13   concerning the statement of financial affairs?

14       A.    I did not.  That was an oversight.  I thought

15   these were the two schedules being sought.

16            MS. MICKELSEN:  That was actually -- I will

17   take blame for that, because I understood that it was

18   just these two, and we will provide you the wet

19   signature on the other.  So please do not hold this

20   against our client.

21            MS. GLOSSON:  That's fine.  Let me return this

22   to you, because that is your original, right?

23            THE WITNESS:  Get the other one too.

24            MS. GLOSSON:  Give that back, because we have

25   to do HashFast LLC, still.  So some of the documents I

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 295
of 326

```
 1  just want to cover, make sure we have -- we are on the
 2  same page regarding the documents.  I'd like to see a
 3  copy of the 8/21/13 memorandum of understanding.  Is
 4  that something you think you can provide?
 5           MS. MICKELSEN:  Yes.  Well, so --
 6           MS. GLOSSON:  It's not subject to
 7  confidentiality.
 8           MS. MICKELSEN:  So there are two memorandums
 9  of understanding.  There's one for DXCorr, and that's
10  the one you are referring to, and then there's also a
11  LiquidBits one, which I don't know if you are getting
12  to.  Okay.  So the one for DXCorr, I don't think we have
13  an issue with it.  I would have to review it just to see
14  if it has similar terms to the Uniquify contract, as we
15  just provided some information on the record.  I think
16  that there are -- I don't think the same confidentiality
17  rules apply, but I really would like to check first.
18           MS. GLOSSON:  That's fine.
19           MS. MICKELSEN:  That said, even if they do, it
20  might be that we can disclose them to you, just not --
21           MS. GLOSSON:  Or you can disclose it in a
22  redacted form, if you think that is necessary.
23           MS. MICKELSEN:  Okay.  Thank you.
24           MS. GLOSSON:  Q.  Summary of payments to
25  DXCorr with the detail regarding which entity made the
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 296
                                      of 326

```
 1    payments.  It's something -- I had the impression you
 2    were --

 3         A.    Yeah.

 4         Q.    -- looking at something that you could provide
 5    to us.  And then the Sandgate contract.  So those are
 6    the three items I have.  All right.

 7              I am going to continue the meeting in this
 8    case, because there was at least one instance where you
 9    were not -- you did not have an answer to it, to my
10    questions.  And so I would like Mr. Barber to come back
11    for that purpose.  He seems to be the one person that
12    probably has the knowledge about that, some of those
13    topics that we covered.  So I will continue it.

14              I have talked to his attorney, Mr. Katz, of
15    Sheppard Mullin, and he has indicated to me that
16    Mr. Barber and Mr. Katz would be available on
17    August 12th.  So I'll be continuing this meeting to
18    August 12th at 9:00 o'clock.

19              MS. MCDOW:  August 12th, you said?

20              MS. GLOSSON:  Yes.  I believe that's the
21    second Tuesday in August.

22              MS. MICKELSEN:  I have a Webinar at 10:00
23    o'clock.

24              MS. GLOSSON:  At what time?

25              MS. MCDOW:  10:00 o'clock.
```

```
 1              MS. GLOSSON:  I said 9:00, but...

 2              What is your availability?

 3              MS. MCDOW:  11:15.

 4              MS. GLOSSON:  Let's do 11:15, then.

 5              MS. MICKELSEN:  August 12th at 11:15.

 6              MS. GLOSSON:  So we are adjourned until then.

 7              Are you not available?

 8              THE WITNESS:  Yeah, that's fine.

 9              MS. GLOSSON:  All right.  So we are adjourned

10    until then.

11              (The proceedings adjourned at 2:10 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 298
of 326

```
1    STATE OF CALIFORNIA      )
                              )  ss.
2    COUNTY OF SAN FRANCISCO  )

3

4

5

6                  CERTIFICATE OF REPORTER

7         I, KARLA K. ELLIS-DAVIS, a Certified Shorthand
     Reporter, duly authorized to administer oaths pursuant
8    to Section 2093(b) of the California Code of Civil
     Procedure, I hereby certify that the witness in the
9    foregoing deposition was by me duly sworn to tell the
     truth, the whole truth, and nothing but the truth in the
10   within-entitled cause;

11        That said deposition was taken down in shorthand
     by me, a disinterested person, at the time and place
12   therein stated, and that the testimony of the said
     witness was thereafter reduced to typewriting, by
13   computer, under my direction and supervision;

14        I further certify that I am not of counsel or
     attorney for either or any of the parties to the said
15   deposition, nor in any way interested in the events of
     this cause, and that I am not related to any of the
16   parties thereto.

17

18   Dated:  July 18, 2014

19

20

21

22

23                   _____

24

25                   KARLA ELLIS-DAVIS, CSR NO. 12998
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 299 of 326

```
 1                    ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4   I,_____, do hereby certify that I have

 5   read the foregoing pages, and that the same is a correct

 6   transcription of the answers given by me to the

 7   questions therein propounded, except for the corrections

 8   or changes in form or substance, if any, noted in the

 9   attached Errata Sheet.

10

11                       _____

12                                MONICA HUSHEN

13

14   Subscribed and sworn to before me this

15   _____ day of _____, 20_____.

16

17

18

19

20

21

22

23

24

25
```

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 300
of 326

1    I, MONICA HUSHEN, have read my proceedings transcript

2    consisting of the preceding pages, taken on

3    July 15, 2014, and I certify that: (Check One)

4

5    _____I have no corrections.

6

7    _____I have corrections as reflected on the
     attached Deponent's Correction Sheet, and I now
     approve my deposition as true and correct.

8

9

10

11                              _____

12                              MONICA HUSHEN

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 301 of 326

