1  Ashley M. McDow (245114)
   Michael T. Delaney (261714)
2  **BAKER & HOSTETLER LLP**
   11601 Wilshire Boulevard, Suite 1400
3  Los Angeles, CA 90025-0509
   Telephone:   310.820.8800
4  Facsimile:   310.820.8859
   Email:       amcdow@bakerlaw.com
5                mdelaney@bakerlaw.com

6  [Proposed] Attorneys for the OFFICIAL
   COMMITTEE OF UNSECURED CREDITORS
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10             **SAN FRANCISCO DIVISION**

11

12 | In re                                      | Lead Case No.: 14-30725 DM
13 | HASHFAST TECHNOLOGIES, LLC, a              | Jointly Administered with:
   | California limited liability company,      |
14 |                                            | Case No.: 14-30866 DM
   |          Debtor and Debtor in Possession.  |
15 |                                            | Chapter 11

16 | x  Affects HASHFAST LLC, a Delaware        | **Hearing:**
   |    limited liability company,              | Date:   July 28, 2014
17 |                                            | Time:   2:00 p.m.
   |          Debtor and Debtor in Possession.  | Dept:   235 Pine St., 19th Fl.
18 |                                            |         San Francisco, CA 94104
   |                                            | Judge:  Hon. Dennis Montali
19

20     **OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
21     THE DEBTORS' MOTION FOR ENTRY OF ORDERS (1) AUTHORIZING THE SALE
       OF ESTATE PROPERTY, (2) AUTHORIZING THE SALE OF ESTATE PROPERTY
22     FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND
       (3) AUTHORIZING THE (A) ASSUMPTION AND ASSIGNMENT OF CERTAIN
       EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (B) ASSUMPTION OF
23     CERTAIN LIABILITIES, AND (C) GRANTING CERTAIN RELATED RELIEF**

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

The Official Committee of Unsecured Creditors (the "Committee") in the above-captioned bankruptcy case of *In re Hashfast Technologies, LLC*, case no. 14-30725 DM (the "HFT Bankruptcy"), hereby respectfully submits the within opposition (the "Opposition")[1] to the *Debtors' Motion pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9014 and 9019 for Entry of Orders (I) Authorizing the Sale of Estate Property, (II) Authorizing the Sale of Estate Property Free and Clear of Liens, Claims, Encumbrances and Interests, and (III) Authorizing the (a) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (b) Assumption of Certain Liabilities, and (c) Granting Certain Related Relief* (the "Motion") [HFT Bankruptcy, Docket Entry 134].[2]  In support of the Opposition, the Committee states as follows:

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

A theme has developed in this case.  Hashfast Technologies, LLC ("HFT") and Hashfast, LLC ("HF") (collectively, the "Debtors") present half-cocked ideas and, once teed-up on shortened time or an emergency basis, attempt to conceal or explain-away the absence of evidence or a logical justification due to the purported exigency.  With this may warrant quick action in some instances, proclaiming that "the sky is falling" does not excuse the unconscionable sale proposed by the Debtors to their insider/joint venturor Liquidbits, Corp. ("LB")—a sale negotiated on behalf of the Debtors by an individual poised to lead the purchaser after the sale is consummated.

Essentially, and making every effort to avoid hyperbole, Debtors propose selling substantially all of their tangible assets, granting an irrevocable and transferrable license (including the right to create derivative works), and 33% of the net recovery from any avoidance actions or suits against insiders to LB—items of substantial, quantifiable value—without any

[1] The order shortening time expressly allowed for the submission of written and oral oppositions.  The Committee expressly reserves its right to present and further or additional arguments in opposition to the Motion orally during the hearing on the Motion.

[2] All references to documents or docket entries in the HFT Bankruptcy shall be noted as "HFT Doc."  All references to documents or docket entries in *In re Hashfast, LLC*, case no. 14-30866 DM (the "HF Bankruptcy"), shall be noted as "HF Doc."

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1 guarantee of return to any class of creditors except certain, unidentified administrative (e.g.,

2 Debtors' counsel) and priority (e.g., insider wage claimants) claimants and for a sum less than the

3 current market value of the existing inventory—inventory the Debtors claim can be shipped

4 within days to customers as minimal cost.

5      Then, as if being patently ridiculous was not enough, the Debtors have the temerity to

6 present the LB offer as the highest and best offer without providing any evidence regarding,

7 among other things, the Debtors' marketing efforts, asset valuation, due diligence,[3] the identity of

8 the apparently yet-to-be-formed purchasing entity (the "Purchaser"), the Purchaser's

9 capitalization, projections for the performance of the Purchaser's proposed mining operation, the

10 ability to finance the Purchaser's proposed mining operation, the ability to obtain resources

11 essential to the Purchaser's proposed mining operation (e.g., realty, electricity, etc.), a complete

12 and accurate description of the assets subject to the proposed sale (most notably, the intellectual

13 property the Debtors intend to assume and assign), an evaluation of LB's claim against the HFT

14 bankruptcy estate (the release of which is purportedly part of the consideration), an evaluation of

15 potential avoidance and breach of contract claims the Debtors have against HFT, the value of the

16 proposed license, the terms of the proposed license, and the list goes on. Simply put, the dearth

17 of information regarding what is essentially an expedited liquidation of HFT is *shocking*.

18      Looking past the Debtors' failure to provide any credible evidence, the proposed

19 transaction is completely ludicrous and unsubstantiated. The most glaring issue is that the

20 consideration is completely illusory. LB only promises $2,000,000 in cash with the remaining to

21 be paid pursuant to a $3,000,000 note secured on "rapidly depreciating" Bitcoin mining

22 equipment with repayment terms that are vague at best and a $3,000,000 "preferred" equity

23 interest buy-out—i.e., an unsecured, interest free loan that should the Purchaser file for

24 bankruptcy before the buy-out was completed would hold a lower priority than general unsecured

25 creditors. Of course, as HFT's CFO admitted, if the Purchaser fails in its mining venture for any

26 reason, the Debtors have provided a convenient out _for the Purchaser_. Specifically, if the

27

28 [3] Despite promising the production of due diligence on multiple occasions, the Debtors failed to produce any due diligence

COMMITTEE'S OPPOSITION TO DEBTORS' SALE MOTION

Case: 14-30725    Doc# 156    Filed: 07/24/14    Entered: 07/25/14 00:00:42    Page 3 of
27

Purchaser ever decides that operating the Bitcoin mine is not profitable enough to warrant performing under the note, the Purchaser can simply surrender the mining equipment to the Debtors in exchange for a full release from the requirement to make payments on the note or on account of "preferred" equity—i.e., the only sources for payment of general unsecured claims.

