KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtors and Debtors-In-Possession
HashFast Technologies LLC and HashFast LLC

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

Katten
KattenMuchinRosenmanLLP

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company,<br><br>    Debtor and Debtor-In-Possession<br><br>———————————————————<br><br>☐ Affects HASHFAST LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor-In-Possession | Lead Case No. 14-30725<br><br>Jointly Administered with:<br><br>Case No. 14-30866<br><br>Chapter 11<br><br>**NOTICE OF FILING OF ASSET PURCHASE AGREEMENT, AND EXHIBITS THERETO, ACCORDING TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365 AND FED. R. BANKR. P. 2002, 6004, 6006, 9014 AND 9019 FOR ENTRY OF ORDERS (I) AUTHORIZING THE SALE OF ESTATE PROPERTY, (II) AUTHORIZING THE SALE OF ESTATE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (III) AUTHORIZING THE (A) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (B) ASSUMPTION OF CERTAIN LIABILITIES; AND (C) GRANTING** |

1

| | |
|---|---|
| | ) **CERTAIN RELATED RELIEF** |
| | ) |
| | ) Hearing |
| | ) Date: July 28, 2014 |
| | ) Time: 2:00 p.m. |
| | ) Place: 235 Pine St., 19th Floor |
| | ) San Francisco, CA 94104 |
| | Judge: Honorable Dennis Montali. |

**TO THE UNITED STATES TRUSTEE, UNIQIFY, INC., CIARA TECHNOLOGIES, SONIC MANUFACTURING TECHNOLOGIES, AS PARTIES POTENTIALLY CLAIMING AN INTEREST IN THE ASSETS SOLD, THE 20 LARGEST UNSECURED CREDITORS, AND ANY PARTY-IN-INTEREST AND THEIR COUNSEL:**

**PLEASE TAKE NOTICE THAT** that the above-captioned debtors and debtors in possession (the "Debtors") hereby file the Asset Purchase Agreement ("APA"), and all exhibits thereto, as Exhibit 1 to this Notice, pursuant to their Motion For Entry of Orders (I) Authorizing the Sale of Estate Property, (II) Authorizing the Sale of Estate Property Free and Clear of Liens, Claims, Encumbrances and Interest, and (III) Authorizing the (A) Assumption and Assignment of Certain Executroy Contracts and Unexpired Leases, (B) Assumption of Certain Liabilities; and (C) Granting Certain Related Relief ("Sale Motion") [Docket No. 134]. The Sale Motion will be heard at the above-captioned time and date.

Dated: July 25, 2014

KATTEN MUCHIN ROSENMAN LLP

Peter A. Siddiqui
Jessica M. Mickelsen

By:/s/ Jessica M. Mickelsen
Counsel for Debtors and Debtors-In-Possession
HashFast Technologies LLC and HashFast LLC

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 2 of 119

# EXHIBIT 1

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is made as of the ___ day of July, 2014, among (i) HASHFAST TECHNOLOGIES LLC, a California limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the Northern District of California, San Francisco Division ("**HashFast**"), (ii) HASHFAST LLC, a Delaware limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court (the "**Company**" and, together with HashFast, the "**Sellers**"), and (iii) [NEWCO] LLC, a Delaware limited liability company ("**Buyer**"). The Sellers and Buyer are sometimes referred to herein each individually as a "**Party**" and collectively as the "**Parties**").

**WHEREAS,** the Sellers are in the business of designing, developing, manufacturing and selling certain computer chips and equipment, including Application Specific Integrated Circuit, semiconductors, for the sole purpose of auditing transaction data for the bitcoin networks, also known as "bitcoin mining" (the "**Business**");

**WHEREAS,** the Company owns all of the issued and outstanding membership interests in HashFast;

**WHEREAS,** each of the Sellers has commenced a voluntary chapter 11 case (collectively, the "**Cases**") in the Bankruptcy Court;

**WHEREAS,** Buyer is an affiliate of Liquidbits Corp. ("**Liquidbits**") which has filed a proof of claim in the Bankruptcy Court (Docket No. 111) (the "**Liquidbits Vendee Claim**") against HashFast in the approximate amount of $5.3 million;

**WHEREAS,** as set forth in the Sellers' sale motion dated July 18, 2014 (Docket No. 134) (the "**Sale Motion**"), Buyer desires to purchase certain assets of the Sellers used or useful in the operation of the Business on an expedited basis, and each Seller desires to sell, assign, and transfer to Buyer the assets on an expedited basis, as more particularly described herein and in accordance with Sections 105, 363 and 365 of the United States Bankruptcy Code (the "**Bankruptcy Code**");

**WHEREAS,** the Parties agree that time is of the essence in connection with the transactions contemplated hereby, and the Sellers and Buyer agree that a rapid consummation of the transactions contemplated hereby is essential;

**WHEREAS,** the assets to be sold by the Sellers and acquired by Buyer hereunder will be sold pursuant to an order of the Bankruptcy Court approving the sale and the other transactions contemplated hereby under Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9014 and 9019; and

**WHEREAS,** this is the Asset Purchase Agreement contemplated by the Sale Motion to evidence the transactions described in the term sheet (the "**Term Sheet**") attached to the Sale Motion;

A/76197451.5

**NOW, THEREFORE**, for and in consideration of the foregoing and their mutual covenants and agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## 1.    SALE OF ASSETS; ASSUMPTION OF LIABILITIES

(a)    <u>Acquired Assets</u>. At the Closing (as defined in <u>Section 3(a)</u>), pursuant to Sections 105, 363, and 365 of the Bankruptcy Code and on the terms and subject to the conditions of this Agreement, and subject to the approval of the Bankruptcy Court and the terms of the Sale Order (as defined in <u>Section 6(a)</u>), each Seller will sell, assign, transfer, convey and deliver to Buyer, free and clear of all liens, claims, interests, and encumbrances, of any nature or kind, and Buyer will purchase from the Seller, all of the Seller's right, title, and interest in and to all of the assets previously or currently used or useful to related to the conduct of all of the Business (collectively, the "**Acquired Assets**"). The Acquired Assets from each Seller include, but are not limited to:

(i)    all chips, wafers, system components, board components, hashing boards, other inventory and equipment;

(ii)    all right, title and interest of the Seller in any executory contract (each a "**Transferred Contract**") to which the Seller is a party and that Buyer elects to require the Seller to assume and assign to Buyer as contemplated by the Sale Motion;

(iii)    a perpetual, royalty-free, non-exclusive, world-wide, transferable license (the "**License**") of any intellectual property of the Seller to use, process, develop or market chips, chips' worth of wafers and for use with mining equipment upon the terms of the license agreement attached hereto as <u>Exhibit A</u>;

(iv)    an interest (the "**Claims Participation**") equal to 33% of the recoveries, net of expenses of recovery, on any claim of the Seller against any person arising under section 547, 548, 549, or 550 of the Bankruptcy Code or any other claims against an insider of the Seller (each an "**Excluded Claim**") and in any abandoned Excluded Claim if requested by Buyer, all as provided the in the claims participation agreement (the "**Claims Participation Agreement**") attached hereto as <u>Exhibit B</u>;

(v)    all bitcoins in the possession of either Seller excluding any bitcoins constituting Segregated Cash (as defined in <u>Section 1(b)(iv)</u>).; and

(vi)    all funds on deposit in any deposit account excluding funds constituting consideration for the Acquired Assets and Segregated Cash.

The Acquired Assets do not include any Excluded Assets (as defined in <u>Section 1(b)</u>). Buyer may require an amendment to an executory contract as a condition to it being a Transferred Contract. If the amendment is not approved by the non-debtor party or parties to the contract, the contract would not be assumed and assigned as a Transferred Contract.

A/76197451.5

(b)    Excluded Assets.  Neither Seller is selling to Buyer under this Agreement any of the following assets (the "**Excluded Assets**") of the Seller:

(i)    any intellectual property of the Seller other than rights provided in the License;

(ii)    any Excluded Claim other than the Claims Participation or as otherwise provided in the Claims Participation Agreement;

(iii)    up to 3,000 chips and 5,000 chips' worth of wafers and any proceeds of sales thereof in the aggregate for the Sellers;

(iv)    the cash and other deposits in that certain segregated account (the "**Segregated Cash**") established pursuant to paragraph 4 of that certain Stipulated Order by and among the Sellers and the Creditors' Committee with Respect to the Sellers' Motion to Amend Gap Period Stipulation entered by the Bankruptcy Court on July 15, 2014 [Docket No. 132];

(v)    the Company's membership interests in HashFast;

(vi)    any intercompany claims by either Seller against the other; and

(vii)    any other asset of the Seller that, at or prior to the Closing, Buyer elects by written notice to the Sellers not to acquire.

(c)    All Liabilities Generally Excluded.

(i)    Except as provided in this subsection, Buyer will not assume or be obligated to pay, perform or otherwise discharge any liability or obligation of either Seller of any kind or nature, whether direct or indirect, known or unknown, absolute or contingent.

(ii)    Buyer will become responsible for all liabilities and obligations that arise under any Transferred Contracts after the Closing and that relate to the period from and after the Closing.

(iii)    Buyer may assume any other liability specified in a written instrument of assumption signed by Buyer and delivered by Buyer to the Sellers at or prior to the Closing and contingent upon the Closing taking place.

2.    **PURCHASE PRICE**

In consideration for the Acquired Assets, Buyer will provide the following consideration (the "**Purchase Price**") to the Sellers:

(a)    Cash Payment.  An amount in cash (the "**Cash Payment**") not to exceed the aggregate sum of $2,000,000 and after taking into account the Segregated Cash (i) to pay for any allowed unpaid administrative and priority claims in the Cases as of the Closing Date and any cure costs for Transferred Contracts other than those with Uniquify, Inc., Ciara Technologies and Sonic Manufacturing Technologies (the "**Supply Chain Service Providers**"), (ii) to establish a

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 6 of 119

cash reserve for the wind-up of the Cases and (iii) in an amount acceptable to the Buyer to resolve claims of the Supply Chain Service Providers to certain inventory of the Sellers including any cure costs relating to the assumption and assignment of any Transferred Contract with a Supply Chain Service Provider.

(b)     Seller Note.  A promissory note issued by Buyer in the principal amount of $3 million upon the terms of the promissory note attached hereto as Exhibit C (the "**Seller Note**") secured by the security interest provided for in the security agreement attached hereto as Exhibit D (the "**Security Agreement**").

(c)     Preferred Equity.  Preferred equity units in Buyer upon the terms for the preferred units contained in the operating agreement of Buyer attached hereto as Exhibit E ("**Buyer's Operating Agreement**") and with a liquidation preference of $3 million (the "**Preferred Equity**");

(d)     Waiver of Liquidbits Vendee Claim.  The waiver by Liquidbits of the Liquidbits Vendee Claim pursuant to the waiver attached hereto as Exhibit F (the "**Liquidbits Vendee Claim Waiver**"); and

(e)     Assumption of Liabilities  Any liabilities that Buyer assumes pursuant to Section 1(c).

## 3.     CLOSING

(a)     Closing.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place at the offices of Bingham McCutchen LLP, Three Embarcadero Center, San Francisco, CA 94111, or at such other place, or pursuant to such other means, as may be mutually agreed upon by the Parties.  The Closing will take place (i) within one (1) business day after all of the conditions set forth in Sections 7 and 8 have been satisfied or waived, or (ii) at such other time as may be fixed by agreement among the Parties (the "**Closing Date**").

(b)     Sellers' Deliveries.  At the Closing, the Sellers will deliver to Buyer (i) possession of all tangible assets comprising the Acquired Assets other than chip and wafer inventory in the possession of a Supply Chain Service Provider, (ii) a Bill of Sale substantially in the form attached hereto as Exhibit G (the "**Bill of Sale**"), the Security Agreement, the License and the Claims Participation Agreement, in each case duly executed by each Seller, (iii) a counterpart signature page to Buyer's Operating Agreement duly executed by each Seller, and (iv) such other instruments of transfer that Buyer may deem to be necessary or advisable to transfer ownership of any of the Acquired Assets to Buyer.

(c)     Buyer's Deliveries.  At the Closing, Buyer will deliver to the Sellers (i) the Cash Payment and (ii) the Seller Note, the Security Agreement, the Claims Participation Agreement and the Liquidbits Vendee Claim Waiver, in each case duly executed by Buyer, and Buyer shall issue and deliver to the Sellers the Preferred Equity.

## 4.     REPRESENTATIONS AND WARRANTIES OF THE SELLERS

4

A/76197451.5

The Sellers, jointly and severally, hereby represent and warrant to, and covenant with, Buyer, as of the date hereof, and as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 4), as follows:

(a) Organization, Standing, Power, and Qualification; Authorization. HashFast is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of California. The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Seller has the power and authority to own, lease, and operate its properties (including the Acquired Assets) and to carry on its business as it is now being conducted. Each Seller has taken, or prior to the Closing will have taken, all action required by the applicable bankruptcy law to authorize the transactions contemplated herein (and no other law is applicable to the Seller's ability to consummate the transactions).

(b) Enforceability; No Conflict. Subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid, and binding agreement of each Seller, enforceable in accordance with its terms. Other than Bankruptcy Court approval, there is no consent or approval required in order for each Seller to consummate the transactions contemplated hereby in compliance with all contracts, agreements, instruments, regulations, laws or orders of any court, administrative agency or federal, state, or local authority to which the Seller is a party, by which it is bound or to which it or its assets may be subject.

(c) Business Information. In connection with the transactions contemplated by this Agreement, the Sellers have made available to Buyer all books, records, correspondence, customer lists, and technical and financial information reasonably requested by Buyer related to the Acquired Assets.

(d) Asset Descriptions. Set forth on Schedule 4(d) is a complete list and description of (i) all real property leased or otherwise used in or associated with the Business; (ii) each vehicle owned or leased by either Seller and used in or held for use in the Business; (iii) each material contract or agreement related to the operation of the Business (whether written or oral) and all amounts required to be paid or actions required to be taken to cure all outstanding defaults or other matters which, with the passage of time, would constitute a default thereunder (including all licenses of intellectual property granted to or by either Seller and all assignments of intellectual property to or by either Seller); (iv) each material piece of equipment used or held for use in the operation of the Business; (v) all material intellectual property used or held for use in the Business; and (vi) all other material assets of the Sellers used or held for use in the Business. Neither Seller owns any real property used in the Business. Each of the contracts listed on Schedule 4(d) is in full force and effect and is enforceable in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles, regardless of whether enforceability is considered in a proceeding at law or in equity; and except as set forth on Schedule 4(d), each Seller and each of the other parties to such contracts have performed in all material respects all the obligations required to be performed under such contracts and no facts exist which, upon notice or with the passage of time, would cause a Seller or any other party thereto to be in default thereunder. The Sellers

5

A/76197451.5

have delivered to Buyer true, correct and complete copies of all of the contracts set forth on Schedule 4(d).

    (e)    <u>Intellectual Property</u>.

    (i)    The Sellers own, or have valid rights to use, all of the intellectual property used in or necessary for the conduct of the Business as currently conducted as currently used or held for use by it in connection with the Business, including the Sellers' design, development, reproduction, manufacture, branding, marketing, use, distribution, import, licensing, provision and sale of the Products and any other proprietary product currently being marketed, sold, licensed or developed by either Seller (the "**Proprietary Products**").

    (ii)    The conduct of the Business as currently conducted, including the design, development, reproduction, manufacture, branding, marketing, use, distribution, import, licensing, provision and sale of Proprietary Products, does not infringe upon or misappropriate any intellectual property or other proprietary right owned by any third party, violate any right of any person (including any right to privacy or publicity), or constitute unfair competition or trade practices under any applicable laws.

    (iii)    To the Sellers' knowledge, except as disclosed to Buyer by the Sellers, no third party is misappropriating, infringing, diluting or violating any intellectual property owned by either Seller. No intellectual property or other proprietary right misappropriation, infringement dilution or violation actions have been brought against any third party by either Seller.

    (iv)    Neither Seller has received written notice of any pending or threatened (and at no time within the three years prior to the date of this Agreement has there been pending any) action, claim or proceeding alleging that the activities or the conduct of the Business dilutes, misappropriates, infringes, violates or constitutes the unauthorized use of, or will dilute, misappropriate, infringe upon, violate or constitute the unauthorized use of the intellectual property of any third party (nor does there exist any basis therefor). Neither Seller is a party to any settlement, covenant not to sue, consent, decree, stipulation, judgment, or order resulting from any action, claim or proceeding which (i) restricts such Seller's rights to use any intellectual property, (ii) restricts the Seller's business in order to accommodate a third party's intellectual property or (iii) requires any future payment by the Seller for the use of any intellectual property.

    (v)    None of the Sellers' current or former employees (including any such employees who have designed, written, tested or worked on any software code contained in any Proprietary Product or otherwise materially contributed to the development of any Proprietary Product), or the consultants and independent contractors currently or previously engaged by either Seller who have written, tested or worked on any software code contained in any Proprietary Product or otherwise materially contributed to the development of any Proprietary Product, have any claim or ownership interest in the Proprietary Products or any of either Seller's intellectual property. To the Sellers' knowledge, other than under an appropriate confidentiality or nondisclosure agreement or contractual provision relating to confidentiality and nondisclosure, there has been no disclosure to any third party of material confidential

A/76197451.5

information or trade secrets of either Seller related to any Proprietary Product.

(vi)     Neither Seller has granted nor is it obligated to grant access or a license to any of its source code to any Proprietary Product (including in any such case any conditional right to access or under which the Seller has established any escrow arrangement for the storage and conditional release of any of its source code). The source code for all Proprietary Products that include software has been documented in a professional manner that is both: (i) consistent with customary code annotation conventions and good programming practices in the software industry; and (ii) reasonably sufficient to independently enable a programmer of reasonable skill, competence and experience with the programming language in which the software is programmed to understand, analyze, and interpret program logic, correct errors and improve, enhance, modify and support the Proprietary Products.

(vii)     Neither Seller has any obligation to pay any third party any future royalties or other fees for the continued use of intellectual property and will not have any obligation to pay such royalties or other fees arising from the consummation of the transactions contemplated by this Agreement.

(f)     Employees.  Schedule 4(f) sets forth an accurate, correct and complete list of all current employees of each Seller and each such employee's title, current salary and any other relevant compensation and benefits, it being understood that any salary and compensation information on Schedule 4(f) will be redacted from the view of persons other than the Parties.

(g)     Title to Assets; Sufficiency of Assets.

(i)     The Sellers have, and at the Closing the Sellers will deliver to the Buyer good and valid title to or, in the case of leased or licensed Acquired Assets, a valid and binding leasehold interest in or license to or rights under (as the case may be), all of the Acquired Assets, free and clear of all liens, claims, interests, encumbrances and security interests.

(ii)     The Acquired Assets include all tangible assets and, pursuant to the License, intellectual property that are necessary for the conduct of the Business immediately following the Closing.

(iii)     None of the Excluded Assets are necessary for the conduct of the Business.

**5.     REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to, and covenants with, the Sellers, as of the date hereof, and as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 5), as follows:

(a)     Organization, Standing, Power, and Qualification; Authorization.  Buyer is a limited liability company duly organized and validly existing under the laws of the State of Delaware. Buyer has taken all action required by the laws of the State of Delaware or any other applicable law to authorize the transactions contemplated herein.

7

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 10 of 119

(b)    No Conflict.  Subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid, and binding agreement of Buyer, enforceable against it in accordance with its terms, and the consummation of the transactions contemplated hereby will not conflict with or result in a breach of any provision of, or constitute a default under, any contract, agreement, instrument, regulation, law or order of any court, administrative agency or federal, state, or local authority to which Buyer is a party, by which it is bound or to which it or its assets may be subject for which Buyer has not obtained a waiver or the consent of the affected party.  The execution, delivery, and performance of this Agreement by Buyer will not (i) conflict with or result in a breach or violation of any term or provision of Buyer's Certificate of Formation or Buyer's Operating Agreement, nor shall its execution, delivery or performance conflict with or result in a breach of any of the terms, conditions or any provision of, or constitute a default (or give rise to any right of termination or acceleration) under, any mortgage, contract, agreement or other instrument to which Buyer is a party or by which it or its properties are or may be bound or affected, or (ii) subject to Bankruptcy Court approval, violate any order, writ, injunction, decree, statute, rule or regulation applicable to Buyer or Buyer's properties or assets.

6.    **COVENANTS**

(a)    Bankruptcy Court Approval. The Sellers shall use reasonable efforts to obtain Bankruptcy Court approval and entry by the Bankruptcy Court of the sale order in the form attached to the Sale Motion or in such other form as Buyer may approve (the **"Sale Order"**).

(b)    Books and Records.  After the Closing, Buyer shall allow the Sellers and any of their respective then current directors, officers, employees, counsel, accountants, and auditors (collectively, the **"Sellers' Representatives"**) reasonable access to all business records and files of the Sellers or the Business included in the Acquired Assets and transferred to Buyer in connection herewith which are reasonably required by the Sellers or any of the Sellers' Representatives in order to complete the Cases or for tax or other valid business purposes during regular business hours and upon reasonable notice to Buyer; provided, however, that any such access shall be had in such a manner so as not to unreasonably interfere with the normal conduct of Buyer's business or operations.  The Sellers and the Sellers' Representatives shall have the right to make copies of any such records and files; provided, however, that any such copying shall be at the Sellers' expense and shall be done in such a manner so as not to unreasonably interfere with the normal conduct of Buyer's business or operations..

(c)    Supply Chain Service Providers.  The Sellers shall seek to obtain settlements with the Supply Chain Service Providers and shall include Liquidbits or Buyer as a participant in the settlement negotiations.

(d)    Employees.  Buyer will offer employment or consulting arrangements to certain employees of HashFast (the **"Designated Personnel"**).  Compensation for the consulting services will be paid to HashFast with respect to Designated Personnel still employed by HashFast.

(e)    Creditor Participation.  Until the expiration of 30 days following the Closing Date, creditors of either of the Sellers will be entitled to purchase Class B Units and notes of Buyer for cash upon the terms of the Unit and Note Purchase Agreement attached hereto as

A/76197451.5

Exhibit H, subject to the eligibility requirements set forth therein.

(f) <u>Downside Protection</u>. If Buyer determines that the cost of its operations, including the cost of bitcoin mining, becomes non-economical and there are no further payments being made on the Seller Note or in the redemption of the Preferred Equity, then, at the election of the holder of the Seller Note and the Preferred Equity, Buyer will, to the extent permitted by law, surrender or otherwise transfer to the holder the built out systems and equipment of Buyer in satisfaction of the Seller Note and in full redemption of the Preferred Equity.

## 7. CONDITIONS TO BUYER'S OBLIGATION

The obligation of Buyer to consummate the transactions and to take the other actions required to be performed by it in connection with the Closing is subject to the satisfaction of all of the following conditions (all or any of which may be waived, in whole or in part, by Buyer in its sole discretion):

(a) <u>Sale Order</u>. The Sale Order shall have been entered by the Bankruptcy Court, shall not be subject to stay, modification, or appeal, shall have become a final order, and shall provide for the transfer of the Acquired Assets to Buyer, free and clear of all liens, claims, interests, encumbrances and security interests and the release of Liquidbits and its affiliates of any claims, including Excluded Claims, by either Seller other than claims arising from the transactions contemplated by this Agreement.

(b) <u>Sellers' Deliveries</u>. Each Seller shall have tendered delivery as provided in Section 3(b).

(c) <u>Representations, Warranties and Covenants</u>. The Sellers' representations and warranties contained in this Agreement shall be true and correct as of the Closing Date as though such representations and warranties were made at such time. The Sellers shall have performed or complied with all obligations and covenants required by this Agreement to be performed or complied with by them on or before the Closing Date.

(d) <u>No Legal Bar, Etc</u>. There shall be no injunction or order of any court or governmental authority of competent jurisdiction prohibiting the transactions contemplated by this Agreement. There shall be no bar to assignment to Buyer of any executory contract elected to be a Transferred Contract and determined by Buyer to be material to the transactions contemplated by this Agreement.

(e) <u>No Material Adverse Change</u>. There shall have been no material adverse change in the assets or properties of either of the Sellers or the Business (including the Acquired Assets) or any damage, destruction or loss of property, whether covered by insurance or not, which alone or in the aggregate would have a material adverse effect on the value or prospects to Buyer of the transactions contemplated by this Agreement.

