**EXHIBIT A**

```
 1                UNITED STATES BANKRUPTCY COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN FRANCISCO DIVISION

 4                         ---oOo---

 5   In re                          )   Case No.:
                                    )   14-30725
 6   HASHFAST TECHNOLOGIES, LLC, a  )
     California limited liability   )   (Jointly
 7   company,                       )   Administered with
                                    )   HashFast, LLC, Case
 8   Debtor and Debtor-in-Possession.)  No. 14-30866)
                                    )
 9   _____)
                                    )
     Affects HASHFAST LLC, a Delaware)  Chapter 11
10   limited liability company,     )
                                    )
11   Debtor and Debtor-in-Possession.)
     _____)
12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                 TUESDAY, JULY 15, 2014

15                    PAGES 1 - 112

16   CONTINUED MEETING OF CREDITORS IN THE CHAPTER 11
       BANKRUPTCY CASE OF HASHFAST TECHNOLOGIES, LLC
17                 CASE NUMBER 14-30725

18

19

20                     SF REPORTERS
21            912 Cole Street, Number 304
              San Francisco, California 94117
22                    415-948-8289
                 Info@sf-reporters.com
23

24
     Reported By: Karla Ellis-Davis
25   Certified Shorthand Reporter No. 12998, RPR
```

```
 1        A.    Yes.
 2        Q.    -- and perhaps 3.
 3        A.    Yes.
 4        Q.    So who owns the IP associated with the first
 5   generation of chips?
 6        A.    That was developed by HashFast and Sandgate in
 7   conjunction with, I believe, Uniquify.
 8        Q.    When you say HashFast, which entity do you
 9   mean?
10        A.    Well, Sandgate was paid primarily through
11   HashFast LLC.
12        Q.    So it's HashFast LLC that owns the -- so my
13   question was --
14        A.    Yes.
15        Q.    -- who owns the IP associated with --
16        A.    HashFast LLC.
17        Q.    And then you also said Sandgate in connection
18   with Uniquify.  Does Sandgate have an ownership interest
19   in the first generation of chips?
20        A.    Sandgate was a subcontractor working for
21   HashFast LLC.
22        Q.    I understand that.
23        A.    And they helped develop the chip design.
24        Q.    Does Sandgate have any ownership interest in
25   that IP associated with the first generation of chips?
```

1     A.   Sandgate is an equity owner in the company;
2 certain principals of Sandgate are.
3     Q.   With respect to the intellectual property that
4 is for the first generation of chips, do you believe
5 that Sandgate as an entity has an ownership interest in
6 that IP?
7     A.   No, as employees of HashFast, and HashFast
8 should have the ownership interest. As a contractor to
9 HashFast. I think Uniquify played a role in the design
10 of the Mask Works as well, but I would have to clarify
11 that with Simon. I'm less versed on the technical
12 aspects.
13     Q.   I'm sorry, what did you say?
14     A.   I am less versed on the technical aspects.
15     Q.   Who would be?
16     A.   Simon.
17     Q.   On HashFast, the parent's bankruptcy
18 documents, there is the two patents. One is the stacked
19 chips and the other is the Golden Nonce interface
20 protocol. Which one of those relates to the first
21 generation of chips?
22     A.   I can't articulate that clearly.
23     Q.   Who owns the IP associated with generation
24 1.5?
25     A.   HashFast LLC paid for DXCorr to develop that,

1  and DXCorr in turn licensed to HashFast.

2  Q.   I want to make sure that we know which entity
3  we are talking about when you say HashFast.  So you said
4  HashFast LLC, which is the parent, paid DXCorr?

5  A.   Right.

6  Q.   Do I understand that right?  And then you said
7  DXCorr licensed to HashFast.  Which HashFast entity are
8  you referring to?

9  A.   HashFast LLC, I assume.  I will have to verify
10  that in the contract.  There were some payments made by
11  both entities to DXCorr, but primarily they were paid
12  through HashFast LLC.

13  Q.   Getting back to the question of who owns the
14  IP associated with that generation 1.5 chip, does --
15  which entity owns the IP?

16  A.   HashFast.

17  Q.   LLC, the parent?

18  A.   Yes.  That would probably be subject to some
19  legal opinion on the contract term, that I'm not in a
20  position to offer.

