**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA


IN RE: HASHFAST, LLC / CASE NO. 14-30866

IN RE: HASHFAST TECHNOLOGIES, LLC / CASE NO. 14-30725

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


STENOGRAPHICALLY TRANSCRIBED VIA PRE-RECORDED AUDIO

MEETING OF CREDITORS BEFORE JULIE GLOSSON

DATE TAKEN:        JULY 8, 2014

TIME:             11:00 A.M.

TRANSCRIBED BY:    ALISON PRESLEY
                    STENOGRAPHIC SHORTHAND REPORTER
                    NOTARY PUBLIC STATE OF FLORIDA
                    COMMISSION NO. FF111939
                    EXPIRES: APRIL 22, 2018

Electronically signed by Alison Presley (001-190-987-5451)          92b6d7ea-e565-fc61-9042-899f3e91c918

1        There are a number of other people who are

2     present in the room.  And I am just going to go

3     through that list.  Patricia Martin is a bankruptcy

4     analyst, and she is sitting to my right.  She is

5     with my office.  We also have four interns from my

6     office.  We have Noshon Aldabashi (ph), Sara

7     Zendahas (ph), Sonya Singh(ph), and Andrew Batwash

8     (ph).  In the back is another person with my office,

9     that's Incy Toh (ph), she is a paralegal with my

10    office.

11       And on the list, the sign-in sheet, we have

12    Ashley McDow, Victor -- I can't read your last name.

13       MR. DELAGLIO:  Delaglio (ph).

14       MS. GLOSSON:  Delaglio, all right.

15       We have Richard Chang, Rob Edgeworth, Ray

16    Gallo, and Igor Kozachenko (ph); is that correct?

17       MR. KOZACHENKO:  Correct.

18       MS. GLOSSON:  And that's it for the people who

19    are in the room.

20       All right.  A few housekeeping matters, and

21    then I will proceed.  I will open up the meeting to

22    questions by creditors.  And then when that is

23    concluded, I will proceed with my examination.

24       I need to verify the debtor's mailing address.

25    Is that 649 Mission Street, Fifth Floor, San

Electronically signed by Alison Presley (001-140-987-5451)

92bad7ea9a665-4c8c-9a42-899f3e91c918

```
1       Francisco, California?

2             MS. HUSHEN:  No.  It is 100 Bush Street, Suite

3       650.

4             MS. MCDOW:  This is just for Hashfast

5       Technologies?

6             MS. GLOSSON:  We are just talking about

7       Hashfast Technologies.

8             So 100 Bush Street, and what's the -- is there

9       a suite?

10            MS. HUSHEN:  Suite 650, San Francisco.  I don't

11      know the zip.

12            Do you know the zip?

13            MS. GLOSSON:  It is probably the same as ours,

14      94104.

15            MR. BARBER:  Yes.

16            MS. GLOSSON:  We need to check to make sure

17      that is correct.  Because I think it is still

18      showing the 649 Mission.

19            MS. MICKELSEN:  Okay.  I thought my firm had

20      corrected that.  But I will go back and check.

21            MS. GLOSSON:  Maybe it was.

22            All right.  So if at any point during the

23      course of the case the address changes, whether it

24      is from 100 Bush Street, it is the debtor's

25      responsibility to make sure that that gets changed
```

Electronically signed by Alison Presley (001-159-967-5491)                92be47ea-a665-4c30-b642-899f3e91c918

Case: 14-30725   Doc# 161-2   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 4
of 26

1    with the bankruptcy court.

2          Do you understand that?

3          MS. HUSHEN:  Yeah.

4          MS. MICKELSEN:  Actually, we had actually --

5          MS. HUSHEN:  I don't know where that address

6    came from.

7          MS. MICKELSEN:  We had actually received a

8    call.  It was the involuntary petition that had used

9    that Mission Street address.

10         MS. GLOSSON:  Right.

11         MS. MICKELSEN:  Yes.  And then my understanding

12   was that it was corrected.  But if it hasn't been

13   corrected on public record, we can correct that.

14         MS. GLOSSON:  All right.  That's fine.  But if

15   it changes from what's currently on the record, it

16   is the debtor's obligation.

17         MS. MICKELSEN:  I understand.  And actually, if

18   I may make one statement before this starts.

19         MS. GLOSSON:  I am going to give you an

20   opportunity to make an opening statement.

