**EXHIBIT D**

Case: 14-30725   Doc# 161-4   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 2 of 28

1           UNITED STATES BANKRUPTCY COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4                ---oOo---

5  In re                   )  Lead Case No.:
                         )  3:14-bk-30725-DM

6  HASHFAST TECHNOLOGIES, LLC, a  )  (Proposed to be)
  California limited liability   )  Jointly

7  company,               )  Administered with:
                         )

8  Debtor and Debtor-in-Possession.  )  Case No.:
                         )  3:14-bk-30866-DM

9  _____  )
  Affects HASHFAST LLC, a Delaware  )  Chapter 11

10  limited liability company,     )
                         )

11  Debtor and Debtor-in-Possession.  )
  _____  )

12

13         2004 EXAMINATION OF MONICA HUSHEN

14           Thursday, July 17, 2014

15

16

17

18

19

20                SF REPORTERS

21        912 Cole Street, Number 304
        San Francisco, California 94117

22            415-948-8289

23        Info@sf-reporters.com

24

25  Reported By: Karla Ellis-Davis
  Certified Shorthand Reporter No. 12998, RPR

```
 1        A.    Yeah.

 2        Q.    Do you know if they are still on the table?

 3        A.    No.  No.

 4        Q.    No, they are not; or no, you don't know?

 5        A.    No, they are not on the table, for the current

 6   HashFast.  If there was a rebirth, I don't know.

 7        Q.    Okay.  Do you know whether or not      has any

 8   sort of connection with LiquidBits?

 9        A.    I don't know.

10        Q.    Did they --

11        A.    I --

12        Q.    Go ahead.

13        A.    That would surprise me, but maybe they do.

14        Q.    You never asked whether they had any?

15        A.    No.

16        Q.    And did they bring the LiquidBits offer to the

17   table, so to speak?

18        A.    No.

19        Q.    But they did -- he did review the LiquidBits

20   offer with you?

21        A.    Not directly, no.  I didn't provide it to him.

22        Q.    Okay.  Did you discuss it generally, about

23   whether it was a...

24        A.    I discussed the general status of types of

25   approaches we were taking and types of deals.
```

Case: 14-30725   Doc# 161-4   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 3
of 28

1      A.    That was a legal issue.

2      Q.    And lastly, have any of the employees, either

3   you, Simon or Eduardo, to your knowledge, been offered

4   or promised a position at LiquidBits if the sale goes

5   through?

6      A.    If the sale goes through, they have stated

7   that they want to hire key employees, and they would

8   trust our judgment to define who those key employees

9   are.  I think some would be excluded and some wouldn't.

10     Q.    Okay.  And have they defined kind of the role

11  that they want these employees to be on?  Do they want

12  CEO, CTO?  Have they defined it?

13     A.    They have defined who would be needed to

14  execute the transactions contemplated.

15     Q.    Is one of those Simon?

16     A.    No.  We would put a provision in the contract

17  that in the event that Simon's resources were needed,

18  they would agree to structure a consulting agreement, at

19  fair rates, to retain Simon.  We wanted to ensure that

20  by Simon not -- if Simon chose to not go to LiquidBits,

21  which was my indication from Simon as well as from Greg,

22  that I wanted to make sure that we weren't defeating our

23  ability, their inability, our collective ability, to

24  succeed.  So we put the provision in to allow for

25  contract services of whatever engineering talent didn't

Case: 14-30725   Doc# 161-4   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 4
of 28

```
 1    go over, but not to preclude him from hiring engineering

 2    talent, if he chose to.

 3         Q.   Okay.  Same question for Eduardo and then for

 4    you.  Did they indicate any express interest in

 5    retaining Eduardo?

 6         A.   They have indicated an express interest in not

 7    retaining Eduardo.

 8         Q.   Okay.  And for you?

 9         A.   Greg has said he would like to see me as part

10    of the deal.  We haven't discussed what that role might

11    be, and whether or not I would be interested.

12         Q.   Okay.  We can stop.  I want you to not be

13    crazed.  So it's 4:32.  We will stop.

14              MS. MCDOW:  Off the record.

15              (Off the record at 4:33 p.m., after which the

16              proceedings reconvened at 4:35 p.m.)

17              MS. MCDOW:  We are going to stipulate to

18    thirty days.  You are going to send a copy of it, right.

19    So a copy will be sent.  You'll have 30 days to review

20    it, to provide any corrections.  Discuss them with

21    counsel and then return it to me.  And then we will

22    continue this, so...

23              MS. MICKELSEN:  And committee counsel will be

24    receiving the original copy and we'll receive a copy.

25              MS. MCDOW:  So stipulated.
```

Case: 14-30725   Doc# 161-4   Filed: 07/25/14   Entered: 07/25/14 17:35:30   Page 5 of 28

**EXHIBIT E**

Published on *United States Bankruptcy Court* (http://www.canb.uscourts.gov)

Home > Procedures/Guidelines > Guidelines for Early Disposition of Assets in Chapter 11 Cases, Pre-Packaged Plans, The Sale of Substantially All Assets Under § > Content

Guidelines for Early Disposition of Assets in Chapter 11 Cases, Pre-Packaged Plans, The Sale of Substantially All Assets Under §

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

### GUIDELINES FOR EARLY DISPOSITION OF ASSETS IN CHAPTER 11 CASES

### PRE-PACKAGED PLANS

### THE SALE OF SUBSTANTIALLY ALL ASSETS UNDER § 363

The following guidelines are promulgated as a result of the increasing use of pre-packaged plans or §363 sales to dispose of substantially all assets of a Chapter 11 debtor shortly after the filing of the petition. The court will consider all requests to modify the guidelines to fit the circumstances of a particular case.

PRE-PACKAGED PLANS

1. Declaration of Counsel for Debtor-In-Possession -- In connection with any request for the special setting of a hearing to approve a disclosure statement or a combined hearing to approve a disclosure statement and confirm a plan, in addition to any other required papers, counsel for the debtor-in-possession should submit a declaration covering the following points:

   a. Retention of counsel. The date counsel was retained by the debtor, the approximate number of hours of professional time expended pre-petition, compensation paid to counsel pre-petition including source of payment and the approximate amount of accrued but unpaid compensation.

   b. Communications with creditors. A description of any written communications of the debtor with creditors during the pre-petition reorganization process. Copies of letters should be attached. If letters contain confidential information, they need not be attached but the court may require in-camera inspection.

   c. Communications with shareholders or partners. A description of any written communications with shareholders or partners of a partnership during the pre-petition reorganization process. Copies of letters should be attached. If letters contain confidential information, they need not be attached but the court may require in-camera inspection.

d.  Creditors' Committee. If a Creditors' Committee existed pre-petition, indicate the date and manner in which the committee was formed.

e.  Counsel for Committee. If the pre-petition Creditors' Committee retained counsel, indicate the date counsel was engaged and the selection process.

f.  Position of United States Trustee. It is expected that the United States Trustee will be consulted prior to, or simultaneously with, the filing. Set forth the position of the United States Trustee regarding the request for a special setting, if known.

