Ashley M. McDow (245114)
Michael T. Delaney (261714)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: amcdow@bakerlaw.com
mdelaney@bakerlaw.com

Attorneys for the OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>HASHFAST TECHNOLOGIES, LLC, a California limited liability company,<br><br>Debtor and Debtor in Possession. | Lead Case No.: 14-30725 DM<br><br>Jointly Administered with:<br><br>Case No.: 14-30866 DM<br><br>Chapter 11 |
| x Affects HASHFAST LLC, a Delaware limited liability company,<br><br>Debtor and Debtor in Possession. | **Hearing:**<br>Date: July 28, 2014<br>Time: 2:00 p.m.<br>Dept: 235 Pine St., 19th Fl.<br>San Francisco, CA 94104<br>Judge: Hon. Dennis Montali |

**AFFIDAVIT OF WILLEM VAN ROOYEN IN SUPPORT OF OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF ORDERS (1) AUTHORIZING THE SALE OF ESTATE PROPERTY, (2) AUTHORIZING THE SALE OF ESTATE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, AND (3) AUTHORIZING THE (A) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (B) ASSUMPTION OF CERTAIN LIABILITIES, AND (C) GRANTING CERTAIN RELATED RELIEF**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES
Case: 14-30725 Doc# 162 Filed: 07/25/14 Entered: 07/25/14 18:33:50 Page 1 of 17

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| In re<br><br>HASHFAST TECHNOLOGIES, LLC, *et al.*,[1]<br><br>Debtors. | Case No.: 14-30725<br><br>(Jointly Administered with HashFast LLC, Case No. 14-30866)<br><br>Chapter 11 |
|---|---|

**AFFIDAVIT OF DIGIMEX LTD.**

I, Willem van Rooyen, hereby swear and attest under oath to the following:

1. I am over 18 years of age. I am competent to testify to the matters set forth herein. I currently reside Spain.

2. I am the managing director of Digimex Ltd. ("Digimex"), and in that capacity, I am authorized to execute this affidavit on behalf of Digimex. Digimex is primarily engaged in two businesses: operating a Bitcoin mine, and developing custom software for other Bitcoin mining operations. I have been personally involved in the Bitcoin industry since 2010.

3. On June 23, 2014, Digimex was appointed to the Official Committee of Unsecured Creditors of HashFast Technologies, LLC (the "Committee"). At all times since June 23, 2014, I have served as Digimex's representative to the Committee.

4. Through Digimex's experience in the Bitcoin industry, prior business relationship with HashFast LLC and HashFast Technologies LLC (collectively, the "Debtors") and its role on the Committee, Digimex has an understanding of the operations, assets, liabilities of the Debtors.

5. I have reviewed the non-binding Term Sheet for Emergency Section 363 Sale prepared by Liquidbits Corp., a copy of which is attached hereto as **Exhibit "A"** (the "Term

[1] The Debtors are HashFast LLC (FEIN 46-2943354) and HashFast Technologies LLC (FEIN38-3913245).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case: 14-30725 Doc# 162 Filed: 07/25/14 Entered: 07/25/14 18:33:50 Page 2 of 17

Sheet"), and the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363, 365 and Fed. R. Bankr. P. 2002, 6004, 9014 and 9019 for Entry of Orders (I) Authorizing the Sale of Estate Property, (II) Authorizing the Sale of Estate Property Free and Clear of Liens, Claims, Encumbrances and Interests, and (III) Authorizsing the (A) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (b) Assumption of Certain Liabilitie, and (c) Granting Certain Related Relief* [D.E. 134] (the "Sale Motion"). While Digimex is not opposed to a potential transaction between the Debtors and Liquidbits Corp., based on Digimex's experience in the Bitcoin industry and its knowledge regarding the Debtors, Digimex does not believe approval or acceptance of the Liquidbits Corp. Term Sheet in its current form, as requested in the Sale Motion, is in the best interest of the Debtors' creditors because it does not maximize the value of the Debtors' assets.

6. Rather, Digimex believes the value of the Debtors' assets would be maximized by using a franchise model that is currently use by other industry participants. A summary of one such franchise program is attached hereto as **Exhibit "B."** Generally speaking, the franchise model involves the manufacturer supplying fully-functional mining rigs to third parties franchisees at a reduced price, or at no up-front cost, in exchange for the franchisee paying an agreed-upon percentage of the Bitcoin revenue generated by the mining rigs to the manufacturer. Based upon my discussions with other Committee members, the Committee members themselves may be willing to fund or finance some of the costs associated with the start-up of a franchise program using the Debtors' existing assets.

