# EXHIBIT 1

Meeting of Creditors - 7/8/2014

Page 22

1  BY MS. GLOSSON:

2      Q    Okay.  Well, the payments that are shown to

3  Mr. deCastro and Mr. Barber on statement of financial

4  affairs number 3C disclose salary and expense

5  reimbursement.  Are you saying that these amounts do not

6  reflect the bonuses that were paid in Bitcoin?

7      **A    (By Ms. Hushen) They do not.**

8      Q    All right.  But it does say bonuses -- it does

9  identify a bonus for Mr. Barber.  So that would be a cash

10 bonus?

11     **A    (By Ms. Hushen) Right.**

12     Q    Is that what you are saying?

13     **A    (By Ms. Hushen) Right.**

14     Q    And what's the timing on the amendment with

15 respect to the statement of financial affairs?

16         MS. MICKELSEN:  We plan to emend everything all

17     at once.

18         MS. GLOSSON:  Okay.

19         MS. MICKELSEN:  That's why we wanted to have

20     all of our numbers verified though, before we filed

21     the amendments.  And the other one that we are still

22     verifying is, we believe, that Eduardo may have had

23     some car payments paid by the company up until the

24     beginning of this year.  But I am not clear on -- we

25     are still verifying when those were paid and when

Electronically signed by Alison Presley (001-159-987-5451)          92be47ea-a665-4c9d-be42-899f3e91c918

**EXHIBIT 1**

Meeting of Creditors - 7/8/2014

Page 30

1    of time.

2            (By Ms. Hushen) They weren't entitled until

3    after December 31st, which was the guaranteed commit

4    date.

5        Q    Okay.  So you are testifying that before

6    January and February of 2014, no customers -- there were

7    no customers that were entitled to refunds, whether in

8    Bitcoin or in dollars?

9        A    (By Mr. Barber) I don't believe so.

10       Q    So January, February of 2014, when you say you

11   first started to encounter financial difficulties, can

12   you explain what that means to you?

13       A    (By Mr. Barber) So we incurred a significant

14   liability at the end of December when we missed our

15   guarantee shipment date for the batch one customers.  And

16   at that point in time, we issued a number of refunds.

17       Q    Okay.  And what was the reason for missing the

18   guaranteed date?

19       A    (By Mr. Barber) So we had issues with the

20   system board design, the event that it was not ready for

21   volume production.

22       Q    Any other reasons?

23       A    (By Mr. Barber) That's it.

24       Q    And I know it hasn't been your testimony, but

25   it has been testified on behalf of the debtor that that

# EXHIBIT 1

Meeting of Creditors - 7/8/2014

1   problem has been fixed.  Do you believe it has been

2   fixed?

3      **A   (By Mr. Barber) Yes.**

4      Q   Okay.  And in what way?

5      **A   (By Mr. Barber) So we -- in mid to late**

6   **January, we were producing boards in volume that met**

7   **specifications.  And we started shipping them in volume.**

8      Q   Did you bring on somebody new to do that or was

9   it just your existing staff?

10      **A   (By Mr. Barber) Existing staff.**

11      Q   Did your hire an outside consultant or anyone

12   to help you kind of figure out what the issue was with

13   the operations?

14      **A   (By Mr. Barber) No.**

15      Q   Okay.  We just talked before about possibly

16   amending the schedules to include, among other things,

17   the bonus you received in December.  What was the bonus

18   you received in December?

19      **A   (By Mr. Barber) I believe it was five Bitcoins.**

20           **(By Ms. Hushen) Five Bitcoins.**

21           **(By Mr. Barber) Yes.**

22           **(By Ms. Hushen) Everybody in the company**

23   **received a bonus to varying levels; five was the most,**

24   **some received three, some received one; based on tenure**

25   **and effort.**

Electronically signed by Alison Presley (001-159-987-5451)      92be47ea-a665-4c9d-be42-899f3e91c918

**EXHIBIT 1**
Meeting of Creditors - 7/8/2014

1      Q      Okay.  And what was the reason for that?  And

2   it -- you may be the best -- whoever is best to answer:

3   What do you think the reason was?

4      **A      (By Ms. Hushen) The company had spent the cash**

5   **proceeds for the systems, and we had significant legal**

6   **claims underway, and we had significant legal bills that**

7   **had to be paid ahead of payroll because they were on**

8   **retainer.**

9      Q      What was your salary, Mr. Barber, as of January

10  1st, 2014?

