TRACY HOPE DAVIS
United States Trustee for Region 17
Office of the U.S. Trustee
235 Pine Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 705-3333
Facsimile: (415) 705-3379

By: JULIE M. GLOSSON,
Trial Attorney (#230709)
Email: julie.m.glosson@usdoj.gov

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Lead Case No. 14-30725 DM |
| HASHFAST TECHNOLOGIES LLC, | Jointly Administered with: |
| Debtor-In Possession | Case No. 14-30866 |
| | Chapter 11 |
| Affects HASFAST LLC, | |
| Debtor-In Possession. | |

**DECLARATION OF PATRICIA A. MARTIN IN SUPPORT OF UNITED STATES TRUSTEE'S MOTION TO APPOINT CHAPTER 11 TRUSTEE UNDER 11 U.S.C. § 1104(A) OR IN THE ALTERNATIVE, A MOTION TO CONVERT CASE TO CHAPTER 7 UNDER 11 U.S.C. § 1112(B)**

I, Patricia A. Martin, declare:

1. I am employed as a Bankruptcy Analyst by the U.S. Department of Justice, Office of the U.S. Trustee, in the San Francisco field office at 235 Pine Street, Suite 700, San Francisco, California.

2. I make this declaration based on my own personal knowledge of the facts of this matter, if called upon would and could testify to the following.

3. As a Bankruptcy Analyst, I perform a number of duties for the Office of the U.S. Trustee with respect to Chapter 11 cases. In the regular course of my duties, I conduct an initial debtor interview at the initial stage of the case. I request documents from the debtor which are necessary to prepare for and conduct the initial interview. I review the financial issues in the case by reviewing Schedules and Statement of Financial Affairs, the Monthly Operating Reports ("MOR"), historical financial documents, and the disclosure statement and plan of reorganization filed by debtors-in-possession in Chapter 11 cases. I am familiar with the above referenced cases of HashFast Technologies LLC ("Subsidiary") and HashFast LLC ("Parent") and their respective case files as I am part of the Chapter 11 team which monitors these cases on behalf of the U.S. Trustee.

4. I conducted an initial interview in the HashFast cases on June 26, 2014. The interview was attended by Monica Hushen, debtors' responsible individual and Chief Financial Officer; Simon Barber, HashFast co-founder and Chief Technology Officer; Peter Siddiqui of Katten Muchin Rosenmann LLP; U.S. Trustee summer interns Sara Cendejas and Mohsin Aldabashi; and myself.

5. I was present at the §341 meeting of creditors conducted on July 8, 2014 at which Ms. Hushen and Mr. Barber testified on behalf of the Subsidiary. I was present at the §341 continued meeting of creditors conducted on July 15, 2014 for the Subsidiary at which Ms. Hushen testified and at which Mr. Barber did not appear. I was present at the §341 meeting of creditors conducted on July 15, 2014 for the Parent at which Ms. Hushen testified and Mr. Barber was not present.

6. I have reviewed both debtors' Schedules and Statements of Financial Affairs filed with the bankruptcy court, all documents produced by the Debtors to our office in conjunction with the U.S. Trustee's initial production request for the initial debtor interview and subsequent information produced by the debtors at the U.S. Trustee's request.

7. In the initial interview, the §341 meetings of creditors, and in the Debtors' documents, the name HashFast was used without distinction for the separate corporate entities in many instances and for that reason may appear as such in this declaration.

8. Based upon my personal review of the documents filed and produced, my notes of the information shared by Ms. Hushen and Mr. Barber at the initial interview, and my notes of the testimony given by Ms. Hushen and Mr. Barber at the §341 meetings of creditors, it is my understanding that:

> a. The primary scheduled assets of the debtors are inventory, scheduled as owned by the Subsidiary, and intellectual property, scheduled as owned by the Parent. Mr. Barber testified on July 8, 2014 that the business purpose of the Parent was to hold, develop, and upgrade the bitcoin intellectual property to keep it competitive. Parent has no employees while the Subsidiary employs approximately 10 employees down from a peak of about 40 in April, 2014.
>
> b. **Status of Technology, Mr. Barber's Testimony Regarding Value of the Technology and Open Question Regarding Interdependence.**
>
> *First Generation.* It is my understanding that the 1st generation chips were designed and manufactured pursuant to a contract dated April 9, 2013 between the Subsidiary and Uniquify under the direction of Chad Spackman, a Subsidiary employee, and Sandgate Technologies.[1] The Subsidiary lists the Uniquify and Sandgate contracts on its Schedule G; the Parent does not. Uniquify did not retain rights to the Generation 1 technology.
>
> *2nd Generation.* Work on the 2nd Generation chip design had commenced pursuant to a Memorandum of Understanding dated August 21, 2013 ("DX Corr MOU") between the Subsidiary and DX Corr Design – again under the guidance

