## EXHIBIT 4

## HASHFAST LLC LIMITED LIABILITY COMPANY AGREEMENT

### (a Delaware limited liability company)

This Amended and Restated Limited Liability Company Agreement (this "**Agreement**") of Hashfast LLC, a Delaware limited liability company (the "**Company**"), is entered into effective as of May 10, 2013 (the "**Effective Date**") by and between the persons and entities who are identified as Members on **Schedule 1** attached hereto or who become Members after the Effective Date in accordance with the provisions of this Agreement. Certain capitalized words and phrases in this Agreement shall have the meanings set forth in **Exhibit A**.

### RECITALS:

**WHEREAS**, the Company was formed as a Delaware limited liability company on May 9, 2013, and Persons wish to become Members to this Agreement and hold Common Units.

### AGREEMENT:

**NOW, THEREFORE**, in consideration of the mutual promises of the parties hereto, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, intending to be legally bound, the parties hereto hereby agree as follows:

SECTION 1:    Organization of the Company

1.1      Name. The name of the limited liability company is Hashfast LLC.

1.2      Purpose; Powers. The purpose of the Company is to engage in any activity for which limited liability companies may be organized in the State of Delaware. The Company shall possess and may exercise all of the powers and privileges granted by the Delaware Limited Liability Company Act (6 Del. C. §§ 18-101, et seq.) as may be amended from time to time (the "Delaware Act") or by any other law or by this Agreement, together with any powers incidental thereto.

1.3      Principal Office; Registered Office. The principal office of the Company shall be c/o Corporation Trust Center, 1209 North Orange Street, Wilmington, Delaware 19801, or at such other location as hereafter may be determined by the Board (as defined below). The registered agent for service of process in the State of Delaware and the address of the registered office of the Company shall be as set forth in the Certificate of Formation.

1.4      Effectiveness; Term. The Members agree that, effective as of the date set forth in the first paragraph of this Agreement, the rights, duties and obligations of the Members shall be as provided in this Agreement and, except as herein otherwise expressly provided, in the Delaware Act. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

1.5      Foreign Qualification. Prior to the Company's conducting business in any jurisdiction other than Delaware, the Board shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Board, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction. At the request of the Board, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

Case: 14-30725    Doc# 194-2    Filed: 09/03/14    Entered: 09/03/14 13:49:38    Page 1 of 28

# **EXHIBIT 4**

Agreement that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business.

1.6     No Partnership Intended for Nontax Purposes. Although the Members intend for the Company to be a partnership for state and federal income tax purposes, the Company is a Delaware limited liability company and not a general or limited partnership, and no Member shall have personal liability for any Company operations, debts, obligations or liability merely as a result of being a Member.

1.7     Filing of Other Certificates. The Company's executive officers shall execute, file, publish, and record all certificates, notices, statements, and other instruments and amendments thereto for the formation and operation of a limited liability company as the executive officers deem appropriate.

1.8     Effect of Inconsistencies with the Delaware Act. To the extent that any provision of this Agreement is prohibited or ineffective under the Delaware Act, this Agreement shall be deemed to be amended to the smallest degree possible in order to make this Agreement effective under the Delaware Act in accordance with the intent of the parties. In the event the Delaware Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**SECTION 2**: Members; Membership Interest Units; Capital Contributions

2.1     Classes of Units.

(a)     The limited liability company interests of Members (including without limitation all rights to distributions and other amounts specified in this Agreement, as well as all rights to vote on, consent to, or approve matters related to the Company) shall be denominated in units of membership interests in the Company (each a "Unit" and collectively, the "Units") as designated in Section 2.1(b), and the relative rights, privileges, preferences and obligations of the Members with respect to Units shall be determined under this Agreement and the Delaware Act to the extent provided herein and therein. The number and the class of Units held by each Member shall be set forth opposite such Member's name on the **Schedule 1**.

(b)     As of the date of this Agreement, the Company shall be authorized to issue three classes of Units which are designated as Class A Common Units ("**Class A Units**"), Class B Common Units ("**Class B Units**").  The Class A Units and Class B Units are also referred to as the "**Common Units**")

(c)     Units in the Company shall, for all purposes, be personal property. A Member shall have no interest in any specific assets or property of the Company. Each Member waives any and all rights that such Member or may have to maintain an action for partition of the Company's property. In the event of the death or legal disability of any Member, the executor, trustee, administrator, guardian, conservator or other legal representative of such Member shall be bound by the provisions of this Agreement. The Units shall be uncertificated; provided, however, that if requested by a Member, the Company may issue to such Member a certificate signed by the Board specifying the number and type of Units held by such Member.

2.2     The Board may from time to time authorize and cause the Company to issue additional Units, securities or rights convertible into Units, options or warrants to purchase Units, or any combination of the foregoing, consisting either of the classes of Units authorized hereby or as otherwise may be authorized in accordance with the terms hereof (collectively, "**New Securities**"), and with such rights, privileges, preferences and restrictions and other terms and conditions, and in exchange for such cash or other lawful consideration, as the Board may determine, and to admit the holders of such New Securities as Members

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# EXHIBIT 4

("**Additional Members**") on such terms as are determined by the Board. Any such New Securities will be issued pursuant to subscription agreements or such other documents deemed appropriate by the Board.

  2.3 Company Right to Repurchase Units. Certain Members have or may in the future acquire Units that are subject to repurchase by the Company on terms set forth in a separate membership unit restriction, restricted unit purchase agreement or other agreement (such agreements sometimes referred to herein as a "**Restricted Unit Purchase Agreement**" or "**RUPA**"). Each Member acknowledges and agrees that the Company (or its assignee) shall have the right to repurchase all or a portion of a Member's Units purchased, if (and to the extent) set forth in any RUPA or other agreement entered into between the Company and such Member.

  2.4 Withdrawal. A Member may not resign or withdraw from the Company prior to the dissolution and winding up of the Company pursuant to Section 8 hereof; provided, however, that a Member who Transfers 100% of his or her Units to the Company or to an Assignee that becomes a Member in accordance with Section 9 hereof will automatically cease to be a Member.

  2.5 Capital Accounts; Capital Contributions. A separate capital account (a "**Capital Account**") shall be maintained for each Member in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv) and as described in detail in **Exhibit B** to this Agreement. The Capital Accounts of each Member will reflect the initial capital contribution, if any, made by such Member upon admission as a Member of the Company, as well as any additional capital contributions made by such Member thereafter; provided, however, that no Member shall be required to make any additional capital contribution to the Company. No Member shall be required to pay the Company any deficit or negative balance which may exist from time to time in the Member's Capital Account (including without limitation upon and after dissolution of the Company). No Member shall be entitled to receive any interest on such Member's Capital Contributions or Capital Account.

  2.6 Loans by Members. A Member may make a loan or advance money or property to or on behalf to the Company only on such terms (including as to security) as may be agreed upon by the Board and such Member. Such loan or advance shall not increase the Member's Capital Account, entitle the lending Member to any greater share of Company distributions or subject such lending Member to any greater proportion of Company losses. The amount of such loans or advances shall be a debt owed by the Company to the expense against income of the Company.

  2.7 Spousal Consent. In the event that any Member is married and such Member or such Member's legal spouse resides in a community property state, such Member shall, if requested by the Company, promptly deliver a spousal consent to the terms of this Agreement, and any amendment thereto, in a form provided by the Company.

