1  UNITED STATES BANKRUPTCY COURT

2  NORTHERN DISTRICT OF CALIFORNIA

3  (SAN FRANCISCO DIVISION)

4

5  In re:

6  HASHFAST TECHNOLOGIES LLC, a          Case No. 14-30725
   California limited liability
7  company,                             Chapter 11

8                                        San Francisco,California
                                         July 7, 2014
9                                        11:01 a.m.
            Debtor.
10  _____/

11
                    TRANSCRIPT OF PROCEEDINGS
12      MOTION TO AMEND STIPULATION AND FURTHER ORDER WITH
    RESPECT TO EMERGENCY MOTION OF LIQUIDBITS CORP. FOR ENTRY
13   OF AN ORDER APPOINTING A CHAPTER 7 TRUSTEE PURSUANT TO
    SECTION 303(g) OF THE BANKRUPTCY CODE OR FOR ALTERNATIVE
14      RELIEF FILED BY HASHFAST TECHNOLOGIES LLC

15
               BEFORE THE HONORABLE DENNIS MONTALI
16              UNITED STATES BANKRUPTCY JUDGE

17

    APPEARANCES:
18

19  Proposed Counsel for        BAKER & HOSTETLER LLP
    Official Unsecured          BY: ASHLEY McDOW, ESQ.
20  Creditors' Committee:       11601 Wilshire Boulevard #1400
                                Los Angeles, California 90025
21

22  For the Debtor:             KATTEN, MUCHIN, ROSENMAN LLP
                                BY: JESSICA M. MICKELSON, ESQ.
23                              2029 Century Park East #2600
                                Los Angeles, California 90067
24
                                (Appearing Telephonically)
25

```
 1  APPEARANCES (CONTINUED):

 2  For Koi Systems:            WEILAND, GOLDEN LLP
                                BY: JEFFREY I. GOLDEN, ESQ.
 3                              650 Town Center Drive Suite 950
                                Costa Mesa, California 92626
 4
                                (Appearing Telephonically)
 5

 6  For creditors:             GALLO LLP
                                BY: RAY E. GALLO, ESQ.
 7                              1299 Fourth Street, Suite 505
                                San Rafael, California 94901
 8
                                (Appearing Telephonically)
 9

10  For Liquidbits Corp.:      BINGHAM McCUTCHEN LLP
                                BY: EDWIN F. SMITH, ESQ.
11                              399 Park Avenue
                                New York, New York 10022
12
                                (Appearing Telephonically)
13

14
    Court Recorder:            JANE GALVANI
15                              UNITED STATES BANKRUPTCY COURT
                                235 Pine Street
16                              San Francisco, California 94104

17

18  Transcription Service:     Jo McCall
                                Electronic Court
19                              Recording/Transcribing
                                2868 E. Clifton Court
20                              Gilbert, Arizona 85295
                                Telephone: (480)361-3790
21

22

23

24

25
```

P R O C E E D I N G S

July 7, 2014                                    11:01 a.m.

-–—oOo—-–

THE CLERK: Line Item No. 1, <u>Hashfast Technologies</u>
<u>LLC.</u>

THE COURT: All right.  We'll start with the
courtroom appearance.

MS. McDOW: Good morning, Your Honor, Ashley
McDow, Baker & Hostetler, proposed counsel for the Official
Unsecured Creditors' Committee.

THE COURT: All right.  On the phone, please.

MS. MICKELSON: Good morning, Your Honor, Jessica
Mickelson.  Can you hear me, Your Honor?

THE COURT: Yes, I got you, Ms. Mickelson.  Good
morning.

MS. MICKELSON: Okay.  Jessica Mickelson appearing
on behalf of Hashfast, and I also have on the phone for the
purpose of listening, our client Monica Hushen.

THE COURT: All right.  Good morning.  Who else?

MR. GOLDEN: Good morning, Your Honor, Jeffrey
Golden of Weiland, Golden, Smiley, Wang, Ekvall on behalf
of Koi Systems.

THE COURT: All right.  Good morning.  Anyone
else?  Mr. Smith?

MR. GALLO: Good morning, Ray Gallo.

1            THE COURT: Why don't I go down the list.  Okay,

2    Mr. Gallo, got you.  And Mr. Smith, are you there?

3            MR. SMITH: I'm here, Your Honor.  Good morning.

4            THE COURT: And is Mr. Siddiqui on the phone?

5            MS. MICKELSON: Mr. Siddiqui is not on the phone.

6    He is on vacation.

7            THE COURT: Right.  Well, I have him on the call-

8    in list.  All right.  Anyone else who wants to make an

9    appearance?  All right, well where are we Ms. Mickelson?

10            MR. PAGE: Good morning, Your Honor.  (Inaudible.)

11            THE COURT: All right.  Thank you, both.  All

12    right.  Ms. Mickelson, what's the story?

13            MS. MICKELSON: Yes, Your Honor.  We have been

14    discussing with certain of the creditors, including

15    Liquidbits' counsel and Ray Gallo and his clients, and we

16    recently sent a revised stipulation to Ashley and the

17    Creditors' Committee this morning, although I don't know if

18    she's had a chance to review it, on proposed terms to

19    resolve the motion that we have pending so that we can sell

20    certain inventory that is specified in the stipulation in

21    order for our client to survive during this period before a

22    transaction is approved with the Court for a sale.  And we

23    actually do have a term sheet now for approval of the

24    transaction which we expect to –- you know, we hope to get

25    approved by the end of the month.  But in the meantime,

1  this inventory is necessary to be able to sell for our

2  client to meet its, you know, budgetary operating expenses.

3  If any monies are made above that, they would of course go

4  into the debtor-in-possession account and be disclosed in

5  monthly operating reports.

6          We also will provide bi-weekly schedules to

7  account for disbursements and in the future to meet the

8  operating expenses.  And more immediately, our client

9  actually has a sale lined up for 600 chips to be sold that

10  will accrue or bring in 105,000 for the estate.  So we have

11  to have this approved today, otherwise we may lose it.  And

12  this is sort of an ongoing concern that, you know, if we

13  don't have approval to be able to go forward with this on

14  the limitations that we have in the stipulation, then we're

15  going to lose the ability to operate during this period,

16  you know, maintain the status quo, and potentially lose

17  value as this case progresses.

18          THE COURT: And what's your --

19          MS. MICKELSON: And there are a couple of other

20  issues --

21          THE COURT: You made reference earlier in your

22  statement about a term sheet.  That's a term sheet for a

23  bigger disposition.

24          MS. MICKELSON: Yes, Your Honor, and this is with

25  Liquidbits; it's something that's been negotiated.  We

1  finally were able to resolve issues in the term sheet.  I

2  did a final for approval this past weekend, and as far as I

3  know, an emergency motion will be brought to have this

4  approved by end of month.

5          THE COURT: A 363 sale?

6          MS. MICKELSON: Yes.

7          THE COURT: Okay.  All right.  Well, I stopped

8  you.  Did you want to raise these other points, or do you

9  want me to ask --

10          MS. MICKELSON: You know, the other points,

11  actually I can wait to raise depending on objections and

12  comments of other counsel, so I feel like I probably

13  (unintelligible).

