1                    UNITED STATES BANKRUPTCY COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                     (SAN FRANCISCO DIVISION)

4

5   In re:

6   HASHFAST TECHNOLOGIES LLC, a      Case No. 14-30725
      California limited liability
7   company,                       Chapter 11

8                             San Francisco,California
                             September 10, 2014
9                             9:32 a.m.
                Debtor.
10  _____/

11
                    TRANSCRIPT OF PROCEEDINGS
12   1.   UNITED STATES TRISTEE'S MOTION TO APPOINT CHAPTER 11
            TRUSTEE UNDER 11 U.S.C. Section (A), OR IN THE
13       ALTERNATIVE MOTION TO CONVERT CASE TO CHAPTER 7
                UNDER 11 U.S.C. SECTION (B)
14   2.  OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION
               FOR SUBSTANTIVE CONSOLIDATION
15
           BEFORE THE HONORABLE DENNIS MONTALI
16           UNITED STATES BANKRUPTCY JUDGE

17
   APPEARANCES:
18

19  Counsel for             BAKER & HOSTETLER LLP
   Official Unsecured       BY: ELIZABETH A. GREEN, ESQ.
20  Creditors' Committee:     200 S. Orange Avenue #2300
                      Orlando, Florida 32801
21
                     (Appearing Telephonically)
22
                        -and-
23
                 BAKER & HOSTETLER LLP
24               BY: ASHLEY McDOW, ESQ.
                11601 Wilshire Boulevard #1400
25              Los Angeles, California 90025

```
 1  APPEARANCES (CONTINUED):

 2
    For the Debtor:          KATTEN, MUCHIN, ROSENMAN LLP
 3                           BY: PETER A. SIDDIQUI, ESQ.
                             525 West Monroe Street
 4                           Chicago, Illinois 60661

 5

 6  Successor Responsible    PETER KRAVITZ
    Individual For the       (Appearing Telephonically)
 7  Debtor:

 8
    For the U.S. Trustee:    OFFICE OF THE U.S. TRUSTEE
 9                           BY: JULIE GLOSSON, ESQ.
                             235 Pine Street #700
10                           San Francisco, California 94104

11

12  For creditors:          GALLO LLP
                             BY: RAY E. GALLO, ESQ.
13                           1299 Fourth Street, Suite 505
                             San Rafael, California 94901
14

15
    For Simon Barber:        SHEPPARD MULLIN RICHTER & HAMPTON
16                           BY: ORI KATZ, ESQ.
                             4 Embarcadero Center, 17TH Floor
17                           San Francisco, California 94111

18

19  For Mr. DeCastro:        LAW OFFICES OF STUPPI & STUPPI
                             BY: CRAIG STUPPI, ESQ.
20                           1630 N. Main Street #332
                             Walnut Creek, California 94596
21

22
    For Liquidbits Corp.:    BINGHAM McCUTCHEN LLP
23                           BY: EDWIN F. SMITH, ESQ.
                             399 Park Avenue
24                           New York, New York 10022

25                           (Appearing Telephonically)
```

```
 1    APPEARANCES (CONTINUED):

 2
      Court Recorder:          JANE GALVANI
 3                             UNITED STATES BANKRUPTCY COURT
                               235 Pine Street
 4                             San Francisco, California 94104

 5
 6    Transcription Service:   Jo McCall
                               Electronic Court
 7                             Recording/Transcribing
                               2868 E. Clifton Court
 8                             Gilbert, Arizona 85295
                               Telephone: (480)361-3790
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                  P R O C E E D I N G S

2  September 10, 2014                    9:32 a.m.

3                       --—oOo—--

4              THE CLERK: Matter of <u>Hashfast Technologies LLC.</u>

5              THE COURT:  We'll start with the courtroom

6  appearances.  Ms. Glosson?

7              MS. GLOSSON: Good morning, Your Honor, Julie

8  Glosson for the United States Trustee.

9              THE COURT: Mr. Siddiqui.

10             MR. SIDDIQUI: Good morning, Your Honor, Peter

11 Siddiqui on behalf of both Hashfast Technologies LLC and

12 Hashfast LLC, the Debtor.

13             THE COURT: Good morning.

14             MR. GALLO: Good morning, Ray Gallo on behalf of,

15 I think it's approximately 80 creditors.

16             THE COURT: Good morning, Mr. Gallo.

17             MR. KATZ: Good morning, Your Honor, Ori Katz

18 appearing on behalf of Simon Barber, individually.

19             MR. STUPPI: Good morning, Your Honor, Craig

20 Stuppi for Mr. deCastro.

21             THE COURT: All right.  On the phone, please.

22             MR. KRAVITZ: Good morning, Your Honor, this is

23 Peter Kravitz.

24             THE COURT: Good morning, Mr. Kravitz.

25             MR. SMITH: Good morning, Your Honor, Edwin Smith

1   for Liquidbits.

2           MS. GREEN: Good morning, Your Honor, Elizabeth

3   Green with Baker & Hostetler, for the Committee.

4           THE COURT: Ms. Green, are you on a cell phone?

5   Ms. Green, are you there?

6       (No response.)

7           Maybe she is.

8           MS. GREEN: Yes, Your Honor, I am, but I'm going

9   to leave my line.

10          THE COURT: Okay.  All right.  Mr. Siddiqui, or

11  actually Ms. Green, both of you, I'm confused about one

12  thing, I thought the -- I mean I received the word that the

13  motion for substantive consolidation was going to be

14  continued, but it's unopposed.  And the Debtor supported

15  the Committee's motion.  So Mr. Siddiqui, what's the story,

16  because it does seem to relate to the U.S. Trustee's

17  motion.

18          MR. SIDDIQUI: It does, Your Honor.  As I

19  understand it, the Committee wanted to send out a little

20  bit more notice, and that was the reason for wanting to

21  continue the date.  But I do agree, Your Honor, that the

22  motion is unopposed by all the material parties, to my

23  knowledge.

24          THE COURT: Well, Ms. Green, I don't want you

25  to -- I want you to participate.  You're the only

1  representative for the Committee on the call, right?

2      MS. GREEN: Your Honor, is Ms. McDow not in the

3  courtroom?

4      THE COURT: No, not in the courtroom.  Was she

5  supposed to be coming here?

6      MS. GREEN: Yes, she is.  She is coming, but she's

7  going to appear in person.

8      THE COURT: Well --

9      MS. GREEN: But in terms of the motion for

10 substantive consolidation, as you know, the Committee all

11 along has taken the position that the cases should be

12 substantively consolidated.  At the last hearing, however,

13 Your Honor, you indicated that you felt that the motion was

14 very premature and you were not really inclined to set it,

15 and so based upon that and some notices, we thought it

16 would be appropriate to continue it.

17     THE COURT: Well, I thought my point originally

18 was that it was too significant a motion to be heard on an

19 expedited basis without ample notice, but I thought the

20 Committee gave notice.

21     MS. GREEN: Yes, we did, Your Hour Honor, but if

22 you recall, at the last hearing, the issue was whether at

23 this point in the case you felt it was necessary to have

24 that motion heard.

25     THE COURT: Okay.  I won't belabor the point, but

1   my recollection was I had my doubts, but if the Committee
2   wanted to notice it and be heard and get it out, it would
3   be there –- look, I don't case.  If the Committee doesn't
4   want me to act on it, I won't, but it does seem to relate
5   to Ms. Glosson's argument to some extent.  So I'm kind of
6   in a quandary about whether to presume it's going to happen
7   or not.

8           MS. GREEN: Well –-

9           THE COURT: Go ahead.

10          MS. GREEN: Well, Your Honor, the Committee
11  supports the substantive consolidation as does the Debtor,
12  so if the evidence presented today is going to support
13  that, and the Court would like to rule on it, then I think
14  maybe that makes sense.

15          THE COURT: Okay.  Well, Ms. Glosson, at the
16  moment your motion is the front burner item, and it seemed
17  to me the opposition in part said that your concerns about
18  conflicts are mooted by substantive consolidation.  So even
19  though it seems like it's going to happen, maybe you should
20  presume it's going to happen and do you agree that that
21  takes away a portion of your argument?

22          MS. GLOSSON: Your Honor, I should note that the
23  first I heard about the substantive consolidation motion
24  not being heard today was last night when I spoke with Mr.
25  Siddiqui.

1          THE COURT: Yeah, that's about when I heard about

2     it too.

3          MS. GLOSSON: And so -- but the U.S. Trustee did

4     not file an opposition to the relief requested.  We do

5     think that obviously it would resolve the issue about

6     conflict between the estates if they are substantively

7     consolidated.

8          THE COURT: Right.

9          MS. GLOSSON: But we're not -- the U.S. Trustee

10    isn't taking a position on the merits of substantive

11    consolidation.

12         THE COURT: And it resolves whether you need two

13    trustees, because by definition, you would only need one.

14         MS. GLOSSON: Correct.

15         THE COURT: Okay.  Well, just to think out loud on

16    this subject, I thought that if there was going to be

17    objection, other than the United States Trustee, who hasn't

18    taken a position, that a creditor or creditors who are

19    affected by the outcome would have come forth and none

20    have.  So again, unless the Committee wants the motion --

21         MS. GREEN: Your Honor, given that, I think that

22    we'll just go ahead and have --

23       (Laughter.)

24         You indicate there's no objection.  So there's

25    really no reason why it can't or shouldn't be granted.

