KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtor and Debtor-In-Possession
HashFast Technologies LLC and HashFast LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company,<br><br>    Debtor and Debtor-In-Possession<br><br>---<br><br>☒ Affects HASHFAST LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor-In-Possession | Lead Case No. 14-30725<br><br>Jointly Administered and Substantively Consolidated with:<br><br>Case No. 14-30866<br><br>Chapter 11<br><br>Hearing:<br>Date: December 5, 2014<br>Time: 1:00 1.m.<br>Ctrm: Hon. Dennis Montali<br>      235 Pine Street, Courtroom 22<br>      San Francisco, CA 94104<br><br>**JOINT STATEMENT OF THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF AUCTION AND SALE MOTION** |

The above-captioned debtors (together, the "Debtors") and the official committee of unsecured creditors appointed in these cases (the "Committee") file this joint statement in order to update the Court regarding the results of the sale of certain assets at auction.

For the reasons discussed below, the Debtors and the Committee intend to proceed with the sale hearing tomorrow in order to obtain approval for, and authority to close on, the winning bid of Simon Barber.

## Summary of Auction

The Debtors' and the Committee attempted to conduct an auction of certain assets pursuant to the Court's order authorizing certain bid and sale procedures (the "Bid Procedures Order") [Doc. 228]. Only one qualified bid, submitted by Simon Barber, was received prior to the bid deadline. All other timely bids were determined to be non-qualifying because they consisted of "lowball" offers that were not of interest to the Debtors or the Committee.

The Debtors and the Committee met and conferred following the passage of the bid deadline and together decided to cancel the auction. As is set forth in the attached Declaration of Victor Delaglio, alternative next steps to maximize the value of the Debtors' remaining assets are underway.

## Summary of the Simon Barber Bid

Mr. Barber timely submitted a bid for the claims and causes of action against Simon Barber identified in paragraph (e) of Exhibit 1 to the auction notice attached to the Bid Procedures Order (the "Barber Claims").

The price offered for the Barber Claims was comprised of the following consideration:

- Mr. Barber shall pay to the debtors the sum of $20,000, payable as follows: $10,000 upon entry of an order (the "Sale Order") approving Mr. Barber's bid as the winning bid and authorizing the Mutual Release (defined below); and $500 per

2

month over the 20 month period beginning on February 1, 2015 (until such time as the remaining $10,000 has been paid in full).

- Following his resignation, Mr. Barber will provide the Debtors, the Committee and/or any liquidating trust which is created by and through a plan of reorganization (the "Liquidating Trust") with 60 hours of his time as an independent consultant at no costs to the estate.

- If the Debtors, the Committee and/or the Liquidating Trust require more than 60 hours of Mr. Barber's services, Mr. Barber shall make himself reasonably available to provide such additional support at a rate of $350 per hour, and shall not unreasonably refuse to provide additional support to the Debtors, the Committee and/or the Liquidating Trust.

- Mr. Barber and the Debtors will enter into a broad mutual release (the "Mutual Release"), which will cover any and all remaining pre- and post-petition claims of Mr. Barber and the Debtors against each other (but shall not release Mr. Barber's right to receive any unpaid wages); provided, however, that the Mutual Release will be subject to the Debtors, the Committee's, and/or the Liquidating Trust's right to pursue claims against Mr. Barber to the extent there is insurance coverage available to pay such claims. The Mutual Release shall be documented in a separate agreement in a form acceptable to Mr. Barber, the Committee, and the Debtors, and shall include a non-disparagement provision. The Debtors and/or the Committee will use best efforts to ensure that the non-disparagement provision is binding on any purchasers of the "Hashfast" name, domain name and/or similar intellectual property. The Sale Order shall authorize the Debtors to enter into such an agreement and the Committee to sign off on it.

In addition, as part of the bid, Mr. Barber will be discharged as an employee of the Debtors upon entry of the Sale Order and shall immediately be paid his wages earned through that date and unpaid at the time of discharge. Mr. Barber also provided the Debtors and the Committee a personal financial statement in order to facilitate their evaluation of his bid in the context of a compromise as discussed further below.

### The Timing of the Filing of This Statement

The Debtors recognize that filing this statement on the eve of the sale hearing is not ideal. In this case, however, the Debtors felt it was necessary. Up until the bid deadline (5:00 p.m. on December 2) the Debtors believed one or more parties other than Mr. Barber might submit a bid for the Barber Claims. Indeed, to accommodate certain bidders, the Debtors and the Committee agreed to extend the bid deadline with respect to the Barber claims until 12:00 p.m. on December 3, 2014. In the end a competing qualified bid did not materialize. But, had the Debtors filed the below analysis of the Barber Claims prior to the bid deadline, it might have had a chilling effect on potential overbidders. Accordingly, in order to truly test the market, the Debtor withheld the filing of this statement until after it was clear that no other bidder had stepped forward with a qualifying overbid.

