KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtor and Debtor-In-Possession
HashFast Technologies LLC and HashFast LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Lead Case No. 14-30725 |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, | Jointly Administered and Substantively Consolidated with: |
| Debtor and Debtor-In-Possession | Case No. 14-30866 |
| | Chapter 11 |
| ☒ Affects HASHFAST LLC, a Delaware limited liability company, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR APPROVAL OF COMPROMISE WITH LIQUIDBITS CORPORATION** |
| Debtor and Debtor-In-Possession | |
| | Date: June 12, 2015 |
| | Time: 11:00 am |
| | Place: 235 Pine St., 19th Floor |
| | San Francisco, CA 94104 |
| | Judge: Honorable Dennis Montali. |

The above-captioned debtors and debtors-in-possession (the "Debtors") hereby submit their Memorandum of Points and Authorities in support of their Motion for Approval of Compromise with Liquidbits Corporation ("Motion"), pursuant to Federal Rule of Bankruptcy

Procedure 9019(a), for approval of a compromise with Liquidbits Corporation ("Liquidbits") regarding all mutual claims, and in support of this Motion, respectfully represents:

## I.

### RELIEF REQUESTED

1.     The Debtors respectfully request that the Court enter an order granting the following relief:

(a)     authorizing and approving the Debtor to enter into the Settlement Agreement (the "Settlement Agreement"), which is attached as **Exhibit 1** hereto, with Liquidbits to resolve and settle all claims each side has against the other; and

(b)     granting such other and further relief as the Court deems just.

## II.

### JURISDICTION

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Federal Rule of Bankruptcy Procedure 9019(a).

## III.

### BACKGROUND

3.     On May 9, 2014 (the "Petition Date"), certain petitioning creditors filed a chapter 7 Involuntary Petition against HashFast Technologies LLC under title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") [Doc. No. 1].  On June 3, 2014, HashFast Technologies LLC filed its Conditional Consent to an Order for Relief [Doc. No. 36] and its Motion to Convert to Chapter 11 [Doc. No. 35].  This Court entered its order converting HashFast Technologies LLC's case to one under chapter 11 on June 5, 2014 [Doc. No. 40].

4.     On June 6, 2014, HashFast LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.     On July 9, 2014, this Court granted the Debtors' motion to jointly administer their cases [Doc. No. 12].

Katten
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

Case: 14-30725   Doc# 373-1   Filed: 05/29/15   Entered: 05/29/15 15:48:42   Page 2 of 33

1    6.    On or about July 23, 2014, the Committee of Unsecured Creditors filed its motion

2    to substantively consolidate the Debtors' bankruptcy estates, which this Court granted on

3    September 28, 2014 [Doc. No. 202].

4    7.    The Debtors designed, developed, manufactured, and sold certain computer chips

5    and equipment, including Application Specific Integrated Circuit, or ASIC, semiconductors, for

6    the sole purpose of auditing transaction data for the Bitcoin networks, also known as "Bitcoin

7    mining." Those ASIC chips were originally designed to be sold as part of an integrated piece of

8    hardware that included boards, chasses, power supplies, and fans, some versions of which the

9    Debtors called Sierra units.

10    8.    The Debtors and Liquidbits have had a long and, oftentimes, contentious business

11    relationship. The relationship began with that certain Order Confirmation Agreement dated as of

12    October 3, 2013 (the "Purchase Agreement"). (See **Exhibit 2** hereto at 7-15.) Pursuant to the

13    Purchase Agreement, Liquidbits contracted to buy from the Debtors up to 2,500 Sierra units

14    incorporating 7,500 ASICs for the price of $6,000,000. The Purchase Agreement also provided, in

15    brief summary, that Liquidbits would engage in Bitcoin mining with the Sierra units purchased

16    from the Debtors, and, as additional compensation for those units, Liquidbits would pay the

17    Debtors a percentage of Liquidbits' gross revenues related to such mining activity.

18    9.    Liquidbits paid the entire $6,000,000 due under the Purchase Agreement, but the

19    Debtors did not deliver all purchased Sierra units to Liquidbits. Also, Liquidbits never paid any

20    mining revenues to the Debtors pursuant to the terms of the Purchase Agreement. To address

21    those realities, the Debtors and Liquidbits entered into that certain Memorandum of Understanding

22    dated March 4, 2014 (the "MOU"). (See **Exhibit 2** hereto at 17-18.) Pursuant to the MOU,

23    among other terms, Liquidbits and the Debtors agreed that, instead of the 2,500 Sierra units

24    contemplated by the Purchase Agreement, the Debtors would ship, and Liquidbits would accept,

25    30,000 ASICs for the purchase price Liquidbits already paid. The sharing of mining revenues

26    feature of the Purchase Agreement was reaffirmed in the MOU.

27    10.    In April 2014, and less than 90 days before the Petition Date, the Debtors shipped

28    2,000 ASICs to Liquidbits per the MOU. However, the Debtors failed to ship any further ASICs

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

1  or other mining equipment to Liquidbits under the MOU.  Additionally, Liquidbits never remitted
2  any mining revenues to the Debtors.

3      11.    As a result of the foregoing, the Debtors believe that their estates have certain
4  litigation claims against Liquidbits.  First, the Debtors believe the April 2014 transfer of 2,000
5  ASICs to Liquidbits constitutes an avoidable and recoverable preferential transfer pursuant to 11
6  U.S.C. §§ 547 and 550 (the "Preference Claim").  Second, the Debtors believe that Liquidbits has
7  breached both the Purchase Agreement and the MOU by failing to remit the Debtors'
8  proportionate share of Liquidbits' mining revenues (the "Breach of Contract Claim").

9      12.    Following the Petition Date, Liquidbits filed claim number 11, a copy of which is
10 attached hereto as **Exhibit 2**, in the amount of $5,364,725 (the "Unsecured Claim").  The
11 Unsecured Claim asserts a right to payment for alleged breaches by the Debtors of the Purchase
12 Agreement and the MOU.

13     13.    During the pendency of these chapter 11 cases, Liquidbits placed several purchase
14 orders with the Debtor to buy various mining equipment in the ordinary course of business.  While
15 many of those purchase orders were successfully consummated, certain of the post-petition
16 purchase orders were not fulfilled and were canceled.  The Debtors and Liquidbits dispute the
17 basis on which those purchase orders were canceled and what remedies for those cancellations
18 exist.  Liquidbits believed that it was entitled to a post-petition refund in the amount of $88,726.75
19 (the "Administrative Expense").  On February 24, 2015, Liquidbits filed the Application of
20 Liquidbits Corporation for Allowance of Chapter 11 Administrative Expense Under 11 U.S.C.
21 § 503(b)(1)(A), Docket No. 315.  That application has not been set for hearing.

22     14.    In summary, the Debtors and Liquidbits have several claims against each other:  the
23 Debtors' Preference Claim and Breach of Contract Claim against Liquidbits, on the one hand, and
24 Liquidbits' Unsecured Claim and Administrative Expense against the Debtors, on the other.  The
25 Debtors dispute liability to Liquidbits on the Prepetition Claim and the Administrative Expense.
26 Liquidbits disputes any liability on the Preference Claim and the Breach of Contract Claim.

27     15.    After extensive settlement discussions between the Debtors and Liquidbits, the
28 parties entered into that certain Settlement Agreement (the "Settlement Agreement"), dated May

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

4

29, 2015, by which they propose to resolve and settle all of their disputes, including the Prepetition Claim, the Administrative Expense, the Preference Claim, and the Breach of Contract Claim, without resorting to litigation. But for the Settlement Agreement, the Debtors otherwise would have filed adversary proceedings and claim objections, which Liquidbits would vigorously defend.

16. The terms of the Settlement Agreement provide for the exchange of mutual and general releases without the payment of money by any party to any party.

## IV.

## DISCUSSION

17. Rule 9019(a) of the Federal Rules of Bankruptcy Procedure ("FRBP") provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The Court has great latitude in approving compromise agreements. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).

18. Settlement of time-consuming and burdensome litigation claims, especially in the bankruptcy context, is encouraged. *In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). For a compromise to be approved, the proposed compromise must be fair and equitable. *Id*. In determining the fairness and equity of a compromise, the bankruptcy court must apprise itself of all facts necessary to form an intelligent and objective opinion of the probability of ultimate success should the claims be litigated, and estimate the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *Id*.; *see also Martin v. Kane*, 784 F.2d 1377, 1380-84 (9th Cir. 1986). The Court need not, however, conduct an exhaustive investigation into the validity of the claims to be compromised, nor is the Court expected to conduct a mini-trial on the merits. *Walsh Constr., Inc. v. Alaska Nat'l Bank of the North*, 669 F.2d 1325, 1328 (9th Cir. 1982).