```
 1              DEPONENT'S CORRECTION SHEET
 2          To add testimony, indicate "Add" and print the
 3   exact words you wish to add.  To delete testimony,
 4   indicate "Delete" and print the exact words you wish to
 5   delete.
 6
 7   Deposition of:  MONICA HUSHEN
 8   Proceedings Date:  07/15/2014
 9
10   I, MONICA HUSHEN, have made the following changes to my
11   proceedings transcript:
12
13   PAGE        LINE        CHANGE (Add/Delete)
14   _____      _____      _____
15   _____      _____      _____
16   _____      _____      _____
17   _____      _____      _____
18   _____      _____      _____
19   _____      _____      _____
20   _____      _____      _____
21   _____      _____      _____
22   _____      _____      _____
23
24   _____      Date:_____
25   MONICA HUSHEN
```

Case: 14-30725  Doc# 148  Filed: 07/23/14  Entered: 07/23/14 19:01:10  Page 302 of 326

## $

**$1** 45:9

**$15** 91:18

**$150,000** 96:17

**$175** 94:22

**$200** 75:22

**$30** 51:19

**$350,000** 54:7

**$400,000** 76:23

**$6** 50:16,24 82:23

**$8.5** 90:20

## 1

**1** 16:3 19:22 20:7 25:3 26:11,24

**1,202,643** 44:18

**1.0** 79:1

**1.1** 26:2

**1.5** 10:23 12:24 13:14 14:6,18, 21:22,24 22:1,3,4 25:8,12,19 27:20 42:22 52:14

**1/1** 20:7

**10** 47:25 48:14,18 77:19 87:15 90:21 91:15

**100** 19:19

**100,000** 20:1

**100K** 19:18,20 20:5,8,10,13

**1099s** 66:17

**10th** 98:20

**11** 4:13

**11:18** 4:2

**11:20** 4:16

**12** 10:6

**12/1** 26:6

**120** 94:22

**12998** 4:5

**12:22 p.m** 40:22

**12:47 p.m** 52:1

**12:54 p.m** 56:22

**12th** 99:14,21

**13th** 99:14,21

**14-30725** 4:15

**14th** 26:18

**15** 4:1,15 91:1,13

**150,000** 96:1

**15th** 66:16

**16-millimeter** 25:9

**16-nanometer** 16:13,23

**1:05 p.m** 56:23

**1:25** 67:7

**1:56 p.m** 98:3

**1:57 p.m** 98:4

**1st** 25:6,7,12 26:7

## 2

**2** 10:25 16:14 19:23 52:15

**2,000** 75:16

**2.0** 14:22 21:25 22:6,7 28:14

**20** 83:15,18 87:15 91:17

**200** 91:8

**2003** 25:3

**2004** 71:12,22 88:13 95:18 96:6,9, 24 104:12

**200K** 19:23 20:8 26:6

**2013** 15:14 16:3,9,21 26:11, 32:24, 34:25 37:20 61:3 66:18

**2014** 4:1,15,21 10:7 46:14,19

**21** 15:14 16:20

**21st** 16:15 53:23 54:2

**235** 4:3,16

**28th** 46:22,24

**29,000** 22:5

## 3

**3** 11:2 19:23

**3,000** 94:15,20 97:7

**30** 77:19

**341** 7:15

**350K** 26:4

## 4

**4** 19:23

**401,008** 98:22

**425** 19:18,21

**425K** 20:5

**4th** 26:18

## 5

**5** 19:23

**5,000** 94:16 97:8

**5.3** 83:13,24 84:2

**500,000** 26:14

**500K** 26:5

**57K** 20:10,13

**5th** 26:16,18

## 6

**6** 32:24 83:12,13,18

**60** 91:8,11,16

**6th** 33:9

## 7

**700** 4:3

**73,668** 98:24

**750K** 26:3

**7th** 59:24

## 8

**8** 4:20

**8,000** 96:2,16,19

**8.5** 83:25

**80** 71:2

**85** 20:6,7

**85,000** 47:11

**8500** 20:2

**85K** 19:22 26:13,17,19

**8th** 4:17 98:20 99:5

---

**9**

**9** 34:25 37:20

**90** 20:22 21:1 35:17,21 49:16 75:12,15

**90K** 71:2

**94104** 4:4

**982K** 20:4

**9th** 33:1,7,9,11 54:7,8 55:1 56:2 99:6,7,9,17,20

---

**A**

**a.m.** 4:2

**ability** 90:23

**absence** 59:4

**absorbed** 15:24

**accepted** 73:11

**accessible** 7:24

**accompany** 57:11

**account** 65:6 76:25 78:14

**accountant** 40:9,10 42:16

**accounting** 67:3

**accounts** 78:16

**accrue** 77:13 79:11

**acquainted** 67:17

**acquire** 34:15 83:9

**acquired** 79:8

**acquiring** 77:12

**act** 102:2

**acting** 68:18

**actions** 82:8 102:9

**activities** 58:4,22

**activity** 63:11 65:12

**actual** 16:17 62:2,25 93:15

**actuals** 98:12

**Adam** 24:1

**add** 49:19

**added** 8:2,3 47:21,23 48:5, 76:6

**adding** 98:23

**addition** 8:1 47:22

**additional** 5:2 7:13 91:17 95:1

**addressed** 18:24 46:9

**adds** 98:24

**advice** 45:22 49:7 101:5,15

**affairs** 6:7,14 34:13 44:16 48:1,11 60:22 61:15 99:8 105:11,13

**affect** 88:6

**affiliated** 68:7

**afloat--** 62:17

**afternoon** 99:23 104:16

**agency** 30:10

**agents** 75:7

**agree** 60:6,7 64:12 95:21

**agreed** 73:11,13

**agreement** 16:5,17,21 24:8,12,13 32:15 33:4,11,18,21 34:5,7,16 37:9,13,14 38:20 39:10,11,18 40:3 44:24 80:23 81:9,15,19 82:1,5,22 84:5 86:9,10,12 87:5 90:19

**ahead** 13:23 21:18 71:17

**Aldabashi** 5:23

**alleviate** 103:19,21

**allocate** 42:13

**allocates** 38:7

**allocating** 37:6

**allocation** 37:21 38:17 40:16 50:17,20,22 80:18 81:19,20

**alternative** 91:9

**alternatives** 83:18

**amend** 48:10

**amended** 15:3 53:13

**amendment** 7:16

**amendments** 7:7,8,10 105:3

**amount** 15:5 18:17 19:16,17

20:18 26:21 41:13,15 44:18 45:2 47:9 84:11 85:24 88:3 98:6,10

**amounts** 20:14 54:4

**analysis** 53:11 75:10 86:19

**analyst** 5:21

**ancillary** 29:3

**Andrew** 5:23

**announced** 10:7

**announcement** 10:10

**anticipated** 59:17

**apologies** 8:21

**apologize** 33:9

**apparently** 93:4

**appearance** 5:12

**appeared** 76:6

**appearing** 5:14

**appears** 21:19 26:12,15,20 41:21

**application** 7:1

**applied** 22:4,5

**approve** 52:8,9

**approved** 93:11

**approximately** 28:12

**April** 32:25 33:1,11 34:25 37:20 46:13,14,16,19 59:24 65:14 68:20, 21

**arbitrations** 100:3

**arms** 61:13

**arrest** 62:14

**arrived** 38:17 59:22 60:1 61:21 63:16,19 64:20 65:4,14 102:11

**articulate** 12:22

**ascribed** 77:10,14 84:21,24 85:1 87:25

**Ashley** 5:16 67:14

**aspect** 62:9,13

**aspects** 12:12,14 34:10 62:8,20 64:19

**asset** 81:22 82:10

**assets** 51:10,12 53:23 55:2 80:7, 21 81:2,10,13,18 82:2,3 88:22

**assign** 52:20 77:5 82:11

**assigned** 71:25 75:21

**assigning** 72:2

**assignment** 72:1,12

**assignments** 72:14

**assisted** 48:17

**assume** 13:9 23:24 35:3 79:19,22 85:9,11,20,24

**assumed** 86:6

**assuming** 26:8 48:13 85:17 93:16

**assumption** 76:11 83:16

**attached** 52:24 65:19

**attention** 62:16 103:23

**attentive** 103:13

**attorney** 5:6 49:23

**August** 15:14 16:9,15,20

**authority** 56:15 59:3,16 92:7

**authorize** 100:5

**authorized** 94:15

**authorizes** 93:7

**authorizing** 93:9

**avoidance** 82:8

**aware** 24:11 27:2,4 37:8, 51:23 55:11 66:4 72:6 76:10,15,16,18

---

**B**

**back** 24:13 35:23 37:10 38:2 47:21 56:24 73:4 78:2 88:24,25 89:16 98:5 105:24

**backlog** 60:20 103:19

**backwards** 100:21

**Bakerhostetler** 5:16 67:14

**balance** 64:10,11,14 84:25 89:3, 9,12

**balances** 21:23

**ball** 74:16

**bank** 24:3,4,5 42:4 46:22 47:2

**bankruptcy** 4:14 5:21 12:17 28:6 32:23 45:4 52:7 58:12 61:17 69:2

103:7,14

**banks** 15:24

**Barber** 9:1 27:3 29:5, 30:16 51:18 57:3,17 58:6,25 67:19 100:11,13 101:6

**based** 14:6 26:12,21, 45:22 49:10 75:22 77:7 84:22,25 87:24 88:10 105:6

**basic** 60:21 87:2

**basically** 7:15

**basis** 15:1 27:25 36:17 65:16 71:1 73:16

**Batwash** 5:23

**bears** 104:22

**begin** 16:23

**beginning** 8:3 56:17 74:3

**behalf** 5:14 18:10 67:15 68:16

**belief** 66:22 77:21 103:11,15

**believed** 90:20 103:17

**belonged** 81:6

**belongs** 50:2

**benefit** 49:2 87:16,20 102:3

**bet** 83:20

**bit** 7:12 19:25 20:3 53:2 71:20

**bitcoin** 61:24 70:21 87:14,21,24 88:5,7,8,10 90:2 91:1

**bitcoins** 67:22 83:14 87:22

**bits** 88:25

**blame** 105:17

**bleed** 62:14

**block** 25:15

**board** 29:7,9,12, 30:24 31:9,15,17 32:6,7 41:6 68:21 79:5 100:12,19, 22

**board-related** 79:5

**boards** 76:12,21 89:12

**booked** 65:7,9

**books** 60:1 61:20 62:9,19 65:15 66:5 70:17 84:11,12 99:1

**bought** 102:10

**boundaries** 93:16

**break** 56:20

**breaking** 96:4

**bridge** 24:3 25:8 46:22

**briefly** 82:8

**bring** 6:9 80:6

**bucket** 63:10

**bucketed** 63:6

**bucketing** 63:5

**budget** 92:1,2,10,14,15 94:4,9,10 95:6,16 96:1

**build** 80:25 89:11

**build-out** 79:2

**building** 76:21

**built** 76:4,11,12 81:2 91:5

**burn** 62:12

**business** 18:14 26:1 27:8 34:13 50:21 58:17 87:8 99:14

**buy** 89:23 90:1

**buyer's** 83:5

**buyers** 83:7

**buys** 89:23

---