Regrettably, the deficiencies do not end with consideration. The Debtors also fail to justify the other provisions of the proposed transaction. Most notably, the Debtors fail to justify the releases provided to LB. The Debtors provide no evaluation of the avoidance and breach of contract claims against LB. The Debtors also fail to provide any analysis of the LB proof of claim, the release of which the Debtors count as dollar-for-dollar consideration for the proposed transaction. The Debtors also fail to establish the ability to assume and assign the licenses—an integral part of the proposed transaction. Indeed, the Debtors fail to clearly delineate what intellectual property they own (if any) versus what intellectual property they license from other entities. Further, with respect to the former class, the Debtors fail to explain why assignment is even necessary since HF (the purported owner of the intellectual property) is a party to the transaction and, thus, can simply grant a new license. Lastly (for purposes of this introduction to the myriad issues with the proposed sale), the Debtors fail to provide any basis for a good faith finding under 11 U.S.C. § 363(m). The Debtors have failed to demonstrate that the sale is for fair market value (or a reasonable approximation) to a third party via an arm's length transaction. In fact, based on the available evidence (which was omitted from the Motion), the LB sale was negotiated by Monica Hushen, who has been promised employment with the Purchaser after the sale is consummated, with LB, which is not only the parent company for the Purchaser (i.e., Ms. Hushen's future employer) but is also presently an insider of the Debtors by virtue of the joint venture established as part of the first stipulated order on LB's motion to appoint a receiver. Thus, in essences, the LB deal was the product of one hand washing the other and not an arm's length transaction.

In sum, the proposed transaction represents a truly egregious disregard for the fiduciary duties of the Debtors to the unsecured creditors. Even if the sky is falling, impending diminution of estate assets does not warrant a below-market fire sale in which the consideration is contingent

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

upon the future performance of an untested entity without the Debtors at least providing *some evidence* and *some guaranteed disbursement* to the unsecured creditors, which, if the Committee simply took over liquidation of the existing assets, would likely obtain as much if not more (especially once $200,000 per month in payroll is eliminated) than the best case scenario under the LB sale proposal. Accordingly, the Committee respectfully submits that the Debtors have failed to establish *with credible **evidence*** that the proposed sale benefits the estates or its creditors and, thus, requests that the Court deny the Motion in its entirety.

## II.   **PROCEDURAL HISTORY**

1.   On or about May 9, 2014, Koi Systems Ltd., UBE Enterprises, Timothy Lam, Edward Hammond, and Grant Pederson (collectively, the "Petition Creditors") commenced the HFT Bankruptcy by filing a Chapter 7 Involuntary Petition against Hashfast Technologies, LLC, a California limited liability company (referred to herein as "HFT"). *See* HFT Doc. 1.[4]

2.   On or about May 21, 2014, LB filed an *Emergency Motion for Entry of an Order Appointing a Chapter 7 Trustee or for Alternative Relief* (the "Trustee Motion"). *See* HFT Doc. 8. On or about May 28, 2014, the Court entered the *Stipulated and Further Order with Respect to Emergency Motion of Liquidbits Corp. for Entry of an Order Appointing a Chapter 7 Trustee Pursuant to Section 303(g) of the Bankruptcy Code or for Alterantive Relief* (the "Trustee Order"). *See* HFT Doc. 31. Pursuant to the Trustee Order, HFT was permitted to continue its business operations subject to certain limitations.

3.   On or about June 3, 2014, HFT filed the *Debtor's Motion to Convert to Chapter 11* and the *Debtor's Conditional Consent to an Order for Relief Regarding Involuntary Petition*. *See* HFT Doc. 35 and 36, respectively.

4.   On or about June 4, 2014, the Court entered an order converting the HFT Bankruptcy to one under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). HFT Doc. 40. Following conversion, HFT has operated the business as debtor in

---

[4] The Committee requests that the Court take judicial notice of all documents herein referenced on file with the Court pursuant to Fed. R. Evid. 201.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

COMMITTEE'S OPPOSITION TO DEBTORS'S SALE MOTION

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

possession pursuant to 11 U.S.C. §§ 1107 and 1108, subject to the stipulated order governing the amount of sales and oversight allowed to the Committee. *See* HFT Doc. 132.

5. On or about June 6, 2014, Hashfast, LLC, a Delaware limited liability company (referred to herein as "HF"), filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "HF Bankruptcy"). *See* HF Doc. 1.

6. On or about June 6, 2014, HFT filed the *Debtors' Motion for an Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing the Joint Administration of Their Chapter 11 Cases*, seeking to administratively consolidate the HFT Bankruptcy and HF Bankruptcy (collectively, the "Bankruptcy Cases"). *See* HFT Doc. 48. On or about July 8, 2014, the Court entered an order in the HFT Bankruptcy consolidating the Bankruptcy Cases and naming the HFT Bankruptcy the lead bankruptcy case. *See* HFT Doc. 121.

7. On or about July 18, 2014, the Debtors filed the *Debtors' Motion pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9014 and 9019 for Entry of Orders (I) Authorizing the Sale of Estate Property, (II) Authorizing the Sale of Estate Property Free and Clear of Liens, Claims, Encumbrances and Interests, and (III) Authorizing the (a) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (b) Assumption of Certain Liabilities, and (c) Granting Certain Related Relief* (the so-called "Motion"). *See* HFT Doc. 134. By and through the Motion, the Debtors seek to sell most of HFT's inventory, assign to LB certain unspecified irrevocable and transferrable license(s), and grant LB a 33% interest in any recovery from any future avoidance actions or actions against insiders for damages, which may include LB (the "Sale" or "Transaction"). *Id*. A true and correct copy of the non-binding term sheet associated with the proposed Sale (the "Term Sheet") is attached to the McDow Declaration as **Exhibit C**. The Debtors also filed an application to have the Motion on shortened time (the "Motion OST Application") [HFT Doc. 137], which the Court granted on or about July 21, 2014 (the "Motion OST").[5] *See* HFT Doc. 140. The Motion OST set July 24, 2014 as the deadline for filing any written objection. *Id*.

---

[5] The Committee prepared an opposition to the Motion OST Application due to the absence of any competent evidence demonstrating cause to have the Court consider the Motion on an expedited basis—a timeline that has adversely affected the Committee's ability to fully evaluate the proposed Sale. Before the Committee could file its

8.     On or about July 23, 2014, the Committee filed the *Official Committee of Unsecured Creditors' Motion for Substantive Consolidation*, seeking to substantively consolidate the Bankruptcy Cases and their estates (collectively, the "Estates")[6] into a single estate (the "Consolidation Motion").  *See* HFT Doc. 148.  The Committee also filed an application to have the Consolidation Motion heard on shortened time—specifically, on June 28, 2014, at 2:00 p.m. (the "Consolidation Motion OST Application")  *See* HFT Doc. 149.  The Court has yet to issue an order on the Consolidation Motion OST Application.

## III.   STATEMENT OF FACTS

### A.   Company Ownership and Operation

9.     The Debtors engage in a single enterprise for the design, manufacture and sale of computer chips and systems utilized in Bitcoin mining.  HF is the parent company of HFT and owner of 100% of the membership interest in HFT.  *See* HFT Doc. 44.  In turn, HF is owned by several individuals and entities in varying percentages, including, but not limited to, Eduardo de Castro (26.94%), Simon Barber (26.94%), Chad Spackman (11.97%),[7] the Port Family Trust (11.97%), and the Wells Family Trust (11.97%).[8]  *See* HF Doc. 5.  In addition to being owners of HF, Eduardo de Castro and Simon Barber are executive or former executives of HFT—former CEO and current CTO, respectively.