(f) <u>Other Matters</u>. The Acquired Assets shall include not less than 27,000 working chips and, based on the then current yield fallout percentage, the equivalent of total working chips' worth of wafers. The Sellers shall have entered into settlements satisfactory to Buyer on

9

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 12 of 119

the claims of the Supply Chain Service Providers to certain inventory of the Sellers and any cure costs relating to any Transferred Contract with a Supply Chain Service Provider, and the amount of the Cash Payment shall have been otherwise determined to the satisfaction of Buyer. Buyer shall have entered into arrangements with the Designated Personnel satisfactory to Buyer.

## 8. CONDITIONS TO THE SELLERS' OBLIGATIONS

The obligation of the Sellers to consummate the transactions and to take the other actions required to be performed by them in connection with the Closing is subject to satisfaction of all of the following conditions (all or any of which may be waived, in whole or in part, by Sellers in their sole discretion):

(a) <u>Sale Order</u>. The Sale Order shall have been entered by the Bankruptcy Court.

(b) <u>Buyer's Deliveries</u>. Buyer shall have tendered delivery as provided in <u>Section 3(c)</u>.

(c) <u>Representations, Warranties and Covenants</u>. Buyer's representations and warranties contained in this Agreement shall be true and correct as of the Closing Date as though such representations and warranties were made at such time. Buyer shall have performed or complied with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or before the Closing Date.

(d) <u>No Legal Bar</u>. There shall be no injunction or order of any court or governmental authority of competent jurisdiction prohibiting the transactions contemplated by this Agreement.

## 9. SURVIVAL OF REPRESENTATIONS AND WARRANTIES

The representations and warranties of the Parties in this Agreement shall survive the Closing until December 1, 2014. If the Closing has occurred, no Party will be liable for any claim for a breach of a representation or warranty made after December 1, 2014, whether such liability accrued prior to or after the Closing. If a claim for a breach of a representation or warranty is made, the breach must be in a material respect. The liability of the Sellers, on the one hand, and Buyer, on the other, for timely made claims under this section may not exceed the aggregate sum of $250,000. This section does not preclude any Party from raising any defense to a claim made under this section.

## 10. TERMINATION

(a) <u>Termination</u>. At any time before the consummation and completion of the Closing, this Agreement (i) may be terminated by mutual written agreement of the Parties; (ii) unless otherwise agreed to in writing by Buyer and the Sellers, will terminate automatically if the Bankruptcy Court approves a bid or bids for the Acquired Assets by a purchaser other than Buyer; (iii) may be terminated by Buyer in the event of any material breach by either Seller of any of the Seller's agreements, representations or warranties contained herein; (iv) may be terminated by the Sellers in the event of any material breach by Buyer of any of its agreements, representations or warranties contained herein; and (v) may be terminated by Buyer if the Closing has not occurred by August 1, 2014, and a later date for the Closing has not been

10

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 13 of 119

mutually agreed by the Parties.

(b) _Effect of Termination_. If this Agreement is terminated pursuant to Section 10(a), all obligations of the Parties shall terminate without liability of any Party to the other Parties, except for any claim for breach of any provision of this Agreement that gave rise to the right of termination.

## 11.  MISCELLANEOUS PROVISIONS

(a) _No Third-Party Beneficiaries_. This Agreement shall not confer any rights or remedies upon any person or entity other than the Parties and Liquidbits and their respective successors and permitted assigns.

(b) _Entire Agreement_. This Agreement and all other documents referred to herein constitute the entire agreement among the Parties and supersede the Term Sheet and any other prior understandings, agreements, or representations by or among any of the Parties, written or oral, to the extent they have related in any way to the subject matter hereof.

(c) _Succession and Assignment_. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties.

(d) _Counterparts; Facsimile Signatures_. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, will constitute one and the same instrument. For purposes of this Agreement, any signature page delivered by facsimile or other electronic transmission shall be binding to the same extent as an original signature page.

(e) _Notices_.  All notices, demands, requests, consents, approvals or other communications required or permitted to be given with respect to this Agreement shall be in writing and shall be delivered (charges prepaid, receipt confirmed or return receipt requested (if available)) by hand, by nationally recognized air courier service or by facsimile, addressed as set forth below or to such other address or facsimile number as such person or entity shall have specified most recently by written notice in accordance herewith. Notice shall be deemed given and effective (i) if delivered by hand or by nationally recognized air courier service, when delivered at the address specified in this subsection (or in accordance with the latest unrevoked written direction from such person or entity) or (ii) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this subsection (or in accordance with the latest unrevoked written direction from such person or entity); provided, that appropriate confirmation is received and that any such facsimile is promptly followed by delivery of written notice by hand or by nationally recognized air courier service.

If to either Seller:

HashFast Technologies LLC
100 Bush Street, Suite 650
San Francisco, CA 94104

11

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 14 of 119

Attn: Monica Hushen
Tel: (415) 429-4512
Fax: _____

With copies (which shall not constitute notice) to:

Katten Muchin Rosenman LLP
525 W. Monroe Street, Suite 1900
Chicago, IL 60661
Attn: Peter A. Siddiqui
Tel: (312) 902-5200
Fax: (312) 902-1061


If to Buyer:

_____
_____
_____
Attn: _____
Tel: _____
Fax: _____

With copies (which shall not constitute notice) to:

Bingham McCutchen LLP
One Federal Street
Boston, MA 02110
Attn: Michael K. Barron and Edwin E. Smith
Tel: (617) 951-8850
Fax: (617) 951-8736

(f)     Governing Law.   This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than State of California.

(g)     Jurisdiction.   The Bankruptcy Court shall have exclusive jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement. Each Party (i) irrevocably submits to the jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party, and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement; provided, however, that, to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then the federal and state courts sitting in the State of California in which venue is properly laid will have such

12

jurisdiction, and each Party submits thereto and waives the objections described above with respect thereto.

(h)     Amendments and Waivers.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.  No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

(i)     Severability.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(j)     Expenses.  Except as provided in Section 2(a), each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

(k)     Further Assurances.  Each Party will cooperate with the other and execute and deliver to the other Party such other instruments and documents and take such other actions as may be reasonably requested from time to time by the other Party as necessary to carry out, evidence, and confirm the intended purposes of this Agreement.

(l)     Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including, without limitation."

(m)     Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**[Signature page follows.]**

A/76197451.5

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

**"SELLERS":**

**HASHFAST LLC**

By: _____
    Name:
    Title:


**HASHFAST TECHNOLOGIES LLC**


By: _____
    Name:
    Title:


**"BUYER":**

**[NEWCO] LLC**

By: _____
    Name:
    Title:

A/76197451.1

# EXHIBIT A

## NON-EXCLUSIVE INTELLECTUAL PROPERTY LICENSE AGREEMENT

**THIS NON-EXCLUSIVE INTELLECTUAL PROPERTY AGREEMENT** (this "**Agreement**"), dated as of ____, 2014, among HashFast Technologies LLC, a California limited liability company ("**HashFast CA**") and debtor in possession in a Chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "**Bankruptcy Court**"), HashFast LLC, a Delaware limited liability company ("**HashFast DE**" and together with HashFast CA, the "**Licensors**") and debtor in possession in a Chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court, and [NewCo], a Delaware limited liability company ("**Licensee**") (individually, a "**Party**" and collectively, the "**Parties**").

**WHEREAS**, pursuant to an Asset Purchase Agreement dated as of [July []], 2014 (as amended and in effect from time to time, the "**Asset Purchase Agreement**"), among the Parties, and as approved by the Sale Order (as defined therein), Licensee is purchasing certain assets from the Licensors including a perpetual, royalty-free, non-exclusive, world-wide, transferable license of each Licensor's intellectual property (as more fully described in Section 2.1(a), the "**License**") used in connection with designing, developing, manufacturing and selling certain computer chips and equipment, including Application Specific Integrated Circuit, semiconductors, for the purpose of auditing transaction data for the bitcoin networks, also known as "bitcoin mining" (collectively, the "**Product**"); and

**WHEREAS**, Licensee desires to obtain the License in accordance with the terms of this Agreement, and the Licensors desire to grant the License in accordance with the terms of this Agreement;

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties do hereby covenant and agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1. " Documentation" means any manuals, technical materials, functional documentation, design documents, and other documentation that are made available by either Licensor pertaining to the Intellectual Property.

Section 1.2. "Improvements" means, individually and collectively, all discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data and all proprietary rights therein or associated therewith (whether or not protectable under patent, copyright, trade secrecy or similar laws) relating to additions, enhancements, updates, alterations, modifications, derivative works or other changes to the Intellectual Property created by Licensee or any of its affiliates.

Section 1.3. "Intellectual Property" means, as of the date hereof, all the following whether arising under the laws of the United States or of any other jurisdiction in respect of the

A/76249266.4

Product: (i) patents, patent applications (including patents issued thereon) and statutory invention registrations, including reissues, divisions, continuations, continuations in part, extensions and reexaminations thereof, and all rights therein provided by international treaties or conventions; (ii) published and unpublished works of authorship of any type, including, but not limited to, copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, in each case, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions; (iii) trade secrets; and (iv) all other intellectual property rights arising from, in respect of or necessary for the production or use of the Product, whether directly owned or licensed to either of the Licensors.

Section 1.4.    "Person" means any natural person, corporation, firm, business trust, joint venture, association, organization, company, partnership or other business entity, or any government or agency or political subdivision thereof.

## ARTICLE 2.
## LICENSE GRANT

Section 2.1.    License.

(a)        Each Licensor hereby grants to Licensee a perpetual, royalty-free, non-exclusive, world-wide, transferable license under the Intellectual Property (i) to allow employees, managers, directors, officers, suppliers, contractors and consultants of Licensee to use and practice the Intellectual Property and Documentation; (ii) to make, have made, use, sell, offer to sell, have sold, import, and otherwise provide, commercialize and legally dispose of products and services; and (iii) to use, practice, copy, perform, display, render, develop, create derivative works from and otherwise make use of the Intellectual Property and Documentation. If any Intellectual Property is licensed to the Licensor as a licensee, the license granted hereunder, to the extent permitted by applicable law, with respect to such Intellectual Property is a perpetual, royalty-free, non-exclusive, world-wide, transferable sublicense of such Intellectual Property, and the term "License", as used in this Agreement, includes such sublicense.

(b)        The License is transferable in whole or in part.  Licensee may grant sublicenses in the License.  Any sale, license or other disposition by either Licensor of the Intellectual Property or Documentation will be subject to the terms of the License and this Agreement.

Section 2.2.    Licensee Intellectual Property Rights. Any Improvements will remain the property of Licensee and its affiliates.  This Agreement does not grant to either Licensor any license or other rights, express or implied in such Improvements of Licensee or any intellectual property rights therein.

Section 2.3.    Bankruptcy. All rights and licenses granted under this Agreement are, for purposes of Section 365(n) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), licenses of rights to "intellectual property" as defined under Section 101(35A) of the Bankruptcy Code.

Section 2.4.    Delivery. Promptly after the date hereof, Licensor will deliver to Licensee the physical or digital manifestation of the Intellectual Property along with any Documentation relating thereto.

2

A/76249266.4

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES

Section 3.1. <u>Licensors' Representations</u>. Each Licensor hereby represents and warrants to Licensee that: (a) the Licensor has the right to enter into the Agreement, (b) the Intellectual Property or use thereof does not infringe, misappropriate or otherwise violate in any respect upon the intellectual property rights or any other rights of any Person, and (c) no claim is pending or threatened to the effect that any Intellectual Property or the use thereof infringes, misappropriates or otherwise violates the intellectual property rights or any other rights of any Person.

## ARTICLE 4.
## DISCLAIMER AND LIABILITY

Section 4.1. <u>Disclaimer</u>. EXCEPT AS SET FORTH IN SECTION 3.1, THE INTELLECTUAL PROPERTY IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND. LICENSOR MAKES NO WARRANTIES, AND HEREBY DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, CONCERNING THE INTELLECTUAL PROPERTY. EACH LICENSOR SPECIFICALLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, AND ANY WARRANTIES ARISING FROM COURSE OF DEALING, USAGE OR TRADE PRACTICE OR THAT THE SERVICES WILL BE PERFORMED IN A PROFESSIONAL OR WORKMANLIKE MANNER.

Section 4.2. <u>Limitation of Liability</u>. IN NO EVENT SHALL EITHER LICENSOR HAVE ANY LIABILITY OR RESPONSIBILITY FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, OR FOR LOST DATA OR LOST PROFITS, IN EACH CASE REGARDLESS OF THE FORM OF ACTION (WHETHER IN CONTRACT OR IN TORT OR OTHERWISE) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY, THE LICENSE, THE INTELLECTUAL PROPERTY OR THE USE THEREOF.

## ARTICLE 5.
## TERM

Section 5.1. <u>Term</u>. The term of this Agreement and of the License will continue in perpetuity.

Section 5.2. <u>Quiet Use</u>. Neither Licensor may seek to cancel or otherwise limit or terminate the License. Either Licensor's sole and exclusive remedy for any breach of this Agreement by Licensee is limited to money damages. Each Licensor hereby waives its right to seek injunctive relief against Licensee in connection with any such breach that has the effect of interrupting Licensee's access to or use of the Intellectual Property.

3

A/76249266.4

## ARTICLE 6.
## GENERAL PROVISIONS

Section 6.1. <u>Independent Contractors</u>. Each Party to this Agreement shall be and remain an independent contractor, nothing herein shall be deemed to constitute the Parties as partners, and neither the Licensors nor Licensee shall have any authority to act, or attempt to act, or represent itself, directly or by implication, as an agent of the other or in any manner assume or create, or attempt to assume or create, any liability or obligation on behalf of, or in the name of the other, nor shall either be deemed the agent or employee of the other.

Section 6.2. <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between the Parties on the subject matter of this Agreement and supersedes all previous understandings, commitments or agreements, oral or written, pertaining to the subject matter of this Agreement. This Agreement may not be modified or waived, in whole or in part, except by an express writing signed by authorized representatives of the Parties.

Section 6.3. <u>Severability</u>. In the event that any provision of this Agreement shall, in whole or in part, be determined to be invalid, unenforceable or void for any reason, such determination shall affect only the portion of such provision determined to be invalid, unenforceable or void, and shall not affect in any way the remainder of such provision or any other provision of this Agreement. The Parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision of this Agreement so held invalid, unenforceable or illegal with a valid provision that is as similar as possible in substance to the invalid, unenforceable or illegal provision.

Section 6.4. <u>Waiver</u>. The waiver by either the Licensors or Licensee of a breach or a default of any provision of this Agreement by the other shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of either party to exercise or avail itself of any right, power or privilege that it has, or may have hereunder, operate as a waiver of any right, power or privilege by such Party.

Section 6.5. <u>Applicable Law; Jurisdiction and Venue; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than State of California. The Bankruptcy Court shall have exclusive jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement. Each Party (i) irrevocably submits to the jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party, and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement; provided, however, that, to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then the federal and state courts sitting in the State of California in which venue is properly laid will have such jurisdiction, and each Party submits thereto and waives the objections described above with respect thereto. Each Party irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement.

4

A/76249266.4

Section 6.6.    Section Headings.  The section headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of such section or in any way affect this Agreement.

Section 6.7.    Assignment.    This Agreement shall be binding upon and inure to the benefit of the Parties' successors and assigns.

Section 6.8.    Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be considered an original, and all of which together shall constitute one and the same Agreement.

Section 6.9.    Construction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any of the provisions of this Agreement.  Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean "including, without limitation."

*[signature page follows]*

A/76249266.4

5

**IN WITNESS WHEREOF**, the Parties hereto have duly executed this Agreement as of the date set forth above.

**"LICENSORS":**

**HASHFAST LLC**

By: _____
    Name:
    Title:

**HASHFAST TECHNOLOGIES LLC**

By: _____
    Name:
    Title:

**"LICENSEE":**

**[NEWCO] LLC**

By: _____
    Name:
    Title:

A/76249266.4

# EXHIBIT B

## CLAIMS PARTICIPATION AGREEMENT

This **CLAIMS PARTICIPATION AGREEMENT** (this "**Agreement**") is made as of the ___ day of _____, 2014, among (i) HASHFAST TECHNOLOGIES LLC, a California limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the Northern District of California, San Francisco Division ("**HashFast**"), (ii) HASHFAST LLC, a Delaware limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court (together with HashFast, the "**Claimants**"), and (iii) [NEWCO] LLC, a Delaware limited liability company ("**Participant**"). The Claimants and Participant are sometimes referred to herein each individually as a "**Party**" and collectively as the "**Parties**.").

**WHEREAS**, pursuant to an Asset Purchase Agreement dated as of July __, 2014 (as amended and in effect from time to time, the "**Asset Purchase Agreement**"), among the Parties, and as approved by the Sale Order (as defined therein), Participant is purchasing certain assets of each of the Claimants including a participating interest equal to 33% (the "**Participation Percentage**") of any recoveries, net of expenses thereon ("**Net Recoveries**"), on claims of either Claimant against any person arising under section 547, 548, 549, or 550 of the Bankruptcy Code or any other claims against an insider of the Claimant (each a "**Specified Claim**"); and

**WHEREAS**, as contemplated by the Asset Purchase Agreement, the Parties are entering into this Agreement to evidence Participant's interest in any Net Recoveries and the terms thereof;

**NOW, THEREFORE**, for and in consideration of the foregoing and their mutual covenants and agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.     **Participation**. Participant has a participation, determined with reference to its Participation Percentage, in any Net Recoveries, including with respect to any payments or other property actually received by either Claimant on any Specified Claim. The participation is a property interest in each Net Recovery and not merely a contractual right to receive the amount of the Net Recovery from the Claimant.

2.     **Payments**. After either Claimant has actually received a Net Recovery, the Claimant will promptly pay to Participant the Participation Percentage of the Net Recovery. If the Net Recovery is in cash, the Claimant will pay to Participant the

Participation Percentage of the amount in cash in immediately available funds to such deposit account as Participant may designate. If the Net Recovery is in other property, the Claimant will distribute to Participant the Participation Percentage of the other property unless other arrangements are agreed to between the Claimant and Participant.

**3.** **Information and Consultation Rights**. Each Claimant will from time to time, at the request of Participant, provide to Participant a summary of the investigation, discovery and brief particulars of each Specified Claim, whether the Specified Claim is to be pursued or abandoned, the status of any pursuit of the Specified Claim, the expenses (incurred or projected) in pursuing the Specified Claim and, if applicable, the amount of gross and net recovery on the Specified Claim. Each Claimant will from time to time consult with Participant on all material strategies and developments relating to the investigation, existence, pursuit or abandonment of any Specified Claim.

**4.** **Expenses; Abandoned Claims**. Participant will not be responsible for any expenses incurred by either Claimant pursuing any Specified Claim. However, if the pursuit of a Specified Claim is to be abandoned by the Claimant, the Claimant will, at the request of Participant, assign to Participant, without recourse or further consideration, the Specified Claim pursuant to an instrument of assignment reasonably acceptable to Participant. Thereafter, the Claimant will have no interest in the Specified Claim, and any recovery on the Specified Claim, and any expenses relating to the pursuit of the Specified Claim, will be entirely for the account of Participant. The Claimant will, at Participant's expense, provide to Participant such information and assistance as Participant may reasonably request for Participant to pursue the Specified Claim.

**5.** **Settlements**.

(a) Subject to Sections 5(b), neither Claimant will settle any Specified Claim without the consent of Participant.

(b) If the Claimant is not able to obtain Participant's consent to the settlement of the Specified Claim, this Agreement does not prohibit Claimant from obtaining the approval of the Bankruptcy Court for the settlement or Partiicpant from objecting to the approval. If the approval is obtained by final order of the Bankruptcy Court, Participant will be bound by the settlement as approved.

**6.** **Successors and Assigns**. This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Parties. However, so long as the assignee is bound by the terms of this Agreement as if it were the Claimant, either Claimant may, without the consent of Participant, assign (a) the right to pursue a Specified Claim to the creditors' committee in its chapter 11 case and (b) a Specified Claim to the trustee of a liquidation or litigation trust for the benefit of creditors of the Claimant or its estate. If a Claimant's chapter 11 case is converted to a chapter 7 case, this Agreement will be binding upon any trustee appointed in the chapter 7 case.

-2-

A/76249336.3

7.     **Setoff**.  Participant waives any right that it may have to recoup or setoff any amount owed to Participant under the Seller Note or the Preferred Equity (as such terms are defined in the Asset Purchase Agreement) against any amount owed to Purchaser on the participation granted hereby if, at the time that the respective amounts are owed, the holder of the Seller Note and the Preferred Equity is not the obligor on the participation granted hereby.

8.     **Governing Law**.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than State of California.

8.     **Jurisdiction**.  The Bankruptcy Court shall have exclusive jurisdiction over any dispute, claim or controversy arising out of or related to this Agreement.  Each Party (i) irrevocably submits to the jurisdiction of the Bankruptcy Court, (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court, (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party, and (iv) agrees that service of process upon such Party in any such action or proceeding shall be effective if given in accordance with the notice provisions of this Agreement; provided, however, that, to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction with respect to the matter in question, then the federal and state courts sitting in the State of California in which venue is properly laid will have such jurisdiction, and each Party submits thereto and waives the objections described above with respect thereto.

[Signature page follows]

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 28 of 119

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

**"CLAIMANTS":**

**HASHFAST LLC**

By: _____
    Name:
    Title:


**HASHFAST TECHNOLOGIES LLC**

By: _____
    Name:
    Title:


**"PARTICIPANT":**

**[NEWCO] LLC**

By: _____
    Name:
    Title:

# EXHIBIT C

EXHIBIT C

## SECURED PROMISSORY NOTE

### July __, 2014

FOR VALUE RECEIVED, [NewCo], a Delaware limited liability company (the "**Company**"), promises to pay to the estates of HashFast Technologies LLC, a California limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "**Bankruptcy Court**"), and HashFast LLC, a Delaware limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court (collectively, the "**Holder**"), on or before [two years from the closing date] (the "**Maturity Date**") the principal amount of $3,000,000, together with interest thereon as provided in this Secured Promissory Note (this "**Note**"). This Note is secured by a security interest granted by the Company to the Holder in all substantially all of the assets of the Company pursuant to a security agreement (the "**Security Agreement**") dated the date hereof. Reference is made to the Security Agreement for a description of the collateral securing this Note and the rights of the Holder in respect of such collateral.

The principal amount from time to time outstanding under this Note will bear simple interest at the annual rate of 8% per annum based on a 365-day year. Commencing on the date (the "**Payment Commencement Date**") which is the earlier to occur of December 1, 2014, or the first business day in the calendar month following fourteen (14) calendar days from the completion of the build out of all systems using the chips and wafers acquired by the Company from the Holder, and on the first business day of each calendar month thereafter, the Company will pay to the Holder for application to unpaid interest accrued on, and then to the principal amount of, this Note, an amount equal to 17% of the gross revenues from operations of the Company actually received by it during the prior calendar month. If systems are built out and deployed in mining activity by the Company prior to the Payment Commencement Date, the Company will also pay to the Holder on the Payment Commencement Date an amount equal to 17% of the gross revenues from operations of the Company actually received by the Company prior to the Payment Commencement Date, less remaining build out costs. The Company will pay to the Holder on the Maturity Date the amount of an unpaid interest accrued on and principal of this Note outstanding on the Maturity Date.

Although amounts owing under this Note are denominated in U.S. dollars, all payments under this Note will be made in bitcoins, unless otherwise agreed in writing by the Company and the Holder. Each payment in bitcoins will be credited against amounts owing under this Note in U.S. dollars based on the customary price using recognized pricing sources for the sale of bitcoins in exchange for U.S. dollars on the date of payment.

The unpaid principal of and any unpaid accrued interest on this Note will be due and payable on the Maturity Date. If before the Maturity Date the Company fails (a) pay any amount due and payable under this Note within 5 days following the Holder's written demand on the Company for payment or (b) perform when due any other obligation under the Note or the Security Agreement within 15 days following the Holder's written demand on the Company for performance, the Holder will be entitled, by written notice to the Company, to declare the unpaid principal of and all accrued and unpaid interest on this Note to be immediately due and payable.

This Note is transferable to a liquidating trust for the benefit of holders of allowed general unsecured claims against the Holder. This Note is not otherwise transferable.