21       Is there a --

22  Q.   I'm sorry?

23  A.   Nothing.  Go ahead.

24       MS. GLOSSON:  Did you need to connect?

25       THE WITNESS:  Yeah.  Just to a network.  I

sent an outline of the IP.

        MS. MICKELSEN: No, I'm sorry. We don't have WiFi available.

        MS. GLOSSON: Q. So I was under the impression that DXCorr had the rights and license -- had the rights to the generation 1.5 chip, based on information that you provided to my office through the initial depo interview, and that DXCorr licensed that IP to HashFast.

    A.    Yes.

    Q.    So DXCorr owns the IP?

    A.    I said that piece is subject to a legal review of the contract terms. I don't know that for a fact. HashFast LLC makes payments to DXCorr, DXCorr was contracted on by HashFast LLC and DXCorr licensed to HashFast LLC.

    Q.    Is there litigation regarding who owns the generation 1.5 IP?

    A.    I don't believe there is litigation. I believe there is a claim as it relates to what work was done under which version of which contract. There was a 1.5 contract and a 2.0 contract. One of them was unsigned. There was work done under both contracts. DXCorr's position is different than HashFast's position.

    Q.    DXCore's claim is listed as disputed. Is that

the basis for the dispute?

A. Yes.

MS. MICKELSEN: On our amended schedules we will be including a possible claim against DXCorr.

MS. GLOSSON: And what's the amount of that claim?

MS. MICKELSEN: That information will be provided on the schedules. Our client did provide that information, but at this time I'd rather just wait until our schedules have come out.

MS. GLOSSON: Q. So on the debtor's -- HashFast Technologies, LLC, it identifies a memorandum of understanding between HashFast Technologies and DXCorr that is dated August 21, 2013. What is the scope of that memorandum of understanding?

A. I would have to look at that specifically to answer that.

Q. Do you know which generation of chips that covered?

A. Would you like me to look at that? I don't...

Q. Well, do you know which --

A. Not without looking. You are referring to names of contracts and I haven't been here long enough to have absorbed all of that in the memory banks yet. I'd have to go look at all of the specific contracts to

Case: 14-30725   Doc# 161-1   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 7 of 13

```
 1  see what the terms state.
 2      Q.  There is another contract that is dated
 3  December 1, 2013, on Schedule G, and that's between
 4  HashFast Technologies and DXCorr.  Do you know what
 5  DXCorr was supposed to do under that agreement?
 6      A.  Let me try and pull up the schedules.
 7      Q.  I can show you a copy, if you would like.
 8      A.  Yeah, that's what I'm looking at.
 9          So there's one dated August of 2013, a memo of
10  understanding.  Is that one of the ones you were
11  referring to?
12      Q.  Yes.  That was the first one I mentioned.
13      A.  And that is work on the 16-nanometer chip,
14  which was generation 2.
15      Q.  That's the one dated August 21st?
16      A.  Yes.
17      Q.  So are you reviewing the actual agreement
18  right now?
19      A.  Yes.  The two-page memo of understanding.
20      Q.  What are the other terms of that August 21,
21  2013 agreement -- or memorandum?
22      A.  We provided the non-refundable deposit for
23  them to be begin work on the 16-nanometer design.  There
24  was a structure of the payment terms.  They were to
25  deliver a tape-out.
```