21         MS. MICKELSEN:  Okay.

22         MS. GLOSSON:  Is that what you were

23   contemplating or did you have something else in

24   mind?

25         MS. MICKELSEN:  It is not so much an opening

Electronically signed by Alison Presley (001-159-587-3491)          92be47ea-a665-4c30-b842-899f3e91c918

Page 24

1     Q    All right.  And you have -- the debtor has

2  identified all of its assets as of the date of the

3  involuntary?

4     **A**    **(By Ms. Hushen) Yes.**

5     Q    Okay.  So, Ms. Hushen, when did you come on

6  board with the debtor?

7     **A**    **(By Ms. Hushen) In April.**

8     Q    Can you tell me, was there any specific date?

9     **A**    **(By Ms. Hushen) April 7th, I believe.**

10    Q    So what is -- as of the date of the

11  involuntary, what is the debtor's business?  And when I

12  say "debtor," I mean Hashfast Technologies.

13    **A**    **(By Ms. Hushen) As of the date of the**

14  **involuntary, we were providing equipment to be used for**

15  **Bitcoin mining.  And we were selling both systems, raw**

16  **components, and chips to be assembled into systems.**

17    Q    Has the debtor's business changed since it was

18  formed in 2013?

19    **A**    **(By Ms. Hushen) Yes.  In 2013, I think the**

20  **primary focus was selling systems.  As the company got**

21  **into a pinch point in the January time frame, February**

22  **time frame as it relates to cash, given that a lot of the**

23  **inventory existed in chip format and we had other**

24  **components, there were attempts to sell bundled parts, if**

25  **you will, as opposed to producing systems.**

Electronically signed by Alison Presley (001-189-987-5451)

92bd47ea-a665-4c9d-b849-899f3e91c918

1      Q     Now, Mr. Barber, since Ms. Hushen wasn't with

2   the company in January 2014, do you agree with the

3   statements that she made with respect to the change in

4   the debtor's business?

5      **A     (By Mr. Barber) Yes.  We have made informal**

6   **offers of selling the chips earlier.  But we didn't have**

7   **a formal program listed publically.  But in general, yes.**

8      Q     Do you have anything to add other than what you

9   have already just said to what Ms. Hushen stated?

10     **A     (By Mr. Barber) No.**

11     Q     All right.  So when you say "pinch point," that

12  was the word that you used, what did you mean by that?

13     **A     (By Ms. Hushen) There was less cash than**

14  **desirable to fund ongoing production of systems and meet**

15  **payroll.**

16     Q     So what led to the debtor's cash shortage?

17     **A     (By Ms. Hushen) Delays in product development**

18  **and, therefore, the ability to ship product.**

19     Q     Okay.  So I --

20         MS. MICKELSEN:  May I actually --

21         MS. GLOSSON:  Yes.

22         MS. MICKELSEN:  And I just don't want to forget

23     this, for the record, the one last -- and I was

24     trying to wrack my brain for this last one.  The

25     last one we are going to amend is the lease that

1    have two cases that we need to conduct meetings in.

2    There is only a committee in the Technologies case.

3    Do you anticipate, Ms. McDow, asking any questions

4    on behalf of the committee in the LLC case?

5         MS. MCDOW:  Unfortunately, a lot of mine are

6    going to be crossovers; for example, transfers from

7    the Technologies to the LLC.  So I will try and -- I

8    don't have any specifically about the LLC case, I

9    don't think.

10        MS. GLOSSON:  Okay.

11        MS. MCDOW:  But there are going to be some

12   crossovers about transfers of money.

13        MS. GLOSSON:  I understand that.

14        MS. MCDOW:  Okay.  I will try to do it all in a

15   half-an-hour.

16              EXAMINATION BY MS. MCDOW

17   BY MS. MCDOW:

18        Q    We were just talking a moment ago about, kind

19   of, you know, the pinch of money.  When did the company

20   first -- I think that is a question for Simon:  When did

21   the company --

22        MS. GLOSSON:  Can you speak up?

23        MS. MCDOW:  Yes, of course.

24   BY MS. MCDOW:

25        Q    When did the company first start to experience

Electronically signed by Alison Presley (001-189-687-8461)

92b8d7e3d665-fc84be42-899f3e91c918

1    financial difficulties?

2        A    (By Mr. Barber) It was in the -- maybe the

3    January, February time period.

4        Q    Of 2014?

5        A    (By Mr. Barber) Of 2014, yes.

6        Q    Okay.  So before January, February 2014, was

7    the company meeting all of its obligations as they came

8    due?