2.  Declaration of Counsel for Creditors' Committee -- Where counsel has represented a pre-petition Creditors' Committee and anticipates representing the Official Creditors' Committee when appointed, counsel should submit a declaration covering the following points:

a.  Retention of counsel. The date counsel was retained by the Committee, the approximate number of hours of professional time expended pre-petition, compensation paid to counsel pre-petition including source of payment and the approximate amount of accrued but unpaid compensation.

b.  Investigation of Committee and Counsel. A description of the scope and results of any investigation into the debtor's affairs conducted by the Committee and/or its counsel.

c.  Communication with creditors. A description of any written communications of the Committee or its counsel with creditors during the pre-petition reorganization process. Copies should be attached. If letters contain confidential information, they need not be attached but the court may require in-camera inspection.

d.  Involvement in formulation of plan and disclosure statement. A description of the Committee's and counsel's involvement in the formulation of the plan and disclosure statement.

THE SALE OF SUBSTANTIALLY ALL ASSETS UNDER § 363 WITHIN 60 DAYS OF THE FILING OF THE PETITION

3.  Declaration of Counsel for Debtor-In-Possession -- In connection with any hearing to approve the sale of substantially all assets within 60 days of the filing of the petition, the request for the special setting of a

hearing or the sale motion itself when regularly noticed, should be supported by a separate declaration by counsel for the debtor-in-possession covering the following points:

    a.  Retention of counsel. Same as ¶ 1.a. above.

    b.  Communications with creditors. Same as ¶ 1.b. above.

    c.  Communications with shareholders or partners. Same as ¶ 1.c. above.

    d.  Creditors' Committee. Same as ¶ 1.d. above.

    e.  Counsel for Committee. Same as ¶ 1.e. above.

    f.  Sale Contingencies. Statement of all contingencies to the sale agreement together with a copy of the agreement.

    g.  Creditor Contact List. If no committee has been formed, a list of contact persons together with fax and phone numbers for each of the largest 20 unsecured creditors.

    h.  Administrative Debts. Assuming the sale is approved, an estimate of administrative debts to be incurred prior to closing and the source of payment for such debts.

    i.  Proceeds of sale. An estimate of the gross proceeds anticipated from the sale together with an estimate of the net proceeds coming to the estate with an explanation of the items making up the difference.

    j.  Debt Structure of debtor. A brief description of the debtor's debt structure including the amount of the debtor's secured debt, priority claims and general unsecured claims.

    k.  Disposition of Proceeds. A statement setting forth, to the best of declarant's knowledge, the

likely distribution of proceeds to secured claimants, administrative claimants, priority claimants and general unsecured creditors.

4. Declaration of Responsible Individual for Debtor-In-Possession -- Counsel's declaration referred to in ¶ 3 above should be accompanied by a declaration from the responsible individual covering the following matters:

    a. Alternatives to Sale. A description of the efforts, if any, to pursue other alternatives such as financing, capital infusion, etc., including the period of time involved and the results achieved.

    b. Marketing of Assets. A description of the manner in which the assets were marketed for sale including the period of time involved and the results achieved.

    c. Decision to Sell. The date on which the debtor accepted the offer to purchase the assets.

    d. Asset Valuation. Disclosure of the debtor's prior valuations, within the last year, of the assets to be sold, if any. (i.e., book value, appraisals, financial statements, etc.)

    e. Relationship of Buyer. A statement identifying the buyer and setting forth, to the best of declarant's knowledge, all of the buyer's (including its officers, directors and shareholders) connections with the debtor, creditors, any other party in interest, their respective attorneys, accountants, the United States Trustee or any person employed in the office of the United States Trustee.

    f. Post Sale Relationship with Debtor. A statement setting forth, to the best of declarant's knowledge, any relationship or connection the debtor (including its officers, directors, shareholders, and employees) will have with the buyer after the consummation of the sale, assuming it is approved.

    g. Relationship with Secured Creditors. If the sale involves the payment of all or a portion of secured debt(s), a statement of all connections between debtor's officers, directors, employees or other insiders and each secured creditor involved (for example, release of insider's guaranty).

    h. Insider Compensation. Disclosure of current compensation received by officers, directors,

key employees or other insiders pending approval of the sale.

5. Declaration of Counsel for Creditors' Committee -- Where counsel has represented a pre-petition Creditors' Committee and anticipates representing the Official Creditors' Committee when appointed, counsel should submit a declaration covering the following points:

   a. Retention of counsel. Same as ¶ 2.a. above.

   b. Investigation of Committee and Counsel. Same as ¶ 2.b. above.

   c. Communication with creditors. Same as ¶ 2.c. above.

   d. Involvement in sale. A description of the Committee's and counsel's involvement in the negotiation of the sale.

6. Hearing and Notice Regarding Sale -- Unless the court orders otherwise, all sales governed by these guidelines, including auctions or the presentation of competing bids, will occur at the hearing before the court.

   The notice sent to creditors and other parties in interest regarding the sale should contain the information required by ¶¶ 3. h - k and 4. a - g above, in addition to any other matters normally set forth in a notice of sale.

7. Proposed Order Approving Sale -- A proposed order approving the sale should be provided to chambers 24 hours prior to the hearing.

8. Good Faith Finding -- There must be an evidentiary basis for a finding of good faith under § 363(m). Evidence can be presented in the form of a declaration from the prospective purchaser.

9. Competing Bids -- Unless the court orders otherwise, competing bids can be presented at the time of the hearing.

10. Financial Ability to Close -- Unless the court orders otherwise, any competing bidder must be prepared to demonstrate to the satisfaction of the court its ability to consummate the transaction if it is the successful bidder.

11. Overbids -- Unless the court orders otherwise, each overbid must be at least 5% more than the amount of the original offer. The amount of the original offer is determined without regard to any commission or payment to a broker or agent.

12. Damages Payable to Prospective Purchaser -- Whether denominated liquidated damages, breakup fee, topping fee or other designation, no damages of any kind are payable to a prospective purchaser or its agents absent approval of the court.

    If a provision for damages is contained in the original purchase agreement, and the parties intend to seek court approval for the provision separately, the provision should provide that it can be approved separately from the agreement itself.

    A request for the approval of a damage provision shall be supported by, in addition to any other required papers, a declaration from counsel for the debtor-in-possession setting forth the precise conditions under which damages would be payable and the factual basis on which the seller determined the provision was reasonable. Counsel for the proposed buyer may, but is not required to, submit a similar declaration.

---

**Source URL (retrieved on *07/24/2014 - 14:51*):** http://www.canb.uscourts.gov/node/441

**EXHIBIT F**

## Memorandum of Understanding

March 4, 2014

On October 3, of 2013, Hashfast Technologies, LLC (Hashfast) and Liquidbits Corp (Liquidbits) entered into written agreement whereby Hashfast was to provide a number of Sierra 2U3 and 4U3 units to Liquidbits and/or its affiliates in exchange for advance cash payment and a fraction of subsequent operational revenues derived from the commercial use of these units. However, due to difficulties in the supply and manufacturing process, to date not all the promised units have been unavailable.