7. However, in order to evaluate and confirm that a franchise model is, in fact, in the best interest of the Debtors' estates, Digimex or some other third party would need to conduct due diligence regarding the Debtors and their financial affairs. In the event that due diligence confirms that moving forward with a franchise-type model, using some or all of the Debtors'

existing assets, maximizes the value of the Debtors' assets, Digimex believes that it, together with the other Committee members and other participants in the Bitcoin industry, could make an offer that is superior to the terms set forth in the Term Sheet

I declare, under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

Executed this 25th day of July, 2014.

Willem van Rooyen
Managing Director of Digimex Ltd.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Case: 14-30725 Doc# 162 Filed: 07/25/14 Entered: 07/25/14 18:33:50 Page 4 of 17

**EXHIBIT A**



**CONFIDENTIAL**
**7/18/14**

THIS TERM SHEET REPRESENTS AN OUTLINE OF THE BASIS ON WHICH THE PURCHASER DESCRIBED BELOW WOULD PURCHASE THE ASSETS OF HASHFAST LLC AND HASHFAST TECHNOLOGIES LLC. THE ACTUAL TERMS AND CONDITIONS UPON WHICH THE PURCHASER MIGHT PURCHASE THE ASSETS ARE SUBJECT TO SATISFACTORY COMPLETION OF INTERNAL APPROVALS, SATISFACTORY DOCUMENTATION AND SUCH OTHER TERMS AND CONDITIONS AS ARE REASONABLY DETERMINED BY THE PURCHASER.

**TERM SHEET FOR EMERGENCY SECTION 363 SALE**

**Executive Summary**

Liquidbits Corp. ("**Liquidbits**") has prepared this nonbinding term sheet for discussion with HashFast Technologies LLC ("**HashFast**") regarding a purchase of assets from HashFast Technologies LLC and HashFast LLC (collectively, the "**Company**") by a newly-created affiliate of Liquidbits Corp. (the "**Purchaser**") on an accelerated time table through an emergency sale pursuant to section 363 of the United States Bankruptcy Code (the "**Bankruptcy Code**").

Liquidbits understands that HashFast LLC is a Delaware limited liability company, is the parent company of HashFast and owns all of the intellectual property rights used by HashFast in its business. Liquidbits also understands that both HashFast and HashFast LLC are debtors in jointly administered cases in the Northern District of California under chapter 11 of the Bankruptcy Code (collectively, the "**Case**). This term sheet contemplates that the Purchaser would purchase the assets of both HashFast and HashFast LLC.

Following the formation of the Purchaser, the Purchaser would purchase all of the Assets (as defined below and with the exceptions set forth below) through an emergency section 363 sale for the consideration described in this term sheet including a seller note in the principal amount of $3 million and preferred equity in the Purchaser with a liquidation preference equal to $3 million. Following the closing of the purchase, the Purchaser would (i) complete the manufacture of all of the chips and other processing hardware currently in HashFast's inventory and realize on the value of HashFast's inventory through bitcoin mining, and (ii) repay the seller note and redeem the preferred equity from the cash proceeds of that realization. This structure is designed to ensure that the value of the finished products from HashFast's current inventory would be realized as expeditiously as possible and would flow back to HashFast's estate and its creditors.

**Terms**

**Assets to Be Purchased**: All of the assets previously or currently used in or useful to, necessary to or related to the conduct of all of the business of the Company, including but not limited to all chips, system components, board components, hashing boards other inventory and equipment and all deposit accounts, but excluding from the assets (the "**Assets**") to be purchased

(a) intellectual property,

(b) claims arising under sections 547, 548, 549, and 550 of the Bankruptcy

A/76192260.16

Code and any other claims that are against insiders (collectively, the "**Excluded Claims**"),

(c) HashFast LLC's equity interests in HashFast,

(d) intercompany claims between HashFast LLC and HashFast,

(e) an amount not to exceed 3,000 chips and 5,000 chips' worth of wafers (the "**Excluded Inventory**"), which HashFast reserves the right to sell in the ordinary course of its business operations during the pendency of the Case, and the proceeds of such sales of the Excluded Inventory, and

(f) any other assets determined by the Purchaser not to be purchased.