11     **A      (By Ms. Hushen) Same as it is now.**

12             **(By Mr. Barber) No, right around then, I got a**

13  **raise.  And I don't remember whether the raise was just**

14  **before or right after that date.  So I can't tell you**

15  **exactly.**

16     Q      January -- after January 1st, you think

17  perhaps; what would the raise have been, whenever it was?

18     **A      (By Mr. Barber) So the raise was to an annual**

19  **salary of 220,000.**

20     Q      From where would it have started?

21     **A      (By Mr. Barber) Sorry, from --**

22     Q      I'm sorry.  What was the raise amount itself,

23  so from 200 to 220, from 220 to --

24     **A      (By Mr. Barber) No.  The raise was to 220.**

25     Q      From what?

Case: 14-30725   Doc# 168-1   Filed: 08/08/14   Entered: 08/08/14 12:44:53   Page 4
of 21

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

# EXHIBIT 1
Meeting of Creditors - 7/8/2014

Page 40

1      **A    (By Mr. Barber) From, I believe, it was 144.  I**
2  **would have to check.**

3      Q    144?

4      **A    (By Mr. Barber) Yeah.**

5      Q    So when the company started having increasing
6  liabilities, you increased your pay by 70 or $80,000,
7  what was the reason for that?

8          Let me back up.  Who was responsible at the
9  company for determining who gets salary increases and
10  why?

11     **A    So Eduardo and I were responsible.**

12     Q    Okay.

13         MR. KOZACHENKO:  Same question for Eduardo.

14         MS. GLOSSON:   Okay.

15  BY MS. MCDOW:

16     Q    So in your estimation, you testified the
17  company, January or February, unsure when your raise
18  was -- what was the reason for giving yourself nearly a
19  $100,000 raise when the company was experiencing
20  significant liabilities and couldn't then, either close
21  to or before your raise, could not meet its obligations
22  as they became due?

23     **A    (By Mr. Barber) So at that point in time, I had**
24  **a choice of either leaving the company or being paid a**
25  **more appropriate salary for the role.**

Case: 14-30725   Doc# 168-1   Filed: 08/08/14   Entered: 08/08/14 12:44:53   Page 5
of 21

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

# EXHIBIT 1
Meeting of Creditors - 7/8/2014

Page 41

1          (By Ms. Hushen) It is an appropriate market

2    rate compared to Silicon Valley.  I have done numerous

3    external competitive executive salaries, and it is very

4    appropriate.

5        Q    Perhaps for a company that's operating and

6    meeting --

7        A    (By Ms. Hushen) Right.

8        Q    -- its obligations?

9        A    (By Ms. Hushen) Right.  I am just saying.  At

10    the time, it may have been appropriate.  It was prior to

11    the cash issues.

12        Q    It may have been, but we don't know.

13          In any event, okay, so the salary is 144 to

14    220.  Did you -- any Bitcoin component to your salary

15    raise?

16        A    (By Mr. Barber) The only Bitcoin that I have

17    ever received from the company was the Christmas bonus.

18        Q    Okay.  What was Eduardo's pay, say January 1st,

19    what was his raise, from what to what?

20        A    (By Ms. Hushen) He didn't have a raise.  He

21    went from -- he was always at 144.

22        Q    And what's he at today?

23        A    (By Ms. Hushen) 144.

24        Q    But in a sales position?  When was the last

25    time Eduardo had a raise?

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 168-1   Filed: 08/08/14   Entered: 08/08/14 12:44:53   Page 6
of 21
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