---

[1] Ms. Hushen testified that Mr. Spackman is a principal of Sandgate Technologies, an Australian company. I understand its other principals are Adrian Port and John Wells. Chad Spackman, the Port Family Trust and the Wells Family Trust (non-cash contributors) each received 666,667 shares of Class A stock in the Parent upon its formation. [*See Case No. 14-30866, List of Equity Security Holders, Pacer Docket #5.*]

of Chad Spackman and Sandgate Technologies. The work was suspended on the 2nd Generation chip. I have reviewed the DX Corr MOU, a copy of which was provided to the U.S. Trustee by Ms. Hushen. The MOU states that DXCorr shall retain ownership of any IP it develops with respect to its fulfilling the 2nd Generation project for a finite period of time, that it will license same to Hashfast, and that it will not use the developed IP in a product competitive to Hashfast.

*Generation 1.5*. Thereafter, an upgrade to the 1st Generation – Generation 1.5 – was commenced under a separate proposal dated December 1, 2013 between the Subsidiary and DX Corr Design. [See Case No. 14-30725, Schedule G, Pacer Docket #88, pages 1 through 3 and Case No. 14-30866, Schedule G, Pacer Docket #23.] At the July 15th §341 meeting, Ms. Hushen indicated that, to her knowledge, the Generation 1.5 proposal had not been signed by the parties.

*Best and Worst Case Scenarios.* At the July 8, 2014 §341 meeting, Mr. Barber gave a best and worst case scenario of the value of the two provisional patents and the mask works as $10-$30 million best case and zero as worst case. Mr. Barber testified that the next generation chip design had been stalled due to lack of funds and that Hashfast was developing a new board design, which when associated with the mask works, would increase the value at the same time reducing production costs significantly.

*Open Question Regarding Inter-Dependence of 1st Generation, Generation 1.5 and Generation 2 Intellectual Property*. It remains unclear to me whether and to what extent the Generation 2.0 and 1.5 Generation work in progress relies upon or is founded on the 1st Generation intellectual property described in more detail in paragraph (e) below. At the July 15, 2014 §341 meeting, Ms. Hushen deferred questions regarding the intellectual property to Mr. Barber who was not present for questioning.

MARTIN DEC RE UST'S MOTION TO APPT TRUSTEE; CONVERT CASE: 14-30725, 14-30866    4

Case: 14-30725    Doc# 170    Filed: 08/08/14    Entered: 08/08/14 12:51:58    Page 4 of 11

c. **Purported Disputes with Uniquify and DX Corr.**

*Uniquify.* The Subsidiary is the only debtor listing a claim payable to Uniquify. The Subsidiary's Schedule F shows Uniquify has having a $424,427.10 disputed claim. [*See Case No. 14-30725, Pacer Docket #87, Page 122 of 130.*] It is my understanding that the Uniquify contract entailed not only design and development of the 1st Generation chip but also management of the processing of Hashfast's product using 3rd parties. Based upon Ms. Hushen's testimony, it is unclear to what extent, if any, Uniquify may be held responsible for the Hashfast product delays. Ms. Hushen indicated negotiations are underway with Uniquify. It appears Hashfast products, sitting in various 3rd party warehouses, may require resolution of amounts owed to various parties to obtain their release to a potential purchaser.

*DX Corr Design.* Both debtors list a disputed claim payable as '0' owed to DX Corr Design, Inc. on their respective Schedule Fs. [*See Case No. 14-30866, Pacer Docket #22 and Case No. 14-30725, Pacer Docket #87, Page 33 of 130.*] At the July 15, 2014 §341 meeting, Ms. Hushen indicated the dispute with DX Corr Design stemmed from confusion between the work performed and charged between the 2nd Generation and Generation 1.5 phases of DX Corr work, the manner in which DX Corr applied payments, the fact that the proposal for Generation 1.5 had not been signed by both parties, and the technology which would be deemed DX Corr intellectual property. At the July 15, 2014 meeting Ms. Hushen stated verbal communications had ceased between the companies but then offered that Mr. Barber had met with DX Corr "last week". When questioned further for more specifics, Ms. Hushen stated she did not know which entity Mr. Barber was representing at the meeting, whether anyone else accompanied him to the meeting, debtors' counsel did not accompany him, but she believed the meeting was related to Hashfast's claims.