  2.8 No Right to Employment. Each Member acknowledges and agrees that nothing in this Agreement will be construed as providing any Member any right to employment or continuing employment by the Company, nor will it be construed as limiting or otherwise affecting any obligations or duties owed to the Company by a Member who is an employee in his or her capacity as an employee of the Company. Each Member acknowledges that the Company has the right to terminate the employment of any Member who from time to time is or becomes a Member of the Company at any time for any reason, with or without cause, subject only to such Member's written employment contract, if any.

  2.9 Right of Member to Conduct Business with the Company and Others. The Member and any affiliate of the Member shall, notwithstanding the Member's ownership of Units in the Company, have the right to:

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

(a)     engage in or possess an interest in other business ventures of every kind and description, independently or with others, and the Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement; and

(b)     do business with the Company at any time (including without limitation the power to purchase property from or sell property to the Company and to borrow funds from or lend or advance funds to the Company) in the same manner and with the same rights and obligations as would apply to a person that is not a Member (or affiliate of a Member) of the Company.

**SECTION 3**:  Management of the Company.

3.1     Board of Managers; Authority; Election.

(a)     The business and affairs of the Company shall be managed by or under the direction of a board of managers (the "**Board**") which shall be comprised of one or more individuals (each, a "**Manager**"), each appointed by the vote or written consent of a Unitholder Majority. A Manager need not be a Member. It is agreed that as of the Effective Date, the Board shall consist of two (2) Managers, who will be the individuals identified on **Schedule 1.**

3.2     A Manager will serve until the earlier of his or her resignation, death or removal (with or without cause) by the vote or written consent of a Unitholder Majority. The Members, acting by vote or written consent of a Unitholder Majority, may (i) increase or decrease the number of Managers comprising the Board, and (ii) remove or replace the initial Managers or any subsequent Managers, and fill any vacancies on the Board.

3.3     The Board shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the Company's purposes, including all powers, statutory or otherwise, including without limitation, the right to execute documents and instruments for the acquisition, mortgage, or disposal of property on behalf of the Company; provided, however, that the prior consent of the Members shall be required for certain actions as set forth in Section 4.3.

3.4     Board Action by Written Consent. The Board may take action and give their vote and approve matters: (a) at a meeting at which both Managers are present; (b) by a majority of the Managers if the Company is then Managed by less or more than two Managers; or (c) by unanimous written consent of the Managers.  Such vote or approval of a Manager will be deemed to constitute such Manager's vote or approval as a holder of Units.

3.5     Meetings of Board. Meetings of the Board may be called by any Manager. Notice of any meeting shall be given pursuant to Section 10.5 below to all Managers not less than forty-eight (48) hours prior to the meeting. A majority of the total number of Managers authorized pursuant to Section 3.1 shall be required to constitute a quorum for the transaction of business by the Board. Except as otherwise provided in this Agreement, a simple majority of the Managers present at any duly constituted meeting of the Board at which a quorum is present shall be required for the Board to take any action. A notice need not specify the purpose of any meeting. Notice of a meeting need not be given to any Manager who signs a waiver of notice, a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting the lack of notice prior to the commencement of the meeting. Managers may participate in any meeting of the Managers by means of conference telephones or other means of electronic communication so long as all Managers participating can hear or communicate with one another. A Manager so participating is deemed to be present at the meeting.

Case: 14-30725   Doc# 194-2   Filed: 09/03/14   Entered: 09/03/14 13:49:38   Page 4 of 28

# **EXHIBIT 4**

3.6    Tie-Breaking Advisor.

(a)    If the Managers do not concur in a particular vote or approval, and are evenly split such they cannot attain a majority vote or approval, then any Manager may request the vote or approval of the Tie-Breaking Advisor.

(b)    The Tie-Breaking Advisor has the authority to arbitrate the matter brought before him by any Manager for his vote or approval, and may require each Manager to cooperate and participate fully in whatever procedure he or she requires to vote, approve, or disapprove the matter, including accepted procedures and rules of arbitration.  In particular, the Tie-Breaking Advisor may do so using electronic meetings using video or chat.

(c)    The Tie-Breaking Advisor will either (i) abstain, or (ii) concur (the "Concurrence") with the vote, approval or disapproval of a Manager holding at least 40% of the Class B Units.  The Concurrence will be deemed that of an additional Manager.  All other Managers hereby agree to vote (in person, by proxy or by action by written consent, as applicable) all Units now or hereafter directly or indirectly owned of record or beneficially by such Manager in accordance with the Concurrence and adopt and to execute and deliver all related documentation and take such other action in support of the approved action.

3.7    Unless specifically authorized in writing to do so by the Board pursuant a delegation of its authority under this Agreement, no Member, employee or other agent of the Company shall have any power or authority to bind the Company, in any way, to pledge its credit or to render it liable for any purpose

3.8    Officers.

(a)    Subject to the provisions of the Delaware Act and the Certificate of Formation, the Board may determine from time to time to appoint one or more individuals as officers of the Company. An officer need not be a Member of the Company, and any number of offices may be held by the same person. The officers of the Company shall be a chief executive officer or a president, a secretary, and a chief financial officer. The Company may also have, at the discretion of the Board such other officers as may be designated from time to time by the Board. Unless otherwise specified in resolutions adopted by the Board, if an officer appointed by the Board has a title that is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such offer of the authority and duties that are normally associated with that office.

(b)    The officers shall be appointed by the Board. Each officer, including an officer elected to fill a vacancy, shall hold office at the pleasure of the Board until his or her successor is elected, except as otherwise provided by the Act. Any officer may be removed, with or without cause, at any time by the Board.

**SECTION 4**:  Member Voting Rights.

4.1    Members Are Not Agents. The management of the Company is vested in the Board. No Member, acting solely in the capacity of a Member, is an agent of the Company, and no Member in such capacity may bind or execute any instrument on behalf of the Company.

4.2    Actions of Members. Except as otherwise explicitly provided herein, (i) no action may be taken under this Agreement by the Members as such, whether at a meeting, by written consent or otherwise,

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

and (ii) all effective action is to be taken by the Board. Except as expressly provided in this Agreement, Members will have no voting, approval or consent rights. Members will have the right to approve or disapprove only those matters that are specifically stated in this Agreement to be subject to their approval. Where this Agreement explicitly provides for action by Members, such action may be taken (i) by the affirmative vote of Members entitled to vote and holding Units sufficient to authorize such action taken at a meeting of Members called with at least 48 hours' notice to Members entitled to vote on such action, or (ii) without prior notice and without a meeting, if consents in writing shall be signed by Members holding Units sufficient to authorize such action.

4.3     Matters Requiring Majority Approval.

(a)     The Company shall not, without the prior approval of Class B Members holding Units representing a Unitholder Majority authorize, agree to, or otherwise take any of the actions set forth in **Schedule 2.** The following actions shall not be deemed to contravene Section 4.3(a): Agree to or consummate a Liquidation or Deemed Liquidation Event; create, authorize or issue a new class or series of units other than Class A Units and Class B Units; or issue Units or other equity interests in the Company.

**SECTION 5**:  Limitations on Liability; Indemnification.

5.1     Liability of Members and Managers Generally. Except as otherwise provided in the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be personally liable for any debt, obligation or liability of the Company solely by reason of being a Member or Manager. Except as otherwise expressly required by law, the Member, in its capacity as such, shall have no liability to the Company in excess of the Member's obligations to make payments required to be made by the Member under this Agreement.