14          THE COURT: Well, Ms. McDow, I guess we should

15  start with the Committee.  Is the Committee on board with

16  the stip now?

17          MS. McDOW: We're not, Your Honor.  And also, Your

18  Honor, present in court with me is Mr. Edgeworth who's the

19  chair of the Committee and also Mr. Delaglio (Phonetic) of

20  Provence who is -- you should receive today, Your Honor, a

21  motion for the Committee to employ a financial consultant,

22  and he's a representative from Provence.

23          THE COURT: Okay.

24          MS. McDOW: Your Honor, we have decided -- we have

25  gone back and forth, had many Committee meetings, and quite

1  frankly, there is nothing operating, and the budget is only

2  to pay approximately $200,000 in payroll.  There is no rent

3  being paid.  There's no operating expenses being paid.

4  Presumably, there was prepaid rent which is why it's not

5  included in here.  As far as we can --

6         THE COURT: Well, I mean that's a good thing;

7  isn't it?

8         MS. McDOW: Except that nothing is being operated

9  except that employees are being paid, and these are the

10 same employees who were there before who weren't able to

11 operate it efficiently.  It is still Eduardo who is the

12 person of most concern for the Committee, certainly is

13 getting paid.  We tried to have very open discussions.  All

14 of us were on the call, with Debtor's counsel, to try and

15 find out a few things.  What is the income that's being

16 generated?  I don't know how we make an informed decision

17 about whether to approve 200,000 in payroll without knowing

18 the income, and they wouldn't give it to us.

19        We wanted to know what the gross profits were

20 that were being made by the sales staff.  They didn't have

21 those numbers ready for us.  If we look at what we have to

22 rely on, which is the SOFA, it shows that about 1.2 million

23 was made before the petition date, which means if $200,000

24 is being paid in payroll alone, we're going to be operating

25 at a deficit with not a single dime for unsecured

1  creditors.  We explored an alternative, which is, can you

2  have a reserve for unsecured creditors each month, which

3  is, you know, something nominal.  They weren't interested

4  in entertaining that.

5         So from our point of view, Your Honor, we are the

6  only parties, so to speak, with anything at stake here.

7  There is no reassurance for the Committee at all to offer.

8  All it does is insure that $200,000 goes to employees who

9  the Committee is concerned caused the problems we're in.

10  Inventory goes --

11         THE COURT: Well, but this is post-petition labor,

12  though, right?

13         MS. McDOW: Your Honor, I believe so, but we don't

14  know the other issues.  We don't know what they're doing.

15  It's engineers who are at least $60,000 a month, and if

16  there's going to be a 363 sale in two weeks, why are we

17  paying engineers $60,000 a month.  It just all doesn't add

18  up, and the Committee is prepared to just sit on the chips,

19  Your Honor, and they are ready for the next month.  There

20  are no operations that need to be done.  If there's a

21  363 --

22         THE COURT: So the Committee doesn't want me to

23  approve this 600 chip sale that's on board today?

24         MS. McDOW: And Your Honor, with the 600 chips,

25  not only is that something we don't approve, it's $120 less

1   a chip than was in the price list they proposed to us.  So

2   it's a chip far below market value, and even a value that

3   we almost agreed to.  It's well below even on the price

4   list that's been given to the Committee.  And we do not.

5   And we'd ask that Your Honor put it on regular notice.

6   We're going to have an emergency motion for a Trustee,

7   hopefully today or tomorrow.  We also are doing a couple of

8   2004 exams.  You'll have the motions before Your Honor

9   probably by close of business today as well, although we

10  need to shoot out a meet and confer.

11          We -- you know, again, the Committee has looked

12  at their alternatives.  One is they approve this; 200,000

13  goes out the door along with inventory, or they sit on it

14  for a period of time while they take discovery and see

15  what's going on, and if it depreciates in this time, it's

16  the Committee's -- it's the unsecured creditors' risk to

17  bear, and we've had lots of informed discussions about it,

18  and unanimously they're ready to do that, and they know

19  their obligations to the other unsecured creditors of the

20  estate.  I've told them every which way from Sunday;

21  they're comfortable with it, and they are much more

22  comfortable waiting this out, giving it again, a 21-days

23  notice.  There's no operations here.  The only thing being

24  paid is payroll, and --

25          THE COURT: Well, but you keep saying that as

1 though I can ignore that. I mean I don't know if we have

2 low level people that are expected to get paid. California

3 law requires that they be paid. I mean if they're not

4 paid, it's an administrative expense. You don't really

5 think I can go back and unring the bell if people have

6 performed labor.

7 MS. McDOW: Of course not, Your Honor. It would

8 be for services going forward.

9 THE COURT: Well, but I thought that -- I'm

10 confused. The motion is to amend the stipulation to give

11 the Debtor more freedom to make sales. Are you saying

12 that -- and maybe I'm just missing something -- do you

13 doubt that the Debtor can pay payroll today or whenever

14 it's due to people that have performed work already?

15 MS. McDOW: I have no -- Your Honor,

16 unfortunately, I have no understanding of what they can do

17 because they won't give us an income stream. We don't have

18 any information at all.

19 THE COURT: Well no, but I'm focusing on what they

20 are legally permitted to do. Obviously they can't pay

21 payroll if they don't have any money, but if they have

22 money, is the existing order -- it doesn't prohibit them

23 from maintaining current expenses, right?

24 MS. McDOW: You're absolutely right, Your Honor.

25 To the extent that they are a Chapter 11 debtor in

1  possession, they have the ability to operate in the

2  ordinary course.  The issue is, the stipulation that

3  they're trying to amend now doesn't allow for certain

4  sales, and that's what we're here trying to deal with.

5          THE COURT: Right.  Right.

6          MS. McDOW: So, again, I think we are -- we don't

7  want to -- to the extent that services have already been

8  provided, they have an obligation to pay; it's going to be

9  an admin expense anyway.  It's not something we're

10  interested in doing, but we are interested in essentially

11  shutting down the company for the next month while we are

12  able to get formal discovery.  It seems like it's the only

13  way we're going to be able to do anything here, while we

14  evaluate the sale proposal, which at first blush is

15  something we're not even going to be remotely interested

16  in, and while we figure out what is really going on here,

17  because to say they have been less than forthright is an

18  understatement I think.

19          THE COURT: Has the Committee seen the term sheet

20  that Ms. Mickelson referred to?

21          MS. McDOW: We have, Your Honor.  We have.

22          THE COURT: And you don't support it at this

23  point?

24          MS. McDOW: Not even -- not one part of it do we

25  support, Your Honor.

1          THE COURT: Okay.

2          MS. McDOW: Because we don't have –- here's the

3  real truth.  It seeks to give away avoidance actions; it

4  seeks to do, you know, sell the IP, all of these things for

5  a cap of six million dollars to the estate, and we don't

6  have any understanding at all what the avoidance actions

7  are worth, what the IP is worth.  The inventory alone we

8  know is worth more than six million.  So to us, it's not a

9  deal we're interested in.  Are we interested in putting it

10 for sale potentially?  Yes, but we want a real marketing

11 process.  This is, one again, it doesn't entertain

12 overbids.  There's nothing about this, you know, and to

13 have it, again, to hear it this morning, it's going to be

14 before us before the end of the month, when we've expressed

15 concern that we want to get our financial guys in there.