1    THE COURT: I mean, look, again –- Ms. Green, it's

2  not my place to become an advocate here, and so as I said

3  weeks ago in my first rejection of it on an expedited

4  basis, I've never seen a substantive consolidation where

5  one side may be disadvantaged over another, and here, it

6  would seem to be the creditors who have a clear shot at

7  more assets than those who would have to share it with a

8  larger pool.

9    Mr. Gallo, you're standing, so I guess it means

10 you want to speak.

11   MR. GALLO: Your Honor, if you would entertain it,

12 we would have earlier filed a joinder had we thought it

13 necessary.  So if you would accept my clients' speaking

14 joinder for the motion to consolidate.

15   THE COURT: Well, what am I going to do if I get a

16 speaking objection?

17   (Laughter.)

18   I see Mr. Stuppi, who made his appearance, and

19 for example, he, on his behalf of his client, was one I

20 thought might object, but Mr. Stuppi knows the rules, and

21 he didn't.  So look, I'm going to put this baby to rest.

22 I'll grant the motion authorizing substantive

23 consolidation, and I'll ask Ms. Green if she finds her

24 colleague, Ms. McDow, you can decide who -- one of you

25 should serve and upload an order granting the motion for

1  substantive consolidation.  So --

2          MS. GREEN: Your Honor, I'll submit the order.

3          THE COURT: Okay.  Ms. Glosson, I don't -- the

4  comment was made I believe by the Debtor that the United

5  States Trustee routinely seeks a trustee when a CRO is

6  appointed.  You don't have to respond to that because if

7  that is the policy, it doesn't matter.  The U.S. Trustee

8  has a right to make the motion, but we're down to, I think,

9  just the question of whether Mr. Kravitz serving at the --

10  you know, with the only other operative or active member of

11  the Board, I guess, being a former manager, that seems to

12  be all that we're down to; isn't it?  I mean, again, I

13  don't want to take away your argument, but it seems to me

14  that's the argument that you're resting your case on

15  primarily once we get this consolidation out of the way.

16          MS. GLOSSON: Your Honor, I think that is the

17  principal issue here.  With respect to the merits of this

18  case, we think that cause exists to appoint a Chapter 11

19  trustee, because there's been a delay in the administration

20  of the case, that delay is evidenced in part by the

21  employment or retention, what have you, with respect to Mr.

22  Kravits and his role as the CRO.

23          The CRO in this case is really in essence a

24  negotiated resolution between the Committee and between the

25  Debtor, the Debtors I should say, to replace current

1 management and sort of restore the confidence that I
2 believe that the Committee thought was –- that it did not
3 have confidence in current management.  But the concern is,
4 is that while I think that we take from certain recent
5 opinions, like the <u>Lehman</u> decision and the <u>AMR</u> decision
6 that while parties are free to negotiate, they're not free
7 to negotiate a resolution that circumvents or undermines
8 the Bankruptcy Code.  And we think that where there are
9 concerns about gross mismanagement and management's ability
10 to carry out its fiduciary duties, the Code sets forth the
11 remedy, and that remedy is appointment of a Chapter 11
12 trustee.

13         THE COURT: Well, okay.  So what would that
14 Chapter 11 trustee do aside from be charged with trying to
15 dispose of the inventory?  He or she presumably would
16 investigate prior management.

17         MS. GLOSSON: Perhaps.

18         THE COURT: What else?

19         MS. GLOSSON: Well, the other issue here, Your
20 Honor, that I also think supports cause for appointment of
21 a trustee is that the Debtors appear to have unilaterally
22 withheld the value of the intellectual property.  They have
23 stated in their original amendment –- or original schedules
24 as well as the amended Schedule B that the value is, quote,
25 "unknown."  And the Debtors are presumed to have assigned

1 some value to intellectual property when they negotiated

2 the sale with Liquidbits, when they say in their response

3 to our motion that they are going to reorganize around the

4 intellectual property.

5 Mr. Barber testified at the meeting of creditors

6 that he believed that the range of the value of the

7 intellectual property was zero to 30 million dollars, and

8 perhaps –- and as the Debtor stated, that that might be a

9 future value or might require some development, but the

10 point is, is that on the one hand, they're assigning some

11 value when they're negotiating a sale, and on the other

12 hand, in their disclosures that they signed under penalty

13 of perjury, they're saying it's unknown.  And they have not

14 satisfied the statutory requirement under Section 107 to in

15 essence seal that information.

16 THE COURT: Well, suppose we had a trustee.  What

17 would that trustee do in your mind to ascertain the value?

18 I mean this isn't like going on a website to look up used

19 Chevies and find that they're worth fifteen hundred

20 dollars.  You don't go get something as unique as this IP

21 and find a value just quickly.  What would the trustee do?

22 MS. GLOSSON: Well, the trustee would undertake an

23 evaluation of the –- what I understand that the patent

24 applications are provisional patents, so it would require

25 an analysis of what's been filed with the Patent Office.

1    Perhaps it would include whether there are other similar

2    designs or patents that may have been filed or companies

3    that are doing the same thing.  It would be a comparative

4    analysis.

5              THE COURT: But isn't that what makes patents so

6    different, because if somebody is doing the same thing,

7    they may be infringing on your patent.

8              MS. GLOSSON: Perhaps.  I mean I think that --

9              THE COURT: Or you on their patent.

10             MS. GLOSSON: Quite possibly, but I think -- I

11   agree that there are patents and intellectual property that

12   by themselves are unique and I recognize that it may be

13   difficult to assign a value to that, but the Debtors have

14   at a minimum assigned some value because it was a term --

15   it was one of the items that was going to be sold to

16   Liquidbits.

17             THE COURT: Well, no, I understand that, and I was

18   curious whether you really thought I should appoint a

19   trustee because the Liquidbits deal was negotiated.  It

20   seemed to be, you know, there were a number of reasons why

21   I wasn't going to approve the Liquidbits deal, and that's

22   history -- behind us.  But let's go back to this dilemma of

23   the IP.  I mean this is my first bit coin case, but it's

24   not my first Chapter 11 case where the marketplace tells us

25   the value of things far more reliably than an appraiser

1  does, so even if we went on, you know, a website for

2  appraisers.com, we probably could find somebody to value

3  this stuff, but that doesn't do any good if nobody will buy

4  it.  So --

5          MS. GLOSSON: Well, Your Honor, somebody wanted to

6  buy the intellectual property.

7          THE COURT: Right.  But what if -- what if there

8  weren't all the other problems -- in other words, in your

9  paper, you said what I was thinking about the Liquidbits

10 deal; it wasn't just an asset sale; it was a disguised

11 Plan.  But what if the debtor in possession just said,

12 we're having an auction tomorrow, and we're selling off all

13 the IP and advertise it quietly, and the only offer was the

14 Liquidbits dollar offer, what would we do, say no, we think

15 we can get better because it's worth more?

16         MS. GLOSSON: Well, it's not about what the U.S.

17 Trustee's opinion of value -- of the intellectual property;

18 it's whether there was an adequate, as you indicated,

19 adequate, you know, publication of the sale --

20         THE COURT: Right.

21         MS. GLOSSON:  -- if there are procedures in place

22 to assure that this is the best and highest price for that

23 particular asset.  We have that all the time with

24 bankruptcy sales.

25         THE COURT: Okay.  But if the trustee got

1  appointed, and Mr. Smith called up and said, hello, Mr.

2  Trustee, I represent Liquidbits, and here's our offer, and

3  it was the same offer that Liquidbits made to the DIP, and

4  the trustee said, okay, we'll go with that.  Then what?

5       MS. GLOSSON: Well, the trustee has the same --

6  would be charged with the same duties and responsibilities

7  that a debtor in possession would have, and that would be

8  to make sure that that price that was offered was the best

9  and highest price, given the circumstances of the case, and

10 I don't think that we had that assurance with the

11 Liquidbits sale, and I think it's entirely appropriate to

12 review the conduct in connection with that sale in terms

13 of -- in the context of whether current management should

14 be replaced.

15       THE COURT: But, again, I don't want to turn this

16 into just you and I having an argument -- you and me having

17 an argument, but if Liquidbits or the Debtor had said,

18 here's the Liquidbits deal and here's an appraiser or an

19 expert who knows about this stuff who says the price is a

20 fair price, I question -- I mean I still doubt I would have

21 approved the sale because it had all those other

22 ramifications -- disguised Plan, releases, you know.

23       MS. GLOSSON: I agree.  Correct.  I don't think --

24 I mean I think you're looking purely at just this issue of

25 value of the IP and not the other issues surrounding the

1  Liquidbits sale.  I think it goes back to the same

2  protections and assurances that we have in any sale.  Was

3  it properly vetted?  Were there adequate protections in

4  place, you know, over the procedures or what have you, or

5  sufficient publication as to that particular sale.  That is

6  going to be present in any bankruptcy sale.

7        THE COURT: Okay.  Do you want to add anything

8  further?  I'm going to let the Debtor's counsel and the

9  Committee respond, but if you want to make any further oral

10 argument –- I mean you briefed it fully, and I appreciate

11 the hard work and the extensive discussion, but here's your

12 chance to say more.

13        MS. GLOSSON: Well, I might have a comment –- I'd

14 like to reserve any rebuttal –-

15        THE COURT: Okay.  Sure.  All right.  Mr.

16 Siddiqui.  In addition to responding, give me your best

17 judgment or the Debtor's best judgment on an exit plan now,

18 an exit strategy, you know time line.