### Viewed as a Compromise, the Sale of the Barber Claims to Mr. Barber is Fair and Equitable

Notwithstanding Mr. Barber's winning bid for the Barber Claims, a transaction amounting to a sale of causes of action to a defendant must be analyzed as a compromise as to which the Court has an independent duty to determine whether it is "fair and equitable." *In re Lahijani*, 325 B.R. 282, 290 (B.A.P. 9th Cir. 2005). The discussion that follows below is intended to provide the Court with the legal framework and factual basis for such a determination.

As stated by the Supreme Court in *Protective Committee of Indep. Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968), to approve a proposed settlement, a court must have found that the settlement was "fair and equitable" based on an "educated estimate

4

of the complexity, expense, and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."

The Ninth Circuit has established the following factors to determine whether to approve a settlement:

> [I]n determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the Court must consider (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1381 (9th Cir), *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854 (1986), overruled in part on other grounds by *In re Washington Public Power Supply* System *Sec. Litig.*, 823 F.2d 1349, 1350 (9th Cir. 1987) (hereafter "A & C Props.").

In approving a settlement, the Court need not conduct an exhaustive investigation of the claims sought to be compromised. *See, e.g., United States v. Alaska Nat'l Bank of the North (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982) (hereafter, "*Walsh Constr.*"). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *See, e.g., A & C Prop.*, 784 F.2d at 1381; *In re Churchfield*, 277 B.R. 769, 774 (Bankr. E.D. Cal. 2002). Accordingly, a settlement need only "be in the best interests of the estate and 'reasonable, given the particular circumstances of the case.'" *Goodwin v. Mickey Thompson Ent. Group, Inc. (In re Mickey Thompson Ent. Group, Inc.)*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003). As a result, the Court is not required to decide the numerous questions of law and facts raised by the litigation. A "mini-trial" on the merits of the underlying cause of action is not required. *See In re Blair*, 538 F.2d 849, 851-52 (9th Cir. 1976); *Walsh Constr.*, 669 F.2d at 1328; *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997). Instead, the Court's responsibility is only

Case: 14-30725    Doc# 242    Filed: 12/04/14    Entered: 12/04/14 16:23:04    Page 5 of 10

to "canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir. 1983) (internal citation and quotation marks omitted).

Here, when viewing the sale of the Barber Claims to Mr. Barber through the lens of a compromise, the relevant factors identified in *A & C Properties* support approval of the transaction.

1. <u>The Probability of Success in the Litigation.</u>

The Barber Claims consist of all claims of the Debtors against Mr. Barber. For purposes of the following analysis, those claims have been broken down into two general categories: (a) avoidance actions, and (b) fraud/breach of fiduciary duty.

Based upon the information and documentation that has been evaluated by the Debtors and/or the Committee thus-far, the avoidance actions against Mr. Barber have questionable value because the vast majority of transfers to Mr. Barber appear to be on account of wages or expense reimbursements. With the exception of a bonus of five Bitcoins (cash value of $4,160 at the time), the transfers to Mr. Barber appear on their face to be payments in the ordinary course of business. In other words, the Debtor believes that the likelihood of success on such claims in litigation is low.

Beyond the avoidance actions, the other potentially material claims are for breach of fiduciary duty and fraud. Those claims would turn in large part on a showing of (a) actions taken in a manner inconsistent with reasonable business judgment under the circumstances, and (b) outright fraud, most likely in the form of stolen Bitcoins, defalcation of Debtors' other assets, and several other theories. The Debtors and/or the Committee have had occasion to test and investigate such claims in several ways.

First, Mr. Barber sat for questioning at two separate Section 341(a) meetings of creditors, where he was questioned under oath on matters relating to his pre-petition business decisions and an accounting of Debtors' assets (including personal property, cash and Bitcoin). Questions were asked of Mr. Barber by Committee counsel, individual creditors, and the United States Trustee.

Second, Mr. Barber was examined under Rule 2004 by counsel for the Committee. In connection with that examination, the Debtors produced documents as requested by Committee counsel. Similarly, the Committee deposed and sought documents from the Debtors' former CEO, former CFO and a former employee. In each of those depositions the Committee asked the deponents questions about Mr. Barber, including his role with the company and his conduct during critical times.

Third, at the request of the Debtors and the Committee, Mr. Barber finalized a Bitcoin reconciliation which purports to provide a detailed explanation of the accounting of the Debtors Bitcoin holdings.

Fourth, the Debtors' current CRO has unfettered access to the Debtors' books and records, and has been able to review documents and question Mr. Barber regarding his role with the Debtors, and

Fifth, the Mutual Release of Mr. Barber expressly preserves the right of the Debtors and the Committee to name Mr. Barber in an action and pursue any available insurance coverage that may be available.

They believe the extreme difficulty of collection that the Debtors and/or the Committee will face in the event a judgment is entered against Mr. Barber warrants an approval of the Mutual Release, subject to the right of the Debtors and the Committee to pursue claims against Mr. Barber to the extent there is insurance coverage available to pay such claims.