19. The purpose of any compromise agreement is to avoid the expenses and burdens associated with litigating sharply contested and dubious claims. *Walsh Constr.,* 669 F.2d at 1328 (citing *Wil-Rud Corp. v. Lynch (In re Cal Assoc. Prod.)*, 183 F.2d 946, 949-50 (9th Cir. 1950)).

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

The law favors compromise and not litigation for its own sake. *Port O' Cail mv. v. Blair (In re Blair)*, 538 F.2d 849, 851 (9th Cir. 1976).

20. In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, a court should consider: "(1) the probability of success in litigation, (2) the difficulties, if any, to be encountered in the matter of collection, (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it, and (4) the paramount interest of the creditors and the proper deference to their reasonable views. *In re A&C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986). Consideration of these factors does not require the Court to decide questions of law and fact in the parties' dispute or to determine that the settlement is the best possible resolution; instead the Court need only determine whether the settlement falls below the lowest point of the range of reasonableness. *See Burton v. Ulrich Un re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997).

21. The Debtors submit that the Settlement Agreement meets the foregoing requirements. Applying the above standards to the circumstances here, the Motion should be granted and the Settlement Agreement approved. The Settlement Agreement resolves the several disputes among the parties without resorting to contested litigation through adversary proceedings and contested matters that would cost considerable time and expense.

Probability of Success

22. But for the settlement, the Debtors would commence adversary proceedings with respect to the Preference Claim and the Breach of Contract Claim. In addition, the Debtors would object to the Prepetition Claim and the Administrative Expense. The Preference Claim is arguably the stronger of the two adversary proceedings as the transfer of the 2,000 ASICs was on account of the antecedent debt manifest under the Purchase Agreement, to a creditor, during the 90 days prior to the petition, and that enabled Liquidbits to receive more than it would in a hypothetical liquidation. The Debtors enjoy the presumption of insolvency at the time the transfer was made, but, even if that presumption were rebutted, the Debtors believe they could prove insolvency as of April 2014. The difficulty of the Preference Claim, however, lies in damages. The Debtors assert that valuing the ASICs at the time they were transferred could be a difficult burden. In addition,

Katten
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

Liquidbits likely would assert various defenses, including contesting the existence of antecedent debt, contemporaneous new value, and ordinary course of business. The outcome of that litigation is far from certain.

23.     The same is true regarding the Breach of Contract Claim. Though the Debtors never received any mining revenues pursuant to the terms of the Purchase Agreement and the MOU, Liquidbits likely will have various defenses to any payment of such revenues. Liquidbits likely would argue that both the Purchase Agreement and MOU were breached by the Debtors, which brief excuses Liquidbits' performance thereunder. Additionally, Liquidbits may well argue that it generated no mining revenues.

24.     While the Debtors believe the Preference Claim and the Breach of Contract Claim are strong claims, neither claim is a "slam dunk" and that both would require significant time and resources to prosecute. Moreover, Liquidbits believes it has very strong defenses to both claims and would vigorously defend them.

25.     With respect to the Prepetition Claim and the Administrative Expense, the Debtors believe both claims warrant objections. For starters, section 502(d) of the Bankruptcy Code requires the disallowance of a claim of a transferee of a voidable transfer that has not been returned. In addition, the Prepetition Claim potentially would be subject to setoff for any damages recovered by the Breach of Contract Claim. Finally, the Administrative Expense would also be subject to factual and legal defenses, specifically related to the ability and propriety of Liquidbits' attempts to cancel purchase orders and the damages caused to Debtors thereby. As before, any litigation over the Prepetition Claim and the Administrative Expense would be hotly contested and the outcome is not certain.

26.     As a result, the probability of success prong of the *A&C* factors supports approving the settlement.

<u>Collection Issues</u>

27.     The Debtors are not aware of any collection issues in the event they prevail in their claims against Liquidbits. However, the settlement eliminates any risk that amounts payable from

Katten
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1 | Liquidbits would be uncollectable. Accordingly, that prong of the *A&C* factors supports

2 | approving the settlement.

3 | Complexity and Delay

4 | 28. As set out in paragraphs 23-26 above, the disputes resolved by the settlement are

5 | complex, fact-intensive, and highly contested. The resolution of each of the Preference Claim, the

6 | Breach of Contract Claim, the Prepetition Claim, and the Administrative Expense would require

7 | significant litigation, discovery, and potentially expert testimony and opinions. The amount of

8 | time necessary to try each issue to finality would be tremendous, especially in light of how far

9 | apart the parties would be on each of the issues.

10 | 29. The complexity and delay *A&C* factor easily supports the settlement in this case.

11 | Interests of Creditors

12 | 30. The final *A&C* factor also supports the settlement. Not only does the settlement

13 | resolve large claims by and against the estate, it eliminates the need for the estate to expend its

14 | resources in prosecuting and defending the disputes. Moreover, the settlement creates an avenue

15 | for the Consolidated Plan of Liquidation, Docket 344, proposed by the Committee to be confirmed

16 | and to go effective.

17 | 31. The Settlement Agreement is the most reasonable and cost-effective way of

18 | proceeding at this juncture and will save significant expense, inconvenience, and delay associated

19 | with continued and protracted litigation. It permits the administration of the Debtors' estates to

20 | move to the next step, and eliminates claims from the claims pool, thereby increasing the recovery

21 | to all other creditors.

22 | 32. The settlement between the Debtors and Liquidbits as set out in the Settlement

23 | Agreement is in the best interest of the estates and should be approved.

24 | **V.**

25 | **NOTICE AND NO PRIOR REQUEST**

26 | 33. Pursuant to FRBP 2002(a)(3), notice of this Motion will be given to: (a) the Office

27 | of the United States Trustee for the Northern District of California; (b) counsel for the Official

28 | Committee of Unsecured Creditors; and (c) all those parties entitled to notice pursuant to that

**Katten**
KattenMuchinRosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

certain order limited service of notice of certain matters [Doc. 107]. The Debtors submit that, under the circumstances, no other or further notice is required.

34.     No previous motion or other request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Debtors respectfully request that this Court grant the relief requested in the Motion.

Dated: May 29, 2015                       KATTEN MUCHIN ROSENMAN LLP
                                          Peter A. Siddiqui
                                          Jessica M. Mickelsen


                                          By:/s/ Jessica M. Mickelsen
                                          Counsel for Debtor and Debtor-In-Possession
                                          HashFast Technologies LLC and HashFast LLC

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

# EXHIBIT 1

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** (this "*Agreement*") is hereby entered into on May 29, 2015, by and between HashFast Technologies LLC and HashFast LLC (together, the "*Debtors*") and Liquidbits Corporation ("*Liquidbits*"). The Debtor and Liquidbits (together, the "*Parties*") hereby agree as follows.

### RECITALS

**WHEREAS**, on May 9, 2014 (the "*Petition Date*"), certain of the HashFast Technologies LLC's creditors filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "*Bankruptcy Court*"). On June 3, 2014, the Bankruptcy Court entered an order converting the bankruptcy case to one under chapter 11 of the Bankruptcy Code;

**WHEREAS**, on June 6, 2014, HashFast LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

**WHEREAS**, prior to the Petition Date, the Debtors and Liquidbits entered into that certain Order Confirmation Agreement (the "*Purchase Agreement*") dated as of October 3, 2013, pursuant to which Liquidbits purchased certain specific Bitcoin mining equipment and inventory from the Debtors for both cash and for a proportion of future gross revenues generated from Liquidbits' mining operations;

**WHEREAS**, following the execution of the Purchase Agreement, the Debtors and Liquidbits entered into that certain Memorandum of Understanding dated March 4, 2014 (the "*MOU*") to address alleged defaults of the Purchase Agreement that existed and were continuing;

**WHEREAS**, on or about April 2014, the Debtors transferred 2,000 Golden Nonce ASIC chips to Liquibits pursuant to the terms of the MOU (the "*Transfers*");

**WHEREAS**, Liquidbits has asserted that the Debtors breached their obligations under the Purchase Agreement and MOU, and, in connection therewith, Liquidbits filed proof of claim number 11 in the Debtors' bankruptcy case asserting an unsecured, prepetition right to payment in the amount of $5,364,725 (the "*Unsecured Claim*");

**WHEREAS**, on February 24, 2015, Liquidbits filed the Application of Liquidbits Corporation for Allowance of Chapter 11 Administrative Expense Under 11 U.S.C. § 503(b)(1)(A), Docket No. 315, seeking allowance and payment of an administrative expense in the amount of $88,726.75 (the "*Administrative Expense*");

**WHEREAS**, the Debtors have asserted that Liquidbits breached its obligations under the Purchase Agreement and the MOU, which breach caused monetary damage to the Debtors (the "*Breach of Contract Claim*");

**WHEREAS**, the Debtors have asserted that the Transfers constitute preferential transfers that are avoidable and recoverable from Liquidbits pursuant to 11 U.S.C. §§ 547 and 550 (the "*Preference Claim*");