**C**

**California** 4:4,6,18 18:13

**call** 35:3 98:19

**called** 4:8 9:23 37:14 74:15 99:25 100:1

**calling** 5:3

**cap** 43:23 44:7,9,13 82:23

**capacity** 68:19

**capitalists** 75:7

**Capitalization** 44:14

**capitalized** 44:4

**capped** 83:14 88:4

**carefully** 73:5

**carve-out** 53:19

**carve-outs** 52:24

**carved** 53:15 85:4

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 305 of 326

**case** 4:14 5:3,4 22:3 37:6 65:11 97:9

**cash** 44:17 45:14,21,25 46:4 61:24 62:12 63:1,6,8,9 68:15,25 70:20,21,22

**catch-up** 70:25

**category** 48:19 54:13

**caused** 67:20

**Cendejas** 5:24

**cents** 90:21 91:1,3,8,11,16

**CEO** 100:11,12,15,17

**Certified** 4:5

**CFO** 97:3 100:14

**Chad** 43:8

**chain** 60:14 61:16

**chance** 88:14 90:4

**change** 76:24 102:12 104:1

**changed** 101:8

**Chapter** 4:13

**characterized** 49:11

**charge** 99:1

**check** 24:22

**checks** 40:5

**Chicago** 24:25

**chip** 11:23 13:14 14:6 16:13 25:20 26:3 31:4,8,9,10 32:12 36:22 41:6 42:23 44:2 81:1 94:16,23 103:18

**chips** 10:14,15,18,19 11:5,19,25 12:4,19,21 15:18 33:17,21,22 34:6 42:18 52:15 75:11,16,19 76:6,10 79:3 85:5 91:23 92:4,9,24 93:2,8,9 94:3,16,20 96:4,17,19 97:8 103:21,23

**chipsful** 97:8

**chose** 104:5

**circumstance** 77:22

**claim** 14:20,25 15:4,6 19:15 27:6 28:8 84:2,4,16 85:21,24 86:15,17, 20,22

**claimed** 84:7

**claims** 53:14,15 57:16 77:22 78:4, 18 82:2 83:13

**clarify** 12:10 17:17 18:18 37:1,3 47:5 53:1 55:19 60:12

**class** 44:12

**clause** 34:8

**clean** 61:23 62:1,23,25 63:2,4

**cleaned** 46:7

**cleaning** 62:20

**clear** 22:2 35:22 47:18 49:19 50:1 62:3 81:8,24

**client** 7:14 15:8 24:25 105:20

**clients** 95:10

**close** 28:20

**combined** 80:10,16 81:14

**combining** 81:21

**commenced** 99:17

**commencing** 4:2 26:7

**committed** 33:14

**committee** 4:23 5:1,20 55:3,8 57:1 67:7,15 73:20 76:15

**communicate** 28:7 59:15

**communications** 28:6

**comp** 69:1

**companies** 48:4 81:14,18 97:10

**company** 12:1 23:13 38:23 39:1 44:3,6 49:17 61:25 62:17 74:8 75:5 92:24 93:8 94:2,18 99:19 103:24

**compared** 83:20

**compensation** 68:10

**competitor** 77:23

**competitors** 75:6

**complete** 60:15,17

**completed** 53:10 62:6

**completely** 60:2 62:22

**components** 73:3 96:5

**concerned** 19:3 78:25

**conditions** 40:2

**conduct** 39:12 84:18 92:22

**conducting** 5:7 92:21

**confidence** 49:23

**confidential** 34:11,19,20

**confidentiality** 18:19 19:1,4 32:16 33:18 34:7 54:22

**confirmed** 22:18

**confirming** 27:12

**conjunction** 11:7 30:20

**connect** 13:24

**connection** 11:17

**consent** 34:22

**considered** 49:18

**consolidate** 80:6

**consolidated** 51:9

**consolidation** 80:8

**consult** 48:16

**consultant** 68:22

**consulting** 33:3 67:21

**contact** 9:18

**contemplate** 78:9

**contemplates** 78:8

**contemplating** 80:9

**continue** 29:17 58:16

**continued** 4:13,19,20

**continuing** 26:16 32:7 99:14

**continuous** 29:13

**contract** 10:3 13:10,19 14:13,21, 22 16:2 17:18 18:22,24 19:10,16 20:4 21:24 22:8,12,24 23:22 24:2 25:12 26:5,9,18,21 32:20 33:16 34:10,24 35:15 37:21,24 38:4,10 40:25 41:10 42:6,9,10,19,20 85:9, 11,17,20,25 86:7,11,13,16

**contracted** 14:15

**contractor** 12:8 30:15 68:22

**contractors** 27:7,8 30:3 66:25

**contracts** 15:23,25 24:15,19 32:22 38:6 47:12 89:14

**contradict** 92:14

**controversial** 93:24

**conversations** 103:25

**conversion** 103:18

**conversions** 60:18

**converted** 87:4

**copies** 6:4

**copy** 8:4 16:7 39:17 40:1,3 105:9

**corporation** 18:14 25:17

**correct** 7:2,3, 9:5,6 10:17 17:18 45:13 79:20 87:18 105:5

**corrected** 29:8

**correcting** 62:20

**correctly** 31:13 32:17 49:14

**cost** 20:4 29:14 77:25

**cost-cutting** 102:7

**costs** 102:2 103:1

**counsel** 4:23 5:1,11,17 9:3 24:1, 7,17,21,23 32:9 45:23 48:17 57:1, 11 67:7 77:3

**counsel's** 51:22

**counsels** 100:2

**counting** 48:3

**country** 57:18

**couple** 7:17 98:1

**court** 39:23 50:14 52:8 54:24 60:10 98:18

**cover** 6:24 25:19

**covered** 15:19

**creation** 19:13

**creditor** 41:7

**creditors** 4:13,17,19,22 5:17 18:25 20:20 49:5 50:6,11 52:3,10 58:18 87:17,21 88:14 90:5,17 101:25

**creditors'** 4:22

**cryptocurrency** 19:12

**CSR** 4:5

**current** 10:18 29:14 56:18 64:25 65:1 79:3 90:10 94:20

**customer** 34:15 54:12,14, 55:21, 22 56:2

**customers** 103:20

**cut** 68:25 102:2

**cut-off** 54:9

---

**D**

**daily** 93:17

**damage** 86:1

**damages** 89:2

**data** 60:19 61:13 62:22,24 103:6

**date** 7:23 42:9 46:17 47:3 54:1,9, 11 56:2 57:21 68:1,5,8 74:4 88:8 99:9,12

**dated** 15:14 16:2,9,15 25:7 32:24, 25

**dates** 54:4

**day** 26:7 28:9 64:11

**day-to-day** 58:4,8,22

**days** 7:18 8:6 20:22 21:1 35:17,21 54:16,20 75:12,15 76:5,8,9 98:1

**de** 103:1

**deadline** 66:13

**deal** 74:1,5 76:25 77:5 87:13 89:15 90:10,15,17 91:4

**deals** 93:18

**debated** 48:6

**debt** 38:24 51:9,13

**debtor** 6:7,25 23:1 26:23 28:1 30:21 32:16 46:1 49:3 51:14,17 52:21 53:10,13,20,22 55:1,2,10 57:7 62:20 63:21 73:12 79:23 85:8,10,17 86:6 87:7 91:22 92:8

**debtor's** 15:11 23:3 40:15 43:7 57:11 62:9

**debtors** 20:21 36:3 39:12 53:24 65:1 66:6 67:18 68:8,17 76:16 78:11 80:22

**debtors'** 104:21

**debts** 39:7

**decastro** 27:1 67:19

**December** 16:3 20:7 25:3,6,7,12 26:11,18,24 61:4

**decide** 79:17

**decision** 36:7 38:18 40:5,16 42:12 50:10 71:16 80:13 93:3

**decisions** 102:12,13 103:3,5,9

---

**declaration** 6:22 104:20 105:10, 12

**declining** 82:16

**defect** 30:24

**defer** 43:3 50:9 77:8

**deferred** 70:24,25 71:7

**define** 38:7

**defined** 52:3 88:9

**defines** 37:18

**definitional** 33:16

**delays** 31:9,10

**deliver** 16:25 17:2

**deliverables** 34:18

**delivered** 17:9 76:11

**delivery** 26:3

**depend** 94:21

**depending** 59:2 76:24 83:16

**depo** 14:8

**deposit** 16:22 19:17 20:1

**describe** 32:19

**design** 9:13,15 10:7 11:23 12:9 16:23 19:12 24:18 25:9,10,23 26:2 29:7,12,14,19,24 32:12 33:3,11, 17,22 34:6 36:25 41:6 45:1 79:2,6

**designate** 7:1

**designated** 80:1

**designs** 79:11

**detail** 21:15

**details** 36:23 49:3 61:12 63:1 95:18 103:6,8

**determination** 51:23,24 53:18 93:13,20,23

**determine** 38:22 39:25 81:19

**determined** 51:2 80:18,19 81:20 100:10,19

**determining** 92:24

**develop** 11:23 12:25

**developed** 11:6 78:20

**development** 9:2 17:10

**develops** 17:15

**dialogue** 28:10 58:20 73:17 74:25 75:3

**dialogues** 77:9

**difference** 41:12 85:23

**differently** 90:8

**difficulty** 95:5

**digging** 61:11

**Digimex** 55:10

**diligence** 83:10

**diminish** 90:23,25

**diminishes** 91:3

**directly** 49:5 51:3

**disclose** 49:20

**disclosed** 34:21

**disclosure** 50:4

**discretion** 39:25

**discuss** 93:18

**discussed** 7:6 10:12 30:20 47:13 79:14 82:8 105:4

**discussing** 55:6

**discussion** 32:15 40:21 50:12

**discussions** 55:10 58:6 68:23 69:17,20 85:16 104:3

**dispute** 15:1 21:23 22:7

**disputed** 14:25

**distinct** 89:14

**distribute** 90:16

**distributing** 45:18

**distribution** 38:20,24 45:10,14, 16 46:2

**distributions** 38:21,23

**divided** 20:5

**documentation** 37:4 62:2

**documents** 12:18 21:3 32:23 45:4 72:2 105:25

**dollar** 90:22 91:2,3,9,12,16,25

**dollars** 61:3 89:15 90:16,20

**doors** 62:17

**double-check** 37:11 38:2 41:21

**downside** 91:7

**draft** 53:3,8

**driven** 31:10

**drives** 61:14

**due** 26:5,6 41:15 83:10

**duly** 4:9

**DXCORE'S** 14:25

**DXCORR** 12:25 13:1,4,7,11 14:5, 8,11,14,15 15:4,14 16:4,5 17:9,14, 15 18:1 19:7,11 20:15,18,21,24 21:5,10,19 22:4,10,12,13 24:18 25:3,6 26:10,16 27:1,3 28:5 29:2 35:14 42:25 47:14 52:13 57:3,7,14 71:25

**DXCORR'S** 14:24

**E**

**e-mail** 6:18 8:5 28:8 59:2,20

**E-t-t-i-n-g-e-r** 24:7

**earlier** 22:9 33:19 65:21 75:9

**early** 42:1

**easiest** 17:5 60:3

**Edgeworth** 5:19 96:7,10,16

**Eduardo** 9:21 18:12 23:24 36:11 40:8 42:16 44:5 68:4 71:18 72:22 77:16 85:2 86:24 87:1 93:16 100:12,17,23 101:7,13 102:16 103:10,15

**Eduardo's** 102:4

**effect** 50:7 79:2 80:8 85:15,17 87:20

**effected** 102:12,13

**effective** 23:9

**effectively** 103:4

**efficiency** 29:15

**effort** 102:13

**efforts** 103:16

**eight-and-a-half** 82:13

**eliminate** 102:14

**ELLIS-DAVIS** 4:5

**emphasized** 19:11

**employ** 30:8

**employed** 69:23

**employee** 43:12

**employees** 12:7 43:4 71:16 79:6, 7,11 81:4

**employing** 30:15

**end** 7:19 90:6

**engaged** 18:14

**engineering** 30:3,5 41:1,2,3 44:2

**engineers** 102:9

**entered** 78:10 80:23 82:18,19 84:1, 86:4 90:19 94:15 95:25 98:9, 16

**entering** 82:22 86:8

**entities** 13:11 41:15,19 68:11 81:18

**entities'** 80:16

**entity** 11:8 12:5 13:2,7, 21:15 25:13,17 36:7 41:18 43:14 46:6 50:19,22,24 51:13,21 57:4 59:10 79:20

**entries** 65:7

**entry** 98:9

**equal** 20:6

**equipment** 91:1

**equity** 12:1 44:11 68:13,15,24,25 69:1,6 88:4

**equivalent** 103:20

**essence** 30:10

**essentially** 82:2

**estate** 51:7

**estates** 51:8 52:4 80:6,9,16 82:4, 9,24 87:23 102:3

**estimate** 91:2,22,25 92:12 94:1,8, 17,24,25 95:3,11,23 96:1,11 97:4, 9,23,25 98:1

**estimates** 92:17

**estimation** 90:9,14

**Ettinger** 24:1

**Ettinger's** 24:6

**evaluate** 86:14,16

events 84:20