10.     HF does not engage in any business independent of HFT.  HF has no meaningful business operations, no employees,[9] the same officers as HFT,[10] and the same principal place of

---

opposition, the Court entered the Motion OST.  The Committee has incorporated its opposition to the hearing of the Motion on shortened time into this Opposition.

[6] The HFT Bankruptcy estate may be referred to herein as the "HFT Estate". The HF Bankruptcy estate may be referred to herein as the "HF Estate".

[7] Chad Spackman as well as the Port Family Trust and Wells Family Trust, or their trustees, settlors or beneficiaries, as the principals of Sandgate Technologies ("Sandgate"), which is one of the principal engineering firms used by the Debtors.  *See, e.g.,* Transcript of July 15, 2014, Continued Meeting of Creditors for Hashfast Technologies, LLC, at 11:4-7.  A true and correct copy of the Transcript of July 15, 2014, Continued Meeting of Creditors for Hashfast Technologies, LLC, is attached to the Declaration of Ashley M. McDow (the "McDow Declaration") as **Exhibit A**.

[8] Based on the testimony provided by HFT's CFO during the continued Meeting of Creditors held on July 15, 2014, it appears that the ownership interests of HF have been redistributed as Monica Hushen now holds a 3% interest and Tim Wong now holds a 1% interest in HF.  *See* Transcript of July 8, 2014, Meeting of Creditors for Hashfast Technologies, LLC, at 48:10-49:15.  A true and correct copy of the Transcript of July 8, 2014, Meeting of Creditors for Hashfast Technologies, LLC, is attached to the McDow Declaration as **Exhibit B**.

[9] *See* Ex. B, 53:20-23.

[10] *See* HF Doc. 17, p. 7; HFT Doc. 92, at p. 10.

COMMITTEE'S OPPOSITION TO DEBTORS'S SALE MOTION

603839298.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

business as HFT. *See* HF Doc. 1, p. 1; Ex. B, 7:24-8:11. HF exists solely for the purpose of purportedly owning and developing certain intellectual property – identified on HF's schedules as two United States provisional patent applications and various "trade secrets, mask works related to chip design" (collectively, the "Intellectual Property") – solely for the benefit of HFT.

### B. Intellectual Property

11. The Intellectual Property purportedly held by HF is primarily related to the Golden Nonce chip. In or about June 2013, the Debtors began designing their first generation Golden Nonce ("GN1"), with the assistance of Sandgate and Uniquify, Inc. ("Uniquify"). *See* Ex. A., 11:4-7. HF claims to be the exclusive owner of the intellectual property relating to the GN1 (the "GN1 IP"). HF further claims to license this intellectual property to HFT, although the Debtors have yet to produce any licensing agreement establishing this relationship.

12. Following the development of the GN1, the Debtors worked with DXCorr Design ("DXC") to design and develop subsequent generations of the GN1—generations 1.5 ("GN1.5") and 2.0 ("GN2"). *See* Ex. A, at 12:23-17:19. The ownership of the intellectual property related to the GN1.5 (the "GN1.5 IP") is uncertain. *Id*. The Debtors contend that they own the GN1.5 IP while simultaneously stating that the Debtors (or HF) received a license to use the GN1.5 IP from DXC. *Id*. These contentions are mutually exclusive unless the GN1.5 IP involves multiple rights or the GN1.5 is a derivative work and, although DXC owns the GN1.5 IP, the Debtors have blocking rights due to the GN1 IP. The ambiguity is in part due to the fact that the contract between DXC and HF or HFT (another point that is uncertain) is unsigned. *Id*.

13. The ownership of the GN2 intellectual property (the "GN2 IP") is not plagued by the same ambiguities as the GN1.5 IP. *Id*. Indeed, as the Debtors' representative testified, the GN2 IP is owned by DXC. *Id*. at 17:9-19.

14. Notwithstanding the question of ownership, the Debtors contend that HF or HFT (another uncertainty) holds a valid license or licenses to use the GN1.5 IP and GN2 IP. *See* Ex. A, at12:23-18:16. These licenses, however, are not appended to the Motion and, as a result, are not subject to review.

603839298.1

### C. **Product Roll-out**

15. In or about July 2013, HFT began advertising a special purpose computer system built around the GN1 for sale and started accepting orders for the "batch one" mining computers in early August 2013. *See, generally,* Ex. A, at pp. 119-120. "Batch one" sales were quickly followed by batches two through four. *See Id*. Despite taking orders with short delivery guarantees, the Debtors had yet to fully develop a system capable of mass production; indeed, chips for the systems were not available until in or about November 2013. *See Id*., at pp. 119-122.

16. The delays in production ultimately resulted in unhappy customers. The Debtors have yet to describe what led to the delays and the failures to fulfill customer orders by the guaranteed delivery dates. The Debtors merely contend that "everybody had a part in it" and that the issues causing the delivery difficulties have now been corrected. *See* Ex. B., at 30:24-31:7, 34:13-14.

17. Notwithstanding the delivery issues, the Debtors earned approximately $18,000,000 in the last five to six months of 2013—in other words, annualized revenues in excess of $36,000,000. *See* HFT Doc. 92, at p. 1. The Debtors quickly spent these funds on chip design and six-figure salaries for nearly every employee. *See* Ex. B, at 32:21-33:2.

18. Despite substantial investments in developing product and Intellectual Property, the Debtors could not meet delivery deadlines, which led to refund demands in early 2014 and a corresponding "pinch point" or financial distress. *See Id*. 25:11-15, 28:25-29:4. The inability to fulfill orders lead to the commencement of a variety of litigation and, ultimately, the HF Bankruptcy.

19. During the course of the Bankruptcy Cases, the Committee and HFT have entered into consensual agreement to allow for the sale of the Debtors' products subject to certain safeguards.

20. At present, the Debtors have approximately 17,100 GN1 chips available. 16,000 of the GN1 chips are ready for shipment following testing, which, according to the Debtors, has a 90% pass rate and only takes a day or two. *See* Ex. B, at 175:7-12. Thus, within a couple of

COMMITTEE'S OPPOSITION TO DEBTORS'S SALE MOTION

603839298.1

days, the Debtors would have approximately 14,400 chips available for sale.[11]  In total, HFT's inventory has a present market value between $7,500,000 and $9,000,000.  Ex. B, at 82:18-83:3 (valuing the inventory between $7,500,000 and $9,000,000); Ex. A, at 82:11-14 (valuing the inventory at $8,500,000); *see also* HFT Doc. 145, at p. 3 (valuing the inventory in the June 2014 operating report at $7,412, 819).  At these figures, the inventory has a liquidation value of between $6,000,000 and $7,200,000.  *See* Ex. B, at 89:19-24.  The value of the inventory, is exclusive of the value of the Intellectual Property, which HFT's CTO valued between $10,000,000 and $30,000,000.  Ex. B, at 65:25-66:5.  Additionally, the Debtors possession certain claims against insiders and LB to avoid preferential claims (a claim worth approximately $400,000)[12] and breach of contract.  The Debtors also possess claims against Uniquify and Signetics for violating the automatic stay and refusing to turnover estate property.  Thus, in sum, the assets of the Estates have an estimated market value in excess of $17,500,000, which does not include any value for the potential lawsuits.