This Note is governed by the law of the State of California.

IN WITNESS WHEREOF, the Company has executed this Note as of the date first above written.

[Newco]

By_____

Name:
Title:

2

# EXHIBIT D

## SECURITY AGREEMENT

SECURITY AGREEMENT dated as of July [  ], 2014 (this "Agreement"), between (i) [NewCo, LLC], a Delaware limited liability company (the "Debtor"), and (ii) HashFast Technologies LLC, a California limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "Bankruptcy Court"), and HashFast LLC, a Delaware limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court (hereinafter, collectively, the "Secured Party").

WHEREAS, pursuant to an Asset Purchase Agreement dated as of [July [], 2014 (as amended and in effect from time to time, the "Asset Purchase Agreement"), between the Debtor and the Secured Party, following approval by the Bankruptcy Court, the Secured Party has sold certain assets to the Debtor; and

WHEREAS, as contemplated by the Asset Purchase Agreement, a portion of the purchase price for the assets has been paid by the Debtor issuing to the Secured Party a promissory note dated as of [July [], 2014 (the "Seller Note"), in the principal amount of $3 million; and

WHEREAS, as also contemplated by the Asset Purchase Agreement, the Debtor wishes to grant a security interest in favor of the Secured Party, as herein provided, to secure the payment of the Seller Note;

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Definitions.**  All terms defined in the Uniform Commercial Code of the State of California and used herein shall have the same definitions herein as specified therein.  However, if a term is defined in Article 9 of the Uniform Commercial Code of the State of California differently than in another Article of the Uniform Commercial Code of the State of California, the term has the meaning specified in Article 9.  The term "Obligations", as used herein, means all of the Debtor's obligations under the Seller Note and this Agreement.  The term "Event of Default", as used herein, means the failure of the Debtor (a) to pay any amount when due under the Seller Note at maturity or, if prior to maturity, on or before 5 days following the Secured Party's written demand on the Debtor for payment or (b) to pay or perform when due any other obligation under the Seller Note or this Agreement on or before 15 days following the Secured Party's written demand on the Debtor for payment or performance.

2. **Grant of Security Interest.**  The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of the Obligations, a continuing security interest in and pledges and assigns to the Secured Party, the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral") subject to §3: all personal and fixture property of every kind and nature of the Debtor including all goods (including inventory, equipment and any accessions and attachments thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts (including health-care-insurance receivables), chattel paper (whether

A/76227245.5

tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, all general intangibles (including all payment intangibles). The Collateral includes, subject to §3, all bitcoins, all proceeds of the Debtor's mining operation, money, cash and cash equivalents, and any all accessions to, substitutions and replacements of any of the foregoing, and cash and non-cash proceeds, products, rents and profits of any of the foregoing.

**3. Exclusions.** The grant of the security interest contained in §2 shall not extend to, and the term "Collateral" shall not include, any directly held investment property, or any general intangibles, now or hereafter held or owned by the Debtor, to the extent, in each case, that (i) a security interest may not be granted by the Debtor in such directly held investment property or general intangibles as a matter of law, or under the terms of the governing document applicable thereto, without the consent of one or more applicable parties thereto and (ii) such consent has not been obtained. The grant of the security interest contained in §2 shall extend to, and the term "Collateral" shall include, (i) any and all proceeds of such directly held investment property or general intangibles to the extent the proceeds are not themselves directly held investment property or general intangibles subject to foregoing sentence and (ii) upon any such applicable party or parties' consent with respect to any otherwise excluded directly held investment property or general intangibles being obtained, thereafter such directly held investment property or general intangibles. The provisions of this section shall not apply to (i) directly held investment property or general intangibles to the extent that the restriction on the Debtor granting a security interest therein is not effective under applicable law or (ii) payment intangibles.

**4. Authorization to File Financing Statements.** The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment. The Debtor agrees to furnish any such information to the Secured Party promptly upon the Secured Party's request.

**5. Covenants.** The Debtor will (a) upon request of the Secured Party and at the Secured Party's option, take any and all other actions as the Secured Party may reasonably determine to be necessary or useful for the attachment, perfection, first priority and maintenance  of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral, (b) not change its name without providing at least 30 days prior written notice to the Secured Party, (c) not change its type of organization, jurisdiction of organization or other legal structure or liquidate, merge, transfer, acquire or consolidate with any person or entity, or dissolve, (d) except for the security interest herein granted or liens junior to the security interest of the Secured Party, be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party, (e) not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or other encumbrance in the Collateral in favor of any person, or become bound (as provided in Section 9-203(d)

of the Uniform Commercial Code of the State of California or any other relevant jurisdiction or otherwise) by a security agreement in favor of any person as secured party, other than the Secured Party, except for liens junior to the security interest of the Secured Party, (f) keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, (g) pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, and (h) not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for (i) sales and leases of inventory and licenses of general intangibles in the ordinary course of business and (ii) so long as no Event of Default has occurred and is continuing, sales or other dispositions of obsolescent items of equipment consistent with past practices.

A/76227245.5

**6. Insurance.** The Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas. Such insurance shall be in such minimum amounts that the Debtor will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party. In addition, upon request of the Secured Party, all such insurance shall be payable to the Secured Party as loss payee. The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights, if any, of other parties with an interest having priority in the property covered thereby, so long as no Event of Default has occurred and is continuing be disbursed to the Debtor for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed. All policies of insurance shall, if requested by the Secured Party, provide for at least 30 days' prior written cancellation notice to the Secured Party. In the event of failure by the Debtor to provide and maintain insurance as herein provided, the Secured Party may, at its option, provide such insurance and charge the amount thereof to the Debtor. Upon request of the Secured Party, the Debtor shall furnish the Secured Party with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

**7. Collateral Protection Expenses; Preservation of Collateral.** In the Secured Party's discretion the Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums, in each case to the extent that the Debtor fails to do so. The Debtor agrees to reimburse the Secured Party on demand for all expenditures so made. The Secured Party shall have no obligation to the Debtor to make any such expenditures, nor shall the making thereof be construed as a waiver or cure any Event of Default. Anything herein to the contrary notwithstanding, the Debtor shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times.

**8. Rights and Remedies.** If an Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Debtor, shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State of California or any other relevant jurisdiction and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Secured Party may, so far as the Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom. The Secured Party may in its discretion require the Debtor to assemble all or any part of the Collateral at such

A/76227245.5

location or locations as the Secured Party may reasonably designate. In any public disposition, the Secured Party reserves the right to credit bid.

**9. No Waiver by Secured Party, etc.** The Secured Party shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All rights and remedies of the Secured Party with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Secured Party deems expedient.

**10. Suretyship Waivers by Debtor.** The Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto. The Debtor waives the Debtor's rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the Debtor or other surety by reason of Sections 2787 to 2855 of the California Civil Code, inclusive; and any rights or defenses the Debtor or other surety may have in respect of the Debtor's obligations as an obligor or surety by reason of any election of remedies by the Secured Party. The Debtor further waives any and all other suretyship defenses.

**11. Marshaling.** The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

**12. Proceeds of Dispositions; Expenses.** The Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving or enforcing the Secured Party's rights and remedies under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually

A/76227245.5

received in cash, be applied to the payment of the Obligations in such order or preference is provided in the Asset Purchase Agreement, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State, any excess shall be returned to the Debtor. In the absence of final payment and satisfaction in full of all of the Obligations, the Debtor shall remain liable for any deficiency.

**13. Overdue Amounts.** Until paid, all amounts due and payable by the Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest set forth in the Seller Note.

**14. Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA.

**15. Miscellaneous.** The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Debtor and its successors and assigns, and shall inure to the benefit of the Secured Party and the successors and assigns of the Secured Party. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Debtor acknowledges receipt of a copy of this Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the Debtor has caused this Agreement to be duly executed as of the date first above written.

***

[Signature page follows.]

A/76227245.5

[NEWCO LLC]


By:_____
      Name:
      Title: *


Accepted:

HASHFAST LLC


By:_____
      Name:
      Title: *

HASHFAST TECHNOLOGIES LLC


By:_____
      Name:
      Title: *

A/76227245.5

# EXHIBIT E

# [NEWCO] LLC

## (a Delaware Limited Liability Company)

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

Dated as of [＿＿＿＿＿], 2014

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS LIMITED LIABILITY OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN OF THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AND THE OTHER RESTRICTIONS SET FORTH HEREIN.

# TABLE OF CONTENTS

ARTICLE I        CERTAIN DEFINITIONS ................................................................1

Section 1.1    "Additional Securities" ..........................................................1
Section 1.2    "Additional Unitholder" ........................................................1
Section 1.3    "Affiliate" ...........................................................................1
Section 1.4    "Agreement" .........................................................................1
Section 1.5    "Approved Sale" ....................................................................1
Section 1.6    "Asset Purchase Agreement" ...............................................1
Section 1.7    "Asset Value" .......................................................................1
Section 1.8    "Capital Account" .................................................................2
Section 1.9    "Capital Contributions" ........................................................2
Section 1.10   "Certificate" .........................................................................2
Section 1.11   "Class A Common Unit" .......................................................2
Section 1.12   "Class A Preferred Unit" .......................................................2
Section 1.13   "Class A Preferred Unit Preference Amount" .......................2
Section 1.14   "Class B Common Unit" .......................................................2
Section 1.15   "Code" ..................................................................................3
Section 1.16   "Delaware Act" .....................................................................3
Section 1.17   "Depreciation" ......................................................................3
Section 1.18   "Distribution" .......................................................................3
Section 1.19   "Event of Withdrawal" .........................................................3
Section 1.20   "Family Group" ....................................................................3
Section 1.21   "Fiscal Quarter" ...................................................................3
Section 1.22   "Fiscal Year" ........................................................................3
Section 1.23   "Governmental Entity" .........................................................4
Section 1.24   "Holder" ...............................................................................4
Section 1.25   "Indebtedness" ......................................................................4
Section 1.26   "Independent Officer" ..........................................................4
Section 1.27   "Investor Debt" .....................................................................4
Section 1.28   "Joinder Agreement" ............................................................4
Section 1.29   "Liens" .................................................................................4
Section 1.30   "Liquidation" ........................................................................4
Section 1.31   "Liquidator" .........................................................................4
Section 1.32   "LLC" ..................................................................................4
Section 1.33   "LLC Counsel" .....................................................................4
Section 1.34   "Managers" ..........................................................................5
Section 1.35   "Member" .............................................................................5
Section 1.36   "Membership Interest" ..........................................................5
Section 1.37   "Net Proceeds from Operations" ...........................................5
Section 1.38   "Net Proceeds from Sales or Dispositions" ..........................5
Section 1.39   "Net Profit" or "Net Loss" ....................................................5
Section 1.40   "Note Purchase Agreement" .................................................6
Section 1.41   "Officers" .............................................................................6
Section 1.42   "Permitted Transferee" .........................................................6
Section 1.43   "Person" ...............................................................................6
Section 1.44   "Proceeding" ........................................................................6

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 43 of 119

# TABLE OF CONTENTS
### (continued)

| | | |
|---|---|---|
| Section 1.45 | "Required Interest" | 6 |
| Section 1.46 | "Rules" | 6 |
| Section 1.47 | "Sale of the LLC" | 6 |
| Section 1.48 | "Securities" | 6 |
| Section 1.49 | "Securities Act" | 7 |
| Section 1.50 | "Securities Exchange Act" | 7 |
| Section 1.51 | "Seller Note" | 7 |
| Section 1.52 | "Subsidiary" | 7 |
| Section 1.53 | "Substituted Unitholder" | 7 |
| Section 1.54 | "Tax Distribution" | 7 |
| Section 1.55 | "Tax Matters Partner" | 7 |
| Section 1.56 | "Taxable Year" | 7 |
| Section 1.57 | "Transaction Documents" | 7 |
| Section 1.58 | "Transfer" | 8 |
| Section 1.59 | "Treasury Regulations" | 8 |
| Section 1.60 | "Unit" | 8 |
| Section 1.61 | "Unitholder" | 8 |
| Section 1.62 | "Unitholder Group" | 8 |
| ARTICLE II | ORGANIZATIONAL MATTERS | 8 |
| Section 2.1 | Formation | 8 |
| Section 2.2 | The Certificate, Etc. | 8 |
| Section 2.3 | Name | 9 |
| Section 2.4 | Purpose | 9 |
| Section 2.5 | Powers of the LLC | 9 |
| Section 2.6 | Foreign Qualification | 9 |
| Section 2.7 | Principal Office; Registered Office | 10 |
| Section 2.8 | Term | 10 |
| Section 2.9 | No State-Law Partnership | 10 |
| ARTICLE III | UNITS; CAPITAL ACCOUNTS | 10 |
| Section 3.1 | Unitholders. | 10 |
| Section 3.2 | Unitholder Meetings. | 11 |
| Section 3.3 | Action of Unitholders by Written Consent or Telephone Conference. | 13 |
| Section 3.4 | Issuance of Additional Units and Interests | 14 |
| Section 3.5 | Capital Accounts. | 15 |
| Section 3.6 | Negative Capital Accounts | 16 |
| Section 3.7 | No Withdrawal | 16 |
| Section 3.8 | Loans From Unitholders | 16 |
| ARTICLE IV | DISTRIBUTIONS AND ALLOCATIONS; REDEMPTION OF CLASS A PREFERRED UNITS | 17 |
| Section 4.1 | Distributions. | 17 |
| Section 4.2 | Allocations. | 19 |

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 44 of 119

Section 4.3 Special Allocations. ................................................................................19
Section 4.4 Indemnification and Reimbursement for Payments on Behalf of a Unitholder ....................................................................................20
Section 4.5 Transfer of Capital Accounts.................................................................21

ARTICLE V MANAGERS; OFFICERS .......................................................................21

Section 5.1 Management by the Managers...............................................................21
Section 5.2 Managers. ..............................................................................................21
Section 5.3 Officers. .................................................................................................22

ARTICLE VI GENERAL RIGHTS AND OBLIGATIONS OF UNITHOLDERS .......25

Section 6.1 Limitation of Liability ...........................................................................25
Section 6.2 Lack of Authority ...................................................................................25
Section 6.3 No Right of Partition ..............................................................................25
Section 6.4 Unitholders Right to Act .......................................................................26
Section 6.5 Conflicts of Interest ...............................................................................26
Section 6.6 Transactions Between the LLC and the Unitholders............................26
Section 6.7 Approval Rights of the Class A Preferred Units and Class B Common Units...................................................................................26

ARTICLE VII EXCULPATION AND INDEMNIFICATION .......................................26

Section 7.1 Exculpation.............................................................................................26
Section 7.2 Right to Indemnification........................................................................27
Section 7.3 Advance Payment...................................................................................27
Section 7.4 Indemnification of Employees and Agents ...........................................27
Section 7.5 Appearance as a Witness .......................................................................28
Section 7.6 Non-Exclusive Rights............................................................................28
Section 7.7 Insurance.................................................................................................28
Section 7.8 Savings Clause........................................................................................28

ARTICLE VIII BOOKS, RECORDS, ACCOUNTING AND REPORTS.......................28

Section 8.1 Records and Accounting.........................................................................28
Section 8.2 Fiscal Year..............................................................................................29
Section 8.3 Tax Information.......................................................................................29
Section 8.4 Transmission of Communications ..........................................................29

ARTICLE IX TAXES ......................................................................................................29

Section 9.1 Tax Returns ............................................................................................29
Section 9.2 Tax Elections ..........................................................................................29
Section 9.3 Tax Matters Partner ................................................................................29

ARTICLE X TRANSFER OF MEMBERSHIP INTERESTS ......................................30

Section 10.1 Transfers by Unitholders. ......................................................................30
Section 10.2 Approved Sale Rights.............................................................................31
Section 10.3 Effect of Assignment..............................................................................31

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 45 of 119

| | | |
|---|---|---|
| Section 10.4 | Section 7704 Safe Harbor | 32 |
| Section 10.5 | Transfer Fees and Expenses | 32 |
| Section 10.6 | Void Transfers | 32 |
| **ARTICLE XI** | **ADMISSION OF UNITHOLDERS** | **32** |
| Section 11.1 | Substituted Unitholders | 32 |
| Section 11.2 | Additional Unitholders | 32 |
| **ARTICLE XII** | **WITHDRAWAL AND RESIGNATION OF UNITHOLDERS** | **33** |
| **ARTICLE XIII** | **DISSOLUTION AND LIQUIDATION** | **33** |
| Section 13.1 | Dissolution | 33 |
| Section 13.2 | Distributions Upon Liquidation | 33 |
| Section 13.3 | Cancellation of Certificate | 34 |
| Section 13.4 | Reasonable Time for Winding Up | 34 |
| Section 13.5 | Return of Capital | 34 |
| Section 13.6 | Reserves Against Distributions | 34 |
| **ARTICLE XIV** | **GENERAL PROVISIONS** | **35** |
| Section 14.1 | Power of Attorney. | 35 |
| Section 14.2 | Amendments | 35 |
| Section 14.3 | Title to LLC Assets | 35 |
| Section 14.4 | Remedies | 36 |
| Section 14.5 | Successors and Assigns | 36 |
| Section 14.6 | Severability | 36 |
| Section 14.7 | Opt-in to Article 8 of the Uniform Commercial Code | 36 |
| Section 14.8 | Notice to Unitholder of Provisions | 36 |
| Section 14.9 | Counterparts | 36 |
| Section 14.10 | Consent to Jurisdiction | 37 |
| Section 14.11 | Descriptive Headings; Interpretation | 37 |
| Section 14.12 | Applicable Law | 37 |
| Section 14.13 | Mutual Waiver of Jury Trial | 37 |
| Section 14.14 | Addresses and Notices | 38 |
| Section 14.15 | Creditors | 38 |
| Section 14.16 | Waiver | 38 |
| Section 14.17 | Further Action | 38 |
| Section 14.18 | Offset | 38 |
| Section 14.19 | Entire Agreement | 38 |
| Section 14.20 | Delivery by Facsimile or PDF | 39 |
| Section 14.21 | Survival | 39 |
| Section 14.22 | Certain Acknowledgments | 39 |
| Section 14.23 | Tax and Other Advice | 39 |
| Section 14.24 | Counsel to the LLC | 40 |

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 46 of 119

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 47 of
119

# [NEWCO] LLC

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT, dated as of [_____], 2014 (the "Effective Date"), is adopted, entered into, executed and agreed to, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, by and among [NEWCO] LLC (the "LLC" or the "Company"), the Managers and the Members. The LLC, the Managers and the Members are each a "party" to this Agreement.

The undersigned parties hereby agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the following meanings:

**Section 1.1**    "Additional Securities" shall have the meaning set forth in Section 3.4.

**Section 1.2**    "Additional Unitholder" means a Person admitted to the LLC as a Unitholder pursuant to Section 3.4 and in compliance with Section 11.2.

**Section 1.3**    "Affiliate" of any particular Person means (i) any other Person controlling, controlled by, or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract, or otherwise, and (ii) if such Person is a partnership, any partner thereof (including any limited partner).

**Section 1.4**    "Agreement" means this Limited Liability Company Operating Agreement, including the Exhibits and Schedule A attached hereto, as amended or modified from time to time in accordance with the terms hereof.

**Section 1.5**    "Approved Sale" has the meaning set forth in Section 10.2(a).

**Section 1.6**    "Asset Purchase Agreement" means that certain Asset Purchase Agreement by and among HashFast Technologies LLC, a California limited liability company, HashFast LLC, a Delaware limited liability company and the LLC dated as of [*date*], 2014.

**Section 1.7**    "Asset Value" of any noncash property of the Company means its adjusted basis for federal income tax purposes unless:

(a)    the property was accepted by the Company as a contribution to capital at a value different from its adjusted basis, in which event the initial Asset Value for such property shall mean the gross fair market value of the property agreed to by the Company and the contributing Member; or

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 48 of 119

(b)     as a consequence of the issuance of additional Units or the redemption of all or part of the Interest of a Member, the property of the Company is revalued in accordance with Section 3.5(b).

As of any date references to the "then prevailing Asset Value" of any property shall mean the Asset Value last determined for such property less the depreciation, amortization and cost recovery deductions taken into account in computing Net Profit or Net Loss in fiscal periods subsequent to such prior determination date.

**Section 1.8**     "Capital Account" means the capital account maintained for a Unitholder pursuant to Section 3.5.

**Section 1.9**     "Capital Contributions" means any cash, cash equivalents, or the fair market value of other property that a Unitholder contributes or is deemed to have contributed to the LLC with respect to any Unit pursuant to Sections 3.1 or 3.4 (with it being understood that if the adjusted basis of any LLC property is different from the property's fair market value at the time of contribution, such Capital Contribution shall be valued at the fair market value of such property).

**Section 1.10**     "Certificate" means the LLC's Certificate of Formation as filed with the Secretary of State of Delaware.

**Section 1.11**     "Class A Common Unit" means a Unit representing a fractional part of the interest of a Unitholder in Net Profits, Net Losses and Distributions and having the rights and obligations specified with respect to the Class A Common Units in this Agreement. Allocations and distributions to the holders of Class A Common Units as a group shall be allocated among such holders based on their respective holdings of Class A Common Units.

**Section 1.12**     "Class A Preferred Unit" means a Unit representing a fractional part of the interest of a Unitholder in Net Profits, Net Losses and Distributions and having the rights and obligations specified with respect to the Class A Preferred Units in this Agreement; provided that a Class A Preferred Unit shall have no voting rights other than as required under the Delaware Act or as set forth in this Agreement. Allocations and distributions to the holders of Class A Preferred Units as a group shall be allocated among such holders based on their respective holdings of Class A Preferred Units.

**Section 1.13**     "Class A Preferred Unit Preference Amount" means Three Million Dollars ($3,000,000).

**Section 1.14**     "Class B Common Unit" means a Unit representing a fractional part of the interest of a Unitholder in Net Profits, Net Losses and Distributions and having the rights and obligations specified with respect to the Class B Common Units in this Agreement; provided that a Class B Common Unit shall have no voting rights other than as required under the Delaware Act or as set forth in this Agreement. Allocations and distributions to the holders of Class B Common Units as a group shall be allocated among such holders based on their respective holdings of Class B Common Units.

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 49 of 119

**Section 1.15** "Code" means the United States Internal Revenue Code of 1986, as amended. Such term shall, at the Managers' sole discretion, be deemed to include any future amendments to the Code and any corresponding provisions of succeeding Code provisions (whether or not such amendments and corresponding provisions are mandatory or discretionary; provided, however, that if they are discretionary, the term "Code" shall not include them if including them would have a material adverse effect on any Unitholder).

**Section 1.16** "Delaware Act" means the Delaware Limited Liability Company Act, 6 Del. L. § 18-101, *et seq.*, as it may be amended from time to time, and any successor to the Delaware Act.

**Section 1.17** "Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction allowable for such year is zero, Depreciation shall be determined with reference to such beginning Asset Value using any reasonable method selected by the Managers.

**Section 1.18** "Distribution" means each distribution made by the LLC to a Unitholder with respect to such Person's Units, whether in cash, property or Securities and whether by liquidating distribution, redemption, repurchase, or otherwise; provided that any recapitalization or exchange or conversion of Securities of the LLC (including any exchange of Units for Class A Preferred Units), and any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units shall not be deemed a Distribution.

**Section 1.19** "Event of Withdrawal" means the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Unitholder or the occurrence of any other event that terminates the continued membership of a Unitholder in the LLC.

**Section 1.20** "Family Group" means a Person's spouse and descendants (whether natural or adopted) and their respective spouses and descendants and living parents of spouses, and any trust, family limited partnership, limited liability company or other entity wholly-owned, directly or indirectly, by any or all of such Persons, and any retirement plan for any or all of the foregoing, that is and remains solely for the benefit of any or all of the foregoing.

**Section 1.21** "Fiscal Quarter" means each calendar quarter ending March 31, June 30, September 30 and December 31, or such other three-month periods as may be established by the Managers in connection with the LLC's annual accounting period established pursuant to Section 8.2.

**Section 1.22** "Fiscal Year" means the LLC's annual accounting period established pursuant to Section 8.2.

A/76212018.8

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 50 of 119

**Section 1.23** "Governmental Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government or any agency or department or subdivision of any governmental authority, including the United States federal government or any state or local government.