1    Q.   Say that again?
2    A.   They were to deliver a tape-out.
3    Q.   What is a tape-out?
4    A.   It's a point at which production can become
5  real.  It's probably the easiest way to explain it.
6         MS. MICKELSEN:  I think that's how you
7  explained it to me.
8         THE WITNESS:  And I don't believe that was
9  delivered.  I could be wrong.  DXCorr would retain
10 ownership of the IP in the development of fulfilling
11 these products and services, and would license the IP to
12 HashFast.
13        MS. MCDOW:  Can you say that again.
14        THE WITNESS:  DXCorr shall retain ownership of
15 the IP that DXCorr develops, and will license the IP to
16 HashFast.  The license fee should be included...
17        MS. MICKELSEN:  I want to clarify, though,
18 that this is the contract that was not signed, correct?
19        THE WITNESS:  This one is signed.
20        MS. MICKELSEN:  Oh, this one is the one that
21 was signed.
22        THE WITNESS:  Right.
23        MS. MICKELSEN:  It's the other one.
24        THE WITNESS:  This one is signed.
25        MS. GLOSSON:  Q.  The last part, you said

```
 1  DXCorr licenses to HasfFast?
 2      A.   To HashFast.
 3      Q.   Does is specify which HashFast?
 4      A.   No, it doesn't.
 5      Q.   All right.
 6           MS. MARTIN:  Who signed it; which HashFast
 7  signed it?
 8           THE WITNESS:  HashFast Technologies actually
 9  signed it.
10           MS. GLOSSON:  Q.  Who signed it on behalf of
11  HashFast Technologies?
12      A.   Eduardo.  And the letterhead is HashFast
13  Technologies, LLC.  HashFast Technologies, a California
14  corporation engaged in the business of producing
15  microchips.  So they are the party, HashFast
16  Technologies.
17      Q.   What was the non-refundable deposit amount?
18           MS. MICKELSEN:  Just to clarify, I want make
19  sure there aren't any confidentiality provisions in
20  there.
21           THE WITNESS:  I don't see one in here.  I
22  don't know if this refers to another contract.
23           MS. MICKELSEN:  All that she knows is that the
24  initial signed contract was particularly addressed as a
25  result of the last questioning from the creditors.  The
```

```
 1  HasfFast LLC?  Have you ever seen any assignment
 2  documents or any documents assigning the license to
 3  HashFast LLC?
 4       A.   You mean to HashFast Technologies?
 5       Q.   Yes, I'm sorry.
 6       A.   Not that I am aware of.
 7       Q.   Well, I think actually -- who was the
 8  original --
 9       A.   The contract was with HashFast Technologies,
10  but the payments were made through the LLC.
11       Q.   Okay.  So I was right the first time.  So have
12  you ever seen an assignment of that license to HashFast
13  LLC?
14       A.   No.  I haven't seen any assignments of
15  licenses, but that doesn't mean they don't exist.  I
16  haven't been able to find them yet.
17       Q.   Have you asked whether any of those exist?
18       A.   No.
19       Q.   Who was responsible primarily for negotiating
20  the term sheet for LiquidBits?
21       A.   I was.
22       Q.   Did Eduardo and Simon play a significant role
23  in that or was it primarily you?
24       A.   Primarily me.
25       Q.   Okay.
```

```
 1  agreement -- other than the specifically excluded
 2  assets, which are the inter-company claims essentially
 3  between the two -- did you view all of the assets of
 4  both estates as being sold through this purchase and
 5  sale agreement?
 6       A.   Yes.
 7       Q.   Other than the intellectual property, the
 8  avoidance actions we just discussed briefly, what else
 9  did you view as having value in these estates?
10       A.   The inventory is the primary asset.
11       Q.   Okay.  And how much value did you assign to
12  the inventory?
13       A.   Probably in the eight-and-a-half million
14  range, at market value --
15       Q.   Okay.
16       A.   -- with a rapidly declining value.
17       Q.   And was it the same or was it more at the time
18  you entered into the term sheet?
19       A.   That's the value at the time we entered into
20  the term sheet.  It's less now.
21       Q.   Okay.  What then was the rationale for
22  entering into an agreement that was for a total of
23  $6 million, and that was a cap of $6 million to the
24  estates, with no guarantee on either portion of the six
25  million?
```

1    A.   You know, if you buy the stock today, it could
2  be worthless tomorrow.  That's the nature of bitcoin
3  mining.
4    Q.   So there's a chance the general and unsecured
5  creditors would get nothing except the inventory turned
6  over at the end of this venture?
7    A.   Possibly, yes.  It could be structured
8  differently.
9    Q.   So why in your estimation is that a better
10  deal than liquidating the current inventory which you --
11    A.   The inventory, you could get.
12    Q.   Let me -- can I finish my question, please.
13    A.   Sorry.
14    Q.   Why in your estimation, as the one who
15  negotiated this deal, do you believe this deal -- which
16  you just testified could distribute zero dollars to the
17  general unsecured creditors -- is better than a deal
18  which just liquidates the inventory, which you
19  testified, at the time you entered into this agreement,
20  you believed was $8.5 dollars?
21    A.   Well, I think you are going to get 10 cents on
22  the dollar in liquidating the inventory, and your
23  ability to get that is going to diminish with time.  I
24  have done numerous inventory liquidations in prior lives
25  with a product that doesn't diminish in value at the