9        A    (By Mr. Barber) I would have to go and check

10   records.  See, in my role as chief technology officer, I

11   have been hats down on technology rather than business

12   functions.

13            (By Ms. Hushen) In general, the cash flow was

14   supported through the January, February time frame with

15   the orders that were flowing in.

16       Q    So what does that mean?  Just so I understand.

17       A    (By Ms. Hushen) The orders that were coming in

18   were funding operations.  And there was sufficient cash

19   on hand to fund the operation.

20       Q    Was there sufficient cash, for example, again,

21   before January, February, 2014?  For example, November

22   and December, if somebody had requested a refund, were

23   they always getting it before January and February 2014?

24       A    (By Mr. Barber) So I don't think customers were

25   entitled to refunds if they requested them in that period

Electronically signed by Alison Presley (001-159-987-8481)

92be47ea-a665-4c90-be42-899f3e91c918

Page 30

1    of time.

2          (By Ms. Hushen) They weren't entitled until

3    after December 31st, which was the guaranteed commit

4    date.

5    Q    Okay.  So you are testifying that before

6    January and February of 2014, no customers -- there were

7    no customers that were entitled to refunds, whether in

8    Bitcoin or in dollars?

9    A    (By Mr. Barber) I don't believe so.

10   Q    So January, February of 2014, when you say you

11   first started to encounter financial difficulties, can

12   you explain what that means to you?

13   A    (By Mr. Barber) So we incurred a significant

14   liability at the end of December when we missed our

15   guarantee shipment date for the batch one customers.  And

16   at that point in time, we issued a number of refunds.

17   Q    Okay.  And what was the reason for missing the

18   guaranteed date?

19   A    (By Mr. Barber) So we had issues with the

20   system board design, the event that it was not ready for

21   volume production.

22   Q    Any other reasons?

23   A    (By Mr. Barber) That's it.

24   Q    And I know it hasn't been your testimony, but

25   it has been testified on behalf of the debtor that that

Electronically signed by Alison Presley (001-159-587-5654)          82b6a78d-a665-4e8d-8e4d-899f3e91c918

1    problem has been fixed.  Do you believe it has been

2    fixed?

3         A    (By Mr. Barber) Yes.

4         Q    Okay.  And in what way?

5         A    (By Mr. Barber) So we -- in mid to late

6    January, we were producing boards in volume that met

7    specifications.  And we started shipping them in volume.

8         Q    Did you bring on somebody new to do that or

9    it just your existing staff?

10        A    (By Mr. Barber) Existing staff.

11        Q    Did your hire an outside consultant or anyone

12   to help you kind of figure out what the issue was with

13   the operations?

14        A    (By Mr. Barber) No.

15        Q    Okay.  We just talked before about possibly

16   amending the schedules to include, among other things,

17   the bonus you received in December.  What was the bonus

18   you received in December?

19        A    (By Mr. Barber) I believe it was five Bitcoins.

20             (By Ms. Hushen) Five Bitcoins.

21             (By Mr. Barber) Yes.

22             (By Ms. Hushen) Everybody in the company

23   received a bonus to varying levels; five was the most,

24   some received three, some received one; based on tenure

25   and effort.

Electronically signed by Alison Presley (001-159-987-5451)

1      Q      What was the value of the Bitcoin when you

2    looked last; do you know?

3      A      (By Ms. Hushen) About $740, I believe, 743 or

4    something in that range.  I would have to look at the

5    specific schedule.

6      Q      In January or February of 2014, you referred to

7    significant liabilities being incurred.  What dollar

8    amount would you assign to that liability?

9      A      (By Mr. Barber) I don't know how many -- it

10   would depend on how many customers requested a refund.

11   And I would have to go and look in the records.

12     Q      Okay.  Can you give me a ballpark; is it

13   $10,000, half a million?

14     A      (By Mr. Barber) I think Monica might be more

15   familiar with the records.

16            (By Ms. Hushen) Well, total refunds requested

17   were about 3 million.  And we had another 250K actually

18   refunded.  I don't know how many of those were in the

19   January time frame without looking at the records.  I

20   could pull that up, if that's important.

21     Q      On the statement of financial affairs, it shows

22   that last year the company made 18 million, give or take.