Liquidbits understands and sympathizes with Hashfast's difficulties in the supply and manufacturing process, and continues to see value both in the technology and its continued relationship with Hashfast. Accordingly, after good faith negotiations, Hashfast and Liquidbits have agreed to amend the agreement as follows:

Liquidbits agrees that the two thousand five hundred (2,500) Sierra units identified in the original agreement will be converted into thirty thousand (30,000) Golden Nonce Chips capable of hashing at up to 750 Ghash per second to be delivered over three months on a ongoing basis. Liquid Bits further agrees that delivery of said chips will fully discharge all prior agreements hashfast has entered into with LiquidBits, it successors or assigns.

The delivery schedule for said chips will be as follows:

1- A first batch of up to seven thousand (7,000) is to be delivered in month of March.
2- A second batch of up to ten thousand (10,000) is to be delivered in the month of April.
3- A third and final batch thirteen thousand (13,000) is to be delivered in the month of June.

In addition, Hashfast further agrees to provide to LiquidBits a non-transferrable, non-exclusive license under a non-disclosure agreement for the following designs and technologies developed by Hashfast:

1- Board designs, software and firmware, for the processing modules developed by Hashfast currently referred to as "Linear Rev 2", and "EVO".
2- Procedures, test software and scripts, automated test machine designs, and other manufacturing technologies developed by HashFast.
3- Technical, project management, sourcing and vendor selection assistance as shall be required to enable Liquidbits to produce Yoli Evo Mining boards from externally sourced materials.

Hashfast will, during an interim period lasting approximately six to eight weeks, continue to manufacture and sell to Liquidbits mining boards at a cost equal to their fully loaded fabrication cost as paid by Hashfast. Liquidbits may at it's discretion elect to provide Hashfast with funds to expedite part sourcing for the production of finished modules to be delivered to LiquidBits. Sales to Liquidbits will continue to be given priority consideration over sales to other clients.

Liquidbits shall establish independent relationships with all required material suppliers and make all commercially reasonable efforts to obtain the required materials independently. However, in the event that these efforts are unsuccessful, Hashfast will provide reasonable good faith assistance to ensure Liquid bits is able to source, produce, and test working boards of a quality and performance comparable to the boards being produced by HashFast.

Finally, in recognition and consideration of the mutually beneficial on-going commercial relationship between Hashfast and Liquidbits, both companies agree that Hashfast will provide access and priority availability to Liquidbits as described below;

- For the current GN chip, hashfast shall provide LiquidBits with the option to purchase up to four wafer lots to be delivered as wafers at Hashfast's direct costs
- For the upcoming chip design to be taped out within 6 weeks, HashFast shall provide Liquid Bits with "most favored nation" pricing

Conversaly. Liquidbits shall;

- Extend to all GN chips acquired by LiquidBits under this agreement the payment of twenty-five percent (25%) of operational profit established in the original agreement.

  This 25% operational profit will be net of Liquidbits Hosting Cost as defined in the agreement, but also allow Liquidbits to deduct the cost of deploying the Golden Nonce Chips into an operational environment as amortized equipment cost along with amortized equipment cost of Hashfast as defined in the agreement.

Hashfast and Liquidbits signify that these changes are agreed by signing in the respective locations provided.

Eduardo deCastro
Chief Executive Officer
Hashfast Technologies, LLC

Date  3/8/14

Gregory Bachrach
Chief Executive Officer
Liquidbits Corp

Date  3/4/14

**EXHIBIT G**

Not Reported in B.R., 2010 WL 716198 (Bkrtcy.D.Mont.)
**(Cite as: 2010 WL 716198 (Bkrtcy.D.Mont.))**





Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Montana.
In re Edra D. BLIXSETH, Debtor.

No. 09–60452–7.

Feb. 23, 2010.

West KeySummary**Bankruptcy 51 ☞3070**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3070 k. Order of Court and Proceedings Therefor in General. Most Cited Cases

**Bankruptcy 51 ☞3072(1)**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
            51k3072 Manner and Terms
                51k3072(1) k. In General. Most Cited Cases

A bankruptcy court would not approve bidding procedures proposed by a Chapter 7 trustee for the sale of developable real property. The trustee's judgment that the sale of the property was necessary was not entitled to deference because the trustee failed to produce any credible evidence as to the value of the property. The trustee's personal opinion concerning the value of the property was based solely on information obtained from the prospective purchaser. The trustee made no independent effort to ascertain the value of the property, and it would cost the trustee little or nothing to familiarize himself with the real estate market in the area of the property's location. The trustee testified that he was wholly unaware that there may have been up to $40 million of sales in the area during the holiday season,

which was in stark contrast to the trustee's testimony that real estate sales in the area were flat.

### MEMORANDUM OF DECISION

RALPH B. KIRSCHER, U.S. Bankruptcy Judge.

**\*1** In this Chapter 7 bankruptcy, after due notice, a hearing was held January 29, 2010, in Missoula on the Chapter 7 Trustee's:

MOTION OF CHAPTER 7 TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), 363(f) AND 365, AND FED. R. BANKR. P.2002(a)(2),6004 AND 6006 FOR ORDER (A) APPROVING THE SALE OF REAL PROPERTY KNOWN AS "FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB" FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (B) APPROVING BIDDING PROCEDURES AND AUTHORIZING THE TRUSTEE TO SOLICIT HIGHER AND BETTER OFFERS PURSUANT TO PROPOSED NOTICE OF SALE, (C) GRANTING RELIEF FROM STAY ON THE FAMILY COMPOUND AT YELLOWSTONE MOUNTAIN CLUB AND ON PROPERTY LOCATED AT 18 KING EDWARD COURT, RANCHO MIRAGE, CALIFORNIA AND (D) GRANTING RELATED RELIEF

filed December 18, 2009, at docket entry no. 576, together with the objections thereto filed by: Marc S. Kirschner, as Trustee (the "Yellowstone Trustee") of the Yellowstone Club Liquidating Trust ("YCLT"); Western Capital Partners, LLC; and Greg LeMond, David and Sacia Morris and Sacia Enterprises, Inc. (the "LeMond Group"). The Chapter 7 Trustee, Richard J. Samson, who appeared personally at the hearing and testified, was represented by David B. Cotner of Missoula, Montana. In addition, YCLT was represented at the hearing by Charles W. Hingle of Billings, Montana, Western Capital Partners was represented by Robert W. Hatch, II of Denver, Colorado, the LeMond Group was represented at the hearing by K. John Shaffer of Los Angeles, California and James J. Screnar of Bozeman, Montana, and CIP Yellowstone Lending, LLC ("CIP") was represented by Paul D. Moore and Barry D. Green

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of Boston, Massachusetts and Benjamin P. Hursh of Missoula, Montana. The Trustee's Exhibits 2 through 13, CIP's Exhibit 1 and the LeMond Group's Exhibits 14 and 16 were admitted into evidence.

In a footnote, YCLT states that it "will ask the Court to take notice of the testimony on value and entitlements for the Family Compound during the hearing on the motion for relief from the automatic stay held October 2, 8 and 9, 2009, in the BLX Case." Given the inter-relatedness of this case to the other Blixseth entity bankruptcies and associated proceedings, this Court deems it appropriate to take judicial notice of the proceedings in the BLX bankruptcy and the Yellowstone Club entities' bankruptcies.