The Assets would be transferred to the Purchaser free and clear of any and all claims, liens, and interests in a transaction approved by the Bankruptcy Court under Sections 363 and 365 of the Bankruptcy Code.

**Intellectual Property:** In further consideration of its purchase of the Assets, the Purchaser would receive a perpetual, royalty-free, non-exclusive, world-wide, transferable license of any intellectual property of the Company to use, process, develop or market chips, chips' worth of wafers and for use with mining equipment. The license would include the right to create derivative works and to transfer the right. Any subsequent transfer of intellectual property by the Company will be subject to the terms of the license.

**Excluded Claims:** In further consideration of Liquidbits' and its affiliates' investment in the Purchaser and the waiver by Liquidbits of its vendee claim as provided below, Liquidbits and affiliates would receive a general release from the Company including a release of any Excluded Claims against Liquidbits and any of its affiliates.

In further consideration of its purchase of the Assets, the Purchaser shall be entitled to receive a 33% interest in any recoveries on the balance of the Excluded Claims, net of expenses. No settlement on an Excluded Claim will be permitted without the consent of Liquidbits or approval by the bankruptcy court. If an Excluded Claim is abandoned, the Excluded Claim will assigned to the Purchaser at the Purchaser's request, with any recoveries thereon being for the Purchaser's account. The Purchaser shall be consulted on all strategies and material developments relating to the existence, pursuit or abandonment of any Excluded Claims. The Purchaser will not object to any motion or other court approved arrangement by which Excluded Claims are pursued by the creditors' committee or any successor.

**Capital Structure of** The Purchaser would be a Delaware limited liability company. Its operating agreement would be included as an exhibit in the motion to approve the section 363 sale, or would be filed as an exhibit thereto as soon

**Purchaser**: as practicable after the filing of such a motion. The capitalization of the Purchaser would consist of preferred equity, common equity, investor debt and a seller note, all as further described below. The investments in the Purchaser consisting of common equity and investor debt would be sufficient to build out the chips and wafers sold to Purchaser, which amounts are estimated by the Company and the Purchaser not to exceed $8,000,000 to build out 27,000 chips and wafers. The investments would be comprised of a contribution to the Purchaser by Liquidbits of 1850 of chips purchased from HashFast and, for this purpose, valued at $370,000, and the balance in cash.

*Creditor Preferred Equity*. The Purchaser would be authorized to issue one class of preferred units (the "**Creditor Preferred Equity**") that would be in preference to any other classes of equity of the Purchaser. The Creditor Preferred Equity would have a liquidation preference but would not pay mandatory dividends. The Purchaser would not be permitted to make any payments on or redeem any of its other equity interests until the Creditor Preferred Equity is redeemed in full.

Until the Creditor Preferred Equity is redeemed in full, the Purchaser would not be permitted to make payments to any insiders other than on an arm's length basis for goods, services, intellectual property licensing or debt funding. The Purchaser would appoint an independent officer acceptable to the holder of the Creditor Preferred Equity (i.e., at closing the Company) whose approval would be required to insure that any payments to any insiders are made on an arm's length basis. The holder of the Creditor Preferred Equity would be entitled to monthly reports of the finances and operations of the Purchaser and would have a right to inspect the books and records of the Purchaser from time to time on reasonable notice.

The approval of the holder of the Creditor Preferred Equity (i.e., the Company or its permitted assignee) would be required for any changes to the economic terms of the Creditor Preferred Equity or for the selection, removal or replacement of the independent officer.

The Creditor Preferred Equity would be transferable to a liquidating trust for the benefit of holders of allowed general unsecured claims of the Company. The Credit Preferred Equity would not be otherwise transferable.

*Common Equity*. The remaining equity in the Purchaser would consist of Class A Common Units and Class B Common Units that have ratable economic interests in the aggregate without distinction between classes of Common Units.

The Class A Common Units would be owned by Liquidbits or an affiliate of Liquidbits and would have the right to elect the managers of the

Purchaser and, except as provided below, to make all decisions concerning the Purchaser.