# EXHIBIT 1
Meeting of Creditors - 7/8/2014

```
                                            Page 42
  1        A     (By Ms. Hushen) He didn't.

  2        Q     Eduardo has never had a raise at the company?

  3        A     (By Mr. Barber) No.

  4        Q     What is the total amount in bonuses that

  5    Eduardo has received?

  6        A     (By Ms. Hushen) I would have to look at the

  7    disclosure schedule.  I don't remember what we reported.

  8    It wasn't significant.  Less than 10K, I think.

  9              (By Mr. Barber) I would have to look at the

 10    records.  But there would be no large bonuses.

 11              MS. GLOSSON:  No what?

 12              MR. BARBER:  No large bonuses.

 13    BY MS. MCDOW:

 14        Q     And that's in Bitcoin and cash?

 15        A     (By Ms. Hushen) Yeah.

 16        Q     Same?

 17        A     (By Ms. Hushen) Yeah.

 18        Q     Okay.  Who else at the time, January 2014, who

 19    else received a raise?

 20        A     (By Ms. Hushen) In January, I don't know.

 21        Q     Anytime in the past, the year preceding, who

 22    else received a raise?

 23        A     (By Ms. Hushen) A number of employees got

 24    raises just prior to my arrival.  The week prior to my

 25    arrival, a number of employees got raises.
```

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling                800.939.0093
Case: 14-30725    Doc# 168-1    Filed: 08/08/14    Entered: 08/08/14 12:44:53    Page 7
of 21

Electronically signed by Alison Presley (001-159-987-5451)                92be47ea-a665-4c9d-be42-899f3e91c918

# EXHIBIT 1

Meeting of Creditors - 7/8/2014

1          MS. MCDOW:  But I think a couple basic

2      questions about the remaining IP.  And I will move

3      on to some insider questions, and maybe the sale.

4      So maybe I will try to stick to ten minutes.

5          MS. GLOSSON:  Okay.  So let me pause this for a

6      moment then.

7          (Off the record.)

8          MS. GLOSSON:  All right.  We are back on the

9      record.

10          Go ahead, Ms. McDow.

11          MS. MCDOW:  Thank you.

12  BY MS. MCDOW:

13      Q    What do you think the value is as we sit here

14  today?  And I am just going to try to wrap this up.  I,

15  obviously, have a million more questions about it, but

16  what is the value of the IP today?  And again, not an

17  expert evaluation, but just your understanding of general

18  knowledge of the depreciation issues we talked about

19  that -- the competition.  What's the value now of all

20  three of them put together?

21      **A    (By Mr. Barber) All three of them put together,**

22  **there are some questions that -- it is hard to say.**

23  **There are some questions that may mean that some of it**

24  **could be very valuable or not have that much value.**

25      Q    Give me worst case.  Give me a range, worst

**EXHIBIT 1**
Meeting of Creditors - 7/8/2014

Page 66

1  case to best case, if you were to --

2      A    (By Mr. Barber) Best case, the value could be,

3  you know, substantial, many millions.

4      Q    "Many" like 5 million, 10 million, 30 million?

5      A    10 million, 30 million.

6          MS. MICKELSEN:  And are these presuming that

7      all conditions are completely ideal and the

8      environment, competitors don't have an advantage?

9          MR. BARBER:  Uh-huh, yeah.

10 BY MS. MCDOW:

11     Q    Yeah.  If we were to market it, let's say

12 again, in open market auction process, and, you know,

13 whoever wanted it the most got it at a price that was

14 fair, can you narrow it anymore between ten and

15 30 million?

16         Best case, okay.  Was that your range, ten to

17 30 or was that your range just for best case?

18     A    (By Mr. Barber) That's my range for best case.

19     Q    Okay.  What's your range for worst case?  Or

20 preferably, just your worst case, not the range.

21     A    (By Mr. Barber) For worst case, could be zero.

22     Q    Okay.  And why do you think it could be zero?

23     A    (By Mr. Barber) Let's see.

24         MR. GALLO:  Doesn't make --

25         MS. GLOSSON:  Okay.  We really only need one

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

**EXHIBIT 1**

Meeting of Creditors - 7/8/2014

Page 138

1      Q     Very small number of -- ten?

2      **A     (By Mr. Barber) I don't remember the exact.**

3   **But no, in the, sort of, ten kind of range.**

4      Q     But others failed, right, of those?

5      **A     (By Mr. Barber) Did not meet specification.**

6      Q     So basically, it is fair to say that by the end

7   of December, you didn't have any board in production

8   which were working properly?

9      **A     (By Mr. Barber) Correct.  We had a small**

10  **number.**

11     Q     And it is fair to say that you didn't have any

12  working product to sell by the end of December?