d. **Subsidiary Inventory.** The Subsidiary inventory, valued as $8,502,313 on its Schedule B, consists of 1st Generation (1) 15,162 Golden Nonce ASIC chips located in San Jose valued at $2,274,300; (2) 9,600 Golden Nonce ASIC chips (Assembly in Progress) location in Korea valued at $1,440,000; and (3) 14,880 - 80 wafers (each wafer makes 186 Golden Nonce ASICs) located in Korea valued at $2,232,000 and (4) substrates, boards, and other bitcoin server components. Schedule B also lists a "license from DxCorr Design Inc. for use of DXCorr Design Inc.'s technology – value unknown. [*See Case No. 14-30725, Schedule B, Pacer Docket #84, pages 3 through 12*.]

e. **Parent Intellectual Property**. The Parent intellectual property, valued as "unknown" on the Parent's Schedule B, consists of

(1) a US provisional patent application (Stacked Chips Powered from Shared Voltage Sources) "Stacked Chips application" ;

(2) a US provisional patent application (Golden Nonce (GN) ASIC Interface protocol) "Protocol application" ; and

(3) trade secrets, mask works related to chip design.

[*See Case No, 14-30866, Schedule B, Pacer Docket #19, Page 3 of 3.*]

The stacked chips application (#61917828, acknowledged as received on 12/18/13) lists Simon Barber as the inventor and the Parent as the assignee. The protocol application, (#61896559, acknowledged as received on 10/28/13) lists Adrian Port as the inventor and the Parent as the assignee. As footnote 1 indicates, Mr. Port is a principal of Sandgate Technologies.

As stated above in 8(b) and 8(c), there are open questions regarding (1) whether and to what extent the various generation chips and boards rely upon and/or are

founded on the intellectual property scheduled by the Parent and (2) to what extent, if any, the dispute with DX Corr impacts the same technology. As set forth below, there is also a potential question as to whether the Parent or the Subsidiary is the rightful owner of the intellectual property.

f. **Single Governing Agreement Between Entities.** The only agreement identified by Ms. Hushen, to her knowledge, that exists by and between the Parent and the Subsidiary, is the subsidiary's LLC operating agreement. It is my understanding that there is no licensing agreement or assignment of a licensing agreement by and between the Parent and the Subsidiary regarding the use of the intellectual property. Neither the Subsidiary's Schedule G nor the Parent's Schedule G discloses a licensing agreement between the debtors.

g. **Formation and Capitalization of Parent.** The Parent was formed on May 9, 2013 as a Delaware LLC. The Parent was capitalized with cash contributions of $641,642 by parties other than the co-founders, Mr. Simon and Mr. Eduardo de Castro.

h. **Formation and Source of Working Capital for Subsidiary**. The Subsidiary was formed on June 10, 2013 as a California LLC. Its primary source of cash consisted of pre-production and post- production sales of its bitcoin mining chips, servers and boards. Upon my request, Ms. Hushen provided a summary of those sales which indicates that $19.846 million was received between August, 2013 and May, 2014. On July 8, 2014, Mr. Barber testified that Hashfast, which had experienced design and production problems, finally commenced shipping product in January, 2014. Using that date, I calculated that $17.688 million in orders were received prior January 1, 2014 and $2.168 million after January 1, 2014. Exhibit 2 is a true and correct copy of the summary columns and rows of the spreadsheet entitled "raw order totals by month" provided by Ms. Hushen.

i. **No Borrowing**. Neither entity borrowed funds from a financial institution to fund operations and/or product development.

j. **Overview of Usage of Cash.** Upon my request, Ms. Hushen provided various spreadsheets which had reconstructed Hashfast's transactional data and cash activity to show how the Parent spent its initial funding of $641,642 and the Subsidiary spent the $19.846 million it had received from its customers. Based upon my review of the spreadsheets, disbursements were as follows:

> (i) *The Parent* disbursed $1.172 million from its account at Bridge Bank between June, 2013 through April, 2014. It is my understanding that there were additional disbursements prior to June, 2013 for which information is being obtained by Ms. Hushen.
>
> (ii) *The Subsidiary* disbursed $23.529 million from its Silicon Valley accounts.