5.2     Fiduciary Duties. To the maximum extent permissible under applicable law, the Managers shall not owe fiduciary duties to the Company or its Members.  Notwithstanding the foregoing sentence, in their management of the ordinary operations of the Company's business, the Managers shall exercise reasonable care in the performance of their management duties, which standard of care shall be satisfied by the exercise of the Managers' reasonable business judgment.

5.3     Exculpation. No Member, Manager or officer of the Company shall be liable to the Company or to any other Member, Manager or officer of the Company in damages for any action that such Member, Manager or officer of the Company takes or fails to take in such capacity, unless: (a) such action or failure to act  was undertaken in bad faith or involves gross negligence, intentional misconduct, or a knowing violation of law; and (b) such liability is not limited by other provisions of this Agreement.  No Tie-Breaking Advisor shall be liable to the Company or to any other Member, Manager or officer of the Company in damages for any action that the Tie-Breaking Advisor takes or fails to take in such capacity.

5.4     Indemnification. The Company will indemnify and hold harmless each Person who was or is a Manager, officer, Tie-Breaking Advisor, or attorney acting as legal representative of the Company (each, an "*Indemnified Party*") from and against any and all losses, claims, damages, liabilities, expenses (including reasonable legal and other professional fees and disbursements), judgments, fines, settlements and other amounts incurred (collectively, the "*Indemnification Obligations*") in connection with any and all claims, demands, actions, suits, investigations, or proceedings (civil, criminal, administrative or investigative), actual

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

or threatened, in which such Indemnified Party may be involved, as a party or otherwise, by reason of such Indemnified Party's service to, or on behalf of, or management of the affairs of, the Company, or rendering of advice or consultation with respect thereto, whether or not the Indemnified Party continues to be serving in the above-described capacity at the time any such Indemnification Obligation is paid or incurred. Notwithstanding the foregoing, (i) no indemnification shall be provided by the Company under this Section 5.4 with respect to any Indemnification Obligation that resulted from action or inaction of such Indemnified Party that, in each case, constituted gross negligence or willful misconduct and any indemnity provided under this Section 5.4 shall be provided out of and to the extent of Company assets only, and the Members shall not have personal liability on account thereof.

5.5     Advance of Expenses. To the fullest extent permitted by applicable law, expenses (including reasonable legal fees and other professional fees and disbursements) incurred by an Indemnified Party defending any claim, demand, action, suit or proceeding may, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnified Party to repay such amount if it shall be determined that the Indemnified Party is not entitled to be indemnified as authorized in this Section 5.5.

5.6     Reliance. An Indemnified Party shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnified Party reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements.

5.7     Indemnification Not Exclusive. The indemnification provided by Section 5.7 shall not be deemed to be exclusive of any other rights to which each Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in such Indemnified Party's official capacity and to action in another capacity, and shall continue as to such Indemnified Party who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Company, or any Person granted authority thereby, and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Party.

5.8     Insurance on Behalf of Indemnified Party. The Company shall have the power but not the obligation to purchase and maintain insurance on behalf of each Indemnified Party, at the expense of the Company, against any liability which may be asserted against or incurred by him or her in any such capacity, whether or not the Company would have the power to indemnify the Indemnified Party against such liability under the provisions of this Agreement.

5.9     Amendment of Agreement; Separate Indemnification Agreements. The indemnification provided for in this Section 5.10 shall apply as written here to acts occurring prior to any amendment of this Agreement, notwithstanding such amendment to this Agreement.  The Company may enter into separate agreements providing for the indemnification of Managers, officers or other agents of the Company, on such terms as are from time to time approved by the Board, to the fullest extent permitted by applicable law.

**SECTION 6**:  Distributions.

6.1     Tax Distributions. The Company shall distribute to each Member, on a quarterly basis, no later than 10 days prior to estimated quarterly tax payment due dates for individuals and no later than April 1 of each taxable year of the Company such Member's Tax Distribution Amount. The "**Tax Distribution Amount**" in respect of each Unit means an amount equal to the product of (i) the cumulative net taxable

# **EXHIBIT 4**

income of the Company allocated in respect of (or reasonably estimated to be allocable to) such Unit for the relevant quarter, in excess of any cumulative net taxable loss of the Company allocated in respect of (or reasonably estimated to be allocated to) such Unit through the applicable quarter and (ii) the maximum combined effective federal and state income tax rate (expressed as a percentage) applicable to an individual who is resident in California for such period taking into account deductibility of state taxes against federal income and the character of net taxable income allocated; provided, however, that for purposes of determining the Tax Distribution Amount, any allocation pursuant to Code § 704(c) and the Treasury Regulations promulgated thereunder shall be disregarded. If available cash, as determined by the Board, is insufficient to pay all of the Tax Distribution Amounts due hereunder, then each Member's share thereof shall be reduced by a pro rata amount based on the ratio of such Member's Tax Distribution Amount to all Members' Tax Distribution Amounts. Distributions to a Member under this Section 6.1 shall not be treated as advances against, nor reduce by any amount any distributions otherwise due such Member under, the applicable provisions of Section 6(b) or other applicable provisions of this Agreement relating to distributions.

6.2 **Operating Distributions.** In addition to any distributions required pursuant to Section 6.1, the Company may make distributions of Available Cash and Property at such times and in such amounts as are from time to time as determined by the Board (such distributions "**Operating Distributions**"). Operating Distribution shall be made to the holders of Class B Units in proportion to the number of Class B Units held by them.

6.3 **Distributions of Net Liquidation Proceeds.** Furthermore, upon a Liquidation or a Deemed Liquidation Event, after payment of, or other adequate provision for, the debts and obligations of the Company, including the expenses of its liquidation and dissolution or other transaction expenses, the Company shall distribute the net proceeds or assets available for distribution, whether in cash or in other property ("**Net Liquidation Proceeds**"), to the holders of Units.

(a) All Net Liquidation Proceeds shall be made to holders of Class B Units and Class A Units in proportion to their respective Class B Unit and Class A Unit holdings on a per Unit pro rata basis.

(b) Notwithstanding the foregoing provisions of Section 6(b)(ii), amounts that would otherwise be distributed to any Common Unit that was issued as a Profits Interest shall be reduced by an amount equal to the remaining Profits Interest Threshold Amount for such Common Unit and the amount by which the distribution to such Profits Interest is reduced shall instead be distributed to the holders of Units as provided in the foregoing provisions of this Section 6(b)(ii). Any amount redistributed with respect to a Common Unit as provided in the preceding sentence shall be redistributed only among (i) those Units that were not issued as a Profits Interest and (ii) those Units that were issued as a Profits Interest and have no remaining Profits Interest Threshold Amount.

6.4 **Withholding.** If any federal, foreign, state or local jurisdiction requires the Company to withhold taxes or other amounts with respect to any Member's allocable share of taxable income or any items thereof, or with respect to distributions, the Company shall withhold from distributions or other amounts then due to such Member an amount necessary to satisfy the withholding responsibility and shall pay any amounts withheld to the appropriate taxing authorities. In such a case, for purposes of this Agreement the Member for whom the Company has paid the withholding tax shall be deemed to have received the withheld distribution or other amount due and to have paid the withholding tax directly and such Member's share of cash distributions or other amounts due shall be reduced by a corresponding amount.