16 We at least need a valuation of the pieces they're trying

17 to sell, or at least some demonstration of active

18 marketing, and we don't have either.

19          So, again –- and then it begs the question of if

20 they really are pushing to sell it in a week or two, why

21 are we paying people to do engineering and to operate what

22 was understood to be a dual exit strategy which was maybe

23 we keep these things for the benefit of creditors.  But

24 it's clear we're on a different path so even more so for

25 us; we're interested in stopping the bleeding, that is the

1  200,000 a month in payroll.

2         THE COURT: Mr. Gallo, you've been outspoken for

3  your creditor constituents.  What's your take on all this?

4         MR. GALLO: Your Honor, there are a few points of

5  ethics, currently proposed deals, that I think I want to

6  negotiate, but I'm actually more optimistic about it by far

7  than the Committee appears to be, because, as I understand

8  it, it involves Liquidbits making a proposal essentially

9  that all the creditors can participate in to the extent

10  they wish to do so.  While I hope that Ms. McDow is correct

11  and that the value of the chips and equipment is more than

12  the six million that's guaranteed to the estate –- not

13  guaranteed but what's the best way to put it, most likely

14  to flow to the estate from this deal –- anybody who

15  actually believes that the purchase price isn't high enough

16  and as a creditor would have the opportunity to put their

17  money where their mouths are, so to speak, and participate

18  in that upside, and the benefit is that we have somebody

19  who's ready to do this deal now, underwrite getting a mine

20  going now with these chips, and so, you know, the creditors

21  who feel that they don't have the ability to participate

22  may not like it, but I like the fact that it sort of keeps

23  everybody honest.  I don't think anybody really knows what

24  the ultimate outcome of this mining operation will be.  And

25  as you know, I have favored a value-added approach as

1  opposed to selling these chips for whatever cash they're

2  worth because I know that's not going to get people

3  anywhere near whole, based on what I'm told.

4  THE COURT: Does anybody, either the Debtor or the

5  Creditors' Committee counsel, or anybody, have a fix on

6  what the total universe of unsecured debt is?  I've got a

7  shaking yes/no from the Committee?  (Laughing).

8  MS. McDOW: I'm sorry, Your Honor.  We don't.  I

9  think there's 90 claims so far.  If you take into account

10  the Liquidbits, which I thought was going to be withdrawn

11  in the event that that offer is approved, although I don't

12  think it's expressed in the term sheet, I think that it's

13  close to a hundred million --

14  THE COURT: A hundred million, okay, but well in

15  excess of six million.

16  MS. McDOW: -- fifty million -- oh, yes.  Oh, yes.

17  THE COURT: Okay.  Well, again, I don't know.  All

18  right.  So the only matter, again, before me today is

19  whether I amend the current operating agreement, or order,

20  not approve a term sheet, and what I've heard is the

21  Debtor's going to move promptly to notice a sale, and the

22  Committee is going to move promptly to seek appointment of

23  a trustee.  Okay?  So there we are.  Anyone else want to be

24  heard?

25  MR. GALLO: Your Honor?

1          THE COURT: Yes.  Who's that?

2          MR. GALLO: Your Honor, Ray Gallo again.  I

3    just -- I think what I would support would be to allow the

4    company, the Debtor, to, you know, some reasonable amount

5    for payroll in July simply because I understand that

6    Liquidbits would like the option to pick up those employees

7    who will be useful for this proposed mining operation, and

8    that seemed reasonable to me.  Otherwise, I can understand

9    Ms. McDow's concern.

10          MS. MICKELSON: Your Honor, we would like to

11   respond to Ms. McDow's concerns after the others have had

12   an opportunity to be heard.

13          THE COURT: Yeah, no, I want you to.  Mr. Golden,

14   I don't think you or anybody for your client has

15   participated before.  Is Koi a creditor or interested in

16   some other way?  Go ahead.

17          MR. GOLDEN: Yes, Your Honor.  Koi is a creditor

18   who's actually on the Committee, Your Honor.

19          THE COURT: Oh, okay.

20          MR. GOLDEN: I have nothing else to add, unless at

21   some point the Court has questions.  Obviously we support

22   the Committee, but I don't want to belabor the time of the

23   Court.

24          THE COURT: Okay.  Well, does anyone other than

25   the Debtor's counsel wish to be heard on what's before me

1  now?

2          MR. SMITH: Your Honor, this is Edwin Smith for

3  Liquidbits.  Our intervention is really based on the fact

4  that this company is a melting ice cube.  It would be nice

5  to give Ms. McDow and the Committee all of this wonderful

6  time to try to figure out everything that's going on and to

7  dissect everything that's happened in the past, but by the

8  time they complete this exercise, there won't be a company

9  left.  That's because the chips, as Your Honor has been

10  informed, are depreciating on a daily basis, and the only

11  thing that can really provide a meaningful return to

12  creditors is for someone -- it doesn't have to be

13  Liquidbits although Liquidbits has made the proposal to do

14  it, but it's for someone to come in and to take these

15  unfinished widgets, as Your Honor alluded to earlier, and

16  finish them off, and that's the best value for the

17  creditors.  But that has to be done very, very quickly.  So

18  Liquidbits supports the Debtor's motion because it

19  preserves the status quo for a sufficient time to try to

20  get this deal done that would finish off these widgets and

21  provide the most value for creditors.  Thank you.

22          THE COURT: Well, again, the term sheet that your

23  client has negotiated with the Debtor is not supported by

24  the Committee at this point.  Whether it can be modified to

25  get their support is for another day, but does the term

1 sheet depend upon my approval of today's motion or my

2 approval of this 600 chip sale, that Ms. Mickelson referred

3 to?

4        MR. SMITH: The approval of the sale is consistent

5 with the term sheet, Your Honor.

6        THE COURT: But is it a deal breaker if I

7 disapprove the sale?  In other words, if I say no, because

8 the Committee wants me to say no, does that affect

9 negatively Liquidbits' willingness to go forward under the

10 term sheet?

11        MR. SMITH: It does not, unless the failure to

12 approve the sale means that Liquidbits cannot continue to

13 exist in order to bridge to our sale, Your Honor.

14        THE COURT: Okay.  Well, Ms. Mickelson, I'm

15 confused about something.  As Ms. McDow acknowledged, the

16 Debtor is a debtor in possession.  It has -- it can

17 operate, except to the extent that the order that I entered

18 early in the case restricts its ability to sell things.

19 But that has nothing to do with paying payroll.  Is the

20 Debtor able to pay --

21        MS. MICKELSON: But I think --

22        THE COURT: Huh?  Go ahead.

23        MS. MICKELSON: Well, actually, Your Honor, it has

24 everything to do with paying payroll, and I also want to

25 clarify the amounts that we're asking for which are

1    entirely consistent with the term sheet, but I will get to

2    that in a moment.  The only way that we can pay payroll is

3    if we conduct these sales.  That is what's allowing us to

4    continue to operate and to make, you know, payment, which

5    is roughly 176,000 a month, and we have provided the

6    operating expense forecast in detail to the Creditors'

7    Committee and actually we provided them the expense sheet.

8    They said they wanted further detail.  We provided them

9    further detail, and this is of course after they hadn't

10   raised any questions about this expense sheet previously --

11   I think it was up until this week.  There was an extensive

12   telephone conference held on Wednesday to discuss all the

13   issues.  I personally was not involved so unfortunately I

14   cannot speak to what occurred during that conference, but

15   my understanding is that there was agreement as to, you

16   know, what was included in the expense forecast, and then

17   apparently something changed in the interim, and we thought

18   that all questions had been answered, and we have been more

19   than willing to oblige the Creditors' Committee to answer

20   any questions concerning the expense report, which is quite

21   detailed, and, you know we are happy to continue to provide

22   detail, but we believe we have met our burden in going

23   forward.