19        MR. SIDDIQUI: Yes, sir.  Will do.  If I may, Your

20 Honor, I'd like to address the colloquy you and Ms. Glosson

21 just went through, and I kind of want to go in the same

22 order that you went, which is, you said, is Mr. Kravitz'

23 leadership and replacement of management, with that fact,

24 does the Trustee wish to proceed, and she essentially said,

25 well, let's talk about the IP because there can be no

1   dispute that Mr. Kravitz is new; he's professional,

2   competent, highly skilled, and a choice accepted by the

3   Debtor and the Committee and there's been no opposition --

4       THE COURT: But he does report to Mr. Barber in a

5   sense; doesn't he?

6       MR. SIDDIQUI: To be sure, Your Honor; however,

7   and this is important to note, that Mr. Kravitz makes all

8   of the day-to-day decisions, and he makes all of the long-

9   term strategic decisions affecting the Debtor.  Mr. Barber

10  is the sole manager of the members -- I'm sorry, is the

11  sole manager of the LLC's that are the Debtor, but he has,

12  by proper governance, ceded the decision-making authority,

13  both short term at the end of the day and long term with

14  respect to this case, to Mr. Kravitz, and --

15      THE COURT: So if an angel flew in the door and

16  offered seven figures, and leaving aside court approval,

17  but Mr. Kravitz has authority in a corporate sense to

18  accept the deal?

19      MR. SIDDIQUI: Correct, Your Honor, and I will go

20  even further to say that if Mr. Kravitz says yes and Mr.

21  Barber says no, I'm filing a motion to seek approval and

22  Mr. Kravitz wins.

23     (Laughter.)

24      THE COURT: Well, who do you -- does that mean you

25  as counsel take your marching orders from Mr. Kravitz?

1          MR. SIDDIQUI: That is correct, Your Honor.

2          THE COURT: Okay.

3          MR. SIDDIQUI: Obviously Mr. Barber is a member of

4    the Debtors and he is an officer of the Debtors.  I do take

5    direction from him; however, he is, as an officer,

6    subordinate to Mr. Kravitz, and to be perfectly blunt, this

7    is a collaboration.  Mr. Kravitz and Mr. Barber work

8    together.  We all work together, and Mr. Kravitz sits at

9    the head of the table leading.

10         THE COURT: Well, but if we had a traditional

11   corporate structure, which we don't, and you had a chief

12   executive officer, but no Board of Directors, then you

13   couldn't function in a traditional way because the officer

14   would have no Board to report to.

15         MR. SIDDIQUI: I suppose that's correct, Your

16   Honor, and I --

17         THE COURT: Which sometimes is why you have to

18   have a trustee --

19         MR. SIDDIQUI: I agree.

20         THE COURT:  -- and you lose your management.

21         MR. SIDDIQUI: I agree.  If a company is not

22   capable of performing its governance in a compliant way,

23   then you have a different set of issues than we face here

24   essentially.

25         THE COURT: Okay.

1          MR. SIDDIQUI: And to go on, Ms. Glosson cites to

2    Lehman and RadLax for cases saying that you can't upend

3    strictures of the Bankruptcy Code, and that is true;

4    however, she's presuming cause in her argument there.  That

5    argument is premised on the fact that she has presumed that

6    cause exists, and we obviously stridently oppose that

7    assertion.  Cause does not exist.  If you were to find

8    cause, Your Honor, then yeah, your hands are –- your next

9    steps are limited under the Bankruptcy Code.  But this

10   hearing is about whether cause exists, so we're not

11   implicating RadLax; we're not implicating Lehman Brothers.

12   What we are implicating are the cases that we cited, 1031

13   Tax Group, Adelphia, the BAP case of Real Estate Partners

14   here, where it says that when a CRO of the quality and

15   independence of Mr. Kravitz comes in and rights the ship,

16   that eliminates any allegations of misconduct.

17         Now, we can obviously talk whether there was

18   mismanagement and we of course in our pleadings dispute

19   that there was, and I don't see a lot of push-back from the

20   Trustee in her reply.  But RadLax, Lehman Brothers, those

21   don't apply here, Your Honor.

22         The next statement made is about we're

23   unilaterally withholding valuation information with respect

24   to intellectual property.  That's wrong, sir.  We're not

25   withholding anything.  If I had valuation information with

1   respect to intellectual property, or if Mr. Barber had it,

2   Mr. Kravitz had it, we would tell the world.  We don't have

3   it.  It's expensive and we can't afford it.  It doesn't

4   make sense to spend the money there when we can allocate

5   those resources toward maximizing value.  The intellectual

6   property was not going to be sold to Liquidbits.  It was

7   not going to be sold to Liquidbits.

8           THE COURT: Well, they were getting a license;

9   weren't they?

10          MR. SIDDIQUI: They were getting a license, Your

11  Honor, but we were going to continue pursuing what we're

12  doing now, which is speaking to people in this space who

13  would either invest money into a reorganized debtor or

14  perhaps just buy the intellectual property, tackle some

15  framework where we'd bring in more value for the estate,

16  because that intellectual property isn't just today's

17  stuff; it isn't just today's chip design and today's

18  patents.  It's the future of future chip design, future

19  Board makeup.  Those things are also intellectual property

20  that are valuable.  I don't know what they're worth, Your

21  Honor.  You hit the nail exactly on the head when you said

22  we're not talking about, you know, a 1992 -- we're talking

23  about a complex thing that's only worth what someone is

24  going to pay for it.  And yes, it's true that at the

25  initial 341 meeting, Mr. Barber said, in response to

1  questions in a very specific context, that the value of the

2  intellectual property could be zero or it could be 30

3  million dollars, but the questioning there, which of course

4  isn't appended to the record here, was very specific and

5  very conceptualized.  It is not the Debtor's belief that

6  the value of the intellectual property is 30 million

7  dollars.  We hope it is; we hope someone comes in and pays

8  30 million dollars, but we're not prepared to, under

9  penalty of perjury, to put that on the schedules.

10         Ms. Glosson also said that it's not –- this

11  motion is not about the U.S. Trustee's opinion of value.  I

12  totally agree with that.  The U.S. Trustee in the reply

13  brief says, based on what was in our response, our

14  opposition, it doesn't seem likely that there's going to be

15  a reorganization.  That's the U.S. Trustee's opinion of how

16  this case works.  The Trustee puts on the business person's

17  hat and say, man, if I were to drop into this situation,

18  I'd give up.  Well, that's not the role of the U.S. Trustee

19  obviously.  The role –- we have very competent expert

20  business people who in the face of these types of financial

21  conundrums know exactly what to do and are taking the steps

22  that need to be done.

23         I want to emphasize, although I don't want to –-

24  I just want to emphasize for Your Honor that the very day

25  this motion was filed, is the day that the creditors and

1  the Debtors all got on the same page and reached an accord.

2  And as Your Honor knows, this case has been a bit of a

3  battle every step of the way, and it happens to of course

4  coincide with all the significant holidays of the summer,

5  and we reached a deal.  We sat down and we said, let's

6  solve all of our problems, all of our disputes.  And the

7  solution involved new confidence-inspiring management.  The

8  purpose of that was not to spackle over a breach of the

9  Bankruptcy Code, not at all.  The purpose of that was to

10  maximize the value of the assets for the estate.

11       Your Honor asked me, what is our time line for

12  doing that.  And you again hit the nail on the head in your

13  colloquy with Ms. Glosson; you said what if we hold an

14  auction tomorrow and said, come in everyone and make your

15  bid.  We are embarking on that very process.  We have, with

16  the collaboration of the Committee, put together a --

17  essentially a target bid sheet, sent it to the people we

18  know who are interested and people that we -- other people

19  too who haven't expressed interest who said, shoot at us.

20  We sent --  fill this out and send it back in, and we're

21  going to hold an auction.  Of course, we're not going to do

22  anything without the Court's approval, once we have bids to

23  move on.  And we --

24       THE COURT: But are you able to put some deadlines

25  or time lines on that or not?

1          MR. SIDDIQUI: Your Honor, I'm loathe to promise

2    anything, but we're moving as quickly as possible.  The

3    mandate from the client is, immediately, right away, push,

4    push, push.  And it's --

5          THE COURT: Well, when I -- the first hearing in

6    this case, I was told that these things decline in value

7    every 14 days.  By definition, we should be about negative

8    hundreds of millions of dollars by now.  So -- that didn't

9    prove to be the case.

10          MR. SIDDIQUI: Well, I'm not sure -- I don't know

11   the answer to that, thankfully, as everything shrinks, it

12   can't go negative, but --

13          THE COURT: Right.

14          MR. SIDDIQUI:  -- that is true.  Now, there have

15   been -- I've learned a lot about the bit coin industry

16   since May, Your Honor, and there are factors that

17   contribute to the value of the hardware that Hashfast

18   sells, and those factors include other people's hashing in

19   the marketplace, competitors' products being dumped in the

20   marketplace, of course, the price of bit coin.  And those

21   things have all moved and fluctuated wildly, Your Honor,

22   where throughout this case -- and I'm no expert -- but

23   throughout this case, I can report to you, Judge, that

24   we've been super-sanguine on some days and we've been

25   gloomy on other days.  It's like bushels of wheat, you

1  know, it moves.

2          But, Your Honor, the representation, though, is

3  immediately, as soon as possible.  Obviously we can't --

4  we're not going to spoil the opportunity to get as much

5  value as possible by improvidently moving quickly, but we

6  are going to be moving quickly.  And the idea, Your Honor,

7  is exactly as you said, liquidating inventory, and either

8  selling our intellectual property including future rights

9  or reorganizing around it.  And if it's a sale, and we

10  reorganize around the proceeds; it's a liquidating Plan.