2. Difficulties to Be Encountered in the Matter of Collection.

Mr. Barber has provided a personal financial statement to the Debtors' CRO (Peter Kravitz) and to counsel for the Committee (Ashley McDow). The financial statement was provided in strict confidence and subject to an agreement not to be shared with anyone other than Ms. McDow and Mr. Kravitz.

Mr. Barber has agreed that limited facts may be shared with the Court and made a part of the public record in connection with the filing of this statement. Mr. Barber has sworn under penalty of perjury to the accurateness and completeness of his financial statement, and any material misstatement or omission would be grounds for the voiding of the sale/settlement with Mr. Barber.

Mr. Barber's financial statement shows that he is currently insolvent on a balance sheet basis. It shows that Mr. Barber would be unable to respond to even a mid-five figure judgment. It also shows that he has no material unencumbered assets, and that his encumbered assets (primary residence and vehicles) have no equity. Mr. Barber does not have the ability to fund a defense of any cause of action and would likely be forced into a chapter 7 if forced to defend against claims brought by the estate. The financial statement suggests that such a chapter 7 filing would be determined to be a "no asset" case. Accordingly, the Debtors and the Committee believe that absent a settlement, it would be very difficult to collect anything at all from Mr. Barber, even if a judgment was already in hand today.

This factor weighed heavily in the Debtors' and Committee's decision-making.

3. <u>Complexity and Expense of the Litigation Involved.</u>

As previously noted, four depositions (Simon Barber, Edward de Castro, Monica Hushen and Tim Wong) and extensive document production have already taken place. To date those discovery efforts have not yielded a clear basis for establishing claims against Mr. Barber beyond the general theories of liability discussed above; however, the Debtors and/or the Committee are

8

continuing their discovery efforts with respect to other officers and directors. If the discovery is fruitful, the claims and causes of action would be relatively straightforward and not complex. However, it is believed that Mr. Barber would likely file for chapter 7 relief as opposed to defending the litigation. However, if a vigorous defense were pursued, the expense of such litigation (i.e., full blown officer/director litigation) would be significant, with multiple witnesses and significant discovery.

    4.      The Paramount Interest of the Creditors and Their Views

Creditors have been active in these cases from the outset. It was a group of creditors who initially petitioned for involuntary relief to initiate these cases. Later certain members of that group were appointed to the Committee. Once formed, the Committee immediately retained counsel and has had a strong voice throughout these proceedings. The Committee supports the sale of the Barber Claims to Mr. Barber for several reasons.

First, Mr. Barber has agreed to provide continuing support to the Debtors, the Committee and/or the Liquidation Trust in connection with, among other things, a buyer's purchase of HashFast Golden Nonce ASIC, wafers and other remaining inventory. To date an initial payment has been made. The remaining payment is contingent upon the Debtors providing the buyer certain technical support, and both the Debtors and the Committee believe Mr. Barber plays an extremely important role in that process. While Mr. Barber has expressed a willingness and desire to help, he is not interested in continuing to provide support and assistance to the Debtors only to be sued and forced into bankruptcy months from now.

Second, the auction of the Debtors' assets was cancelled. As a result, significant assets remain in the estate. There is a reasonable likelihood that Mr. Barber's technical expertise will be needed in order to efficiently monetize those remaining assets. Mr. Barber's bid for the assets includes a provision that requires him to continue to make himself reasonably available for such

purposes at a pre-arranged rate once the initial period of support ends. Such a provision will also be important because there will likely be litigation claims pursued by the Committee or the Liquidating Trust. Someone with knowledge and familiarity with the Debtors will be needed to respond to basic factual questions surrounding the operations of the Debtors. Mr. Barber can do those things.

Third, assuming the accurateness of his financial statement, Mr. Barber is paying over a significant portion of his liquidity at closing, and will continue to make payments for the next 20 months. While $20,000 in total cash consideration may seem small, it will help cover expenses until a time when additional asset sales can close. In addition, the $20,000 in cash consideration is greater than what would likely be obtained in litigation followed by a chapter 7 filing by Mr. Barber.

Finally, other than his claims for unpaid wages, Mr. Barber is also releasing all of his claims against the estate. This includes his timely filed indemnity claim and any claim for delinquent payment of wages under California labor law.

Under the circumstances, the Committee supports the sale (and compromise) of the Barber Claims to Mr. Barber.

Dated: December 4, 2014

KATTEN MUCHIN ROSENMAN LLP
Peter A. Siddiqui
Jessica M. Mickelsen

By: /s/ Jessica M. Mickelsen
Counsel for Debtor and Debtor-In-Possession
HashFast Technologies LLC and HashFast LLC

Dated: December 4, 2014

BAKER HOSTETLER LLP
Ashley M. McDow

By: /s/ Ashley M. McDow *Ashley M. McDow -*
Counsel for the Official Committee of *by JMM*
Unsecured Creditors *w/Ashley M. McDow*
*express permission*