**WHEREAS**, Liquidbits denies any liability to the Debtors in connection with the Breach of Contract Claim and/or the Preference Claim;

**WHEREAS**, the Debtors deny liability to Liquidbits in connection with the Unsecured Claim and/or the Administrative Expense;

**WHEREAS**, after discussion and extensive settlement discussions between the Parties, and based on Liquidbits' determination that the likelihood of recovery on the Debtors' litigation claims is insufficient to justify continued litigation regarding allowance of its claims, the Parties desire to avoid the expense and uncertainty of litigation;

**WHEREAS**, the Parties wish to resolve and settle their disputes amicably, without having to resort to any litigation.

**NOW, THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

1.     Incorporation of Recitals.  The Recitals set forth above are incorporated herein.

2.     General Release.  Upon the approval of this Agreement pursuant to paragraph 10 hereof, each Party hereto, on behalf of itself and its respective agents, representatives, assigns, employees, officers, directors, attorneys, affiliates, subsidiaries, successors, predecessors, and insurers releases and forever discharges each other Party and its respective agents, representatives, employees, officers, directors, attorneys, subsidiaries, affiliates, successors, predecessors, insurers and assigns from liability from any and all claims, controversies, actions, causes of action, demands, debts, liens, contracts, agreements, promises, representations, torts, damages, costs, losses, attorneys' fees, moneys due on account, obligations, judgments or liabilities of any kind whatsoever in law or equity, arising out of agreement or imposed by statute, common law or otherwise, from the beginning of time to the date this Agreement is signed, whether or not known now, anticipated, unanticipated, suspected or claimed, fixed or contingent, whether yet accrued or not and whether damage has resulted from such or not, including, without limitation, with respect to the Unsecured Claim, the Administrative Expense, the Preference Claim, and/or the Breach of Contract Claim; , *provided*, however, that Liquidbits specifically retains, and does not release, the Debtors' agents, representatives, employees, officers, and directors from any direct and personal claims, actions, or causes of action Liquidbits may retain against such agents, representatives, employees, officers and directors, in their individual capacities.

3.     Entire Agreement.  This Agreement constitutes the entire agreement between the Parties and supercedes all other prior agreements and understandings, both written and oral, and

may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever as to any Party, except by a writing duly executed by each Party.

4.      Approval. Each Party represents and warrants that it has taken all requisite action to approve this Agreement and, upon due execution by all Parties, this Agreement shall be a valid and binding obligation of such Party enforceable in accordance with its terms. Each Party that executes this Agreement on behalf of a given Party represents and warrants that he or she is lawfully authorized to do so on behalf of such Party. All representations and warranties contained herein shall survive the execution and delivery of this Agreement.

5.      Further Assurances. The Parties will, at their own cost and expense, cause to be promptly and duly taken, executed, acknowledged and delivered all such further acts, documents and assurances as may be necessary or as the Parties may reasonably request in order to carry out the intent and purposes of this Agreement and the transactions contemplated herein.

6.      Execution of Counterparts. This Agreement may be executed in any number of identical counterparts, by the respective Parties, each of which, for all purposes, shall be deemed to be an original and all of which shall constitute, collectively, one Agreement. This Agreement may be executed via facsimile, and any facsimile execution shall be fully effective as an original.

7.      No Inducement. This Agreement is the result of arms-length negotiations among the Parties. The Parties hereby represent and warrant that they have not been induced to agree to and execute this Agreement by any statement, act or representation of any kind or character by anyone, except as contained herein. The Parties further represent that each of them has fully reviewed this Agreement and has full knowledge of its terms, and each executes this Agreement of its own choice and free will, after having received the advice of their respective attorneys.

8.      Construction. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party.

9.      Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties, their respective heirs, legal representatives, successors and assigns.

10.      Court Approval and Jurisdiction. The Parties agree that this Agreement is subject to and conditioned upon the approval of the compromise reflected herein by the Bankruptcy Court. The Parties further agree that this Agreement shall be construed and governed by the applicable federal law and/or under the laws of the State of California, irrespective of its choice of law rules, and the Bankruptcy Court shall have exclusive jurisdiction over this Agreement and the Parties.

11.      Costs and Expenses. If any Party makes any claim or demand or commences any action, lawsuit, or other legal proceeding in violation of this Agreement, such Party shall pay all costs, expenses, and attorneys' fees incurred by the non-breaching Party in defending such claim, demand, action, lawsuit or other proceeding.

12. <u>Notices</u>.  Any notice or communication required or permitted to be given hereunder will be in writing and addressed to the respective Party (and its counsel) set forth below its signature hereunder, or to such other address as the Party may designate in writing.

13. <u>Waiver of California Civil Code Section 1542</u>.  Each Party further covenants and agrees that any and all rights under the provisions of Section 1542 of the California Civil Code, and other similar rights or laws in other states, are expressly waived by each Party to this Agreement.  Section 1542 of the California Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH DEBTOR." Each Party expressly waives and relinquishes all the benefits of Section 1542 and of any other similar law of this or any other jurisdiction, and expressly acknowledge that this release is intended to include in its effect, without limitation, all claims, whether known or unknown, and that this Agreement contemplates the extinction of any and all such claims

14. <u>Headings</u>.  The titles, captions or headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first written above.

**HashFast Technologies LLC**
**HashFast LLC**

**Liquidbits Corporation**


By:_____
Their Chief Restructuring Officer

By:_____
Its:_____

with a copy to

With a copy to

Peter A. Siddiqui
Katten Muchin Rosenman LLP
525 W. Monroe
Chicago, IL 606611
Telephone:  (312) 902-5455
peter.siddiqui@kattenlaw.com

Greg Rougeau
Diamond McCarthy LLP
150 California Street, Suite 2200
San Francisco, CA 94111
Telephone:  (415) 692-5200
grougeau@diamondmccarthy.com

# EXHIBIT 2

B10 (Official Form 10) (04/13)

<table>
<tr>
<td colspan="2">UNITED STATES BANKRUPTCY COURT    Northern District of California</td>
<td>**PROOF OF CLAIM**</td>
</tr>
</table>

| Name of Debtor:<br><br>Hashfast Technologies LLC | Case Number:<br><br>14-30725 |
|---|---|

NOTE: *Do not use this form to make a claim for an administrative expense that arises after the bankruptcy filing. You may file a request for payment of an administrative expense according to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Liquidbits Corp.

**COURT USE ONLY**

Name and address where notices should be sent:
Liquidbits Corp., 20201 E. Country Club Dr., #1502, Aventura, Florida 33180

With a copy to: Edwin Smith, Bingham McCutchen LLP, 399 Park Ave., New York, NY 10022

Telephone number: (305) 903-5088    email:   gbachrach@coinware.io

❏ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
  (*If known*)

Filed on:_____

Name and address where payment should be sent (if different from above):




Telephone number:      email:

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:**    $_____5,364,725.00_____

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** ___Please see attached Schedule._____
  (See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:**<br><br>_____<br>(See instruction #3a) | **3b. Uniform Claim Identifier (optional):**<br><br>_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _<br>(See instruction #3b) |
|---|---|---|

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

**Nature of property or right of setoff:** ❏ Real Estate   ❏ Motor Vehicle   ❏ Other
**Describe:**

**Value of Property:** $_____

**Annual Interest Rate_____%** ❏ Fixed   or   ❏ Variable
**(when case was filed)**

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any:

$_____

**Basis for perfection:** _____

**Amount of Secured Claim:** $_____

**Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507 (a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

❏ Domestic support obligations under 11 U.S.C. § 507 (a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. § 507 (a)(5).

❏ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507 (a)(7).

❏ Taxes or penalties owed to governmental units -- 11 U.S.C. § 507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. § 507 (a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/01/16 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #6)

**7. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, security agreements, or, in the case of a claim based on an open-end or revolving consumer credit agreement, a statement providing the information required by FRBP 3001(c)(3)(A). If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. If the claim is secured by the debtor's principal residence, the Mortgage Proof of Claim Attachment is being filed with this claim. *(See instruction #7, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**8. Signature:** (See instruction #8)

Check the appropriate box.

☑ I am the creditor. ☐ I am the creditor's authorized agent. ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.) ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Gregory Bachrach
Title: Chief Executive Officer
Company: Liquidbits Corp.
Address and telephone number (if different from notice address above):

_____ (Signature)      7/18/14 (Date)

Telephone number: _____ email: _____

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

---

**INSTRUCTIONS FOR PROOF OF CLAIM FORM**

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the

claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. § 507 (a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**7. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest and documents required by FRBP 3001(c) for claims based on an open-end or revolving consumer credit agreement or secured by a security interest in the debtor's principal residence. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**8. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

_____DEFINITIONS_____   _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. § 506 (a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. § 507 (a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may access the court's PACER system (www.pacer.psc.uscourts.gov) for a small fee to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

In re: HashFast Technologies LLC (the "Debtor")
Case No. 14-30725
United States Bankruptcy Court
Northern District of California

# SCHEDULE TO PROOF OF CLAIM

## Liquidbits Corp.

The claim of Liquidbits Corp. (the "Claimant") is based upon a written agreement, dated October 3, 2013 (the "Original Agreement") for the purchase by the Claimant from the Debtor of certain equipment manufactured by the Debtor and used in bitcoin mining. A true and correct copy of the Original Agreement is attached hereto as <u>Exhibit 1</u>.