exact 46:17 47:3 57:21 74:4

exam 95:18 96:6 100:20 104:12

examination 6:2 67:10 83:2
104:19

examined 4:10

Excel 63:16,20

excess 89:11

excluded 82:1

exclusivity 19:11

excuse 30:19

execution 26:6

executive 71:5

executives 70:24 71:4

exercise 26:8

exist 72:15,17

expect 7:10

expected 57:19

expense 63:7

expenses 96:12 98:22

explain 17:5 33:15 40:16 78:22
84:8

explained 17:7 23:25

explanatory 48:22

extended 19:13

extension 66:11

extent 9:8 59:15 69:8 80:2,7 88:5
97:15

extracurricular 102:15

**F**

fact 14:13

factor 76:13

factored 75:23

fair 63:12

fairly 74:20

family 58:1 71:6

fantastic 84:13

fast 19:25 60:9

February 21:2 26:16,18 46:22,24
47:4,7,8

fee 17:16

felt 22:2 91:6

fight 78:1

figure 50:15,16 61:9 79:21,22,24
89:19 97:20

figured 67:23

file 7:17 53:4 54:23 66:8

filed 6:25 55:2 66:11 98:8,14,17,
19,25 99:5,9,12,20 100:7

files 65:20

filing 20:23 48:2 66:14

fill 87:6

filled 60:20

final 20:9,12 26:2 53:6,8 73:17
93:13,20,23

finalize 7:16

finalized 7:12 53:3,4

finalizing 7:11

finally 31:14

financial 6:6,14 44:16 47:25
48:10 60:6,7,23 61:6 62:24,25
63:3,12,15,22 64:1 99:8 105:10,13

financials 61:14

financing 75:7

find 21:8 33:14,24 72:16 99:24

fine 6:21 38:13 105:21

finish 88:13 90:12

finishing 26:3

firm 24:21

firms 30:5

fixed 29:11 31:17,23 32:2

floor 4:17

flow 60:14,16

flying 57:25

focus 31:18 61:12,21

focused 50:21 62:10,16 103:6

follow 7:14 71:11

follow-up 5:2 56:25

force 70:9

forgive 71:22

form 37:15

format 4:24

formed 73:16

forum 95:17

forward 64:5

found 39:15 99:21

frame 7:9 21:2 42:1,2 96:23

Francisco 4:4,18

freight 98:23

Friday's 59:13

front 42:10,20

fulfilling 17:10

funds 47:16

future 79:11

**G**

G1 25:10

G2 25:9

GAAP 63:10

gap 98:13,18

gather 39:15

gave 83:13 91:7

general 58:9 64:21,23,25 65:3
73:13 89:14 90:4,17

generate 64:1 92:3

generated 45:18 46:6 79:7 96:11

generating 89:10

generation 10:15,18,19,22,23
11:5,19,25 12:4,21,23 13:14 14:6,
15:18 16:14 21:22 25:19 27:20
28:14 32:13 36:22 42:18,22 52:14,
15

generic 35:18

give 5:1 7:8,9 49:7 54:4 61:1 69:3
76:23 88:19 92:12 97:5 101:1,5,14
103:8 105:24

Glosson 4:12 5:5,11,18 6:2,3,13,

17,21 7:4,6,19,21 8:7,10,13,21,25
9:7,11 13:24 14:4 15:5,11 17:25
18:10 19:8 23:1,6 25:2 30:22,25
33:10 35:20 38:13,16 39:10,22
40:4,23 48:12,23 49:2,10,21 51:8,
14 52:7,13 53:10,20 55:17,22,25
56:3,10,12,20,24 59:21 60:9,11
67:5, 94:13 95:17 97:12 98:2,5
104:9,11,14,17,19,20 105:21,24

**Golden** 12:19

**good** 4:12 25:18 27:22 87:13 91:9

**governs** 39:12

**Greg** 74:23 85:2 86:25 87:1

**ground** 23:4

**grow** 83:15

**guarantee** 82:24

**guess** 25:18 40:8 68:10 75:3
78:22,23 92:12 95:5 97:2

**guidance** 83:21

**guided** 45:20

**guidelines** 93:8

**Guido** 53:22 55:4,21,25

**guys** 93:4,12

---

## H

**H-u-s-h-e-n** 5:10

**half** 58:15

**handed** 6:22

**handle** 45:24 46:10 58:7

**happen** 86:6

**happened** 22:2 50:9

**happy** 6:10 49:25

**Hasffast** 72:1

**Hashfast** 4:14 5:3,14 6:23 10:7
11:6,8,11,12,16,21 12:7,9,17,25
13:1,3,4,7,9,12,16 14:9,14,15,16
15:12,13 16:4 17:12,16 18:2,3,6,8,
11,12,13,15 20:23 21:11,12,13
22:2,9,10,11,13,18,20,21,22 23:2,
11,12,13,16,17,21 24:4,8,9,16
25:7,14,15 26:3 32:20 35:1,3,4,6,
9,10,12,25 36:1,5,14 37:4,5,9,15,
16,17,22 39:4,6,24 40:5,6,7,25
41:2,8,11,13,14,20,22,23 42:4,13
43:4,14,16,19 44:7,15,17,19,20,

21,22,24 45:3,6,10,17 46:1,2,11,
12,23 47:6,15,16,17,22 48:6 50:5,
25 51:14 53:24 58:2,4 59:22,25
64:20,23 65:4,12,18,22,25 66:2,3,
10,11,17 67:1,12 69:23,24 72:3,4,
9,12 79:7,8,15,16,25 80:3,25 81:6,
9,10 98:7 105:25

**Hashfast's** 14:24 19:10 43:12

**head** 31:18

**head-count** 62:13

**healthy** 102:11

**hearing** 50:11 59:14

**held** 8:6 56:22 83:15 87:23 88:8
98:3

**helped** 11:23 103:19

**helps** 21:21

**hesitated** 54:22

**high** 91:2

**hinder** 103:16

**history** 64:9

**hold** 49:22 105:19

**honest** 69:14 74:19

**hope** 7:17

**hoping** 102:14

**host** 99:8,11

**hour** 4:2 40:20

**hourly** 71:1

**hours** 71:1

**HR** 68:19 70:7

**hundred** 91:8,11 98:21

**Hushen** 4:7 5:8,10 7:4,23 9:8
57:2 104:23

---

## I

**identifies** 15:12

**implement** 25:10

**implementation** 25:9 26:2

**important** 19:9

**impression** 14:5

**improve** 29:15,24 61:20

**improvements** 29:14

**improving** 29:18

**include** 48:21 53:14 59:9

**included** 17:16 34:19 48:20 50:16

**includes** 96:3

**including** 15:4 34:16 50:19 73:20

**income** 89:10 92:3 94:1

**increase** 87:17

**incrementally** 22:6

**indemnification** 37:19

**independent** 69:4 99:16

**independently** 84:14

**indication** 28:1

**individual** 7:1 92:9

**individuals** 30:9

**influx** 47:22

**information** 7:13,16 15:7,9
34:12,19 37:25 39:15 54:23 55:20
60:5,12,13 95:12

**informed** 9:2

**initial** 14:8 18:24 29:10 50:21

**initially** 31:24 68:22 76:14 77:8

**initiated** 74:21

**input** 73:1,19

**inputs** 77:7

**installments** 26:17,19

**intellectual** 12:3 19:13 29:17
77:6,8 78:4 79:14 82:7

**intend** 76:24 80:5,6 85:8,10

**intended** 86:18

**intent** 23:8,10,18

**inter-company** 82:2

**interest** 11:18,24 12:5,8 27:1,3,6
43:19 44:1,11 52:14 68:12,13 69:8
88:21 89:8 101:24

**interested** 67:22

**interface** 12:19

**internal** 30:2

**internally** 30:1 77:10,14,15

**interns** 5:22

**interpret** 89:17,19

**interrupted** 38:5 55:14 95:4

**interview** 14:8 30:21

**invalidated** 84:2

**inventory** 7:22 8:2,5 9:12 10:16 54:20,21 55:20 56:4 60:15 63:8 73:4 76:6 82:10,12 88:21 89:16 90:5,10,11,18,22,24 96:3

**investigate** 9:17,18

**investigated** 80:12

**investigating** 53:13

**investigation** 84:3

**investors** 43:20

**invoice** 26:14 66:2,8

**invoices** 36:15 41:17 45:1 46:5 49:13 65:5,6,9,19,20,21,23,24 84:15

**involuntary** 7:23 55:2 98:8,13, 19,25 99:4,9,12,13,17 100:7

**involved** 24:1 32:10,13 36:24,25 67:17

**IP** 11:4,15,25 12:6,23 13:14,15 14:1,8,11,18 17:10,11,15 23:11,12 24:10 26:3 36:12 44:22 50:17 51:15,18,20 52:15 77:11,12,25 78:8,11,12,13,15,16,25 79:5,6 80:1 81:4

**ironed** 73:22

**isolate** 23:12

**issue** 53:16 66:2, 97:17,18 98:17

**issued** 66:23

**issues** 23:4 31:3,11,15,17 32:6,7 53:17 58:9,11,13,14,18 78:5

**item** 63:14

**items** 63:5

---

J

**January** 26:7,18

**Jessica** 5:13

**job** 97:5

**joined** 68:3 70:8

**judgment** 69:5

**Julia** 68:18 69:17,23

**Julie** 5:5

**July** 4:1,15, 98:20

**jump** 71:20

**jumpy** 71:23

**June** 74:3

---

K

**KARLA** 4:4

**Kathleen** 40:11

**keeping** 62:16,17 103:1

**kind** 58:14 87:12 103:5

**kinds** 95:18

**knew** 84:6

**knowing** 69:1

**knowledge** 39:13 92:20 95:13 99:16 105:6

**knowledgeable** 23:21

**Koi** 5:19

---

L