### D.    Proposed Sale

21.    On or about July 18, 2014, the Debtors filed the Motion seeking approval of the Sale.  HFT Doc. 134.  Essentially, Debtors agree to sell their inventory to a subsidiary of LB—the as yet unformed Purchaser—in exchange for the payment of administrative and insider claims, a note secured on the Purchaser, and a limited interest in the proceeds from future Bitcoin mining activities conducted by the Purchaser.  The Term Sheet provides in relevant part:

a.    Assets. The Debtors will sell or assign the majority of HFT's current inventory, the Debtors' Intellectual Property, and a 33% interest in any avoidance actions or claims against the insiders to the Purchase.  The Debtors further agree to release Liquidbits from any and all claims;

Baker & Hostetler llp
Attorneys at Law
Los Angeles

---

[11] The chips are presently held by Uniquify and its subcontractor Signetics.  Uniquify and Signetics have purportedly refused to release chips to the Debtors without payment of their prepetition claims.  The Committee is unaware of any attempt(s) made by the Debtors to compel turnover of the items of estate property or even inform Uniquify and Signetics that the refusal to ship the chips constitutes a violation of the automatic stay.

[12] HFT's CFO acknowledged that the Sale does not account for the value of the proposed preference claim despite the fact that the Transaction calls for the Debtors to release LB from the claim.

b.  <u>Consideration</u>.  As consideration for the Sale, the Purchaser shall provide up to $2,000,000 to pay to administrative and priority creditors, and any amount needed to cure defaults on executory contracts.  The Purchaser shall also provide a note in the principal amount of $3,000,000 secured on the Purchaser's assets that will earn a rate of 8% per annum (the "<u>Note</u>").  The Purchaser shall commence payments on the Note once all the Bitcoin mining systems are built-out or December 1, 2014, whichever is later.  Payment shall be made periodically in an amount equal to 17% of the Purchaser's gross revenue from Bitcoin mining.  The Debtors shall also receive "preferred" equity in the Purchaser with a maximum value of $3,000,000 that Purchaser may purchase from the Debtors at some point in time.  Liquidbits also agrees to release HFT from its proof of claim in the face amount of approximately $5,000,000.  If the Purchaser fails, however, general unsecured creditors will receive no compensation, as the Debtors reluctantly conceded.  *See* Ex. A, 90:4-8.

c.  <u>No Overbid or Competitive Marketing</u>.  The proposed sale ***will not*** be subject to overbid or any competitive offers.  If the Debtors receive an unsolicited offer, the Debtors ***may*** in their discretion consider the offer;

d.  <u>Payments</u>.  All payments will be made in Bitcoin (BTC); and

e.  <u>Accord/Satisfaction</u>.  If the Purchaser determines that performing under the Note is "non-economical and there are no further payments being made on the" Note, the Purchaser may surrender the Bitcoin mining equipment in full satisfaction of its obligation under the Note.

22.  The only evidence offered in support of the Motion is the Declaration of Monica Hushen—HFT's current CFO, who joined HFT in April of 2014.  Ex. B, at 24:5-9.  Monica Hushen negotiated the Sale on behalf of the Debtors.  Ex. A, at 72:19-21.  The Purchaser has also indicated to Ms. Hushen that LB would like to be part of the new venture.  Ex. D, at 161:2-162:11 ("[H]ave any of the employees, either you, Simon or Eduardo, to your knowledge been offered or promised a position at Liquidbits if the sale goes through?  A.  If the sale goes through, they have stated that they want to hire key employees, and they would trust our judgment to define who those key employees are. … Greg has said he would like to see me as party of the deal.").  A true

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

and correct copy of the Hushen 2004 transcript is attached to the McDow Declaration as **Exhibit D**.

## IV.    DISCUSSION

A cursory review of the Motion demonstrates a shocking absence of anything justifying the relief requested. Indeed, the Motion fails to meet every applicable requirement set forth in the Court's *Guidelines for Early Disposition of Assets in Chapter 11 Cases*.[13] There is no evidence of any emergency. There is no evidence of value for the assets being sold, the marketing efforts undertaken, or the reason the Court should not require overbid. There is no evidence that the Debtors can assume or assign any of the purported licenses. Indeed, not only do the Debtors fail to provide copies of these alleged license agreements, the Motion cites to inapposite case law from the Third Circuit—a circuit that follows a markedly different rule than the Ninth Circuit. The Motion is also devoid of any explanation or analysis regarding the claims the Debtors intend to release through the Motion or why the release satisfies the requirements of Fed. R. Bankr. P. 9019. In short, the Debtor provides nothing and asks that the Court authorize the Debtors to sell the majority of the inventory, assign an irrevocable license, and grant 33% of any recovery from any avoidance action or lawsuit against an insider, which could conceivably including a suit against LB, in exchange for an illusory promise of future payment. Additionally, even assuming the Debtor provided information and/or documents to fill-in the nearly innumerable evidentiary gaps, the Transaction is at its core a bad deal—a deal that shifts all the risks to the unsecured creditors. Accordingly, the Committee requests that the Court deny the Motion in its entirety.

### A.    Debtors Completely Fail To Abide By Any Of The Guidelines For Early Disposition Of Assets In Chapter 11 Cases

The sale of substantially all assets early in a case poses a significant risk that the estate is not obtaining the highest and best offer, which only a broad-spectrum marketing effort and an offer subject to overbid can bring. Accordingly, the Court has promulgated *Guidelines for Early Disposition of Assets in Chapter 11 Cases* (the "Guidelines"). Pursuant to the Guidelines, if a

---

[13] A true and correct copy of the *Guidelines for Early Disposition of Assets in Chapter 11 Cases* is attached to the McDow Declaration as **Exhibit E**.

- 12 -

debtor seeks to sell substantially all of the debtor's assets within 60 days of the petition date,[14] the debtor must submit a declaration from the responsible individual for the debtor covering:

    a.    <u>Alternatives to Sale</u>.  A description of the efforts, if any, to pursue other alternatives such as financing, capital infusion, etc., including the period of time involved and the results achieved.

Although the Declaration of Monica Hushen[15] ("Hushen Declaration") states that the Debtors "actively marketed the Acquired Assets,"[16] the declaration does not provide any details—e.g., what are the "Acquired Assets"?  Who did the Debtors market these assets to?  When did the Debtors engage the "2 key competitors," financers, and venture capitalists?  How long and in what manner did Debtors market the "Acquired Assets"?

Additionally, the Hushen Declaration provides no information about any efforts to market the Intellectual Property for sale or in an effort to license the technology.  The Hushen Declaration also provides no information about any effort to sell or monetize the potential claims against, among others, LB, which received a $400,000 preference within 90 days of the petition date.

    b.    <u>Marketing of Assets</u>.  A description of the manner in which the asserts were marketed for sale including the period of time involved and the results achieved.

The Hushen Declaration provides no information regarding the marketing efforts.  It merely states that the Debtor "actively marketed" by meeting with certain individuals.  The Hushen Declaration does not describe the method of marketing.  For instance, were these formal meetings during which the Debtors presented a business plan or informal, initial meetings?  What information did the Debtors provide these potential buyers?

    c.    <u>Decision to Sell</u>.  The date on which the debtor accepted the offer to purchase the assets.