**Section 1.24** "Holder" means, collectively, HashFast Technologies LLC, a California limited liability company and HashFast LLC, a Delaware limited liability company.

**Section 1.25** "Indebtedness" means at a particular time, without duplication, (i) any indebtedness for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the ordinary course of business which are not more than 120 days past due), and (iv) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit).

**Section 1.26** "Independent Officer" has the meaning set forth in Section 5.3(c)(vii).

**Section 1.27** "Investor Debt" means those certain unsecured Promissory Notes of the Company issued pursuant to the terms of the Note Purchase Agreement.

**Section 1.28** "Joinder Agreement" means a joinder agreement substantially in the form of Exhibit 3.

**Section 1.29** "Liens" means any mortgage, pledge, security interest, encumbrance, lien, or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the LLC, any Subsidiary or any Affiliate thereof, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute other than to reflect ownership by a third party of property leased to the LLC, any Subsidiary or any Affiliate under a lease which is not in the nature of a conditional sale or title retention agreement, or any subordination arrangement in favor of another Person (other than any subordination arising in the ordinary course of business).

**Section 1.30** "Liquidation" means any liquidation, dissolution or winding up of the LLC, whether voluntary or involuntary.

**Section 1.31** "Liquidator" means any Person or Persons (which may include one or more of the Managers) charged with winding up and/or liquidating the business, affairs and/or assets of the LLC in accordance with the provisions hereof, each of which Persons shall be deemed to be a "liquidating trustee" within the meaning of the Delaware Act.

**Section 1.32** "LLC" means [NewCo] LLC, a Delaware limited liability company. References herein to "Company" are references to the LLC.

**Section 1.33** "LLC Counsel" has the meaning set forth in Section 14.25.

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 51 of 119

**Section 1.34** "<u>Managers</u>" means any one or more Persons elected by the Class A Unitholders as a Manager and any Persons which become a substitute or replacement Manager as permitted by this Agreement.

**Section 1.35** "<u>Member</u>" means any Person which is a holder of record of one or more Units, in each such Person's capacity as (and for the period during which such Person continues to be) such holder.

**Section 1.36** "<u>Membership Interest</u>" means the interest of a Unitholder in Net Profits, Net Losses, and Distributions.

**Section 1.37** "<u>Net Proceeds from Operations</u>" means the net proceeds (which shall include without limitation bitcoins) from LLC operations (including sales and dispositions in the ordinary course of business), other than Net Proceeds from Sales or Dispositions, available after paying all ordinary and necessary expenses of the LLC, and any current debt of the LLC subject to its terms, including without limitation, payments in respect of the Seller Note, or other debt of the LLC which the Managers determine to prepay in whole or in part, and after establishing reserves to meet current or reasonably expected obligations of the LLC, contingent or otherwise, and other purposes and uses of the LLC to the extent the Managers determine that such reserves are necessary or advisable. Net Proceeds from Operations shall not, however, include any payment if such payment to the Members would be restricted or prohibited by any note, mortgage, deed of trust or other agreement to which the LLC is a party, by which the LLC is bound or to which LLC assets are subject.

**Section 1.38** "<u>Net Proceeds from Sales or Dispositions</u>" means the net proceeds (which shall include without limitation bitcoins), from all sales and other dispositions of assets of the LLC, other than in the ordinary course of the LLC's business, after payment of all expenses of such sale or disposition, any current debt of the LLC subject to its terms, including without limitation, payments in respect of the Seller Note, and after establishing reserves to meet current or reasonably expected obligations of the LLC, contingent or otherwise, and other purposes and uses of the LLC to the extent the Managers determine that such reserves are necessary or advisable. Net Proceeds from Sales or Dispositions shall not, however, include any cash if the payment of such cash to the Members would be restricted or prohibited by any note, mortgage, deed of trust or other agreement to which the LLC is a party, by which the LLC is bound or to which LLC assets are subject. "Net Proceeds from Sales or Dispositions" shall also include all principal and interest payments with respect to any note or other obligation received by the LLC in connection with sales or other dispositions of assets of the LLC (other than in the ordinary course of business).

**Section 1.39** "<u>Net Profit</u>" or "<u>Net Loss</u>" of the Company for each Fiscal Year or relevant part thereof shall mean the Company's taxable income or loss for federal income tax purposes for such period (including all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code) with the following adjustments:

        (a)     Gain or loss attributable to the disposition of property of the Company with an Asset Value different than the adjusted basis of such property for federal income tax purposes shall be computed with respect to the Asset Value of such

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 52 of 119

property, and any tax gain or loss not included in Net Profit or Net Loss shall be taken into account and allocated for federal income tax purposes among the Members pursuant to Section 4.3(b).

        (b)     Depreciation, amortization or cost recovery deductions with respect to any property with an Asset Value that differs from its adjusted basis for federal income tax purposes shall be computed in accordance with Asset Value, and any depreciation allowable for federal income tax purposes shall be allocated in accordance with Section 4.3(b).

        (c)     Any items that are required to be specially allocated pursuant to Section 4.3(a) shall not be taken into account in determining Net Profit or Net Loss.

**Section 1.40** "Note Purchase Agreement" means that certain Unit and Note Purchase Agreement by the Company as issuer and seller and the purchasers identified therein dated as of [*date*], 2014.

**Section 1.41** "Officers" means each individual designated as an officer of the LLC to whom authority and duties have been delegated pursuant to Section 5.3.

**Section 1.42** "Permitted Transferee" has the meaning set forth in Section 10.1(b).

**Section 1.43** "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Entity.

**Section 1.44** "Proceeding" has the meaning set forth in Section 7.2.

**Section 1.45** "Required Interest" means at least [*TBD*%] in number of Class A Common Units.

**Section 1.46** "Rules" has the meaning set forth in Section 14.24.

**Section 1.47** "Sale of the LLC" means any transaction or series of related transactions pursuant to which any Person or group of related Persons in the aggregate acquire(s) (i) equity Securities of the LLC possessing the voting power (other than voting rights accruing only in the event of a default or breach) to elect a majority of the LLC's Managers (whether by merger, consolidation, reorganization, combination, sale or transfer of the LLC's equity securities, security holder or voting agreement, proxy, power of attorney or otherwise) or (ii) all or substantially all of the LLC's assets determined on a consolidated basis.

**Section 1.48** "Securities" means notes, stocks, bonds, debentures, evidences of indebtedness, certificates of interest or participation in any profit-sharing agreement, partnership interests, beneficial interests in trusts, collateral-trust certificates, pre-organization certificates or subscriptions, transferable shares, investment contracts, voting-trust certificates, certificates of deposit for securities, certificates of equity interests, notional principal contracts and certificates of interest or participation in, temporary or interim certificates for, receipts for or warrants or

A/76212018.8

DRAFT 07/25/14 5:42PM

rights or options to subscribe to or purchase or sell any of the foregoing, and any other items commonly referred to as securities.

**Section 1.49** "Securities Act" means the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules, or regulations. Any reference herein to a specific section, rule, or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

**Section 1.50** "Securities Exchange Act" means the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules, or regulations. Any reference herein to a specific section, rule, or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

**Section 1.51** "Seller Note" means that certain Secured Promissory Note by and between the Company as borrower and the Holder dated July __, 2014.

**Section 1.52** "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association, or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control any board of managers, managing director or general partner of such limited liability company, partnership, association, or other business entity. For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the LLC.

**Section 1.53** "Substituted Unitholder" means a Person that is admitted as a Unitholder to the LLC pursuant to Section 11.1.

**Section 1.54** "Tax Distribution" has the meaning set forth in Section 4.1(b).

**Section 1.55** "Tax Matters Partner" has the meaning set forth in Section 9.3.

**Section 1.56** "Taxable Year" means the taxable period required pursuant to Section 706 of the Code and the Treasury Regulations promulgated thereunder.

**Section 1.57** "Transaction Documents" means this Agreement, and all other agreements, instruments, certificates, and other documents to be entered into or delivered by any Unitholder in connection with the transactions contemplated to be consummated pursuant to this Agreement, and any side agreements related to the foregoing.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 54 of 119

**Section 1.58** "Transfer" means any sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (including, without limitation, by operation of law) or the acts thereof, but explicitly excluding conversions or exchanges of one class of Unit to or for another class of Unit. The terms "Transferee," "Transferred," and other forms of the word "Transfer" shall have correlative meanings.

**Section 1.59** "Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof. Such term shall, at the Managers' sole discretion, be deemed to include any future amendments to such regulations and any corresponding provisions of succeeding regulations (whether or not such amendments and corresponding provisions are mandatory or discretionary; provided, however, that if they are discretionary, the term "Treasury Regulations" shall not include them if including them would have a material adverse effect on any Unitholder).

**Section 1.60** "Unit" means a Membership Interest of a Unitholder in the LLC representing a fractional part of the Membership Interests of all Unitholders and shall include Class A Preferred Units, Class A Common Units and Class B Common Units; provided that any class or group of Units issued shall have relative rights, powers, and duties set forth in this Agreement and the Membership Interest represented by such class or group of Units shall be determined in accordance with such relative rights, powers, and duties set forth in this Agreement.

**Section 1.61** "Unitholder" means any owner of one or more Units as reflected on the LLC's books and records, and any Person admitted to the LLC as an Additional Unitholder or Substituted Unitholder; but only for so long as such Person is shown on the LLC's books and records as the owner of one or more Units.

**Section 1.62** "Unitholder Group" has the meaning set forth in Section 6.5.

## ARTICLE II

## ORGANIZATIONAL MATTERS

**Section 2.1** **Formation**. The LLC has been organized as a Delaware limited liability company by the filing with the Secretary of State of the State of Delaware of the Certificate under and pursuant to the Delaware Act and shall be continued in accordance with this Agreement.

**Section 2.2** **The Certificate, Etc**. The Certificate was filed with the Secretary of State of the State of Delaware on [_____], 2014. The Unitholders hereby agree to execute, file and record all such other certificates and documents, including amendments to the Certificate, and to do such other acts as may be appropriate to comply with all requirements for the formation, continuation and operation of the LLC as a limited liability company, the ownership of property, and the conduct of business under the laws of the State of Delaware and any other jurisdiction in which the LLC may own property or conduct business.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 55 of 119

**Section 2.3**    <u>Name</u>.  The name of the LLC shall be [NewCo] LLC.  The Managers in their sole discretion may change the name of the LLC at any time and from time to time.  Notification of any such change shall be given to all Unitholders.  The LLC's business may be conducted under the LLC's name and/or any other name or names deemed advisable by the Managers.

**Section 2.4**    <u>Purpose</u>.  The purpose and business of the LLC shall be to engage in the business of designing, developing, manufacturing and selling certain computer chips and equipment, including Application Specific Integrated Circuit, or ASIC, semiconductors, for the sole purpose of auditing transaction data for the Bitcoin networks, also known as "Bitcoin mining" and any lawful act or activity which may be conducted by a limited liability company formed pursuant to the Delaware Act and to engage in all activities necessary or incidental to the foregoing.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the LLC to possess any purpose or power, or to do any act or thing, forbidden by law to a limited liability company organized under the laws of the State of Delaware.

**Section 2.5**    <u>Powers of the LLC</u>.

    (a)    <u>General</u>.  Subject to the provisions of this Agreement and the agreements contemplated hereby, the LLC shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purposes set forth in <u>Section 2.4</u>.

    (b)    <u>Managers</u>.  Subject to the provisions of this Agreement and the other agreements contemplated hereby, (i) the LLC may, with the approval of a Manager, enter into and perform under any and all documents, agreements and instruments, all without any further act, vote or approval of any Unitholder, and (ii) a Manager may authorize any Person (including any Unitholder or Officer) to enter into and perform under any document, agreement or instrument on behalf of the LLC.

    (c)    <u>Merger</u>.  Subject to the provisions of this Agreement, the LLC may, with the approval of the Managers and without the need for any further act, vote or approval of any Unitholder, merge with, or consolidate into, another limited liability company (organized under the laws of Delaware or any other state), a corporation (organized under the laws of Delaware or any other state) or other business entity (as defined in Section 18-209(a) of the Delaware Act), regardless of whether the LLC or such other entity is the survivor.

**Section 2.6**    <u>Foreign Qualification</u>.  Prior to the LLC's conducting business in any jurisdiction other than Delaware, the LLC shall comply, to the extent procedures are available and those matters are reasonably within the control of the LLC, with all requirements necessary to qualify the LLC as a foreign limited liability company in that jurisdiction.  At the request of a Manager or any Officer, each Unitholder shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate to qualify, continue and terminate the LLC as a foreign limited liability company in all such jurisdictions in which the LLC may conduct business.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 56 of 119

**Section 2.7** **Principal Office; Registered Office**. The principal office of the LLC shall be located at such place as the Managers may from time to time designate, and all business and activities of the LLC shall be deemed to have occurred at the principal office of the LLC. The LLC may maintain offices at such other place or places as the Managers deem advisable. Notification of any such change shall be given to all Unitholders. The registered office of the LLC required by the Delaware Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the LLC) as the Managers may designate from time to time in the manner provided by law. The registered agent of the LLC in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managers may designate from time to time in the manner provided by law.

**Section 2.8** **Term**. The term of the LLC commenced upon the filing of the Certificate in accordance with the Delaware Act and the LLC shall continue in existence until termination and dissolution thereof in accordance with the provisions of Article XIII.

**Section 2.9** **No State-Law Partnership**. The Unitholders intend that the LLC not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Unitholder be a partner or joint venture of any other Unitholder by virtue of this Agreement (except for tax purposes as set forth in the next succeeding sentence of this Section 2.9), and neither this Agreement nor any other document entered into by the LLC or any Unitholder relating to the subject matter hereof shall be construed to suggest otherwise. The Unitholders intend that the LLC shall be treated as a partnership for federal and, to the extent applicable, state or local income tax purposes, and that each Unitholder and the LLC shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

## ARTICLE III

## UNITS; CAPITAL ACCOUNTS

**Section 3.1** **Unitholders**.

(a) General.

(i) Each Person named on Schedule A attached hereto has made the Capital Contributions to the LLC as set forth on the books and records of the LLC and as more particularly described in the Asset Purchase Agreement in exchange for the Units specified on Schedule A. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time. Each Person listed on Schedule A has previously been admitted to the Company as a Member.

(ii) Each Unitholder shall file all tax returns, including any schedules thereto, in a manner consistent with this Agreement. Each Unitholder's interest in the LLC, including such Unitholder's interest in Net Profits, Net Losses and Distributions of the LLC and the right to vote, if any, on certain matters as provided in this Agreement, shall be represented by the Units owned by such Unitholder. The ownership of Units shall entitle each

A/76212018.8

Unitholder to allocations of Net Profits and Net Losses and other items and distributions of cash and other property as set forth in Article IV hereof. The Units initially shall not be represented by certificates. However, the Managers may in their discretion issue certificates to the Unitholders representing the Units held by each Unitholder. If certificates are issued, each such certificate shall bear a legend to the effect that the Units have not been registered under the Securities Act, and are subject to the restrictions or transferability and sale set forth in this Agreement, as well as any other legends that the Managers deem appropriate.

      (b)    No Liability of Unitholders.

      (i)    No Liability. Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Unitholder shall have any personal liability whatsoever in such Unitholder's capacity as a Unitholder, whether to the LLC, to any of the other Unitholders, to the creditors of the LLC or to any other third party, for the debts, liabilities, commitments or any other obligations of the LLC or for any losses of the LLC. Each Unitholder shall be liable only to make such Unitholder's Capital Contribution to the LLC and the other payments provided expressly herein.

      (ii)    Distribution. In accordance with the Delaware Act and the laws of the State of Delaware, a Unitholder of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such Unitholder. It is the intent of the Unitholders that no distribution to any Unitholder pursuant to Article IV hereof shall be deemed a return of money or other property paid or distributed in violation of the Delaware Act. The payment of any such money or distribution of any such property to a Unitholder shall be deemed to be a compromise within the meaning of the Delaware Act, and the Unitholder receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Unitholder is obligated to make any such payment; such obligation shall be the obligation of such Unitholder and not of any other Unitholder.

      (c)    Class A Preferred Units. The relative rights, powers and duties, including voting rights, allocation rights, distribution rights and the qualifications, limitations and restrictions thereof, of Class A Preferred Units are set forth in this Agreement.

      (d)    Class A Common Units. The relative rights, powers and duties, including voting rights, allocation rights, distribution rights, and the qualifications, limitations and restrictions thereof, of Class A Common Units are as set forth in this Agreement.

      (e)    Class B Common Units. The relative rights, powers and duties, including voting rights, allocation rights, distribution rights, and the qualifications, limitations and restrictions thereof, of Class B Common Units are as set forth in this Agreement.

**Section 3.2    Unitholder Meetings.**

      (a)    Voting of Unitholders. A quorum shall be present at a meeting of Unitholders if the Unitholders holding the Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of all Unitholders entitled to vote is required by the

11

Delaware Act or by this Agreement, the affirmative vote of the Unitholders holding the Required Interest at a meeting of Unitholders at which a quorum is present shall be the act of the Unitholders.

(b)     Place. All meetings of the Unitholders shall be held at the principal place of business of the LLC or at such other place within or without the State of Delaware as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Unitholders may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 3.3(d).

(c)     Adjournment. Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting or the Unitholders holding the Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Unitholders, such time and place shall be determined by a vote of the Unitholders holding the Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

(d)     Meetings. Annual Meetings of Unitholders shall not be required. Meetings of the Unitholders for any proper purpose or purposes may be called at any time by a Manager. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Unitholders entitled to call a meeting is the date any Unitholder first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a meeting of the Unitholders.

(e)     Notice. A written or printed notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered to each Unitholder entitled to vote at such meeting not less than five (5) nor more than thirty (30) days before the date of the meeting, either personally, by overnight courier mail or by facsimile, by or at the direction of a Manger. If sent by overnight courier or fax, any such notice shall be deemed to be delivered two (2) business days after deposit, addressed to the Unitholder at the Unitholder's address provided for in the LLC's books and records, or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. A "business day" shall mean a day on which banks are open for business (other than a Saturday or Sunday) in the jurisdiction of the sender and the receiver of the notice. These notice provisions, and any required notice, may be waived in writing by the affected Unitholder. Participation of a Unitholder shall constitute a waiver of notice of such meeting, except where a Unitholder attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f)     Record Date. Unless otherwise determined by the Managers, the date on which notice of a meeting of Unitholders is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Unitholders entitled to notice of or to vote at such meeting (including any adjournment thereof) or the Unitholders entitled to receive such distribution.

A/76212018.8                                                                 DRAFT 07/25/14 5:42PM

(g)    Required Interest.  Except as otherwise expressly provided for in this Agreement, all matters to be voted on by the Unitholders pursuant to this Agreement shall require the affirmative vote of Unitholders holding the Required Interest, which vote shall only be valid and binding if a notice of the meeting at which such vote is taken is given in accordance with Section 3.2(e).

(h)    Proxies.  A Unitholder may vote either in person or by proxy executed in writing by the Unitholder.  A telegram, telex, cablegram or similar transmission by the Unitholder, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Unitholder shall be treated as an execution in writing for purposes of this Section 3.2(h).  Proxies for use at any meeting of Unitholders or in connection with the taking of any action by written consent pursuant to Section 3.3 shall be filed with the Secretary of the LLC, before or at the time of the meeting or execution of the written consent as the case may be.  All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Secretary of the LLC, who shall decide all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions.  No proxy shall be valid after 11 months from the date of the proxy's execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the LLC shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

(i)    Conduct of Unitholder Meetings.  All meetings of the Unitholders shall be presided over by the chairman of the meeting, who shall be a Manager.  The chairman of any meeting of Unitholders shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

(j)    Voting Rights.  Subject to the restrictions set forth in this Agreement, in any matter submitted to Unitholders for a vote, each Unitholder shall be entitled to one vote for each Unit held of record.  The Class A Preferred Units and the Class B Common Units shall be non-voting except as otherwise provided in this Agreement, as required by the Delaware Act or with respect to any consent required under Section 14.2, if any.  Except as otherwise required by this Agreement or law, the Unitholders shall not have the right to vote on any matter except to the extent provided in Sections 3.2(a) or (g) hereof.

**Section 3.3    Action of Unitholders by Written Consent or Telephone Conference.**

(a)    Written Consent in Lieu of Meeting.  Any action required or permitted to be taken at any annual or special meeting of Unitholders may be taken without a meeting,

A/76212018.8

without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Unitholder or Unitholders holding not less than the minimum percentages of Units that would be necessary to take such action at a meeting at which all Unitholders entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Unitholder who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the LLC in the manner required by this Section 3.3(a), a consent or consents signed by the Unitholder or Unitholders holding not less than the minimum Units that would be necessary to take the action that is the subject of the consent are delivered to the LLC by delivery to the registered office of the LLC, the principal place of business of the LLC or the chief executive officer of the LLC, in each case in accordance with Section 14.14. Any such delivery to the LLC's principal place of business shall be addressed to the chief executive officer. A telegram, telex, cablegram or similar transmission by a Unitholder, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Unitholder, shall be regarded as signed by the Unitholder for purposes of this Section 3.3(a). Prompt notice of the taking of any action by Unitholders without a meeting by less than unanimous written consent shall be given to those Unitholders who did not consent in writing to the action.

(b)     Record Date for Written Consent in Lieu of Meeting. The record date for determining Unitholders entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the LLC by delivery to the registered office of the LLC, the principal place of business of the LLC, or the chief executive officer of the LLC, in each case in accordance with Section 14.14. Any such delivery to the LLC's principal place of business shall be addressed to the chief executive officer.

(c)     Filings. If any action by Unitholders is taken by written consent, any certificate or documents filed with the Secretary of State of Delaware as a result of the taking of the action shall state, in lieu of any statement required by the Delaware Act concerning any vote of Unitholders, that written consent has been given in accordance with the provisions of the Delaware Act and that any written notice required by the Delaware Act has been given.

(d)     Telephone Conference. Unitholders may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**Section 3.4     Issuance of Additional Units and Interests.**

(a)     Subject to the provisions of this Agreement, including without limitation this Section 3.4, and Section 14.2 the Managers shall have the right to cause the LLC to issue or sell to any Person (including Unitholders and their Affiliates) any of the following (which for purposes of this Agreement shall be "Additional Securities"):  (i) additional Units or other interests in the LLC (including other classes or series thereof having different rights); (ii) obligations, evidences of indebtedness, or other securities or interests convertible or

A/76212018.8                                                                                           DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 61 of 119

exchangeable into Units or other interests in the LLC; and (iii) warrants, options, or other rights to purchase or otherwise acquire Units or other interests in the LLC. Subject to the provisions of this Agreement, and in particular subject to the rights of the holders of the Class A Preferred Units and the Class B Common Units, the Managers shall determine the terms and conditions governing the issuance of such Additional Securities, including the number and designation of such Additional Securities, the preference (with respect to distributions, liquidations, or otherwise) over any other Units and any required or deemed contributions in connection therewith, provided that as long as the Class A Preferred Units remain outstanding, absent the prior written consent of the Class A Preferred Unitholders, no such Additional Securities shall have a payment priority or preference over the Class A Preferred Units.

(b)     Any Person who acquires Units pursuant to this Section 3.4 may be admitted to the LLC as an Additional Unitholder pursuant to the terms of Section 11.2 hereof and on that admission Schedule A shall be amended by a Manager to reflect such admission.

Section 3.5     **Capital Accounts**.

(a)     Capital Accounts.  A separate account (each a "**Capital Account**") shall be established and maintained for each Member which:

(i)     shall be increased by (i) the amount of cash and the fair market value of any other property contributed by such Member to the Company as a Capital Contribution (net of liabilities secured by such property or that the Company assumes or takes the property subject to) and (ii) such Member's allocable share of the Net Profit of the Company, and

(ii)     shall be reduced by (i) the amount of cash and the fair market value of any other property distributed to such Member (net of liabilities secured by such property or that the Member assumes or takes the property subject to) and (ii) such Member's allocable share of the Net Loss of the Company.

It is the intention of the Members that the Capital Accounts of the Company be maintained in accordance with the provisions of Section 704(b) of the Code and the Regulations thereunder and that this Agreement be interpreted consistently therewith.