23   What was the majority of those -- that income spent on?

24     A      (By Ms. Hushen) Over 10 million of it was spent

25   on design and manufacturing with our subcontract

Electronically signed by Alison Presley (001-159-987-5651)

1  manufacturers.  And then another couple million was on

2  inventory.

3      Q    So when you say design and manufacturing, does

4  that mean paying people to design it; what does that

5  mean?

6      A    (By Ms. Hushen) We had subcontract engineering

7  firms such as DXCore.  Uniquify was doing the design and

8  production of the chips.  DXCore was doing the design of

9  the future next generation chip.  Sandgate was doing

10  current boards and future boards; and Sierra was doing

11  assembly of boards into systems; Sonic; and there was

12  another vendor.  Sonic was doing the -- also board

13  assembly and test.

14      Q    So when you say "design and manufacturing,"

15  just so I understand in my head, is that just for

16  services rendered for different parts of the company?

17      A    (By Ms. Hushen) Yes.

18      Q    Okay.

19      A    (By Ms. Hushen) It is services rendered, you

20  know, as well as IP.  It is not all tangible product,

21  some of it is future product, future value.

22      Q    Okay.

23      A    (By Ms. Hushen) And in addition to that, there

24  is also a large chunk of money in that that related to

25  expedite fees.  Because of the problems in the production

Electronically signed by Alison Presley (001-159-987-5454)                    92b6a7ed-a665-48d4-8e42-899f3e91c918

1  and the fact that the product wasn't ready in time, there

2  was probably a half-a-million dollars spent just on

3  expedite fees to do rework, swap out parts, pull parts in

4  overnight express.

5          So, you know, some of it wasn't actual labor

6  and tangible value in the product.  It was to respond to

7  customer needs.

8      Q    Who is -- when you just talked about the delay

9  and having to expedite, who is -- as best you can assess,

10  who was responsible for the delay?  Is it something the

11  debtor is responsible for or one of these independent

12  companies?

13     A    (By Ms. Hushen) I think everybody had a part in

14  it.  All of the subcontractors, there were a number of

15  failures, and unfortunately, it was kind of a perfect

16  storm.

17     Q    Does the debtor intend to pursue any of those

18  claims against those engineering firms to the extent they

19  think they are responsible for the delay?

20          MS. MICKELSEN:  Actually, I will answer that

21      question.  We are currently investigating these

22      claims, and we haven't made a decision at this

23      point.

24  BY MS. MCDOW:

25     Q    Of those engineering firms you just listed, are

Electronically signed by Alison Presley (001-169-987-5651)          Case 14-30735  Doc 161-2  Filed: 07/25/14  Entered: 07/25/14 17:35:20  Page 14 of 26          b16f550fa0d215e3-899f3e91c918

1          MS. GLOSSON:  We are talking about Hashfast,

2     LLC?

3          MS. MCDOW:  Yeah.

4          MS. GLOSSON:  I just want to make sure it is

5     clear on the record.

6          MS. MCDOW:  Sorry, I apologize.

7          MR. BARBER:  The formation was done by our

8     corporate counsel, Adam Ettinger.

9  BY MS. MCDOW:

10     Q    Okay.  And what was the process for -- who went

11  to Adam and said, Please form this LLC:  Hashfast, LLC?

12     A    (By Mr. Barber) I don't recall.  It was either

13  myself or Eduardo.  I don't recall.

14     Q    Okay.  And what was the reason?

15     A    (By Ms. Hushen) Simon has 23.66 percent.

16     Q    23.66, is that what you --

17     A    (By Ms. Hushen) Yes.

18     Q    Okay.

19     A    (By Ms. Hushen) As does Eduardo.

20     Q    Okay.  While we are here, what's the rest of

21  the make up; it's long, right?

22     A    (By Ms. Hushen) Yeah.

23     Q    Okay.  Can I just have a couple that matter

24  while you have it out?  Tim Wong, what's his percentage

25  interest in Hashfast, LLC?