### BACKGROUND

Timothy L. Blixseth ("Blixseth") and his former spouse, Edra Blixseth ("Debtor"), were the founders of Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Big Sky Ridge, LLC, and Yellowstone Club Construction Company, LLC, which limited liability companies are referred to generally by this Court as the Yellowstone Club entities. Blixseth and Debtor were also the founders of Yellowstone Club World, LLC ("YCW"), Big Springs Realty, LLC ("BSR") and BLX Group, Inc., f/k/a Blixseth Group, Inc. or BGI. Blixseth and Debtor separated sometime in 2006 and Blixseth retained sole control of BGI, YCW, BSR and the Yellowstone Club entities from 2006 until August of 2008, when Debtor was awarded BGI, YCW, BSR and the Yellowstone Club entities as part of a marital settlement agreement. Debtor, on August 19, 2008, changed the name of BGI to BLX Group, Inc. ("BLX"). Also, in August of 2008, Debtor, at the suggestion of Samuel T. Byrne ("Byrne") and CrossHarbor Capital Partners ("CrossHarbor"), hired Discovery Land Company to manage and oversee the Yellowstone Club's operations, administration, design, construction, completion, maintenance, marketing, sales and all other day-to-day functions. Under the marital settlement agreement between Debtor and Blixseth, Debtor was required to make various payments to or on behalf of Blixseth. To allow for Debtor to make such payments, CIP, on or about August 13, 2008, granted Debtor and BLX a 45–day loan in the original principal amount of $35 million (the "CIP

Loan").[FN1] The CIP Loan was evidenced by two notes:

**\*2** 1. A Promissory Note in the principal sum of $13,000,000.00 made by BLX and Debtor to CIP; and

2. A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Debtor to CIP.

The CIP Loan is secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "CIP Deed of Trust") granted by the Debtor and BLX which purportedly encumbers property commonly known as 42765 Dunes View Road, Rancho Mirage, California (the "Porcupine Creek Property"), as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property and commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California. The Porcupine Creek property is owned by BLX. An appraiser, Raymond L. Dozier, appraised the Porcupine Creek property at roughly $195,000,000 in October of 2007 and $128,000,000 in January of 2009. In a memorandum of decision entered by this Court on October 2, 2009, in the BLX bankruptcy, the Court concluded that the "as is" impaired value of Porcupine Creek is currently $73,500,000. In that same memorandum of decision and related order, the Court granted CIP relief from the automatic stay as to the two single family homes commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California.

The CIP Loan is also secured by real property commonly referred to as the 160–acre Blixseth Family compound ("Family Compound"). The 160–acre Family Compound is the subject of this Motion.

Of the $35 million CIP Loan, CIP retained $13,094,973.33 to payoff a loan that Blixseth and Kawish, LLC (an entity belonging to Blixseth) owed to CIP. CIP also retained $225,000 for closing costs and $28,000.00 for pre-closing interest. In addition, cash was paid out as follows:

© 2014 Thomson Reuters. No claim to Original U.S. Gov. Works.

| | |
|---|---|
| Title Insurance Premium/Costs | $102,012.80 |
| LeMond Title Insurance Premium/Costs | $13,540.00 |
| Owner's Policy Title Insurance Premium/Cost | $7,834.00 |
| LeMond Payment (wired directly to LeMond) | $8,000,000.00 |
| California Property Tax | $624,763.00 |
| Tim Blixseth Payment (wired directly to Blixseth) | $4,944,396.17 |
| Archer Financing Fee (wired directly to Archer Capital) | $200,000.00 |
| Borrower Proceeds | $1,016,477.28 |
| Commerce Escrow Fee | $18,000.00 |
| Federal Tax Lien | $2,176,779.22 |
| Borrower Counsel Fee | $500,000.00 |

Shortly thereafter, on November 10, 2008, Debtor caused the Yellowstone Club entities to seek protection under Chapter 11 of the Bankruptcy Code.[FN2] Pursuant to the Yellowstone Club entities' confirmed Chapter 11 plan, YCLT is the successor-in-interest to Yellowstone Mountain Club, LLC and Yellowstone Development, LLC.

The Yellowstone Club entities comprise what is commonly referred to as the Yellowstone Club, an exclusive 13,000 acre plus master-planned residential and recreational community/retreat for members-only that targets individuals with high net worth. Byrne is the founder and managing member of CrossHarbor and is also a principal and co-founder of CIP and New CH YMC Acquisition, LLC. Byrne is also a member of the Yellowstone Club and both Byrne and CrossHarbor own substantial property within the Yellowstone Club.[FN3] In addition, CIP was the entity that eventually provided the Yellowstone Club entities with $19,750,000 of debtor-in-possession financing, and New CH YMC Acquisition, LLC acquired the bulk of the Yellowstone Club entities assets for $115 million in 2009 and is operating

as the Reorganized Debtors.[FN4]

**\*3** In addition, an involuntary bankruptcy petition was filed against YCW on January 25, 2009 (Case No. 09–60061), BSR filed a voluntary Chapter 7 bankruptcy petition on June 5, 2009 (Case No. 09–61079), and an involuntary Chapter 11 bankruptcy petition was filed against BLX on September 21, 2009 (Case No. 09–61893). Debtor filed a voluntary Chapter 11 bankruptcy petition on March 26, 2009. Debtor's case was converted to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Richard J. Samson was appointed the Chapter 7 Trustee.

Debtor filed her Summary of Schedules, Schedules and Statement of Financial Affairs on April 29, 2009. Debtor's Summary of Schedules reflects that Debtor's assets have a total value of $106,981,315.00, while Debtor's liabilities total $157,720.567.07. With respect to real property, Debtor's Amended Schedule A filed June 12, 2009, identifies the following:

| Description of Property | Current value | Amount of secured claim |
|---|---|---|
| 185 ANDESITE RIDGE ROAD, BIG SKY, MONTANA. MORE PARTICULARLY DESCRIBED AS FOLLOWS: LOT 48, OF YELLOWSTONE MOUNTAIN CLUB SUBDIVISION, PHASES 1 AND 2, IN MADISON COUNTY, | $7,200,000.00 | $6,199,418.07 |

© 2014 Thomson Reuters. No claim to Original U.S. Gov. Works.

MONTANA, ACCORDING TO THE
OFFICIAL PLAT THEREOF ON FILE
AND OF RECORD IN THE OFFICE
OF THE CLERK AND RECORDER,
MADISON COUNTY, MONTANA.
(PLAT REFERENCE IN BOOK 4 OF
PLATS, PAGE 408, RECORDS OF
MADISON COUNTY, MONTANA)

| | | |
|---|---|---|
| FAMILY COMPOUND AT YELLOW-STONE MOUNTAIN CLUB PHASE 1 & 2, SECTION 7, TOWNSHIP 7 SOUTH, RANGE 3 EAST, LOT 1A, AMENDED COS 7/1544, MADISON COUNTY, MONTANA (2 SMALL GUEST CABINS AND 160 ACRES) | $20,000,000.00 | $20,000,000.00 |
| 18 KING EDWARD COURT, RAN-CHO, MIRAGE, CA | $650,000.00 | $650,000.00 |
| CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, # 2304, BEL-LEVUE, WA | $2,000,000.00 | $2,000,000.00 |
| CONDOMINIUM LOCATED AT 76620 HOLLYHOCK DRIVE, PALM VALLEY, CA | $150,000.00 | $150,000.00 |
| 42391 RANCHO LAS PALMAS, UNIT 23, RANCHO MIRAGE, CA | $100,000.00 | $100,000.00 |
| 71361 GARDESS ROAD, RANCHO MIRAGE, CA PROPERTY IS OWNED BY TIM BLIXSETH AND EDRA BLIXSETH AS JOINT TENANTS | $375,000.00 | $375,000.00 |
| 71621 GARDESS ROAD, RANCHO MIRAGE, CA | $300,000.00 | $300,000.00 |

On July 16, 2009, creditor One Lincoln Tower was granted relief from the automatic stay to proceed against Debtor's "CONDOMINIUM LOCATED AT 650 BELLEVUE WAY NE, # 2304, BELLEVUE, WA" and on October 26, 2009, Western Capital Partners was granted relief from the automatic stay with respect to the same property. Thereafter, on November 5, 2009, the Court entered an Order authorizing the Chapter 7 Trustee to sell the Bellevue condominium.