The Class B Common Units would be owned by those creditors of HashFast or HashFast LLC that, within 30 days following the closing of the sale, choose to purchase the Class B Common Units for cash and to participate in the debt financing referred to below and who meet the eligibility requirements established by the Purchaser to comply with federal and applicable state securities law for a non-public offering. Each eligible creditor electing to purchase Class B Common Units would be entitled to purchase the Class B Common Units ratably with each other eligible creditor electing to purchase. The approval of the Class B Common Units would be required for any changes to the economic terms of the Class B Common Units. The holders of the Class B Common Units would be entitled to periodic reports of the finances and operations of the Purchaser and would have a right to inspect the books and records of the Purchaser from time to time on reasonable notice.

*Investor Debt.* The holders of the Class A Common Units and the Class B Common Units would provide debt financing to the Purchaser ratably in accordance with their ownership of Class A Common Units and Class B Common Units at the time of purchase of the Common Units. The amount of the debt financing would be determined before or as soon as possible after the closing of the sale, and the terms of the debt financing would provide for interest at the annual rate of 8%. Any debt financing would be entitled to be repaid before there is any redemption of or other distribution on the Creditor Preferred Equity, except as provided below, or the Common Units.

*Seller Note.* The Purchaser would issue to the Company a note (the "Seller Note") in the principal amount of $3 million bearing simple interest at 8% per annum and having a maturity date of two years from closing. The Seller Note would be secured by a perfected security interest in all or substantially all of the assets of the Purchaser. If the investor debt is also secured by a security interest in assets of the Purchaser, there would be an intercreditor agreement that would address the priorities between the two security interests.

The Seller Note would be transferable to a liquidating trust for the benefit of holders of allowed general unsecured claims of the Company. The Seller Note would not be otherwise transferable.

**Payments:** Since the gross revenues of the Purchaser would be in bitcoins, all payments on the Seller Note and in redemption of the Creditor Preferred Equity would also be in bitcoins and would be transferred to a bitcoin wallet designated by the holder of the Seller Note or the Creditor Preferred Equity. Payments in bitcoins would reduce the obligations under the Seller

Note, or the liquidation preference of the Creditor Preferred Equity, denominated in U.S. dollars based on customary prices for sales of bitcoins in exchange for U.S. dollars .

From and after the earlier to occur of (a) fourteen calendar days following the completion of the build out of all systems using the chips and wafers sold to the Purchaser by the Company (the "**Complete Build Out**"), and (b) December 1, 2014 (the "**Payment Commencement Date**"), on a periodic basis to be agreed and in any event weekly, an amount equal to 17% of the gross revenues of the Purchaser would be applied to the Seller Note and, once the Seller Note has been paid, to the redemption of the Creditor Preferred Equity. In the event systems are built out and deployed in mining activity by the Purchaser prior to the occurrence of the Complete Build Out, the Purchaser would sequester an amount equal to 17% of the gross revenues, less remaining build out costs, generated by such mining activity and distribute such amount to the Company on the Payment Commencement Date.

**Consideration:** The consideration that the Purchaser would pay to the Company for the Assets would consist of the following:

1. Cash sufficient in the total amount not to exceed $2,000,000 (a) to pay for any allowed unpaid administrative and priority claims in the Case as of the closing date of the sale and any cure costs for executory contracts to be assumed and assigned to the Purchaser other than those with Uniquify, Sonic and Ciara Tech, (b) to establish a cash reserve for the wind-up of the Case and (c) in an amount acceptable to the Purchaser to resolve claims of Uniquify, Sonic and Ciara Tech to certain inventory of HashFast including any cure costs relating to the assumption and assignment of any executory contract with Uniquify, Sonic or Ciara Tech identified by the Purchaser to be included in the Assets;

2. Liquidbits' waiver of its pre-petition vendee claim against HashFast;

3. The Seller Note;

4. The issuance to the Creditor Preferred Equity to HashFast with a liquidation preference equal to $3 million; and

5. Any other liabilities of the Company that the Purchaser expressly agrees to assume in the definitive documentation.

**Assignment and Assumption of Certain** The Company would assume and assign to the Purchaser those executory contracts of the Company identified by the Purchaser. The Purchaser may require an amendment to an executory contract as a condition to assumption. If the amendment is not approved by the non-debtor party or

**Contracts**: parties to the contract, the contract would not be assumed and assigned.

**Employees, Etc.**: The Purchaser would offer employment or consulting arrangements to certain employees of HashFast (the "Designated Personnel"). Compensation for the consulting services would be paid to the Company with respect to Designated Personnel still employed by the Company.

**No Other Liabilities**: Other than those executory contracts and any other liabilities that the Purchaser expressly agrees to assume in the definitive documentation, the Purchaser would assume no other liabilities whatsoever, fixed, contingent, known or unknown, matured or unmatured.