13     **A     (By Mr. Barber) We had a small number.**

14     Q     But they were not ready for mass production?

15     **A     (By Mr. Barber) It was not ready for mass**

16  **production, no.**

17     Q     Right.  So can you tell -- look at this?

18           MS. GLOSSON:  Do you have a copy for him?

19           MR. KOZACHENKO:  Yes, if you want, here.

20           MS. GLOSSON:  Is this about your claim?

21           MR. KOZACHENKO:  No.  It is just in general.

22           MS. GLOSSON:  Okay.  So this is an order

23        confirmation on Hashfast Technologies, LLC.  Order

24        number 12.5.4.

25

Case: 14-30725   Doc# 168-1   Filed: 08/08/14   Entered: 08/08/14 12:44:53   Page 10
of 21

Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

**EXHIBIT 1**
Meeting of Creditors - 7/8/2014

Page 159

1    he was no longer CEO; is that correct?

2        **A    (By Mr. Barber) Correct, yes.**

3        Q    Has there been any change to the type or nature

4    of the services that he provides to the debtor since his

5    termination?

6        **A    (By Mr. Barber) Yes, very significant.**

7        Q    Okay.  What are -- can you just give me an

8    example of what has changed with regards to the services

9    or responsibilities that he has performed?

10       **A    (By Mr. Barber) So previously, he was**

11   **responsible for the day-to-day operations of the company.**

12   **And after he was removed from the CEO position, he has**

13   **now been filling a sales and business development role**

14   **and is being purely focused on closing sales.**

15           MS. MCDOW:  Can you say that last part again,

16       focused on something?

17           MR. BARBER:  On closing sales.

18           MS. MCDOW:  And then before that?

19           MS. GLOSSON:  Business development, sales and

20       business development role.

21           Was that right?

22           MR. BARBER:  Yes.  So he has been helpful in

23       negotiating contracts and closing sales.

24   BY MS. GLOSSON:

25       Q    So who is now responsible for the day-to-day

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093
Case: 14-30725   Doc# 168-1   Filed: 08/08/14   Entered: 08/08/14 12:44:53   Page 11
of 21
Electronically signed by Alison Presley (001-159-987-5451)                    92be47ea-a665-4c9d-be42-899f3e91c918

**EXHIBIT 1**

```
 1   application to designate a responsible individual; is

 2   that correct?

 3           MS. MICKELSEN:  Yes, that is correct.

 4           MS. GLOSSON:  And that is Ms. Hushen, right?

 5           MS. MICKELSEN:  That's correct.

 6           MS. GLOSSON:  And we have discussed a number

 7   of amendments that needed to made, and I don't recall

 8   seeing any amendments.  Can you give me -- since our

 9   last meeting.  Can you give me a time frame on when you

10   expect those amendments to be made?

11           MS. MICKELSEN:  We have been finalizing them.

12   They are near finalized.  We just need a little bit of

13   additional information, and we received that, mostly in

14   parts.  We are going to follow up with our client after

15   this 341 meeting, to obtain -- basically obtain the last

16   information that we need to finalize the amendment.  And

17   we hope to have those on file in the next couple of

18   days.

19           MS. GLOSSON:  So by the end of the week?

20           MS. MICKELSEN:  That is the plan, yes.

21           MS. GLOSSON:  Q.  And with respect to the

22   inventory, we had asked for an updated inventory list

23   from the date of the involuntary, and Ms. Hushen, I

24   think your testimony was that is readily accessible to

25   you.  Do you have that with you today?
```

# EXHIBIT 1

1  clarify some of the questions.  I know this was raised a

2  bit at the last meeting.  The sale motion has been --

3  still has to be finalized.  There is a draft that still

4  has to be finalized.  We do plan to get this on file as

5  soon as possible.  But the terms of the term sheet are

6  still under final revision and review, and I think a

7  number of these questions are going to be answered in

8  the final draft.  So at this point, I just think it's a

9  little premature to be able to answer.

10           MS. GLOSSON:  Has debtor completed its

11  preference analysis?

12           MS. MICKELSEN:  That is something that the

13  debtor is still investigating.  We are on the amended

14  schedule.  It's going to include potential claims that

15  there may be.  These claims, however, may be carved out

16  of the term sheet, so it won't be an issue for the sale.

17  We do understand that those would be issues with the

18  sale if that determination has not been made, which is

19  why there may be a carve-out, among other reasons.