Both the $1.172 million and $23.529 million figures include transfers between the entities and transfers between accounts; therefore the total exceeds the known sources of cash for both entities.

k. **Subsidiary Usage of Cash.** The Subsidiary's primary account was a Silicon Valley account ending 2418 which showed $18.2 million in disbursements. Of the $18.2 million, it appears at least $13.13 million was paid to design and manufacturing vendors.

l. **Parent Usage of Cash**. The supportive transactional schedule for the Parent's Bridge Bank account showed disbursements of $1,048,596, roughly 85% of which or $900,000 was paid on technology design. The disbursements made were funded by transfers from the Subsidiary.

m. **Payments to Uniquify, DX Corr and Sandgate**. Based upon my review of the transactional reconstruction provided by Ms. Hushen, it appears the following payments were made to the key intellectual property vendors - Uniquify, DX Corr, and Sandgate - by the Parent and the Subsidiary:

|  |  | HF Parent | HF Subsidiary |
|---|---|---|---|
| Uniquify | 1st Generation | 269,000 | 7,613,939 |
| DX Corr | Generation 2 and 1.5 | 525,000 | 85,000 |
| Sandgate |  | 105,000 | 166,081 |
|  | Total | 899,000 | 7,865,020 |

n. **Upstreaming from Subsidiary to Parent.** Although an unspecified amount of the Parent's $641,642 initial contribution may have flowed to the Subsidiary, it appears at least $1,048,596 flowed upstream from the Subsidiary to the Parent "starting June 21, 2013 through May 23, 2014 to provide Hashfast LLC with capital to pay its debts". [2] There appears to be a direct correlation between at least $340,000 (four $85,000 payments) made to DX Corr by Parent and upstreaming of the same amount by the Subsidiary. At the. July 15, 2014 §341 meeting Ms. Hushen testified the decisions to upstream funds from the Subsidiary to the Parent at various times were made prior to her joining HashFast and that the three persons who would have been in a position to cause the transfers were Mr. de Castro, Mr. Barber and Ms. Kathleen Shy.

o. **Operating Agreement Provision Regarding Distributions from Subsidiary to Parent**. The Subsidiary's LLC operating agreement was referred to and read by Ms. Hushen at July 15, 2014 §341 meeting as possible justification for the transfers. The copy of Subsidiary LLC operating agreement which was provided

---

[2] This wording and amount appears in the Statement of Financial Affairs for Subsidiary [*See Case No. 14-30725, Pacer Docket #92, page 10 – Question 23 – Withdrawals from a partnership or distributions by a corporation.*]

MARTIN DEC RE UST'S MOTION TO APPT TRUSTEE; CONVERT CASE: 14-30725, 14-30866    9
Case: 14-30725    Doc# 170    Filed: 08/08/14    Entered: 08/08/14 12:51:58    Page 9 of 11

to the U.S. Trustee and which I reviewed contains the following provision regarding distributions from the Subsidiary to the Parent:

> 6.1 <u>Payment.</u> Distributions shall be made at such times, and from time to time as Member may determine.
> 6.2 <u>Restrictions on Distributions.</u> Notwithstanding Section 6.1, no distribution shall be made if, after giving effect to the distribution; (a) the Company would not be able to pay its debts as they become due in the usual course of business; or (b) the Company's total assets would be less than the sum of its total liabilities.

    p. **Status of Books and Records Upon Ms. Hushen's Arrival.** At the July 15, 2014 §341 meeting, Ms. Hushen testified that she started at Hashfast on April 7, 2014. Ms. Hushen described the Subsidiary's books and records upon her arrival as "not completely pulled together". Transactional systems did not agree with the financial records. There was missing information on order flow, order chain and inventory records were incomplete. The company was incorrectly reporting a large profit for 2013 but had only made a few shipments by the end of the year. Ms. Hushen testified that she focused on reconstructing the transactional systems, tying out cash flow to the companies' bank statements, and then reconciling the transactional and cash records. Ms. Hushen testified that the Quickbooks general ledger system remains unreliable. Ms. Hushen stated she could, however, produce a reliable balance sheet and profit and loss statement. Ms. Hushen stated that the transactions by and between the Subsidiary and the Parent would need to be reviewed for characterization for tax reporting purposes. Tax returns for both entities are on extension.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct, and, if called upon to testify thereon as a witness, I would be competent to so testify. Executed this 8th day of August, 2014, at San Francisco, California.

                                                  /s/ Patricia A. Martin
                                                  Bankruptcy Analyst

# EXHIBIT 2

| Date | Dollars |
|---|---|
| Aug-13 | 4731306.15 |
| Sep-13 | 899139.61 |
| Oct-13 | 5014535.01 |
| Nov-13 | 4998534.31 |
| Dec-13 | 2034029.02 |
| Jan-14 | 837322.88 |
| Feb-14 | 137419.48 |
| Mar-14 | 577388.24 |
| Apr-14 | 83569.11 |
| May-14 | 532914 |
| Grand Total | 19846157.81 |



HashFast Technologies Order Dollars