# EXHIBIT 4

**SECTION 7**:  Allocations; Certain Tax Matters.

7.1    Allocation of Profits and Losses.

(a)    After taking account of the special allocations of **Exhibit B** to this Agreement, Profits and Losses for each fiscal year or portion thereof shall be allocated among the Members so as to, as nearly as possible, increase or decrease, as the case may be, each Member's Capital Account to the extent necessary such that each Member's Capital Account is equal to the amount that would be made as a distribution to such Member pursuant to Sections 6.2 and 6.3 if the Company were dissolved, its assets sold for cash equal to their Book Value, its liabilities satisfied in accordance with their terms (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and all remaining amounts Distributed to the Members in accordance with Sections 6.2 and 6.3 of this Agreement immediately after making such allocation, minus the sum of (1) such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain, and (2) the amount, if any, that such Member is obligated (or deemed obligated) to contribute, in its capacity as a Member, to the Company; computed immediately prior to the hypothetical sale of Company assets.

(b)    The intent of the foregoing allocation is to comply with Treasury Regulations Section 1.704-1(b) and ensure that the Members receive allocations of Profits and Losses pursuant to this Section 7.1 in accordance with their relative interests in the Company, with the interest of each Member in the Company determined by reference to such Member's relative rights to receive distributions from the Company pursuant to Section s 6.2 and 6.3. If the Capital Accounts of the Members are in such ratios or balances that distributions in the manner set forth in Section s 6.2 and 6.3  would not be in accordance with the positive Capital Accounts of the Members, such failure shall not affect or alter the distributions set forth in Section 6(s 6.2 and 6.3. Instead, the officers of the Company will have the authority to make other allocations of Profits and Losses, or items of income, gain, loss or deduction, among the Members which will result in the Capital Accounts of each Member having a balance prior to such distributions equal to the amount of Distributions to be received by such Member in accordance with Sections 6.2 and 6.3.

7.2    Additional Allocation Provisions. **Exhibit B** sets forth certain additional allocation and other provisions that shall apply as set forth therein.

7.3    Transfer of Units During Taxable Year. In the case of the transfer of a Member's Units or the addition of an additional Member or issuance of Units at any time other than the end of a Fiscal Year, the distributive share of the various items of income, gain, loss, deduction, credit or allowance in respect of the Units so transferred shall be allocated between the transferor and the transferee to take into account the varying interests of the Members during the taxable year in accordance with Code Section 706, using a convention permitted by law and selected by the officers of the Company.

7.4    Tax Matters Member. The Person identified on **Schedule 1** shall be the "tax matters partner" of the Company within the meaning of Code Section 6231(a)(7) (the "Tax Matters Member"), and shall serve as the Tax Matters Member of the Company until its successor is duly designated by the Board (which the Board shall do promptly upon request by such Person or if such Person is no longer a Member). The Tax Matters Member shall cause all other Members to be a "Notice Partner" within the meaning of Section 6231(a)(8) of the Code. The Tax Matters Member shall notify the other Members in writing of all material matters that come to its attention in its capacity as Tax Matters Member. The Tax Matters Member will give the other Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter. The Tax Matters Member shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

Case: 14-30725   Doc# 194-2   Filed: 09/03/14   Entered: 09/03/14 13:49:38   Page 9 of 28

# **EXHIBIT 4**

The Company shall reimburse the Tax Matters Member for its reasonable expenses in connection with the performance of his duties hereunder.

**SECTION 8**: Dissolution, Winding Up and Liquidating Distributions.

8.1     Dissolution Triggers. The Company shall dissolve upon the first occurrence of the following events:

(a)     The determination by a Unitholder Majority that the Company should be dissolved; or

(b)     The entry of a decree of judicial dissolution or the administrative dissolution of the Company as provided in the Delaware Act.

8.2     Winding Up; Termination. Upon a dissolution of the Company, the Board, or, if there are no members of the Board, a court appointed liquidating trustee, shall take full account of the Company's assets and liabilities and wind up the affairs of the Company. The Persons charged with winding up the Company shall settle and close the Company's business, and dispose of and convey the Company's non-cash assets as promptly as reasonably possible following dissolution as is consistent with obtaining the fair market value for the Company's assets.

8.3     Liquidating Distributions. Any distribution in connection with the dissolution and winding up of the Company pursuant to this Section 8 shall be made in accordance with Section 6.3.

**SECTION 9**: Assignment, Transfer Restrictions; Drag-Along Right.

9.1     Restrictions on Transfer.

(a)     No Member may transfer, sell, assign, pledge, encumber, enter into any swap or other arrangement that transfers to another, in whole or in part, or otherwise in any manner dispose of or encumber, whether voluntarily or by operation of law, or by gift or otherwise ("Transfer") any Units held by such Member, or any of the economic consequences of ownership or rights or interests component thereof, unless:

(i)     the Company has given its prior written consent to such Transfer, by resolution duly approved by the Board (which consent may be withheld in its sole discretion); and

(ii)     such Member has otherwise complied with the requirements of this Section 9 and any rights of first refusal, transfer restrictions or other applicable terms of any RUPA or other written agreement then in effect between the Company and such Member (collectively, the "Member Agreements"). If any provision of a Member Agreement conflicts with this Section 9, then this Section 9 shall govern, and the non-conflicting remainder of such Member Agreement shall continue in full force and effect.

9.2     No transferee of a Member's Units (the "Assignee") may be admitted as a Member unless such Assignee becomes a party to and agrees to be bound by this Agreement as a Member by signing a counterpart signature page to this Agreement and executing such other documents and instruments as the Company reasonably may request. Any Transfer made by a Member in contravention of this Agreement shall be null and void and of no effect whatsoever and no Assignee shall have any rights under this Agreement with respect to such transfer, including without limitation the right to vote or participate in any allocations or distributions. Any Member who shall transfer all of its Units in the Company pursuant to Section 9.1shall

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units, except that unless and until the Assignee of such Member is admitted as a Member in accordance with the provisions of Section 2, such transferor Member shall retain the statutory rights and obligations of a transferor under applicable law.

9.3    The requirement for the Company's prior written consent to Transfers contained in subsection 9.1(a)(i) shall not apply to the following transactions:

(a)    any repurchase of Units by the Company (A) from managers, officers, employees, consultants, advisors or other persons performing services for the Company or any subsidiary pursuant to agreements under which the Company has the option to repurchase such shares at cost, , a price agreed in writing, or fair market value upon the occurrence of certain events, such as the termination of employment or services, (B) that are otherwise approved by the Board, or (C) pursuant to the exercise of a right of first refusal of the Company;

(b)    any transfer by a Member to a trust or other legal entity (including a tax-deferred account) for the benefit of Member or Member's spouse or Spousal Equivalent (as defined below), or where all of the equity and other ownership interests of such entity are owned by such Member or by another Person to whom such Member could transfer his, her or its Units without the Company's prior written consent; provided, however, that other members of Member's Immediate Family (as defined below) may also be or become beneficiaries of the trust or other legal entity upon the death of Member and Member's spouse or Spousal Equivalent;

(c)    any transfer(s) to members of a Member's Immediate Family, or a trust or legal entity (including a tax-deferred account) for the benefit of Member's Immediate Family, that in the aggregate (inclusive of any previous transfer(s) by a Member pursuant to this Section 9.3(c) represent less than twenty five percent (25%) of the aggregate Units held by the Member;

(d)    any transfer to a Member's Immediate Family, or a trust or legal entity for the benefit of Member's Immediate Family, effected pursuant to the Member's will or the laws of intestate succession;

(e)    in the case of a Member that is a corporation, partnership, limited liability company or other legal entity, any transfer by such Member to a 100% owned subsidiary, a Person that owns 100% of such Member ("Parent"), or another Person that is 100% owned by a Parent of such Member; and

(f)    any transfer to another Member.