24            But also, you know, to get to your original

25   question, we have to have these sales conducted in order

1   for us to continue making payroll.  And any amounts that

2   are sold above that -- and, you know, we may not even sell

3   anything above that; I mean it may be that whatever assets

4   aren't sold wind up being sold to Liquidbits, and this is

5   all part of the term sheet.  But if something is sold above

6   that, it is going into a debtor in possession account and

7   would have full disclosure.  It's not as if anything is

8   being hidden, and, you know, this money eventually will be

9   going to the use of the creditors to maximize the value of

10  the estate, and it has been raised that the value is

11  depreciating each day.  Mr. Gallo made one comment about us

12  selling, wanting to sell even these initial 600 chips, you

13  know, under the last provided market value which was 200,

14  and these will be sold for 175.  But unfortunately that's

15  what occurs, and they can continue to depreciate each day,

16  and if the Creditors' Committee has what they want,

17  shutting us down, there would be a lot less and a lot less

18  for the sale to go through and to change the sale

19  eventually in July.  And that's something that we're not

20  willing to do.

21          I can go back now and actually clarify what it is

22  that we're requesting to go forward at this time.

23          THE COURT: Well, but you still -- you're

24  confusing me a bit, because what you said in your opening

25  remarks is that you want me to approve something that at

1  least isn't even in writing for me, but I take your word

2  for it, something that will produce 105,000, but you tell

3  me there's a payroll of 176,000.  Well, what's –- so how

4  does the payroll get covered even if I approve this sale?

5          MS. MICKELSON: Because actually what I said was

6  initially what we really need is –- well, initially what we

7  need is approval of the sale today because it won't go

8  forward if we don't have this initial approval, but that

9  actually isn't the amount that we're requesting.  What

10  we're actually requesting –- and I apologize; I should have

11  started with this –- is that we have the ability to sell

12  3,000 chips and 5,000 chips worth of wafers during the

13  pendency of this case.  Now this is a nominal amount.

14  There is a contemplated sale of 27,000 chips and chips

15  worth of wafers according to this sale, which could bring

16  in approximately 4.725 for a value of about –- a 4.725

17  million or 5.4 million.  What we're requesting is during

18  the pendency of the case to be able to sell this very

19  nominal amount to be able to continue to cover our payroll,

20  and this amount is expressly included in the term sheet so

21  the sale will not in any way be affected, and in fact, has

22  already been agreed upon by Liquidbits.

23          THE COURT: Did I miss something?  Did you file

24  something in the last couple of days that lays out the

25  specifics of what you want me to grant you permission to do

1 | today?

2 | MS. MICKELSON: We did not file something, and
3 | this is because we've been trying to work out the terms by
4 | a stipulation of the parties.

5 | THE COURT: Okay. Understood.

6 | MS. MICKELSON: And we were just circulating --

7 | THE COURT: Okay. But keep in mind, the last
8 | document that I'm aware of from the Debtor that was filed
9 | on June 18th asked that I simply modify the prior stipulated
10 | order so the Debtors may sell inventory in their own
11 | judgment, in the ordinary course. Period. So now what
12 | you're telling me is there's some very specific --
13 | something I have no idea what I'm approving. I realize
14 | that things have to move quickly from the Debtor's side,
15 | but how can I approve something that I don't even know what
16 | it is, but the Committee opposes it as the Committee knows
17 | what it is?

18 | MS. MICKELSON: Well, we were hoping to reach
19 | agreement of the parties before so we could come in, you
20 | know, holding hands --

21 | THE COURT: Right.

22 | MS. MICKELSON: -- and to alert the Court that
23 | this is what we had agreed upon because we have agreed to
24 | limit our sales to what we believe is actually necessary to
25 | maintain this case until a sale goes through for the

1  benefit of the estate.

2        THE COURT: No, look, you're preaching to the

3  choir here.  If there had been an agreement, I think it was

4  Ms. McDow herself that the other day rejected the

5  suggestion that we bring in a mediator and said we've got

6  experienced counsel who know how to negotiate, and if you

7  had all stood up today and said we have a stipulation that

8  the Debtor can sell these chips on these terms, I'd say

9  fine; I wouldn't second guess them at all.  But now I have

10  kind of a motion that I don't know the specifics of it.  I

11  only know that the creditors oppose it, so I don't know how

12  I can approve it.  And that's really what it comes down to.

13  And Ms. McDow knows and I know that if there are employees

14  who are providing services, and there isn't money to pay

15  them now, that's not good, but they'll get first crack at,

16  you know, at getting paid, subject to the normal

17  priorities.  And I don't want a situation continuing where

18  people are –- particularly people who aren't at management

19  level –- I'm not unsympathetic to any employee, but I'm

20  less sympathetic to top management if they know the risk,

21  but if there's some people down at the worker bee level

22  that are working and expect to get paid and there's no hope

23  of paying them, then that has to end promptly.  But I can't

24  do anything about it at this point.  So I'm just –-

25        MS. MICKELSON: Well, Your Honor, I suppose

1  that --

2          THE COURT: Yeah, go ahead.

3          MS. MICKELSON: I suppose -- the bind that we're

4  in is that in order for certain chips to be sold, we would

5  need authority to sell them today and that even next week

6  for some other ones, and this is to maintain the normal

7  operating costs.  This is a limited basis, and we would ask

8  that the Court would at least allow us to have certain

9  sales go through.  It would be very minor and limited

10  inventory to allow us to meet our operating costs,

11  including the payroll expenses.  And we would ask for that

12  to be done today just because it's a necessity, and we

13  don't want to do anything to tank the sale going that

14  will -- we hope to go through at the end of the month

15  despite the objections of the creditors' counsel.  We

16  understand that that's at the core of the hearing.

17          THE COURT: But Mr. Smith just said it won't tank

18  the sale.  I understood him to say that if I don't --

19          MS. MICKELSON: If we're allowed to sell some of

20  this inventory now so that we can maintain the operating

21  costs of the company until that sale goes through.

22          MR. SMITH: Your Honor, this is Edwin Smith.  We

23  do have a concern that unless some small group of sales

24  goes through, the company will not be able to meet payroll

25  and will have to shut its doors.  And that would tank the

1 sale.

2            THE COURT: Well, the Committee doesn't seem to be
3 worried about that, I guess.  Again, Ms. McDow, it seemed
4 to me that the Committee is making hopefully an informed
5 decision that if shutting the doors is what has to happen,
6 that's what has to happen.