11          THE COURT: Well, I think from the outset, maybe

12  it was Mr. Gallo or someone who said maybe there ought to

13  be new money coming in, but no new money has come in yet,

14  so or if it has, it hasn't, you know, opened a wallet yet,

15  a real wallet, and so, it seems to me that liquidation

16  looks like more the Plan, but maybe not.  I don't know.

17          MR. SIDDIQUI: Your Honor, I think that's --

18  you're again right, but there is a distinction between

19  buckets of assets.  We have what we have made and what we

20  can make.

21          THE COURT: Right.  Yes, I understand, tangible,

22  intangible.

23          MR. SIDDIQUI: That's right.  And the "have made"

24  needs to be sold and turned into money, and "what we can

25  make" also needs to be sold or reorganized around and

1  turned into money, but that is, as you say, we need a
2  believer to come in and understand the process --
3  understand what the intellectual property is, pump in the
4  money, assess the risk, all those things, which is
5  challenging, but we are up to the challenge and have been
6  vigorously pursuing it.

7          THE COURT: Okay.  Ms. Glosson, I want to let the
8  counsel for the Committee speak, but do you believe that as
9  an alternative, I could -- the notion that Mr. Kravitz
10  could be the trustee?  I mean I realize that if there is a
11  trustee ordered, your job is to select one or your Ms.
12  Davis, but is Mr. Kravitz ineligible to be a trustee under
13  these circumstances?

14          MS. GLOSSON: Well, Your Honor, based on what I
15  understand is Mr. Kravitz' position, I think he's an
16  insider; he's an officer of the Debtor at this point.

17          THE COURT: Yeah, okay.  All right.  Ms. Green, I
18  guess you've still got the duty here because Ms. McDow --

19          MS. GREEN: Yes.  That's fine, Your Honor.  I've
20  been involved on a day-to-day basis anyway in this case.

21          THE COURT: Very good.  But have you heard from
22  Ms. McDow?  Do you know where she is?  Is she stuck in
23  traffic?

24          MS. GREEN: I have not.  I don't know where she
25  is.

1          THE COURT: Okay.  All right.

2          MS. GREEN: And, Your Honor, I had a hearing

3    myself; I had actually planned to be there today, but I had

4    an emergency hearing that came up in one of my cases in

5    Tampa, so unfortunately I wasn't able to be there in

6    person, and I apologize.

7          THE COURT: That's okay.

8          MS. GREEN: Mr. Siddiqui is correct in that this

9    case started out as a very contentious case, with the

10   Committee and the Debtor fighting pretty much at all

11   avenues, and the Committee and the Debtors decided that at

12   some point that was having diminishing returns, and we sat

13   in a conference room in my offices in Los Angeles and had a

14   nine-hour meeting with the Debtor and its representative

15   and the chairman of the Committee and myself and Ms. McDow,

16   and we spent a long time going through what we saw in terms

17   of assets and what we saw in terms of what was happening at

18   the Debtor.  And it was the collective decision of all of

19   the parties there that it made sense to replace the senior

20   officer of the Debtor at the highest level so that there

21   would be a different person in control of the Debtor.

22          The reason for that was because Mr. Kravitz has

23   business knowledge; he has the ability; he has the faith of

24   the Committee, and one of the reasons why it was Mr.

25   Kravitz was because the Committee was certain that he could

1  maximize the value of the assets for the benefit of them,

2  because that's really what his job is, and that's the job

3  of any debtor in a bankruptcy Chapter 11 case. He is the

4  officer of the Debtor under the corporate governance

5  documents. He has control of the Debtor. He's clearly a

6  proper officer. Courts don't generally get involved in

7  determining who can and can't be an officer of the debtor.

8  He reports -- he control the Debtor. He does talk with Mr.

9  Simon -- I mean with Mr. Barber, and he makes sure that

10 there's information, because obviously Mr. Barber is an

11 important part of this piece of the puzzle. He created

12 what the U.S. Trustee has determined is the intellectual

13 property here. And so we do need Mr. Barber to stay

14 involved to some extent because it is his brain that

15 created this IP. This isn't IP for, you know, a widget.

16 It's IP for a complex system for bit coin mining.

17       The Committee -- in terms of valuation of the IP,

18 I personally have talked with both Mr. Barber and an

19 intellectual property attorney and determined and looked at

20 the IP and Mr. Siddiqui is correct, it's very difficult to

21 determine the value of the IP. They're provisional

22 patents. As you know, now under the patent filing system,

23 it's first in time. So there is some issue about, you

24 know, what actually was filed at the Patent Office and it's

25 actually what other systems were out there at what point in

1  time.

2        In order to convert those provisional patents to

3  permanent patents, the patents are going to require some

4  work, and it could take the Patent Office well over a year

5  if the applications are converted right now.  And so this

6  isn't something that can be easily determined.  We think

7  that the patents do have value, and obviously the Committee

8  has been very concerned about the IP and the motion to

9  substantively consolidate.  However, it is very, very

10 difficult to put a valuation on these patents, and for the

11 Court to appoint a trustee because the Debtor is unable to

12 provide a value of its patents, I think is really not

13 appropriate.

14        THE COURT: Okay.

15        MS. GREEN: We really believe that where we are in

16 this case is that we're ready to work with the Debtors.  We

17 have been working with the Debtors on a day-to-day basis.

18 We've been working with their appropriate corporate

19 officer, and quite frankly, this motion has cost time and

20 effort that really could have been put toward completing

21 the process that Mr. Siddiqui expressed.

22        THE COURT: Okay.  Does anyone else want to –- one

23 second; I'm getting a note here.  Ms. McDow's flight was

24 delayed, so that's what happens when you try to come to

25 court on the morning of the hearing.  Mr. Siddiqui, when

1  did you come in from --

2          MR. SIDDIQUI: Last night, Your Honor.

3          THE COURT: Last night.  All right.  Anyone else

4  want to be heard in either way, support or opposition?

5          MR. SMITH: Yes, Your Honor.  It's Edwin Smith for

6  Liquidbits.

7          THE COURT: Yes, sir.

8          MR. SMITH: My understanding was that the

9  Trustee's motion was in the alternative for either the

10  appointment of a Chapter 11 trustee --

11          THE COURT: Yes, it is.

12          MR. SMITH:  -- or conversion of the case.

13          THE COURT: It is.  That is.

14          MR. SMITH: Yes.  And I know we've had a

15  discussion about the Chapter 11 trustee, but let me address

16  the conversion issue for a second.  Our biggest concern has

17  been the delay in the Debtors selling their assets, and

18  there has been a significant assignment of value especially

19  the chips.  The chips have a value based on the conversion

20  cost, and looking at the cost of conversion, plus the value

21  of the chips and comparing that to finished chips that are

22  in the marketplace, and so given the fact that it's been

23  four months or so since this case was filed and the chips

24  have declined in value and the conversion cost now makes

25  the chips uneconomical, the real value as we understand

1  that's left with the Debtors are the power units and other

2  pieces of equipment, but not so much the chips.

3       Now, we're gratified that the Debtors and the

4  Committee have a plan to sell off the Debtor's assets, but

5  we haven't seen anything happen, other than seeing a

6  proposed bid sheet, and our suggestion, Your Honor, is that

7  the portion of this motion dealing with conversion of the

8  case to Chapter 7 be continued for a short period of time

9  until it gets determined whether there's going to be any

10 activity at all in selling the assets.  But if not, then it

11 seems to us a conversion to Chapter 7 may be appropriate

12 just because nothing else has happened.

13      THE COURT: Okay.  But the point is, I thought

14 your opening comment made you think you were going to urge

15 that I skip the Chapter 11 trustee and order conversion.  I

16 think whether I --

17      MR. SMITH: No, Your Honor.  Our interest is in

18 getting the assets sold, and we recognize that conversion

19 to a Chapter 7 will bring in a whole new person who has to

20 familiarize himself with the Debtor and would delay things

21 even further.  So our inclination is to give the Debtors

22 and the Committee a short period of time to try to

23 liquidate these assets, but this can't go on forever, where

24 there is just continual decline in value.  So it seemed to

25 us that if Your Honor would continue the portion of the

1  motion relating to the conversion to Chapter 7, and do so

2  for a short period of time, that that might inspire the

3  Debtors and the Committee to actually do something tangible

4  on selling the assets.

5       THE COURT: Well, keep in mind, Mr. Smith, Ms.

6  Glosson I think correctly stated why, if I ordered a

7  Chapter 11 trustee, Mr. Kravitz could not be the trustee.

8  Even if I wanted him to be, I don't think I could influence

9  that.  So whether it's a Chapter 11 trustee or a Chapter 7

10 panel trustee, it's a new player on the scene, and that has

11 its ramifications, both good and bad, and either way, if

12 there's a new player, that doesn't mean Mr. Barber has to

13 cooperate.  It doesn't mean Mr. Kravitz has to do anything.

14 They all could do something if the trustee wanted them to,

15 but they couldn't be required to.  And as Ms. Glosson

16 knows, it's my habit of continuing these motions over and

17 over again, but whether I continue a portion of the motion

18 or deny it, doesn't really make a huge difference because

19 if I give the Debtor a deadline for filing a Plan or doing

20 something, and it doesn't make that deadline, that in and

21 of itself could be a basis for conversion of the case.  But

22 anyway, I understand your point.  Anyone else want to be

23 heard, either way, up or down?  I'll come back to you in a

24 minute, Ms. Glosson.  Let's see if you've got anybody in

25 your camp here.