Beginning in October 2013, Liquidbits made or caused to be made $6 million in payments to HashFast under the Original Agreement. Between January and March 2014, the Debtor delivered only a small fraction of the equipment that it was obligated to deliver to the Claimant under the Original Agreement. In an effort to contain the considerable and continuing economic damages being inflicted on the Claimant by the late delivery and non-performance by the Debtor, in March 2014, the Claimant agreed to an amendment to the original agreement, which permitted the Debtor to deliver to the Claimant 30,000 Golden Nonce Chips ("Chips") in lieu of the certain other equipment that it was obligated to deliver under the Original Agreement. A true and correct copy of that amendment, titled a Memorandum of Understanding ("MOU") and dated March 4, 2014, is attached hereto as <u>Exhibit 2</u>.

After the MOU was executed, the Debtor only delivered to the Claimant a small portion of the Chips that the Claimant had purchased. The Debtor made no deliveries in March 2014, and delivered only 2,000 Chips in April 2014. However, the Debtor did not provide the Claimant with the hardware developer kits that the Claimant needs to build the mining boards upon which the Chips need to be mounted.

Based on the Debtor's non-performance under the Original Agreement and the MOU, the Debtor owes the Claimant no less than $5,364,725. This proof of claim is hereby filed to preserve the rights of the Claimant with regard to any and all amounts which are or may become owing by the Debtor to the Claimant under the Original Agreement and the MOU. To the extent not otherwise provided herein, the Claimant holds a non-contingent, liquidated claim against the Debtors.

The Claimant reserves the right to amend its proof of claim from time to time to restate amounts contained in this claim as it becomes further liquidated or

for other lawful purposes, including, without limitation, to file additional proofs of claim for additional claims which may be based on the respective rights and obligations arising under the documents, the relationships described herein or the events and circumstances described herein. The Claimant reserves the right to claim all amounts due in respect of any post-petition interest, all rights of and to indemnification, fees, costs and expenses, including, without limitation, attorneys' fees, costs and expenses, in amounts as yet undetermined, pursuant to the applicable documents and to the extent allowed by applicable law.

Filing of this proof of claim is not and shall not be deemed or construed as (a) a waiver or release of the Claimant's rights against any person, entity or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this court); (b) a consent by the Claimant to the jurisdiction of this court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving the Claimant; (c) a waiver or release of the Claimant's right to trial by jury in this court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (d) a consent by the Claimant to a jury trial in this court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (e) a waiver or release of the Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (f) a waiver of the right to move to withdraw the reference with respect to the subject matter of this proof of claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving the Claimant; (g) an election of remedies; or (h) a waiver or release of any right of setoff or recoupment that the Claimant may hold against the Debtors. Furthermore, the Claimant reserves the right to attach or bring forth additional documents supporting its claims and additional documents that may become available after further investigation and discovery. The filing of this proof of claim shall in no way be deemed a waiver of the Claimant's right to assert that any or all of the amounts owed to it, if any, are entitled to administrative priority status.

# EXHIBIT 1



## Order Confirmation Agreement

This Order Confirmation Agreement ( "**Agreement**") is entered into, delivered and effective as of October 3, 2013 ("**Effective Date**"), by and between:

*On one hand:*

Liquidbits Corp. ("**Liquidbits**"), a Florida corporation with its principal address of 20201 E Country Club Drive, #1502, Aventura, Florida 33180
*and*

HashTrade Inc.("**Hashtrade**"), a Delaware corporation with its principal address of 20201 E Country Club Drive, #1502, Aventura, Florida 33180

*And on the other hand:*

Hashfast Technologies LLC ("**Hashfast**"), a California limited liability with its principal address of 97 South Second Street #175
San Jose, 95113

Liquidbits and Hashfast may be referred to individually as a "**Party**" and collectively as the "**Parties**." The capitalized terms "Party" and "Parties" does not refer to Hashtrade.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement, the Parties agree as follows:

1. Purchase of Hashing Capacity. Liquidbits will purchase Sierra 2U3 and 4U3 units manufactured by Hashfast capable of three (3) petahash per second ("**Phash**") total hashing capacity.  This may total up to 2,500 units incorporating 7,500 ASICs.   However, the actual number of units may be lower depending on the actual hashing capacity of such ASICs, which is currently expected to be 400 Ghash per second ("**Ghash**") per ASIC.

   If the aggregate hashing capacity of the 2,500 units is lower than the three (3) Phash expected, the proportional economic value of that diminution will be calculated and taken from Hashfast's distribution under Section 3.  Further, if the power requirements of the units (currently expected to be 1 watt per Ghash at the wall plug, plus or minus 20%) are greater than expected, such increase will be reflected in the resulting increase in Hosting Cost used to calculate Distributions in Section 3.

   a. Delivery. Hashfast will deliver the units as they are manufactured.  Units totaling approximately 200,000 Ghash (0.2 Phash) will be delivered from Hashfast's production designated "Batch 1", which is also referred to as the first "engineering run", whose current expected delivery date begins November 5, 2013.  For subsequent units, which will come from Hashfast's production designated Batch 2, the subsequent expected delivery begins November 15, 2013. Units that remain undelivered after December 31, 2013 (except for non-payment) may be cancelled and refunded.

2. Initial Payments. Liquidbits will pay Hashfast $6,000,000 ("**Initial Amount**") in four payments (each, an "**Initial Payment**") wired to a bank account designated by Hashfast, or in the case of the payment required by Section 2(d), to wired to the escrow account described in Section 5:

<ol type="a">
<li>$2,000,000 by 6:00 PM EST Friday, October 4, 2013;</li>
<li>$2,000,000 by 6:00 PM EST Friday, October 11, 2013;</li>
<li>$1,000,000 by 6:00 PM EST Monday, October 14, 2013; and</li>
<li>$1,000,000 by 6:00 PM EST Monday, October 14, 2013.</li>
</ol>

If a payment is not received by the time set forth above, Hashfast may, in its sole discretion, cancel the order as to the proportional number of units; provided, however, that if Hashfast receives substantial proof from Liquidbits that the electronic wire for such payment has been executed by the transmitting bank, the deadline for Hashfast's receipt of the applicable payment will be extended by 48 hours with respect to a payment under 2(b)-(d), and by 24 hours with respect to the payment under Section 2(a). If Hashfast cancels the proportional number of units as permitted under this paragraph, the Net Equipment Cost defined in Section 4(a) and the expected aggregate hashing capacity stated in Section 1 will be reduced proportionally.

3. <u>Payment from Operational Revenues</u>. In addition to the Initial Amount, Liquidbits will pay Hashfast payments ("**Distributions**") calculated based on the gross revenues of Liquidbits and its Affiliates related to use of the units ("**Operation Revenues**"), whether from trade contracts, Bitcoin mining, resale or otherwise. Operational Distributions include each of the following, without limitation, <u>calculated for each two week period</u>:

    a. Capacity Contracts. For hashing capacity sold, leased or licensed:

        Distributions = 0.25 * (Contract Sales less Amortized Equipment Cost, less Hosting Cost of the units used under the applicable contracts for capacity)

    b. Mining. For Bitcoins mined:

        Distributions = 0.25 * (Generated Bitcoin divided by BTCP less Amortized Equipment Cost, less Hosting Cost to generate such Bitcoins)

    c. Other. For any other Operation Revenues:

        Distributions = 0.25 * Operation Revenues

4. <u>Additional Payment Terms</u>.

    a. For the purposes of this Agreement, the following capitalized terms shall mean the following:

        "**Affiliates**" of any Person means any other Person that controls, is controlled by, or is under common control. As used herein, "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through ownership of voting securities or other interests, by contract or otherwise. As used herein, "**Person**" means any individual, corporation, partnership, trust, joint venture, limited liability company, association, or organization.

        "**Amortized Equipment Cost**" for Section 3(a) means $2 per Ghash of capacity used for Contract Sales until the Net Equipment Cost reaches $0, and thereafter "Amortized Equipment Cost" means $0. "**Amortized Equipment Cost**" for Section 3(b) means ($2 per Ghash of capacity used for the mining/31) until the Net Equipment Cost reaches $0, and thereafter "Amortized Equipment Cost" means $0.