**laptop** 21:6

**large** 61:2 77:10,13 94:22

**largely** 63:1

**late** 32:4 42:1 65:14

**lawsuits** 100:3

**lawyers** 79:17 91:6

**lead-time** 76:20

**learning** 67:22 100:6

**leave** 57:18,24

**leaves** 9:9 91:14

**ledger** 64:21,23,25 65:3

**left** 5:20 48:7 57:22,23 58:7 70:8 89:16 94:6

**legal** 13:19 14:12 23:19,25 46:6 49:7 50:22 77:3 80:8 85:17 100:2

**lengthy** 33:16

**letterhead** 18:12

**level** 26:19 59:18

**liabilities** 61:16 80:7,22 83:19 91:13,15,18 103:20

**liability** 35:5 84:10 103:22

**license** 14:5 17:11,15,16 22:24 23:14,16,17 52:19,20 71:25 72:2, 12 80:25 81:1

**licensed** 13:1,7 14:8,15 22:19 23:17

**licensees** 78:9

**licenses** 18:1 72:15 78:9

**licensing** 52:17 78:5

**limitation** 34:16

**limited** 35:4 78:13,15

**lining** 92:21 95:8

**Linkedin** 74:24

**liquidate** 91:23

**liquidates** 90:18

**liquidating** 90:10,22 92:5

**liquidation** 83:6,20 92:4,6

**liquidations** 90:24

**Liquidbits** 50:13 55:5,8 59:10,13, 14 72:20 73:12 74:1,6,15,21 75:4, 11 76:21,25 79:8 84:4,15 87:8 88:17,18,19 89:13,20 91:14

**list** 20:22 47:15 93:11 99:7

**listed** 14:25 24:15 41:7 49:5 85:6

**lists** 41:13

**litigation** 14:17,19 78:3

**lives** 90:24

**LLC** 4:14 5:3,15 6:23 11:11,12,16, 21 12:25 13:4,9,12,17 14:14,15,16 15:12 18:13 20:24 21:11,12 22:9, 12,18,23 23:11,16 24:4,8 35:1,4,9, 12 36:1,13 37:15,16,22 38:25 39:4,6,24 40:7 41:13,20,23 42:13 44:7,15,20,21,22 45:6,10,21 46:3, 4,5,6,12,23 47:6,17,23 48:6 50:5, 19,25 51:15 64:23 65:13,18,23,25 66:2,12 69:4,5,9,18,21,24 72:1,3, 10,13 79:25 80:3 81:6,10 98:7 105:25

**locally** 29:25

**lodged** 59:20

**logic** 36:16

**long** 8:6 15:23 40:1 54:5 61:9 76:20

**longer** 76:21 85:15

**looked** 21:20 66:5,7 79:22,24 83:17 91:6

**loss** 64:17

**lot** 60:5 62:16 103:23

**low** 77:14 94:5

**lower** 29:14

**lunches** 102:10,15,25

---

**M**

---

**made** 7:7, 13:10 20:21 21:10,15 22:10 24:3,5 25:13 26:15 31:14 35:6,10,12,16,25 36:1,3,7,12,14 38:17,21,25 39:5 40:4,17 41:18 45:8 47:6,10 50:4,17,20 51:24 53:18,21,22 61:2 65:17 71:15,16 72:10 76:16 80:13 84:20 92:25 93:2,14 97:3 98:7,10 99:2,8 100:6 103:3,9

**main** 73:3

**maintain** 64:21

**maintained** 34:20

**maintaining** 29:16,21

**majority** 51:11,12,13 52:3 78:21

**make** 13:2 18:18 19:6 22:11,12 26:14,23 29:17 36:8,19 40:7 62:3 69:4 92:9,13 93:20 94:2 99:11 101:4,14

**makes** 14:14 93:13

**making** 26:13 42:12 44:25 62:17 70:24 79:19 93:3,22

**management** 71:15 93:17 101:16,21 102:5,8,16,23 104:2,4,6

**managing** 58:3

**manner** 23:23

**manufacturable** 31:24

**manufacture** 32:10 34:13

**manufacturing** 31:25 32:12 33:2,3,8,17,22 36:13 76:19

**market** 82:14 83:5,7,8 89:24

**marketing** 97:4

**Martin** 5:20 8:22 18:6 30:19,23 39:19

**Mask** 12:10

**master** 33:2,11

**material** 64:19 73:18,22

**materiality** 62:8

**math** 94:19

**Mcdow** 5:16 8:9,18,24 17:13 33:5 67:10,11,14,16 75:1 78:7 80:4,5, 14,20 81:3,23 83:24 85:23 86:2,5 92:18,23 94:12,14 95:20,22 96:9, 21,25 97:17,24 98:6 100:21 104:10,13,15

**means** 84:8

**measure** 102:7

**meet** 58:1

**meeting** 4:13,17,19,20,21 5:3,7 7:9,15 8:12 10:13 19:1 28:11 29:5 50:11 53:2 57:4,7,12,14 93:17 105:11

**member** 5:19 37:16,17 38:22 55:3

**memo** 16:9,19 85:4

**memorandum** 15:12,15 16:21

**memory** 15:24 33:14

**mention** 30:23

**mentioned** 16:12 48:14 50:15 56:17 57:2 60:23 100:3

**met** 28:9 40:2 57:3 75:6

**methods** 34:13

**Mickelsen** 5:13,14 6:11,16,19 7:3,5,11,20 8:4,8,14,15,19 9:6 14:2 15:3,7 17:6,17,20,23 18:18, 23 19:6 22:17 23:5 24:20 35:16 37:24 38:2,11,15 39:3,24 48:9,13 49:1,9 51:1,11,25 52:2,11,23 53:12 55:19 56:9,11,14 59:12 67:9 74:14,20 80:2,11,17 81:16 83:1,4 85:18 86:1 92:16,19 94:9 95:1,5, 21 96:13,22 97:15,21 100:17 105:16

**microchips** 18:15

**million** 26:2 44:19 45:2,9 50:16,

24 77:19 82:13,23,25 83:13,15,18, 25 84:2 87:15 88:3,5,7 89:4,9 91:14,15,17,18

**millions** 61:3

**mine** 25:18 87:22 89:10,22

**minimus** 103:1

**mining** 10:10 76:13 88:24 89:20 90:3 91:1

**minute** 48:5,7

**minutes** 56:21

**misquoting** 87:16

**missed** 47:24 84:23

**missing** 60:5,12,13

**misunderstanding** 48:4 96:22

**Mm-hmm** 45:12

**mode** 92:6

**models** 83:17

**moment** 51:25

**Monday** 99:23 104:15

**money** 26:10 40:6 46:12 50:23,24 51:24 77:25

**Monica** 4:7 5:10 8:15 24:24

**month** 20:9 26:7,13 47:2,3,7,10 57:20 65:10 68:1,2 70:11,13 71:8, 9 74:2 87:10 91:23 94:2,5,6

**monthly** 62:24

**months** 20:10 94:7 96:21

**months'** 41:25

**moot** 86:11

**morning** 4:12,16 99:23 104:15

**Moshin** 5:23

**motion** 52:5,25 53:2

**MOU** 75:21 85:2,3 86:22,24 87:2

**MOUS** 84:19

**move** 40:19 91:22

**moved** 100:17

---

**N**

---

**named** 24:25

**names** 15:23 55:21,23

**nature** 32:19 40:24 90:2

**necessarily** 81:21 83:5

**needed** 7:7 58:25 62:20 67:23 102:2 103:7,12

**negotiate** 58:16

**negotiated** 68:16 79:18 86:24 90:15

**negotiating** 72:19 73:25 77:4 80:15

**negotiation** 80:15

**negotiations** 76:9

**network** 13:25

**non-inventory** 95:2

**non-refundable** 16:22 19:17,20 20:1

**Nonce** 12:19

**notation** 50:7

**note** 88:3

**noticed** 95:19

**notified** 99:13

**notion** 103:24 104:6

**November** 20:7 32:5

**number** 4:15,21 7:6 25:23 32:22 49:6 52:11 53:7 54:12 60:18 83:17 84:1 87:4 89:18 99:8 104:3

**numerous** 87:4 90:24 91:5

---

**O**

**oath** 77:18

**object** 52:12,19

**obligation** 88:18,23

**obtain** 7:15

**occurred** 28:7 40:21 48:1 65:6

**Ochoa** 53:22,25 54:6

**October** 20:6 31:3

**off-the** 40:21

**offer** 13:20

**offering** 103:20

**office** 4:3 5:6,21,22 14:7 45:9

**officially** 22:8

**open** 58:13,14,18 62:17 75:3

**operating** 24:12,13 37:9,12,14 38:20 39:10,18 40:2 44:24 98:22

**operation** 37:16

**operational** 60:24 61:13,21 62:24

**operations** 23:14 58:8 99:14

**opinion** 23:19 101:5

**opport** 24:17

**opportunity** 57:1 91:4,17 105:1

**opposed** 104:1

**opposite** 77:20

**option** 69:13

**order** 46:5 54:7,14 59:19 60:14, 16,21 61:16 75:22 84:10,21,24 93:6 94:14 95:24 98:9,14,16 103:23

**ordering** 76:20

**orders** 60:20 61:25 62:2 84:11 87:4 93:10

**ordinary** 58:16

**organization** 30:8

**organizational** 37:18

**original** 6:5 43:20 72:8 104:22 105:12,22

**originally** 74:13,15

**originated** 74:13,19

**outflow** 45:6 46:4 47:22

**outflows** 49:16,17

**outline** 14:1

**outright** 78:11

**outstanding** 41:9

**overseas** 58:1

**oversight** 47:18 105:14

**owe** 22:6

**owed** 41:13

**owes** 22:5

**owned** 23:16 37:1 78:11,13,16, 17,19

**owner** 80:1

**ownership** 11:18,24 12:5,8 17:10,14 44:11 52:14 78:5 79:1,20 80:3

**owns** 11:4,12,15 12:23 13:13,15 14:11,17 79:13,22,24

---

**P**

**paid** 11:10 12:25 13:4,11 20:15, 18,24 22:4 26:10,15,21 41:12,22 46:7, 70:12,20,22 71:4 87:24 88:7, 9

**paragraph** 33:25

**parameters** 46:7

**parent** 13:4,17 37:5 45:11,19 48:4 49:17

**parent's** 12:17

**part** 17:25 24:11 31:5,10 37:1,2 49:4,18 54:12 62:7 79:19 84:23 85:9 87:12

**participate** 19:12

**parties** 34:20,24 49:16 52:11 73:20,23 78:20

**partners** 45:1 76:19

**partnership** 9:13,15 10:7,11

**parts** 7:14 76:20

**party** 18:15 34:14,15,21,23 52:9

**party's** 34:14

**patents** 12:18

**Patricia** 5:20

**pay** 23:11 38:24 39:7 51:5 58:19 70:22 77:12 91:15

**payable** 26:5,6

**payables** 41:9

**paying** 22:3 26:13

**payment** 16:24 20:5 21:1,19 22:11 23:22 24:4 25:25 26:4,15,21 36:8 38:21 40:7 42:6 44:21 45:6, 14,21 46:5,24 47:9 66:3 75:25 76:23

**payments** 13:10 14:14 19:22 20:2,6,9,12,20,21,22 21:5,10,13, 14,16 22:4,5,10,12 24:3 26:12,24 35:6,10,12,13,16,19 36:1,3,12,13,

Case: 14-30725   Doc# 148   Filed: 07/23/14   Entered: 07/23/14 19:01:10   Page 313 of 326

18 37:6 38:8 39:5,8,25 41:18,23
42:13 47:10 49:4 65:16,20 70:25
72:10 77:3,11 84:20 98:7,10 99:2,
8,11 100:6

**payout** 87:25

**payroll** 30:9 43:6,7,13,17 62:18
70:24 102:11

**PDF** 6:20

**pendency** 97:8

**pending** 61:16

**people** 103:22

**Pepper** 10:10

**percent** 69:10,12 91:8

**performing** 29:23 34:21

**period** 98:8,13,18

**peripherals** 94:23

**person** 30:11,12 48:16 67:3 70:7

**personal** 95:13 101:4

**personally** 4:6 24:21 27:13 66:21
100:5

**perspective** 28:17 29:4 63:10
80:15