Although the Hushen Declaration states that the Term Sheet was executed on July 18, 2014, the Term Sheet is not an offer to purchase.  Rather, the Term Sheet is a non-binding description of a proposed deal—a deal the Debtors have prematurely presented to the Court.

---

[14] The order for relief in the HFT Bankruptcy was not entered until June 3, 2014.  The HF Bankruptcy was commenced on or about June 6, 2014.

[15] Monica Hushen is the Debtors' responsible individual.

[16] The term "Acquired Assets" refers to the "certain of the Debtors' assets…."  HFT Doc. 137, p. 2.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

COMMITTEE'S OPPOSITION TO DEBTORS' SALE MOTION

d. <u>Asset Valuation</u>. Disclosure of the debtor's prior valuations, with the last year, of the assets to be sold, if any (e.g., book value, appraisals, financial statements, etc.).

The Hushen Declaration provides no valuation of any of the assets, rights or interests to be transferred to LB as part of the proposed Sale. The Hushen Declaration merely provides an unsubstantiated opinion that certain assets have a present value of $5,700,000—a value that is substantially lower than the valuation given by Ms. Hushen for the same assets during the Meetings of Creditors for the Debtors ($7,500,000 to $9,000,000)—meetings that took place less than 10 days ago. The Hushen Declaration is completely silent on the values of the Intellectual Property license and the avoidance actions—two other assets included in the Transaction.

e. <u>Relationship of Buyer</u>. A statement identifying the buyer and setting forth, to the best of declarant's knowledge, all of the buyer's (including its officers, directors and shareholders) connections with the debtor, creditors, any other party in interest, their respective attorneys, accounts, the United States Trustee or any person employed in the office of the United States Trustee.

The Hushen Declaration is completely silent on the relationship between LB (the parent company of the Purchaser) and the Debtors. LB and the Debtors are related by virtue of the joint venture for the mining of Bitcoin. Per the parties' agreement (the "<u>JV Agreement</u>"),[17] the Debtors provided substantial proceeding power to LB in exchange for a portion of the proceeds from the mining venture LB promised to establish and operate. Although LB has yet to establish the mining venture since October 2013 (which does not bode well for a venture headed by LB's subsidiary, the Purchaser), the Debtors' interests are intertwined with those of LB—a fact this element requires the Debtors to disclose and explain, which they have not done.

f. <u>Post Sale Relationship with Debtor</u>. A statement setting forth, to the best of declarant's knowledge, any relationship or connection the debtor (including its officers, directors, shareholders, and employees) will have with the buyer after the consummation of the sale, assuming it is approved.

The Hushen Declaration is also silent on the proposed relationship between the Debtors' principals and the Purchaser after the transaction is closed. As Ms. Hushen testified at her 2004 examination, the LB intends to bring on "key employees" from the Debtors to operate the Purchaser. Ex. C, at 161:2-162:11. LB has apparently entrusted the Debtors (i.e., the Debtors' principals) to decide which directors, principals, and employees are "key employees" and, thus,

---

[17] A true and correct copy of the JV Agreement is attached to the McDow Declaration as **Exhibit F**.

- 14 -

COMMITTEE'S OPPOSITION TO DEBTORS' SALE MOTION
603839298.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

will transition to the Purchaser.  *Id*.  In fact, Ms. Hushen testified that the management of LB requested that

> g.  <u>Insider Compensation</u>.  Disclosure of current compensation received by officers, directors, key employees or other insiders pending approval of the sale.

The Hushen Declaration does not disclose the current compensation received by any of the Debtors insiders.  The Debtors' failure to comply with the Guidelines warrant denial of the Motion.

## B.  **The Court Should Continue The Hearing As No Exigent Circumstances Exist**

Throughout this case, the Debtors have run into Court proclaiming that the "sky is falling" and that without immediate intervention the Estates will be irreparably harmed.  The Motion is no different.  In the Motion OST Application, the Debtors contend that shortened notice is necessary because the assets "that are the subject of the Sale (i) are subject to rapid depreciation given the nature of the Bitcoin mining industry and the value of the equipment used therein and (ii) are languishing in the hands of" the Debtors' vendors—namely, Uniquify and Signetics—which refused to turnover assets without receiving payment of their prepetition claim.  *See* HFT Doc. 137, at p. 3.

First, the retention by the Debtors' vendors is a red herring.  The Debtors may file a motion for turnover, send a demand letter stating that conditioning the release of Estate assets condition on the payment of prepetition claims constitutes a stay violation, and/or sue for violation of the automatic stay.[18]  The Debtors have not pursued any of these avenues.  More importantly, an emergency sale of substantially all assets is not the proper mechanism to recover these assets.

Second, the Debtors have provided no evidence that hearing the Motion on regular notice would result in any injury to the Estate or that a brief delay to allow creditors a fully and fair opportunity to evaluate the Sale prior to the hearing would cause the deal to fail.  Indeed, the

---

[18] Although Signetics is a Korean company, it appears that the Debtors' contract is with Uniquify, which in turn subcontracted with Signetics.  Thus, to the extent Signetics refuses to turn over the Estate assets, damages could be available from Uniquify—a corporation located and operating in the United States.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Debtors did not even provide a declaration from LB or the Purchaser that the close of the sale by any date was a prerequisite for the Transaction moving forward.

Finally, the only parties harmed by any delay are the unsecured creditors. To the extent any harm may result, the Committee feels a full and fair opportunity to evaluate the proposed Sale, review the due diligence materials (which the Debtors have promised but not delivered despite multiple requests), and investigate whether any other parties might be interested in purchasing some or all of the Debtors' assets for a higher price. This additional time is made all the more essential by the Debtors failure to provide for overbid in the proposed Sale.[19]

The Committee requests that the Court continue the hearing on the Motion for a term of no less than 14 days from the disclosure of all due diligence information to allow the Committee and other interested parties to evaluate the Debtors and determine whether to put in a bid on the assets.

**C.     The Sale Should Not Be Approved Due To The Absence Of Material Information And The Detrimental Terms Of The Proposed Transaction**

The Sale is premised on a number of assumptions; most importantly, that the Purchaser will be able to perform and that the proposed consideration is sufficient. The Debtors, however, have failed to provide any evidence substantiating many critical issues and, even disregarding the dearth of relevant information, the proposed Sale shifts all the risk to the creditors while disregarding the simple fact that the liquidation of the inventory would provide a greater return than the best case scenario under the Sale.

**1.     The Motion is Premature**

As a threshold matter, the Committee submits that the Motion is premature. At present, there is no agreement for the Court to consider. Rather, the Term Sheet is merely a ***non-binding*** proposal or expression of interest. Without an actual, binding agreement, the Sale cannot proceed and, indeed, given the non-binding nature of the Term Sheet, the provisions of the Sale may actually change prior to the finalization of any agreement. Thus, the Committee submits that the

---

[19] In just a few days, the Committee has been able to locate multiple parties interested in conducting due diligence on the Debtors to determine whether to purchase the companies or some or all of the Debtors' assets. Declarations to this effect will be filed separately.