(b)     Revaluations of Assets and Capital Account Adjustments.  As of the date hereof, the Capital Accounts of the Members shall be as set forth on Exhibit A.  Unless otherwise determined by the Board of Managers, immediately preceding the issuance of additional Units in exchange for cash, property or services to a new or existing Member and upon the redemption of the Interest of a Member, the then prevailing Asset Values of the Company shall be adjusted to equal their respective gross fair market values, as determined in good faith by the Board of Managers, and any increase or decrease in the net equity value of the Company (Asset Values less liabilities) shall be credited or charged to the Capital Accounts of the Members in the same manner as Net Profits and Net Losses are credited or charged under Section 4.2.  Accordingly, as of the date of issuance of additional Units or the redemption of all or a portion of a Member's Interest in the Company, the Capital Accounts of Members will reflect both realized and unrealized gains and losses through such date and the net fair market

Case: 14-30725     Doc# 158     Filed: 07/25/14     Entered: 07/25/14 16:37:45     Page 62 of 119

value of the equity of the Company as of such date. Any determination made by the Managers under this Section 3.5(b) may not, unless such determination is made with the consent of a majority of the Class A Preferred Units, have an adverse effect on the rights that the holders of the Class A Preferred Units have under this Agreement.

(c)     Additional Capital Account Adjustments. Any income of the Company that is exempt from federal income tax shall be credited to the Capital Accounts of the Members in the same manner as Net Profits are credited under Section 4.2 when such income is realized. Any expenses or expenditures of the Company which may neither be deducted nor capitalized for tax purposes (or are so treated for tax purposes) shall be charged to the Capital Accounts of the Members in the same manner as Net Losses are charged under Section 4.2. If the Company makes an election under Section 754 of the Code to provide a special basis adjustment upon the transfer of an Interest in the Company or the distribution of property by the Company, Capital Accounts shall be adjusted to the extent required by the Regulations under Section 704 of the Code following such transfer or distribution.

(d)     Additional Capital Account Provisions. No Member shall have the right to demand a return of all or any part of such Member's Capital Contributions. Any return of the Capital Contributions of any Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement. No interest shall be paid to any Member with respect to such Member's Capital Contributions or Capital Account. In the event that all or a portion of the Units of a Member are transferred in accordance with this Agreement, the transferee of such Units shall also succeed to all or the relevant portion of the Capital Account of the transferor (and, for purposes of this Agreement, shall be treated as having made the contributions and received the distributions made or received by the transferor of the transferred Units). Units held by a Member may not be transferred independently of the Interest to which the Units relate.

**Section 3.6     Negative Capital Accounts**. No Unitholder shall be required to pay to any other Unitholder or the LLC any deficit or negative balance which may exist from time to time in such Unitholder's Capital Account (including upon and after dissolution of the LLC).

**Section 3.7     No Withdrawal**. No Person shall be entitled to withdraw any part of such Person's Capital Contributions or Capital Account or to receive any Distribution from the LLC, except as expressly provided herein.

**Section 3.8     Loans From Unitholders**. Loans by Unitholders to the LLC shall not be considered Capital Contributions. If any Unitholder shall loan funds to the LLC, the making of such loans shall not result in any increase in the amount of the Capital Account of such Unitholder. The amount of any such loans shall be a debt of the LLC to such Unitholder and shall be payable or collectible in accordance with the terms and conditions upon which such loans are made.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 63 of 119

**ARTICLE IV**

**DISTRIBUTIONS**
**AND ALLOCATIONS; REDEMPTION OF CLASS A PREFERRED UNITS**

**Section 4.1**     **Distributions**.

(a)     Gross Revenue. For so long as all or any portion of the Seller Note or the Class A Preferred Unit Preference Amount then remains outstanding, gross revenue of the Company shall be applied as follows:

(i)     First, subject to and in accordance with the periodic payment terms set forth in the Seller Note, seventeen percent (17%) of the gross revenues from LLC operations actually received by the Company during the prior calendar month shall be paid to the Holder in accordance with the terms of the Seller Note until the Seller Note has been paid in full and all obligations thereunder reduced to zero.

(ii)     Commencing on the first business day of the calendar month immediately following the date the Seller Note has been paid in full and all obligations thereunder reduced to zero, and on the first business day of each calendar month thereafter, seventeen percent (17%) of the gross revenues from LLC operations actually received by the Company during the prior calendar month shall be paid to the holders of Class A Preferred Units as a group in proportion to and to the extent of their respective Class A Preferred Unit Preference Amounts until the Class A Preferred Unit Preference Amount is reduced to zero.

(iii)     All payments of gross revenue from LLC operations shall be made in accordance with Section 4.1(f) hereof.

(b)     Net Proceeds From Operations and Net Proceeds From Sales or Dispositions. Except as otherwise set forth in this Section 4.1, in accordance with Section 4.1(f) and subject the provisions of Section 18-607 of the Delaware Act and as otherwise provided in Section 13.2(b), for so long as all or any portion of the Investor Debt then remains outstanding, Net Proceeds From Operations and Net Proceeds From Sales or Dispositions, for avoidance of doubt, after payments are made by the Company pursuant to Section 4.1(a), shall only be distributed to the holders of the Investor Debt, pro rata in proportion to the principal amount of Investor Debt held by each, to be applied toward reducing the balance of the Investor Debt, and not to any other Member, including the holders of Class A Preferred Units, until the outstanding amount of the Investor Debt is reduced to zero. Further, for so long as all or any portion of the Class A Preferred Unit Preference Amount then remains outstanding, Net Proceeds From Operations and Net Proceeds From Sales or Dispositions shall only be distributed to the holders of Class A Preferred Units to be applied toward reducing the balance of the Class A Preferred Unit Preference Amount, and not to any other Member, until the outstanding amount of the Class A Preferred Unit Preference Amount is reduced to zero. Subject to the foregoing, the Managers may in their sole discretion make Distributions of Net Proceeds from Operations and Net Proceeds from Sales or Dispositions at any time or from time to time, after the repayment of the Seller Note and Investor Debt in full, to the Members as follows:

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 64 of 119

(i)     First to the holders of Class A Preferred Units as a group in proportion to and to the extent of their respective Class A Preferred Unit Preference Amounts, if any, not previously distributed to such holders under this Section 4.1 until the Class A Preferred Unit Preference Amount is reduced to zero at which time the Class A Preferred Units shall be deemed to have been redeemed and paid in full with no further action of the Company and the holders of Class A Preferred Units shall thereafter have no rights or obligations as Members of the LLC and each shall be deemed to have withdrawn on the date it has then received aggregate distributions in respect of the Class A Preferred Units held by it in the amount equal to the Class A Preferred Unit Preference Amount; and

(ii)     Next to the holders of Class A Common Units and the holders of the Class B Common Units in proportion to the number of Units held by each.

(c)     Tax Distributions.  Notwithstanding any other provision herein to the contrary, so long as the LLC is treated as a partnership for federal income tax purposes, at least 10 days prior to the date prescribed by the Code for calendar year corporations and individuals to pay the quarterly installment of estimated taxes for each Fiscal Quarter after the Effective Date, in the sole discretion of the Managers and to the extent funds are legally available therefor, the LLC may distribute to the Unitholders pursuant to this Section 4.1(c) (and not pursuant to Section 4.1(b)) an aggregate amount of cash (a "Tax Distribution") in respect of such Fiscal Quarter which in the good faith estimation of the Managers equals the product of (x) the aggregate amount of all taxable income allocable to the Unitholders in respect of such Fiscal Quarter determined without regard to adjustments under Section 743(b) of the Code, multiplied by (y) the highest maximum combined federal, state and local income tax rate (including due to self-employment and similar taxes) to which an individual or a corporation that was a Unitholder during such Fiscal Quarter may be subject with respect to such taxable income in the [Commonwealth of Massachusetts] (regardless of whether a Unitholder is an individual or a corporation); provided that if any Tax Distributions are not made for any reason, then, in the sole discretion of the Managers, the LLC may distribute such amounts once the LLC has funds available to do so.  Each Tax Distribution with respect to a Fiscal Quarter shall be distributed among the Unitholders on a pro rata basis according to the allocation of the LLC's taxable income for the Fiscal Quarter determined without regard to adjustments under Section 743(b) of the Code.  Any amounts distributed to a Unitholder pursuant to this Section 4.1(c) shall be applied against and reduce the next Distributions that would otherwise be made to such Unitholder pursuant to Section 4.1(b), as if actually distributed pursuant to Section 4.1(b) and the subsections thereof, in the order of priority set forth in Section 4.1(b).

(d)     Persons Receiving Distributions.  Each Distribution shall be made to the Persons shown on the LLC's books and records as Unitholders as of the date of such Distribution; provided, however, that any transferor and transferee of Units may mutually agree as to which of them should receive payment of any Distribution under Section 4.1.  In the event that restrictions on transfer or change in beneficial ownership of Units set forth herein have been breached, the LLC may withhold distributions in respect of the affected Units until such breach has been cured.

(e)     Withholding.  If a distribution to any Unitholder is subject to withholding pursuant to the Code, or any other provision of federal, state or local law, the LLC shall withhold

A/76212018.8                                                                                                    DRAFT 07/25/14 5:42PM

all amounts otherwise distributable to such Unitholder as are required by law and any amounts so withheld shall be deemed to have been distributed to such Unitholder under this Agreement. The Unitholders acknowledge that Section 1446 of the Code currently requires that the LLC withhold U.S. federal income taxes with respect to taxable income allocable to Persons who are "foreign partners" within the meaning of that Section.

(f)     Form of Payment of Payments and Distributions. Although the amount of the Class A Preferred Unit Preference Amount is denominated in U.S. dollars, all payments and distributions in respect of the Class A Preferred Unit Preference Amount shall be made in bitcoins, unless otherwise agreed in writing by the Company and holder of the Class A Preferred Units.  Each payment in bitcoins will be credited against amounts owing in respect of the Class A Preferred Unit Preference Amount under this Agreement in U.S. dollars based on the then customary price using recognized pricing sources for the sale of bitcoins in exchange for U.S. dollars. All such distributions shall be transferred to a bitcoin wallet designated by the holder of the Class A Preferred Units.

(g)     Optional Redemption of Class A Preferred Units.  In the event that the Managers determine that the cost of Company operations, including the cost of bitcoin mining, becomes non-economical and no further payments are being made on the Seller Note or in respect of the Class A Preferred Units, then, at the election of the Holder and the holders of the Class A Preferred Units, the Company shall, to the extent permitted by law, surrender or otherwise transfer to the Holder the built out systems and equipment of the Company in satisfaction of the Seller Note and in full redemption of the Class A Preferred Units.

**Section 4.2     Allocations of Net Profit and Net Loss**.  Net Profit or Net Loss of the Company for any relevant period shall be allocated to the Capital Accounts of the Members so as to ensure, to the extent possible, that the Capital Accounts of the Members as of the end of such period are equal to the aggregate Distributions that Members would be entitled to receive if all of the assets of the Company were sold for their Asset Values, the liabilities of the Company were paid in full (except that non-recourse liabilities shall be paid only to the extent, with respect to each asset subject to a non-recourse liability, the non-recourse liability does not exceed the Asset Value), and the remaining proceeds were distributed as of the end of such accounting period in accordance with Section 4.1.  The allocations made pursuant to this Section 4.2 are intended to comply with the provisions of Section 704(b) of the Code and the Regulations thereunder and, in particular, to reflect the Members' economic interests in the Company as set forth in Section 4.1, and this Section 4.2 shall be interpreted in a manner consistent with such intention. *[NOTE: Allocation provisions subject to tax review.]*

**Section 4.3     Special Allocations**.

(a)     Regulatory Allocations.  Although the Members do not anticipate that events will arise that will require application of this Section 4.3(a), provisions governing the allocation of taxable income, gain, loss, deduction and credit (and items thereof) shall be deemed to be included in this Agreement as may be necessary to provide that the Company's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Nonrecourse Deductions" and "Member Nonrecourse Deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code

A/76212018.8                                                                                    DRAFT 07/25/14 5:42PM

("Regulatory Allocations"); provided, however, that the Members intend that all Regulatory Allocations that may be required shall be offset by other Regulatory Allocations or special allocations of tax items so that each Member's share of the Net Profit, Net Loss and capital of the Company will be the same as it would have been had the events requiring the Regulatory Allocations not occurred. For this purpose, the Managers, based on the advice of the Company's tax counsel and advisors, is hereby authorized to make such special curative allocations of tax items as may be necessary to minimize or eliminate any economic distortions that may result from any required Regulatory Allocations.

        (b)    Tax Allocations: Code Section 704(c) and Unrealized Appreciation or Depreciation.

        (i)    Contributed Assets.  In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the Company with an adjusted basis for federal income tax purposes different from the initial Asset Value at which such property was accepted by the Company shall, solely for tax purposes, be allocated among the Members so as to take into account such difference in the manner required by Section 704(c) of the Code and the applicable Regulations.

        (ii)    Revalued Assets.  If upon the acquisition of additional Units in the Company by a new or existing Member the Asset Value of any the assets of the Company is adjusted pursuant to Section 3.5(b), subsequent allocations of income, gain, loss and deduction with respect to such assets shall, solely for tax purposes, be allocated among the Members so as to take into account such adjustment in the same manner as under Section 704(c) of the Code and the applicable Regulations.

        (iii)    Limitation.  The allocations required by this Section 4.3(b) are solely for purposes of federal, state and local income taxes and shall not affect the allocation of Net Profits or Net Losses as between Members or any Member's Capital Account.

        (iv)    Allocations.  Except as noted in this Section 4.3(b), all items of income, deduction and loss shall be allocated for federal, state and local income tax purposes in the same manner such items are allocated for purposes of calculating Net Profits and Net Losses.

**Section 4.4    Indemnification and Reimbursement for Payments on Behalf of a Unitholder**.  If the LLC is required by law to make any payment that is specifically attributable to a Unitholder or a Unitholder's status as such (including federal withholding taxes, state personal property taxes, and state unincorporated business taxes), then such Unitholder shall be notified of this in advance of making any payments and, so long as such payments are required by law to be made and are not otherwise made by the Unitholder, shall indemnify the LLC in full for the entire amount paid (including interest, penalties and related expenses).  The LLC may pursue and enforce all rights and remedies it may have against each Unitholder under this Section 4.4, including withholding from Distributions payable to such Unitholder and instituting a lawsuit to collect such indemnification and contribution with interest calculated at a rate equal to 10% per annum, compounded as of the last day of each year (but not in excess of the highest rate per annum permitted by law), and all costs and reasonable attorneys' fees with respect to any such lawsuit.

20

**Section 4.5**    **Transfer of Capital Accounts**.  If a Unitholder Transfers an interest in the LLC to a new or existing Unitholder in accordance with and as permitted by this Agreement, the transferee Unitholder shall succeed to that portion of the transferor's Capital Account that is attributable to the transferred interest.  Any reference in this Agreement to a Capital Contribution of, or Distribution to, a Unitholder that has succeeded any other Unitholder shall include any Capital Contributions or Distributions previously made by or to the former Unitholder on account of the interest of such former Unitholder transferred to such successor Unitholder.

## ARTICLE V

## MANAGERS; OFFICERS

**Section 5.1**    **Management by the Managers**.

(a)    No Management by Unitholders.  The Unitholders shall not manage or control the business and affairs of the LLC, except for situations in which the approval of certain Unitholders is required by this Agreement or by non-waivable provisions of applicable law.

(b)    Authority of the Managers.

(i)    Except for situations in which the approval of the holders of certain Unitholders is otherwise required, and subject to the provisions of Section 5.1(b)(ii), the powers of the LLC shall be exercised by or under the authority of, and the business and affairs of the LLC shall be managed under the direction of the Managers, acting by vote of a majority in number and the Persons constituting the Managers shall be the "managers" of the Company for all purposes under the Act.

(ii)    The Managers may act by delegating power and authority to any Officer pursuant to Section 5.3(c).

(iii)    Each Unitholder acknowledges and agrees that a Manager, in the capacity as Manager, shall devote whatever time, effort, and skill as the Manager deems appropriate for the operation of the LLC.

(c)    Officers.  The management of the business and affairs of the LLC by the Officers and the exercising of their powers shall be conducted under the supervision of and subject to the approval of the Managers.  Officers, as a result of being such, unless otherwise individually allowed by the Managers, shall be bound to devote all of their business time to the affairs of the LLC.

**Section 5.2**    **Managers**.

(a)    Number and Designation.  The number of Managers shall be determined by the Required Interest from time to time.

(b)    Term.  A Person shall serve as Manager from the date of the Person's acceptance of designation as a Manager in accordance with the terms hereof until such Person's resignation, death or removal in accordance with the terms hereof.  A Person may resign as

A/76212018.8

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 68 of 119

Manager by delivering the Person's written resignation to the LLC at the LLC's principal office addressed to each other Manager. Such resignation shall be effective upon receipt unless the resignation is specified to be effective at some other time or upon the happening of some other event.

(c)     Any Manager may be appointed, removed or replaced at any time by a vote of the Unitholders holding at least a majority in number of the Class A Common Units. Any removal shall be without prejudice to the rights, if any, of the Manager under any employment contract and, if the Manager is also a Member, shall not affect the Manager's rights as a Member or constitute a withdrawal of a Member.

(d)     Vacancies. In the event that any Manager ceases to serve as a Manager, either (i) the vacancy shall remain unfilled and the remaining Manager(s) shall be the sole Manager(s) of the LLC, or (ii) the resulting vacancy shall be filled by the affirmative vote of the holders of majority in number of the Class A Common Units.

(e)     Reimbursement. The LLC shall pay all reimbursable out-of-pocket costs and expenses incurred by each Manager in the course of the Manager's service hereunder.

(f)     Compensation of Managers. Managers may receive compensation for serving in such capacity.

(g)     Reliance by Third Parties. Any Person dealing with the LLC, other than a Unitholder, may rely on the authority of a Manager (or any Officer authorized by the Managers) in taking any action in the name of the LLC without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provisions of this Agreement. Every agreement, instrument or document executed by a Manager (or any Officer authorized by a Manager) in the name of the LLC with respect to any business or property of the LLC shall be conclusive evidence in favor of any Person relying thereon or claiming thereunder that (i) at the time of the execution or delivery thereof, this Agreement was in full force and effect, (ii) such agreement, instrument or document was duly executed according to this Agreement and is binding upon the LLC and (iii) a Manager or such Officer was duly authorized and empowered to execute and deliver such agreement, instrument or document for and on behalf of the LLC.

**Section 5.3     Officers**.

(a)     Designation and Appointment. The Manager may (but need not), from time to time, designate and appoint one or more individuals as an Officer of the LLC. No Officer need be a Unitholder or a Manager. Any Officers so designated shall have such authority and perform such duties as the Managers may, from time to time, delegate to them. The Managers may assign titles to particular Officers. Each Officer shall hold office until such Officer's successor shall be duly designated and shall qualify or until such Officer's death or until such Officer shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same individual. The salaries or other compensation, if any, of the Officers and agents of the LLC shall be fixed from time to time by the Managers.

A/76212018.8

(b)    Resignation; Removal; Vacancies.   Any Officer (subject to any contract rights available to the LLC, if applicable) may resign as such at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of receipt of the resignation by a Manager.  The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  Any Officer may be removed as such, either with or without cause, by a Manager in the Manager's discretion at any time; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the individual so removed.  Designation of an Officer shall not of itself create contract rights.  Any vacancy occurring in any office of the LLC may be filled by vote of the Required Interest.

(c)    Duties of Officers; Generally.   Subject to Section 6.5, the Officers, in the performance of their duties as such, shall owe to the Unitholders duties of loyalty and due care of the type owed by the officers of a corporation to such corporation and its stockholders under the laws of the State of Delaware.  The following Officers, to the extent such Officers have been appointed by the Managers, shall have the following duties:

(i)    Chief Executive Officer.    Subject to the powers of the Managers, the chief executive officer of the LLC shall be in the general and active charge of the entire business and affairs of the LLC, and shall be its chief policy-making Officer.  Unless otherwise expressly provided in an employment agreement approved by the Managers, the president, chief financial officer and each other senior officer of the LLC shall report directly to the chief executive officer.  The chief executive officer shall see that all orders of the Managers are carried into effect.  The chief executive officer shall have such other powers and perform such other duties as may be prescribed by the Managers.

(ii)    President.   The president shall, subject to the powers of the Managers and the chief executive officer, be the chief administrative officer of the LLC and shall have general charge of the business, affairs and property of the LLC, and control over its Officers (other than the chief executive officer), agents and employees.  The president shall see that all orders and resolutions of the Managers and the chief executive officer are carried into effect.  He or she shall be responsible for the employment of employees, agents and Officers (other than the chief executive officer) as may be required for the conduct of the business and the attainment of the objectives of the LLC.  He or she shall have authority to suspend or to remove any employee, agent or Officer (other than the chief executive officer) of the LLC and, in the case of the suspension for cause of any such Officer, to recommend to the Managers what further action should be taken.  In the absence of the president, the president's duties shall be performed and the president's authority may be exercised by the chief executive officer.  In the absence of the president and the chief executive officer, the duties of the president shall be performed and the president's authority may be exercised by such Officer as may have been designated as the most senior officer of the LLC.  The president shall have such other powers and perform such other duties as may be prescribed by the chief executive officer or the Managers.

(iii)    Chief Technology Officer.   The chief technology officer shall have responsibility for technology development, product performance and reliability, and all aspects of maintaining the technological excellence of the LLC's products and services.  The

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 70 of 119

chief technology officer shall report to the Managers. The chief technology officer shall have such other powers and perform such other duties as may be prescribed by the Managers.

(iv)     Chief Financial Officer. The chief financial officer shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transactions of the LLC, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital and Units. The chief financial officer shall have the custody of the funds and securities of the LLC, and shall keep full and accurate accounts of receipts and disbursements in books belonging to the LLC, and shall deposit all moneys and other valuable effects in the name and to the credit of the LLC in such depositories as may be designated by the Managers. The chief financial officer shall have such other powers and perform such other duties as may be prescribed by the chief executive officer or the Managers.

(v)     Vice President(s). The vice president(s) shall perform such duties and have such other powers as the chief executive officer, the president, the chief financial officer or the Managers may from time to time prescribe, and may have such further denominations as "Executive Vice President," "Senior Vice President," "Assistant Vice President," and the like.

(vi)     Secretary and Assistant Secretaries. The secretary shall keep all documents as may be required under the Delaware Act or this Agreement. The secretary shall perform such other duties and have such other authority as may be prescribed elsewhere in this Agreement or from time to time by the Managers. The secretary shall have the general duties, powers and responsibilities of a secretary of a corporation. If the Managers choose to appoint an assistant secretary or assistant secretaries, the assistant secretaries, in the order of their seniority, in the absence, disability or inability to act of the secretary, shall perform the duties and exercise the powers of the secretary, and shall perform such other duties as the Managers may from time to time prescribe.

(vii)     Independent Officer;

(A)     Appointment by Holders of Class A Common Units. Notwithstanding anything to the contrary in this Section 5, as long as any portion of the Class A Preferred Unit Preference Amount remains outstanding, the holders of a majority in number of the Class A Common Units shall designate and appoint an independent officer, who shall be subject to the prior written approval of the holders of a majority in number of the Class A Preferred Units, not to be unreasonably withheld (the "Independent Officer"). The Independent Officer need not be a Unitholder or a Manager. Any Independent Officer so designated shall have such authority and perform the duties set forth in this Section 5.3(c)(vii). The Independent Officer shall hold office until such Independent Officer's successor shall be duly designated and shall qualify or until such Independent Officer's death or until such Independent Officer shall resign or shall have been removed in the manner hereinafter provided. The removal, replacement, and appoint of any successor Independent Officer shall be subject to the prior written approval of the holders of a majority in number of the Class A Preferred Units, not to be unreasonably withheld.

A/76212018.8

Case: 14-30725     Doc# 158     Filed: 07/25/14     Entered: 07/25/14 16:37:45     Page 71 of 119

(B)  Resignation; Removal; Vacancy.  The Independent Officer (subject to any contract rights available to the LLC, if applicable) may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of receipt of the resignation by a Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation.  The Independent Officer may be removed as such, at any time, either with or without cause, by a vote of a majority in number of the Class A Common Units subject to the prior written approval of the holders of a majority in number of the Class A Preferred Units, not to be unreasonably withheld; provided, however, that the LLC shall have an Independent Officer as long as Class A Preferred Unit Preference Amount remains outstanding. Any vacancy occurring in the office of the Independent Officer may be filled by the vote of a majority in number of the Class A Common Units subject to the prior written approval of the holders of a majority in number of the Class A Preferred Units, not to be unreasonably withheld and shall remain vacant until filled by such vote.