Electronically signed by Alison Presley (001-159-987-5451)

```
 1      A     (By Ms. Hushen) 1 percent.

 2      Q     For Wong?

 3      A     (By Ms. Hushen) Yes.

 4      Q     And what's yours?

 5      A     (By Ms. Hushen) Three.

 6      Q     3 percent?

 7      A     (By Ms. Hushen) Yes.

 8      Q     What about Joseph Russell (ph)?

 9      A     (By Ms. Hushen) .14.

10      Q     Chad Spackman?

11      A     (By Ms. Hushen) Chad is close to ten, 9.56.

12      Q     Shaun Taffler?

13      A     (By Ms. Hushen) .57.

14      Q     Cara Johnson?

15      A     (By Ms. Hushen) .1.

16      Q     Is there anybody else on that list with a

17      percentage over 25 percent?

18      A     (By Ms. Hushen) No.

19      Q     Okay.  Any over the --

20      A     (By Ms. Hushen) Actually, there was actually

21      21.5 percent, 22 percent.

22      Q     You want to -- 22 percent, I think for Eduardo

23      and Simon, yes?

24      A     (By Ms. Hushen) Yeah.

25      Q     Anyone else over 15 percent that we haven't
```

Electronically signed by Alison Presley (001-159-987-5451)                                          92be47ca-a665-4c9d-be42-699f3e91c918

1      A      (By Mr. Barber) Our attorney advised us to set

2  up a structure.

3      Q      Just to hold the IP?

4      A      (By Mr. Barber) Yes.

5      Q      Okay.  Who uses the IP, the Hashfast, LLC?

6      A      (By Mr. Barber) Hashfast Technologies.

7      Q      And what is the arrangement as far as how it

8  used, the IP?

9           MS. MICKELSEN:  Just one clarification on what

10          Hashfast, LLC does.  It does more than just hold the

11          IP.

12          MS. HUSHEN:  Yes.  It continues to develop and

13          augment the IP.  So all payments for design work

14          went through the LLC.

15  BY MS. MCDOW:

16      Q      Who are the credit --

17      A      (By Ms. Hushen) Hashfast Technologies funded

18  the LLC and the LLC licensed that technology back to

19  Hashfast Technologies.  That was the legal structure.

20      Q      Who are the current employees of Hashfast, LLC?

21      A      (By Ms. Hushen) There are none.  It is the

22  contract employees that are paid through the LLC.

23      Q      Wait, they are paid through -- Hashfast, LLC

24  actually cuts checks to --

25      A      (By Ms. Hushen) To Sandgate, DXCore, and

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

Page 65

```
 1        MS. MCDOW:  But I think a couple basic

 2    questions about the remaining IP.  And I will move

 3    on to some insider questions, and maybe the sale.

 4    So maybe I will try to stick to ten minutes.

 5        MS. GLOSSON:  Okay.  So let me pause this for a

 6    moment then.

 7        (Off the record.)

 8        MS. GLOSSON:  All right.  We are back on the

 9    record.

10        Go ahead, Ms. McDow.

11        MS. MCDOW:  Thank you.

12  BY MS. MCDOW:

13     Q    What do you think the value is as we sit here

14  today?  And I am just going to try to wrap this up.  I,

15  obviously, have a million more questions about it, but

16  what is the value of the IP today?  And again, not an

17  expert evaluation, but just your understanding of general

18  knowledge of the depreciation issues we talked about

19  that -- the competition.  What's the value now of all

20  three of them put together?

21     A    (By Mr. Barber) All three of them put together,

22  there are some questions that -- it is hard to say.

23  There are some questions that may mean that some of it

24  could be very valuable or not have that much value.

25     Q    Give me worst case.  Give me a range, worst
```

Electronically signed by Alison Presley (001-159-987-5451)

Case: 14-30725   Doc# 161-2   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 18
of 26

92be47ea-a665-4c9d-be42-899f3e91c918

1    case to best case, if you were to --

2         **A     (By Mr. Barber) Best case, the value could be,**

3    **you know, substantial, many millions.**

4         Q    "Many" like 5 million, 10 million, 30 million?

5         **A    10 million, 30 million.**

6              MS. MICKELSEN:  And are these presuming that

7         all conditions are completely ideal and the

8         environment, competitors don't have an advantage?

9              MR. BARBER:  Uh-huh, yeah.

10   BY MS. MCDOW:

11        Q    Yeah.  If we were to market it, let's say

12   again, in open market auction process, and, you know,

13   whoever wanted it the most got it at a price that was

14   fair, can you narrow it anymore between ten and

15   30 million?

16             Best case, okay.  Was that your range, ten to

17   30 or was that your range just for best case?

18        **A    (By Mr. Barber) That's my range for best case.**

19        Q    Okay.  What's your range for worst case?  Or

20   preferably, just your worst case, not the range.