The Family Compound is relatively flat, develop-

able land situated in the heart of the Yellowstone Club, between the lodge area and the golf course. Improvements on the Family Compound include a residential unit with an attached guest house. In approximately April of 2008, while Blixseth owned the Family Compound, CrossHarbor secured preliminary plat approval from the Madison County Board of Commissioners for 40 development units at the Family Compound. CrossHarbor's efforts in obtaining final plat approval of 40 development units were made in conjunction with CrossHarbor's efforts to purchase the Family Compound

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

from Blixseth for $56 million in as late as June of 2008. CIP did not inform the Trustee of its prior agreement with Blixseth to purchase the Family Compound. The Trustee testified that he only learned of the prior purchase agreement between CrossHarbor and Blixseth during discussions with Blixseth in July or August of 2009. The Trustee later learned more about the prior purchase agreement when the LeMond Group raised the matter in their objection to the Trustee's pending Motion. To date, none of the parties have secured final plat approval for the 40 development units.

**\*4** The Trustee states that the Family Compound is allegedly subject to a variety of liens and encumbrances that total in excess of $48.5 million. The Trustee's Exhibit 2 is a schedule from a title report. Exception 5 is the $56 million Purchase and Sale Agreement between Blixseth and CIP dated August 28, 2007. Exception 6 is $13 million of the CIP Loan, exception 7 is an obligation owed to the LeMond Group, exception 8 is the other $22 million of the CIP Loan. Western Capital Partners, LLC, does not have a secured interest in the Family Compound, but is an unsecured creditor of Debtor's estate.

The Trustee did an initial evaluation of the Family Compound, including the three major liens of CIP and the LeMond Group. The Trustee testified that he had a hard time determining the value of the Family Compound because of the real estate market decline in 2008. In approximately July of 2009, the Trustee commenced discussions with CrossHarbor and the Yellowstone Trustee about the Family Compound. Those discussions broke down in August of 2009, but the Trustee again renewed the discussions with CIP in September of 2009. In approximately October of 2009, the Trustee and CIP reached a "verbal agreement" whereby CIP agreed to purchase the Family Compound from the Trustee. That verbal agreement is the basis for the Motion before the Court today.

Debtor's bankruptcy estate is not generating any income and the Trustee has not been able to liquidate any assets for the benefit of the estate. Thus, the Trustee does not have any money to pay for an appraisal of the Family Compound. However, CIP had an appraisal of

the Family Compound done in June or July of 2009. Based upon discussions with CIP and after reviewing CIP's appraisal, which CIP made available to the Trustee, the Trustee believes that the Family Compound is worth approximately $8 million.

CIP proposes to be a stalking horse bidder for the sale of the Family Compound under the terms set forth in the Real Estate Purchase Agreement filed December 18, 2009, at docket entry no. 576. CIP's stalking horse bid of $8.5 million consists of an $8 million credit bid and a $500,000 cash carve-out.[FN5] The $500,000 is intended, in part, to reimburse the estate for its time and effort in facilitating a sale of the Family Compound. As explained by the Trustee, CIP has agreed to pay $500,000 in exchange for the Trustee's accommodation to sell the property free and clear of liens. Under a sale free and clear of liens, CIP could move forward without having to go through State court foreclosure proceedings, thus eliminating any rights of redemption that other parties may have.

The $500,000 is also an accommodation for the Trustee's release of all claims against CIP. The Trustee's Motion, which was drafted in large part by CIP, provides in paragraphs 15 and 16:

15. In consideration of CIP joining in this Motion and agreeing to the Real Estate Purchase Agreement and providing a Carve-out for the benefit of the Debtor's estate, the Trustee acknowledges and agrees that the Loan and all the liens created thereby are valid, legal, binding and enforceable obligations of the Debtor; that there are no defenses, offsets, or counterclaims of any kind with respect thereto; that as of November 30, 2009, the amount outstanding under the Loan was $44,607,892 and that interest at the rate of 15% was accruing thereon; no portion of the Loan is subject to avoidance, recharacterization, recovery, subordination or other challenge under the Bankruptcy Code, other applicable law or otherwise; and that the liens and security interests granted under the Loan Documents are perfected, enforceable first priority liens on and security interests in the collateral (other than the Third Mortgage and Security Agreement, which is a perfected, enforceable third priority

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

lien on and security interest in the collateral) and are not subject to avoidance, recharacterization, subordination or other challenge. Further, the Trustee hereby releases CIP from all claims, rights, damages and causes of action arising on or before the date hereof relating in any way to the Loan, the Property or the Loan Documents.

**\*5** Trustee acknowledges, and agrees not to object to, contest, or otherwise challenge, or support the challenge of, the amount, validity, perfection, priority and/or enforceability of (I) the Loan, (ii) the Loan Documents, (iii) any of CIP's security and/or mortgage interests in the Property and/or any other collateral granted under or in connection with the Loan Documents and/or (iv) the Obligations.

The Trustee testified that at the time he reached a verbal agreement with CIP in October of 2009, release of all claims was not part of the deal. The Trustee did not learn of the release issue until sometime in November of 2009 when CIP provided the Trustee with the first draft of the Real Estate Purchase Agreement.

When the Trustee first learned that CIP wanted him to release all claims against CIP, the Trustee undertook "a close scrutiny of the background of all the information—the notes, everything that transpired—that led to the liens on the Family Compound that were held by CIP[.]" According to the Trustee, he looked at whether CIP's liens against the Family Compound were avoidable transfers. The Trustee testified that he also examined other possible and potential claims, but did not identify the nature of the other claims examined. The Trustee concluded that funds of at least $26 million of the $35 million loan were used by Debtor for her personal benefit based on obligations that she assumed under her marital settlement agreement with Blixseth. The Trustee thus ascribed no value to the releases.

Under the proposed Notice of Sale, any competing bid to CIP's stalking horse bid had to be no less than $9,000,000.00 to cover the $8 million credit bid, the $500,000 carve-out, $250,000 for a termination fee to CIP, plus all out of pocket expenses incurred by CIP in pursuing the acquisition of the Family Compound not to exceed the sum of $150,000 in the aggregate. CIP agreed at the hearing to waive the $250,000 termination fee, and thus any competing bid would now be $8,750,000.00.