**Downside Protection:** If the Purchaser determines that the cost of operations, including the cost of bitcoin mining, becomes non-economical and there are no further payments being made on the Seller Note or in the redemption of the Creditor Preferred Equity, then, at the election of the holder of the Seller Note and the Creditor Preferred Equity, the Purchaser would, to the extent permitted by law, surrender or otherwise transfer to the holder the built out systems and equipment of the Purchaser in satisfaction of the Seller Note and in full redemption of the Preferred Equity

**Other Material Matters**:

1. The definitive agreement will contain other representations, warranties, covenants and agreements customary for transactions of this type.

2. The Bankruptcy Court will order all officers, directors and employees of the Company to transfer to the Purchaser at the closing all Assets of the Company in their possession or under their control.

3. The closing date of the acquisition of the Assets will be subject to customary conditions for a transaction of this type but would in any event include (i) the Assets including at least 27,000 chips and chips' worth of wafers, (ii) agreement as to definitive documentation, (iii) settlements satisfactory to the Purchaser on the claims of Uniquify, Sonic and Ciara Tech to certain inventory of HashFast, including any cure costs relating to the assumption and assignment of any executory contract with Uniquify, Sonic or Ciara identified by the Purchaser to be included in the Assets, with HashFast and the Purchaser jointly participating in the settlement negotiations, (iv) approval of the Bankruptcy Court of the sale under an order in form and substance satisfactory to the Purchaser before the closing date, (v) there being no bar to assignment to the Purchaser of any executory contract elected to be assigned to the Purchaser and determined by the Purchase to be material to the transaction; (vi) the absence of a material adverse change in the business, with certain defined events excluded from the definition of material adverse change, (vii) arrangements between the Purchaser and the Designated Personnel satisfactory to the Purchaser, and

(viii) the completion of the closing by an agreed upon "fast track" date.

**EXHIBIT B**



(index.php)

# BECOME A BITCOIN MINER

## MEGABIGPOWER IS PLEASED TO ANNOUNCE OUR NEW FRANCHISE PROGRAM

This program offers you the chance to go into business mining bitcoin on an industrial scale without many of the costs usually associated with this kind of endeavor. By supplying you at little or no cost with the equipment and training you need to get started, we will get you mining for bitcoin quickly and profitably.

## HERE'S HOW THE BUSINESS BREAKS DOWN

**MegaBigPower supplies (at no up-front cost)**

Case: 14-30725 Doc# 162 Filed: 07/25/14 Entered: 07/25/14 18:33:50 Page 14 of 17

| **MegaBigPower supplies (at no up-front cost)** |
|---|
| **MegaBigPower supplies (at no up-front cost)** |
| All mining equipment - mining rigs with power supplies and rPi controllers complete with disk images. |
| On-site training and installation assistance |
| A private mining pool with detailed stats and easy payouts. |

| **You supply** |
|---|
| A facility with power ready to go at the wall |
| The more power you have, the more bitcoin you can mine |
| Demonstrated ability to cool your stated power capacity * |

Once your equipment is up and running, MegaBigPower splits all mining revenue with you, starting at 50% / 50%.

> To see what your revenue might look like, please fill out our Franchise Sign-up Form (signup.php). We will be glad to answer any questions you have and do whatever we can to help you get a successful mining franchise up and running as quickly as possible.
>
> * Not sure what this means? Get in touch and we'll figure it out.

ABOUT US (ABOUTUS.PHP)

THE MINE (THEMINE.PHP)

IN THE MEDIA (INTHEMEDIA.PHP)

CONTACT US (CONTACT.PHP)

PRIVACY POLICY (PRIVACY.PHP)

FRANCHISE PROGRAM

>> INFO (INFO.PHP)

>> SIGN UP (SIGNUP.PHP)

>> LOG IN (LOGIN.PHP)

TERMS OF USE (TERMS.PHP)

**Combined Mine Stats**

| | |
|---|---|
| Hash Rate: | 7.85 PH/s |
| Past 24hr Rewards: | 217.11 BTC |
| Total Rewards: | 8890.93 BTC |
| % Accepted Shares: | 99.79 % |

f (https://www.facebook.com/megabigpower) (https://twitter.com/_MegaBigPower)

© 2014 MegaBigPower. All Rights Reserved.