20           MS. GLOSSON:  Q.  Now, the debtor -- with

21  respect to sales that have already been made by the

22  debtor, the debtor made a sale to Guido Ochoa in May --

23  May 21st, I believe.  Since May 21st, have any assets of

24  the debtors or HashFast Technologies been sold to

25  Mr. Ochoa or his company?

EXHIBIT 1

1  doing that?

2      A.    E-mail or phone, depending on the urgency.

3      Q.    What is the scope of your authority in his

4  absence?

5      A.    What is your specific question?

6      Q.    Do you understand the question?

7      A.    Yes.  I mean, I would go to him for anything

8  of significance.

9      Q.    Would that include authorizing a sale to

10 LiquidBits or any other entity?

11     A.    Yes.

12         MS. MICKELSEN:  And also, just to clarify,

13 LiquidBits -- this was on the record during Friday's

14 hearing.  LiquidBits had stated that they can

15 communicate with him, I mean to the extent that they

16 need certain authority for things while he's on vacation

17 and he is -- it is anticipated that he's going to do a

18 certain number of -- a certain level of work while he's

19 on vacation, and that's all in our stipulated order that

20 was lodged yesterday, by telephone and e-mail.

21         MS. GLOSSON:  Q.  Remind me again when you

22 arrived, when you started to work at HashFast

23 Technologies.

24     A.    April 7th.

25     Q.    What was the state of HashFast Technologies'

# EXHIBIT 1

```
1   books and records at the time that you arrived?
2        A.   They were not completely pulled together.
3   That's probably the easiest way to put it.
4        Q.   What do you mean by that?
5        A.   A lot of information was missing;
6   transactional systems didn't agree with financial
7   records, and financial records, vice-versa, didn't agree
8   with transactional systems.
9             MS. GLOSSON:  You might be speaking too fast
10  for the court reporter.
11            MS. GLOSSON:  Q.  All right.  So just to
12  clarify.  So there was missing information.  What kind
13  of information was missing.
14       A.   The order -- order flow, order chain -- was
15  not complete.  Inventory records were not complete.
16       Q.   What do you mean by the order flow was not
17  complete?
18       A.   There had been a number of system conversions
19  and the data had not been reconciled as to total
20  orders -- total and filled orders, backlog, refunds
21  requested, order shifts.  Just the basic status of
22  affairs.
23       Q.   You also mentioned that the financial records
24  didn't reconcile with the operational records?
25       A.   Right.
```

**EXHIBIT 1**

1    Q.   Can you give me an example?

2    A.   Well, it said we made a very large profit in

3    2013, which was significant millions of dollars in

4    revenue.  And we only shipped a few systems in December,

5    so...

6    Q.   So you are saying the financial records showed

7    a profit, but in reality there wasn't one?

8    A.   Right.

9    Q.   How long did it take for you to figure out

10   that there was no profit?

11   A.   Well, I -- it took a few weeks of digging

12   through details.  My first focus was getting the

13   operational data -- my arms around the operational data,

14   so that -- because that drives the financials.  I was

15   trying to understand what the status of affairs was with

16   regard to the order chain and our pending liabilities

17   and whether or not we really had a bankruptcy ahead of

18   us.

19   Q.   What -- can you be specific as to what you did

20   to improve the status of the books and records since you

21   arrived?  You said your first focus was operational.

22   Can you be more specific about that?

23   A.   Well, we tried to get a clean view of all the

24   bitcoin transactions, all the cash transactions and all

25   of the orders placed with the company, as well as a

**EXHIBIT 1**

1   clean view of all shipments, refunds requested,

2   documentation of what the actual scope of the orders

3   were, make sure that was clear.  And then reconcile the

4   sides out to each other.

5       Q.   Is this process that you just described, has

6   it been completed?  Or is it --

7       A.   For the most part, yeah.  Within -- in all

8   materiality aspects.  There are some stragglers.

9       Q.   What other aspect of the debtor's books and

10  records have you focused on, other than what you just

11  described?

12      A.   Well, the cash burn was the most significant

13  aspect.  We had to reduce head-count significantly and

14  arrest the bleed.

15      Q.   But --

16      A.   A lot of the attention was focused on keeping

17  the company afloat-- keeping the doors open and making

18  payroll.

19      Q.   With respect to the books and records of the

20  debtor, what other aspects needed correcting or cleaning

21  up, than what you've already described?