9.4    Further Transfers.  In the case of any Transfer to which the Company has consented or that is permitted under Section 9.3 without Company consent, the Assignee shall receive and hold the Units subject to the provisions of this Section 9, and there shall be no further transfer of such Units except in accordance with this Section 9.

9.5    Transfer Requirements.  As a condition to any Transfer, the Company may, in its sole discretion, (i) require in connection with such Transfer that the transferring Member deliver a written opinion of legal counsel, in form and substance satisfactory to the Company or its legal counsel in their respective discretion, that such Transfer is exempt from applicable federal, state or other securities laws and regulations, and will not subject the Company to laws or regulations that are different or in addition to those that applied to the transferring Member  (a "Legal Opinion"), (ii) charge the transferor, transferee or both an aggregate transfer fee equal to such amount as the Company may reasonably determine in order to recoup its internal and external costs of processing such transfer as determined by the Company's management, due and payable

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

to the Company prior to or upon effectiveness of such Transfer, or (iii) require such transfer to be effected pursuant to a standard form of transfer agreement in such customary and reasonable form as may be determined by the Company's management from time to time in its discretion.

9.6     Effect of Member's Death or Disability. Notwithstanding Section 9.1(a), if a Member who is a natural person dies or is adjudged by a court of competent jurisdiction to be legally disabled or otherwise incompetent to manage such Member's person or property, then Units held by such Member shall be assigned as determined by such Member's executor, trustee, administrator, guardian, conservator or other legal representative (acting in accordance with such Member's will or other applicable binding instructions), and no vote of the Board shall be required in order for the Assignee of such Member's Units to be admitted as a Member.

9.7     Drag Along Right. In the event that the Company's consummation of a Deemed Liquidation Event is approved by both a Unitholder Majority and the Board, then each Member hereby agrees to vote (in person, by proxy or by action by written consent, as applicable) all Units now or hereafter directly or indirectly owned of record or beneficially by such Member in favor of, and adopt, such Deemed Liquidation Event and to execute and deliver all related documentation and take such other action in support of the Deemed Liquidation Event as shall reasonably be requested by the Company in order to carry out the terms and provision of this Section 9.7, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, unit certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents. The obligation of any party to participate in a transaction pursuant to this Section 9.7 shall not apply to a Deemed Liquidation Event, where the other party involved in such transaction is an affiliate of a Member that holds Units representing more than 10% of the outstanding Units of the Company.

9.8     Conversion to Corporation. If both the Board and a Unitholder Majority determine that the conversion of the Company from a limited liability company to a corporation would be advantageous to the Company and its Members, the Members agree to take all actions that the Board determines in good faith to be necessary to effect such conversion, including either the approval of a statutory conversion, a merger of the Company with a newly formed corporation, if applicable, or the contribution of all Units to a newly formed corporation, in each case in exchange for shares of stock in such corporation on a basis which provides to all Members with substantially equivalent ownership interests, economic rights (including liquidation preferences, to the extent then applicable), voting rights and investor protections, if any, as existed immediately prior to such conversion, contribution or merger, as well as provides for the automatic conversion of the preferred stock of such corporation into common stock upon a "Qualifying IPO" (as defined below). A "Qualifying IPO" means a firm commitment underwritten public offering pursuant to an effective registration statement filed under the Securities Act of 1933, as amended, covering the offer and sale of common stock for the account of any successor corporation in which the aggregate public offering price (before deduction of underwriters' discounts and commissions) equals or exceeds Twenty Million ($20,000,000).

9.9     Books and Records; Confidentiality; Publicity.

(a)     Books and Records. The Company shall keep adequate books and records at its principal place of business, which shall set forth an accurate account of all transactions of the Company as well as the other information required by the Act.

(b)     Taxable Year; Accounting Methods. The Company's taxable year shall be the calendar year, and, with respect to the last year of the Company, the period beginning on January 1 and

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# **EXHIBIT 4**

ending with the date of the final liquidating distributions, in each case, unless otherwise required by the Code. The Company shall report its income for income tax purposes using such method of accounting selected by the Board and permitted by law.

9.10    Tax Information. Tax information necessary to enable each Member to prepare its state, federal, local and foreign income tax returns shall be delivered to each Member within sixty (60) days after the end of each Fiscal Year, or as soon as practicable thereafter. Tax information necessary for the Members to make their quarterly estimated tax payments shall be given to the Members as soon as practicable after reasonably requested by the Members.

9.11    Confidentiality. Each Member covenants and agrees that: (a) it will not disclose or make use of any Confidential Information of the Company; and (b) it shall not, directly or indirectly, transmit or disclose any Confidential Information of the Company to any Person and shall not make use of any such Confidential Information, directly or indirectly, for itself or others, without the prior written consent of the Company, except for a disclosure that is required by any law, order or legal process, in which case such Member shall provide the Company prior written notice of such requirement as promptly as practicable so that the Company may contest such disclosure.

9.12    Confidentiality of Business Plan; No Publicity. The Members acknowledge and agree that the Company's business model and business plans constitute Confidential Information of the Company, subject to the obligations described in Section 9.11. Furthermore, each Member agrees not to disclose such Member's investment in the Company on any internet website or online profile, or to otherwise publically announce or disclose such Member's investment in or affiliation with the Company, without Company's prior written consent which Company may withhold in its sole discretion.  Such written consent may be given via email from either Manager, or other form of writing.

**SECTION 10**:  Miscellaneous.

10.1    Entire Agreement. This Agreement, including the schedules and exhibits hereto, together with the other documents and agreements referred to herein, is the entire, final and complete agreement and understanding of the parties hereto relating to the subject matter hereof and supersedes and replaces all prior and contemporaneous agreements and understandings, whether written and oral, by and among the parties or their representatives with respect thereto.

10.2    Governing Law. This Agreement shall be governed by and construed under the laws of the State of Delaware, excluding any conflict of laws rule or principles that might refer the governance or construction of this Agreement to the law of another jurisdiction, and all rights and remedies shall be governed by said laws.

10.3    Dispute Resolution.

(a)    Each Member (a) agrees not to commence any suit, action or other proceeding arising out of or based upon this Agreement (an "**Agreement Dispute**") except in the federal or state courts located in the Northern District of California, (b) hereby irrevocably and unconditionally submits to the jurisdiction of the federal or state courts located in the Northern District of California for the purpose of any such Agreement Dispute, and (c) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# EXHIBIT 4

that this Agreement, or the subject matter hereof and thereof may not be enforced in or by such court; provided the following exceptions:

        (b)    any dispute between a Company and a Member arising out of or relating to matters governed by the RUPA entered into between the Company and such Member (including without limitation any dispute relating to the Company's repurchase of Units pursuant to the terms of the RUPA) shall be governed by the applicable arbitration or other dispute resolution provisions of the RUPA, and (ii) any dispute between a Company and a Member arising out of or relating to such Member's employment or service relationship with the Company or any of its affiliates, such dispute shall be governed by the applicable arbitration or other dispute resolution provisions of the offer letter, employment agreement or consulting or service agreements entered into between the Company (or its affiliates) and such Member; and

        (c)    Manager Disagreement.  The provisions of Section 10.3(a) and (b) do not apply to disagreements between or among the Managers that may be brought to the Tie-Breaking Advisor pursuant to Section 3.6 above, which disagreement shall be resolved by the Tie-Breaking Advisor, unless the Tie-Breaking Advisor directs the Managers to resolve such disagreement as provided in Section 10.3(a) and (b).