7            MS. McDOW: We've had that exact discussion, Your
8 Honor, and we are -- we evaluated -- we think part of the,
9 you know, the cost of the inventory depreciating at 40
10 billion percent per day is a lot of "the sky is falling,"
11 and we've had a lot of talks with not only the Committee,
12 very informed, you know, detailed discussions, but other
13 creditors as well, and we are -- again, we have one option
14 here.  One is to approve what we see as exorbitant payroll
15 for a company that all it's doing is winding down to
16 liquidate in two weeks, and inventory going out the door.
17 Those things we can be sure of if we approve this.  And
18 alternatively, we sit on these for 21 days or a month while
19 we evaluate the sale offer, evaluate it, and the creditors
20 take the risk of whatever depreciation that is.  And after
21 looking at everything we have, you know, the Committee has
22 made an informed decision that the latter is the avenue
23 they choose to take.  And quite frankly, there is no future
24 debt here, and the unsecured creditors are the only ones
25 with something to lose.  And I have to listen to them.

1  They are the ones who know the real risk of the

2  depreciation and the amount and the quickness at which it's

3  going to depreciate.  I can only give them, you know,

4  informed advice about what's on the table now; what will

5  happen if we do it; and if we don't, what there is to risk,

6  and we've had those discussions.  Mr. Edgeworth (Phonetic)

7  did speak to them himself about, you know, even talked

8  amongst the Committee, of course subject to privilege, but

9  that is where we are, Your Honor, and we don't intend on

10  approving this sale, certainly without a lot more

11  information and time to evaluate it.  So we are there

12  and --

13        THE COURT: So what do you, Ms. McDow, believe

14  that the Debtor can do now without an order and what

15  requires an order.  Where do you draw the line between, you

16  know, where we are on the existing order?

17        MS. McDOW: Your Honor, again, I recognize they

18  are a Chapter 11 debtor in possession.  We don't have a

19  trustee yet, so they are free to operate in the ordinary

20  course and pay expenses.  So whatever money they have in

21  their kitty, so to speak, they are free to pay payroll.

22  They are bound by the stipulation, which is the subject of

23  the motion to amend, and --

24        THE COURT: Right.  But let's review that

25  stipulation again.  What is your understanding of how that

1 operates?  Can they sell even a single chip?

2          MS. McDOW: Your Honor, I think it was under a

3 thousand chips.

4          THE COURT: I was just looking to see my copy of

5 it and it's not around, but if it's under a thousand, then

6 why can't they sell the 600 chips that Ms. Mickelson just

7 referred to?

8          MS. McDOW: Your Honor, the issue is the creditors

9 have to approve the amount.  It would be appearing

10 creditors then.

11          THE COURT: Right.

12          MS. McDOW: The Committee has to approve the price

13 at which they'll be paid.  And certainly the proposal

14 that's being put on the table now is actually if you look

15 at 600 chips or less, it's $125 less per chip than is in

16 the price list we even got to review.

17          THE COURT: Well, but again, you said that before,

18 but you've seen the price list.  All I wrote down was 600

19 chips 105,000.  I can do the math, whatever that comes out

20 to be.

21          MS. McDOW: Right.  And I think it was 275 on the

22 price list we got, Your Honor.  So again, we were -- when

23 we were trying to figure out how all the missing pieces

24 would move and work together, we were comfortable with the

25 price list of the Committee.  Unfortunately, we then

1  weren't comfortable with the stipulation.

2        The other thing we have very, very serious
3  concerns about is the one thing we've asked for every day,
4  is a declaration with respect to current inventory, and
5  they have refused to give it to us every day.  My gut is
6  that it's been sold post-petition, and that's why we aren't
7  able to get a declaration from the Debtor as to the
8  amounts.  And we've been put off in that regard, Your
9  Honor, for two and a half weeks.  Every day I've asked for,
10 again, what's the current inventory behind held?  We'll get
11 back to you.  We're working on other things; we'll get back
12 to you, and I never got it.  So I don't even have an
13 understanding as we sit here today, again, what amount of
14 money the company is producing, if any, if it's operating
15 at a deficit, what the sales -- we know that it's operating
16 at 2X, but we don't know whether that pays even the other
17 operating -- you know, the payroll of the other companies.
18 We know they're not paying rent.  There's, you know, again,
19 there are so many pieces we don't know, and again, how much
20 inventory we're dealing with.  And for whatever reason, the
21 Debtor has been unwilling to share any of that information
22 with us.

23        So until we can get -- you know, if we have to do
24 it formally through 2004 exams, it looks like we're going
25 to have to do it because we don't have enough information

1  to say, go ahead and go, and, you know, if the need is –- I

2  also sympathize, your Honor, because I'm on the debtor's

3  side quite a bit, that we need to pay kind of the low level

4  guys, which is like you're saying, the guys who we know

5  aren't perhaps going to be the subject of avoidance

6  actions, aren't the insiders, maybe we can work something

7  out in that regard, but it's going to cut it substantially.

8          THE COURT: Well, but if somebody worked last week

9  and Hashfast has cash in the bank, there's no prohibition

10  on paying that person his or her salary.

11          MR. McDOW: Agreed.

12          THE COURT: And it's a coincidence or perhaps a

13  fortuitous coincidence that there's no rent that has to be

14  paid because it's already paid.  Well, okay, that can be

15  good or bad.  If the lease should be rejected, then maybe

16  it made no sense to prepay, but at least it's not a current

17  cash drain.  So the question is, what are the cash

18  expenses.

19          MS. McDOW: And it's only payroll, Your Honor.

20          THE COURT: And no one has told me what the

21  current cash situation is either.

22          MS. McDOW: We don't know either, Your Honor.

23  That's another piece that they wouldn't –-

24          THE COURT: Ms. Mickelson, how can the Committee

25  be expected to do its job if it can't be told the cash on

1    hand and the inventory on hand?  That seems --

2         MS. MICKELSON: Your Honor, my understanding --

3    and I do have my client on the phone who can, you know,

4    help to respond if necessary, but my understanding is that

5    our client has provided the Committee with everything that

6    they have asked for, including inventory, and I believe

7    cash on hand, but we can confirm with my client who is on

8    the phone right now.

9         THE COURT: Well, I don't want your client to

10   talk.  It's not that -- I don't doubt what she says, but

11   I'm not going to turn this into a, you know, a fireside

12   chat.  If we had a witness subject to cross-examination

13   under oath, that would be fine, but the same with the

14   Committee, I don't want the chair of the Committee to talk

15   either.  That's why counsel can make representations.  The

16   statement was made, Ms. McDow, that maybe some members of

17   the Committee have been given the information about cash or

18   inventory.  You're telling me that's not the case.

19        MS. McDOW: We have not.  And if you listen, this

20   has been kind of a cute ploy of the Debtor, that her words

21   are exactly right and counsel's words that we've given them

22   everything they've asked for.  So it's been a teeth

23   pulling, and our position was, here is -- again, we've

24   asked for them, but even if so, to make an informed

25   decision, if I'm the debtor, I want somebody to approve

1  expenses to be paid; I give them three basic things,

2  income, expenses and an operating cash flow budget.  And

3  those are the three things I start with, and they've given

4  us –- they gave us none of them, and we had to beg expenses

5  out of them, and I mean, drag and beg and have them refine

6  line items to get a five-line item budget, because it's

7  only for payroll, Your Honor.  There's not one dime of

8  anything else except payroll for operating expenses.  And

9  we still don't have the income and we don't have the

10  inventory or the cash on hand or any cash flow projections.