1    (Laughter.)

2    I haven't heard any yet.  All right.  Not a word.  Nobody.

3    Mr. Stuppi, Mr. Katz, Mr. Gallo, last chance.

4          MR. KATZ: No, Your Honor.

5          THE COURT: Okay.  All right.

6          MR. GALLO: I have a few things to say, Your

7    Honor, but not on this issue.

8          THE COURT: Okay.  Well, Ms. Glosson, go ahead,

9    closing -- you wanted a chance to reply, so please reply.

10         MS. GLOSSON: All right.  Thank you.  I think --

11   if Your Honor is -- following on the last comment that you

12   just made -- if Your Honor is inclined to continue the

13   motion, I think that we need very firm and very short

14   deadlines for some action.  The concern that we have that I

15   said at the outset is that there's been this delay in the

16   administration.  We think that the delay manifests itself

17   in the new officer that came in, sort of, you know, two

18   months into the case.  We have heard from the get-go that

19   the plan is going to be to sell inventory.  That was the

20   basis of the --

21         THE COURT: Well, some has been sold though,

22   right?

23         MS. GLOSSON: Some of it has been sold.

24         THE COURT: Yeah, right.

25         MS. GLOSSON: The July operating report shows that

1   some of it has been sold, but we don't have a Plan yet.  We

2   don't have a concrete exit strategy.  We keep getting -- we

3   hear promises that it's coming, but we don't have it yet.

4   And we don't even have -- we didn't hear from the Debtor

5   and we didn't hear from the Committee that we're going to

6   have one on file by this date and we have one in very short

7   order.  We didn't hear that.  And I think with respect to

8   the Debtor's comments that our argument presumes -- that

9   the U.S. Trustee's argument presumes that there's been

10  gross mismanagement, I think is not entirely accurate.  We

11  think that the mere fact that Mr. Kravitz came in to

12  assuage concerns about current management is the basis

13  for -- is almost an acknowledgment that there has been

14  gross mismanagement.  And if you read the --

15          THE COURT: But therefore, what?  Therefore a

16  debtor and a committee who try to apply some triage get

17  rewarded by being thrown out by a trustee because of what

18  they've done?  I mean I guess I'm confused by where you go

19  with this argument.

20          MS. GLOSSON: Well, I think --

21          THE COURT: Let's assume you had a convicted felon

22  running the business, stealing money, and the first thing

23  the new administration did is get rid of that person, under

24  your theory, that's reason enough to appoint a trustee,

25  because you had bad management, even though you got rid of

1  the bad management.

2         MS. GLOSSON: But if the basis for getting rid of

3  management is because current management -- the reason the

4  case is in bankruptcy perhaps is because of mismanagement

5  or if post-petition that particular group of officers is

6  unable to fulfill the obligations of the Debtor, then

7  that's the reason to replace them, and the Code says the

8  replacement remedy is appointment of a trustee.  I would

9  note that the Committee --

10         THE COURT: Well, we're back to cause though,

11  right?

12         MS. GLOSSON: -- the Committee acknowledged in

13  its opening paragraph that it does not dispute any of the

14  factual underpinnings of the U.S. Trustee's motion, and so

15  I think that --

16         THE COURT: Well, the statute --

17         MS. GLOSSON: -- the fact -- that suggests that

18  the Committee and creditors have concerns about current

19  management, and so this is a negotiated resolution, which

20  is, as I said previously, is not consistent with the

21  Bankruptcy Code.

22         THE COURT: Well, let's look at the statute.

23  Okay?  So, I order the appointment for cause, including

24  fraud, dishonesty, incompetence, or gross mismanagement --

25  I'll skip a little bit -- by current management, either

1 before or after the commencement of the case, so where is

2 the –- leave aside fraud, dishonesty and let's use less

3 than stellar management by the current management; where is

4 it?

5       MS. GLOSSON: Your Honor, as I stated in the

6 reply, Mr. Barber is still current management.  Mr. Kravitz

7 answers to Mr. Barber.  They concede that.

8       THE COURT: Well then I'm getting different

9 opinions about that.

10       MS. GLOSSON: Well, no, I think that –- I would

11 disagree with that.  I think Mr. Siddiqui conceded that

12 point, that –- but perhaps I misunderstood, but I think

13 that what we stated in our reply and the documents that the

14 Debtor provided to the U.S. Trustee show that Mr. Barber is

15 still the sole member of the board of managers and he's the

16 one who –- he serves –- Mr. Kravitz has to report to Mr.

17 Barber.  If for some reason Mr. Barber doesn't like

18 something Mr. Kravitz has done or decision that he has

19 made, or perhaps accepted an offer that Mr. Barber thought

20 was not a fair value, then Mr. Kravitz could be replaced.

21 And I think it's illusory to assume that Mr. Kravitz is new

22 management.  He still reports to the same parties that --

23 or the same individual now.

24       THE COURT: So again, Mr. Barber has to decide

25 what he wants to do, but if he resigned from his position,

1   then you wouldn't have that concern.  Then we're back to

2   the question of, well, who is the managing entity?  Who

3   does Mr. Kravitz answer to?

4          MS. GLOSSON: Well, I think then we have to go

5   back to the operating agreements and the governing

6   documents and --

7          THE COURT: So what did Mr. Barber do that's so

8   horrible that fits this category?  Let's go through it

9   again.  I mean the fact that the company is in bankruptcy

10  isn't alone a reason.  There's nothing -- there's no

11  indication that he's engaged in any fraud or dishonesty; is

12  there?

13         MS. GLOSSON: Your Honor, I think the evidence of

14  gross mismanagement post-petition is that there's been this

15  extraordinary delay in administration of the case, that we

16  have been hearing the same story that we're going to sell

17  and we're going to reorganize, but we haven't really seen

18  anything.

19         THE COURT: Well, let's personalize it on the

20  manager.  I mean, come on, we have a very, very unusual

21  asset in an unusual new industry.  What did Mr. Barber do

22  that might arguably come within any of these labels of

23  incompetence or gross mismanagement?

24         MS. GLOSSON: Well, I think that the haste in

25  which the Liquidbits sale was presented to the Court.  Mr.

1  Barber, he was the chief technology officer, perhaps had a

2  role in negotiating or --

3      THE COURT: Well, we're told that Ms. Hushen did

4  that, but look, what bothers me, this is my point about

5  your theory here.  Without personalizing it, the debtor in

6  possession presented an offer on an expedited basis that I

7  independently thought was a non-starter.  You obviously

8  thought that.  Mr. Smith and his clients wanted to do the

9  deal; I'm not faulting them.  But the deal got disapproved,

10  and you're saying, therefore, that is cause to replace

11  management?

12      MS. GLOSSON: I think that the facts and

13  circumstances surrounding the Liquidbits transaction

14  evidences questionable business judgment on the part of

15  current management.

16      THE COURT: But Ms. Glosson, you are a bankruptcy

17  professional, and I am, and we live in this little bizarre

18  world of bankruptcy.  How many business people out in the

19  real world understand what a disguised Plan is or ever

20  heard of the <u>Lionel</u> case or know anything about impairment

21  and classification of creditors and, you know, all these

22  weird legal labels that we put on things that have to

23  happen with Plans and Disclosure Statements, in contrast to

24  business deals that close in hours out there in the real

25  world, acquisitions and mergers and sales, and nobody cares

```
 1  because it doesn't -- it's not a creditor issue.  How can
 2  business people, even business people that have the
 3  advantage of having experienced insolvency counsel be told,
 4  because you went with a deal that couldn't be done as a
 5  matter of bankruptcy law, you are going to be thrown out
 6  and a new trustee is going to be appointed.  That seems
 7  like a very, very bad rule here.
 8          MS. GLOSSON: I think the point is well taken.  I
 9  think that the concern is, when you look at the terms of
10  the sale, the terms of the sale were -- some of which were
11  ambiguous or vague, we did not know what value was being
12  assigned to this intellectual property.
13          THE COURT: Right.  I agree.  There are 20 reasons
14  why that deal couldn't be done, but Congress didn't say --
15          MS. GLOSSON: From a legal standpoint -- but I
16  think it still applies to the person who is the one making
17  the decision for the Debtor and that was Mr. Barber.  Mr.
18  Siddiqui isn't going to parade in a motion to sell assets
19  when he doesn't have the authority of the client, and --
20          THE COURT: But Ms. Glosson, if Hashfast
21  Technologies had not been in bankruptcy, would there have
22  been any illegality to doing the Liquidbits deal by the
23  company out there outside of bankruptcy?
24          MS. GLOSSON: Well, when you consider the terms
25  that represent it, I think that there were -- they evidence
```

1  questionable business judgment, and when you pair all of

2  that -- it's not just stand-alone -- when you pair all of

3  that with the pre-petition conduct which include --

4          THE COURT: What pre-petition conduct?  What pre-

5  petition conduct?

6          MS. GLOSSON: I will get there in just a moment.

7          THE COURT: So when you look at the pre-petition

8  conduct, we have a Debtor who sold 17 million dollars worth

9  of product in 2013, and its business -- its books and

10  records were so insufficient and so inadequate, and Ms.

11  Hushen testified to these facts that they were not -- I

12  can't remember precisely her quote, but --

13          THE COURT: Right, it was less than stellar; I

14  understand that.