        "**BTCP**" means the Bitcoin exchange price published at www.coindesk.com/price/ on the last day of the calculated distribution period, or if that published price becomes unavailable, then such publications as the Parties may agree, or if they cannot so agree then weighted daily average of the three leading Bitcoin to U.S. dollar exchanges by volume.

        "**Contract Sales**" means Operation Revenues from hashing capacity sold, leased or licensed.

Hosting set-up costs to be
shared between both
parties. Hosting Cost not
to exceed $1,500 per
cabinet.

Agreed - GB & EC

"**Generated Bitcoin**" means the Bitcoin generated from units mining Bitcoin, which in no case will be less than the theoretical yield based on the hashing capacity of the units, the then-applicable network difficulty rate, and the period for the calculation.

"**Hosting Cost**" means the charges paid by Liquidbits by third-parties (not including Affiliates) to host the applicable units, not to exceed $0.0769 per Ghash per two week period (i.e. $2.0 per Ghash per year) except as adjusted to reflect power requirements above 1 watt per Ghash at the wall plug. ~~Hosting costs will not include set up costs or construction costs~~

"**Net Equipment Cost**" means $6,000,000, less all Amortized Equipment Costs deducted from Operation Revenues to calculate Distributions.

b.  Calculations Using Exchange Rates.  In calculating Distributions under Section 3, all Operation Revenues will be deemed paid in U.S. dollars at the BTCP. All Operating Revenues earned in fiat currency other that U.S. dollars will be deemed paid in U.S. dollars at an exchange rate method of calculation to which the Parties agree is reasonable or at the exchange rates set forth in The Wall Street Journal, Eastern U.S. Edition, for the trading day period ending on the last day of the calculated Distribution period.

c.  Currency of Distributions.  Liquidbits will pay the Distributions resulting from Operation Revenues earned in fiat currency (i.e. currency other than in Bitcoin) to Hashfast in U.S. dollars. For Operation Revenues earned in Bitcoin, Liquidbits will pay the resulting Distributions at the option of Hashfast: (i) either in U.S. dollars at the BTCP if that exchange rate is available to Liquidbits; (ii) at an exchange rate available to Liquidbits (such as provided by Bitpay) agreed to in writing (in this case, including by email) for the specific Distribution, or (iii) in Bitcoin.

d.  Method of Distribution Payments.  Liquidbits will pay Distributions to Hashfast for each two week period seven (7) days after each two week period.  Payments in U.S. dollars will be by wire to the bank account designated by Hashfast, and in Bitcoin will be to the Bitcoin address designated by Hashfast.  Hashfast may update the designated bank account or designated Bitcoin address from time to time.

e.  Reports.  Hashfast, Liquidbits and Hashtrade will negotiate in good faith terms such as are common in related industries requiring reports that substantiate the Distribution calculations, and that permit Hashfast to examine and otherwise audit records that substantiate the Distribution calculations and enable their verification. However, neither Hashtrade nor any other Liquidbits Affiliate is a third party beneficiary of this Agreement.

f.  Hashfast, Liquidbits and Hashtrade will negotiate in good faith terms granting Hashfast a security interest in the units to ensure payment of Distributions.

g.  Operation Revenues for the purposes of this Agreement will be calculated on a cash basis (assuming Bitcoins generated or received are receipts in cash) under generally accepted accounting principles, commonly applied.

5.  Escrow Account.  Liquidbits will escrow the fourth $1,000,000 Initial Payment (the "**Escrow Funds**") to First Republic Bank as escrow agent under an escrow agreement acceptable to the bank and finalized by the Parties in good faith.   If reasonably necessary or desirable to repair or replace wafers (or the ASICs thereby manufactured) or otherwise remedy manufacturing issues  relating to the units, the Parties will instruct the Escrow Agent to release sufficient Escrow Funds to Hashfast to be used solely for such purposes. The Parties will instruct the escrow agent to release all remaining Escrow Funds upon Hashfast demonstrating successful "board bring-up" as that term is used in the computing industry.

6.  General Terms.

a.  Independent Business Decisions.  The Parties acknowledged and agree that Liquidbits will have the sole determination whether to mine Bitcoin or sell hashing capacity contracts, and the Distributions have been agreed to defer what would otherwise be larger Initial Payments.

Liquidbits and Hashtrade shall indemnify and hold Hashfast, its employees, owners, Affiliates, agents, successors and assigns harmless from and against any and all loss, damage, liability, cost and expense arising from any action, claim or investigation brought against any such indemnified party alleging that the business(es) of Liquidbits or its Affiliates violate any law, regulation, statute, or government action.

b. Entire Agreement. This Agreement, together with the Terms of Sale attached as Exhibit A, constitute the entire agreement between Hashfast, Liquidbits and Hashtrade with respect to the subject matter of this Agreement; and supersede any prior or contemporaneous written or oral agreements pertaining thereto.

c. Counterparts. This Agreement may be executed and delivered in one or more counterparts (including by facsimile transmission or transmission by Portable Document Format (PDF) or other electronic means), each of which shall be deemed to be an original but all of which together shall constitute one and the same agreement. The parties may execute this Agreement by Docusign or Echosign electronic signatures.

d. Review by Counsel. Each party represents and warrants that it has had an opportunity to seek review by its own independent legal counsel of this Agreement and the relationship contemplated between the parties, and that it has received such legal review, counsel and guidance regarding this Agreement to such party's full satisfaction.

*(SIGNATURE PAGE FOLLOWS)*

NOW, THEREFORE, the Parties hereto have executed this Agreement by their duly authorized representatives, effective as of the date first set forth above:

Hashfast Technologies LLC

_Signature_

Eduardo de Castro
_Print name_

CHIEF EXECUTIVE OFFICER
_Print title_

_Date_

Liquidbits Corp.

_Signature_

Greg Bachrach
_Print name_

CHIEF EXECUTIVE OFFICER
_Print title_

10/9/2013

_Date_

HashTrade Inc.

_Signature_

Greg Bachrach
_Print name_

CHIEF EXECUTIVE OFFICER
_Print title_

10/9/2013

_Date_

Exhibits:      Exhibit A "Terms of Sale"

# HASHFAST TERMS OF SALE

1. OFFER, QUOTATION, ACKNOWLEDGEMENT OR CONFIRMATION. These terms and conditions of sale (the "Terms") apply to and form an integral part of: (a) all quotations and offers (hereinafter both referred to as "Offer") of Hashfast Technologies, Inc. ("Hashfast") to Liquidbits Corp. ("Buyer"), (b) all acceptances, acknowledgements or confirmations by Hashfast (hereinafter all referred to as "Confirmation") of any order of Buyer, including orders of Buyer resulting from any pricing or other framework agreement between any Buyer and Hashfast, (c) any agreement resulting from such Offer or Confirmation, and (d) any agreement sent by Hashfast incorporating these Terms by reference (both types of agreements referred to under (c) and (d) shall hereinafter be referred to as an "Agreement") regarding the sale by Hashfast and purchase by Buyer of goods or licenses to software ("Products").

These Terms shall constitute all of the terms and conditions of any Offer, Confirmation and Agreement between Hashfast and Buyer relating to the sale by Hashfast and purchase by Buyer of Products. Acceptance by Buyer of an Offer may be evidenced by Buyer or its representative's (i) written or verbal assent, (ii) acceptance of delivery of the Products or the first installment of the Products (if applicable), or (iii) payment or partial payment, or (iv) other conduct constituting acceptance. Hashfast Offers are open for acceptance within the period stated by Hashfast in the Offer or, when no period is stated, within ten (10) days from the date of the Offer, but any Offer may be withdrawn or revoked by Hashfast at any time prior to Buyer's acceptance. No Offer, Confirmation or Agreement constitutes an acceptance by Hashfast of any other terms and conditions, and Hashfast does not intend to enter into an Agreement other than under these Terms.

## 2 PURCHASE AND PAYMENT

(a) Other Delivery Dates. Except for delivery dates explicitly guaranteed using the words "guaranteed delivery" in the order confirmation sent by Hashfast: (i) delivery dates communicated or acknowledged by Hashfast are approximate only; (ii) Hashfast shall not be liable for, nor shall Hashfast be in breach of its obligations to Buyer because of any delivery made within a reasonable time before or after the stated delivery date; and (iii) Buyer will give Hashfast written notice of failure to deliver and ten (10) days within which to cure. In any case, Buyer's sole and exclusive remedy after such cure period or guaranteed delivery date is to cancel the affected and undelivered portions of the order, and receive a refund for the undelivered portions that were cancelled.

(b) Products shall be delivered EXWORKS (Incoterms 2000) Hashfast's manufacturing facility, or other facility as designated by Hashfast, unless otherwise agreed in writing between Hashfast and Buyer. Prices do not include shipping, and do not include any taxes, insurance, duties or similar levies ("Taxes"). Buyer will pay all Taxes. If Hashfast is required by law to pay or collect Taxes, Buyer will pay such Taxes to Hashfast upon invoice. Buyer will pay all shipping costs.