**pertain** 58:17

**Pete** 74:17

**Peter** 49:20

**petition** 98:8,14,16,19,25 99:4,9,
12,17,20 100:7

**phone** 59:2

**piece** 14:12 68:24

**Pine** 4:3,16

**place** 4:19 23:15 28:11 48:18,20
73:7

**plan** 7:20 26:5 53:4

**plans** 29:12 57:18

**play** 72:22

**played** 12:9

**plays** 23:19

**point** 17:4 20:17 22:25 24:2 32:6
51:20 53:8 67:6 86:11,12 87:23
88:1 89:10,16 92:17 104:11 105:8

**polled** 27:5,10

**poorly** 103:9

**portion** 78:19 82:24 88:4 92:1

**portray** 86:18

**pose** 58:25

**position** 13:20 14:24 23:3 27:22
28:24 29:2 49:12 92:22 101:6,16
102:17 103:2

**positions** 101:8

**possibility** 89:14

**Possibly** 90:7

**pot** 76:7

**potential** 53:14 74:16 75:24 76:6,
23 78:3

**potentially** 51:10 77:12,24 79:8

**power** 103:21

**prefer** 52:4

**preference** 53:11 75:10 76:23
77:2 88:4

**preferential** 75:25

**preferred** 43:18 44:1

**premature** 53:9

**Premier** 9:12,14,15 10:7

**prepared** 9:4 35:24

**preparing** 24:23

**present** 4:22

**presented** 73:21

**president** 100:13,15

**press** 67:23

**pretty** 91:9

**previous** 78:2

**previously** 56:3

**price** 50:18 75:23 87:24 88:10
93:11 94:20

**primarily** 11:10 13:11 21:12 22:9
41:20,22 58:12 72:19,23,24 75:8
79:10

**primary** 82:10

**principal** 88:3

**principals** 12:2

**prior** 19:1 20:22,25 44:3 74:2
90:24

**privilege** 102:19

**privileged** 49:24

**problem** 30:16,17,20,24

**problem-solving** 31:16

**problems** 29:6,8,11 31:1,13,20
32:2

**proceed** 9:8

**proceedings** 28:6 38:5 55:14
56:23 58:12 98:4

**process** 62:5

**processing** 103:21

**procurement** 89:11

**produce** 63:22 64:14

**producing** 18:14

**product** 23:15 29:21 84:20 87:6
89:23 90:25

**production** 17:4 28:22 29:7
33:17,22 34:6

**products** 17:11 34:12,18

**profit** 45:17,18 61:2,7,10 64:17

**program** 10:8

**prohibited** 92:20 95:7,15

**project** 26:8

**projection** 95:10 97:22

**projections** 94:10 95:7 97:16,18

**projects** 22:7

**properly** 63:14

**property** 12:3 19:13 29:17 77:6,8
78:4 79:14 82:7

**proposal** 25:3,6,13,22 26:1,11,24
74:7,16

**proposals** 74:8,10

**proposed** 50:13,14 94:20

**protected** 91:7

**protects** 102:20

**protocol** 12:20

**provide** 5:25 15:8 21:9,15,17
38:14 39:17 54:16,19 56:9 94:17
105:9,18

**provided** 14:7 15:8 16:22 39:21
43:5 44:22 49:15 56:13 94:9 95:6,

9, 97:16 98:11 104:21

**providing** 95:11

**provision** 39:8 41:1 95:2

**provisions** 18:19 19:2 91:5

**public** 28:3

**publicized** 50:15

**pull** 16:6 87:3

**pulled** 60:2

**Pullman** 24:25

**purchase** 28:3 50:18 80:23 82:4 85:14

**purchased** 54:6

**purchases** 55:24,25 56:2

**purely** 36:24

**purpose** 33:10 81:19

**purposes** 46:8,9 81:14

**pursuant** 26:10

**pursue** 77:22

**pushing** 103:24

**put** 48:21 49:25 50:6 60:3 64:8 83:23 92:10 101:16

**Q**

**question** 13:13 21:4 23:6,10 28:25 33:19 34:2 43:22 49:6 54:14 58:24 59:5,6 66:24 80:20 81:16 86:23 90:12 91:21 94:12 97:1,6 100:9

**questioning** 18:25

**questions** 4:25 5:2 9:9 27:13 52:6 53:1,7 56:19,25 57:2 58:21 67:6 96:23 104:9

**quick** 33:15

**Quickbooks** 64:22,24 66:7

**quotations** 33:8

**R**

**raise** 93:25

**raised** 52:6 53:1 66:24 67:1,3

**ran** 32:6 83:16

**range** 82:14 83:17,18

**rapidly** 82:16

**rate** 91:1

**rationale** 82:21 83:12

**re-sort** 54:13

**reach** 67:20

**reached** 67:19 74:22,23 87:5

**read** 33:25 89:18

**readily** 7:24

**reading** 19:20

**ready** 28:3 73:9

**real** 17:5

**reality** 61:7

**realize** 77:24

**reallocation** 87:6

**reason** 36:17 70:3 102:15,22

**reasonable** 71:21 83:19

**reasoning** 48:19

**reasons** 53:19 54:22 104:5

**recall** 7:7 8:24 31:12 37:10 42:11 70:14 99:25 100:4

**receipt** 44:17

**receivable** 45:3,5

**receive** 70:22

**received** 7:13 44:17 70:25 75:11 77:7 87:22 88:1

**receiving** 22:23

**recent** 8:5 56:16

**recently** 57:3

**recess** 56:22 98:3

**recognize** 9:22,24 71:22

**recollection** 45:8

**recommendation** 101:19

**recommendations** 101:4,14

**reconcile** 60:24 62:3

**reconciled** 60:19 62:23 63:2

**reconciles** 56:19

**reconciliation** 56:16

**reconciliations** 65:5,6,9

**reconvened** 56:23 98:4

**record** 5:9 34:1 40:21 52:1 56:25 59:13 98:2,5 104:18 105:4

**records** 26:22 36:2 40:15 60:1,7, 15,23,24 61:6,20 62:10,19 65:16 66:6 70:18 84:13 99:1

**recreate** 63:20

**recreating** 64:8

**redoing** 29:7

**reduce** 62:13

**reduced** 70:5

**reduction** 70:8

**refer** 21:3

**referring** 13:8 15:22 16:11 37:12, 13 39:1 44:6 55:18 65:23 91:12

**refers** 18:22

**reflect** 10:14 35:21 46:2,3

**reflected** 63:14

**reflects** 46:4

**refunds** 60:20 62:1

**regard** 61:16

**reject** 85:24

**rejected** 86:6,11

**rejection** 86:1

**relate** 42:19 47:12

**related** 5:4 10:11 27:7 29:19 55:5 57:15 58:12 79:6

**relates** 14:20 46:9 68:11

**relating** 34:12

**relationship** 19:14 71:6

**reliable** 63:13,18,19,22 64:4,15, 18

**relied** 44:24

**relief** 98:9,14

**relinquish** 103:22

**rely** 23:2

**remain** 34:11 101:6

**remained** 81:5

**remaining** 77:11 84:24 89:3

**remains** 80:11

**remember** 8:10 71:2

**REMEMBERED** 4:1

**remembering** 8:22

**Remind** 59:21

**removal** 102:16

**remove** 100:10

**removed** 102:23 104:6

**removing** 104:2

**rendering** 34:22

**reorient** 21:20

**report** 45:20 84:6

**reported** 49:19

**reporter** 4:6 38:5 39:23 55:14
60:10 95:4

**represent** 44:19

**representing** 57:4

**represents** 44:21

**requested** 56:4 58:19 60:21 62:1

**required** 20:22

**requirements** 34:17 89:11

**resend** 8:11,16

**resignation** 70:4

**resolution** 28:7

**resolved** 58:13

**resource** 30:7

**respect** 7:21 9:11 10:14 12:3
24:9,18 28:2,18,25 29:6,9 32:2
37:6 40:24 49:3 50:4,18 53:21
55:22 58:8 62:19 64:10 105:3

**respectful** 71:20

**response** 27:17 38:14

**responsible** 7:1 42:12 58:3 71:14
72:19 92:23 93:3,9

**rest** 30:3

**restarted** 22:1

**restrictions** 38:23

**result** 18:25

**retain** 17:9,14

**retained** 9:3 79:6,7,12

**retaining** 102:3

**return** 57:17,19 83:14 105:21

**returns** 66:9

**revenue** 61:4 94:17 96:1,11,15
97:10

**review** 14:12 40:14 53:6 93:10,17,
18 105:1,12

**reviewed** 24:18 33:12 93:11

**reviewing** 16:17 26:22 36:2 81:17

**revision** 53:6

**rights** 14:5,6 23:17 37:19 52:17
79:14,20 80:3,25 81:1,4

**rise** 88:19

**rises** 88:5

**Rob** 5:18

**role** 12:9 43:2 70:6 72:22

**rolling** 74:16

**room** 5:18

**Rooyen** 55:18

**rose** 87:14

**Roy** 100:23,25

**run** 23:4

**running** 42:4

---

## S

**S-h-y** 40:13

**S-p-a-c-k-m-a-n** 43:10

**safe** 81:13

**salary** 68:15 102:4

**sale** 28:4,19 50:12,13,14 52:5,8,9,
12,25 53:2,16,18,22 55:4 59:9
78:25 79:19 80:9,23 81:14,25 82:5
85:19 86:4 92:9,24 93:2,7,9,14
94:2,15

**sales** 53:21 56:12,14 92:21,22
95:7,8 96:12 97:10 100:18 101:16
102:5

**salesperson** 93:15

**San** 4:4,18

**Sandgate** 11:6,10,17,18,20,24
12:1,2,5 30:7 36:21,24 37:1,2
40:19,24,25 41:2,7,14,15,18,21,24
42:18,22 43:5,6

**Sara** 5:23

**sat** 27:11

**save** 104:10

**scenario** 83:20,21 88:13

**schedule** 9:23 10:14,16 16:3
23:2,23 24:15 35:24 48:10 49:25
53:14 54:6,7,20,21 56:1 85:6 99:7

**scheduled** 23:1 51:15 57:24

**schedules** 6:8,15,23 15:3,8,10
16:6 20:19 24:24 27:6 35:17,21
56:8 63:17 91:19 104:21 105:1,4,
15

**scope** 30:14 33:20 59:3 62:2

**section** 47:25 48:14

**security** 88:21 89:8

**seek** 74:12

**seeking** 73:19 74:8

**segregated** 36:18

**sell** 56:15 92:7 96:16 97:7

**seller** 81:12 88:3

**selling** 81:10 92:5 96:19

**send** 6:17 8:9 40:1 56:18

**sense** 33:20 103:13

**separate** 63:11 81:18

**September** 20:6 24:4 32:24 33:7,
9 66:15,16

**September/october** 87:11

**sequence** 84:19

**services** 17:11 33:3,8 34:22
36:14 41:1,2,3 44:22 45:15

**set** 23:11 36:16 78:13

**sets** 63:23

**shape** 84:13

**shares** 44:12

**sheet** 50:21 52:24 53:5,16 64:10,
11,14 72:20 73:2,7,14 75:24 76:5,
10,14 78:7,14,23 82:18,20 86:18,
21 88:14