- 16 -

Court should deny the Motion without prejudice to the Debtors re-filing a motion on regular notice if a final agreement is reached.

## 2. The Debtors Failed to Demonstrate a Proper Justification for the Proposed Transaction

Pursuant to § 363(b), a debtor in possession may ordinarily sell assets outside the ordinary course of business so long as the debtor demonstrates a sound business justification. The deference to a debtor's decision, however, is not limitless. For instance, the presumption that a sale serves the best interests of creditors based on the "exercise of business judgment" does not attach where the debtor fails to provide evidence regarding the value of the asset to be sold or the debtor has failed to effectively market the assets for sale. *See, e.g. In re Mama's Original Foods, Inc.*, 234 B.R. 500, 503-504 (1999); *see also In re Blixseth*, 2010 WL 716198, *9 (Bankr. D. Mont. Fed. 23, 2010).[20]

> The court's obligation in § 363(b) sales is to assure that the optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's.

*Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288-289 (B.A.P. 9th Cir. 2005). Indeed, in the circumstances presented, the presumption afforded by the business judgment rule in inapplicable. As noted by the *Blixseth* court:

> Where, as here, the proposed bidding procedure propose a sale to an entity with very close ties to the Debtor and the property at issue, before the Trustee has engaged an experienced broker and intensively explored non-insider proposals, and where the bidding procedures provide … terms aimed at cutting off other competing bids, the business judgment rules simply does not apply.

2010 WL 716198, *9.

### a. Value and Consideration

Here, like in *Blixseth*, the Debtors propose a sale to a related entity (an entity with which the Debtors conduct a joint venture) and with which the Debtors and their principals have a

---

[20] A true and correct copy of the *Blixseth* opinion is attached to the McDow Declaration as **Exhibit G**.

COMMITTEE'S OPPOSITION TO DEBTORS' SALE MOTION

603839298.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

pecuniary interest in seeing acquire the Assets—namely, the principals' future employment. Additionally, the Debtors have also failed to present any evidence of marketing the Assets for sale in a reasonable or customary manner. The Debtors have not employed a broker or other professional to assist in the sale or marketing of the company. The Debtors have presented no evidence that the Debtors have generally marketed the property for sale—as opposed to speaking to a few select people or entities about an undisclosed proposed transaction on undisclosed terms. Indeed, the Debtors have produced no evidence except the conclusory declarations of HFT's CFO and counsel that the proposed Sale is based on the "exercise of [sound] business judgment" or that the Debtors marketed the Assets in any way. Accordingly, the presumption that the Sale is an exercise of business judgment does not attach.

Additionally, the Debtors have failed to provide any reliable evidence regarding the adequacy of the proposed consideration. The only evidence regarding valuation is the testimony of HFT's CFO, Monica Hushen. Ms. Hushen, however, has provided a variety of valuations. During the § 341 meeting of creditors, Ms. Hushen valued the tangible portion of the Assets between $7,500,000 and $9,000,000. Ex. B, at 82:18-83:3 (valuing the inventory between $7,500,000 and $9,000,000); Ex. A, at 82:11-14 (valuing the inventory at $8,500,000). Then, in the June 2014 operating report, the Debtors valued the tangible inventory at approximately $7,400,000. HFT Doc. 145, at p. 3. Now, in the Motion, Ms. Hushen values the tangible Assets at $5,700,000—approximately, 67% of her prior median valuation—less than 10 days after prior valuation of $8,500,000.

The value of the tangible assets, however unreliable, is not the worst of it. Simply put, the Debtors provide no value whatsoever for the license or the 33% interest in the avoidance actions the Debtors propose giving to the Purchaser. Indeed, the Debtors provide no description whatsoever of the licenses other than saying that the license is perpetual, royalty-free and transferable. Most importantly, the Debtors do no describe what intellectual property is subject to the license or whether the license allows the Purchaser to sub-license the technology, which would essentially render the Debtors' retention of the Intellectual Property moot. Similarly, as for the avoidance actions, the Debtors provide no description of the action, the defendants, the

- 18 -

likelihood of success, the basis for the claims, or the entity that will prosecute the actions. Essentially, the Debtors provide no information whatsoever from which anyone could determine what the Purchaser's 33% interest is worth.

Based on the evidence provided, there is no way to determine whether the proposed consideration, regardless of how illusory it might be, is adequate (assuming the best case scenario and the Purchaser pays every cent due). This is especially true given the potential offsets. Essentially, part of the consideration is the release. LB releases the HFT Estate from its approximately $5,000,000 claim while the Debtors release LB from the preference and breach of contract causes of action.[21] The Debtors, however, has failed to provide any information about the value of the Debtors' claims against LB or the veracity or amount of the claim LB asserts against the HFT Estate. If, for instance, the LB claim is really only worth $2,500,000 instead of over $5,000,000 and the claims against LB have a total value of $2,500,000 this consideration would cancel out and LB would essentially receive a windfall in the form of a perpetual, royalty-free license to create and sell next generation chips.

In sum, the Debtors have failed to demonstrate that the Transaction is based on sound business judgment because the Debtors have failed to present any evidence regarding the value of the assets subject to the Sale (the "Assets") or the adequacy of the consideration provided (assuming the best case scenario.

### b. Capabilities of the Purchaser

The Debtors have also failed to demonstrate that the Transaction is in the best interest of the creditors because the Debtors have provided no information about the Purchaser. According to the Term Sheet and the Motion, the Purchaser is a yet-to-be-formed subsidiary of LB or entity associated with LB. The Debtors, however, has failed to present any evidence or information regarding the Purchaser's finances, the financing arrangement between the Purchaser and LB, the assets of the Purchaser (other than the Assets), or the projected performance of the Purchaser.

---

[21] The breach of contract action is premised on LB's failure to establish the mining operation under the JV Agreement and provide the Debtors their interest in the proceeds from the mining operation, which, given the rise in the value of Bitcoin and the hashing capabilities of 2000 systems, could be millions of dollars.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

For instance, the Debtors have not identified who will manage the Purchaser, whether these individuals have Bitcoin mining experience, and, if so, how they have performed in the past—which, given the association with LB and LB past failure to set up a mining operation in accordance with the JV Agreement, such information is extremely important to evaluate the *bona fides* of the proposed Transaction and its likelihood of success. The Debtors have also failed to provide any information about the Capitalization of the Purchaser—i.e., whether the Purchaser will have $2,000,000 to cover the initial payments plus sufficient funds to set up the mining operation. Moreover, the Debtors have failed to provide any projections regarding the performance of the mining operation—e.g., when the mining operation will be ready to mine; what the projection return from the mining operation will be (BTC/day); whether the equipment's performance will remain constant over time; if not, how will performance be effected; and, most importantly, will the mining operation generate enough money to make the payments on the note at the contract rate.[22]

By and through the Transaction, the Debtors tie the only hopes unsecured creditors have of receiving a distribution to the performance of the Purchaser—a brand new company with unknown management and financial wherewithal. Absent at least some information regarding the potential performance of the Purchaser, the Debtors cannot reasonably content the proposed Transaction is better than a controlled liquidation of the Debtors' inventory, which would generate between $6,000,000 and $7,200,000 based on an 80% realization on current value.[23]

### c. The Consideration is Illusory

Notwithstanding the dearth of information regarding the valuation of the Assets or the financial capabilities of the Purchaser, the consideration is illusory as the Debtors provide a surrender provision pursuant to which the Purchaser may, if performing under the Note is no longer advantageous and the Debtors consent (i.e., the Purchaser's employees), the Purchaser may cease making payments and surrender the equipment—not all the Assets, just the tangible

---

[22] Assuming the Note is fully amortized over the two year term, the mining operation would have to generate approximately $860,000 per month in BTC (which would vary depending on the market) to fully repay the Note within interest at 8% in two years if the repayment amount was 17% of gross.