(C)  Duties of Independent Officer.  The Independent Officer's sole duty shall be the review and approval of all payments for goods, services, intellectual property licensing or debt funding by the LLC to the Affiliates of a Unitholder and each of their respective stockholders, directors, officers, controlling persons, members, managers, partners and employees, to ensure that such payments described above are made on an arm's length basis.

## ARTICLE VI

## GENERAL RIGHTS AND OBLIGATIONS OF UNITHOLDERS

**Section 6.1**  **Limitation of Liability**.  Except as otherwise provided by applicable law, the debts, obligations, and liabilities of the LLC, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations, and liabilities of the LLC, and no Unitholder shall be obligated personally for any such debt, obligation, or liability of the LLC solely by reason of being a Unitholder of the LLC; provided that a Unitholder shall be required to return to the LLC any Distribution made to it in clear and manifest accounting or similar error. The immediately preceding sentence shall constitute a compromise to which all Unitholders have consented within the meaning of the Delaware Act. Notwithstanding anything contained herein to the contrary, the failure of the LLC to observe any formalities or requirements relating to the exercise of its powers or management of its business and affairs under this Agreement or the Delaware Act shall not be grounds for imposing personal liability on the Unitholders for liabilities of the LLC.

**Section 6.2**  **Lack of Authority**.  No Unitholder in the Unitholder's capacity as such (other than the Managers or an authorized Officer of the LLC) has the authority or power to act for or on behalf of the LLC in any manner, to do any act that would be (or could be construed as) binding on the LLC or to make any expenditures on behalf of the LLC, and the Unitholders hereby consent to the exercise by each of the Managers of the powers conferred on him by law and this Agreement.

**Section 6.3**  **No Right of Partition**.  No Unitholder shall have the right to seek or obtain partition by court decree or operation of law of any LLC property, or the right to own or use particular or individual assets of the LLC.

Case: 14-30725　Doc# 158　Filed: 07/25/14　Entered: 07/25/14 16:37:45　Page 72 of 119

**Section 6.4   Unitholders Right to Act**.  For situations in which the approval of any Unitholders or class thereof (rather than the approval of the Managers on behalf of the Unitholders) is required, the Unitholders shall act through meetings and written consents as described in Section 3.2.

**Section 6.5   Conflicts of Interest**.  A Unitholder, the Affiliates of a Unitholder and each of their respective stockholders, directors, officers, controlling persons, members, managers, partners and employees (collectively, the "Unitholder Group"), except for Officers unless otherwise approved by the Managers, may have business interests and engage in business activities in addition to those relating to the LLC and any Subsidiary of the LLC.  Neither the LLC nor any Unitholder shall have any rights by virtue of this Agreement in any business ventures of any such Person except for any business interests or activities which any such Person has agreed in writing with the LLC or any of Subsidiary of the LLC to not pursue or consummate (whether directly or indirectly), in which case all of such Person's direct and indirect interest in such business interests or activities shall become an asset of the LLC and the LLC shall be entitled to all rights in such business interests or activities and to all income or profits derived therefrom.  In addition, to the maximum extent permitted from time to time under the law of the State of Delaware, the LLC renounces any interest or expectancy of the LLC in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to the LLC's Managers or Unitholders.  No amendment or repeal of this Section 6.5 shall apply to or have any effect on the liability or alleged liability of any Manager or Unitholder of the LLC for or with respect to any opportunities of which such Manager or Unitholder becomes aware prior to such amendment or repeal.

**Section 6.6   Transactions Between the LLC and the Unitholders**.  Notwithstanding that it may constitute a conflict of interest, the Unitholders, Managers or their Affiliates may engage in any transaction (including the purchase, sale, lease or exchange of any property or rendering of any service or the establishment of any salary, other compensation or other terms of employment) with the LLC so long as such transaction is approved by the Managers.

**Section 6.7   Approval Rights of the Class A Preferred Units and the Class B Common Units**.  For so long as any Class A Preferred Units remain outstanding, the LLC shall not, without the affirmative vote of the holders holding a majority of the Class A Preferred Units, take any action that constitutes or results in any change to the existing economic terms relating to the Class A Preferred Units.  For so long as any Class B Common Units remain outstanding, the LLC shall not, without the affirmative vote of the holders holding a majority of the Class B Common Units, take any action that constitutes or results in any change to the existing economic terms relating to the Class B Common Units, or the respective holders thereof in a manner that is disproportionate to that of the Class A Common Units.

## ARTICLE VII

## EXCULPATION AND INDEMNIFICATION

**Section 7.1   Exculpation**.  No Officer or Manager shall be liable to any other Officer, Manager, the LLC or to any Unitholder for any loss suffered by the LLC or any Unitholder unless such loss is caused by such Person's gross negligence, willful misconduct or fraud.  The

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 73 of 119

Officers and Managers shall not be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence, willful misconduct or fraud. Any Officer or Manager may consult with counsel and accountants in respect of LLC affairs, and provided such Person acts in good faith reliance upon the advice or opinion of such counsel or accountants, such Person shall not be liable for any loss suffered by the LLC or any Unitholder in reliance thereon.

**Section 7.2      Right to Indemnification**.  Subject to the limitations and conditions as provided in this Article VII, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of whom such Person is the legal representative, is or was a Unitholder, Manager or Officer, or while a Unitholder, Manager or Officer is or was serving at the request of the LLC as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the LLC to the fullest extent permitted by the Delaware Act, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the LLC to provide broader indemnification rights than said law permitted the LLC to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article VII shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder.  The rights granted pursuant to this Article VII shall be deemed contract rights, and no amendment, modification or repeal of this Article VII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal.  It is expressly acknowledged that the indemnification provided in this Article VII could involve indemnification for negligence or under theories of strict liability.

**Section 7.3      Advance Payment**.  Reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 7.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding shall be paid by the LLC in advance of the final disposition of the Proceeding subject to an undertaking, if so requested by the Managers, by or on behalf of such Person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the LLC.

**Section 7.4      Indemnification of Employees and Agents**.  The LLC, with the written approval of a Manager, may indemnify and advance expenses to any Person who is an employee or agent of the LLC to the same extent and subject to the same conditions under which the LLC may, under Section 7.2, indemnify and advance expenses to Persons who are not or were not Managers or Officers but who are or were serving at the request of the LLC as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 74 of 119

against such Person and incurred by such Person in such a capacity or arising out of such Person's status as an employee or agent of the LLC.

**Section 7.5**    **Appearance as a Witness**.  Notwithstanding any other provision of this Article VII, the LLC shall pay or reimburse reasonable out-of-pocket expenses incurred by any Person who is a Unitholder, Manager or Officer in connection with the appearance by the Person as a witness or other participation in a Proceeding at a time when the Person is not a named defendant or respondent in the Proceeding.

**Section 7.6**    **Non-Exclusive Rights**.  The right to indemnification and the advancement and payment of expenses conferred in this Article VII shall not be exclusive of any other right which a Manager, Officer or other Person indemnified pursuant to Section 7.2 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement, agreement, vote of Unitholders or disinterested Managers or otherwise.

**Section 7.7**    **Insurance**.  The LLC may purchase and maintain insurance, or cause any Subsidiary of the LLC to purchase and maintain insurance, at the expense of the LLC or Subsidiary, to protect the LLC, any Subsidiary of the LLC and any Person who is or was serving as a Manager, Officer or agent of the LLC or any Subsidiary of the LLC , or is or was serving at the request of the LLC as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of any Subsidiary of the LLC, another foreign or domestic limited ability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the LLC or any Subsidiary of the LLC would have the power or obligation to indemnify such Person against such expense, liability or loss under this Article VII.

**Section 7.8**    **Savings Clause**.    If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the LLC shall nevertheless indemnify and hold harmless each Manager, Officer or any other Person indemnified pursuant to this Article VII as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE VIII

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

**Section 8.1**    **Records and Accounting**.    The LLC shall keep, or cause to be kept, appropriate books and records with respect to the LLC's business, including all books and records necessary to provide any information, lists, and copies of documents required to be provided pursuant to Section 8.3 or pursuant to applicable laws.  The unit ledger for the LLC and any unit certificates held by the LLC, and the stock or unit ledgers and equity certificates for each of the LLC's Subsidiaries, shall be maintained at the Boston offices of Bingham McCutchen LLP, or at such other place as directed by the Managers from time to time hereafter. All matters concerning (i) the determination of the relative amount of allocations and

A/76212018.8  DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 75 of 119

distributions among the Unitholders pursuant to Articles III and IV and (ii) accounting procedures and determinations, and other determinations not specifically and expressly provided for by the terms of this Agreement, shall be determined by the Managers, whose determination shall be final and conclusive as to all of the Unitholders absent manifest clerical error. Each Unitholder shall have the right to examine the books and records of the LLC together with such financial information reasonably requested, and upon reasonable notice to the Managers.

**Section 8.2**   **Fiscal Year**. The fiscal year (the "Fiscal Year") of the LLC shall constitute the 12-month period ending on December 31 of each calendar year, or such other annual accounting period as may be established by the Managers.

**Section 8.3**   **Tax Information**. The LLC shall use reasonable efforts to deliver or cause to be delivered, within 120 days after the end of each Fiscal Year, to each Person who was a Unitholder at any time during such Fiscal Year all draft information regarding the LLC necessary for the preparation of such Person's United States federal and state income tax returns ("Tax Documents"). Finalized Tax Documents will be provided as soon as possible thereafter, but in no case later than fourteen (14) days prior to the Members' United States federal income tax return filing deadline, including extensions.

**Section 8.4**   **Transmission of Communications**. Each Person that owns or controls Units on behalf of, or for the benefit of, another Person or Persons shall be responsible for conveying any report, notice, or other communication received from the Managers to such other Person or Persons.

## ARTICLE IX

## TAXES[1]

**Section 9.1**   **Tax Returns**. The LLC shall prepare and file all necessary federal and state income tax returns, including making the elections described in Section 9.2. Each Unitholder shall furnish to the LLC all pertinent information in the Unitholder's possession relating to LLC operations that is necessary to enable the LLC's income tax returns to be prepared and filed.

**Section 9.2**   **Tax Elections**. The LLC shall make any election under the Code that the Managers deem appropriate for the LLC to make.

**Section 9.3**   **Tax Matters Partner**. The Managers shall designate a Class A Common Unitholder to be the "tax matters partner" of the LLC pursuant to Section 6231(a)(7) of the Code (the "Tax Matters Partner"). The Tax Matters Partner shall take such action as may be necessary to cause each other Unitholder to become a "notice partner" within the meaning of Section 6223 of the Code. The Person serving as Tax Matters Partner shall inform each other Unitholder of all significant matters that may come to such Person's attention in such Person's capacity as Tax Matters Partner by giving notice thereof on or before the fifth business day after becoming aware thereof and, within that time, shall forward to each other Unitholder copies of all significant written communications he may receive in that capacity. The Tax Matters Partner may not take

---

[1] Note to draft: To be reviewed by tax counsel.

A/76212018.8      DRAFT 07/25/14 5:42PM

any action contemplated by Sections 6222 through 6232 of the Code without the consent of the Managers, but this sentence does not authorize the Tax Matters Partner (or any Manager) to take any action left to the determination of an individual Unitholder under Sections 6222 through 6232 of the Code.

# ARTICLE X

## TRANSFER OF MEMBERSHIP INTERESTS

**Section 10.1  <u>Transfers by Unitholders</u>.**

(a)  <u>Required Consent</u>.  Subject to Section 10.1(d), no Unitholder shall Transfer, or offer or agree to Transfer, all or any part of any interest of such Unitholder's Units without the prior written consent of the Managers (which consent may be withheld in a Manager's sole discretion), except for Transfers: (i) to a Permitted Transferee in accordance with <u>Section 10.1(b)</u>; (ii) in accordance with <u>Sections 10.2</u> and <u>10.3</u>; and (iii) pursuant to an Approved Sale in accordance with this Agreement.  With a Manager's written consent, a Unitholder may Transfer all or any part of such Unitholder's Units, subject to compliance with this Agreement (including, without limitation, <u>Section 10.1(c)</u>) and any other agreement binding upon the Unitholders which restricts the Transfer of Units.

(b)  <u>Permitted Transfers</u>.  The restrictions set forth in <u>Section 10.1(a)</u> or <u>Section 10.2</u> shall not apply to:  (i) any Transfer of Units by any Unitholder to or among the Unitholder's Affiliates or Family Group; (ii) any Transfer of Units to a holder of Class A Common Units; (iii) any Transfer of Units to the LLC or any of the LLC's Subsidiaries; (iv) as to any Class A Preferred Unit, to a liquidating trust for the benefit of holders of allowed general unsecured claims of HashFast Technologies LLC and HashFast LLC; or (v) an Approved Sale; <u>provided</u> that the restrictions contained in this Agreement will continue to be applicable to the Units after any Transfer pursuant to clause (i) or (ii) above.  Upon the Transfer of Units pursuant to clause (i) or (ii) of the previous sentence, the transferees will deliver a written notice to the LLC, which notice will disclose in reasonable detail the identity of such transferee.  A transferee permitted pursuant to this <u>Section 10.1(b)</u> who receives a transfer of Units in accordance with this Agreement shall be referred to herein as a "<u>Permitted Transferee</u>."  Notwithstanding the foregoing, no party hereto shall avoid the provisions of this Agreement by either making one or more transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee, or by Transferring the securities of any entity holding (directly or indirectly) Units.

(c)  <u>Requirement to Join Agreement</u>. Each transferee of Units or other interest in the LLC shall, as a condition precedent to such Transfer, execute a Joinder Agreement pursuant to which such transferee shall agree to be bound by the provisions of this Agreement.

(d)  <u>Restriction on Class A Preferred Units</u>.  Notwithstanding any other provision herein to the contrary, the Class A Preferred Units are transferable to a liquidating trust for the benefit of holders of allowed general unsecured claims of HashFast Technologies LLC and HashFast LLC but not otherwise.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 77 of 119

**Section 10.2    Approved Sale Rights**.

(a)    General Obligations.  If the Managers approve a Sale of the LLC (an "Approved Sale"), each Unitholder shall vote for, consent to and raise no objections against such Approved Sale.  If the Approved Sale is structured as a merger or consolidation, each Unitholder shall waive any dissenters' rights, appraisal rights or similar rights in connection with such merger or consolidation.  If the Approved Sale is structured as a sale of Units, each Unitholder shall agree to sell all of the Unitholder's Units or rights to acquire Units on the terms and conditions approved by the Managers.  Each Unitholder shall take all necessary or desirable actions in furtherance of or in connection with the consummation of the Approved Sale as requested by the Managers.

(b)    Distributions Upon a Sale of Units.  In the event of an Approved Sale that is structured as a sale of Units, each Unitholder shall receive in exchange for the Units held by such Unitholder the same portion of the aggregate consideration from such Approved Sale that such Unitholder would have received if such aggregate consideration had been distributed by the LLC pursuant to the terms of Section 13.2(b) (assuming, for purposes of this determination, that the Units sold in such Approved Sale are the only Units then outstanding).  Each Unitholder shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from such Approved Sale as requested by the LLC or the holders of the Required Interest in order to effectuate the provisions of this Section 10.2(b).

(c)    Appointment of Purchaser Representative.  If either the LLC or the holders of any class of Units enter into a negotiation or transaction for which Rule 506 (or any similar rule then in effect) promulgated by the Securities and Exchange Commission may be available with respect to such negotiation or transaction (including a merger, consolidation or other reorganization), the Unitholders (other than any Unitholder who is an "accredited investor" under Rule 501) will, at the request of the LLC, appoint a purchaser representative (as such term is defined in Rule 501) reasonably acceptable to the LLC.  If any Unitholder appoints a purchaser representative designated by the LLC, the LLC will pay the fees of such purchaser representative, but if any Unitholder declines to appoint the purchaser representative designated by the LLC, such Unitholder will appoint another purchaser representative, and such Unitholder will be responsible for the fees of the purchaser representative so appointed.

(d)    Approved Sale Expenses.  Unitholders will bear their pro rata share (based upon the number of Units to be sold and net proceeds to be received from such sale) of the costs of any sale of Units pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all holders of Units and are not otherwise paid by the LLC or the acquiring party.  For purposes of this Section 10.2(d), costs incurred in exercising reasonable efforts to take all actions in connection with the consummation of an Approved Sale in accordance with Section 10.2(a) shall be deemed to be for the benefit of all holders of Units.  Costs incurred by holders of Units on their own behalf will not be considered costs of the transaction hereunder.

**Section 10.3    Effect of Assignment**.

(a)    Any Unitholder who assigns any Units or other interest in the LLC, which may be transferred or assigned pursuant to or in accordance with this Agreement, shall cease to

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 78 of 119

be a Unitholder of the LLC with respect to such Units or other interest and shall no longer have any rights or privileges of a Unitholder with respect to such Units or other interest.

(b) Any Person who acquires in any manner whatsoever any Units or other interest in the LLC, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms and conditions of this Agreement that any predecessor in such Units or other interest in the LLC of such Person was subject to or by which such predecessor was bound.

Section 10.4 **Section 7704 Safe Harbor**. In order to permit the LLC to qualify for the benefit of a "safe harbor" under Code Section 7704, notwithstanding anything to the contrary in this Agreement, no Transfer of any Unit or economic interest shall be permitted or recognized by the LLC or the Managers (within the meaning of Treasury Regulation Section 1.7704-1(d)) if and to the extent that such Transfer would cause the LLC to have more than 100 partners (within the meaning of Treasury Regulation Section 1.7704-1(h), including the look-through rule in Treasury Regulation Section 1.7704-1(h)(3)).

Section 10.5 **Transfer Fees and Expenses**. The transferor and transferee of any Units or other interest in the LLC shall be jointly and severally obligated to reimburse the LLC for all reasonable expenses (including attorneys' fees and expenses) of any Transfer or proposed Transfer, whether or not consummated.

Section 10.6 **Void Transfers**. Any Transfer by any Unitholder of any Units or other interest in the LLC in contravention of this Agreement (including, without limitation, the failure of the transferee to execute a Joinder Agreement in accordance with Section 10.1(c) or which would cause the LLC to not be treated as a partnership for U.S. federal income tax purposes shall be void and ineffectual and shall not bind or be recognized by the LLC or any other party. No purported assignee shall have any right to any profits, losses or distributions of the LLC.

## ARTICLE XI

## ADMISSION OF UNITHOLDERS

Section 11.1 **Substituted Unitholders**. In connection with the transfer of a Membership Interest of a Unitholder permitted under the terms of this Agreement and the other Transaction Documents, the transferee shall become a "Substituted Unitholder" on the effective date of such Transfer, which effective date shall not be earlier than the date of compliance with or waiver by the Managers of the conditions to such Transfer (unless one of the conditions to such Transfer is that the Managers or Unitholder consent is required under the terms of this Agreement or the admission of such transferee, in which case such consent must first be obtained), including, but not limited to, those set forth in Section 11.2, and such admission shall be shown on the books and records of the LLC.

Section 11.2 **Additional Unitholders**. A Person may be admitted to the LLC as an Additional Unitholder only as contemplated under, and in compliance with, the terms of this Agreement, including furnishing to the Managers (a) an executed Joinder Agreement indicating

acceptance of all the terms and conditions of this Agreement, including the power of attorney granted in Section 14.1, and (b) such other documents or instruments as the Managers determine in their sole and absolute discretion may be reasonably necessary or appropriate to effect such Person's admission as a Unitholder. Such admission shall become effective on the date on which the Managers reasonably determine in their sole discretion that such conditions have been satisfied and when any such admission is shown on the books and records of the LLC.

## ARTICLE XII

## WITHDRAWAL AND RESIGNATION OF UNITHOLDERS

No Unitholder shall have the power or right to withdraw or otherwise resign or be expelled from the LLC prior to the dissolution and winding up of the LLC pursuant to Article XII, except as otherwise expressly permitted by this Agreement or any of the other agreements contemplated hereby or if required by applicable law or court order. Notwithstanding that payment on account of a withdrawal may be made after the effective time of such withdrawal, any completely withdrawing Unitholder will not be considered a Unitholder for any purpose after the effective time of such complete withdrawal, and, in the case of a partial withdrawal, such Unitholder's Capital Account (and corresponding voting and other rights, if any) shall be reduced for all other purposes hereunder upon the effective time of such partial withdrawal.

## ARTICLE XIII

## DISSOLUTION AND LIQUIDATION

**Section 13.1  Dissolution**.  The LLC shall not be dissolved by the admission of Additional Unitholders or Substituted Unitholders, or by the death, retirement, expulsion, bankruptcy or dissolution of a Unitholder. The LLC shall dissolve, and the affairs of the LLC shall be wound up upon the first to occur of the following:

> (a)     at any time as determined by the Managers; or

> (b)     the entry of a decree of judicial dissolution of the LLC under Section 18-802 of the Delaware Act.

Except as otherwise set forth in this Article XIII, the LLC is intended to have perpetual existence. An Event of Withdrawal shall not cause a dissolution of the LLC and the LLC shall continue in existence subject to the terms and conditions of this Agreement.

**Section 13.2  Distributions Upon Liquidation**.

> (a)     Upon dissolution of the LLC, the Liquidator shall satisfy liabilities owing to creditors, including by establishing such reserves as may be required by non-waivable provisions of Section 18-804(b) of the Delaware Act or as the Liquidator otherwise deems reasonably necessary for any contingent liabilities or obligations of the LLC. Said reserves may be paid over by the Liquidator to a bank, to be held in escrow for the purpose of complying with any such provisions of Section 18-804(b) of the Delaware Act or paying any such contingent

A/76212018.8

DRAFT 07/25/14 5:42PM

liabilities or obligations and, at the expiration of such period as may be required by non-waivable provisions of Section 18-804(b) of the Delaware Act or as the Liquidator may deem advisable, such reserves shall be distributed to the Members or their assigns in the manner set forth in Section 13.2(b).

(b)     After satisfying such liabilities (including by and through the creation of reserves), the Liquidator shall cause the remaining net assets of the LLC to be distributed to all Persons which are Members as of the record date for the making of such liquidating distribution, in accordance with Section 4.1 hereof.

In the event that any part of such net assets consists of notes or accounts receivable or other noncash assets, the Liquidator may take whatever steps it deems appropriate to convert such assets into cash or into any other form which would facilitate the distribution thereof. If any assets of the LLC are to be distributed in kind, such assets shall be distributed on the basis of their fair market value net of any liabilities.

Section 13.3  **Cancellation of Certificate**.  On completion of the distribution of LLC assets as provided herein, the LLC shall be terminated (and the LLC shall not be terminated prior to such time), and the Managers (or such other Person or Persons as the Delaware Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to this Agreement that are or should be canceled, and take such other actions as may be necessary to terminate the LLC. The LLC shall be deemed to continue in existence for all purposes of this Agreement until it is terminated pursuant to this Section 13.3.

Section 13.4  **Reasonable Time for Winding Up**.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the LLC and the liquidation of the LLC's assets pursuant to Section 13.2 in order to minimize any losses otherwise attendant upon such winding up.

Section 13.5  **Return of Capital**.  The Liquidator shall not be personally liable for the return of Capital Contributions or any portion thereof to the Unitholders (it being understood that any such return shall be made solely from LLC assets).

Section 13.6  **Reserves Against Distributions**.  The Liquidator shall have the right to withhold from Distributions payable to any Unitholder under this Agreement amounts sufficient to pay and discharge any reasonably anticipated contingent liabilities of the LLC. Any amounts remaining after payment and discharge of any such contingent liabilities of the LLC will be paid to the Unitholders from whom Distributions were withheld.