21        **A    (By Mr. Barber) For worst case, could be zero.**

22        Q    Okay.  And why do you think it could be zero?

23        **A    (By Mr. Barber) Let's see.**

24             MR. GALLO:  Doesn't make --

25             MS. GLOSSON:  Okay.  We really only need one

Electronically signed by Alison Presley (001-159-887-5451)

1  $3 million.  The guarantee is we get all of the stuff

2  back that wasn't producing the money?

3     A    (By Ms. Hushen) You get all of the equipment

4  back that isn't selling in the market today, yes.

5          So relative to a liquidation scenario, it

6  certainly has a much more positive outcome than having

7  inventory sit there and not collecting any income.

8  Putting it into a mining operation delivers substantially

9  more value to the creditors.

10         There is also an additional 8,000 chips that

11  are not turned over as part of the deal that remain in

12  Hashfast's estate that we have two other negotiations

13  underway on that will deliver more value to the

14  creditors.  And then future IP, if that is sold or

15  developed, remains in the estate.  Then would be

16  potentially more value elsewhere.

17     Q    Okay.  So just so I understand, what do you

18  think, if we, today, went out and liquidated it either on

19  the price list that we gave or something close, we

20  liquidated all of the inventory today, what would be the

21  amount we will get?

22     A    (By Ms. Hushen) We are estimating market values

23  somewhere between seven-and-a-half million and nine

24  depending on the price.

25     Q    For just the chips today?

Electronically signed by Alison Presley (001-159-987-5451)

82be47ea-a665-4c9d-be42-899f3e91c918

1      A      (By Ms. Hushen) For all of the inventory,

2   including all of the physical assets, not counting the IP

3   value.

4           (By Mr. Barber) You would have to find buyers.

5           (By Ms. Hushen) You would have to find buyers.

6   And you would also have to pay at least a million in cure

7   claims to realize that value.

8      Q      Okay.  So I must be the most dense human on the

9   planet.  If today we could sell the inventory, finding

10  willing buyers, which is seems like we could do, that's

11  9 million exclusive of avoidance actions and exclusive of

12  IP.  And the deal on the table is for 6 million,

13  3 million of which is not guaranteed and 3 million of

14  which is of promissory note.

15          In your estimation, why is it a better deal to

16  go forward with this sale?

17     A      (By Ms. Hushen) Well, we haven't been able

18  to -- we haven't been allowed to sell for the last month.

19  And so the value in our product is diminishing rapidly.

20  And it is hard to find buyers today for the inventory.

21  Nobody else has stepped up to the table.  It has been on

22  the market for two months.  We have been out --

23     Q      What does that mean, "been on the market;" what

24  does that mean?

25     A      (By Ms. Hushen) We have been out talking to

Electronically signed by Alison Presley (001-159-987-5451)                    82be47ea-a665-4c9d-be42-899f3e91c918

1    Q    Okay.  So when did you start selling batch one

2  products?

3    A    (By Mr. Barber) August 8th.

4    Q    When did you end selling batch one products?

5    A    (By Mr. Barber) Monica, do you know --

6         (By Ms. Hushen) Yeah.

7         (By Mr. Barber) -- when the last batch one sale

8  was?

9         (By Ms. Hushen) Yeah.  I was just looking for

10  the sheet with the order history.  Well, it is in this

11  pile somewhere anyways.  I don't know, it seems to have

12  walked off.

13         MS. MICKELSEN:  Maybe I have it in my file.

14         MS. HUSHEN:  Yeah.  It has got colors on the

15    top, different colors of the order batches.

16  BY MR. KOZACHENKO:

17    Q    So the other question would be:  How much were

18  the sales of batch one, batch two, batch three, batch

19  four; separately, if possible.

20    A    (By Ms. Hushen) It was here.  I don't know what

21  happened to it.

22         I don't recall.  I wasn't -- I don't know

23  without looking at the document.  I wasn't here so I

24  would have to look at the document.

25         What was your question again?  Let me pull it

Electronically signed by Alison Presley (001-169-387-5451)

1   **up.**

2      Q   When did you start selling batch one?

3      **A   (By Ms. Hushen) The batches.**

4      Q   When did you start selling -- for every batch

5   basically, the start and end date of sale.

6        MS. MICKELSEN:  Of each batch.

7        MR. KOZACHENKO:  Of each batch.  As well as the

8      total amount of gross sales from each batch.

9        MS. HUSHEN:  Batch one was available for sale

10      from August 1st to September 10th, 2013.