The Trustee seeks to limit service of his pending Motion and Notice of Sale to:

the Debtor, the Debtor's twenty largest unsecured creditors, the Office of the United States Trustee, all parties who are known to the Debtor to claim interest in or liens upon the California Property and all parties having filed notices of appearance pursuant to Fed. R. Bankr.P.2002. The Trustee will cause the Notice of Sale to be served upon all of the foregoing entities; all parties who are known to the Debtor to claim interests in or liens upon the Property; all governmental units, including taxing authorities who have, or as a result of the sale of the Property may have, claims, contingent or otherwise, against the Debtor in connection with the Debtor's ownership of the Property; all creditors; and all entities that have expressed to the Trustee an interest in purchasing the Property.

The Trustee explained that he has not attempted to market the property because he does not believe the Debtor has any equity in the Family Compound. The Trustee also has no plans to market the property going forward or to retain a real estate broker and has no plans to advertise the Family Compound. The Trustee believes that the only persons interested in the Family Compound are those parties involved in this case.

**\*6** The Trustee contends that an immediate sale is necessary because of the ongoing expense to the estate of keeping the property. For instance, the Trustee has not been able to pay the real property taxes on the property. The Trustee is similarly financially unable to insure the structures on the Family Compound. However, CIP has the two dwellings on the property insured at a value of $2 million. The Trustee also testified that the estate is incurring ongoing monthly bills of $750.00 to $1,000.00 for heat and snow removal at the Family Compound. The Trustee, however, conceded that he is not paying the monthly costs out of pocket as those are costs that can be surcharged against the property under

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 U.S.C. § 506(c). The Trustee summarily concluded that he does not see any potential of selling the property for a sum in excess of the three major liens because he has "not been contacted or had any communication from anyone with an interest in purchasing the property[.]"

### CONTENTIONS of the PARTIES

In the pending matter, the Trustee requests entry of two orders: (1) a Procedures Order, (i) approving notice of the Bid Procedures Hearing and the matters heard and considered by the Court therein as proper, timely, adequate and sufficient notice under the circumstances; (ii) approving and authorizing the execution and delivery of the Real Estate Purchase Agreement, including, without limitation the acknowledgment by the Trustee of the validity, priority and perfection of the liens granted pursuant to the Loan Documents and the right of the Buyer to credit bid, subject to higher and better offers; (iii) approving the Notice of Sale, including approving the bidding and sale procedures (the "Bid Procedures"); (iv) granting CIP relief from the automatic stay to pursue its rights and remedies under the Loan Documents and applicable non-bankruptcy law as to the Family Compound in the event one or more Foreclosure Trigger Events occurs; and (v) granting CIP relief from the automatic stay to immediately pursue its rights and remedies under the Loan Documents and applicable non-bankruptcy law as to the California Property; and (2) a Sale Order, (i) approving notice of the proposed sale of the Family Compound, the bidding procedures, the objection period and the Sale Hearing as proper, timely, adequate and sufficient notice under the circumstances; and (ii) approving and authorizing the proposed sale of the Property to the Buyer or other Successful Bidder pursuant to the Bidding Procedures.

While the Trustee states that his is not seeking final approval of a sale to a particular purchaser at this time, the Trustee requests that the Court ratify "the validity, priority and perfection of" CIP's $35 million loan and grant CIP the right to credit bid up to the amount of its "allowed claim of $15,652,139.26 as of November 30, 2009, with interest continuing to accrue on said amount at a rate of fifteen percent (15%) per annum, as well as

accrued and accruing costs and expenses of collection, including attorneys' fees." The bidding procedures require overbids of $500,000 and provide for reimbursement of CIP's fees and costs up to $150,000.FN6 The Trustee contends that approval of the sale is appropriate because "[n]o one other than CIP, has expressed any interest in acquiring the Family Compound, nor has the Trustee had the ability to pay any of its related accrued expenses, including real estate taxes, homeowners association fees or costs of maintenance of the Family Compound." The Trustee argues that a sale of the property at a price of $8.5 million (subject to higher and better offers at auction) will maximize the proceeds received by the bankruptcy estate. The Trustee asserts that the sale, under procedures that the Trustee maintains are intended to enhance competitive bidding, is fair, even though the Trustee has not exposed the property to the market. The Trustee has also not obtained an independent appraisal of the property. Rather, the Trustee relies solely on CIP's opinion of value, including an appraisal of the subject property provided by CIP to the Trustee. If the Trustee is not permitted to sell the Family Compound under the above provisions, he states that his alternative is to abandon the property.

**\*7** Western Capital Partners, a creditor in this case, opposes the Trustee's motion arguing that CIP is surreptitiously attempting to obtain judicial approval CIP's $35 million loan to Debtor, even though the validity of such loan is the subject of dispute before this Court. In addition, because the Trustee is agreeing to waive any claims the Debtor's estate may have against CIP, Western Capital Partners seeks, by way of its Amended Objection, authority to pursue a Uniform Fraudulent Transfer Act against CIP relative to the $35 million loan.

The LeMond Group opposes the Trustee's Motion arguing that CIP's stalking horse bid of $8.5 million is unreasonably low, particularly when CIP was willing to pay $56 million for the property as late as June 30, 2008. The LeMond Group also argues that CIP does not need a breakup fee because CIP needs no additional incentive to bid on the Family Compound. The LeMond Group's latter objection is moot given CIP's oral wavier of the breakup fee at the hearing.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Next, the LeMond Group argues that the Trustee's proposed bid procedures do not encourage competitive bidding because: (1) the Real Estate Purchase Agreement, which is in excess of 20 pages, is unduly complicated; (2) bids are due on January 22, 2010, which is just over one month after the Trustee filed his Motion; (3) bids and deposits are due prior to the January 29, 2010, hearing on approval of the bid procedures; (4) the Trustee has made no attempt to market the property; and (5) a foreclosure proceeding in state court is more beneficial to junior lienholders, such as the LeMond Group, as opposed to the Trustee's proposed sale. The Trustee's Notice of Errata filed January 25, 2010, includes an amended version of the Notice of Sale. The Trustee's amended Notice of Sale removes the dates that give rise to the LeMond Group's second and third objections discussed above. The Trustee's amended Notice of Sale renders the LeMond Group's second and third objections to the Trustee's proposed bidding procedures moot. Finally, the LeMond Group argues that under *Clear Channel Outdoor, Inc. v. Knupfer (In re PW,LLC),* 391 B.R. 25 (9th Cir.BAP2008), the Trustee cannot sell, pursuant to 11 U.S.C. § 363(f), the Family Compound free and clear of liens over the objection of junior lienholders such as the LeMond Group.

Similar to the LeMond Group, YCLT argues that the Trustee's proposed sales price of $8.5 million is improvident and does not approximate the true value of the Family Compound. YCLT also argues that the Trustee unfairly proposes a quick sale of the Family Compound with no marketing plan. Finally, YCLT also argues that the Trustee cannot sell the Family Compound over the objections of junior lienholders under *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC),* 391 B.R. 25 (9th Cir.BAP2008).

### JURISDICTION

This is a core proceeding within this Court's jurisdiction. 28 U .S.C. §§ 1334(a), and 157(a) and (b)(2)(A), and (M). According to the parties, at issue is whether § 363(f) permits a sale free and clear of liens when the sale price is insufficient to satisfy all liens.