22      A.   Well, the QuickBooks data isn't completely

23  clean.  We have gone through and reconciled each of the

24  monthly financial now, to the operational data.  The

25  actual financial statements aren't clean, but the

**EXHIBIT 1**

1    transaction details are largely -- the cash transactions

2    are clean.  We've reconciled those.

3        Q.   When you say that the financial statements

4    aren't clean, what do you mean by that?

5        A.   The bucketing of line items, so we know where

6    the cash went.  It may not be bucketed in the system in

7    the right -- you know, did it go to expense versus

8    inventory.  But we know that all cash that came in has

9    been tied to the cash that went out.  It may not be from

10   a GAAP perspective in the right bucket.  But that is a

11   separate activity.

12       Q.   So is it fair to say that the financial

13   statement might not be reliable because you don't know

14   if it is properly reflected in each line item?

15       A.   Right.  I haven't used the financial

16   statements since I arrived.  I have used all Excel

17   schedules, because of the --

18       Q.   Because they were not reliable?

19       A.   Because they weren't reliable when I arrived.

20   So I had to recreate some Excel sheets.

21       Q.   Do you believe that the debtor is in a

22   position today to produce reliable financial statements?

23       A.   With the right time and skill sets.

24       Q.   But today --

25       A.   Yes.

## EXHIBIT 1

1      Q.    -- if you were to generate financial
2  statements today --
3      A.    Yes.
4      Q.    -- do you believe that they would be reliable?
5      A.    Oh, yes.  Yes.  For going forward?
6      Q.    Well, no, like, I mean something that would
7  take time --
8      A.    Having put the time into recreating the
9  history, right, I could.
10      Q.    So with respect to a balance sheet -- a
11  balance sheet is a snapshot of one particular day; do
12  you agree with that?
13      A.    Right.
14      Q.    So if you were to produce a balance sheet
15  today, would it be reliable?
16      A.    Yes.
17      Q.    What about a profit and loss statement; would
18  that be reliable?
19      A.    In material aspects, yes.
20      Q.    When you arrived, did HashFast Technologies
21  maintain a general ledger?
22      A.    Yes.  QuickBooks.
23      Q.    Did HashFast LLC have a general ledger?
24      A.    Yes.  Also QuickBooks.
25      Q.    Was it current; was that general ledger

**EXHIBIT 1**

1   current for both of the debtors?

2       A.   No.

3       Q.   So what was the status of the general ledger

4   for HashFast Technologies at the time that you arrived?

5       A.   There were invoices and reconciliations that

6   had not occurred.  Account reconciliations and invoices

7   and entries that had not been booked.

8       Q.   So how -- over what period of time had these

9   invoices and reconciliations not been booked?

10      A.   Probably about a month.

11      Q.   Would that be the case for both entities?

12      A.   There was very little activity for HashFast

13  LLC, so no.

14      Q.   At the time that you arrived in late April,

15  would you have been able to tell from the books and

16  records at that time, the underlying basis for payments

17  that were made, say perhaps to various vendors or up to

18  HashFast LLC?

19      A.   Yes.  There were invoices attached to any

20  payments.  There were files of invoices.

21      Q.   When you spoke about invoices earlier to

22  explain why HashFast Technologies would pay HashFast

23  LLC, were those invoices that you were referring to,

24  were they invoices from the vendor or were they invoices

25  from HashFast LLC?

EXHIBIT 1

1     A.   From the vendor.

2     Q.   Did HashFast LLC ever issue an invoice to

3  HashFast Technologies for payment?

4     A.   Not that I am aware of.  They may have.

5     Q.   Have you looked at all of the books and

6  records for both of the debtors?

7     A.   I have looked through the QuickBooks.  I

8  haven't gone through every file for every invoice, no.

9     Q.   What's the status of the tax returns for

10  HashFast Technologies?

11     A.   We filed an extension for both HashFast

12  Technologies and the LLC.

13     Q.   So what would be the deadline, then, for

14  filing?

15     A.   For September, I believe it is;

16  September 15th.

17     Q.   Did HashFast Technologies issue any 1099s for

18  2013?

19     A.   I believe they did.

20     Q.   Have you seen them?

21     A.   I haven't personally seen them, no.

22     Q.   How do you have the belief that they were

23  issued?

24     A.   Because there was a question raised from one

25  of the contractors about it.