    10.4    Benefits of Agreement; No Third-Party Rights. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Member. Nothing in this Agreement shall be deemed to create any right in any person not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third person.

    10.5    Notices. Any notice, request, demand or other communication required or permitted hereunder shall be in writing, shall reference this Agreement and shall be deemed to be properly given when delivered personally or one (1) business days after delivery or attempted delivery by an internationally recognized overnight courier service addressed (a) if to a Member, to the Member's address as set forth on **Exhibit A** hereto (or to such other address as such Member may designate to the Company and all other Members in accordance with this Section 10.5) or (b) if to the Company, at the Company's principal place of business located at Corporation Trust Center, 1209 North Orange Street, Wilmington, Delaware 19801 (or, if later changed, as the Company may from time to time notify the Members in accordance with this Section 10.5).

    10.6    Counterparts; Electronic and Facsimile Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. Such executions may be transmitted to the Company or the other Members by facsimile or by confirmed electronic signature enabled by a prominent national digital signature company (such as Docusign, or Echosign) and such execution and transmission has the full force and effect of an original signature. All fully executed counterparts, whether original executions or facsimile executions or a combination, shall be construed together and shall constitute one and the same agreement.

    10.7    Amendments. This Agreement may be amended by the written consent of Members holding at least a Unitholder Majority; provided, however, that, without any requirement for written consent of the Members, this Agreement may be amended to admit additional persons or entities as Members and holders of Units as provided in Section 2. Any amendment effected in accordance with this Section 10.7 shall be binding upon each Member, each permitted successor or assignee of a Member, and the Company.

(signature page follows)

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

# EXHIBIT 4

IN WITNESS WHEREOF, the parties hereto are signing this Limited Liability Company Agreement as of the date first above written.

**MEMBER, CLASS B COMMON UNITS**

SIMON BARBER

*(Print name)*

*(Signature)*

_____

*(Print name of signatory, if signing for an entity)*

_____

*(Print title of signatory, if signing for an entity)*

## EXHIBIT 4

IN WITNESS WHEREOF, the parties hereto are signing this Limited Liability Company Agreement as of the date first above written.

**MEMBER, CLASS B COMMON UNITS**

_EDWARD T. DE CASTRO_
(Print Investor name)

_(signature)_
(Signature)

_____
(Print name of signatory, if signing for an entity)

_____
(Print title of signatory, if signing for an entity)

# EXHIBIT 4

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**MANAGER:**

**HASHFAST LLC**
a Delaware limited liability company

By: _____

Name: Eduardo de Castro
Title: Chief Executive Officer

SIGNATURE PAGES

LLC AGREEMENT WITH CLASS A AND B COMMON UNITS

## <span style="color:blue">EXHIBIT 4</span>

      IN WITNESS WHEREOF, the parties hereto are signing this Limited Liability Company Agreement as of the date first above written.

**MEMBER, CLASS A COMMON UNITS**

_____
(*Print name*)

_____
(*Signature*)

_____
(*Print name of signatory, if signing for an entity*)

_____
(*Print title of signatory, if signing for an entity*)

# **EXHIBIT 4**

**EXHIBIT A**

**CERTAIN DEFINITIONS**

"Available Cash and Property" means (A) all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions and cash funds obtained from loans to the Company) after payment of or provision for (i) all accrued operating expenses of the Company as of such time, (ii) all outstanding and unpaid current obligations of the Company as of such time, and (iii) a working capital reserve determined necessary or appropriate by the Board, and (B) virtual currency or other property acquired by the Company that the Board determines to be appropriate for distribution; provided, however, that the Company will obtain the approval of a Unitholder Majority before making any non-cash distributions. The distribution of any virtual currency or other non-cash assets shall be made on the basis of the fair market value of such assets as of the date of distribution, as determined by the Board in good faith.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor federal revenue law.

"Confidential Information" shall mean all information regarding the Company, the Company's activities, the Company's business, clients or customers. Notwithstanding the foregoing, Confidential Information shall not include information that (i) has become generally available to the public by the act of one who has the right to disclose such information without violating any legal right or contractual right of the Company, (ii) becomes available to a third-party without violating any Company right of confidentiality, (iii) was previously known by the recipient without violation of any Company right of confidentiality, or (iv) was independently developed by the recipient without recourse to Confidential Information.

"Deemed Liquidation Event" means (a) any merger, consolidation, recapitalization or sale of the Company, transfer of Units or other transaction or series of transactions in which the Members existing immediately prior to such transaction do not own and control a majority of the voting power represented by the outstanding equity of the surviving entity after the closing of such transaction, or (b) a sale, exclusive license or other transfer or disposition of all or substantially all of the Company's assets (determined on a consolidated basis) to any Person.

"Immediate Family" means a Member's spouse or Spousal Equivalent, the lineal descendant or antecedent, brother or sister, of such Member or such Member's spouse or Spousal Equivalent, or the spouse or Spousal Equivalent of any lineal descendant or antecedent, brother or sister of such Member, or such Member's spouse or Spousal Equivalent, whether or not any of the above are adopted.

"Liquidation" shall mean any liquidation, dissolution or winding up, voluntary or involuntary, of the Company.

"Members" shall refer collectively to the Persons listed on Schedule 1 hereto as Members and to any other Persons who are admitted to the Company as Members or who become Members under the terms of this Agreement until such Persons have ceased to be Members under the terms of this Agreement. "Member" shall mean any one of the Members.

"Person" shall mean any natural person, partnership, trust, estate, tax-deferred account, association, limited liability company, corporation, custodian, nominee, governmental instrumentality or agency, body politic or any other entity in its own or any representative capacity.

B-1

# <u>EXHIBIT 4</u>

"Profits Interest" shall mean a Common A Unit that is issued with a Profits Interest Threshold Amount (which may be zero) fixed on the date of issuance and is designated as a Profits Interest by the Board. A Common Unit with a Profits Interest Threshold Amount that is designated as a "Profits Interest" is intended to meet the definition of a "profits interest" in Internal Revenue Service Revenue Procedures 93-27 and 2001-43. A Profits Interest shall be treated as a Common Unit for all purposes of this Agreement except for adjustments of amounts distributable with respect to such Profits Interest as provided in Section 6.3(c).

"Profits Interest Threshold Amount" for a Common Unit issued as a Profits Interest shall mean an amount equal to the amount that would be distributed in respect of a Common A Unit that has no Profits Interest Threshold Amount, if, immediately after the Profits Interest is issued, the Company were to liquidate completely and in connection with such liquidation (i) sell all of its assets at their fair market values as determined by the Board, (ii) settle all of its liabilities to the extent of the available assets of the Company (but limited, in the case of nonrecourse liabilities, to the value of the property securing such liability), and (iii) each Member were to pay to the Company at that time the amount of any obligation then unconditionally due to the Company, and then the Company were to distribute any remaining cash and other proceeds to the holders of Units in accordance with the distribution provisions of Sections 6.2 and 6.3; provided, however, the Profits Interest Threshold Amount shall not be less than zero dollars ($0). The Board shall have the discretion to set any Common Unit's Profits Interest Threshold Amount to equal an amount that is greater than the amount determined in the prior sentence. The Profits Interest Threshold Amount of a Common Unit issued as a Profits Interest shall be reduced (but not below zero dollars ($0)) dollar-for-dollar by the amount by which distributions with respect to such Common Unit were previously reduced by reason of the existence of the Profits Interest Threshold Amount.