11  And so to say that they gave us everything we asked for,

12  you know, even if that were true, we should be given the

13  pieces we need to make an informed decision if they're

14  looking for us to approve something.  And to withhold

15  income and current inventory and cash on hand is pretty

16  disingenuous.

17       THE COURT: Okay.  Ms. Mickelson, I'll put it

18  simply to you this way.  I'm not going to do anything

19  drastic, but suppose I did something drastic and shut the

20  company down today, how much accrued payroll, post-

21  petition, is there and how much cash is available to pay

22  that payroll, and if you don't –-

23       MS. MICKELSON: My understanding –-

24       THE COURT: If you don't know the answer, for that

25  one, I'll let your client answer the question.  Do you

1 know?

2         MS. MICKELSON: Your Honor, I will confer with my

3 client and answer the question because that is a very

4 specific one.

5         THE COURT: All right.  Then go ahead and you ask

6 her the question for me, and then I'll listen to her

7 answer, and I won't put her under oath, and I won't subject

8 her to cross-examination.  I'll just get the representation

9 that if we were in court, you'd ask for a moment and you'd

10 talk to her and she'd tell you.  So go ahead, ask your

11 client.

12         MS. MICKELSON: Monica, are you there?

13         MS. HUSHEN: Yes.

14         MS. MICKELSON: Okay.  If the company were shut

15 down today, how much accrued payroll, post-petition, is

16 there and how much remains in our accounts to pay that

17 payroll?  How much of a deficit would there be?

18         MS. HUSHEN: Well, it's the 7th, so we have a week

19 of payroll.  Including contractors, it would be half of the

20 budget that was provided.  It would be --

21         THE COURT: What's the amount?  What's the dollar

22 amount?

23         MS. HUSHEN: I'm trying to finish my sentence.  It

24 would be 77K.

25         THE COURT: Okay.

1              MS. HUSHEN: Or, wait a minute, 57K.  Excuse me.

2              THE COURT: All right.

3              MS. MICKELSON: And that's the amount that we

4    would need to pay for the salaries and income, or the

5    amount that we have on hand?  Just to clarify.

6              MS. HUSHEN: That's the amount of payroll required

7    and operating expenses because we did provide other

8    operating expenses other than payroll.  Despite what was

9    said, we did provide a detailed budget of other operating

10   expenses, and the total of all expenses that is required is

11   57K for the first week.

12             THE COURT: And the cash on hand?

13             MS. HUSHEN: Thirteen thousand.

14             THE COURT: Okay.  Well, Ms. McDow, now I've got

15   that information anyway.  So it seems like --

16             MS. HUSHEN: Roughly.

17             THE COURT: Yeah.  I understand it's roughly.  It

18   seems like if I were to approve this one sale, that covers

19   the expenses, but I don't know what else it does.  Well, I

20   don't see how I can approve anything if the Committee is

21   opposing it.  Ms. Mickelson, I understand what you want to

22   do, but I think that it's their money, and they are

23   organized and are taking a position that I presume is

24   informed as much as it can be.  If there is some more

25   information that can be provided such that the Committee

1  changes its mind, so be it, but for now, I don't know how I

2  can authorize anything, other than status quo.

3           MS. MICKELSON: Your Honor, if I can --

4           THE COURT: Yes, go ahead.

5           MS. MICKELSON: If I can just make a couple of

6  points, and I understand, you know, what you're saying,

7  where you're coming from right now.  But just a couple of

8  points and maybe these, you know, are not exactly on point

9  at this time, but we do want to point out that the

10 Creditors' Committee is seeking a financial advisor, which

11 is going to accrue further administrative costs of the

12 estate at a great expense, and we do want to have, you

13 know, enough to be able to meet those administrative costs.

14 I also don't understand the relevancy of this financial

15 advisor.  Also I don't understand why they're seeking this

16 when we can't even, you know, meet our payroll at this

17 time.

18           In the past, they have sought a CRO to come at an

19 expense of 350,000 so some of their concerns about

20 budgetary things are a little disingenuous in our mind.  A

21 third point regarding the Committee, we recently found

22 out -- and again, I don't know if this is the time or

23 place, but I do think, you know, we have a need to raise

24 it, is that Koi is perceived to be a competitor in our

25 marketplace.  We don't know if this will give them a

1  competitive advantage to shut us down.  We're hoping that

2  this is not the only reason that they're on the Committee.

3  We're hoping -- we intend to -- you know, we just found

4  this out so we do insist having further investigations into

5  this, and we don't want to disclose further confidential

6  information.  But there are some other factors in place

7  here that we -- I'm not saying all of the motives are

8  disingenuous, but we do believe that some of them are, and

9  we do think that there is a lot of reason to approve even a

10 finite amount here, even if it's just 1,000 chips at this

11 time with a continued hearing two weeks later or a

12 continued hearing three weeks later, just so that we can

13 continue to operate and keep functioning so that we can go

14 forward with this proposed sale that we have and maybe it

15 can be approved and maybe they'll have objections.  We can

16 just come in at a later time.  We just need enough to be

17 able to continue on status quo without rocking the boat at

18 this time, and we think that the Court has authority to do

19 that.

20         THE COURT:  Ms. McDow, any further --

21         MS. McDOW:  Your Honor, if I may.  One is to the

22 point of the members of the Committee.  With all respect to

23 counsel, that is something for the UST to vet, and of

24 course it can come before Your Honor, but that's something

25 I'm very comfortable that Ms. Glosson and her client did a

1   very good job of vetting.  Again, that is something that
2   can be brought up at a later time, but Koi is one member of
3   the Committee.  There are seven members, all with different
4   interests on every level.  In fact, one of the members who
5   voted against -- this is very telling -- again, one of the
6   Committee members is the person who holds these chips and
7   who actually has an interest in selling them, a financial
8   interest in selling them, and again, the vote was unanimous
9   to come in here to Your Honor and tell them that we're more
10  interested in shutting the doors, so to speak, for a brief
11  period of time while we're allowed to do some discovery and
12  figure out what we want to do.

13          So there are varying interests on the Committee,
14  all of which have no interest in what's been put before us.
15  And again, part of it is, we haven't been given even close
16  to the information we need to make an informed decision
17  about whether it's in the best interest of the creditors.
18  But from what we've seen, we don't think it is.  And again,
19  can we -- you know, if Your Honor sets in on regular time
20  which is what I propose, can we still work in the interim
21  to do something?  Of course.  But we're going to need a lot
22  more information.  We need all the parties to be a lot more
23  forthright as to what's really going on in the company,
24  because we just haven't got that.  And again, we will have
25  emergency motions for 2004's before Your Honor, and if

1  that's the way it needs to be done, that's the way it needs

2  to be done.