15          MS. GLOSSON: Correct.  And she even said that the

16  Debtor believed it had made a profit in 2013 when the books

17  and records, once reconciled and once sort of, you know,

18  she had an opportunity to review them, it was clear that

19  there was no profit in 2013.  And the fact that the Debtor

20  doesn't even realize that until it brings in a new CFO,

21  replaces the current CFO, and that occurs four months into

22  the following year, I think that that -- the state of the

23  Debtor's books and records also evidences gross

24  mismanagement.

25          THE COURT: Okay.  So to recap -- well, you said

1 you were going to -- I mean if for the moment the current
2 management consists of two people, one of whom is truly
3 new; one of whom is old, and you're focusing on Mr. Barber,
4 and so what is the -- beyond the general notion that the
5 company did a lot of sales that it couldn't deliver on and
6 that its books were less than perfect, do you think that is
7 gross mismanagement and incompetence?

8             MS. GLOSSON: Your Honor, I also think --

9             THE COURT: I mean that's every debtor we have
10 here, every one of them.

11             MS. GLOSSON: And, Your Honor, we -- Your Honor, I
12 think that the other issue that -- while I recognize is
13 resolved by the substantive consolidation motion, what you
14 had was, you had two entities that were operating as a
15 single economic unit but were legally separate, and all of
16 the liabilities were centralized into one -- into the
17 operational entity, and the value that the Debtors say
18 exist in this estate is with the inventory and intellectual
19 property, the intellectual property resided in another
20 entity.

21             THE COURT: No, I understand.

22             MS. GLOSSON: And there are virtually no creditors
23 in that case.  And still, I can't figure out at this point
24 that we have amended schedules and there are -- the amended
25 schedules have removed one particular creditor from the

 1 | parent.

 2 | THE COURT: So Ms. McDow just arrived.  Shall we
 3 | tell her that I just appointed her trustee for being late?
 4 | That's her reward.

 5 | (Laughter.)

 6 | Ms. McDow, do you want to make your appearance.

 7 | MS. McDOW: I apologize, Your Honor.  Yes, it's
 8 | Ashley McDow, Baker Hostetler, on behalf of the Official
 9 | Committee of Unsecured Creditors.

10 | THE COURT: Your colleague, Ms. Green, has been
11 | conducting her representation quite admirably, but go
12 | ahead, Ms. Glsson.

13 | MS. GLOSSON: I think that when you look at the
14 | totality of the circumstances of this case and we think
15 | that there is cause to appoint a Chapter 11 trustee, and
16 | that the Committee doesn't dispute that there has been
17 | mismanagement; that there is cause to appoint a trustee,
18 | and that's the reason why Mr. Kravitz is now in place, that
19 | negotiated resolution or settlement of that issue is not
20 | consistent with the Bankruptcy Code.

21 | THE COURT: Okay.  Mr. Siddiqui, what can you
22 | offer me by way of a solution here if Ms. Glosson says if I
23 | don't order the trustee, I do put some real deadlines on
24 | there.  And Mr. Smith said the same thing.  And I realize
25 | that it's like if you order a Debtor to sell Black Acre or

1    it goes to foreclosure, and you give them a date 30 days

2    out, nobody is going to be in a hurry to bid more than the

3    bank is owed, that it's going to foreclose on day 31,

4    right?  But what can you suggest by way of a more reliable

5    time table or deadlines?

6              MR. SIDDIQUI: Well, as I'm thinking, Your Honor,

7    I'm worried exactly about the issue you state, which is, if

8    you don't buy on November 1st -- I'm picking a day out of

9    thin air -- then there will be --

10             THE COURT: There'll be a trustee on November 2nd,

11   who will set to you cheaper.

12             MR. SIDDIQUI: Yeah, right, for ten cents on the

13   dollar, right.  And then what's what I don't want, Your

14   Honor.  And --

15             THE COURT: But how do we solve the problem?

16             MR. SIDDIQUI: Well, to be honest, Your Honor, I

17   don't -- the problem is that the Trustee's motion requires

18   clear and convincing evidence of gross mismanagement -- of

19   cause.  There isn't any.  I'm not suggesting, Your Honor,

20   that you let me roam free and no leash and I can behave and

21   the Debtors can behave however they want; we're not

22   interested in that.  We've been trying our best to move

23   quickly.  I'm sort of confounded by the dual arguments that

24   were just made that we have two problem here, that there's

25   been a bunch of delay and we moved quickly on the

 1  Liquidbits deal.  This whole case has been, unfortunately,

 2  a reaction.  We had a Liquidbits deal.  We came in here,

 3  and it was disapproved, as you say.  Fine.  Then we're

 4  dealing with this.  And it's distracting.  It's creating --

 5  this is the reason why we're not moving forward, is my

 6  client has been distracted.  Ms. McDow and Ms. Green's

 7  client has been distracted.  Mr. Barber and Mr. Kravitz'

 8  time has been distracted from the real game.  Now of course

 9  we're all professionals and distraction is the world we

10  live in, but --

11          THE COURT: Goes with the territory, right?

12          MR. SIDDIQUI:  -- but there's still only enough

13  time in the day, so, Your Honor, our commitment is to move

14  promptly.  If a deadline is imposed, we will strive to meet

15  it, and if -- I'm loathe --

16          THE COURT: Well, let me ask -- an alternative.

17  Is there a way to kind of skin the cat differently and that

18  is have a formal Plan before you have all the specifics of

19  a business plan.  In other words, what if the Debtor and

20  the Committee sponsored a joint capital "p" Plan, that

21  said, the reorganized consolidated Debtor will be managed

22  by Mr. Kravitz, who will proceed to exploit and liquidate,

23  on the best terms feasible, the IP and lower the inventory,

24  and I'm not saying you want to get rid of Ms. Glosson;

25  she's a nice colleague and a member of our Bar here, but if

1  you had a confirmed Plan that everybody accepted and then

2  under that confirmed Plan, the business people, Mr. Kravitz

3  and others, were given some freedom, would that accomplish

4  anything?  Would that be worth pursuing?

5            MR. SIDDIQUI: It might be worth pursuing, Your

6  Honor.  And I don't want to say something without, you

7  know, giving it full thought, but if I were capable of

8  confirming that Plan today, we would file that Plan.

9            THE COURT: Ms. Glosson doesn't get a vote.

10           MR. SIDDIQUI: No, I'm not worried about --

11           THE COURT: She gets to object if it's legally

12  defective, but I think that Ms. Glosson knows my style well

13  enough to know, if the creditors vote for something that

14  isn't flatly illegal, then they get what they voted for.

15  Period.

16           MR. SIDDIQUI: Understood, Your Honor.  Yes, and

17  it's a valid fact.

18           THE COURT: So if you file the Plan, a joint Plan,

19  and you got the requisite votes, and you no longer had a

20  DIP, and you no longer had the traditional monthly

21  operating reports, and more importantly, you had relief

22  from some of the rules of 363, not to mention payment of

23  professionals, again, I'm not speaking for the United

24  States Trustee, but to some extent, the Chapter 11 will

25  have served its purpose.  Obviously you have to reach an

1  agreement that the Committee would support, and the other
2  creditors.  Again, Liquidbits is a creditor; Mr. Gallo has
3  a bunch of creditors.  I'm not saying they don't count, and
4  the Committee couldn't force something down their throats
5  without, you know, unless they had enough votes, it's not
6  something you have to act on today.  I wish your client
7  contact were here so you could confer with him, but I'm not
8  asking you to come back and say, sure, that's a good deal;
9  we'll do it.  We'll have a Plan on file next week, because
10 that might not be possible.  I'm just asking you to
11 consider that as an option.

12      So your point is that I should say to Ms.
13 Glosson, sorry, you haven't made your case for cause.
14 Motion denied.  See you later.  And then we wait for the
15 next thing to happen.  But that's not quite what Mr. Smith
16 is looking for either.  He wants me to -- he wants the
17 Chapter 7 option to be hanging over the Debtor's head too.

18      MR. SIDDIQUI: To be sure.  But Mr. Smith is a
19 very skilled lawyer.  He's capable of filing a motion if
20 the facts and circumstances warrant it.  Yes, Your Honor,
21 that's exactly --

22      THE COURT: Well, one way to make them warrant it
23 is for you to have a deadline.  And again, I'm reluctant to
24 do the deadline for the reasons I told you.  But the fact
25 of the matter is sometimes that's what happens.  I mean if

1  I were smart enough to know what the market's deadline

2  would be, I'd just give you a little more time after that

3  deadline.  I don't know what it is.

4          MR. SIDDIQUI: Nor do we Your Honor.  It is a real

5  conundrum, but only if a remedy is appropriate today, and I

6  don't think a remedy is appropriate today.  I totally

7  understand both Ms. Glosson, Mr. Smith, and Your Honor's

8  concern that if we're in the exact same situation in 45 to

9  60 days time and there's no movement, then we're in a

10 different situation.  That is not where we're at today.  We

11 are at the beginning of a new chapter.  Like I said, the

12 motion was filed before Mr. Kravitz is even on board.

13         THE COURT: Well, he was -- in his corporate form,

14 the motion to appoint his company had been filed; hadn't

15 it?

16         MR. SIDDIQUI: True, but for the Committee.

17         THE COURT: Oh, that's right, yes, you're right.

18 That's true.  Excuse me.  One second, let me just look at

19 the Code for a minute.  Well, conversion or dismissal,

20 1112(b)(4),

21              "...continuing loss or diminution, gross

22              mismanagement, failure to maintain insurance,

23              unauthorized use of cash, failure to comply with

24              order of the court, failure to make reports,

25              failure to attend meeting of creditors, failure

1          to file Disclosure Statement or Plan within time

2          fixed by the court."