(c) In the event Buyer contests delivery, the Buyer must request a proof of delivery from Hashfast within ten (10) days of the date of Hashfast's invoice or guaranteed delivery date (whichever occurs first), otherwise delivery shall be deemed completed. If Buyer fails to take delivery, then Hashfast may deliver the Products in consignment at Buyer's costs and expenses. Timely delivery requires Buyer to provide all necessary order and delivery information sufficiently prior to the agreed delivery date. Delivery may also be contingent on full payment. No order, Agreement or any part thereof may be rescheduled or cancelled without Hashfast's prior written consent except for cancellations permitted under this Section 2.

## 3. DELIVERY AND QUANTITIES.

(a) Products shall be delivered EXWORKS (Incoterms 2000) Hashfast's manufacturing facility, or other facility as designated by Hashfast, unless otherwise agreed in writing between Hashfast and Buyer. Except for delivery dates explicitly guaranteed in the Order or Confirmation, delivery dates communicated or acknowledged by Hashfast are approximate only, and Hashfast shall not be liable for, nor shall Hashfast be in breach of its obligations to Buyer because of any delivery made within a reasonable time before or after the stated

delivery date. Timely delivery requires Buyer to provide all necessary order and delivery information sufficiently prior to the agreed delivery date.

(b) In the event Buyer contests delivery, the Buyer must request a proof of delivery from Hashfast within ten (10) days of the date of Hashfast's invoice or guaranteed delivery date (whichever occurs first), otherwise delivery shall be deemed completed. If Buyer fails to take delivery, then Hashfast may deliver the Products in consignment at Buyer's costs and expenses. No order, Agreement or any part thereof may be rescheduled or cancelled without Hashfast's prior written consent.

(c) Buyer will give Hashfast written notice of failure to deliver and thirty (30) days within which to cure, unless the Order or Confirmation explicitly guarantees a delivery date. In any case, Buyer's sole and exclusive remedy after such cure period or guaranteed delivery date is to cancel the affected and undelivered portions of the order.

4. RIGHTS IN SOFTWARE, DOCUMENTATION AND INTELLECTUAL PROPERTY. All intellectual property rights covering Products including without limitation any and all software or documentation or data included in, with or comprising Products, and all ownership rights in and to such intellectual property rights, software, documentation and data, shall remain solely and exclusively with Hashfast or its third party suppliers, whether or not it was developed specifically for the Buyer. Payment by Buyer of non-recurring charges, as may be made to Hashfast for special design, engineering or production materials required for Hashfast's performance on orders deviating from Hashfast's established product line, shall not convey title to either the design or special materials, but title shall remain in Hashfast. Except for licenses explicitly identified in an Offer or Confirmation, no rights or licenses are granted, or implied by estoppel or otherwise, under any intellectual property rights of Hashfast or its Affiliates or any intellectual property residing in the Products, including software or documentation or any data furnished by Hashfast, except for the license under Hashfast's intellectual property rights to operate the Products delivered by Hashfast to Buyer for their ordinary function, and subject to the provisions set forth herein. None of the software, data or electronic files embedded into the Products or accompanying the Products are sold to Buyer. Notwithstanding anything to the contrary herein, these Terms shall not be construed as conferring any license, right or immunity, either directly or by implication, estoppel or otherwise to Buyer or any third party: (a) with respect to any trademark, trade or brand name, a corporate name of Hashfast or its Affiliate(s), or any other name or mark, or contraction abbreviation or simulation thereof; (b) covering a standard set by a standard setting body or agreed to between at least two companies; or (c) if Hashfast has informed Buyer or has published (in a datasheet concerning the Product or elsewhere) a statement that a separate license is needed or useful. The absence of such a statement in a given version of the datasheet is of no consequence whatsoever if a subsequent version of the datasheet does contain such a statement. Notwithstanding anything to the contrary herein, these Terms shall not be construed as obligating Hashfast or its Affiliate(s) to furnish any manufacturing or technical information.

Buyer shall not duplicate, copy or distribute software or documentation except as specifically provided pursuant to a separate, written license duly executed by Hashfast. Unless otherwise specifically provided in writing and signed by Hashfast, Buyer shall not have the right to any software source code. Buyer shall not: (a) modify, adapt, alter, translate, or create derivative works from, the software; (b) assign, sublicense, lease, rent, loan, transfer, disclose, or otherwise make available the software; (c) merge or incorporate the software with or into any other software; or (d) reverse assemble, decompile, disassemble, or otherwise attempt to derive the source code for the Software without written authorization from Hashfast. If Hashfast licenses Buyer to make copies of software or documentation, then Buyer shall reproduce, without any amendments or changes thereto, any proprietary rights legends of Hashfast or its third party suppliers in any software or documentation provided by Hashfast. Signatures required under these Terms do not include electronic signatures as may otherwise be permitted by applicable law.

Buyer's rights under the Agreement are conditioned upon Buyer not performing

any actions that would result in the Product or any derivative work thereof to be licensed as "Open Source Software", for example, that would require a Product to be disclosed or distributed in source code form, be licensed for the purpose of making derivative works, or redistributable at no charge.

5. CUSTOM PRODUCT. Hashfast shall have exclusive rights to goods designed and manufactured for the unique needs of Buyer, to Buyer's specifications or requirements, such as an ASIC to specific clock rate or thermal specifications ("Custom Product"). Hashfast shall retain title to and possession of designs, masks and database tapes. Individual segments or parts of Custom Product designs, including standard cells, megacells, or base arrays, are the property of Hashfast and may be used by Hashfast in other designs and may not be used by Buyer except as a part of Custom Product designed and manufactured by Hashfast. Prices or schedules are subject to increase by Hashfast if any specifications are revised or supplemented or there are unforeseen difficulties with the design.

6. COMMERCIAL USE. Buyer represents and agrees that the Products it purchases are for its own internal, commercial use, and not for resale purposes. These Terms do not grant distribution rights as a reseller for Hashfast, which must be agreed to separately.

7 LIMITED PRODUCT WARRANTY AND DISCLAIMER.

(a) WARRANTY AGAINST DEFECTS. Hashfast warrants that under normal use the Products (excluding those referred to in Section 7(b) below) shall, at the time of delivery to Buyer be substantially free from defects in material or workmanship and shall substantially conform to Hashfast's specifications for such Product. Buyer will notify Hashfast in writing of any non-conforming Products within fifteen (15) business days of delivery, otherwise Hashfast will have no further obligation or warranty for such Products. Such notice will describe in reasonable detail the non-conformance claimed by Buyer. Delivered Product will be deemed accepted and conforming unless Buyer provides such notice within the fifteen (15) business day period.

(b) HASHFAST' SOLE AND EXCLUSIVE OBLIGATION, AND BUYER'S SOLE AND EXCLUSIVE RIGHT, WITH RESPECT TO CLAIMS UNDER ITS WARRANTIES SHALL BE LIMITED TO THE REPLACEMENT OR REPAIR OF A DEFECTIVE OR NON-CONFORMING PRODUCT, OR IF HASHFAST CANNOT REPAIR OR REPLACE SUCH PRODUCT AFTER USING COMMERCIALLY REASONABLE EFFORTS, THEN A REFUND TO BUYER FOR THE PURCHASE PRICE THEREOF. HASHFAST WILL HAVE A REASONABLE TIME TO REPAIR, REPLACE OR REFUND. THE NON-CONFORMING OR DEFECTIVE PRODUCTS SHALL BECOME HASHFAST' PROPERTY AS SOON AS THEY ARE RETURNED FOR REPLACEMENT OR REFUND.

(c) At Hashfast's request, Buyer will ship Products returned under warranty claims to Hashfast's designated facility in conformance with Hashfast's then-current Return Material Authorization policy and are accompanied by a statement of the reason for the return on a Return Material Authorization form issued by Hashfast. Where warranty adjustment is made, Hashfast will pay for freight expenses. Buyer shall pay for returned Products that are not defective or conforming together with the freight, testing and handling costs associated therewith. Except as provided in this Section 7, Hashfast has no obligation to accept returns.

(d) Notwithstanding the foregoing: (i) Hashfast shall have no obligations for breach of warranty if the alleged defect or non-conformance is found to have occurred as a result of environmental or stress testing, misuse, neglect, improper installation, accident or as a result of improper repair, operation at voltages other than as specified by Hashfast, use with equipment other than that sold by Hashfast, alteration, modification, storage, transportation or improper handling; (ii) a computing Product will be deemed to operate within its specifications if it varies within ten percent (10%) more or less than the performance stated in its specifications, provided, however, variances in hashrate or power requirements within ten percent (10%) more or less than the performance stated in Section 1 in the body of the Agreement above shall have the remedy stated in Section 1 (i.e. a reduction in Distributions due to unexpectedly low hashrate capacity, or increase in Hosting Costs deducted from Distributions due to unexpectedly high power requirements) as the sole and exclusive remedies with respect to such warranty claims in lieu of Section 7(b).