**sheets** 51:3 63:20

**shifted** 31:18

**shifts** 60:21

**shipment** 75:11

**shipments** 62:1 75:14

**shipped** 61:4 84:21

**shipping** 98:23

**short** 33:25 44:13

**Shorthand** 4:5

**show** 16:7

**show-stopper** 77:9

**showed** 61:6

**shown** 45:3 48:12,24,25 49:4,8

**shows** 44:16

**Shy** 40:11

**sic** 20:2

**side** 48:8

**sides** 47:23 62:4

**signatories** 35:2

**signatory** 22:20

**signature** 6:5,6 25:15 104:22
105:12,19

**signatures** 6:4

**signed** 17:18,19,21,24 18:6,7,9,
10,24 22:8 25:4 104:25

**significance** 59:8

**significant** 61:3 62:12 72:22
88:10

**significantly** 62:13 103:19

**Silicon** 24:5 42:4

**similar** 19:7 35:14 41:11,19 77:23

**Simon** 9:21 12:11,16 23:24,25
28:8 29:3 36:11 40:13 42:16 44:3,
4 58:2 68:4,18 69:17 71:18 72:22
77:16,18 93:21,22 100:11,13,23
101:6,8

**Singh** 5:24

**sitting** 5:20 97:13

**situation** 43:11 46:10 102:12
103:14

**skill** 63:23

**slaughtering** 101:1

**slow** 19:24

**small** 94:21

**snapshot** 64:11

**software** 34:13

**sold** 50:17 53:24 55:2 82:4

**sole** 37:17

**solving** 31:19

**Sonia** 5:24

**sort** 29:16 32:15 37:25 50:7 89:2
95:18

**sorted** 54:11,12

**sought** 73:1 74:11 105:15

**sounds** 51:22

**Spackman** 43:8,18

**speak** 51:4

**speaking** 60:9

**speaks** 37:21

**specific** 15:25 36:15 49:16 52:23
54:9 59:5 61:19,22 68:23

**specifically** 15:16 43:1 44:5 82:1

**specifications** 34:17

**speculating** 95:11

**spell** 24:6 40:12 43:9

**spelled** 55:17

**spelling** 101:3

**spellings** 5:25

**spent** 58:15 73:6 103:24

**spoke** 29:16 65:21 83:4

**stacked** 12:18

**staff** 30:4 70:5

**stand** 36:17

**stands** 23:7

**start** 19:18 26:8 67:12,16 73:25
74:5 75:4

**started** 44:3 59:22 74:25 87:7

**starts** 89:9,10

**state** 4:6 5:9,11 16:1 19:17 59:25

67:13

**stated** 59:14 100:20

**statement** 6:6,14 8:3 32:9 33:7
36:19 44:16 47:2,25 48:10 51:22
63:13 64:17 105:10,13

**statements** 29:19 45:8 62:25
63:3,16,22 64:2

**status** 27:20 28:14,25 60:21
61:15,20 65:3 66:9

**stay** 102:4

**steer** 103:7

**stipulated** 59:19 93:6 94:14
95:24 97:7

**stipulation** 58:16

**stock** 43:18 44:1,11 90:1

**stopped** 21:25 28:5 76:20

**stragglers** 62:8

**Strategic** 24:1,7

**strategy** 103:18 104:1

**stream** 33:1

**Street** 4:3,17

**strict** 19:1

**structurally** 52:3

**structure** 16:24 23:9,10,18 25:25
37:19 50:22 68:10 73:16

**structured** 22:15 23:23 26:4 90:7

**structures** 24:2

**subcontractor** 11:20

**subject** 13:18 14:12 19:15 21:23
73:19 93:10

**submitted** 27:5 74:7

**subsequent** 19:22 20:8 41:17
100:6

**substantive** 80:8

**substantively** 80:5

**substrate** 31:11 32:3

**substrates** 31:3,13,14,17,21 32:5

**succeeding** 91:5

**sue** 88:17

**sued** 89:1

**suggest** 45:16 77:18

**suggestion** 69:3

**suit** 88:19 89:1

**Suite** 4:3

**sum** 26:1

**summary** 21:5,14 35:13

**supervisory** 43:2

**supplier** 38:6,7

**support** 101:19,20 102:23

**supported** 102:16 103:1 104:5

**supposed** 16:5 22:1

**surprised** 38:9

**sworn** 4:9 5:8

**system** 60:18 63:6

**systems** 5:19 60:6,8 61:4

---

**T**

**table** 43:23 44:7,9 58:10 83:22,23
  91:10 93:18

**talk** 10:13 28:16 74:24 104:17

**talked** 27:11 30:24 31:12,13 75:9
  86:7

**talking** 13:3 85:18 96:8,9,10,12,
  14

**tanks** 89:24

**tape-out** 16:25 17:2,3 19:23 20:3,
  8,9,11

**tax** 66:9

**tax-type** 46:8

**team** 9:19 19:10 29:25 30:2 71:15
  104:4

**technical** 12:11,14 27:25 28:16
  30:12,14 31:9 34:17

**Technologies** 4:14 5:15 15:12,
  13 16:4 18:8,11,13,16 20:23
  21:11,13 22:11,13,20,21 23:2,12,
  13,18,22 24:9,16 32:21 35:1,3,4,7,
  11 36:5,14 37:5,10,15,17,18,22
  39:2,6 40:5,6,25 41:8,11,14,22
  42:5,14 43:4,16,19 44:18,19,24
  45:10,17 46:2,11 47:6,15,16 50:5,
  25 53:24 58:3,4 59:23 64:20 65:4,
  22 66:3,10,12,17 67:2,12 69:24

**Technologies'** 45:3 59:25

**technology** 27:21 28:2,15,19
  29:1 77:23

**telephone** 59:20

**telling** 48:24

**ten** 83:19 91:3

**term** 10:3 13:19 19:9 34:15 50:21
  51:3 52:24 53:5,16 72:20 73:2,7,
  13 75:24 76:4,10,13 78:7,14,23
  82:18,20 86:18,20 88:9,13

**terminate** 71:16

**terminating** 71:14

**termination** 19:14 70:3

**terms** 4:24 14:13 16:1,20,24
  25:22,23,24 26:4 32:16 35:2 41:12
  46:6 50:13,21 53:5 73:13,17,18,22
  76:25 85:14 87:2

**testified** 4:10 84:12 90:16,19

**testify** 4:9

**testimony** 6:13 7:24 26:23 78:3
  83:25

**theoretically** 23:16

**thereof** 4:2

**thing** 38:19

**things** 10:12 58:7 59:16 83:9
  89:21 96:8 103:12,16

**thinking** 101:13

**thinks** 51:17 97:18

**thought** 6:9 8:16 32:14 47:21,23
  76:3 87:13 100:14 101:5 105:14

**thoughts** 101:15

**thousand** 98:22

**three-way** 19:4

**tie-breaker** 100:23,24

**tied** 10:9 31:3,8 63:9

**Tim** 9:21 93:15

**time** 4:18 15:9 21:2,21 24:20 27:5
  38:22 40:9,11 42:1,2 46:11 52:6
  60:1 63:23 64:7,8 65:4,8,14,16
  67:3,21 68:19 69:18, 71:21 72:11
  73:6 75:19 76:4,12 78:10 80:12,13
  82:17,19 83:5,25 86:3 87:23 88:1

**Technologies'** 72:4,9 80:25 98:7

**timeline** 31:2 32:1

**times** 38:22 87:5 89:18

**timing** 28:2,18 58:19

**TM&C** 19:4

**today** 4:15,25 5:3 7:25 9:4 33:12
  47:13 57:25 63:22,24 64:2,15 90:1

**today's** 5:7

**told** 49:23 73:8 81:3

**tomorrow** 90:2

**Tons** 104:10

**top** 25:14

**total** 20:4 21:19 26:1 54:5,8 60:19,
  20 75:16 82:22 83:19 91:13 96:2,
  11 97:19 98:6,10

**transacted** 55:9

**transaction** 63:1 88:2

**transactional** 60:6,8

**transactions** 61:24 63:1

**transfer** 44:17,25 47:1, 48:5
  78:14 79:21,23

**transferred** 45:9 46:12 75:20
  78:12,17,24 81:1

**transferring** 40:6 78:8,9

**transfers** 47:16 48:1,25 50:4,6

**transpired** 28:10

**tricky** 81:17

**true** 87:16,19 105:5

**Trustee** 4:3

**Trustee's** 5:6,22

**truth** 4:9,10

**tubes** 89:24

**Tuesday** 4:1,15 99:23

**turn** 13:1 67:6 88:23,25 103:12

**turned** 90:5

**two-and-a-half** 93:5

**two-page** 16:19

**type** 46:3

89:10 90:19,23 91:4 96:5,23 97:6
98:8,14,21,25 102:4,5 103:7
104:25 105:8

**types** 58:11

**typical** 38:8

**typically** 38:7

---

**U**

**U.S.** 4:3 5:6,22

**Uh-huh** 99:10

**unclear** 22:24 78:23

**underlying** 65:16

**understand** 9:1 11:22 13:6 22:19 23:8 32:17 35:20 41:10 57:17 59:6 61:15 79:13 80:14 86:1,3 88:2,23

**understanding** 6:12 15:13,15 16:10,19 29:10 45:13 49:14 51:1,6 77:17 81:7 85:4 86:5,23

**understood** 86:3 89:25 105:17

**unfair** 92:17

**unfilled** 84:11

**Uniquify** 11:7,18 32:9,16,20,22 35:1,6 36:4,24 37:2,7,21

**unit** 75:22

**unknown** 51:15

**unpaid** 21:22

**unsecured** 87:17,21 89:14 90:4, 17

**unsigned** 14:23 25:7,16

**unsuccessful** 88:24 89:13,20

**update** 48:9

**updated** 7:22 56:4,11 98:21

**updates** 58:9

**upfront** 20:5

**uploaded** 93:7

**upside** 91:17

**urgency** 59:2 103:13

---

**V**

**vacation** 28:9 58:19 59:16,19

**validate** 24:14 25:5

**validated** 84:6,9

**validity** 84:3,14

**Valley** 24:5 42:4

**valuable** 29:18

**valve** 69:21

**Van** 55:18

**variation** 88:11

**vendor** 9:24,25 34:14 65:24 66:1

**vendors** 27:7,8 41:19 65:17

**venture** 75:7 90:6

**verbal** 28:5

**verify** 13:9 36:5,15 46:20 84:14

**versed** 12:11,14

**version** 14:21

**versus** 37:1,2 40:6 42:13 63:7 96:4

**vice-versa** 60:7

**view** 61:23 62:1 76:3 80:16 82:3,9

**viewed** 80:21

**viewing** 80:24 81:13,21

**volume** 94:21

**volumes** 94:22

**voluntary** 98:16

---

**W**

**W-i-l-l-e-m** 55:17

**wafer** 30:17,20 31:1,5

**wafers** 30:17 31:20 32:2,10 33:18,21,23 97:8

**wafers'** 94:16

**wait** 15:9 49:22 52:5 94:13

**wanted** 28:7 33:20 36:19

**website** 10:6

**week** 4:20 7:19 28:13 29:5 30:17, 23 31:12 32:8,15 50:12 58:15 73:7,21

**weeks** 61:11 70:10,23 93:5 96:19, 20

**wet** 6:4,5,6 105:12,18

**wife** 68:18

**Wifi** 14:3

**Willem** 55:12,16

**Wong** 93:15

**work** 14:20,23 16:13,23 21:25 22:3,4,6 29:23 30:14 33:1,7,8,16 34:18, 42:22 44:2,3 59:18,22

**Workbridge** 30:8,9,12,13

**worked** 37:2

**working** 11:20 21:24 29:13,18 30:6,7,11 43:5 51:3 67:12 95:14 100:2

**Works** 12:10

**worth** 41:25 77:18 83:25 94:16 97:4

**worthless** 90:2

**write** 40:5

**writing** 40:14,15 44:23

**written** 34:17,22

**wrong** 17:9 36:21 67:4 88:17 89:21

---