[23] The Debtors' representative testified that the costs of liquidation were between 18% and 20%. Ex. B, at 89:22-24.

- 20 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

equipment. Specifically, in a section comically titled "Downside Protection," the Term Sheet provides:

> If the <u>Purchaser determines</u> that the costs of operation, including the costs of bitcoin mining [(i.e., the only source of funds to repay the Note)], becomes non-economical and there are no further payments being made [(i.e., the Purchaser is not making payments whether the default is by choice or due to financial hardship)] on the Seller Note or in the redemption of the Creditor Preferred Equity [(which has absolutely no time frame for repayment)], then, <u>at the election of the holder of the Seller Note and the Creditors Preferred Equity</u> [(i.e., the Debtors, whose "key employees" will be working for the Purchaser after the Sale)], the Purchaser would, to the extent permitted by law, surrender or otherwise transfer to the holder of the built out systems and equipment of the Purchaser in satisfaction of the Seller Note and in full redemption of the Preferred Equity.

HFT Doc. 134, at p. 27.

In other words, if the Purchaser and the Debtors' principals (the Purchaser's employees) decide not to mine any more, say, in 18 months, the Purchaser can simply surrender the equipment, which, if such equipment really depreciates at a rate of 15% every 10-15 days, will be worth less than 0.1% of its current value, discharge its liability under the Note and its obligation to pay any portion of the "preferred" equity and keep the perpetual licenses for the Intellectual Property and its 33% interest in avoidance actions. The provision is utter ridiculous. If provides the Purchaser a complete out and, as the Debtors begrudgingly admit, could result in a $0.00 distribution to unsecured creditors—a substantial risk to take without any information regarding the Purchaser.[24] The Debtors have provided no justification for this walk-away provision that allows the Purchaser to exchange worthless machinery for a $6,000,000 release if things don't work out. The only rational explanation is that the Debtors' provided the walk-away because the Purchaser is quite simply Hashfast mark III, with the same employee and the same technology; only this time Hashfast doesn't have to worry about repaying or providing systems to all the customers that financed the development of the Debtors Intellectual Property and product line. Such a result would be an aberration, a complete mockery of the bankruptcy system.

---

[24] It cannot be said enough, the Committee has requested the due diligence materials on multiple occasions and, despite promising to provide this critical information, the Debtors have yet to provide any due diligence documentation, which lead the Committee to conclude that the Debtors simply have no due diligence information or documentation substantiating their believe that the proposed Transaction even a remote chance of providing any return to general unsecured creditors.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

An integral part of the proposed transaction is that the Sale is <u>not</u> subject to overbid. Given the tight timeline and the complete absence of any verifiable evidence that the Debtors actually marketed the companies or their assets to any entity other than LB, the Committee finds it very troubling that the Sale is not subject to overbid. Overbid is intended to provide assurance that the proposed transaction is really the highest and best offer by subjecting the proposed sale to (essentially) an auction. Allowing overbid is premised on the nearly universal understanding that "the market value of property that the trustee offers for sale is the highest price that an informed buyer is willing to pay after the property has been appropriately exposed to the marketplace for a reasonable period of time." *Mama's Original Foods*, 234 B.R. at 504; *see also Bank of America NT & SA v. 203 North LaSalle Street Partnership*, 119 S.Ct. 1411, 1423 (1999). Thus, in the absence of overbid, the proposed price may be deemed less reliable and, thus, viewed with skepticism. *See In re Luhijani*, 325 B.R. at 289 ("The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders. When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully.").

In the instant case, there are already substantial issues with the Transaction presented and the supporting evidence (or lack thereof). The removal of the competitive process is simply another inexplicable provision that evidences a non-market, insider transaction—a transaction that the Debtors hope to squeeze past the Court using hyperbolic proclamations of exigency as a disguise. Such a transaction should not be allowed.

e.     **The Proposed Transaction is not the Best or Only Potential Exit Strategy**

Throughout the Motion, the Debtors contend that they marketed the Debtors for sale and have only received LB's Sale proposal to support the contention that the Transaction is the highest and best (and, indeed, only) potential offer and that LB is the only interested party. The proposed Transaction is not the only potential exit strategy. Since the filing of the Motion, the Committee has contacted multiple individuals to outline potential exit strategies that could be

Case: 14-30725    Doc# 156    Filed: 07/24/14    Entered: 07/25/14 00:00:42    Page 22 of 27
603839298.1

quickly implemented. These strategies are outlined in the related declarations and run the gamut. One exit strategy proposed by multiple individuals independently of one another is a franchise or cooperative strategy. Under this plan, the Debtors would franchise independent miners to utilize the existing chip inventory to mine Bitcoins in exchange for a portion of the proceeds. A slight variation on this idea is to sell the chips or boards to independent miners at or slightly above cost and receive a portion of the mining proceeds. A sample proposal from one of the Committee members is attached to the McDow Declaration as **Exhibit H**. In the franchise models, the Debtors retain ownership of some or all of the chips while earn profit from the mining operations—a deal not too different from the Debtors' proposal, except that the Debtors, as opposed to LB, own the chip and get a portion of the upside from the mining operation directly from the independent miner. Additionally, under the franchise model, the Debtors retain exclusive control over the Intellectual Property and the avoidance actions.

Accordingly, the Committee respectfully requests that the Court view the Transaction as merely one of several possibilities and allow the Committee sufficient time (after gaining access to due diligence documentation) to develop and present these alternate proposals.