A/76212018.8

DRAFT 07/25/14 5:42PM

**ARTICLE XIV**

**GENERAL PROVISIONS**

**Section 14.1  Power of Attorney.**

(a)     Each Unitholder hereby constitutes and appoints each Manager and the liquidators, with full power of substitution, as the Unitholder's true and lawful agent and attorney-in-fact, with full power and authority in the Unitholder's name, place and stead, to execute, swear to, acknowledge, deliver, file, and record in the appropriate public offices (i) this Agreement, all certificates, and other instruments and all amendments (in the manner set forth herein) thereof in accordance with the terms hereof which the Managers deem appropriate or necessary to form, qualify, or continue the qualification of, the LLC as a limited liability company in the State of Delaware and in all other jurisdictions in which the LLC may conduct business or own property; (ii) all instruments which the Managers deem appropriate or necessary to reflect any amendment, change, modification, or restatement of this Agreement in accordance with its terms; (iii) all conveyances and other instruments or documents which the Managers deem appropriate or necessary to reflect the dissolution and liquidation of the LLC pursuant to the terms of this Agreement, including a certificate of cancellation; and (iv) all instruments including, but not limited to, an amendment of Schedule A relating to the admission, withdrawal, or substitution of any Unitholder pursuant to any or all of Sections 3.4, 4.6, and Articles XI and XII.  Nothing in this section shall be construed to authorize the Manager to take any actions on behalf of a Member (including, without limitation, the making of any representations, warranties, indemnities or agreements on behalf of a Member) that creates or would be reasonably likely to create a liability or potential liability for the Member.

(b)     The foregoing power of attorney is irrevocable and coupled with an interest, and shall survive the death, disability, incapacity, dissolution, bankruptcy, insolvency, or termination of any Unitholder and the Transfer of all or any portion of the Unitholder's Membership Interest and shall extend to such Unitholder's heirs, successors, assigns, and personal representatives.

**Section 14.2   Amendments.**  This Agreement may be amended from time to time by a written instrument executed by the Managers, provided that: (a) for so long as any Class A Preferred Units remain outstanding, any amendment of the terms of Section 5.3(c)(vii) (Independent Officer) or Section 6.7 (with respect to the rights of the Class A Preferred Units) shall require the prior written approval of the holders of a majority of the Class A Preferred Units; and (b) any amendment to Section 6.7 (with respect to the rights of the Class B Common Units) shall require the prior written approval of the holders of a majority of the Class B Common Units.

**Section 14.3   Title to LLC Assets.**  LLC assets shall be deemed to be owned by the LLC as an entity, and no Unitholder, individually or collectively, shall have any ownership interest in such LLC assets or any portion thereof.  Legal title to any or all LLC assets may be held in the name of the LLC or one or more nominees, as the Managers may determine.  The Managers hereby declare and warrant that any LLC assets for which legal title is held in the

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 82 of 119

LLC's name or the name of any nominee shall be held in trust by the Managers or such nominee for the use and benefit of the LLC in accordance with the provisions of this Agreement. All LLC assets shall be recorded as the property of the LLC on the LLC's books and records, irrespective of the name in which legal title to such LLC assets is held.

**Section 14.4    Remedies**.  Each Unitholder and the LLC shall have all rights and remedies set forth in this Agreement and all rights and remedies which such Person has been granted at any time under any other agreement or contract and all of the rights which such Person has at law or in equity, and no remedy shall be considered a sole or exclusive remedy of any party.  Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted at law or in equity.

**Section 14.5    Successors and Assigns**.  All covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, legal representatives, and permitted assigns, whether so expressed or not.

**Section 14.6    Severability**.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein; provided, however, to the extent any invalid or unenforceable provision can be modified or amended to make it enforceable under applicable law, such invalid or unenforceable provision shall be deemed to be modified or amended to the maximum extent necessary to render it enforceable under applicable law.

**Section 14.7    Opt-in to Article 8 of the Uniform Commercial Code**.  The Unitholders hereby agree that the Units shall be securities governed by Article 8 of the Uniform Commercial Code of the State of Delaware (and the Uniform Commercial Code of any other applicable jurisdiction).

**Section 14.8    Notice to Unitholder of Provisions**.  By executing this Agreement, each Unitholder acknowledges that he, she or it has actual notice of:  (a) all of the provisions hereof (including the restrictions on the Transfer set forth herein), and (b) all of the provisions of the Certificate.

**Section 14.9    Counterparts**.  This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

**Section 14.10    Consent to Jurisdiction**.  Each Unitholder irrevocably submits to the nonexclusive jurisdiction of the United States District Court for the State of Delaware and the

A/76212018.8                         DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 83 of 119

state courts of the State of Delaware for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby. Each Unitholder further agrees that service of any process, summons, notice or document by overnight courier delivery to such Unitholder's respective address set forth in the LLC's books and records or such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth above in the immediately preceding sentence. Each Unitholder irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the State of Delaware or the state courts of the State of Delaware and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

**Section 14.11 <u>Descriptive Headings; Interpretation</u>**. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa. The use of the word "including" in this Agreement shall be by way of example rather than by limitation. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. Without limiting the generality of the immediately preceding sentence, no amendment or other modification to any agreement, document, or instrument that requires the consent of any Person pursuant to the terms of this Agreement or any other agreement will be given effect hereunder unless such Person has consented in writing to such amendment or modification. Wherever required by the context, references to a Fiscal Year shall refer to a portion thereof. The use of the words "or," "either," and "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict.

**Section 14.12 <u>Applicable Law</u>**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

**Section 14.13 <u>Mutual Waiver of Jury Trial</u>**. Because disputes arising in connection with complex transactions are most quickly and economically resolved by an experienced and expert Person and the parties wish applicable state and federal laws to apply (rather than arbitration rules), the parties desire that their disputes be resolved by a judge applying such applicable laws. Therefore, to achieve the best combination of the benefits of the judicial system and of arbitration, each party to this Agreement (including the LLC) hereby waives all rights to

A/76212018.8

DRAFT 07/25/14 5:42PM

trial by jury in any action, suit, or proceeding brought to resolve any dispute between or among any of the parties hereto, whether arising in contract, tort, or otherwise, arising out of, connected with, related or incidental to this agreement, the transactions contemplated hereby and/or the relationships established among the parties hereunder.

Section 14.14 **Addresses and Notices**. All notices, demands, or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) telecopied to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if telecopied before 5:00 p.m. local time on a business day (as defined in Section 3.2(e)), and otherwise on the next business day in the jurisdiction of the recipient of the notice, or (c) two (2) business days after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands, and other communications shall be sent to the address for such recipient set forth in the LLC's books and records, or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. Any notice to the Managers or the LLC shall be deemed given if received by the Managers at the principal office of the LLC designated pursuant to Section 2.7.

Section 14.15 **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the LLC or any of the LLC's Affiliates, and no creditor who makes a loan to the LLC or any of the LLC's Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the LLC in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Net Profits or Net Losses or Distributions, capital, or property other than as a secured creditor.

Section 14.16 **Waiver**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement, or condition. Notwithstanding the other provisions of this Agreement, Section 18-305(a) of the Delaware Act shall not apply to the LLC and no Member shall have any rights thereunder.

Section 14.17 **Further Action**. The parties shall execute and deliver all documents, provide all information, and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 14.18 **Offset**. Whenever the LLC is to pay any sum to any Unitholder or any Affiliate or related Person thereof, any amounts that such Unitholder or such Affiliate or related Person owes to the LLC or any of the LLC's Subsidiaries may be deducted from that sum before payment.

Section 14.19 **Entire Agreement**. This Agreement, those documents expressly referred to herein, the other documents of even date herewith, and the other Transaction Documents embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

A/76212018.8

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 85 of 119

**Section 14.20 <u>Delivery by Facsimile or PDF</u>.** This Agreement and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format ("<u>pdf</u>"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or electronic transmission in pdf to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission in pdf as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

**Section 14.21 <u>Survival</u>.** Sections 4.4, 6.1, 7.1, 7.2 and 7.3 shall survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement or the dissolution of the LLC.

**Section 14.22 <u>Certain Acknowledgments</u>.** Upon execution and delivery of a counterpart to this Agreement or a Joinder Agreement, each Unitholder shall be deemed to acknowledge the following: (a) the determination of such Unitholder to acquire Units in connection with this Agreement or any other agreement has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase by any agent or employee of any other Member; (b) no other Unitholder has acted as an agent of such Unitholder in connection with making such Unitholder's investment hereunder and that no other Unitholder shall be acting as an agent of such Unitholder in connection with monitoring the Unitholder's investment hereunder; and (c) such Unitholder will, if the Unitholder wishes counsel on the transactions contemplated hereby, retain the Unitholder's own independent counsel.

**Section 14.23 <u>Tax and Other Advice</u>.** Each Member has had the opportunity to consult with such Member's own tax and other advisors with respect to the consequences to such Member of the purchase, receipt or ownership of the Units, including the tax consequences under federal, state, local and other income tax laws of the United States or any other country and the possible effects of changes in such tax laws. Such Member acknowledges that none of: (a) the LLC or any Subsidiary of the LLC and (b) the Affiliates, successors, beneficiaries, heirs and assigns and past and present managers, directors, officers, employees, and agents (including, without limitation, their attorneys) of the LLC or any Subsidiary of the LLC, makes or has made any representations or warranties to such Member regarding the consequence to such Member of the purchase, receipt or ownership of the Member's Units, including the tax consequences under federal, state, local and other tax laws of the United States or any other country and the possible effects of changes in such tax laws.

**Section 14.24 <u>Counsel to the LLC</u>.** Counsel to the LLC may also be counsel to any Manager, Member or any Affiliate of a Manager or Member. The Managers may execute on behalf of the LLC and the Members any consent to the representation of the LLC that counsel may request pursuant to the Massachusetts Rules of Professional Conduct or similar rules in any

A/76212018.8

other jurisdiction ("Rules"). The LLC has initially selected Bingham McCutchen ("LLC Counsel") as legal counsel to the LLC. Each Member acknowledges that LLC Counsel does not represent any Member in the absence of a clear and explicit written agreement to such effect between the Member and LLC Counsel, and that in the absence of any such agreement LLC Counsel shall owe no duties directly to a Member. Notwithstanding any adversity that may develop, in the event any dispute or controversy arises between any Members and the LLC, or between any Members or the LLC, on the one hand, and a Manager (or Affiliate of a Manager) that LLC Counsel represents, on the other hand, each Member agrees that LLC Counsel may represent either the LLC or such Manager (or the Manager's Affiliate), or both, in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.

*(Signature Page Follows)*

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 87 of
119

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf the Agreement as of the Effective Date.

[NEWCO] LLC

By:_____
Name:_____
Its:_____

MANAGERS:

_____

_____

MEMBERS:

By:_____
Name:_____
Its:_____

By:_____
Name:_____
Its:_____

A/76212018.8

DRAFT 07/25/14 5:42PM

## SCHEDULE A

| Name and Address of Unitholder | | Number of Class A Preferred Units | Number of Class A Common Units | Number of Class B Common Units |
|---|---|---|---|---|
| [Liquidbits Corp.] | | [_____] | [_____] | [_____] |
| [HashFast Technologies LLC] | | [_____] | [_____] | [_____] |
| **TOTAL** | | [_____] | [_____] | [_____] |

A-1

DRAFT 07/25/14 5:42PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 90 of 119

**Exhibit 2**

**FORM OF JOINDER AGREEMENT**

[Attached]

3-1

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 91 of 119

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Limited Liability Company Operating Agreement of dated [_____], 2014, as amended, modified, restated or supplemented from time to time, (the "Agreement"), of [NewCo] LLC, a Delaware limited liability company (the "LLC").

By executing and delivering this Joinder Agreement to the LLC, the undersigned hereby agrees to become a party to, to be bound by, and to comply with all of the provisions of the Agreement, including but not limited to the Power of Attorney provided for in Section 15.1 of the Agreement, in the same manner as if the undersigned were an original signatory to the Agreement.

The undersigned agrees that the undersigned shall be a Member, as such term is defined in the Agreement, with the [_____] Units as set forth in Schedule A of the Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.

_____
*Signature of Member*

_____
*Print Name of Member*

_____

_____

_____
*Address*

_____
*Facsimile*

_____
*Telephone*

_____
*e-mail address*

3-2

A/76212018.8

DRAFT 07/25/14 5:42PM

# EXHIBIT F

## VENDEE CLAIM WAIVER

This **VENDEE CLAIM WAIVER** (this "**Waiver**") is made as of the ___ day of _____, 2014, by LIQUIDBITS CORP. ("**Liquidbits**") in favor of HASHFAST TECHNOLOGIES LLC, a debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the Northern District of California, San Francisco Division ("**HashFast**").

**WHEREAS**, pursuant to an Asset Purchase Agreement dated as of July __, 2014 (as amended and in effect from time to time, the "**Asset Purchase Agreement**"), among [Newco] ("**Buyer**"), HashFast and HashFast LLC, and as approved by the Sale Order (as defined therein), Buyer is purchasing certain assets of HashFast and HashFast LLC; and

**WHEREAS**, as contemplated by the Asset Purchase Agreement, Liquidbits is providing this Waiver relating to the claim (the "**Claim**") evidenced by its proof of claim (the "**Proof of Claim**") filed by Liquidbits in the Bankruptcy Court (Docket No. 111) against HashFast;

**NOW, THEREFORE**, for and in consideration of the foregoing and their mutual covenants and agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Liquidbits, intending to be legally bound, hereby agrees as follows:

1.     **Waiver**. Liquidbits hereby waives any right that it may have to pursue the Claim against HashFast or participate as a general unsecured creditor in respect of the Claim in any distributions to general unsecured creditors of the HashFast estate.

2.     **Effective Time**. This Waiver is effective upon the Closing (as defined in the Asset Purchase Agreement).

3.     **Proof of Claim**. Promptly following the Closing and the Sale Order becoming a final order, with no appeal pending and any right to further appeal having expired, Liquidbits will withdraw the Proof of Claim.

4.     **Reservation**. If the Sale Order is appealed and is reversed, vacated or modified on appeal without the consent of Liquidbits, this Waiver, at the option of Liquidbits, will be null and void, and Liquidbits and HashFast will be restored to their prior positions with the Claim and any defenses of HashFast to the Claim being preserved.

A/76250080.2

5.     **Governing Law**.  This Waiver shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than State of California

**IN WITNESS WHEREOF**, Liquidbits has executed this Waiver as of the date first above written.

**LIQUIDBITS CORP.**

By: _____
    Name:
    Title:

A/76250080.2

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 95 of 119

# EXHIBIT G

## FORM OF BILL OF SALE AND ASSIGNMENT

Each of HASHFAST TECHNOLOGIES LLC, a California limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30725) pending in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the Northern District of California, San Francisco Division, and HASHFAST LLC, a Delaware limited liability company and debtor in possession in a chapter 11 bankruptcy case (Case No. 14-30866) pending in the Bankruptcy Court (collectively, the "**Sellers**"), does hereby sell, assign, transfer, convey and deliver to [NEWCO] LLC, a Delaware limited liability company (the "**Buyer**"), all of the Acquired Assets (as defined in and pursuant to that certain Asset Purchase Agreement, dated as of [July] ____, 2014 (the "**Agreement**"), among the Sellers and Buyer), free and clear of all liens, claims, interests, encumbrances and security interests of any kind. This Bill of Sale and Assignment and the transfer, assignment, conveyance and delivery evidenced hereby are subject to the terms set forth in the Agreement and the Sale Order (as defined in the Agreement). Each Seller hereby represents and warrants that the Agreement is in full force and effect and that each Seller has full right, power and authority to sell and assign the Acquired Assets and to execute and deliver this Bill of Sale and Assignment as of the date hereof.

This Bill of Sale and Assignment is executed pursuant to the terms of the Agreement and the Sale Order.

**IN WITNESS WHEREOF**, the Sellers have executed this Bill of Sale and Assignment as of _____, 2014.

"**SELLERS**":

**HASHFAST LLC**

By: _____
    Name:
    Title:


**HASHFAST TECHNOLOGIES LLC**

By: _____
    Name:
    Title:

A/76253271.2

# EXHIBIT H

## [NEWCO] LLC
## UNIT AND NOTE PURCHASE AGREEMENT

This Unit and Note Purchase Agreement (this "Agreement"), dated as of [_____], 2014 is entered into by and among [NewCo] LLC, a Delaware limited liability company (the "Company"), the purchasers identified on the signature pages hereto (collectively, the "Purchasers").

In consideration of the mutual promises and covenants contained in this Agreement, the parties hereto agree as follows:

1.    Authorization; Sale of Units and Notes.

    1.1    Authorization.  The Company has duly authorized the sale and issuance, pursuant to the terms of this Agreement, of (i) Class A Preferred Units, Class A Common Units and Class B Common Units (collectively referred to herein as the "Units"), as each such term is defined in that certain [NewCo] LLC Limited Liability Company Operating Agreement dated as of [_____], 2014 and attached hereto as **Annex A** (the "Operating Agreement") and (ii) promissory notes in substantially the form attached hereto as **Annex B** (each individually, a "Note" and collectively, the "Notes" and together with the Units, the "Securities") and secured by the security agreement in substantially the form attached hereto as **Annex C** (the "Security Agreement").  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Operating Agreement.

    1.2    Sale of Units and Notes.  Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 2), the Company will sell and issue to each of the Purchasers, and each of the Purchasers will purchase, the number of Units and a Note in the amount set forth opposite such Purchaser's name on **Annex D** hereto at the aggregate purchase price set forth thereon (the "Purchase Price"), such Purchase Price to be payable by wire transfer.  The Company's agreement with each Purchaser is a separate agreement, and the sale of Units and a Note to each Purchaser is a separate sale.

    1.3    Appointment of Agent under the Security Agreement.  Each Purchaser appoints Liquidbits Corp. to act as agent (the "Agent") such Purchaser for purposes of obtaining, administering and, if applicable, enforcing the security interest granted under the Security Agreement.  The Agent will have no liability for any action taken or omitted to be taken by it in such capacity if taken or omitted in good faith and without gross negligence.

2.    The Closing.

    2.1    Closing.  Subject to the terms and conditions of this Agreement, the closing (the "Initial Closing") of the sale and purchase of the Units and Notes under this Agreement shall take place immediately following the execution of this Agreement at the offices of  Bingham McCutchen LLP, Three Embarcadero Center, San Francisco, CA 94111 (or remotely via the

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 99 of 119

exchange of documents and signatures). In the event there is more than one closing, the term "Closing" shall apply to each such closing unless otherwise specified.

2.2    After the Initial Closing, subject to the terms and conditions of this Agreement, the Company may sell and issue on one or more Closing dates until and including [_____], 2014[1] up to an aggregate of [_____] Class B Common Units and Notes to one or more Purchasers. Annex C to this Agreement shall be updated to reflect the number of Units and Notes purchased at each such Closing and the Purchasers of such Units and Notes.

2.3    Conditions to Closing. At the Closing (unless otherwise noted):

(a)    each of the Purchasers shall execute and deliver the Operating Agreement;

(b)    the Company shall have obtained any and all consents, waivers, registrations, approvals or authorizations, with or by any Governmental Entity, as defined in Section 3.5, and all consents, waivers, approvals or authorizations of any other person or entity required for the valid execution of this Agreement and each of the other transaction documents to be executed in connection herewith and for the consummation of the transactions contemplated hereby and thereby, except for the filing of a Form D with respect to the securities being issued hereunder as required by Rule 506 under Regulation D of the Securities Act of 1933, as amended (the "Securities Act"), and any post-Closing filings necessary for compliance with applicable state securities laws;

(c)    the Company shall deliver to each of the Purchasers certificates as to the good standing of the Company issued by the Secretary of State of the State of Delaware;

(d)    the Company shall deliver to each of the Purchasers certificates dated as of date of the Closing and signed on behalf of the Company certifying that the representations and warranties of the Company contained in this Agreement shall be true and correct on the date of the Closing;

(e)    the Company shall deliver to each of the Purchasers a Certificate dated as of the Closing Date attesting as to (i) the signatures and titles of the representatives of the Company executing this Agreement or any of the other agreements to be executed and delivered by the Company at the Closing, and (ii) resolutions of the [sole member] of the Company, authorizing and approving all matters in connection with this Agreement and the transactions contemplated hereby;

(f)    each Purchaser shall pay to the Company, by wire transfer of immediately available funds, the Purchase Price;

(g)    the Company shall execute and deliver a Note to each of the Purchasers in the amount set forth opposite the name of such Purchaser on **Annex D** hereto, as amended from time to time as permitted by this Agreement;

---

[1] Note to draft: Date to be 30 days after First Closing.

A/76216910.8                                                      DRAFT 07/25/14 5:37PM

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 100 of 119

(h)     the Company shall update its Unit Register to record the purchase of the Units by the Purchasers; and

(i)     After Initial Closing, the Company shall timely file a Form D with respect to the Securities as required by Rule 506 under Regulation D of the Securities Act.

2.4     <u>Independent Nature of Purchasers' Obligations and Rights</u>.     The obligations of each Purchaser under this Agreement are several and not joint with the obligations of the other Purchasers, and no Purchaser shall be responsible in any way for the performance of the obligations of any other Purchaser under this Agreement.  The representations and warranties of each Purchaser under this Agreement are several and not joint with the representations and warranties of the other Purchasers, and no Purchaser shall be deemed to have made any representations and warranties with respect to any other Purchasers under this Agreement. Nothing contained herein, and no action taken by any Purchaser pursuant hereto, shall be deemed to constitute the Purchasers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Purchasers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement.  Each Purchaser shall be entitled to independently protect and enforce its rights, including without limitation, the rights arising out of this Agreement, and it shall not be necessary for the other Purchasers to be joined as additional parties in any proceeding for such purpose.

3.     <u>Representations of the Company</u>.     Except as set forth in a disclosure letter (the "<u>Disclosure Letter</u>") delivered by the Company to each Purchaser at each Closing, the Company hereby represents and warrants to each of the Purchasers that the statements contained in this Section 3 are complete and accurate as of the date of the Closing.

3.1     <u>Organization and Standing; Authority</u>.     The Company is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to carry on its business as presently conducted.  The Company is duly qualified to transact business and is in good standing in the State of California and in each other jurisdiction in which the failure to so qualify has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Company's condition (financial or otherwise), results of operations or business ("<u>Company Material Adverse Effect</u>").  All limited liability company action required to be taken to authorize the Company to enter into this Agreement and to issue the Securities has been taken.  The Company has full legal capacity, power and authority to execute and deliver, and to perform its obligations under this Agreement, and such execution, delivery and performance will not violate any agreement, contract, law, rule, decree or other legal restriction by which the Company is bound.  This Agreement, when executed and delivered by the Company, will constitute a valid and binding obligation of the Company enforceable in accordance with its terms, subject to (i) laws of general application relating to specific performance, injunctive relief or other equitable remedies and (ii) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally.

3

Case: 14-30725     Doc# 158     Filed: 07/25/14     Entered: 07/25/14 16:37:45     Page 101 of 119

3.2     Subsidiaries, Etc.  The Company does not own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association or other business entity.

3.3     Capitalization.  Except as set forth in the Operating Agreement, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from the Company any membership interests, or any securities convertible into or exchangeable for membership interests of the Company.  The outstanding membership interests of the Company are owned by the persons and in the numbers specified in the Disclosure Letter.

3.4     Issuance of Units.  The Units, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued and free of restrictions on transfer other than restrictions on transfer under the Operating Agreement.  The Units will be issued in compliance with all applicable federal and state securities laws.

3.5     No Conflict.  The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and thereby and the compliance with their respective provisions by the Company will not (a) conflict with or violate any provision of the certificate of formation of the Company or the Operating Agreement, (b) require on the part of the Company any filing with, or any permit, order, authorization, consent or approval of, any court, arbitrational tribunal, administrative agency or commission or other governmental or regulatory authority or agency (each of the foregoing is hereafter referred to as a "Governmental Entity"), (c) conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any material contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, Security Interest (as defined below) or other arrangement to which the Company is a party or by which the Company is bound or to which its assets are subject, or (d) violate any material order, writ, injunction, decree, statute, rule or regulation applicable to the Company or any of its properties or assets.

3.6     Governmental Consents.  No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any Governmental Entity is required on the part of the Company in connection with the offer, issuance, sale and delivery of the Securities as contemplated by this Agreement, except such filings as shall have been made prior to and shall be effective on and as of the Closing and such filings required to be made after the Closing under applicable federal and state securities laws.  Based on the representations made by each of the Purchasers in Section 4 of this Agreement, the offer and sale of the Securities to each of the Purchasers will be in compliance with applicable federal and state securities laws.