11   BY MR. KOZACHENKO:

12      Q   Okay.

13      **A   (By Ms. Hushen) And do you want batch two also?**

14      Q   Yes, every one.

15      **A   (By Ms. Hushen) 9/1/2013 to January 2014.**

16      Q   Okay.

17      **A   (By Ms. Hushen) Batch three was**

18   **February 28th -- or no, excuse me.**

19      Q   Can you go back to the second batch.  Because I

20   think something is -- what was the date of the second

21   batch?

22      **A   (By Ms. Hushen) 9/1/2013 to January 2014.**

23      Q   Uh-huh, next one.

24      **A   (By Ms. Hushen) batch three, 10/4/2013 to**

25   **11/12/2013.  Batch four is 11/22 to January 3rd.**

Electronically signed by Alison Boston (001-153-987-5451)

1    Q    11/22, okay.  So -- and I didn't get the

2    numbers for gross sales for each batch.

3    **A    (By Ms. Hushen) At some point.  That will take**

4    **too long to do it here.  We will provide that later.**

5    Q    Right.  So we are saying that you sent for --

6    basically, your design for production for chip

7    manufacturing at the end of August?

8    **A    Yes.**

9    MS. MCDOW:  What was the question, I'm sorry?

10    MR. KOZACHENKO:  I asked when did he send the

11    design for production for chip manufacturing.

12    MR. BARBER:  That was the very end of August.

13    We first sent it off maybe August 28th.  But we did

14    make a small revision in the early stage of

15    manufacturing.

16    BY MR. KOZACHENKO:

17    Q    You are saying mid September?

18    **A    (By Mr. Barber) Yes.**

19    Q    And all chips produced with the revision,

20    right?

21    **A    (By Mr. Barber) Correct.**

22    Q    Okay.  And when did you receive them from --

23    actually, what's the name of the company?

24    **A    (By Mr. Barber) So we contracted with Uniquify**

25    **to do all of the manufacturing.  They had a subcontractor**

Electronically signed by Alison Presley (001-159-887-5451)                    92bb47ea-a665-4e9d-be42-399f3e91c918

1    who actually performed the silicone manufacturing.

2        Q    Okay.  So when did you receive them back from

3    manufacturing, the wafers?

4        A    (By Mr. Barber) So the wafers were ready at the

5    end of -- well, the start of November.

6        Q    Okay.

7        A    (By Mr. Barber) But we had a -- we were

8    originally expecting wafers in the middle of October.

9    And the manufacturer was able to deliver us wafers mid

10   October.  But because of delays with the other parts of

11   the design, we instructed them not to rush.

12       Q    And you mentioned in the previous questions

13   answered that you made research before you started the

14   company, called the contractors, right, and figured out

15   how much it costs?

16       A    (By Mr. Barber) Yes.

17       Q    Can you tell me how much you paid for the mask?

18       A    (By Mr. Barber) That's under nondisclosure with

19   Uniquify.

20       Q    How much did you pay for each chip or each

21   wafer, let's say?

22       A    (By Mr. Barber) So I don't know if I am allowed

23   to answer that under the nondisclosure with Uniquify.

24       Q    Yes.  But we are talking about assets and

25   liabilities.  We should know how much you paid for --

Electronically signed by Alison Presley (001-159-987-5451)

1    **A      (By Ms. Hushen) Right.**

2    Q      But the other ones, the 16,000, is that ready

3    to go?

4    **A      (By Ms. Hushen) They still need to be tested.**

5    Q      They still need to be tested?

6    **A      (By Ms. Hushen) Yes.**

7    Q      So what's the timing on that?

8    **A      (By Mr. Barber) The testing is very quick.   It**

9    **could happen in one day.**

10          **(By Ms. Hushen) Probably not all 16,000.**

11          **(By Mr. Barber) And you will lose about**

12   **10 percent of them.**

13   Q      So with respect to the wafers, which you say

14   there are about 92 wafers, what's the time period of

15   those getting to a finished or final product?

16   **A      (By Ms. Hushen) Probably two to three months.**

17   **Because a good portion of those substrates would need to**

18   **be ordered, and other components.**

19   Q      Now, are any of the --

20          MS. MICKELSEN:  Does it factor in the ability

21          to have cash on hand to be able to finish the build

22          out with the wafers?

23          MS. HUSHEN:  Well, that is presumed in any

24          build out, yeah.

25          MS. GLOSSON:  No, I understand that there is a

Electronically signed by Alison Bresley (001-159-987-5454)