### DISCUSSION

**\*8** Pursuant to 11 U.S.C. § 363(b), a trustee of a li-

quidating case under Chapter 7 of the Bankruptcy Code has statutory authority to sell, other than in the ordinary course of business, the estate's property free and clear of any liens, claims, or encumbrances against the property so long as evidence is presented which meets any one of the five conditions listed in 11 U.S.C. § 363(f), together with the judicially created sale condition that the purchaser of the property be found to have acted in "good faith" throughout the sale process. The relevant portions of 11 U.S.C. § 363(f) provide as follows:

(f) The trustee may sell property under subsection (b) ... of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

In his Motion, the Trustee summarily argues that if CIP were to foreclose upon its interests in the Family Compound, applicable nonbankruptcy law would permit the sale of the Family Compound free and clear of other interests, such as the LeMond Group's, and therefore, the Trustee may sell the Family Compound free and clear of such interests under 11 U.S.C. §§ 363(f)(1) and (f)(5). After attacking the purchase price and the Trustee's proposed bidding procedures, YCLT and the LeMond Group, relying on *Clear Channel Outdoor, Inc. v. Knupfer (In re PW,LLC),* 391 B.R. 25 (9th Cir.BAP2008), argue that the Trustee cannot sell the Family Compound without the consent of junior lienholders. Western Capital Partners does not issue with the sale of the Family Compound per se, but rather, wants the waivers and releases stricken from the Purchase and Sale Agreement and, because the Trustee is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

not willing to pursue a possible UFTA claim against CIP, seeks approval to pursue such claim on behalf of the Debtor's estate. The Trustee filed a response to the objections on January 27, 2010. In his response, the Trustee counters that even if the LeMond Group cannot be forced to accept a money satisfaction under § 363(f)(5), the Trustee can nevertheless sell the Family Compound under § 363(f)(4) because the LeMond Group's claim is subject to a bona fide dispute.

Before reaching the merits of the parties' respective arguments under § 363(f), the Court must first determine whether the Trustee's proposed process leading up to any sale is fair. The parties in this case recognize that proposed bid procedures should enhance bidding and maximize sale proceeds. The Trustee's proposed bid procedures do not satisfy such goals.

The Trustee, citing COLLIER ON BANKRUPTCY and *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr.S.D.Cal.1985), contends that "where it appears from a review of all the facts and circumstances that a sale is in the best interest of the estate, a court will not disturb the trustee's business judgment regarding the terms of the proposed sale absent some compelling reason to do so." The Trustee's reference to *Canyon Partnership* is interesting because in that case, the trustee employed an experienced real estate brokerage house to assist with the trustee's marketing efforts and the trustee also presented testimony at the sale hearing as to the value of the property at issue through an expert real estate appraiser. In addition, the court in *Canyon Partnership* found that the general non-insider unsecured creditors would in all likelihood be paid in full. *Id.* at 524. Based upon the foregoing, the court found the "Trustee's testimony concerning the marketing difficulties associated" with the debtor's real property was meritorious and thus approved the Trustee's proposed sale of the property at a price that was roughly 70% of the property's liquidation value. *Id.* at 525.

**\*9** This case is distinguishable from *Canyon Partnership.* Here, the Court cannot give "deference" to the Trustee's "exercise of business judgment." First, the Trustee failed to produce any credible evidence as to the value of the Family Compound. The Trustee's personal opinion concerning the value of the Family Compound is based solely on information obtained from the prospective purchaser, CIP. The Trustee has made no independent effort to ascertain the value of the Family Compound. The Court fully appreciates the Trustee financial predicament, but it would cost the Trustee little or nothing to obtain a real estate broker's independent opinion of value. It would similarly cost the Trustee little or nothing to familiarize himself with the real estate market in the Yellowstone Club area. Given the potential importance of this one asset to this bankruptcy estate, the Court was deeply troubled when the Trustee testified that he was wholly unaware that there may have been up to $40 million of sales in the Yellowstone Club during the Holiday season. $40 million of sales is certainly in stark contrast to the Trustee's testimony that real estate sales in the Yellowstone Club area are flat.

Second, the Court sees no benefit to the Trustee or Debtor's estate in limiting notice of the proposed sale to only those parties involved in this case. The Trustee attempts to justify his request for limited notice on grounds that CIP is the only party who has expressed an interest in the Family Compound. The record shows that the Trustee is the one who originally reached out to CIP. If the Trustee reached out to other potential purchasers through a robust marketing campaign, the Trustee might find that other unknown third parties might be interested in 160 acres of developable land. The Court doubts that many people would express a desire to purchase the Family Compound unless they knew it is for sale. No one, including this Court or the Trustee, has any idea what interest might be generated by exposing the Family Compound to the market. The Trustee could easily obtain the answer to such inquiry by listing the Family Compound for sale with a reputable real estate agent, at little or no out-of-pocket expense to the Trustee or the bankruptcy estate.

The Trustee suggested at the hearing that given the location of the Family Compound, within the confines of the Yellowstone Club, that it is really only marketable to CIP. The Trustee has not presented any evidence to support such suggestion. Indeed, while a prospective purchaser may not be able to secure membership to the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Yellowstone Club, the Court can envision the property nevertheless being attractive to other developers given its close proximity to other available amenities such as those in the town of Big Sky, or those at Big Sky Ski Resort.

Finally, the bidding procedures proposed by CIP, as presented to the Court through the Trustee, involve a party that has, or at least had, very close ties with the Debtor and the Yellowstone Club. In fact, while CIP does not own the Yellowstone Club, another entity under the control of Byrne does. The Trustee's blind reliance on CIP's appraisal and seemingly blind acceptance of CIP's bidding proposal subjects the proposed bidding procedures to heightened scrutiny. *See In re Biderman Indus. U.S.A.,* 203 B.R. 547, 549 (Bankr.S.D.N.Y.1997) ("conduct of bankruptcy proceedings not only should be right but must seem right"). Where, as here, the proposed bidding procedures propose a sale to an entity with very close ties to the Debtor and the property at issue, before the Trustee has engaged an experienced broker and intensively explored non-insider proposals, and where the bidding procedures provide an expense reimbursement and other terms aimed at cutting off other competing bids, the business judgment rule simply does not apply.

**\*10** If the Trustee wants to pursue a sale process and conduct a fair auction intended to find the highest and best offer for the Family Compound, the sale procedures should be as a bona fide auction—with procedures as transparent and as flexible as possible. Specifically, the Trustee should formulate a proposal that encourages—and potentially rewards—all bidders to proffer their highest and best offers.

This Court previously cautioned in the Yellowstone Club bankruptcies, that "[t]he close relationship of the [Yellowstone Club entities], Edra Blixseth and CrossHarbor requires that this Court be particularly cautious about approving any bidding procedures that would favor CrossHarbor to the detriment of the other parties in interest in this case." That same caution applies in this case and contrary to what Trustee argues, or at least as stated in the Motion drafted by CIP, the Notice of Sale is not "intrinsically fair."