"Spousal Equivalent".  A person is deemed to be a "Spousal Equivalent" of a Member if either (A) the person is a registered domestic partner under applicable state law or (B) provided the following circumstances are true: (i) irrespective of whether or not the relevant person and the Spousal Equivalent are the same sex, they are the sole spousal equivalent of the other for the last twelve (12) months, (ii) they intend to remain so indefinitely, (iii) neither are married to anyone else, (iv) both are at least 18 years of age and mentally competent to consent to contract, (v) they are not related by blood to a degree of closeness that which would prohibit legal marriage in the state in which they legally reside, (vi) they are jointly responsible for each other's common welfare and financial obligations, and (vii) they reside together in the same residence for the last twelve (12) months and intend to do so indefinitely.

"Tie-Breaking Advisor" is identified in **Schedule 1**, as the Members of Class B Units may replace by Unitholder Majority, or in the absence of such replacement after such Advisor has resigned or become unavailable, then the individual Person designated by such Advisor in writing.

"Treasury Regulations" means the final and temporary Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unitholder Majority" means either: (a) the vote or approval of a majority of the Members that each hold  at least 40% of the Class B Units then outstanding, voting together as a single class in which each such Member gets one vote (and not one vote per Class B Unit); or (b) if the vote or approval described in the preceding clause (a) results in a tie or deadlock, then the vote or approval of the Tie-Breaking Advisor together with the vote or approval of those Member(s) that each hold at least 40% of the Class B Units with whom the Tie-Breaking Advisor concurs.

Case: 14-30725    Doc# 194-2    Filed: 09/03/14    Entered: 09/03/14 13:49:38    Page 20 of 28

# **EXHIBIT 4**

**Exhibit B**

**Special Tax Allocation and Capital Account Maintenance Rules**

**Section B1. Additional Allocation Provisions.**

(a) Limitations on Loss Allocation. Losses allocated to a Member pursuant to Section 7.1 shall not exceed the maximum amount of Losses that can be allocated without causing a Member to have a deficit in his, her or its Adjusted Capital Account at the end of any fiscal year. In the event that any Member would have a deficit in his Adjusted Capital Account as a consequence of an allocation of Losses pursuant to Section 7.1, the amount of Losses that would be allocated to such Member but for the application of this Section B1(a) shall instead be allocated to the other Members to the extent that such allocations would not cause such other Members to have deficits in their Adjusted Capital Accounts. To the extent no Member can be allocated Losses without such allocation causing such Member to have a deficit in his Adjusted Capital Account, such Losses shall be allocated as if this Section B1(a) were not in effect. Any allocation of items of income, gain, loss, deduction or credit pursuant to this Section B1(a) shall be taken into account in computing subsequent allocations pursuant to Section 7.1, and prior to any allocation of items in such Section so that the net amount of any items allocated to each Member pursuant to Section 7.1 and this Section B1(a) shall, to the maximum extent practicable, be equal to the net amount that would have been allocated to each Member pursuant to the provisions of Section 7.1 and this Section B1(a) if such allocation under this Section B1(a) had not occurred.

(b) Special Allocations. The following special allocations of this Section B1(b) shall be made prior to the allocations required under Section 7.1 and in the following order:

(i) Company Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Agreement, if there is a net decrease in Company Minimum Gain during any Company fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Section 1.704-2(g) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section B1(b)(i) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

(ii) Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any provision of the Agreement to the contrary, and subject to the exceptions set forth in Section 1.704-2(i)(4) of the Treasury Regulations, if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Company fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Section 1.704-2(i)(4) of the Treasury

Case: 14-30725   Doc# 194-2   Filed: 09/03/14   Entered: 09/03/14 13:49:38   Page 21 of 28

# [EXHIBIT 4](#)

Regulations. This Section B1(b)(ii) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(iii)     Qualified Income Offset. Any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) that causes a deficit in its Adjusted Capital Account shall be allocated items of income and gain in an amount and a manner sufficient to eliminate, to the extent required by the Treasury Regulations, such deficit balance as quickly as possible, provided that an allocation pursuant to this Section B1(b)(iii) shall be made if and only to the extent that such Member would have a deficit in its Adjusted Capital Account after all other allocation provided for in this **Exhibit B** with respect to such fiscal year have been tentatively made as if this Section B1(b)(iii) were not in effect. This Section B1(b)(iii) is intended to comply with the alternate test for economic effect set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in a manner consistent therewith.

(iv)     Nonrecourse Deductions. Nonrecourse Deductions shall be allocated to the Members in proportion to the number of Units then held by such Member.

(v)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any taxable year shall be allocated to the Member(s) bearing the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(vi)     Code Section 754 Adjustments.  To the extent an adjustment to the adjusted basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Sections 1.704-1(b)(2)(iv)(m)(2) or (4) to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulation Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event that Treasury Regulation Section 1.704- 1(b)(2)(iv)(m)(4).

(c)     Tax Allocations; Application of Code Section 704(c).

(i)     Except as set forth in Section B1(c)(ii), all income, gains, losses and deductions of the Company shall be allocated, for U.S. federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts.

(ii)     Income, gain, loss, deduction, and items thereof attributable to property contributed to the Company by a Member, and Company property that has been revalued pursuant to Section B2(b) shall for income tax purposes be shared among the Members so as to take into account any variation between the basis of the property and the fair market value of the property at the time of contribution or revaluation in accordance with the requirements of Section 704(c) of the Code and the applicable Treasury Regulations thereunder. Such Section 704(c) allocations shall be made using the traditional method, as described in Treasury Regulations Section 1.704-3(b), in such manner as the Board determines.

# EXHIBIT 4

**Section B2. Capital Accounts.**

(a)     Capital Account Maintenance. The Capital Accounts of the Members shall be maintained in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited (A) such Member's Capital Contributions, (B) such Member's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Section B1(a) or B1(b), and (C) the amount of any Company liabilities assumed by such Member or that are secured by any Company asset distributed to such Member. The principal amount of a promissory note that is not readily traded on an established securities market and that is contributed to the Company by the maker of the note (or a Member related to the maker of the note within the meaning of Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations) shall not be included in the Capital Account of any Member until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Section 1.704-1(b)(2)(iv)(d)(2) of the Treasury Regulations,

(ii)     To each Member's Capital Account there shall be debited (i) the amount of money and the Book Value of any asset distributed to such Member pursuant to any provision of this Agreement, (ii) such Member's distributive share of Losses and any items in the nature of expenses or losses that are specially allocated pursuant to Section B1(a) or B1(b), and (iii) the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company, and

(iii)     In determining the amount of any liability for purposes of subparagraphs (i) and (ii) above there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Members), the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 6(b)(ii) hereof upon the dissolution of the Company. The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(q) of the Treasury Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Treasury Regulations.

(b) Book Value and Revaluation of Company Property. "Book Value" means, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Book Value of Contributed Property shall be its Agreed Value.

(ii)     The Book Value of all Company assets shall, solely if the Board deems it appropriate, be adjusted to equal their respective gross fair market values, as determined by the Board in accordance with Code Section 7701(g), as of the following times:

# <u>EXHIBIT 4</u>

(A)     the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution (as the term "de minimis" is used in Treasury Regulation Section 1.704-1(b)(2)(iv)(f)) or in exchange for services (if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the economic interests of the Members);

(B)     the distribution by the Company to a retiring or continuing Member as consideration for Units in the Company of more than a de minimis amount of money or other Company property (if the Board reasonably determines that such adjustment is necessary or appropriate to reflect the economic interests of the Members); and

(C)     the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g).