3          THE COURT: Well, let's -- since both you and

4  Debtor's counsel are not local, the practice in this court

5  forever has been 2004's are routinely granted, period.  In

6  fact, if I were king, I wouldn't even have judges signing

7  2004 orders.  I would have them the way lawyers sign

8  subpoenas.  So if I get a motion for a 2004, I will grant

9  it, but obviously if I post it on my own procedures, if

10 there's a dispute, I expect counsel to meet and confer and

11 try to resolve it.  I will take matters on an expedited

12 basis by telephone to resolve essentially a discovery

13 dispute in the context of a 2004.  The formal method

14 obviously is for the respondent or someone else to move to

15 quash, but the point is, if the Committee uploads an order

16 with an application for a 2004 of so and so, I will

17 routinely grant it.  If so and so or the Debtors say no,

18 that's not appropriate, I expect counsel to meet and confer

19 and then contact my courtroom deputy for an expedited

20 telephone hearing about it.  And that's how I get those

21 things resolved.

22         Ms. Mickelson, we're back to my frustration

23 before, again, it's not personal to you, it's I can't

24 approve something that is just floating out there in space.

25 I don't -- you know, you have the ability -- I mean I was

1  personally hopeful that there would be a stip, but if the

2  Debtor says we want to do this sale on this term for this

3  reason, and the Committee says no, I can't even make an

4  informed decision one way or the other.  I have to defer to

5  the Committee at this point, because as I say, they're

6  taking the risk that losing a sale or sales or shutting

7  down for this low term may be permanent.  You know, if the

8  Debtor –- if you suspend the debtor in the emergency urgent

9  care ward, and the debtor dies in the waiting room, then

10  the debtor dies, and that's life in the big city, and

11  there's nothing I can do about it.  So I'm not going to act

12  today for that reason.  If I get a motion –-

13          MS. MICKELSON: Your Honor, if I may –- I realize

14  that –-

15          THE COURT: I was going to say if I get a motion

16  to revisit this on some specific terms or a motion to sell,

17  I will consider it.  Go ahead.

18          MS. MICKELSON: My last endeavor here, because I

19  realize this is an uphill battle at this point, and we're

20  on the losing end, but I guess the last point that I want

21  to make is that I think that there seems to be this

22  underlying assumption, I'm just kind of getting involved

23  more now, so I'm not sure about all of the arguments that

24  have preceded, but, you know, the Debtor does have the

25  opportunity and the right to be able to act in the ordinary

1course of business, and I'm not convinced that being able

2to sell certain chips is not in the ordinary course of

3business. And I do understand that there has been some

4debate in the past about what was ordinary course pre-

5petition and what is ordinary course post-petition, but the

6functionality of what we're selling, you know, the

7powerhouse of these chips, is still essentially the same as

8what we were selling –- or what we were doing pre-petition,

9just not in the entire package. So I guess for us to be

10able to continue to operate in the ordinary course post-

11petition –- I'm still not entirely clear as to why we don't

12even have a limited ability to be able to sell some of this

13inventory to make costs of the company.

14          THE COURT: Well, I think the short answer is if

15Hashfast had filed a voluntary Chapter 11 either in San

16Francisco or Wilmington, Delaware or anywhere else,

17presumably it would continue to do business to the extent

18of so-called ordinary course. But Hashfast was the subject

19of an involuntary that led to an emergency motion that led

20to an agreed order that was the result of something worked

21out on an expedited basis between the –- what Mr. Siddiqui

22continued to call the "alleged debtor," bit was still the

23pre-order for relief Debtor, and the major players who

24popped up early, and that changed things. That order is

25the operative order. If you, Ms. Mickelson, want to

1  counsel the Debtor to do something because you believe that

2  it's allowed to do it, I guess that's your job, and if you

3  do give advice that the Committee thinks is a reason to

4  appoint a trustee or convert the case, then maybe that's

5  what happens.  I don't know.  I'm not going to tell you

6  what not to do.  I'm just going to say I can't approve the

7  existing motion as modified by your oral comments about a

8  sale of 600 chips for 105,000 if the representation from

9  the Committee is that it's inconsistent with the pricing

10 and the Committee has not approved it and therefore it's

11 inconsistent with the prior order.

12       Again, I hope that at the end of some period of

13 time, that the Committee is making a decision that is good

14 for creditors and not, not good for creditors, but I can't

15 second guess them on this call.  They've made that

16 decision.  That's why they're the Committee.  And that's --

17       MR. SMITH: Your Honor?

18       THE COURT: Yes, sir.

19       MR. SMITH: Would it be helpful for you to hear

20 from other creditors, creditors who are not on the

21 Committee?

22       THE COURT: Well, I've heard -- well, I've already

23 heard from them.  Mr. Gallo supports the Committee.

24       MR. SMITH: I'm not sure that that's correct.  Mr.

25 Gallo, do you want to speak up?

1       MR. GALLO: Your Honor, my position was –- as you
2   know, I've been the biggest advocate for a prompt
3   (unintelligible), and I actually am okay with allowing some
4   sales to fund the Debtor into July with the hope that they
5   can actually have a successful 363 sale.  I think that we
6   should be able to work something out.  I have not been
7   communicating with Ms. McDow lately, but it seems to me
8   that some sales are in order to facilitate this deal.  And
9   my suggestion –- if I had –- my request would be, put this
10  over for a few days again, and, you know, perhaps Ms. McDow
11  and counsel for the Debtor can communicate more
12  successfully.  I'm hearing now in your courtroom and have
13  heard separately that there was communication breakdown
14  there.  I wasn't involved in it, but perhaps Ms. McDow can
15  be precise about what she wants.  I believe the Debtor
16  would be happy to provide what is requested, and we can
17  actually make some progress as opposed to squabbling, which
18  I'm sure you can appreciate.

19       THE COURT: Okay.

20       MS. MICKELSON: And, Your Honor, on that point, we
21  would also support having this put over for a bit because
22  also as Mr. Gallo was saying, there are other creditors at
23  play here.  I mean Mr. Gallo alone represents, I believe he
24  said 52 creditors.  It's not just about the creditors on
25  the Creditors' Committee.  There are others that, you know,

1  at stake, along with the sale that we don't want to, you

2  know, go in downhill direction, just because we cannot make

3  operating costs, even over the next month.  So if this is

4  something that has to be -- if a decision can't be made

5  now, if this is something that has to be put over til next

6  week, that's something that we would support at this time.

7          THE COURT: Well, what would happen if I put it

8  over like we've done before and I don't get anything new?

9  Do I get an amendment to the motion that lays out the

10  specifics that the Debtor wants to do?

11          MS. MICKELSON: You could get an amendment to the

12  motion to lay out the specifics.

13          THE COURT: I mean I have to say that it's a

14  little bit awkward in the course of a telephone hearing to

15  have to put your client on the hook and say, what's the

16  cash on hand?  What are the expenses?  And nobody asked her

17  because I didn't press it, what's the inventory total?  But

18  I find it very, very awkward to think that the Committee

19  should be faulted for taking the position it's taking when

20  I'm told it doesn't even know what the inventory is.  So

21  that's not comforting.

22          MS. MICKELSON: Your Honor, so one thing, I am

23  appearing on Mr. Siddiqui's behalf who has been much more

24  involved in these daily communications than I have been,

25  and if he were here, and I believe he had actually wanted

1　to be here and asked for this to be heard at a different

2　time so he could be appear, he would be able to speak to

3　these things probably without putting the client on the

4　spot.  And those are, you know, there's only so much

5　information that I have.  I was hoping I had enough to be

6　able to answer all the questions, but that was not the

7　case.  So some of the shortfalls are that Mr. Siddiqui is

8　not here.  This does not mean that this information was not

9　provided to the other side.