3  You know the rest of them; you know what they are, so --

4          MR. SIDDIQUI: Indeed, Your Honor.  Perhaps that's

5  the resolution, Your Honor, is, if there were a time fixed

6  by the Court -- I mean I recall me standing here and you

7  advising me that exclusivity is an East Coast concept and

8  not one that this Court necessarily is troubled by, but --

9  but the Committee and we and the Debtors are working

10 together.  It will not be a situation where there's a Plan

11 that's filed by the Debtor that --

12         THE COURT: Look, if Mr. Smith or Mr. Gallo or Mr.

13 "X" showed up and said, I have got a killer Plan, I

14 probably will let him file it, but they haven't.

15         MR. SIDDIQUI: Agreed, Your Honor.

16         THE COURT: So it's not an issue.  Okay.  So given

17 your sharing my concerns about artificial deadlines,

18 what -- if I deny today's motion, is that all I do just

19 deny and goodbye?  Or can you suggest something, status

20 conference -- God forbid another status conference --

21         MR. SIDDIQUI: That might work, Your Honor.  I

22 mean I can represent to Your Honor that the Committee's

23 professionals, the Debtor's professional, the Debtor's

24 officers, the Debtor's director, we all want the same

25 thing.  We're all pursuing vigorously the same remedy.

1   We're not –- yes, we've had distractions that we needed to
2   run down, but that is the main goal, and if Your Honor –-
3   maybe that is the answer.  In 28 days we have a status
4   conference and if we report to you what has happened since
5   today, and if Ms. Glosson, if Ms. McDow, Ms. Green, Mr.
6   Gallo and Mr. Snith, Mr. "X" is dissatisfied, and they
7   orally move for a conversion or something and Your Honor is
8   willing to entertain it, then –-

9           THE COURT: Well, I mean then a more technical way
10  to do that is just to continue the motion.

11          MR. SIDDIQUI: Well, I think the motion is
12  improperly founded.

13          THE COURT: I know you do.  Ms. McDow, I don't
14  know if you want to let your colleague follow up on this or
15  you want to say something, but let me tell you something,
16  if your other counsel didn't –- if Mr. Siddiqui didn't tell
17  you, the substantive consolidation is a done deal.  I've
18  authorized it.  It's done.  And no party participating in
19  today's hearing has supported the U.S. Trustee's motion.
20  Mr. Smith for Liquidbits asked that I keep open the
21  possibility of a conversion under some sort of short time,
22  but you've heard the colloquy, and again, if Ms. Green
23  should speak, I'll leave that to the two of you.  I don't
24  want both of you –-

25          MS. GREEN: Your Honor, can I go ahead and address

1  that?

2           THE COURT: Sure.

3           MS. GREEN: Can I respond to Mr. Siddiqui since

4  I've been on the phone for the whole hearing?

5           THE COURT: Sure.

6           MS. GREEN: And I know what I heard.  Your Honor,

7  I think you're correct that, you know, in terms of having

8  reached a solution now between the Debtor and the

9  Committee, and quite frankly, you know, all debtors become

10 debtors for a reason, and so appointment of a trustee in

11 all of those circumstances is clearly not appropriate.  And

12 I agree, and Ms. McDow and I and Mr. Siddiqui have talked

13 about the fastest and expeditious way to sell these assets,

14 and we think that we're getting to where we need to be, and

15 I think a status conference would make perfect sense in 30

16 days.  In terms of keeping the motion open, I agree that

17 the U.S. Trustee hasn't met their burden, and in terms of

18 Mr. Smith's concerns, I understand his concerns.  They're

19 clearly a significant creditor, but they're also an entity

20 that is out as a jilted buyer and obviously conversion may

21 serve their purposes in other respects.  So I think at this

22 point, it makes a lot of sense to set another status

23 conference, and the Committee has pledged to work with the

24 Debtor as quickly as possible to either file a Plan or to

25 dispose of these assets.  It doesn't help anybody to have

1  have us all sitting here arguing about conversion and

2  trustee motions when really the real issue is how are we

3  going to monetize these assets.

4         THE COURT: Okay. Well, Ms. Glosson, I think that

5  if I understand the legal theory, because you've referred

6  me back to the Code repeatedly, correctly, is your view is

7  once we get to cause, then I have to do something, and I

8  think I'm inclined to agree with Mr. Siddiqui that I think

9  under the unusual nature of this business and the way it

10 has played out, the fact that there has been -- there's a

11 slightly unusual form of corporate structure in the form of

12 a member who is prior management who may or may not have a

13 senior position if I use sort of the ranking system to a

14 new manager against whom no one has issued a criticism, I

15 don't think that amounts to cause, in part because I think

16 that the efforts of the Committee to fix some of the

17 problems have gone a long way.  The consolidation is one of

18 them.  Again, I expressed my concerns a half hour ago; I

19 was surprised that there was no objection to substantive

20 consolidation, but there wasn't, so that's why I approved

21 it.  So I think on balance my instincts are to go ahead and

22 deny the motion this time, but obviously that's without

23 prejudice to anyone doing it again.  I don't have to say

24 that; you know you could do it again.  So do you want to

25 make a last pitch effort here to --

1    MS. GLOSSON: Well, no, I just want to –- Mr.

2  Siddiqui indicated that he felt that the burden of proof is

3  a much higher one than we think it is.  To the extent that

4  Your Honor is going to weigh in on that issue, I think –- I

5  would just like an opportunity to speak with respect to

6  that.

7    THE COURT: I don't think you have to talk about

8  burdens.  To me, despite, you know, despite the point about

9  cause, every single case says it's discretion, and the

10  standard of reviewing my decision is abuse of discretion.

11  I've heard, you know –- the fact that creditors haven't

12  opposed your motion other than the Committee isn't

13  dispositive.  What is dispositive to me and important to me

14  is that one thing that I don't think you'll disagree with

15  is the relationships between the debtor in possession and

16  the Committee has changed, or maybe they've been forced

17  to –- you know, the Stockholm Syndrome; you come to love

18  your captors after a while –- but it's also a realistic

19  point of view of they've got to get a fix here, and your

20  role is fine.  I'm not faulting you at all, and I'm going

21  to invite you to keep the pressure on, if you will.  But

22  I'm –- so I don't think we have to get into burdens of

23  proof; it's not the point.  I think in my discretion and

24  I've been, as you know, with this case since it began, and

25  it's just not the right thing to do at this point.

1       MS. GLOSSON: Your Honor, to use your words, to

2   sort of keep the pressure on, I would suggest that we just

3   continue the motion to some point in the future.  We still

4   have not heard a time line, and, Your Honor, I posed that

5   question to the Debtor, and we didn't get any firm response

6   to that.  And I recognize that there are concerns that

7   perhaps might be associated with fixing a date in time, but

8   I think we need some more certainty than just walking away

9   from this hearing, and the U.S. Trustee's motion is denied,

10  and the Debtor and the Committee are left to proceed.

11      THE COURT: The reason why I'm going to decline a

12  portion of what you say is, this is not the -- you know,

13  the little case with two pieces of rental property where

14  you filed a motion and complained about operating reports

15  and, you know, administrative matters, and we continue and

16  continue it.  Here, this is a dynamic case.  The

17  consolidation has changed the impact of your motion.  The

18  Kravitz management has, in my mind, changed it.  So I'm not

19  trying to make more work for you, but I think in this case,

20  if I didn't deny your motion, I'd insist that there be some

21  affirmative amendment to it, if it's going to be something

22  you're going to push at a continued hearing.  So I'd rather

23  say I'll deny it, but you can make an abbreviated motion if

24  something comes up that you believe is reason to revisit

25  the matter.  And I think that if I -- if both the

Committee's counsel and Debtor's counsel are not opposed to
this 30-day status conference –- and let's make a deal
here.  If we keep hearing at continued status conferences
that we just don't have a deadline, then maybe it's time to
impose a deadline.

MS. GLOSSON: And perhaps you'd entertain an oral
motion to shorten time.

THE COURT: Maybe I would, yes.  And again, Ms.
Glosson, I know you well enough to know that you don't like
to be asked advisory opinions because then you'll tell me
you'll have to confer with Ms. Davis, but I would be
curious if you would share with the Debtor's counsel and
the Committee's counsel your views on my suggestion that
they see if they can get a confirmed Plan even if they
don't have all the details of a business plan in place and
whether that would be any help at all in solving your
concerns, and again, don't respond to that now.  So I'm
going to deny the U.S. Trustee's motion on the basis that
I'm not convinced that the cause exists in terms of current
management of any incompetence or gross mismanagement.  I
make no determination about prior management, and I
acknowledge that the current management is itself a bit of
an unusual structure, and if it turns out Mr. Kravitz is
merely a puppet and, you know, you could never have Mr.