(e) THE WARRANTY GRANTED ABOVE SHALL EXTEND DIRECTLY TO BUYER AND NOT TO BUYER'S CUSTOMERS, AGENTS OR REPRESENTATIVES. THE EXPRESS WARRANTY GRANTED ABOVE IS IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, OR NON-INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS. ALL OTHER WARRANTIES WHETHER EXPRESSED OR IMPLIED ARE HEREBY SPECIFICALLY DISCLAIMED BY HASHFAST

(f) Except as provided by Section 9, the foregoing states the entire liability of Hashfast, and Buyer's sole and exclusive remedies, in connection with defect or non-conforming Products.

8. LIMITATION OF LIABILITY.

(a) EXCEPT AS PROVIDED IN SECTION 9, NOTWITHSTANDING ANYTHING TO THE CONTRARY, HASHFAST SHALL IN NO CASE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS OR LOST SAVINGS) ARISING OUT OF ANY AGREEMENT WHETHER OR NOT SUCH DAMAGES ARE BASED ON TORT, WARRANTY, CONTRACT OR ANY OTHER LEGAL THEORY – EVEN IF HASHFAST HAS BEEN ADVISED, OR IS AWARE, OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL HASHFAST BE LIABLE FOR EXCESS PROCUREMENT COSTS AND REWORK CHARGES.

(b) EXCEPT AS PROVIDED IN SECTION 9, HASHFAST' AGGREGATE LIABILITY TOWARDS BUYER UNDER ANY AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO: (1) THE GREATER OF (A) THE AMOUNT ACTUALLY RECEIVED BY HASHFAST IN THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO ANY LIABILITY FOR THE PRODUCTS CAUSING ANY LIABILITY OR (B) $5,000 U.S. DOLLARS; OR (2) IN THE CASE OF LIABILITY FOR DELAY OR NON-DELIVERY OF PRODUCTS, THE PURCHASE PRICE PAID FOR SUCH PRODUCTS.

(c) Any claim for damages must be brought by Buyer within ninety (90) days of the date of the event giving rise to any such claim, and any lawsuit relative to any such claim must be filed within one (1) year of the date of the claim. THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION 8 WILL BE READ TO APPLY TO ANY LIABILITY OF HASHFAST AFFILIATES, AS AGGREGATED WITH THE LIABILITY OF HASHFAST.

9. APPLICABLE LAW EXCEPTIONS. NOTHING IN SECTIONS 7 OR 8 SHALL EXCLUDE OR LIMIT HASHFAST'S WARRANTY OR LIABILITY FOR LOSSES TO THE EXTENT THAT THEY MAY NOT BE LAWFULLY EXCLUDED OR LIMITED BY APPLICABLE LAW. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR CONDITIONS OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR LOSS OR DAMAGE CAUSED BY NEGLIGENCE, BREACH OF CONTRACT, BREACH OF IMPLIED TERMS, OR INCIDENTAL OR CONSEQUENTIAL DAMAGES. ONLY THE EXCLUSIONS AND LIMITATIONS THAT ARE LAWFULLY APPLIED TO BUYER WILL APPLY TO BUYER, AND HASHFAST'S LIABILITY WILL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW. The limitations liability set forth in Section 8 shall not apply to death or personal injury caused by the negligence of Hashfast.

10. CONFIDENTIALITY. Buyer acknowledges that all technical, commercial and financial data disclosed to Buyer by Hashfast is the confidential information of Hashfast. Buyer shall not disclose any such confidential information to any third party and shall not use any such confidential information for any purpose other than as agreed by the parties and in conformance with the purchase transaction contemplated herein.

11. COMPLIANCE WITH LAWS. Each party hereto represents that it its duly authorized to enter into the Agreement and represents that with respect to its performance hereunder, and that each will comply with all applicable federal, state and local laws.

12. EXPORT. Buyer acknowledges that the Products and services provided under these Terms are subject to the customs and export control laws and regulations of the United States ("U.S."), may be rendered or performed either in the U.S., in countries outside the U.S., or outside of the borders of the country in which Buyer is located, and may also be subject to the customs and export laws and regulations of the country in which the Products or services are received. Hashfast's acceptance of any order is contingent upon the issuance of any applicable export license required by the U.S. Government or any other applicable national government, or obtaining an exception to such license; Hashfast is not liable for delays or failure to deliver resulting from your failure to obtain such license or to provide such certification.

13. REGULATORY REQUIREMENTS. Hashfast is not responsible for determining whether any Product satisfies the local regulatory requirements of the country (other than the U.S.A.) to which such Products are to be delivered, and Hashfast shall not be obligated to provide any Product where the resulting Products do not satisfy the local regulatory requirements.

14. ASSIGNMENT AND SETOFF. Buyer shall not assign any rights or obligations under the Agreement without the prior written consent of Hashfast. Buyer hereby waives any and all rights to offset existing and future claims against any payments due for Products sold under the Agreement or under any other agreement that Buyer and Hashfast may have and agrees to pay the amounts hereunder regardless of any claimed offset which may be asserted by Buyer or on

Case 14-30725   Claim 111-1   Filed 07/18/14   Desc Main Document   Page 13 of 18

Case: 14-30725   Doc# 373-1   Filed: 05/29/15   Entered: 05/29/15 15:48:42   Page 28 of 33

its behalf.

15. GOVERNING LAW AND ARBITRATION.

(a) ANY CLAIM, DISPUTE OR CONTROVERSY (WHETHER IN CONTRACT, TORT OR OTHERWISE, WHETHER PRE-EXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, CONSUMER PROTECTION, COMMON LAW, INTENTIONAL TORT) BETWEEN BUYER AND HASHFAST, its agents, employees, principals, successors, assigns, affiliates, subsidiaries, arising from or relating to the purchase of Product, these Terms, its interpretation or the breach, termination or validity thereof, Hashfast's advertising (each, a "Dispute") shall be governed by the laws of the State of California and the Federal Laws of the U.S.A., each without regard to conflicts of law. The parties agree that the UN Convention for the International Sale of Goods will have no force or effect on this Agreement.

(b) ANY CLAIM, DISPUTE OR CONTROVERSY (WHETHER IN CONTRACT, TORT OR OTHERWISE, WHETHER PRE-EXISTING, PRESENT OR FUTURE, AND INCLUDING STATUTORY, CONSUMER PROTECTION, COMMON LAW, INTENTIONAL TORT) BETWEEN BUYER AND HASHFAST, its agents, employees, principals, successors, assigns, affiliates, subsidiaries, arising from or relating to the purchase of Product, these Terms, its interpretation or the breach, termination or validity thereof, Hashfast's advertising, SHALL BE RESOLVED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION.

(c) THE ARBITRATION WILL BE CONDUCTED IN IN SANTA CLARA COUNTY, CALIFORNIA, U.S.A.

(d) The arbitrator shall have exclusive authority to resolve any dispute relating to arbitrability or enforceability of this arbitration provision including any unconscionability challenge or any other challenge that the arbitration provision or the Agreement is void, voidable or otherwise invalid. The arbitration shall be administered by the American Arbitration Association (AAA) or JAMS (or a substitute forum if both are unavailable). Arbitration proceedings shall be governed by this provision and the applicable procedures of the selected arbitration administrator, including any applicable procedures for consumer-related disputes, in effect at the time the claim is filed. The arbitrator(s) will not have the jurisdiction or power to award punitive damages, treble damages or any other damages which are not compensatory, even if permitted under the laws of the California or any other applicable law. Unless otherwise directed by the arbitrator(s), the parties will bear their own costs and expenses that are reasonable and necessary to participate in such arbitration, including attorneys' fees.

(e) NEITHER BUYER NOR HASHFAST SHALL BE ENTITLED TO JOIN OR CONSOLIDATE CLAIMS BY OR AGAINST OTHER BUYERS, OR ARBITRATE OR OTHERWISE PARTICIPATE IN ANY CLAIM AS A CLASS REPRESENTATIVE, CLASS MEMBER OR IN A PRIVATE ATTORNEY GENERAL CAPACITY. If any provision of this arbitration agreement is found unenforceable, the unenforceable provision shall be severed and the remaining arbitration terms shall be enforced (but in no case shall there be a class arbitration).

(f) The arbitrator shall be empowered to grant whatever relief would be available in court under law or in equity. This transaction shall be governed by the Federal Arbitration Act 9 U.S.C. sec. 1-16 (FAA). Any award of the arbitrator(s) shall be final and binding on each of the parties, and may be entered as a judgment in any court of competent jurisdiction.