**Y**

**year** 19:14 46:21 71:2 87:9,10 88:9

**years** 48:2

**yesterday** 9:2 59:20

# EXHIBIT "C"

1   Ashley M. McDow (245114)
    Michael T. Delaney (261714)
2   **BAKER & HOSTETLER LLP**
    11601 Wilshire Boulevard, Suite 1400
3   Los Angeles, CA  90025-0509
    Telephone:   310.820.8800
4   Facsimile:   310.820.8859
    Email:      amcdow@bakerlaw.com
5             mdelaney@bakerlaw.com

6   [Proposed] Attorneys for OFFICIAL COMMITTEE
    OF UNSECURED CREDITORS

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re | Case No.: 14-30725 |
| HASHFAST TECHNOLOGIES, LLC, *et al.,*[1] | (Jointly Administered with HashFast LLC, Case No. 14-30866) |
| Debtors. | Chapter 11 |

**ORDER GRANTING OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUBSTANTIVE CONSOLIDATION**

On or about July 23, 2014, the Official Committee of Unsecured Creditors (the "Committee") filed a motion (the "Motion") to substantively consolidate the bankruptcy estates of *In re Hashfast Technology, LLC*, case no. 14-30725 DM, and *In re Hashfast, LLC*, case no. 14-30866 DM (collectively, the "Estates").

The Court, having considered the Motion and the evidence attached thereto, having received no opposition or objection to the relief requested, and finding good cause therefor, HEREBY ORDERS that the Motion is GRANTED in its entirety and the Estates shall hereafter be substantively consolidated.

---

[1] The Debtors are HashFast LLC (FEIN 46-2943354) and HashFast Technologies LLC (FEIN38-3913245).

ORDER GRANTING MOTION FOR SUBSTANTIVE CONSOLIDATION

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1  IT IS SO ORDERED.

2

3                                    ** END OF ORDER **

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER GRANTING MOTION FOR SUBSTANTIVE CONSOLIDATION

603835615.1

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90025-0509

A true and correct copy of the foregoing document entitled (*specify*): **UNOPPOSED EX PARTE APPLICATION FOR ORDER SETTING THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION FOR SUBSTANTIVE CONSOLIDATION FOR HEARING ON JULY 28, 2014 AT 2:00 P.M.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **July 23, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL OR EMAIL** (state method for each person or entity served): On (*date*) **July 23, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, addressed and/or by email as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Ray E. Gallo: rgallo@gallo-law.com
*Via Email*

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, OR FACSIMILE TRANSMISSION** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 23, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), and/or by facsimile transmission as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Hon. Dennis Montali
U.S. Bankruptcy Court Northern
Division of California
235 Pine Street, 19th Floor
San Francisco, CA 94104
*Via Personal Delivery*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 23, 2014 | Sonia Gaeta | /s/ Sonia Gaeta |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

603835613.1

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Venkat Balasubramani venkat@focallaw.com, pete.morici@alumni.purdue.edu
- Greg P. Campbell ecfcanb@piteduncan.com
- Patrick Chesney pchesney@gallo-law.com, mvananda@gallo-law.com
- Michael Delaney mdelaney@bakerlaw.com, SGaeta@bakerlaw.com
- Caroline R. Djang cdjang@rutan.com
- W. Keith Fendrick keith.fendrick@hklaw.com, Andrea.Olson@hklaw.com
- Julie M. Glosson julie.m.glosson@usdoj.gov
- Ori Katz okatz@sheppardmullin.com
- Ashley McDow amcdow@bakerlaw.com, SGaeta@bakerlaw.com
- Jessica M. Mickelsen jessica.mickelsen@kattenlaw.com
- Office of the U.S. Trustee / SF USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com
- Kristen A. Palumbo kristen.palumbo@bingham.com
- Christopher D. Sullivan csullivan@diamondmccarthy.com, mdomer@diamondmccarthy.com
- Nancy Weng nweng@trinhlawfirm.com, kim@trinhlawfirm.com

**2**. **SERVED BY UNITED STATES MAIL**:

David M. Balabanian
Law Offices of Bingham McCutchen
Three Embarcadero Center
San Francisco, CA 94111-4067

Craig A. Barbarosh
Katten Muchin Rosenman LLP
650 Town Center Dr. 7th Fl.
Costa Mesa, CA 92626-7122

Eric W. Benisek
Vasquez Benisek and Lindgren LLP
3685 Mt. Diablo Blvd., Suite 300
Lafayette, CA 94549

Edward Hammond
3103 Powell Cir.
Austin, TX 78704

Timothy Lam
6156 Temple City Blvd.
Temple City, CA 91780

Grant Pederson
12538 Botanical Ln.
Frisco, TX 75035

Peter A. Siddiqui
Katten Muchin Rosenman LLP
525 W. Monroe St.
Chicago, IL 60661-3693

Edwin E. Smith
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689

Edwin E. Smith
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110-1726

Timefire, Inc.
c/o Eric Benisek
3685 Mt. Diablo Blvd., Suite 300
Lafayette, CA 94549-6833

Satish Ambarti
c/o Eric Benisek
3685 Mt. Diablo Blvd., suite 300
Lafayette, CA 94549-6833

U.S. Attorney
Civil Division
450 Golden Gate Ave.
San Francisco, CA 94102-3661

California Employment Development
Dept. Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280

Tracy Hope Davis
United States Trustee for Region 17
Office of the United States Trustee
235 Pine Street, Suite 700
San Francisco, CA 94104-2745

California Franchise Tax Board
Special Procedures Bankruptcy
Unit
P.O. Box 2952
Sacramento, CA 95812-2952

Chief Tax Collection Section
Employment Development Section
P.O. Box 826203
Sacramento, CA 94230

## LIST OF 20 LARGEST CREDITORS
## SERVED VIA U.S. MAIL AND EMAIL ONLY, WHERE INDICATED

Mark Roy
21745 Duck Creek Square
Ashburn, VA  20148
***Via U.S. Mail***

~~Davide Cavion~~
~~c/o Bryan Reyhani~~
~~Reyhani Nemirovsky LLP~~
~~200 Park Avenue, 17th Floor~~
~~New York, NY 10166~~
***(undeliverable*)**

DXCorr Design Inc.
121 West Washington Ave.
Suite 212
Sunnyvale, CA  94086
***Via U.S. Mail***

Sandgate Technologies
595 Fellowship Road
Chester Springs, PA  19425
***Via U.S. Mail***

Strategic Counsel Corp.
227 Broadway, Suite 306
Santa Monica, CA  90401
***Via U.S. Mail***

Benjamin Lindner
9035 Grayland Drive, Apt. E
Knoxville, TN  37923
***Via U.S. Mail***

WY Gost – ***Via U.S. Mail and Email***
Building A, Haocheng Tech Park
Yanshan Avenue, Baoan District Shenzhen
China
wygost@yahoo.com

Ciara Technologies
9300 Transcanada Highway
Saint-Laurent, Quebec H451K5 Canada
***Via U.S. Mail***

Future Electronics Corp.
3255 Paysphere Circle
Chicago, IL 60674
***Via U.S. Mail***

Liquidbits Corporation
20201 E. Country Club Drive, #1502
Aventura, FL  33180
***Via U.S. Mail***

Michael Gao – ***Via U.S. Mail and Email***
c/o Hongqiu Yang
105 Tamalpais Point
Chapel Hill, NC  27514
Urazexo378@gmail.com

Elton Seah
761 Irwindale Avenue
Las Vegas, NV  89123
***Via U.S. Mail***

Sonic Manufacturing Technologies
P.O. Box 225
Santa Clara, CA  95052-0225
***Via U.S. Mail***

World Electronics
3000 Kutztown Road
Reading, PA  19605
***Via U.S. Mail***

Zuber Lawler & Del Duca LLP
777 S. Figueroa Street
37th Floor
Los Angeles, CA  90017
***Via U.S. Mail***

Craig Beech – ***Via Email only***
craigbeech@gmail.com

Graeme Middleton
Middleton Solicitors
135-137 Dale Street
Liverpool L2 2JH UK
***Via U.S. Mail***

603835613.1

## MEMBERS OF UNSECURED CREDITORS COMMITTEE

Hamilton Hee
761 Irwindale Ave.
Las Vegas, NV  89123
***Via U.S. Mail***

Uniquify Inc.
Attn:  Robert Smith
2030 Fortune Drive #200
San Jose, CA  95131
***Via U.S. Mail***

Koi Systems Ltd.
Attn:  Brian Edgeworth
1191 Center Point Drive, Suite A
Henderson, NV  89074
***Via U.S. Mail***

Peter Morici
1430 Patapsco St.
Baltimore, MD   21230
***Via U.S. Mail***

Sistemas Operativos Sanitarios ca
Attn:  Guido Ochoa
Calle 35 entre Av. 2 y 3 #2-34
Merida, Venezuela  5101
***Via U.S. Mail***

Antony Vo
319 S. Mitchell St.
Bloomington, IN  47401
***Via U.S. Mail***

Digimex Ltd.
Attn:  Willem van Rooyen
Bel Air on the Peak, Phase 4
Tower 7, Unite 19A
Pok  Fu Lam, Hong Kong
***Via U.S. Mail***

603835613.1