**D.** **The Debtors Have Failed To Demonstrate Cause To Authorize Sale Free And Clear Of Liens**

The Debtors contend that they may sell free and clear of any and all liens pursuant to § 363(f) due to a *bona fide* dispute regarding the validity of certain possessory liens asserted by Uniquify and Signetics. The Debtors, however, have failed to specifically identify the purported lien holders, the collateral, or the amounts of the allegedly secured claims. Further, sale free and clear of a possessory lien is unnecessary as the Debtors may simply compel turnover of the products or seek damages for the creditors' violation of the automatic stay by conditioning the release of the items on payment of prepetition claims. Finally, the Committee opposes the Sale free and clear (in addition to the grounds for simply opposing the Sale) because such a sale would effectively transfer the lien which is attached to the physical good to the sale proceeds, which essentially converts a possessory lien that can be simply avoided into a statutory lien on liquid assets.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

**E.** **The Debtors Have Failed To Demonstrate Grounds To Enter A Good Faith Finding**

The Debtors request a finding that the Purchaser is a good faith purchaser.  Under the circumstances presented and based on the evidence available, the request should be denied. "The first requirement of a 'good faith' purchaser is that there be an identifiable purchaser" *Fitzgerald v. Ninn Worx Sr., Inc. (In re Fitzgerald)*, 428 B.R. 872, 882 (B.A.P. 9th Cir. 2010), *citing Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475, 478-80 (9th Cir. 2000).  Here, the Purchaser is unidentified and, as a result, it is impossible to determine whether the Purchaser meets the standards for a good faith purchaser.  "Secondly, generally the purchaser gives 'value.'" *Id*., *citing Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 281 (9th Cir. 1992).  Once again, the Debtors fail to demonstrate that the Purchaser is providing value.  Indeed, the only thing the Purchaser is providing in the prospect for a return in the future.  Finally, collusion between the purchaser and other bidders or the trustee precludes a good faith finding.  *See Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp., Inc.)*, 163 F.3d 570, 577 (9th Cir. 1998).  The Debtors and the Purchaser (through LB) did not engage in an arm's-length transaction.  Rather, HFT's CFO negotiated the Term Sheet on behalf of the Debtors while simultaneously discussing her employment with the Purchaser—a clear conflict of interest that calls the good faith nature of the negotiations into serious question.

Accordingly, the Committee respectfully submits that a good faith determination is inappropriate.

**F.** **The Debtors Have Failed To Demonstrate Their Ability To Assume And/Or Assign Any License Agreements**

As part of the Transaction, the Debtors must assume and assign certain unidentified licenses agreements to the Purchaser, ostensibly so the Purchaser can actually manufacture and sell the Debtors' products.

- 24 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

As a threshold matter, the Debtors have failed to provide any evidence regarding the licenses they must assign.[25]  Throughout the Meetings of Creditors, the Debtors' representatives demonstrated a troubling lack of understanding regarding the ownership of intellectual property integral to the Debtors' operations—e.g., the GN1.5 IP.  Apparently, the Debtors own certain intellectual property while other intellectual property is only licenses by the Debtors for vendors like DXC.[26]  In the Ninth Circuit, courts interpret § 365(c)(1) as barring "a debtor in possession from *assuming* an executory contract without the nondebtor's consent where applicable law precludes *assignment* of the contract to a third party."  *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.)*, 165 f.3D 747, 750 (9th Cir. 1999).[27]  The Debtors have failed to attach copies of the executor contracts to the Motion or otherwise reference the language of the executory contracts and applicable law that establishes that the Debtors is capable of assuming and assigning any of these contract.

As a result of the Debtors' failure to identify the executory contracts to be assigned under the Motion, it cannot be determine whether the Debtors are in default under any of the contracts and, thus, would have to cure to assume (which presumes the Debtors can assume and assign under applicable law).  Additionally, it is unknown whether the Purchaser will have sufficient funds to pay the cure amounts as proposed in the Term Sheet given the $2,000,000 case for administrative and priority claims, and curing executory contract default to enable assumption.

Notwithstanding, the proposed notice provision is also unreasonable.  It provides only 7 calendar days to object to the proposed cure amount, which may prove insufficient.  Additionally, the proposal of a 7-day objection period renders it impossible to know what the cure amounts are as of the hearing on the Motion because objections may be filed up to and including July 30th—2 days after the hearing on the Motion.

---

[25] To the extent the Debtors are relying upon *Notice of Assumption and Cure Amount with Respect to Executory Contracts or Unexpired Leases Potentially to be Assumed and Assigned in Connection with Sale of Debtors' Assets* (HFT Doc. 146), no licenses for any intellectual property are identified.

[26] Although it remains unclear, if the Debtors are merely licensees, the Debtor may not have any right to assume and assign the license agreement.

[27] In the Motion, the Debtors cite to Third Circuit law that is inapposite to the prevailing law in this Circuit.

- 25 -

Moreover, given the potentially substantial impact on the proposed Sale, it seems ill-advised if not impossible to attempt to reach an determination about the permissibility of the proposed Transaction without first determining whether the Debtors can assume and assign the executory contracts, leases and licenses agreements necessary to permit the Purchaser to establish a mining operation and develop next generation technology.

### G. The Debtors Fail To Satisfy The Standard For Approval Of A Settlement Under Rule 9019

Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Rule 9019"), "[a] settlement may be approved if it is fair and equitable when comparing the claims being compromised against the likely rewards of litigation." *In re HyLoft, Inc.*, 451 B.R. 104, 109 (Bankr. D. Nev. 2011). "In approving a compromise, the court id directed to consider (1) the probability of success in litigation of the dispute, (2) the difficulties to be encountered, if any, in the collection of an award, (3) the complexity, expense, inconvenience and delay of litigation, and (4) the interest of creditors in the case, giving deference to any reasonable views expressed." *Id.* In deciding such a motion, the Court must make an informed decision. *Id.* "The trustee's business judgment is not alone determinative…." *Id.* "[T]he 'court is not permitted to act as a mere rubber stamp' but must make an independent determination that the compromise is fair and equitable." *Id.*, *In re Rake*, 363 B.R. 146, 152 (Bankr. D. Idaho 2007).

The Debtors have failed to present any evidence or arguments regarding the factors a court must consider. Rather, the Debtors merely assert that the LB claim is scheduled at over $5,000,000 and, thus, the Debtors conclude that the settlement must be a good deal. *See* HFT Doc. 134, at p. 18. The Debtors, however, have failed to provide any explanation regarding the value of any offset attributable to the avoidance actions the Estates have against LB (approximately $400,000) or the breach of contract claims associated with LB's failure to establish a bitcoin mine and pay dividends in accordance with the JV Agreement.

Accordingly, the Committee respectfully requests that the Debtors have failed to establish grounds to approve the broad releases to LB included in the Term Sheet.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case: 14-30725    Doc# 156    Filed: 07/24/14    Entered: 07/25/14 00:00:42    Page 26 of 27
603839298.1

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

**H.** **Waiver Of The 14-Day Stay Not Warranted**

2

Much like the remainder of the Motion, the Debtors have failed to provide any reason for

3

the Court to waive the 14-day provided in Rules 6004(h) and 6006(d) of the Federal Rules of

4

Bankruptcy Procedure. The Debtors have not provided any evidence that the sale must close

5

within a given time period. Indeed, under the circumstances, if the Sale is approved, unsecured

6

creditors may wish to seek reconsideration with the benefit of evidence withheld by the Debtors

7

thus far, including, most importantly, the due diligence. Thus, the Committee requests that the

8

Court deny the request for waiver of the stay.

9

**V.** **CONCLUSION**

10

WHEREFORE, the Committee respectfully requests that the Court deny the Motion in its

11

entirety.

12

13

Dated: July 24, 2014        Respectfully submitted,

14

15

BAKER & HOSTETLER LLP

16

By:     /s/ Ashley M. McDow

17

Ashley M. McDow
Michael T. Delaney

18

[Proposed] Attorneys for the OFFICIAL

19

COMMITTEE OF UNSECURED CREDITORS

20

21

22

23

24

25

26

27

28

- 27 -

COMMITTEE'S OPPOSITION TO DEBTORS' SALE MOTION