3.7     Litigation.  There is no action, suit or proceeding, or governmental inquiry or investigation, pending, or, to the Company's knowledge after due inquiry and the Company has not received any written notification that alleges, any basis therefor or threat thereof, against the Company which questions the validity of this Agreement, the Ancillary Agreements or the right of the Company to enter into any such agreements, or which might result, either individually or in the

4

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 102 of 119

aggregate, in a Company Material Adverse Effect. The Company is not subject to any outstanding judgment, order or decree.

4. <u>Representations of the Purchasers</u>. Each of the Purchasers severally represents and warrants to the Company as follows:

4.1 <u>Investment</u>. Such Purchaser is acquiring the Units for his, her or its own account for investment and not with a view to, or for sale in connection with, any distribution thereof, nor with any present intention of distributing or selling the same; and, except as contemplated by this Agreement, such Purchaser has no present or contemplated agreement, undertaking, arrangement, obligation, indebtedness or commitment providing for the disposition thereof.

4.2 <u>Authority</u>. Such Purchaser has full power and authority to enter into and to perform this Agreement and the Ancillary Agreements in accordance with their terms. Any Purchaser which is a corporation, limited liability company, partnership or trust represents that it has not been organized, reorganized or recapitalized specifically for the purpose of investing in the Company.

4.3 <u>Experience</u>. Such Purchaser has carefully reviewed the representations concerning the Company contained in this Agreement, and has made detailed inquiry concerning the Company, its business and its personnel; the officers of the Company have made available to such Purchaser any and all written information which he, she or it has requested and have answered to such Purchaser's satisfaction all inquiries made by such Purchaser; and such Purchaser has sufficient knowledge and experience in finance and business that he, she or it is capable of evaluating the risks and merits of his, her or its investment in the Company and such Purchaser is able financially to bear the risks thereof.

4.4 <u>Accredited Investor</u>. The Purchaser is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

4.5 <u>Foreign Investors</u>. If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code), the Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Securities. The Purchaser's purchase and payment for and continued beneficial ownership of the Securities will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

4.6 "<u>Creditor</u>" Status. Such Purchaser, if purchasing Class B Common Units, is a creditor of HashFast Technologies LLC or HashFast LLC as evidenced by the proof of claim filed by such Purchaser in the bankruptcy case of HashFast Technologies LLC or

5

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 103 of 119

HashFast LLC with the docket number and in the amount indicated on the signature page for such Purchaser. The amount of the proof of claim has not been disallowed.

5. Transfer of Securities; No Public Market; Early Redemption.

5.1 Restricted Securities. Such Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, such Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. In addition to the foregoing, the Units are subject to transfer restrictions as set forth in the Operating Agreement.

5.2 No Public Market. Such Purchaser understands that no public market now exists for the Securities and that the Company has made no assurances that a public market will ever exist for the Securities.

5.3 Early Redemption of the Securities. Such Purchaser will notify the Company if the amount indicated on the proof of claim referred to on the signature page is disallowed. Within six months following the later to occur of the disallowance or three months following the Company's receipt of the notification, the Company will have the option to repurchase the Class B Common Units of such Purchaser and to pay the Note ratably in the proportion that the amount of the disallowance bears to the amount indicated on the proof of claim.

6. Miscellaneous.

6.1 Successors and Assigns. This Agreement, and the rights and obligations of each Purchaser hereunder, may be assigned by such Purchaser to any person or entity to which Units are transferred by such Purchaser pursuant to the Operating Agreement, and, in each case, such transferee shall be deemed a "Purchaser" for purposes of this Agreement; provided that such assignment of rights shall be contingent upon the transferee providing a written instrument to the Company notifying the Company of such transfer and assignment and agreeing in writing to be bound by the terms of this Agreement. The Company may not assign its rights under this Agreement.

6.2 Survival of Representations and Warranties. All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the closing of the transactions contemplated hereby.

6.3 Brokers. The Company and each Purchaser (i) represents and warrants to the other parties hereto that he, she or it has not retained a finder or broker in connection with the transactions contemplated by this Agreement, and (ii) will indemnify and save the other parties harmless from and against any and all claims, liabilities or obligations with respect to brokerage or finders' fees or commissions, or consulting fees in connection with the transactions contemplated by this Agreement asserted by any person on the basis of any statement or representation alleged to have been made by such indemnifying party.

A/76216910.8

DRAFT 07/25/14 5:37PM

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 104 of 119

6.4　Severability.　The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement.

6.5　Specific Performance.　In addition to any and all other remedies that may be available at law in the event of any breach of this Agreement, each Purchaser shall be entitled to specific performance of the agreements and obligations of the Company hereunder and to such other injunctive or other equitable relief as may be granted by a court of competent jurisdiction.

6.6　Governing Law.　This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware (without reference to the conflicts of law provisions thereof).

6.7　Notices.　All notices, demands, requests, consents, approvals or other communications required or permitted to be given with respect to this Agreement shall be in writing and shall be delivered (charges prepaid, receipt confirmed or return receipt requested (if available)) by hand, by nationally recognized air courier service or by facsimile, addressed as set forth below or to such other address or facsimile number as such person or entity shall have specified most recently by written notice in accordance herewith.　Notice shall be deemed given and effective (i) if delivered by hand or by nationally recognized air courier service, when delivered at the address specified in this Section 6.7 (or in accordance with the latest unrevoked written direction from such person or entity) or (ii) if given by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section 6.7 (or in accordance with the latest unrevoked written direction from such person or entity); provided, that appropriate confirmation is received and that any such facsimile is promptly followed by delivery of written notice by hand or by nationally recognized air courier service:

If to the Company, at [＿＿＿＿＿＿];

with a copy (which shall not constitute notice) to Bingham McCutchen LLP, One Federal Street, Boston, MA 02110, Attention:　Michael K. Barron, Esq.; or

If to a Purchaser, at his, hers or its address set forth on **Annex D**, or at such other address as may have been furnished in writing by such Purchaser to the Company,

Any party may give any notice, request, consent or other communication under this Agreement using any other means (including, without limitation, personal delivery, messenger service, telecopy, first class mail or electronic mail), but no such notice, request, consent or other communication shall be deemed to have been duly given unless and until it is actually received by the party for whom it is intended.　Any party may change the address to which notices, requests, consents or other communications hereunder are to be delivered by giving the other parties notice in the manner set forth in this Section.

6.8　Complete Agreement.　This Agreement (including its Annexes) constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

7

Case: 14-30725　Doc# 158　Filed: 07/25/14　Entered: 07/25/14 16:37:45　Page 105 of 119

6.9   Amendments and Waivers.  This Agreement may be amended or terminated and the observance of any term of this Agreement may be waived with respect to all parties to this Agreement (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the holders of a majority of the Units then held by all Purchasers.  Notwithstanding the foregoing this Agreement may not be amended or terminated and the observance of any term hereunder may not be waived with respect to any Purchaser without the written consent of such Purchaser unless such amendment, termination or waiver applies to all Purchasers in the same fashion.  The Company shall give prompt written notice of any amendment or termination hereof or waiver hereunder to any party hereto that did not consent in writing to such amendment, termination or waiver.  Any amendment, termination or waiver effected in accordance with this Section 6.9 shall be binding on all parties hereto, even if they do not execute such consent.  No waivers of or exceptions to any term, condition or provision of this Agreement, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

6.10   Pronouns.  Whenever the context may require, any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural, and vice versa.

6.11   Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which shall constitute one and the same document.  This Agreement may be executed by facsimile or PDF signatures.

6.12   Section Headings and References.  The section headings are for the convenience of the parties and in no way alter, modify, amend, limit or restrict the contractual obligations of the parties.  Any reference in this agreement to a particular section or subsection shall refer to a section or subsection of this Agreement, unless specified otherwise.

6.13   Exculpation Among Purchasers.  Each Purchaser acknowledges that it is not relying upon any person or entity, other than the Company and its representatives, in making its investment or decision to invest in the Company.  Each Purchaser agrees that no Purchaser nor the respective controlling persons, officers, directors, partners, members, agents, or employees of any Purchaser shall be liable to any other Purchaser for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Securities.

*[Remainder of Page Intentionally Left Blank]*

8

Case: 14-30725   Doc# 158   Filed: 07/25/14   Entered: 07/25/14 16:37:45   Page 106 of 119

IN WITNESS WHEREOF, the parties have executed this Agreement on the day, month and year first set forth above.

**COMPANY:**                          [NEWCO] LLC

By: _____
Name:
Title:

**PURCHASERS:**                       [_____]

By: _____
Name:
Title:

If purchasing Class B Units:

Proof of Claim Docket No. _____ in the HashFast Technologies LLC case

Proof of Clam Amount:  $_____

Proof of Claim Docket No. _____ in the HashFast LLC case

Proof of Clam Amount:  $_____

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 107 of 119

IN WITNESS WHEREOF, the parties have executed this Agreement on the day, month and year first set forth above.

**PURCHASER:**

[_____]

By: _____
Name:
Title:

If purchasing Class B Units:

Proof of Claim Docket No. _____ in the HashFast Technologies LLC case

Proof of Clam Amount: $_____

Proof of Claim Docket No. _____ in the HashFast LLC case

Proof of Clam Amount: $_____

A/76216910.8

DRAFT 07/25/14 5:37PM

**ANNEX A**

**<u>Operating Agreement</u>**

See attached.

## ANNEX B

## Form of Promissory Note

FOR VALUE RECEIVED, [NewCo], a Delaware limited liability company (the "**Company**"), promises to pay to _____ (collectively, the "**Holder**"), on or before September 1, 2017 (the "**Maturity Date**"), the principal amount of $_____, together with interest thereon as provided in this Secured Promissory Note (this "**Note**"). This Note is secured by a security interest granted by the Company to the Holder in all substantially all of the assets of the Company pursuant to a security agreement (the "**Security Agreement**") dated the date hereof. Reference is made to the Security Agreement for a description of the collateral securing this Note and the rights of the Holder in respect of such collateral.

Except as provided in the Unit and Note Purchase Agreement dated _____ __, 2014, among the Holder, holders of other promissory notes issued by the Company with like terms (the "**Other Notes**") and the Company, any payment by the Company under this Note must be made ratably with payments under the Other Notes.

The principal amount from time to time outstanding under this Note will bear simple interest at the annual rate of 8% per annum based on a 365-day year. Interest will be payable on the first business of each calendar quarter for the prior calendar quarter to the extent that the Company determines that it has positive cash flow to make the payment under this Note and the Other Notes. Any unpaid interest will continue to accrue and will be payable on the first business day of the next calendar quarter subject to the same determination by the Company.

Although amounts owing under this Note are denominated in U.S. dollars, any payment under this Note may, at the option of the Company, be made in bitcoins. Each payment in bitcoins will be credited against amounts owing under this Note in U.S. dollars based on the customary price using recognized pricing sources for the sale of bitcoins in exchange for U.S. dollars on the date of payment.

If an Event of Default (as defined in the Security Agreement) occurs, the unpaid principal of and unpaid accrued interest on this Note may be declared to be immediately due and payable by the Agent under the Security Agreement or by the Holder and the holders of the other Notes that together constitute a majority of the total principal of this Note and the Other Notes outstanding.

This Note is not transferable except together with any Common Unit held by the Holder in the Company.

This Note is governed by the law of the State of Delaware.

IN WITNESS WHEREOF, the Company has executed this Note as of the date first above written.

[Newco]

By_____

Name:
Title:

**SECURITY AGREEMENT**

SECURITY AGREEMENT dated as of July [  ], 2014 (this "Agreement"), between (i) [NewCo, LLC], a Delaware limited liability company (the "Debtor), and (ii) Liquidbits Corp. ("Liquidbits") as agent for itself and the other holders of the Notes defined below (in such capacity, the "Secured Party").

WHEREAS, pursuant to a Unit and Note Purchase Agreement dated as of [July [], 2014 (as amended and in effect from time to time, the "Unit and Note Purchase Agreement"), among the Debtor and other investors in the Company, the Debtor his issued promissory notes (the "Notes") to the investors;

WHEREAS, as contemplated by the Unit and Note Purchase Agreement, the Notes are to be secured by a security interest in all or substantially all of the assets of the Debtor; and

WHEREAS, Liquidbits is a holder of a Note and has agreed to act as agent for itself and the other holders for purposes of obtaining, administering and, if applicable, enforcing the security interest; and

WHEREAS, the Debtor is willing to grant the security interest upon the terms hereof subject to the rights of the holder of Seller Note Security Interest as defined below.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Definitions.  All terms defined in the Uniform Commercial Code of the State of Delaware and used herein shall have the same definitions herein as specified therein.  However, if a term is defined in Article 9 of the Uniform Commercial Code of the State of Delaware differently than in another Article of the Uniform Commercial Code of the State of Delaware, the term has the meaning specified in Article 9.  In addition, as used herein, the following terms have the following meanings:

"Event of Default" means the failure of the Debtor (a) to pay any amount when due under the Notes at maturity or, if due and payable prior to maturity, on or before 5 days following the Secured Party's written demand on the Debtor for payment or (b) to pay or perform when due any other obligation under the Notes or this Agreement on or before 15 days following the Secured Party's written demand on the Debtor for payment or performance.

"Obligations" means all of the Debtor's obligations under the Notes and this Agreement.

"Seller Note Security Interest" means the security interest securing the promissory note dated _____ __, 2014, issued by the Debtor in favor HashFast Technologies LLC and HashFast LLC.

2. Grant of Security Interest; Subordination.

(a)     The Debtor hereby grants to the Secured Party, to secure the payment and performance in full of the Obligations, a continuing security interest in and pledges and assigns to the Secured Party, the following properties, assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (all of the same being hereinafter called the "Collateral") subject to §3: all personal and fixture property of every kind and nature of the Debtor including all goods (including inventory, equipment and any accessions and attachments thereto), instruments (including promissory notes), documents (including, if applicable, electronic documents), accounts (including health-care-insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims and proceeds, all general intangibles (including all payment intangibles).  The Collateral includes "), subject to §3, all bitcoins, all proceeds of the Debtor's mining operation, money, cash and cash equivalents, and any all accessions to, substitutions and replacements of any of the foregoing, and cash and non-cash proceeds, products, rents and profits of any of the foregoing.

(b)     Regardless of the time of attachment or perfection, the security interest shall at all times be junior and subordinate to the Seller Note Security Interest that is perfected and not capable of being avoided.  The Secured Party may not take any action to enforce the security interest except concurrently with the enforcement of the Seller Note Security Interest.

3. Exclusions.  The grant of the security interest contained in §2 shall not extend to, and the term "Collateral" shall not include, any directly held investment property, or any general intangibles, now or hereafter held or owned by the Debtor, to the extent, in each case, that (i) a security interest may not be granted by the Debtor in such directly held investment property or general intangibles as a matter of law, or under the terms of the governing document applicable thereto, without the consent of one or more applicable parties thereto and (ii) such consent has not been obtained.  The grant of the security interest contained in §2 shall extend to, and the term "Collateral" shall include, (i) any and all proceeds of such directly held investment property or general intangibles to the extent that the proceeds are not themselves directly held investment property or general intangibles subject to foregoing sentence and (ii) upon any such applicable party or parties' consent with respect to any otherwise excluded directly held investment property or general intangibles being obtained, thereafter such directly held investment property or general intangibles.   The provisions of this section shall not apply to (i) directly held investment property or general intangibles to the extent that the restriction on the Debtor granting a security interest therein is not effective under applicable law or (ii) payment intangibles.

4. Authorization to File Financing Statements. The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any filing office in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (a)

indicate the Collateral (i) as all assets of the Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the Uniform Commercial Code of the jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment. The Debtor agrees to furnish any such information to the Secured Party promptly upon the Secured Party's request.

5.  Covenants. The Debtor will (a) upon request of the Secured Party and at the Secured Party's option, take any and all other actions as the Secured Party may reasonably determine to be necessary or useful for the attachment, perfection, first priority and maintenance of, and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Collateral, (b) not change its name without providing at least 30 days prior written notice to the Secured Party, (c) not change its type of organization, jurisdiction of organization or other legal structure or liquidate, merge, transfer, acquire or consolidate with any person or entity, or dissolve, (d) except for the Seller Note Security Interest, the security interest herein granted, or liens junior to the security interest of the Secured Party, be the owner of the Collateral free from any right or claim of any other person or any lien, security interest or other encumbrance, and the Debtor shall defend the same against all claims and demands of all persons at any time claiming the same or any interests therein adverse to the Secured Party, (e) not pledge, mortgage or create, or suffer to exist any right of any person in or claim by any person to the Collateral, or any security interest, lien or other encumbrance in the Collateral in favor of any person, or become bound (as provided in Section 9-203(d) of the Uniform Commercial Code of the State of Delaware or any other relevant jurisdiction or otherwise) by a security agreement in favor of any person as secured party, other than the Secured Party, except for the Seller Note Security Interest and liens junior to the security interest of the Secured Party, (f) keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon, (g) pay promptly when due all taxes, assessments, governmental charges and levies upon the Collateral or incurred in connection with the use or operation of such Collateral or incurred in connection with this Agreement, and (h) not sell or otherwise dispose, or offer to sell or otherwise dispose, of the Collateral or any interest therein except for (i) sales and leases of inventory and licenses of general intangibles in the ordinary course of business and (ii) so long as no Event of Default has occurred and is continuing, sales or other dispositions of obsolescent items of equipment consistent with past practices.

6. Insurance. The Debtor will maintain with financially sound and reputable insurers insurance with respect to its properties and business against such casualties and contingencies as shall be in accordance with general practices of businesses engaged in similar activities in similar geographic areas.  Such insurance shall be in such minimum amounts that the Debtor will not be deemed a co-insurer under applicable insurance laws, regulations and policies and otherwise shall be in such amounts, contain such terms, be in such forms and be for such periods as may be reasonably satisfactory to the Secured Party.  In addition, upon request of the Secured Party, all such insurance shall be payable to the Secured Party as loss payee subject to the rights of the holder of the Seller Note Security Interest.   The proceeds of any casualty insurance in respect of any casualty loss of any of the Collateral shall, subject to the rights of the holder of the Seller Note Security Interest and to the rights, if any, of other parties with an interest having priority in the property covered thereby, so long as no Event of Default has occurred and is continuing be

A/76216910.8                                                              DRAFT 07/25/14 5:37PM

disbursed to the Debtor for direct application by the Debtor solely to the repair or replacement of the Debtor's property so damaged or destroyed. All policies of insurance shall, if requested by the Secured Party, provide for at least 30 days' prior written cancellation notice to the Secured Party. In the event of failure by the Debtor to provide and maintain insurance as herein provided, the Secured Party may, at its option, provide such insurance and charge the amount thereof to the Debtor. Upon request of the Secured Party, the Debtor shall furnish the Secured Party with certificates of insurance and policies evidencing compliance with the foregoing insurance provision.

      7. <u>Collateral Protection Expenses; Preservation of Collateral</u>. In the Secured Party's discretion the Secured Party may discharge taxes and other encumbrances at any time levied or placed on any of the Collateral, make repairs thereto and pay any necessary filing fees or insurance premiums, in each case to the extent that the Debtor fails to do so. The Debtor agrees to reimburse the Secured Party on demand for all expenditures so made. The Secured Party shall have no obligation to the Debtor to make any such expenditures, nor shall the making thereof be construed as a waiver or cure any Event of Default. Anything herein to the contrary notwithstanding, the Debtor shall remain obligated and liable under each contract or agreement comprised in the Collateral to be observed or performed by the Debtor thereunder. The Secured Party shall not have any obligation or liability under any such contract or agreement by reason of or arising out of this Agreement or the receipt by the Secured Party of any payment relating to any of the Collateral, nor shall the Secured Party be obligated in any manner to perform any of the obligations of the Debtor under or pursuant to any such contract or agreement, to make inquiry as to the nature or sufficiency of any payment received by the Secured Party in respect of the Collateral or as to the sufficiency of any performance by any party under any such contract or agreement, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to the Secured Party or to which the Secured Party may be entitled at any time or times.

      8. <u>Rights and Remedies</u>. If an Event of Default shall have occurred and be continuing, subject to the rights of the holder of the Seller Note Security Interest, the Secured Party, without any other notice to or demand upon the Debtor, shall have in any jurisdiction in which enforcement hereof is sought, in addition to all other rights and remedies, the rights and remedies of a secured party under the Uniform Commercial Code of the State of Delaware or any other relevant jurisdiction and any additional rights and remedies as may be provided to a secured party in any jurisdiction in which Collateral is located, including, without limitation, the right to take possession of the Collateral, and for that purpose the Secured Party may, so far as the Debtor can give authority therefor, enter upon any premises on which the Collateral may be situated and remove the same therefrom. The Secured Party may in its discretion require the Debtor to assemble all or any part of the Collateral at such location or locations as the Secured Party may reasonably designate. In any public disposition, the Secured Party reserves the right to credit bid.

      9. <u>No Waiver by Secured Party, etc.</u> The Secured Party shall not be deemed to have waived any of its rights and remedies in respect of the Obligations or the Collateral unless such waiver shall be in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right or remedy shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a

bar to or waiver of any right or remedy on any future occasion. All rights and remedies of the Secured Party with respect to the Obligations or the Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly, alternatively, successively or concurrently at such time or at such times as the Secured Party deems expedient.

10. <u>Suretyship Waivers by Debtor.</u> The Debtor waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both the Obligations and the Collateral, the Debtor assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of or failure to perfect any security interest in any Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payment thereon and the settlement, compromising or adjusting of any thereof, all in such manner and at such time or times as the Secured Party may deem advisable. The Secured Party shall have no duty as to the collection or protection of the Collateral or any income therefrom, the preservation of rights against prior parties, or the preservation of any rights pertaining thereto. The Debtor waives the Debtor's rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the Debtor or other surety by reason of Sections 2787 to 2855 of the California Civil Code, inclusive; and any rights or defenses the Debtor or other surety may have in respect of the Debtor's obligations as an obligor or surety by reason of any election of remedies by the Secured Party. The Debtor further waives any and all other suretyship defenses.

11. <u>Marshaling.</u> The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights and remedies under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

12. <u>Proceeds of Dispositions; Expenses.</u> The Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving or enforcing the Secured Party's rights and remedies under or in respect of any of the Obligations or any of the Collateral. After deducting all of said expenses, the residue of any proceeds of collection or sale or other disposition of Collateral shall, to the extent actually received in cash, be applied to the payment of the Obligations in such order or preference is provided in the Asset Purchase Agreement, proper allowance and provision being made for any Obligations not then due. Upon the final payment and satisfaction in full of all of the Obligations and after making any payments required by Sections 9-608(a)(1)(C) or 9-615(a)(3) of the Uniform Commercial Code of the State of

Case: 14-30725    Doc# 158    Filed: 07/25/14    Entered: 07/25/14 16:37:45    Page 116 of 119

Delaware, any excess shall be returned to the Debtor. In the absence of final payment and satisfaction in full of all of the Obligations, the Debtor shall remain liable for any deficiency.

13. <u>Overdue Amounts</u>. Until paid, all amounts due and payable by the Debtor hereunder shall be a debt secured by the Collateral and shall bear, whether before or after judgment, interest at the rate of interest set forth in the Notes.

14. <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

15. <u>Miscellaneous</u>. The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement and all rights and obligations hereunder shall be binding upon the Debtor and its successors and assigns, and shall inure to the benefit of the Secured Party and the successors and assigns of the Secured Party. If any term of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of all other terms hereof shall in no way be affected thereby, and this Agreement shall be construed and be enforceable as if such invalid, illegal or unenforceable term had not been included herein. The Debtor acknowledges receipt of a copy of this Agreement.

IN WITNESS WHEREOF, intending to be legally bound, the Debtor has caused this Agreement to be duly executed as of the date first above written.

***

[Signature page follows.]

[NEWCO LLC]


By:_____
     Name:
     Title:  *


Accepted:

LIQUIDBITS CORP., as Agent


By:_____
     Name:
     Title:  *

## ANNEX D

### List of Purchasers; Units and Notes Purchased

| Name and Address of Purchaser | Class A Preferred Units | Class A Common Units | Class B Common Units | Unit Purchase Price | Amount of Note / Note Purchase Price* | Aggregate Purchase Price |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| *Totals:* | | | | | | |

* Purchasers of Class A Common Units and Class B Common Units to provide debt financing ratably in accordance with their ownership of Class A Common Units and Class B Common Units at the time of the purchase of such units.