This Court will not approve the Trustee's proposed bidding procedures and limited notice, particularly where the Trustee's valuation opinion is based solely upon information that is subject to scrutiny and where the Trustee seeks to sell the Family Compound with no marketing effort whatsoever. Moreover, while the Trustee raised for the first time in his response that the LeMond Group's claim is subject to a bona fide dispute, the Court finds that CIP's claim may also be subject to a bona fide dispute. However, this Court will not disturb the validity of either CIP's liens or the LeMond Group's lien unless the parties challenge the validity os such liens through an adversary proceeding as required by Rule 7001(2), F.R.B.P.

Resolution of all disputes, including the allegations raised by Western Capital Partners, may need to be resolved before anything can be done with this asset. Because the Trustee is either unwilling or unable to pursue any action against CIP and because Western Capital Partners states that Debtor has a claim against CIP that Western Capital Partners is willing to investigate and prosecute on behalf of Debtor and the bankruptcy estate, the Court finds that allowing Western Capital Partners authority to pursue such action against CIP is warranted. *See e.g., In re Valley Park,* 217 B.R. 864, 866 (Bankr.D.Mont.1998), citing *Liberty Mutual Ins. Co. v. Official Unsecured Creditors Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.),* 207 B.R. 899, 903 (9th Cir.BAP1997). Because the Court is allowing Western Capital Partners to pursue potential claims against CIP and its affiliates, it would be nonsensical for this Court to also approve the Trustee's release and waiver of claims against CIP at this time.

The Trustee threatens that he will abandon the Family Compound if the Court denies his motion to sell. However, abandonment requires Court approval and if the Trustee fails to convince this Court that the Family Compound is a burden to the estate, i.e. will provide no benefit, the Court will not approve an abandonment of the Family Compound.

**\*11** Given the inadequacies of the Trustee's proposed bidding procedures and the notice of such procedures, the Court need not address the parties' arguments

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

under § 363(f) and whether *Clear Channel* applies. The Court would note that neither the Trustee nor the objecting parties have mentioned § 363(f)(2) or § 363(f)(3). Perhaps with a little more negotiation between all the parties, the Trustee might be able to formulate bidding procedures that would satisfy all parties. In that instance, the Trustee could seek approval of a sale of the Family Compound free and clear of liens under § 363(f)(2).

Finally, given the absence of opposition, the Court will grant CIP's request for relief from the automatic stay as it relates to the property located at 18 King Edward Court, Rancho Mirage, California. However, for the reasons discussed above, the Court will not grant CIP relief from the automatic stay at this time to proceed against the Family Compound. By this Order, CIP will have obtained relief from the automatic stay with respect to three properties: 18 King Edward Court, 71361 Gardess Road and 71621 Gardess Road. The combined value of such properties according to Debtor's Schedule A is $1,325,000.00. The foregoing amount, in addition to the value assigned by this Court to Porcupine Creek of $73.5 million, together with the value of the Family Compound, whatever that value may be, convinces this Court that CIP is adequately protected at this time.

In accordance with the above, the Court will enter a separate Order providing as follows:

IT IS ORDERED:

1. The Motion of the Chapter 7 Trustee Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(f) and 365, and F.R.B.P.2002(a)(2), 6004 and 6006 for Order Approving the Sale of Real Property Known as "Family Compound at Yellowstone Mountain Club" Free and Clear of Liens, Claims, Interests and Encumbrances is DENIED without prejudice;

2. The Motion of the Chapter 7 Trustee for an order Approving Bidding Procedures and Authorizing the Trustee to Solicit Higher and Better Offers Pursuant to Proposed Notice of Sale is DENIED without prejudice;

3. The Trustee's Motion for an order Granting Relief From Stay on the Family Compound at Yellowstone Mountain Club is DENIED;

4. The Trustee's Motion for an order Granting Relief From Stay on Property Located at 18 King Edward Court, Rancho Mirage, California is GRANTED; and

5. Western Capital Partners request for authorization to file a complaint against CIP is GRANTED; and Western Capital Partners shall continue its review and investigation of Debtor's Uniform Fraudulent Transfer Act claim against CIP and may seek to maximize the value of such claim for the benefit of the bankruptcy estate, its creditors, and other parties in interest, by pursuing such claim(s), including filing and prosecuting appropriate litigation against CIP and it affiliates, on behalf of this bankruptcy estate.

> FN1. According to the Real Estate Purchase Agreement attached to the Trustee's Motion, the current amount owed CIP on the $35 million loan is at least $44,607,892 as of November 30, 2009.

> FN2. Evidence in other cases suggests that Byrne proposed to Blixseth in the summer of 2008 that the Yellowstone Club entities file a "pre-packaged" bankruptcy to escape some of its financial difficulties. Thus, it appears that the bankruptcy filings on behalf of the Yellowstone Club entities may have been in the works for some time.

> FN3. Byrne purchased two Yellowstone Club lots in 2005. Byrne then made a bulk purchase in the Yellowstone Club in 2006 by taking over the 58 unit Sunrise Ridge Condominium Development for a price of $60 million. In August of 2007, Byrne purchased an additional 31 lots on the Yellowstone Club golf course at a price of $54 million.

> FN4. In approximately March of 2008, Byrne, through CrossHarbor, was proposing to purchase the assets of the Yellowstone Club for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

approximately $407 million. Byrne testified in other proceedings that his willingness to purchase the Yellowstone Club for approximately $407 million was based upon months of due diligence wherein Byrne and CrossHarbor spent millions of dollars. The proposed 2008 asset sale fell through, according to Byrne, for various reasons, including Blixseth's inability to accurately determine all the Yellowstone Club's liabilities and because Blixseth would have had to pay money to close the sales transaction as the Yellowstone Club's liabilities exceeded its assets. In the Yellowstone Club entities' bankruptcy, CrossHarbor proposed a stalking horse bid of $100 million under circumstances that provided fairly generous protections to CrossHarbor if it was not the successful bidder, including a $2.0 million breakup or termination fee, plus actual expenses up to $1.0 million incurred subsequent to November 10, 2008. In the Yellowstone Club bankruptcies, CrossHarbor sagaciously positioned itself to purchase the Yellowstone Club at a price that was drastically less than what it was willing to pay for the Yellowstone Club only 12 to 24 months prior. The only other party seriously interested in bidding on the Yellowstone Club was the first position lien creditor, Credit Suisse. In the end, CrossHarbor acquired the Yellowstone Club for $115 million—a mere 28% of what it originally agreed to pay for the Yellowstone Club in 2008 following extensive due diligence.

FN5. Under the terms of the Real Estate Purchase Agreement, the term "Carve-out' "means five hundred thousand United States Dollars ($500,000.00), which constitutes that portion of the Purchase Price which: (1) Buyer shall not be permitted to include in its Credit Bid; and (2) will not be subject to the Liens." The terms "Liens" is defined as "all of [CIP's] duly perfected security and mortgage interests in the Property arising under or in connection with the Loan Documents."

FN6. The bidding procedures also provided for a breakup fee of $250,000 to CIP in the event it is not the successful bidder. However, as previously discussed in this Memorandum of Decision, counsel for CIP agreed at the hearing to waive the breakup fee.

Bkrtcy.D.Mont.,2010.
In re Blixseth
Not Reported in B.R., 2010 WL 716198 (Bkrtcy.D.Mont.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.