(iii) (A)  If the Book Value of an asset has been determined or adjusted pursuant to Section B2(b)(ii)(A) or (B) of this **Exhibit B**, such Book Value shall thereafter be adjusted for the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(B)     If the Book Value is adjusted as required or permitted under this

Agreement, the Member' respective Capital Accounts shall also be adjusted to reflect the adjustments to the Book Value of such assets in accordance with Treasury Regulations Section 1.704-1(b)(2)(iii)(g).

(C)     Where the Book Value of Company property may, but is not required to, be revalued, the decision of whether to revalue the Company property and the Members' Capital Accounts, and the amount of any such adjustments shall be determined by the Board using such reasonable methods of valuation as the Board may adopt.

(c)     Effective Termination Under Code Section 708(b)(1)(B). A transferee of

all or part of a Member's Units will succeed to the Capital Account (or portion thereof) relating to the interest transferred; provided, however, that if the transfer causes a termination of the Company under §708(b)(1)(B) of the Code, the Company properties shall be deemed to have been contributed to a new limited liability company in exchange for all of the interests in such new limited liability company, which interests will then be deemed to be distributed in liquidation of the Company to the Members (including the transferee of an interest). The Capital Accounts of such new limited liability company shall be maintained in accordance with the principles set forth herein, the Agreement will apply to such new limited liability company, and all references herein to the Company will become references to the new limited liability company.

(d)     Code Section 743 Adjustment. Except as is required by the Treasury Regulations, the Capital Account to which a transferee member succeeds pursuant to a Disposition shall not be adjusted to reflect any basis adjustment under Code Section 743.

Section B3. Definitions.

The capitalized words and phrases used in this **Exhibit B**, if not otherwise defined in the Agreement, shall have the following meanings (such meanings shall be equally applicable to both the singular and plural forms of such words and phrases):

Case: 14-30725   Doc# 194-2   Filed: 09/03/14   Entered: 09/03/14 13:49:38   Page 24 of 28

# <u>EXHIBIT 4</u>

(a)     "Adjusted Capital Account" shall mean the balance in the Capital Account of a Member as of the end of the relevant fiscal year of the Company, after giving effect to the following: (i) credit to such Capital Account of any amounts the Member is obligated to restore, pursuant to the terms of the Agreement, the Contribution Agreement or otherwise, or is deemed obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, and (ii) debit to such Capital Account of the items described in Sections 1.704-1(b)(2)(ii)(d)(4),(5) and (6) of the Treasury Regulations.

(b)     "Agreed Value" means the fair market value of Contributed Property as agreed to by the contributing Member, the other Members and the Company, using such reasonable method of valuation as they may adopt. However, if the value of any Contributed Property is redetermined by any federal or state agency or by any federal or state court having jurisdiction over the Company or the Members, the value set forth in this Agreement shall be modified and amended to reflect the value ultimately determined by said agency or court.

(c)     "Company Minimum Gain" has the meaning given to the term "Partnership Minimum Gain" as set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Treasury Regulations, and any Member's share of Company Minimum Gain shall be determined in accordance with Treasury Regulations Section 1.704-2(g)(1).

(d)     "Contributed Property" means any asset (excluding services and cash) contributed by a Member to the Company.

(e)     "Depreciation" means, for each taxable year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction, as computed for federal income tax purposes, allowable with respect to an asset of the Company for such year or other period, except that if the Book Value of a Company asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio at such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such period is zero, Depreciation shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board.

(f)     "Member Nonrecourse Debt" has the meaning given to the term "Partner Nonrecourse Debt" as set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

(g)     "Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, determined in the same manner as "Partner Nonrecourse Debt Minimum Gain" would be determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

(h)     "Member Nonrecourse Deductions" has the meaning given to the term "Partner Nonrecourse Deductions" as set forth in Section 1.704-2(i)(2) of the Treasury Regulations. For any Company taxable year, the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt equal the net increase during the year, if any, in the amount of Member Nonrecourse Debt Minimum Gain reduced (but not below zero) by proceeds of the liability that are both attributable to the liability and allocable to an increase in the Member Nonrecourse Debt Minimum Gain.

(i)     "Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations. The amount of Nonrecourse Deductions for a Company fiscal year equals the excess, if any, of the net increase, if any, in the amount of Company Minimum Gain during that fiscal year over the aggregate

B-7

# EXHIBIT 4

amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Company Minimum Gain, determined according to the provisions of Section 1.704-2(c) of the Treasury Regulations.

       (j)    "Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

       (k)    "Profits" and "Losses" means for each taxable year or other period an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

       (i)    any income of the Company that is exempt from federal income tax shall be added to such taxable income or loss;

       (ii)    any expenditures of the Company not deductible in computing its taxable income and not properly chargeable to capital account (as described in and within the meaning of Code Section 705 (a)(2)(B)) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) shall be subtracted from such taxable income or loss;

       (iii)    in lieu of depreciation, amortization and other cost recovery deductions taken into account for federal income tax purposes, there shall be taken into account Depreciation for such year or other period, computed in accordance with the definition of Depreciation set forth above;

       (iv)    any items that are specially allocated to a Member pursuant to Sections B1 shall not be taken into account in determining Profits and Losses; and

       (v)    for purposes of determining Profit or Loss upon the sale or other disposition of Company property, then in accordance with the Treasury Regulations under Code Section 704(b), the value of an asset properly reflected on the Company's books at the time of sale or other disposition shall be substituted for the property's adjusted tax basis if at the time of sale or disposition there is a variance in such value and adjusted tax basis.

Except as may be otherwise provided in this Agreement, all items that are components of Profits and Losses shall be divided among the Members in the same ratio as they share Profits and Losses.

Case: 14-30725   Doc# 194-2   Filed: 09/03/14   Entered: 09/03/14 13:49:38   Page 26 of 28

# **EXHIBIT 4**

**SCHEDULE 1**

**MANAGERS, MEMBERS AND TAX MATTERS MEMBER**

| Managers | Tie-Breaking Advisor |
|---|---|
| Eduardo R. de Castro | Roy Petrushka |
| Simon Barber | |

| Officers | Tax  Matters Member |
|---|---|
| Eduardo R. de Castro,<br>Chief Executive Officer | Simon Barber |
| Simon Barber,<br>Chief Technology Officer | |

Members

| Class B Common Unit<br>Holder | Units | % | Price* |
|---|---|---|---|
| **Total Class B Units** | | 100.00% | |

| Class A Common<br>Holder | Units | % | Price* |
|---|---|---|---|
| | | 0% | |

**End of Schedule 2**

# EXHIBIT 4

## SCHEDULE 2: REQUIRED CONCURING VOTES

1.      Amend this Agreement.

2.      Agree to or consummate a Liquidation or Deemed Liquidation Event.

3.      Create, authorize or issue a new class or series of units.

4.      Issue Units or other equity interests in the Company.

5.      Remove or replace the Tie-Breaking Advisor.

6.      Make a distribution to Members or agree to make a distribution to Members.

7.      Create, authorize, or issue any debt security in excess of $500.

8.      Sell, lease, transfer, exclusively license or otherwise dispose of a material asset of the Company.

9.      Increase or decrease the number of Managers.

10.    Amend the Board resolutions regarding the opening of bank accounts, writing of checks, transferring deposited amounts, and issuing checks.

11.    Amend this **Schedule 2**.

**End of Schedule 2**