10　　　　　THE COURT: Well, I don't know.  I'm taking

11　counsel's representations, but --

12　　　　　MS. McDOW: Your Honor, we still didn't get an

13　answer about inventory.  We still don't have it, and we

14　haven't got it, and I would put in a declaration and I

15　represent to Your Honor right here, we have never received

16　that, and it's not -- again, I can assure you, Your Honor,

17　it's something we have asked for repeatedly.  It's

18　something, for whatever reasons, they refuse to give us,

19　and we just don't have the comfort we need.  It's a broken

20　record at this point.  We don't have the pieces we need;

21　we're not comfortable.  Are we going to continue to work

22　with them?  Of course.  It's not to say that when we leave

23　here today, we're going to stop having discussions with

24　everybody.  The difference between, for example, Mr.

25　Gallo's clients and my client is that my client has a

1  fiduciary obligation to every creditor in this estate, and

2  we know it.  And they all take it very seriously.  They're

3  all from different walks, different positions.  They know

4  it.  They understand it.  We've had extensive, extensive

5  talks over the weekend since we got this.  Everyone gets

6  it.  It's not something they take lightly, and they know

7  they all have a stake in it too.  And at this point,

8  there's just not -- they're not comfortable with what's

9  before us.  Are we still open to having discussions?  Of

10 course.  But we need more information, and whether we have

11 to do that by 2004 exams or whether after this hearing,

12 they're more forthcoming with the information we need to

13 make an informed decision about whether it's in the best

14 interest to approve this, maybe we'll see a change.  I

15 don't know.

16        THE COURT: When do you expect to have me hear the

17 motion for the trustee?

18        MS. McDOW: By the end of the week is our hope.

19        THE COURT: To hear it by the end of the week?

20        MS. McDOW: Oh, I'm sorry, to have it filed.  No,

21 Your Honor, we don't know.  We are still having discussions

22 among ourselves whether we wait til the end of the two 2004

23 exams depending on timing to bring it forward, although --

24        THE COURT: Is there anybody -- not to jump the

25 gun, but is there any thought of how this trustee would be

1　compensated or would pay his or her professionals?

2　　　　MS. McDOW: Your Honor, we are –- again, we are

3　fine with liquidating the inventory if we understand what

4　it's being used for, how much income we have to do it, how

5　much inventory there is to liquidate, how much it leaves if

6　we sell this, how much it leaves for creditors.  So all we

7　need is more information.  And obviously a trustee can give

8　that to us.  The Debtor could give it to us, and again,

9　whether they're going to do it more voluntarily after this

10　hearing, or whether we have to get it through a 2004 more

11　formally, so be it, but someone else –- there is money for

12　a trustee and a trustee's professionals, and we're not –-

13　we don't want to hold on to it just for the sake of holding

14　on to it.  We just want to make sure it's not going out the

15　door with not a dime going back to the unsecured creditors.

16　And we're not there yet.

17　　　　THE COURT: Okay.  Well, Ms. Mickelson, I

18　understand that you're filling in for your colleague, and I

19　do recall he said he was hoping to get on a vacation, and

20　that happens.  I also informed all counsel at the last

21　hearing that most of our judges are going to be away for a

22　good part of next week, at the Ninth Circuit conference.  I

23　don't know my own personal schedule.  I think for now I'm

24　going to just continue this hearing to this coming Friday

25　with the expectation that if the Debtor who can supplement

1 its motion with something that makes sense, that I can have

2 a basis on which to agree or disagree with it, or agree or

3 disagree with the Committee, I could do it, and if

4 necessary and we have to schedule another hearing later on

5 in the following week, I can make it work somehow. I'll

6 know my schedule a little better, and I may indeed be able

7 to attend to it. I'd rather not lay this off on a judge

8 with no background in the case.

9 So is there anyone -- well, I can't account for

10 everybody -- it would either be the Committee's counsel or

11 the Debtor's counsel that could not participate at a

12 hearing on Friday afternoon? Ms. McDow, you can appear by

13 phone; that's fine.

14 MS. McDOW: Your Honor, I and other members of my

15 firm are going to be speak at TMA's this Wednesday through

16 Friday, and we are going to be speaking at it, I think

17 Friday morning and early Friday afternoon. Let me check --

18 THE COURT: Where will you be?

19 MS. McDOW: Laguna.

20 THE COURT: You could do it perhaps in the

21 afternoon?

22 MS. McDOW: I'm going to check very quickly. We

23 could do it any time after 3:00, Your Honor. I apologize.

24 THE COURT: How about you, Ms. Mickelson?

25 MS. MICKELSON: That would work as well by

1 telephonic appearance.

2          THE COURT: All right.  I'll continue today's

3 hearing to July 11th at 3:00 p.m.  Again, I will encourage

4 the Debtor and the Committee to exchange information and if

5 there's a stipulated order, fine.  I'll trust you both.  If

6 there is not, and the Debtor wants me to act, Ms.

7 Mickelson, you'll have to get something to me at least the

8 day before.

9          MS. MICKELSON: I understand.

10          THE COURT: And I'd like chambers copies, but

11 under these circumstances, if you file something

12 electronically, just notify my courtroom deputy that you've

13 done so and we'll manage to survive on our own getting the

14 copy so I can read it the old fashioned way rather than

15 on --

16          MS. MICHELSON: Thank you, Your Honor.

17          THE COURT: But --

18          MR. GALLO: What time is that again, Your Honor?

19          THE COURT: 3:00 o'clock.

20          MS. McDOW: And then opposition at the hearing,

21 Your Honor?

22          THE COURT: Of course.

23          MS. McDOW: Okay.

24          THE COURT: Of course.  But Ms. Mickelson, at the

25 minimum, I think you've got to be specific as to -- if you

1  want me to approve a particular transaction, you have to be

2  able to put it in context of what does it mean; why is this

3  necessary?  What are our current expenses; what is the

4  impact?  I don't need an audited financial statement, but I

5  have to have some sense that -- and again, this all

6  presumes that the Committee is still opposing it, so you've

7  got to make the case where you persuade me that it's the

8  right thing to do even if the Committee thinks it's the

9  wrong thing to do, and I can't do it in the abstract.

10         MS. MICKELSON: I understand, Your Honor.

11         THE COURT: All right.  We're continuing today's

12 motion to July 11th at 3:00 with the understanding that the

13 Debtor will supplement the motion no later than Thursday

14 the 10th, unless there's an agreed order that the Committee

15 and the Debtor come to for the short term.  And I won't get

16 involved with motions for trustees or 2004's or motions to

17 appoint financial advisors.  Those will all come in due

18 course.  Okay.  Good luck.  Hope you can work something

19 out.

20         ALL COUNSEL: Thank you, Your Honor.

21         THE COURT: Thank you all.

22     (Whereupon, the proceedings are concluded at 11:55

23 a.m.)

24

25

1
2
3
4                    CERTIFICATE OF TRANSCRIBER
5
6
7           I certify that the foregoing is a correct
8  transcript from the digital sound recording of the
9  proceedings in the above-entitled matter.
10
11 DATED: September 3, 2014
12
13
14
15
16
17
18
19
20
21
22
23
24
25