Kravitz and Mr. Barber in the same room speaking at the

1   same time, then that would suggest to me we're looking at a
2   puppet.  But I don't think that's the case.  My instincts
3   tell me Mr. Kravitz is his own man here and is doing what
4   Mr. Siddiqui says he's doing.  And so I think that with the
5   statute having -- it's an "including," so there could be a
6   lot of other reasons for cause, but I don't think -- I
7   don't think, for example, the Debtors moving to do a quick
8   Liquidbits deal that was DOA in my view from a legal point
9   of view is enough to get within cause and certainly the
10  conflicts that could exist between a parent and a
11  subsidiary corporate entity or LLC entity have been
12  resolved by the consolidation.  So it comes down to
13  management.  I don't think the Debtors -- the fact that the
14  Debtor hasn't put a dollar value on its principal asset
15  fits cause under this circumstance.  It might in some other
16  case, but it doesn't in this case because of the whole
17  uncertainty about IP in an industry that is itself new and
18  in a world of patent law and that is changing -- every time
19  the Supreme Court sits, it changes the next day when they
20  issue a decision about patent law.  So all in all, it tells
21  me that the case hasn't been made and there's no -- in my
22  discretion, I would not -- if I have discretion --
23  apparently I have less discretion if I find cause, but I
24  think I don't find cause and therefore I wouldn't consider
25  appointing a trustee at this point.

1          So Mr. Gallo, you said you wanted to say

2    something about something else.  There's nothing else on

3    the calendar, so unless you have something that's --

4          MR. SMITH: Your Honor, it's Edwin Smith.  Could I

5    just make one comment before you go to Mr. Gallo, if I may?

6          THE COURT: Yes, sir.

7          MR. SMITH: Your Honor rightly pointed out that

8    there are other possible grounds for conversion of the case

9    or appointment of a trustee that were not mentioned in the

10   U.S. Trustee's motion, and that Your Honor is making no

11   ruling and finding or other reference to cause.  The one

12   thing we have talked about is the delay in having anything

13   happen in this case, and the fact that during that period

14   of delay, there has been, at least in the view of

15   Liquidbits, continued diminution of the value of the

16   estate.

17         THE COURT: Right.  I understand that.

18         MR. SMITH: So I just wanted to say on the record,

19   Your Honor that that ground is something we expressly

20   reserve to come back to you on if we're not seeing anything

21   happen here.

22         THE COURT: Well, and you have the basis, not

23   under 1104, but under 1112, and so I think Mr. Siddiqui was

24   stroking you by saying you're certainly an experienced

25   lawyer, capable of putting together a motion, but it would

1  have to be a motion supported by competent evidence, and if

2  the competent evidence was that there's just been, you

3  know, to use the words of the statute, "a continuing

4  diminution of the estate," it's substantial or --

5              MR. SMITH: Correct, Your Honor.  I just wanted to

6  make --

7              THE COURT:  -- "substantial or continuing loss to

8                  or diminution of the estate in the absence of a

9                   reasonable likelihood of rehabilitation."

10 That's 1112(b)(4)(A).  And you can make that motion.

11             MR. SMITH: Thank you, Your Honor.  I just wanted

12 to make that point in technicolor.

13             THE COURT: Okay.  Mr. Gallo.

14             MR. GALLO: I wanted to let the Court go ahead and

15 rule on that, and now that we're done with that, though, I

16 think it is appropriate -- and I understand the Court is

17 sensitive to it, but the record should reflect, on behalf

18 of my clients, and I suspect the numerous other

19 unrepresented creditors, in my perception, the Liquidbits

20 deal which this Court disapproved for its own good reasons,

21 was susceptible to reformulation, re-negotiation, and

22 presentation to this Court in a legally acceptable format.

23             THE COURT: Of course.

24             MR. GALLO: The IP and license issue was a license

25 incidental to making good use of the equipment, and it was

1 really the failure of the primary players here to sit down
2 and work with Liquidbits and get that deal done, that
3 probably will have been shown in time to lead to
4 substantial prejudice to the estate in terms of continuing
5 diminution of value.  I have worked hard to get along and
6 be pleasant with everybody here, but in fact, what has been
7 said about delay and loss of value is very true, and I
8 appreciate this Court's efforts to do what it can without
9 prejudicing the effort to monetize that value, to motivate
10 the parties to get their job done, negotiate without
11 bickering and personal issues entering in, and advance this
12 process.
13 　　　　　THE COURT: Okay.  Thanks, Mr. Gallo.  All right.
14 Let's do this.  I'm going to ask you, Mr. Siddiqui, to
15 upload a simple form of order that recites –- serve it on
16 Ms. Glosson –- for the reasons stated on the record, the
17 U.S. Trustee's motion to appoint a Chapter 11 trustee or in
18 the alternative to convert the case is denied.  Just the
19 reasons stated is good enough.  I'm going to then give you
20 a date for a continued statute conference and a deadline to
21 file a status conference statement, and you can do it
22 jointly with the Committee or maybe –- let's do this.
23 Consistent with this kumbaya that you've been saying has
24 been sung lately between the Debtor and the Committee, I
25 want a joint statement, a joint status conference statement

1  from the Committee and the debtor in possession, and let me

2  pick a date and see if that works for all of you.

3          Today is the 10th.  Well, how about if we push it

4  out a little bit and have a joint status conference

5  statement by October 17th and we have a hearing on October

6  24th.  Is that available, Ms. Parada?

7          THE CLERK: Yes.  At 11:00 o'clock?

8          THE COURT: Is that not good for you, Mr. Gallo?

9          MR. GALLO: Your Honor, is there any way that we

10 could try and condense this and really get people

11 motivated.  I understand Mr. Siddiqui talking about all the

12 work that's been done, but I somehow doubt that it's taking

13 up his full time and energy.

14          THE COURT: But that's five weeks, and if he has a

15 deal –- look, if there's a deal tomorrow, I expect him to

16 file a motion tomorrow, or if there's a Plan.  I mean what

17 would you suggest as a more --

18          MR. GALLO: I would just, you know, push it out

19 two weeks and hope that everybody would get to work and get

20 something done, because I believe Mr. Siddiqui, when he

21 told us long ago that he had really talked to a wide number

22 of players and understood who was a real bidder and who

23 wasn't, and we have more people now hopefully doing the

24 same thing, and I would think we could get something done

25 here before there's further diminution.

1        THE COURT: Okay.  Mr. Siddiqui, I'm going to do

2   something unusual.  I'm going to ask your client directly.

3   Mr. Kravitz, are you still there?

4        MR. KRAVITZ: Yes, Your Honor.

5        THE COURT: What do you think would be a realistic

6   time for you through corporate counsel, through Mr.

7   Siddiqui, to have something to report by way of something

8   being done, not -- you heard the colloquy, so what is your

9   estimate of a time frame?

10       MR. KRAFITZ: Absolutely, Your Honor.  I think

11  that we would like to see -- certainly we've gone out to

12  the interested parties that have expressed interest with

13  proposed bid sheets.  We're hoping, working backwards, that

14  we hear from them within the next couple of days.  By the

15  time we get a draft APA signed, that we could get an

16  overbidding process, I think coming back a month from now,

17  but being transparent with the Committee which we have --

18  this is not an average case.  We participate on Committee

19  calls on a weekly basis.  I have people in my office giving

20  me real time updates about where we are.  So the comment of

21  "getting to work," we have people working round the clock

22  on it, so a month is a pretty reasonable time horizon for

23  us to make substantial progress and have found a stalking

24  horse bidder and -- I keep talking, well, we're blocking

25  and tackling, finding somebody to --

1    THE COURT: No, Mr. Kravitz, I'd rather you not

2 talk further, because I don't think -- your lawyers are

3 probably cringing at the thought of, what's he going to say

4 that we don't want the Judge to hear.  I just want --

5    (Laughter.)

6    MR. KRAVITZ: A month sounds like a reasonable

7 time line.

8    THE COURT: I just wanted a month in case there's

9 nothing else that happens.  If you get a term sheet, you

10 know, next Monday and a serious deal that needs to go

11 quickly, then light a fire under your lawyers and we'll

12 hear it on an expedited basis.  My October 17th status

13 conference assumes -- or status conference statement with a

14 hearing on the 24th is to assume that there isn't anything

15 to report, and there isn't an action item, because that's

16 when Mr. Smith and Mr. Gallo and Ms. Glosson all -- or

17 anyone else -- can scream bloody murder and say, see, it's

18 the same old story.  And we can then move quickly on Plan B

19 and if Plan B is to resume the motion to convert or appoint

20 a trustee or something, we'll deal with it on an expedited

21 basis.  So Mr. Gallo, I'm going to -- the reason I did what

22 I did is because I had no sense from a business reality

23 point of view.  Mr. Kravitz sounds to me like somebody that

24 wants to try to move things quickly, and he's running the

25 debtor in possession.  So is there any principal counsel --

1  and I'm not excluding other counsel, but Ms. McDow, Mr.

2  Smith, Mr. Gallo, Mr. Siddiqui, Ms. Glosson, are you all

3  available on October 24th at 11:00?  Or Anybody have a

4  problem with that?

5          (No response.)

6          Okay.  Then I'd like a joint statement from the

7  Debtor and the Committee.  I was only half kidding.  If you

8  can't agree on a joint statement, each of you file a

9  statement as to what's going on, October 17th, joint

10 statement preferably.  We'll have a hearing on October 24th

11 at 11:00.  Nothing prevents any party seeking to move for

12 extraordinary relief from doing it either earlier under the

13 normal shortened time procedures, nor does it preclude the

14 Debtors from, consolidated Debtors, from moving on a more

15 expedited basis for a sale or whatever else might be in the

16 works.  So Ms. Glosson, thanks again for teeing this up.

17 Thank you all for your participation.  I will look forward

18 to getting orders on the two matters that we dealt with,

19 and I'll see you on the 24th of October if not sooner.

20          ALL COUNSEL: Thank you, Your Honor.

21      (Whereupon, the proceedings are concluded at 10:53

22 a.m.)(

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: October 4, 2014

12

13

14

15

16

17

18

19

20

21

22

23

24

25