(g) Notwithstanding any other provision in this Section 15 to the contrary, either party will at all times be entitled to seek and obtain injunctive relief in relation to infringement or threatened infringement of its intellectual property rights, or in relation to misappropriation of its trade secrets, in any court having jurisdiction.

16. BREACH AND TERMINATION. Without prejudice to any rights or remedies Hashfast may have under the Agreement or at law, Hashfast may, by written notice to Buyer, terminate with immediate effect the Agreement, or any part thereof, without any liability whatsoever, if: (i) Buyer fails to make payment for any Products to Hashfast when due; (ii) Buyer fails to accept conforming Products supplied hereunder; (iii) a voluntary or involuntary petition in bankruptcy or winding up is filed against Buyer, any proceedings in insolvency or bankruptcy (including reorganization) are instituted against Buyer, a trustee or receiver is appointed over Buyer, any assignment is made for the benefit of creditors of Buyer, or (iv) Buyer violates or breaches any of the provisions of these Terms. Upon occurrence of any of the events referred to above under (i) through (iv), all payments to be made by Buyer under the Agreement shall become immediately due and payable. In the event of cancellation, termination or expiration of any Agreement, the following terms and conditions will survive: Sections 1, 2, 3(b)-(c), 4, 5, 6, 7 (as to limitations, disclaimers, and exclusions), and 8-24.

17. PRODUCT AND PRODUCTION CHANGES. Hashfast reserves the right to make at any time Product or production changes. In such event, such changes shall not on the whole negatively affect the performance characteristics of Products that have been ordered but not yet delivered.

18. U.S. GOVERNMENT RESTRICTED RIGHTS. The software and documentation provided with the Products, if any, are "commercial items" as that term is defined at 48 C.F.R. 2.101, consisting of "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212. Consistent with 48 C.F.R. 12.212 and 48 C.F.R. 227.7202-1 through 227.7202-4, all U.S. Government end users acquire the software and documentation with only those rights set forth herein. Contractor/manufacturer of Hashfast-branded software is Hashfast Technologies LLC, 97 South Second Street #175, San Jose, 95113 United States.

19. FORCE MAJEURE. Hashfast party will not be deemed in default of an Agreement to the extent that performance of its obligations or attempts to cure any breach are delayed or prevented by reason of any act of God, war, civil war, insurrections, strikes, fires, floods, earthquakes, labor disputes, epidemics, governmental regulations, freight embargoes, natural disaster, act of government, or any other cause beyond its reasonable control.

20. ENTIRE AGREEMENT; SEVERABILITY. These Terms and any Agreement are the entire agreement between buyer and Hashfast with respect to its subject matter and supersedes all prior oral and written understandings, communications, or agreements between buyer and Hashfast. No agreement is made between Buyer and any Affiliate except if expressly stated in the Agreement. No amendment to or modification of these Terms or any Agreement, in whole or in part, will be valid or binding against Hashfast unless it is in writing and manually executed by an authorized representative of Hashfast. If any provision of these Terms or an Agreement should be found to be void or unenforceable, such provision will be stricken or modified, but only to the extent necessary to comply with the law, and the remainder of the provisions will remain in full force and effect.

21. REJECTION OF OTHER TERMS, ACCEPTANCE BY AGENTS. Any specifications and any terms or conditions set forth on any document or documents issued by Buyer either before or after issuance of any offer, order confirmation, or other document by Hashfast are hereby explicitly rejected and disregarded by Hashfast, and any such document shall be wholly inapplicable to any sale made by Hashfast and shall not be binding in any way on Hashfast.

22. CONTRACT CONSTRUCTION. In the event that any provision(s) of the Agreement or these Terms shall be held invalid or unenforceable by a court of competent jurisdiction or by any future legislative or administrative action, such holding or action shall not negate the validity or enforceability of any other provisions hereof. The word "or" as used in this Agreement has the meaning equivalent to "and/or". The terms 'include', 'includes' and 'including' will be deemed to be immediately followed by the phrase "without limitation."

23. WAIVER. The failure on the part of either party to exercise, or any delay in exercising, any right or remedy shall not operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy arising therefrom preclude any other or future exercise thereof or the exercise of any other right or remedy or by any related document or by law.

24. NOTICES. All notices or communications to be given under this Agreement shall be in writing and shall be deemed delivered upon delivery in person, by facsimile communication with written confirmation, by courier service with its confirmation of delivery to the proper address, or by United States certified, registered, first class or equivalent mail with written confirmation of receipt; each as addressed to the parties at their addresses set forth on the Offer or Confirmation, and as Hashfast may update from time to time.

25. RELATIONSHIP OF PARTIES. The parties are independent contractors. No provision of these Terms will or shall be deemed to create an association, trust, partnership, joint venture or other entity or similar legal relationship between Hashfast and Buyer, or impose a trust, partnership or fiduciary duty, obligation, or liability on or with respect to such entities. Neither party will have any rights, power or authority to act or create an obligation, express or implied, on behalf of another party except as specified in these Terms.

HASHFAST TERMS OF SALE - Revised August 5, 2013

# EXHIBIT 2

## Memorandum of Understanding

March 4, 2014

On October 3, of 2013, Hashfast Technologies, LLC (Hashfast) and Liquidbits Corp (Liquidbits) entered into written agreement whereby Hashfast was to provide a number of Sierra 2U3 and 4U3 units to Liquidbits and/or its affiliates in exchange for advance cash payment and a fraction of subsequent operational revenues derived from the commercial use of these units. However, due to difficulties in the supply and manufacturing process, to date not all the promised units have been unavailable.

Liquidbits understands and sympathizes with Hashfast's difficulties in the supply and manufacturing process, and continues to see value both in the technology and its continued relationship with Hashfast. Accordingly, after good faith negotiations, Hashfast and Liquidbits have agreed to amend the agreement as follows:

Liquidbits agrees that the two thousand five hundred (2,500) Sierra units identified in the original agreement will be converted into thirty thousand (30,000) Golden Nonce Chips capable of hashing at up to 750 Ghash per second to be delivered over three months on a ongoing basis. Liquid Bits further agrees that delivery of said chips will fully discharge all prior agreements hashfast has entered into with LiquidBits, it successors or assigns.

The delivery schedule for said chips will be as follows:

1- A first batch of up to seven thousand (7,000) is to be delivered in month of March.
2- A second batch of up to ten thousand (10,000) is to be delivered in the month of April.
3- A third and final batch thirteen thousand (13,000) is to be delivered in the month of June.

In addition, Hashfast further agrees to provide to LiquidBits a non-transferrable, non-exclusive license under a non-disclosure agreement for the following designs and technologies developed by Hashfast:

1- Board designs, software and firmware, for the processing modules developed by Hashfast currently referred to as "Linear Rev 2", and "EVO".
2- Procedures, test software and scripts, automated test machine designs, and other manufacturing technologies developed by HashFast.
3- Technical, project management, sourcing and vendor selection assistance as shall be required to enable Liquidbits to produce Yoli Evo Mining boards from externally sourced materials.

Hashfast will, during an interim period lasting approximately six to eight weeks, continue to manufacture and sell to Liquidbits mining boards at a cost equal to their fully loaded fabrication cost as paid by Hashfast. Liquidbits may at it's discretion elect to provide Hashfast with funds to expedite part sourcing for the production of finished modules to be delivered to LiquidBits. Sales to Liquidbits will continue to be given priority consideration over sales to other clients.

Liquidbits shall establish independent relationships with all required material suppliers and make all commercially reasonable efforts to obtain the required materials independently. However, in the event that these efforts are unsuccessful, Hashfast will provide reasonable good faith assistance to ensure Liquid bits is able to source, produce, and test working boards of a quality and performance comparable to the boards being produced by HashFast.

Finally, in recognition and consideration of the mutually beneficial on-going commercial relationship between Hashfast and Liquidbits, both companies agree that Hashfast will provide access and priority availability to Liquidbits as described below;

- For the current GN chip, hashfast shall provide LiquidBits with the option to purchase up to four wafer lots to be delivered as wafers at Hashfast's direct costs
- For the upcoming chip design to be taped out within 6 weeks, HashFast shall provide Liquid Bits with "most favored nation" pricing

Conversaly. Liquidbits shall;

- Extend to all GN chips acquired by LiquidBits under this agreement the payment of twenty-five percent (25%) of operational profit established in the original agreement.

  This 25% operational profit will be net of Liquidbits Hosting Cost as defined in the agreement, but also allow Liquidbits to deduct the cost of deploying the Golden Nonce Chips into an operational environment as amortized equipment cost along with amortized equipment cost of Hashfast as defined in the agreement.

Hashfast and Liquidbits signify that these changes are agreed by signing in the respective locations provided.

Eduardo deCastro                    Date
Chief Executive Officer
Hashfast Technologies, LLC

Gregory Bachrach                    Date
Chief Executive Officer
Liquidbits Corp